No. 01-669C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND BSA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street
Washington, D.C. 20530
Tel. (202) 307-1011
Fax. (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing & Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

August 15, 2005

TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . . . . . 1

DEFENDANT'S BRIEF. . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 1

I. Nature Of The Case . . . . . . . . . . . . . . . . . . .1

II. Issues Presented . . . . . . . . . . . . . . . . . . . 2

III. Statement Of Facts . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I. Legal Standard Under RCFC 56 . . . . . . . . . . . . 9

II. The United States Is Entitled To Summary Judgment Upon Count VI Because The Contracts At Issue Imposed No Duty Upon HUD To Approve The Sale Of The Collingwood/Kirkwood Apartments . . . . . . . . . 10

III. Even If HUD Had A Duty To Approve The TPA Application For The Sale Of The Collingwood/Kirkwood Apartments, HUD Did Not Breach That Duty Because Plaintiffs Never Submitted A Complete TPA Application . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

CASES PAGE(S)

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . 9, 10

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . 9

Frazier v. United States, No. 04-1481C, 2005 WL 1793417 (Fed. Cl. July 28, 2005) . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 16

Giove v. Dep't of Transportation, 230 F.3d 1333 (Fed. Cir. 2000) . . . . . . . . . . . . . . 10

Gov't Sys. Advisors v. United States, 847 F.2d 811 (Fed. Cir. 1988) . . . . . . . . . . . . . . . 10

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 9

NVT Techs. Inc. v. United States, 370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . 10

Ransom v. United States, 900 F.2d 242 (Fed. Cir. 1990) . . . . . . . . . . . . . . . 13

San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . 11, 12, 13

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 9

United States v. Johnson Controls, Inc., 713 F.2d 1541 (Fed. Cir. 1983) . . . . . . . . . . . . . . 16

STATUTE

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 01-669C<br>(Judge Allegra) |

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RFCF"), defendant, the United States, respectfully moves for summary judgment on count VI of plaintiffs' second amended complaint upon the grounds that there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law. In support of this motion, we rely upon the pleadings, the following brief, the attached appendix, and our proposed findings of uncontroverted fact filed simultaneously with this motion.

DEFENDANT'S BRIEF

STATEMENT OF THE CASE

I. Nature Of The Case

Plaintiffs Benjamin and Shaki Alli and BSA Corporation allege breach of contract claims relating to three multi-family housing projects that plaintiffs owned and managed in Detroit, Michigan.[1]

[1] Each apartment building consisted of several related buildings. One apartment building is commonly referred to as the

Compl. 1-6.[2] Specifically, plaintiffs allege that the United States breached the contracts at issue when the Department of Housing and Urban Development ("HUD") suspended monthly subsidy payments for plaintiffs' three multi-family housing projects after plaintiffs repeatedly failed to correct serious defects identified in HUD's inspection reports. Id. Plaintiffs further claim that the United States breached a contract with plaintiffs when it allegedly refused to approve the sale of one of plaintiffs' apartment buildings to a prospective buyer. Id.

## II. Issues Presented

1. Whether defendant is entitled to summary judgment upon plaintiffs' claim that defendant breached the contracts at issue by allegedly refusing to approve the sale of the Collingwood/Kirkwood apartments where the undisputed facts demonstrate that defendant had no duty or obligation to approve the sale.

---

Collingwood/Kirkwood apartments and is located at 1610 Collingwood and 1635 Calvert in Detroit, Michigan. Compl. 2. Another apartment building is commonly referred to as the Riverside apartments and is located at 1730 Magnolia, 1800 Magnolia and 1830 Magnolia in Detroit, Michigan. Id. Finally, the third apartment building is commonly referred to as the Pingree/Gladstone apartments and is located at 2211 Pingree and 2987 Gladstone in Detroit, Michigan. Id. In this motion, the apartment buildings will be referred to as the Collingwood/ Kirkwood apartments, Riverside apartments and Pingree/Gladstone apartments, respectively.

[2] Plaintiffs' second amended complaint will be cited as "Compl." followed by the specific page reference.

2. Whether defendant is entitled to summary judgment upon plaintiffs' claim that defendant breached the contracts at issue where the undisputed facts demonstrate that plaintiffs never requested HUD's approval of the sale of the Collingwood/Kirkwood apartments.

III. Statement Of Facts

During relevant times, plaintiffs owned and managed the Collingwood/Kirkwood apartments, the Riverside apartments and the Pingree/Gladstone apartments. Compl. 2-6.

On June 8, 1989, HUD and BSA & Associates entered into a 15-year Housing Assistance Payment Contract ("Riverside HAP contract") pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.[3] App. 1.[4] Under the Riverside HAP contract, qualified lower-income residents in the Riverside apartments would pay a percentage of their income in rent and HUD would make up the difference in monthly subsidy payments to plaintiffs. Id. A provision in the Riverside HAP contract required plaintiffs to maintain the Riverside apartments in a decent, safe and sanitary condition. Id. at 11. If HUD determined that the Riverside apartments did not meet these standards, HUD could withhold its subsidy payments. Id.

---

[3] BSA & Associates transferred the Riverside apartments to BSA Corporation in 1996. Compl. 2.

[4] The appendix filed with this motion will be cited as "App." followed by the specific page reference.

On August 22, 1983, HUD and plaintiffs Benjamin and Shaki Alli entered into a 15-year HAP contract for the Pingree/ Gladstone apartments ("Pingree/Gladstone HAP contract"). App. 27. This contract was renewed on August 25, 1998, August 25, 1999, and February 25, 2000. Id. at 70-77. Similar to the Riverside HAP contract, the Pingree/Gladstone HAP contract provided qualified lower-income residents of the Pingree/Gladstone apartments to pay only a certain percentage of their income in rent with HUD subsidizing the remainder. Id. The contract also contained the provision that plaintiffs keep the Pingree/Gladstone apartments in decent, safe and sanitary condition or else HUD would cease subsidizing the apartments. Id. at 44.

In addition to providing subsidy payments for qualified tenants at the Pingree/Gladstone apartments, HUD also held a mortgage upon the building. Id. at 78. Accordingly, on August 24, 1983, HUD and plaintiffs Benjamin and Shaki Alli entered into a Regulatory Agreement for Insured Multi-Family Housing Projects ("Pingree/Gladstone regulatory contract"). Id. Specifically, the Pingree/Gladstone regulatory contract provided that plaintiffs could not, without the prior written approval of HUD, convey, transfer or encumber any of the mortgaged property. Id. at 79-80.

On March 24, 1998, HUD and plaintiff BSA Corporation entered

into a 5-month HAP contract for the Collingwood/Kirkwood apartments.[5] Id. at 86. This contract was renewed by the parties several times, with the last renewal expiring on March 15, 2000. Id. at 102. The Collingwood/Kirkwood HAP contract allowed low-income residents to pay only a certain percentage of their income in rent with HUD subsidizing the remainder. Id. at 86. It also contained the provision that plaintiffs keep the Collingwood/Kirkwood apartments in decent, safe and sanitary condition or else HUD would cease subsidizing the apartments. Id. at 94.

Similar to the Pingree/Gladstone apartments, HUD also held a mortgage upon the Collingwood/Kirkwood apartments. Id. at 104. Accordingly, on July 6, 1990, HUD and BSA Corporation entered into a regulatory contract for the Collingwood/Kirkwood apartments ("Collingwood/Kirkwood regulatory contract"). Specifically, the Collingwood/Kirkwood regulatory contract provided that plaintiffs could not, without the prior written approval of HUD, convey, transfer or encumber any of the mortgaged property. Id. at 105-6.

---

[5] Although the contract was executed on March 24, 1998, the effective date of the contract was January 16, 1998. App. 86. Moreover, before entering into this contract, HUD and plaintiff BSA Corporation had entered into at least three prior HAP contracts for the Collingwood/Kirkwood apartments on October 1, 1996, June 17, 1997, and September 16, 1997, respectively. These three prior HAP contracts and the HAP contract at issue contained similar provisions.

Beginning in the mid-1990's, HUD became concerned that plaintiffs were not maintaining the Collingwood/Kirkwood apartments, Riverside apartments and Pingree/Gladstone apartments (collectively, "housing projects") in decent, safe and sanitary conditions as required by the applicable HAP and regulatory contracts. The housing projects repeatedly failed HUD inspections, and, when HUD concluded that plaintiffs were either unable to or unwilling to correct the serious deficiencies at the housing projects, HUD suspended its monthly subsidy payments. Eventually, plaintiffs sold the Riverside apartments and paid off the HUD-held mortgage for the Pingree/Gladstone apartments.

On or around July 14, 1999, plaintiffs entered into an agreement to sell the Collingwood/Kirkwood apartments to Cory Fanning. Compl. 5; App. 113. Although the regulatory contract and the HAP contract for the Collingwood/Kirkwood apartments explicitly required plaintiffs to seek and obtain written approval from HUD before transferring any interest in the mortgaged property, plaintiffs' purchase agreement with Mr. Fanning was not conditioned upon HUD's approval. App. 113. Indeed, the agreement was silent regarding the regulatory contract, the HAP contract and HUD in general. Id.

Since 1992, HUD has operated under the current regulations governing an owner's request to transfer property covered by a regulatory contract. Id. at 115. These regulations are critical

to HUD because, as in the case of the Collingwood/Kirkwood apartments, HUD has used public funds to insure the mortgage on the property. Therefore, HUD regulations clearly state, in detail and in the form of a checklist, the forms and documents that must be submitted to request HUD's review and written approval of a transfer of property covered by a regulatory contract. Id. at 139-49. This application and subsequent review are referred to as a Transfer of Physical Assets application ("TPA application") and a Transfer of Physical Assets review ("TPA review"), respectively.

In this case, plaintiffs failed to submit the proper forms and documents required for a TPA application and its subsequent review.[6] Id. at 238-39, 244-45. In fact, the only document HUD ever received regarding the proposed sale was a copy of an already executed purchase agreement between plaintiffs and Mr. Fanning. Id. at 244-45. HUD's records show no other documents were received and the required fee was never paid. Id. at 238-39, 244-45. Accordingly, plaintiffs never submitted a complete TPA application requesting HUD's approval of the sale of the Collingwood/Kirkwood apartments to Mr. Fanning.

---

[6] To the extent plaintiffs claim the submission of the TPA application was the responsibility of the buyer, plaintiff's claim should be dismissed because the proposed buyer, Cory Fanning, also failed to submit a complete TPA application. App. 244-45. In fact, Mr. Fanning testified at his deposition that he was not even unaware that HUD had to approve the sale of the Collingwood/Kirkwood apartments. Id. at 217-18.

On August 8, 2002, plaintiffs filed a second amended complaint in this matter, asserting that the United States breached the Riverside HAP contract, the Pingree/Gladstone HAP contract, and the Collingwood/Kirkwood HAP and regulatory contracts. Compl. 1-6. On October 2, 2002, defendant filed counterclaims alleging breach of the Riverside HAP contract, breach of the Pingree/Gladstone HAP and regulatory contracts and breach of the Collingwood/Kirkwood HAP and regulatory contracts.

The parties have conducted discovery, including exchanging documents and conducting depositions. Discovery closed in this case on February 4, 2005. Defendant files this motion pursuant to the Court's July 1, 2005 scheduling order.

## SUMMARY OF ARGUMENT

Plaintiffs have failed to identify any provision in the Collingwood/Kirkwood HAP or regulatory contracts that would have been breached if defendant had refused to approve the sale of the Collingwood/Kirkwood apartments as alleged by plaintiffs. While the contracts impose a duty upon plaintiffs to seek and obtain HUD's written approval prior to selling the Collingwood/Kirkwood apartments to a prospective buyer, the plain language of the contracts did not impose any duty upon HUD to approve the sale. Moreover, even if the contracts imposed a duty upon HUD to approve the sale, plaintiffs never submitted a complete TPA application for HUD to review and approve. As a result, HUD

neither reviewed, approved, nor denied the sale of the Collingwood/Kirkwood apartments to Mr. Fanning.

## ARGUMENT

### I. Legal Standard Under RCFC 56

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. RCFC 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989). A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[T]he burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986))(emphasis in original). Rather, the burden upon the moving party may be discharged by "showing that there is an absence of evidence to support the non-moving party's case.'" Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325).

Finally, contract interpretation is a question of law. Giove

v. Dep't of Transportation, 230 F.3d 1333, 1240 (Fed. Cir. 2000). Where no facts material to the proper interpretation of the contract are disputed, the claim at issue may appropriately be decided by summary judgment. Anderson, 477 U.S. at 248; Gov't Sys. Advisors v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988) (decision concerning contract interpretation precludes need to address factual issues raised by the parties where those factual disputes were not material to the legal standard created by the proper contract interpretation).

## II. The United States Is Entitled To Summary Judgment Upon Count VI Because The Contracts At Issue Imposed No Duty Upon HUD To Approve The Sale Of The Collingwood/Kirkwood Apartments

Contract interpretation begins with the plain language of the agreement. NVT Techs. Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983). Where the language of a contract is clear and unambiguous, the provisions of the contract must be given the meaning that would be understood by a reasonably intelligent person acquainted with the contemporaneous circumstances. Frazier v. United States, No. 04-1481C, 2005 WL 1793417 at *3 (Fed. Cl. July 28, 2005). A contract provision is unambiguous where a plain reading of the provision results in only one reasonable interpretation. Id.

In order to recover for breach of contract, plaintiffs must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). In this case, the Government is entitled to judgment as a matter of law because the plain language of the contracts do not impose upon defendant the duty alleged by plaintiffs.

Although it is not entirely clear, plaintiffs appear to claim that HUD breached either the Collingwood/Kirkwood HAP agreement or regulatory agreement by "arbitrarily and without reason refus[ing] to approve the sale of the Collingwood/Kirkwood Property."[7] Compl. 6. However, plaintiffs cannot point to a provision in either the HAP contract or the regulatory contract that obligated defendant to approve the sale of the Collingwood/Kirkwood apartments.

Instead, paragraph 19(a) of the HAP contract states:

---

[7] In the second amended complaint, plaintiffs refer to count VI as a "Breach of Contract With Regard to the Sale Upon Approval Clause for the Collingwood/Kirkwood Property." However, also in the complaint, plaintiffs claim HUD's alleged refusal to approve the sale was a "breach of [the] purchase contract," which had been previously defined in the complaint as the agreement between plaintiffs and Cory Fanning. If count VI alleges defendant breached the purchase contract, count VI should be dismissed for failure to state a claim under RCFC 12(b)(6) because HUD was neither a party to, a signatory, a third-party beneficiary, nor even mentioned in the purchase contract.

> The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD. However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD shall consent in writing if HUD has approved the terms of the financing.

Id. at 94. Therefore, the plain language of the HAP contract merely imposes a duty upon HUD to consent, in writing, to an assignment of the property as security for obtaining financing of the project if HUD has approved the terms of the financing. Those were not the circumstances in this case. Here, it is undisputed that plaintiffs wanted to sell the building to Mr. Fanning "because of the amount of purported repairs required." Compl. 5. They were not assigning the building as security to finance the project itself. Accordingly, the HAP contract imposed no duty upon HUD to consent to the sale of the building to Mr. Fanning.

Likewise, paragraph 8(a) of the regulatory contract simply provides that plaintiffs "shall not without the prior written approval of [HUD] . . . convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property." Id. at 105. The regulatory contract also imposes no duty upon HUD to consent to plaintiffs' sale of the Collingwood/Kirkwood apartments to Mr. Fanning. Indeed, the duty imposed by the regulatory contract is a duty

upon plaintiffs to seek and obtain HUD's written consent before selling the property to Mr. Fanning, which, as will be demonstrated below, plaintiffs failed to do prior to entering into a purchase agreement to sell the property. Id. at 105, 113-14.

Accordingly, because it is undisputed that plaintiffs sought to sell the Collingwood/Kirkwood apartments to Mr. Fanning due to the amount of required repairs, and not as security for financing, HUD had no duty to approve the sale of the property to Mr. Fanning. Therefore, judgment must be entered for the Government as to count VI of plaintiffs' second amended complaint. See Frazier, No. 04-1481C, 2005 WL 1793417 at *4 ("[W]here there is no duty, there is no breach."); see also Ransom v. United States, 900 F.2d 242, 243 (Fed. Cir. 1990)(affirming decision to grant summary judgment to defendant where defendant owed no obligations to plaintiff that it could have breached).

## III. Even If HUD Had A Duty To Approve The TPA Application For The Sale Of The Collingwood/Kirkwood Apartments, HUD Did Not Breach That Duty Because Plaintiffs Never Submitted A Complete TPA Application

Section 4350.1, Chapter 13 of the HUD handbook contains the regulations governing TPA applications and the TPA review process.[8] Id. at 115. Specifically, the regulations list the

[8] This handbook is publicly available online at www.hudclips.org.

forms, documents and fees that must be submitted to form a complete TPA application. Id. The regulations even include a step by step detailed explanation of the required items and a summary checklist. Id. at 139-49, 168-70. For example, a TPA application for a full review, which is required for a transfer of title from the owner to a buyer, consists of, among other items, an application fee, TPA application form, purchaser's letter, purchaser's certificate of previous participation form, purchaser's resume, executed but unrecorded regulatory agreement by buyer, purchaser's personal financial statement, proposed rental schedule form, attorney's certification, Byrd Amendment Certification, title report, and executed organizational documents of purchaser. Id.

Moreover, the regulations specifically state that HUD will only review TPA applications that are complete. Id. at 145. Once a completed application is submitted, the regulations provide a form letter to be sent to the owner notifying him or her that a complete TPA application was received. Id. at 145, 149. If the deficiencies are not serious, the regulations provide a form letter to alert the applicant that certain documents are missing. Id. at 145, 150. Finally, once a TPA application is reviewed, the regulation provides that HUD will either send the applicant a form letter that the application has been approved or a form letter that the application has been

denied. Id. at 146-49, 153-56.

In this case, HUD never sent a letter approving or denying the sale of the Collingwood/Kirkwood apartments because a complete TPA application was never received. Id. at 243-45. Plaintiffs not only failed to submit a complete TPA application, but they failed to submit even an initial TPA application form that may have triggered a letter from HUD that plaintiffs' TPA application was deficient. Id. Rather, the only document HUD received from plaintiffs was a copy of an already executed purchase agreement between plaintiffs and Cory Fanning. Id.

Moreover, HUD's check registry for the Detroit office for 1999 shows neither plaintiffs nor Mr. Fanning ever submitted a TPA application fee, and Mr. Fanning admitted in his deposition that he did not even know the sale of the Collingwood/Kirkwood apartments had to be approved by HUD. Id. at 217-18, 219-21, 238-39. Mr. Fanning also admitted that he never took any steps towards requesting HUD's approval of the sale. Id. at 217-18. This is relevant because many of the necessary items for a complete TPA application required either the proposed buyer's signature or had to be prepared by the proposed buyer. Id. at 239-49.

Plaintiffs' listing agent for the Collingwood/Kirkwood apartment building, Gary Hopkins, testified at his deposition that he knew HUD's approval was required, but that he believed it

was Mr. Fanning's responsibility or the responsibility of Mr. Fanning's lender to obtain HUD's approval. Id. at 198-99. He admitted that he took no steps to receive HUD's approval, and did not know whether plaintiffs took any steps to obtain HUD's approval either. Id. at 200-1, 203. He also admitted that while he was aware that Mr. Fanning was required to submit at least one form to HUD regarding his previous participation in HUD-related projects, he did not know whether such a form was ever submitted. Id. at 207-8.

Accordingly, even if the Government had a duty to approve plaintiffs' TPA application requesting approval of the sale of the Collingwood/Kirkwood apartments to Mr. Fanning, the Government did not breach that duty because plaintiffs never submitted a complete TPA application. See Frazier, No. 04-1481C, 2005 WL 1793417 at *5-6 (dismissing plaintiffs' breach of contract claim because even if the alleged duties existed, defendant did not breach that duty). Therefore, HUD neither reviewed nor refused to approve the sale as plaintiffs allege.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court enter judgment in favor of the Government as a matter of law as to count VI of plaintiffs' second amended complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Mark A. Melnick by Frank E. White, Jr.
MARK A. MELNICK
Assistant Director

s/Marla T. Conneely
MARLA T. CONNEELY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street
Washington, D.C. 20530
Tel. (202) 307-1011
Fax. (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing & Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

August 15, 2005

No. 01-669C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND BSA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# APPENDIX TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street
Washington, D.C. 20530
Tel. (202) 307-1011
Fax. (202) 307-0972

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing & Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

August 15, 2005

Attorneys for Defendant

# INDEX FOR APPENDIX TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Riverside HAP Contract . . . . . . . . . . . . . . . . . . . . . 1

Pingree/Gladstone HAP Contract . . . . . . . . . . . . . . . . . . 27

Pingree/Gladstone HAP Contract Renewals . . . . . . . . . . . . . 70

Pingree/Gladstone Regulatory Contract . . . . . . . . . . . . . . 78

Collingwood/Kirkwood HAP Contract . . . . . . . . . . . . . . . . 86

Collingwood/Kirkwood HAP Contract Renewal . . . . . . . . . . . . 102

Collingwood/Kirkwood Regulatory Contract . . . . . . . . . . . . 104

Collingwood/Kirkwood Purchase Agreement . . . . . . . . . . . . . 113

HUD Handbook Section 4350.1 Chapter 13 . . . . . . . . . . . . . 115

Gary Hopkins, Deposition Transcript Portions . . . . . . . . . . 191

Cory Fanning, Deposition Transcript Portions . . . . . . . . . . 213

HUD Check Registry for 1999 . . . . . . . . . . . . . . . . . . . 219

Benjamin Alli, Deposition Transcript Portions . . . . . . . . . . 222

Declaration of Kathleen Szymczak . . . . . . . . . . . . . . . . 238

Declaration of Patrick Berry . . . . . . . . . . . . . . . . . . 243

U.S. DEPAR NT OF HOUSING AND URBAN DEVELC NT

Riverside Place Apartments Detroit, MI

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
DISPOSITION OF PREVIOUSLY HUD-OWNED PROJECTS

PART I OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

Type of Project: Private-Owner X or FHA-Owner ____
Partly Assisted Project ____ or Totally Assisted Project X
Substantial Rehabilitation ____ or Moderate Rehabilitation ____ or Neither X

Type of Financing: N/A

[For example: HUD-insured; GNMA tandem; purchase money mortgage; not HUD-insured.]

ACC/HAP CONTRACT LIST NUMBER AND DATE: ____

SECTION 8 PROJECT NUMBER: MI28-E000-049

FHA PROJECT NUMBER (if applicable): 044-AC019

This Housing Assistance Payments Contract (Contract) is entered into between the United States of America acting through the Department of Housing and Urban Development (HUD) and B.S.A. and Associates (Owner) pursuant to the U.S. Housing Act of 1937 (Act), 42 U.S.C. 1437, *et seq.*, and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, *et seq*. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families leasing decent, safe and sanitary units from the Owner.

1.1 SIGNIFICANT DATES AND OTHER ITEMS; CONTENTS AND SCOPE OF CONTRACT.

(a) Effective Date of Contract: June 8, 1989.

(b) Fiscal Year. The ending date of each Fiscal Year shall be December 31. [Insert March 31, June 30, September 30, or December 31, as approved by HUD.] The Fiscal Year for the project shall be the 12-month period ending on this date. However, the first Fiscal Year for the project is the period beginning with the effective date of the Contract and ending on the last day of the Fiscal Year which is not less than 12 months after the effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in section 1.1(c) will be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

(c) Maximum Annual Contract Commitment. The maximum annual amount of the commitment for housing assistance payments under this Contract (see section 2.3) is the amount of contract authority identified in Exhibit 3.

(d) Project Description.
WAYNE, State of MICHIGAN, is described as follows:

CITY OF DETROIT
LOTS 110 THROUGH 112, THE EAST 29.84 FEET OF LOTS 113 THROUGH 119, AND LOTS 120 THROUGH 122 OF ALBERT CRANE'S SECTION OF THE THOMPSON FARM BEING PART OF PRIVATE CLAIM NO. 227, ALSO LOTS 14 THROUGH 20, INCLUDING WEST 1/2 OF VACATED HARRISON AVENUE ADJOINING DICKINSON'S SUBDIVISION OF THAT PART OF OUT LOT 10 LYING NORTH OF MAGNOLIA STREET AND WEST OF NATIONAL AVENUE OF THE SUBDIVISION OF PRIVATE CLAI 25 BEING REAR CONCESSION OF THE LOGNON FARM, DETROIT, WAYNE COUNTY, MICHIGAN. AL INCLUDES THE VACATED ALLEY EAST OF 12TH STREET AND THE VACATED ALLEY WEST OF HARRISON AVENUE FROM MAGNOLIA STREET TO HAZEL STREET, THE VACATED ALLEY NORTH OF MAGNOLIA STREET AND THE SOUTH 1/2 OF ADJACENT VACATED HAZEL STREET.

SEE EXHIBIT A FOR THE REMAINDER OF THE LEGAL DESCRIPTION

(e) Statement of Servi...s, Maintenance and Utilities P... ided by the Owner.

(1) Services and Maintenance:

Parking

(2) Equipment:

Range
Refrigerator
Kitchen exhaust fan
Disposal

(3) Utilities:

Gas heat and cooking
Hot water
(32 units tenant pay electrial)

(4) Other:

Carpet
Bath fan

(f) Contents of Contract. This Contract consists of Part I, Part II (except as indicated in section 1.4), and the following exhibits:

Exhibit 1: The schedule showing the number of units by size (Contract Units) and their applicable rents (Contract Rents).

Exhibit 2: Daily Debt Service (for substantial rehabilitation projects only). (If the project is not permanently financed when the Contract is executed, this exhibit should be added when the necessary information becomes available.)

Exhibit 3: The schedule showing contract and budget authority.

Exhibit 4: The Affirmative Fair Housing Marketing Plan, if applicable.

Exhibit 5: The approved Purchase and Use Plan including a project description and the tenant selection factors. Exhibit 5 may incorporate these items by reference, specify the location of the items, and list them, including any amendments.

Exhibit 6: HUD standards for decent, safe and sanitary housing.

Additional exhibits: [Specify additional exhibits, if any, such as Special Conditions for Acceptance. If none, insert "None."]

EXHIBIT A - Remainder of legal description

(g) Scope of Contract. This Contract, including the exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, any applicable regulations, and agreements entered into in writing by the parties which are not inconsistent with this Contract.

1.2 TERM OF CONTRACT; OBLIGATION TO OPERATE PROJECT FOR FULL TERM.

2

(a) Term of Contract. The term of this Contract for any unit shall be 15 years, beginning with the effective date of this Contract for such unit. [Insert number approved by HUD in accordance with the HUD regulations.] If the project is completed in stages, the term shall be separately related to the units in each stage. However, the

total Contract term for all the stages, beginning with the effective date of the Contract for the first stage, shall not exceed the Contract term for any unit, plus two years.

(b) Obligation to Operate Project for Full Term. The Owner agrees to continue operation of the project in accordance with this Contract for the full term specified in paragraph (a).

1.3 HUD ASSURANCE.

The execution of this Contract by HUD is an assurance by HUD to the Owner that:

(a) The faith of the United States is solemnly pledged to the payment of housing assistance payments pursuant to this Contract, and

(b) HUD has obligated funds for these payments.

1.4 APPLICABILITY OF CERTAIN PROVISIONS OF THIS CONTRACT.

| Provision | Applic. | Not Applic. |
| --- | --- | --- |
| (a) 2.4(i). Payments to Trustee by FHA as Lender. Applicability: Not applicable. | | X |
| (b) (1) 2.7(f). Adjustment of Contract Rents Based on Cost Certification. Applicability: Applicable. If the Contract Rents are adjusted under section 2.4 of the Agreement, section 2.7(f) should be changed to "not applicable" when the Contract is executed. | X | |
| (2) 2.7(g). Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Financing Not Subject to Part 811 or Paragraph (f). Applicability: Not applicable. | | X |
| (3) 2.7(h). Adjustment of Contract Rents: Part 811. Applicability: Not applicable. | | X |
| (c) 2.13. Training, Employment and Contracting Opportunities. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $500,000. | X | |
| (d) 2.14. Flood Insurance. Applicability: All projects in special flood hazard areas. | | |
| (e) 2.15. Clean Air and Federal Water Pollution Control Acts. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $100,000. | X | |

1.5 OWNER'S FAILURE TO COMPLY WITH CONTRACT.

In addition to other remedies available to HUD under this Contract, the Agreement to Enter into Housing Assistance Payments Contract, or the Regulatory Agreement for a default by the Owner, the Owner and HUD agree that if the Owner fails to comply with the requirements of this Contract, HUD may rescind the sale of the project or take other appropriate action in accordance with section 2.21.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER B.S.A. and Associates

By [signature]
* Dr. Ben Alli
owner
(Official Title)

Date 7/28, 1989

United States of America
Secretary of Housing and
Urban Development

By [signature]
* John Terranella
Director, Housing Management
(Official Title)

Date JUL 28 1989, 19

* Type name of signatory under signature line.

[If the project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages of this Contract.]

EXHIBIT 1

SCHEDULE OF CONTRACT UNITS AND CONTRACT RENTS

| Number of Bedrooms | Number of Units 2 | Household Type (elderly, non-elderly family, large nonelderly family) | Contract Rent | PBE |
|---|---|---|---|---|
| Efficiency | 27 | | $230 | -0- |
| 1 | 23 | | $268 | -0- |
| 2 | 8 | | $321 | $20 |
| 3 | 24 | | $356 | $25 |
| | 82 | | | |

1/ This Exhibit must be completed and attached to the Contract at the time the Agreement is executed. It may, however, be amended in accordance with program rules before the Contract is executed. When Contract Rents are amended (e.g. at the time of an annual adjustment) this format should be used.

2/ If less than 100 percent of the units in the project are covered by this Contract, identify specific units to be leased at initial rent-up to eligible families. See section 2.8(c)(6).

This Exhibit shows the initial and subsequent amounts of contract and budget authority obligated for project number: MI28-E000-049. (The Housing Division shall furnish the Legal Division with the information necessary to complete this Exhibit, with appropriate supporting documentation including an ACC/HAP Contract List.)

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Agreement | | |
| Effective Date of Agreement Amendment: ____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Agreement Amendment: ____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Contract | $290,952 | $4,364,280 |
| Effective Date of Contract Amendment: ____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Contract Amendment: ____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

Project Name: Riverside Place Apartments

Project No.: MI28-E000-049

AMENDEMENT TO

HOUSING ASSISTANCE PAYMENTS CONTRACT (HUD 52522C&D 8/80)

The Housing Assistance Payments Contract, dated ______________, between the U.S. Department of Housing and Urban Development and

B.S.A. and Associates

is amended as follows:

1. Paragraph 1.4(b)(1) is amended to read:

| | Applic. | Not Applic. |
|---|---|---|
| (b)(1) 2.7(f) - Adjustment of Contract Rents Based on Cost Certification: Applicability: Not Applicable. | ____ | X |

2. Paragraphs 2.6(b)(1) and (d)(2) are amended to read:

(b) Use of Project Funds.

(1) Project funds must be used for the benefit of the project, to make mortgage payments, to pay operating expenses, and to make required deposits to the replacement reserve in accordance with paragraph (c) of this section and to pay distributions to the owner as provided in paragraph (d).

(d) Limitations on Distributions.

(2) For the life of the Contract, project funds may only be distributed to profit motivated owners at the end of each fiscal year of project operation following the effective date of the Contract after all project expenses have been paid, or funds have been set aside for payment, and all reserve requirements have been met. From the remaining funds (surplus cash, compute in accordance with HUD requirements), the profit-motivated owne may take distributions. Non-profit owners may not make similar withdrawals and are prohibited from making distributions pursua to their organizational documents, and are also subject to the terms of the Regulatory Agreement, if any.

3. Paragraphs 2.6(d)(2)(i) and (ii) are DELETED.

4. A new paragraph 2.6(d)(3) is inserted to read:

   (3) For HUD-insured projects, or projects on which HUD holds a purchase money mortgage, distributions are subject to the terms of the Regulatory Agreement.

5. Paragraphs 2.6(d)(3),(4) and (5) are renumbered 2.6(d)(4),(5) and (6).

6. Paragraph 2.7(f) is DELETED.

OWNER B.S.A.. and Associates

By [signature]
Dr. Ben Alli
Owner
(Official Title)

Date 7/28, 1989

United States of America
Secretary of Housing and
Urban Development

By [signature]
John Terranella
Director, Housing Management
(Official Title)

Date JUL 28 1989, 19

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM

PART II OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

By and between SECRETARY OF HOUSING AND URBAN DEVELOPMENT (CA) and

B.S.A. and Associates (Owner).

Check Type of Project: Private-Owner/HUD X or PHA-Owner/HUD ____
(HUD is the Contract Administrator or "CA.")

or Private-Owner/PHA ____
(The PHA is the CA)

| | | | | |
|---|---|---|---|---|
| NEW - CONSTRUCTION<br>Part 880 ____<br>Part 885 ____ | or | SUBSTANTIAL REHABILITATION<br>Part 881 ____<br>Part 885 ____ | or | PREVIOUSLY HUD-OWNED<br>Part 886, Subpart C X |

SECTION 8 PROJECT NUMBER: MI28-E000-049

FHA PROJECT NUMBER (if applicable): 044-AC019

2.1 OWNER'S WARRANTIES; AMENDMENTS.

(a) Legal Capacity. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

(b) Completion of Work. The Owner warrants that the project as described in section 1.1 is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract (Agreement) or will be completed in accordance with the Special Conditions for Acceptance (see attached exhibit, where applicable). The Owner further warrants that it will remedy any defects or omissions covered by this warranty if called to its attention within 12 months of the effective date of this Contract. The Owner and the CA agree that the continuatio of this Contract shall be subject to the Owner meeting any Special Conditions for Acceptance.

2.2 FAMILIES TO BE HOUSED; CONTRACT ADMINISTRATOR (CA) ASSISTANCE.

(a) Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower-Income Families (Families) for occupancy by such Families solely as private dwellings and as their principal place of residence. (See also section 2.10.)

(b) CA Assistance.

(1) The CA hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable the Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act.

(2) If there is a Utility Allowance and if the Allowance exceeds the total Family contribution, the Owner shall pay the Family the amount of the excess. The CA will pay funds to the Owner in trust solely for the purpose of making this payment. Any pledge by the Owner of payments properly payable under this Contract shall not be construed to include payments covered by this paragraph (b)(2). (See 24 CFR section 880.501(e), 881.501(e), or 886.309(a).)

2.3 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT. 9

(a) Maximum Annual Contract Commitment. Notwithstanding any other provisions of this Contract (other than paragraph (b)(2) of this sect: or any provisions of any other contract between the CA and the Owner, the CA shall not be obligated to make and shall not make any housing

(f) Prohibition of Double Compensation for Vacancies. The owner is not entitled to payments for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, payments from the CA under section 2.8(b), and governmental payments under other programs). If the Owner collects any of the Family's share of the rent for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Contract Rent, the excess must be reimbursed as HUD directs.

(g) CA Not Obligated for Family Rent. The CA has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with section 2.8(b) of this Contract.

The financial obligation of the CA is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

(h) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the CA or as directed by the CA for housing assistance payments. Each request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit 1 for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with section 2.2(b)(2)); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive any payments or other consideration from the Family, the PHA, HUD, or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, the CA (or HUD where the CA is a PHA), in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(i) Payments to Trustee by PHA Where It Is the Lender. (See section 1.4 for applicability of this paragraph.) The amount of the housing assistance payment determined in accordance with the provisions of this Contract, up to the amount of the mortgage repayments due the PHA from the Owner pursuant to the mortgage loan made by the PHA for the project, shall be credited to the Owner and transferred monthly by the PHA from the account maintained under the General Depositary Agreement pursuant to the ACC to the trustee under the note or bond resolution of the PHA under which the notes or bonds to provide the mortgage loan were issued. Any amount of the housing assistance payment in excess of such credit shall be paid by the PHA directly to the Owner.

2.5 MAINTENANCE, OPERATION AND INSPECTION.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe, and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). The Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 35. If the CA determines that the Owner is not meeting one or more of these obligations, the CA shall have the right to take action under section 2.21(b).

(b) Inspection.

(1) Prior to occupancy of any Contract Unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed or approved by the CA, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(2) The CA shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times (including prior to initial occupancy and renting of any unit) as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition including the provision of the agreed-upon utilities and other services. The CA shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

(c) Units Not Decent, Safe, and Sanitary. If the CA notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the CA may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the CA does not have other section 8 funds for such purposes, the CA may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of rent payable by the Family.

(d) Notification of Abatement. Any reduction or suspension of housing assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family of any such abatement.

(e) Overcrowded and Underoccupied Units. Where the CA determines a unit is larger or smaller than appropriate for an eligible family, the Owner agrees to correct the situation in accordance with HUD regulations and requirements in effect at the time of the determination.

2.6 FINANCIAL REQUIREMENTS.

(a) Submission of Financial and Operating Statements.

The Owner must submit to the CA:

(1) Within 60 days after the end of each fiscal year of the project, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(2) Other statements as to project operation, financial conditions and occupancy as HUD may require pertinent to administration of the Contract and monitoring of project operations.



(b) Use of Project Funds. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) Project funds must be used for the benefit of the project, to make mortgage payments, to pay operating expenses, to make required deposits to the replacement reserve in accordance ... and to provide distributions

to the Owner as provided in paragraph (d). To the extent HUD determines that project funds are more than needed for these purposes, the surplus project funds must be deposited with the mortgagee or other HUD-approved depositary in an interest-bearing residual receipts account. Withdrawals from this account will be made only with the approval of HUD and for project purposes, including the reduction of housing assistance payments. Upon termination of the Contract, any excess funds must be remitted to HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (b) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(c) Replacement Reserve. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) The Owner shall establish and maintain a replacement reserve in an interest-bearing account to aid in funding extraordinary maintenance and repair and replacement of capital items in accordance with applicable regulations.

(i) The obligation of the Owner to deposit into the replacement reserve shall commence upon the effective date of the Contract. For staged projects, the obligation shall commence on a pro rata basis for units in each stage on the effective date of the Contract for that stage. The amount of the deposit to the replacement reserve will be adjusted each year by the amount of the automatic annual adjustment factor. See 24 CFR Part 886.

(ii) The reserve must be built up to and maintained at a level determined by HUD to be sufficient to meet projected requirements. Should the reserve achieve that level, the rate of deposit to the reserve may be reduced with the approval of HUD.

(iii) All earnings including interest on the reserve must be added to the reserve.

(iv) Funds will be held by the mortgagee or trustee for the bondholders, and may be drawn from the reserve and used only in accordance with HUD guidelines and with the approval of, or as directed by, HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (c) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially-assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(d) Limitation on Distributions. (Paragraphs (d)(2)-(4) are not applicable to Small, Partially Assisted or Previously HUD-Owned Projects.)

(1) Nonprofit owners are not entitled to distributions of project funds.

(2) For the life of the Contract, project funds may only be distributed to profit-motivated owners at the end of each fiscal year of project operation following the effective date of the Contract after all project expenses have been paid, or funds have been set aside for payment, and all reserve requirements have been met. The first year's distribution may not be made until cost certification, where applicable, is completed. Distributions may not exceed the following maximum returns:

(i) For projects for elderly families, the first year's distribution will be limited to 6 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(ii) For projects for nonelderly families, the first year's distribution will be limited to 10 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(3) For the purpose of determining the allowable distribution, an Owner's equity investment shall be computed in accordance with HUD regulations and requirements.

(4) Any short-fall in return may be made up from surplus project funds (see paragraph (b)(1)) in future years.

(5) In the case of HUD-insured projects, the provisions of this section will apply instead of the otherwise applicable mortgage insurance program regulations, except in the case of small, partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance regulations.

2.7 RENT ADJUSTMENTS.

(a) Funding of Adjustments. Housing assistance payments will be made in amounts commensurate with Contract Rent adjustments under this section up to the maximum amount authorized under section 2.3(a) of this Contract.

(b) Contract Rent Adjustments. Contract Rents shall automatically be adjusted whenever a HUD-approved rent increase as provided under the Regulatory Agreement takes effect, and the HUD-approved rents shall become the new Contract Rents.

(c) None (Omitted)

(d) None (Omitted)

(e) Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit 1 by a dated addendum to the exh[illegible] establishing the effective date of the adjustment.

(f) Adjustment of Contract Rents based on Cost Certification. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner. Within 60 days after HUD accepts the project (or accepts the last stage, where applicable), or any extensions approved by HUD for good cause, the Owner will cert[illegible] actual costs estimated in the Final Proposal or Purchase and U[illegible] Plan of the replacement cost, operating expenses, income, and [illegible] service, and submit a cost certification including the certifi[illegible] of an Independent Public Accountant to HUD in the manner and f[illegible] prescribed by HUD, based on the following guidelines:

(i) Projects which involve HUD mortgage insurance or a HUD loan will be subject to the cost certification requirements of the applicable insurance or loan program.

(ii) For projects not insured by HUD, a simplified form of cost certification as prescribed by HUD will be completed and submitted.

(2) HUD Review. Cost certifications will be subject to review by HUD. As part of this review, the Owner and/or contractor may be required to submit additional documentation.

(3) Reduction of Contract Rents. If the Owner's certified costs provided in accordance with paragraph (f)(1) of this section, as approved by HUD, are less than the cost estimates provided in the Final Proposal or Purchase and Use Plan, the Contract Rents will be reduced accordingly.

(4) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (f)(3) of this section, the maximum annual Contract commitment (and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA.

(g) Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Obligations Issued by a Participating State Agency Not Subject to Part 811 (See section 1.4 for applicability of this paragraph.) After the project is permanently financed, the financing agency shall submit a certification to HUD specifying the actual financing terms. If the actual debt service to the Owner under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the initial Contract Rents or the Contract Rents then in effect shall be reduced commensurately and the amount of savings credited to the project account. The maximum annual Contract commitment (and the maximum annual ACC commitment, in the case of Private-Owner/PHA projects) will not be reduced.

(h) Adjustment of Contract Rents to Reflect Actual Cost for Projects Subject to Part 811. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner and Financing Agency. The Owner and the financing agency shall submit certified statements as to the financing and other costs as required by Part 811 prior to final endorsement. Based on the certified statements, HUD will determine whether any reduction in initial Contract Rents is required under Part 811. Promptly after HUD notification, the Owner and the financing agency agree to amend the Contract to reduce the initial Contract Rents to the extent required by HUD. See sections 2.3(b)(5) and (6) of the Agreement, as appropriate.

(2) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (h)(1) of this section, the maximum annual Contract commitment (and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA

(i) Adjustment of Contract Rents Due to Property Tax Exemption or Similar Savings. The Contract Rents may be reduced to reflect real property tax exemption or similar savings where the initial Contract Rents were approved on the assumption that the project would not receive the benefit of tax abatement or similar savings. The Owner agrees to notify the CA in the event such a project begins to receive such an exemption or similar savings so that the initial Contract Rents or the Contract Rents then in effect may be reduced.

2.8 MARKETING AND LEASI... OF UNITS.

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, sex, handicap, or national origin and in the case of previously HUD-owned projects in accordance with the tenant selection factors shown as Exhibit 6.

(b) Security Deposits. The Owner agrees to comply with applicable section 8 regulations and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) Except for those families in previously HUD-owned projects determined by HUD at the time of the sale of the project to be eligible for section 8, the Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, computation of the amount of housing assistance payments on behalf of each selected Family and of total Family contributions and recordkeeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) In the initial renting of the Contract Units, the Owner must lease at least 30 percent to Very Low-Income Families (determined in accordance with HUD-established schedules and criteria). However, if this requirement cannot be met for substantial rehabilitation or previously HUD-owned projects because of families already residing in the project, HUD may permit the leasing of less than 30 percent of the units to Very Low-Income Families. Thereafter the Owner shall exercise best efforts to maintain (or achieve and maintain) at least 30 percent occupancy of the Contract Units by Very Low-Income Families. In addition, at all times, the Owner will use its best efforts to achieve leasing to Families with a range of incomes so that the average of incomes of all Families in occupancy is at or above 40 percent of the median income in the area.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD.

(5) (i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least as often as required by HUD regulations or other requirements, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with applicable HUD regulations and requirements.

(ii) If a family reports a change in income or other circumstances that would result in a decrease of total family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total family contribution. The Owner may require in its lease that families report increases in income or other changes between scheduled reexaminations.

(iii) In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families and what the average Family income is. If there are fewer than 30 percent Very Low-Income Famili[es] in occupancy, or the average income is below 40 percent of the median, the Owner shall report the fact to HUD and shall adopt appropriate changes in its admission policies

(iv) A Family's eligibility for housing assistance payments c[ontinues] until its total Family contribution equals the total hou[sing] ... The termination of

eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) Where fewer than 100 percent of the units in the project are covered by this Contract, assisted Families shall be dispersed throughout. At initial rent-up, the Owner shall lease the units identified in Exhibit 1 to eligible Families. Thereafter, the Owner may lease other units of appropriate size and type to eligible Families in accordance with Exhibit 1. For projects with units for both elderly and non-elderly Families, the respective family types may be grouped together.

(7) The Owner shall maintain as confidential all information relating to section 8 applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Rent Redetermination after Adjustment in Utility Allowance. In the event that the Owner is notified of a CA determination approving or requiring an adjustment in the Utility Allowance applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

(e) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD and PHA regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD or the PHA.

(f) Review: Incorrect Payments. In making housing assistance payments to Owners, the PHA or HUD will review the Owner's determinations under this section. If as a result of this review, or other reviews, audits or information received by the PHA or HUD at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the PHA or HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery.

2.9 TERMINATION OF TENANCY OR SECTION 8 ASSISTANCE BY THE OWNER.

The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements,in effect at the time of the termination, and any State and lo law.

2.10 REDUCTION OF NUMBER OF UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

(a) Limitation on Leasing to Ineligible Families. Except in the case of previously HUD-owned projects, the Owner may not at any time during th term of this Contract lease more than 10 percent of the assisted units in the project to families which are ineligible under section 8 requirements at initial occupancy without the prior approval of HUD. Failure on the part of the Owner to comply with this prohibition is a violation of the Contract and grounds for all available legal remedi including specific performance of the Contract, suspension or debarment from HUD programs and reduction of the number of units under the Contract, as set forth in paragraph (b) of this section. (See also section 2.21.)

(b) Reduction for Failure to Lease to Eligible Families - New and Rehab Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have at least 90 percent of the assisted units leased or available for leasing by families eligible under section 8 requireme at initial occupancy, HUD (or the PHA at the direction of HUD, as appropriate) may, on at least 30 days' notice, reduce the number of units covered by the Contract. HUD or the PHA may reduce the number units to the number of units actually leased or available for leasin plus 10 percent (rounded up). This reduction, however, will not be if the failure to lease units to eligible families is permitted in writing by HUD under paragraph (a) of this section.

(c) Reduction --Previously HUD-Owned Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have all of the assisted units leased or available for leasing by families eligible under section 8 requirements at initial occupancy, HUD may, on 30 calendar days' notice, reduce the number of Contract units to not less than the number of Contract units under lease, plus 10 percent of such number if the number is 10 or more, rounded up. Failure by the Owner to make a reasonable effort to lease the units to eligible Families shall be a violation of the Contract and grounds for all legal remedies including those specified in paragraph (a) and section 2.21.

(d) Restoration. HUD will agree to an amendment of the ACC or the Contract, as appropriate, to provide for subsequent restoration of any reduction made pursuant to paragraph (b) or (c) of this section if:

(1) HUD determines that the restoration is justified by demand,

(2) The Owner otherwise has a record of compliance with its obligations under the Contract, and

(3) Contract authority is available. (HUD will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out its agreement.

2.11 NONDISCRIMINATION.

(a) General. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against an person on the grounds of race, color, creed, religion, sex, national origin, or handicap..

(b) Members of Certain Classes. The Owner shall not automatically exclud anyone from participation in, or deny anyone the benefits of, the Housing Assistance Payments Program because of membership in a class, such as unmarried mothers, recipients of public assistance, handicapped persons.

(c) Title VIII of the Civil Rights Act of 1968. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, which prohibits discrimination in the sale, rental, financi and advertising of housing on the basis of race, color, religion, se or national origin, and any related rules and regulations.

(d) Title VI of the Civil Rights Act of 1964 and Executive Order 11063. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. et seq.; the HUD Regu tions issued thereunder, 24 CFR, Subtitle A, Part 1; the HUD requirements pursuant to these regulations; and Executive Order 1106 and any regulations and requirements issued thereunder, to the end that, in accordance with that Act, Executive Order 11063, and the regulations and requirements of HUD, no person in the United States shall, on the grounds of race, color, creed, or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to d crimination. This provision is included pursuant to the regulation of HUD, 24 CFR, Subtitle A, Part 1 issued under Title VI of the Ci Rights Act of 1964, HUD regulations issued pursuant to Executive O 11063 and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply therewith inures to the benefit the United States of America, HUD, and the PHA (where the CA is a PHA), any of which shall be entitled to invoke any remedies availa by law to redress any breach or to compel compliance by the Owner.

(e) Section 504 of the Rehabilitation Act of 1973. The Owner shall co with all the requirements imposed by section 504 of the Rehabilita Act of 1973, as amended, and any related rules and regulations. Section 504 provides that no qualified handicapped person shall, the basis of handicap, be excluded from participation in, be deni benefits of, or otherwise be subjected to discrimination under an program or activity which receives or benefits from Federal finan assistance. Accordingly, the Owner (1) shall not discriminate ag ... on the basis of handicap and (2)

cause to be incorporated into all contracts executed in connection with this project a provision requiring compliance with rules and regulations issued pursuant to section 504.

(f) Employees of Owner.

(1) In carrying out the obligations under this Contract, the Owner will not discriminate against any employee or applicant for employment because of race, color, creed, religion, sex, handicap or national origin. The Owner will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, creed, religion, sex, handicap or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

(2) The Owner agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by HUD setting forth the provisions of this nondiscrimination clause. The Owner will in all solicitations or advertisements for employees placed by or on behalf of the Owner state that all qualified applicants will receive consideration for employment without regard to race, color, creed, religion, sex, handicap or national origin. The Owner will incorporate the foregoing requirements of this paragraph in all of its contracts for project work, except contracts for standard commercial supplies or raw materials, and will require all of its contractors for such work to incorporate such requirements in all subcontracts for project work.

(g) Age Discrimination Act of 1975. The Owner shall comply with any rules and regulations issued or adopted by HUD under the Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs and activities receiving Federal financial assistance.

2.12 COOPERATION IN EQUAL OPPORTUNITY COMPLIANCE REVIEWS.

The Owner and the PHA (where the CA is a PHA) agree to cooperate with HUD in the conducting of compliance reviews and complaint investigations pursuant to or permitted by all applicable civil rights statutes, Executive Orders, and rules and regulations.

2.13 TRAINING, EMPLOYMENT AND CONTRACTING OPPORTUNITIES FOR BUSINESSES AND LOWE[R] INCOME PERSONS. (See section 1.4 for applicability of this section.)

(a) The project assisted under this Contract is subject to the requiremen[ts] of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

(b) Notwithstanding any other provision of this Contract, the Owner shall carry out the provisions of section 3 and the regulations issued by HUD as set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of this Contr[act]. The requirements of the regulations include, but are not limited to, development and implementation of an affirmative action plan for utilizing business concerns located within, or owned in substantial by persons residing in, the area of the project; the making of a goo[d] faith effort, as defined by the regulations, to provide training, employment and business opportunities required by section 3; and incorporation of the "section 3 clause" specified by section 135.20( of the regulations and paragraph (d) of this section in all contract for work in connection with the project. The Owner certifies and a[grees] that it is under no contractual or other disability which would pre[vent] it from complying with these requirements.

(c) Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders issued by HUD thereunder prior to execution of this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors, and assigns to the sanctions specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

(d) The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Agreement in excess of $50,000 cost, the following clause:

EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from HUD and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended. 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area, and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B The parties to this Contract will comply with the provisions of section 3 and the regulations issued pursuant thereto by HUD as set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontractor is in violation of regulations issued by HUD, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

"E Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of the Housing Assistance Payments Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors, and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors, and assigns to those sanctions specified by the Housing Assistance Payments Contract, and to such sanctions as are specified by 24 CFR, Section 135.135."

(e) The Owner agrees that it will be bound by the above section 3 clause with respect to its own employment practices when it participates in federally assisted work.

2.14 FLOOD INSURANCE. (if applicable)

The Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.15 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT. (See section 1.4 for applicability of this section.)

In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees:

(a) Not to utilize any facility in the performance of this Contract or any nonexempt subcontractor which is listed on the EPA List of Violating Facilities pursuant to section 15.20 of the regulations;

(b) Promptly to notify the CA of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

(c) To comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 of the Air Act and section 308 of the Water Act, and all regulations and guidelines issued thereunder; and

(d) To include or cause to be included the provisions of this Contract in every nonexempt subcontract and take such action as HUD may direct as a means of enforcing such provisions.

2.16 REPORTS AND ACCESS TO PREMISES AND RECORDS.

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD and the PHA (where the CA is a PHA).

(b) The Owner shall permit HUD and the PHA (where the CA is a PHA) or any of their duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.17 DISPUTES.

(a) For Private-Owner/PHA Projects:

(1) Any dispute concerning a question of fact arising under this Contract which cannot be resolved by the PHA and the Owner may be submitted by either party to the HUD Field Office which will promp a decision and furnish a written copy to the Owner and the PHA.

(2) The decision of the Field Office will not be reviewable unless, within 30 calendar days from the date of receipt of the Field Office's determination, either party mails or otherwise furnishes to HUD a written appeal with written justification addressed to the Secretary of Housing and Urban Development. Both parties sh proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office pending resolut of the appeal.

(b) For Private-Owner/HUD or PHA-Owner/HUD Projects:

Any dispute concerning a question of fact arising under this Contra which cannot be resolved by agreement between the HUD Field Office the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. Both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office, pending resolution of the appeal.

2.18 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY, OR OTHER PUBLIC OFFICIALS.

(a) No person or entity in the following classes shall have an interest, direct or indirect, in this Agreement or in any proceeds or benefits arising from it, during his or her tenure or for one year thereafter.

(1) any member or officer of the PHA (where it is the CA or the Owner), except where his or her interest is as tenant;

(2) (i) any employee of the PHA (where it is the CA or the Owner) who formulates policy or influences decisions with respect to the section 8 project;

(ii) any other employee of the PHA (where it is the CA or the Owner), except where his or her interest is as a tenant;

(3) any member of the governing body or the executive officer of the locality (city or county) in which the project is situated;

(4) any member of the governing body or executive officer of the locality (city or county) in which the PHA (where it is the CA or the Owner) was activated;

(5) any other State or local public official (including State legislators), who exercises any functions or responsibilities with respect to the section 8 project;

(6) any PHA (which is not the CA), where any of its members, officers, or employees has a personal interest in the project, including an interest by reason of membership on the board of the PHA which is the CA (except an employee who does not formulate policy or influence decisions with respect to the section 8 project may have an interest as a tenant).

(b) Members of the classes described in paragraph (a) who involuntarily acquire an interest in the section 8 program or in a section 8 project, or who had acquired prior to the beginning of their tenure any such interest, must disclose any interest or prospective interest to the PHA (where it is the CA or the Owner) and the HUD Field Office, and may, with appropriate justification, if consistent with State law,

apply to the HUD Field Office (through the PHA where it is the CA) for a waiver. Any other requests for waivers of paragraph (a) must be referred to the HUD Headquarters, with appropriate recommendations from the Field Office, for a determination of whether a waiver will be granted.

(c) No person to whom a waiver is granted shall be permitted (in his or her capacity as member of a class described in paragraph (a)) to exercise responsibilities or functions with respect to an Agreement or a Contract executed, or to be executed, on his or her behalf, or with respect to an Agreement or a Contract to which this person is a party.

(d) The Owner shall insert in all contracts, subcontracts, and arrangements entered into in connection with the project or any property included or planned to be included in the project, and shall require its contractors and subcontractors to insert in each of the subcontracts, the provisions of paragraphs (a) through (d).

(e) The provisions of paragraphs (a) through (d) of this section shall not apply to a utility service if the rates are fixed or controlled by a governmental agency or applicable to the Depositary Agreement.

2.19 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

2.3 ASSIGNMENT, SALE OR FORECLOSURE.

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, the ACC (if applicable), or the project or any part of them or any of its interest in them, without the prior written consent of HUD (and the PHA where it is the CA). However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD (and the PHA where it is the CA) shall consent in writing if HUD has approved the terms of the financing.

(b) The Owner agrees to notify HUD (and the PHA where it is the CA) promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD (and the PHA where it is the CA).

(c) (1) For purposes of this section, a sale, assignment, conveyance, or transfer includes but is not limited to one or more of the following:

(i) A transfer by the Owner, in whole or in part,

(ii) A transfer by a party having a substantial interest in the Owner,

(iii) Transfers by more than one party of interests aggregating a substantial interest in the Owner,

(iv) Any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution of interests by any other method or means, and

(v) Any refinancing by the Owner of the project.

(2) An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer. An assignment by one or more general or limited partners of a limited partnership interest to a limited partner, who will have no more than a 25 percent interest, shall not be considered an assignment, conveyance, or transfer.

(3) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(d) The Owner and the party signing this Contract on behalf of the Owner represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect to it.

(e) Except where otherwise approved by HUD, this Contract, the Agreement, and the ACC (if applicable) shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event:

(1) Of assignment, sale, or other disposition of the project or this Contract, the Agreement, or the ACC,

(2) Of foreclosure, including foreclosure by HUD,

(3) Of assignment of the mortgage or deed in lieu of foreclosure,

(4) The PHA or HUD takes over possession, operation or ownership,

(5) The Owner prepays the mortgage.

2.21 DEFAULT BY PHA AND/OR OWNER.

(a) Rights of Owner if PHA Defaults under Contract (for Private-Owner/PHA Projects).

(1) Events of Default. The occurrence of any of the following events, if the Owner is not in default, is defined as a default under the ACC:

(i) If the PHA fails to perform or observe any term or condition of this Contract;

(ii) If the Contract is held to be void, voidable, or ultra vires;

(iii) If the power or right of the PHA to enter into the Contract is drawn into question in any legal proceeding; or

(iv) If the PHA asserts or claims that the Contract is not binding upon the PHA for any such reason.

(2) Owner Request for HUD Determination of Default.

If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event:

(i) Notify HUD of the occurrence of the event;

(ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and

(iii) Request HUD to determine whether there has been a default.

(3) HUD Determination of Default and Curing of Default.

HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines tha the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Contract, including any funds. HUD shall continue to pay annual contributions with respect to the units covered by this Contract in accordance with the ACC and this Contract until reassigned to the PHA. All rights and obligations of the PHA assumed by HUD will be returned as constituted at the time of the return:

(i) When HUD is satisfied that all defaults have been cured and that the project will thereafter be administered in accordance with all applicable requirements, or

(ii) When the Contract is at an end, whichever occurs sooner.

(4) Enforcement by Owner. The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

(b) Rights of PHA and HUD if Owner Defaults under Contract.

(1) Events of Default.

A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or

identified by the CA in connection with any annual or other inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii) For projects with mortgages insured by HUD or loans made by HUD, the Owner has violated or failed to comply with the regulations for the applicable insurance or loan program, with the insured mortgage, or with the regulatory agreement; or the Owner has filed any false statement or misrepresentation with HUD in connection with the mortgage insurance or loan.

(2) CA Determination of Default.

Upon a determination by the CA that a default has occurred, the CA shall notify the Owner and the lender, with a copy to HUD where the CA is a PHA, of

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

(iii) The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.

If the Owner and/or lender fail to respond or take action to the satisfaction of the CA (and HUD where the CA is a PHA), the CA shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD (where the CA is a PHA).

(3) Corrective Actions.

Pursuant to paragraph (b)(2) of this section the CA, in its discretion or as directed by HUD (where the CA is a PHA), may take the following corrective actions either directly or in conjunction with or acting through a PHA:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If the CA takes possession, housing assistance payments shall continue in accordance with the Contract.

(ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other loan documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to the PHA and/or HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

(iv) Reduce or suspend housing assistance payments.

(v) Recover any overpayments.

(4) HUD Rights.

(For Private-Owner/PHA projects where the PHA is the lender.)

(i) Notwithstanding any other provisions of this Contract, in the event HUD determines that the Owner is in default of its obligations under the Contract, HUD shall have the right, after notice to the Owner, the trustee, if any, and the PHA giving them a reasonable opportunity to take corrective action, to proceed in accordance with paragraph (b)(3).

(ii) In the event HUD takes any action under this section, the Owner and the PHA hereby expressly agree to recognize the rights of HUD to the same extent as if the action were taken by the PHA. HUD shall not have the right to terminate the Contract except by proceeding in accordance with paragraphs (b)(1), (2), and (3) of this section and with the ACC.

(c) Remedies Not Exclusive and Non-Waiver of Remedies. The availability of any remedy under this Contract or the ACC, where applicable, shall not preclude the exercise of any other remedy under this Contract or the ACC or under any provisions of law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

2.22 RELATIONSHIP OF PARENT ENTITY PHA AS OWNER TO AGENCY OR INSTRUMENTALITY PHA UNDER PART 811.

The Parent Entity PHA agrees to perform the functions with regard to the Agency or Instrumentality PHA required by the HUD regulations pursuant to which the relationship between the two PHAs was established and to which HUD approved the Agency or Instrumentality PHA.

Project Nos. 044-55119/133
Seldon Court Apartments
Detroit, Michigan
Riverside Place

EXHIBIT "A"

ALSO

Lots 21, 22 and 23 Dickinson's Subdivision of that part of Out Lot 10, lying North of Magnolia Street and West of National Avenue of the Subdivision of Private Claim 25, being rear concession to the Loghon Farm, Detroit, Wayne County, Michigan, as recorded in Liber 11, page 99 of Plats, Wayne County Records.

U.S. DEPAR NT OF HOUSING AND URBAN DEVEL ENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
DISPOSITION OF PREVIOUSLY HUD-OWNED PROJECTS

Pingree Apartments
Detroit, Michigan
Expo+ D

PART I OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

Type of Project: Private-Owner X or FHA-Owner X
Partly Assisted Project ___ or Totally Assisted Project X or Neither X
Substantial Rehabilitation ___ or Moderate Rehabilitation ___

Type of Financing: Purchase Money Mortgage

[For example: HUD-insured; GNMA tandem; purchase money mortgage; not HUD-insured.]

ACC/HAP CONTRACT LIST NUMBER AND DATE: C-83-576 August 22, 1983

SECTION 8 PROJECT NUMBER: MI28-E000-037

FHA PROJECT NUMBER (if applicable): 044-44110-PD

This Housing Assistance Payments Contract (Contract) is entered into between the United States of America acting through the Department of Housing and Urban Development (HUD) and Ben and Shaki Alli (Owner) pursuant to the U.S. Housing Act of 1937 (Act), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families leasing decent, safe and sanitary units from the Owner.

1.1 SIGNIFICANT DATES AND OTHER ITEMS: CONTENTS AND SCOPE OF CONTRACT.

(a) Effective Date of Contract: AUG 25 1983, 19___.

(b) Fiscal Year. The ending date of each Fiscal Year shall be March 31. [Insert March 31, June 30, September 30, or December 31, as approved by HUD.] The Fiscal Year for the project shall be the 12-month period ending on this date. However, the first Fiscal Year for the project is the period beginning with the effective date of the Contract and ending on the last day of the Fiscal Year which is not less than 12 months after the effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in section 1.1(c) will be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

(c) Maximum Annual Contract Commitment. The maximum annual amount of the commitment for housing assistance payments under this Contract (see section 2.3) is the amount of contract authority identified in Exhibit 3.

(d) Project Description.

See Attached Exhibit 7

(e) Statement of Services, Maintenance and Utilities Provided by the Owner.

(1) Services and Maintenance:

(2) Equipment:

Range
Refrigerator
Kitchen Exhaust Fan
Laundry Facilities
Disposal
Carpet

(3) Utilities:

Gas heat
Gas-heated hot water
Gas for cooking
Water

(4) Other:

(f) Contents of Contract. This Contract consists of Part I, Part II (except as indicated in section 1.4), and the following exhibits:

Exhibit 1: The schedule showing the number of units by size (Contract Units) and their applicable rents (Contract Rents).

Exhibit 2: Daily Debt Service (for substantial rehabilitation projects only). (If the project is not permanently financed when the Contract is executed, this exhibit should be added when the necessary information becomes available.) N/A

Exhibit 3: The schedule showing contract and budget authority.

Exhibit 4: The Affirmative Fair Housing Marketing Plan, if applicable.

Exhibit 5: The approved Purchase and Use Plan including a project description and the tenant selection factors. Exhibit 5 may incorporate these items by reference, specify the location of the items, and list them, including any amendments.

Exhibit 6: HUD standards for decent, safe and sanitary housing.

Additional exhibits: [Specify additional exhibits, if any, such as Special Conditions for Acceptance. If none, insert "None."]

Exhibit 7: Project Description

(g) Scope of Contract. This Contract, including the exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, any applicable regulations, and agreements entered into in writing by the parties which are not inconsistent with this Contract.

1.2 TERM OF CONTRACT; OBLIGATION TO OPERATE PROJECT FOR FULL TERM.

(a) Term of Contract. The term of this Contract for any unit shall be 15 years, beginning with the effective date of this Contract for such unit. [Insert number approved by HUD in accordance with the HUD regulations.] If the project is completed in stages, the term shall be separately related to the units in each stage. However, the

total Contract term for all the stages, beginning with the effective date of the Contract for the first stage, shall not exceed the Contract term for any unit, plus two years.

(b) Obligation to Operate Project for Full Term. The Owner agrees to continue operation of the project in accordance with this Contract for the full term specified in paragraph (a).

1.3 HUD ASSURANCE.

The execution of this Contract by HUD is an assurance by HUD to the Owner that:

(a) The faith of the United States is solemnly pledged to the payment of housing assistance payments pursuant to this Contract, and

(b) HUD has obligated funds for these payments.

1.4 APPLICABILITY OF CERTAIN PROVISIONS OF THIS CONTRACT.

| | Applic. | Not Applic. |
|---|---|---|
| (a) 2.4(i). Payments to Trustee by FHA as Lender. Applicability: Not applicable. | | X |
| (b) (1) 2.7(f). Adjustment of Contract Rents Based on Cost Certification. Applicability: Applicable. If the Contract Rents are adjusted under section 2.4 of the Agreement, section 2.7(f) should be changed to "not applicable" when the Contract is executed. | X | |
| (2) 2.7(g). Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Financing Not Subject to Part 811 or Paragraph (f). Applicability: Not applicable. | | X |
| (3) 2.7(h). Adjustment of Contract Rents: Part 811. Applicability: Not applicable. | | X |
| (c) 2.13. Training, Employment and Contracting Opportunities. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $500,000. | X | |
| (d) 2.14. Flood Insurance. Applicability: All projects in special flood hazard areas. | | |
| (e) 2.15. Clean Air and Federal Water Pollution Control Acts. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $100,000. | X | |

1.5 OWNER'S FAILURE TO COMPLY WITH CONTRACT.

In addition to other remedies available to HUD under this Contract, the Agreement to Enter into Housing Assistance Payments Contract, or the Regulatory Agreement for a default by the Owner, the Owner and HUD agree that if the Owner fails to comply with the requirements of this Contract, HUD may rescind the sale of the project or take other appropriate action in accordance with section 2.21.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER [signature]
Ben Alli
[signature]
* Shaki Alli

Date 8-24, 19 83

United States of America
Secretary of Housing and
Urban Development

By [signature]
* John G. Terranella
Director, Housing Division
(Official Title)

Date AUG 25 1983, 19

* Type name of signatory under signature line.

[If the project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages of this Contract.]

EXHIBIT 1

SCHEDULE OF CONTRACT UNITS AND CONTRACT RENTS 1

| Number of Bedrooms | Number of Units 2 | Household Type (elderly, non-elderly family, large nonelderly family) | Contract Rent | PBE | GROSS RENTS |
|---|---|---|---|---|---|
| 1 | 27 | elderly | $205 | $15 | $220 |
| 1 | 39 | non-elderly | 205 | 15 | 220 |
| 2 | ~~10~~ 11 | non-elderly | 280 | 16 | 296 |
| 2 | 3 | non-elderly | 310 | 18 | 328 |

8-22-83 letter from Funnell

1/ This Exhibit must be completed and attached to the Contract at the time the Agreement is executed. It may, however, be amended in accordance with program rules before the Contract is executed. When Contract Rents are amended (e.g. at the time of an annual adjustment) this format should be used.

2/ If less than 100 percent of the units in the project are covered by this Contract, identify specific units to be leased at initial rent-up to eligible families. See section 2.8(c)(6).

HAP CONTRACT: EXHIBIT 1a (TO STAGE 1)

SCHEDULE OF CONTRACT UNITS AND CONTRACT RENTS

| No. of Bedrooms | No. of Units | Household Type | Contract Rents | Personal Benefit Expense | Gross Rents |
|---|---|---|---|---|---|
| 1 BR | 19 | elderly | 205 | 15 | 220 |
| 1 BR | 29 | non-elderly | 205 | 15 | 220 |
| 2 BR | 10 | non-elderly | 280 | 16 | 296 |
| 2 BR | 3 | non-elderly | 310 | 18 | 328 |

61

EXECUTION OF CONTRACT WITH RESPECT TO
CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

Stage 1

This Contract is hereby executed with respect to the units described in Exhibit 1a.

EFFECTIVE DATE: The effective date of this Contract with respect to the units described in Exhibit 1a is AUG 2 5 1983, 19___.

United States of America
Secretary of Housing and
Urban Development

By ___________________
John G. Terranella
Director, Housing Division
(Official Title)

Date AUG 2 5 1983, 19___

OWNER Ben Alli (W)
Ben Alli

Shaki Alli
Shaki Alli

___________________

Date 7 - 24, 19 83

Exhibit 3

This Exhibit shows the initial and subsequent amounts of contract and budget authority obligated for project number: MI28-E000-037. (The Housing Division shall furnish the Legal Division with the information necessary to complete this Exhibit, with appropriate supporting documentation-including an ACC/HAP Contract List.)

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Agreement | $225,120 | 15 X $225,120 |
| Effective Date of Agreement Amendment:____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Agreement Amendment:____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Contract | $225,120 | 15 X $225,120 |
| Effective Date of Contract Amendment:____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Contract Amendment:____ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

"EXHIBIT 5"

The official Final Proposal for Project No. MI28-E000-037 is maintained on file in the

Processing Controls and Reports Section
U. S. Department of Housing and Urban Development
Detroit Area Office
Patrick V. McNamara Building - 15th Floor
477 Michigan Avenue
Detroit, Michigan 48226

The official Final Proposal consists of the following documents:

1. HUD Approval of Final Proposal.
2. Certifications by the Michigan State Housing Authority as to Project Compliance with HUD Regulations.
3. Actual Summary of Project Cost.
4. Legal Description of Site and MAP.
5. Evidence of Site Control.
6. Community Approval.
7. Previous Participation Clearance for Owner, Builder and Managing Agent - HUD 1441.1 (2530)
8. Project Description and Specifications Summary.
9. Statement of Financing Method and Terms.

The above-described official Final Proposal, together with all documents contained therein, is hereby incorporated within this Agreement as if fully contained therein.

EXHIBIT 6

HUD Standards For Decent, Safe and Sanitary Housing, 24 CFR 886.307

§ 886.307 Housing quality standards.

Housing used in this program not requiring substantial rehabilitation at the time of sale shall meet the performance requirements set forth in this section. In addition, the housing shall meet the acceptability criteria set forth in this section except for such variations as are approved by HUD. Local climatic conditions and geographic features and local housing and building codes are examples which may justify such variations.

(a) *Sanitary facilities.* (1) Performance requirement. The dwelling unit shall include its own sanitary facilities which are in proper operating condition, can be used in privacy, and are adequate for personal cleanliness and the disposal of human waste.

(2) *Acceptability criteria.* A flush toilet in a separate, private room, a fixed basin with hot and cold running water, and a shower or tub with hot and cold running water shall be present in the dwelling unit, all in proper operating condition. These facilities shall utilize an approved public or private disposal system.

(b) *Food preparation and refuse disposal*—(1) *Performance requirement.* The dwelling unit shall contain suitable space and equipment to store, prepare, and serve foods in a sanitary manner. There shall be adequate facilities and services for the sanitary disposal of food wastes and refuse, including facilities for temporary storage where necessary.

(2) *Acceptability criteria.* The unit shall contain the following equipment in proper operating condition: Cooking stove or range and a refrigerator of appropriate size for the unit, supplied by either the owner or the family, and a kitchen sink with hot and cold running water. The sink shall drain into an approved public or private system. Adequate space for the storage, preparation, and serving of food shall be provided. There shall be adequate facilities and services for the sanitary disposal of food wastes and refuse, including facilities for temporary storage where necessary (e.g., garbage cans).

(c) *Space and security*—(1) *Performance requirement.* The dwelling unit shall afford the family adequate space and security.

(2) *Acceptability criteria.* A living room, kitchen area, and bathroom shall be present; and the dwelling unit shall contain at least one sleeping or living/sleeping room of appropriate size for each two persons. Exterior doors and windows accessible from outside the unit shall be lockable.

(d) *Thermal environment*—(1) *Performance requirement.* The dwelling unit shall have and be capable of maintaining a thermal environment healthy for the human body.

(2) *Acceptability criteria.* The dwelling unit shall contain safe heating and/or cooling facilities which are in proper operating condition and can provide adequate heat and/or cooling to each room in the dwelling unit appropriate for the climate to assure a healthy living environment. Unvented room heaters which burn gas, oil, or kerosene are unacceptable.

(e) *Illumination and electricity*—(1) *Performance requirement.* Each room shall have adequate natural or artificial illumination to permit normal indoor activities and to support the health and safety of occupants. Sufficient electrical sources shall be provided to permit use of essential electrical appliances while assuring safety from fire.

(2) *Acceptability criteria.* Living and sleeping rooms shall include at least one window. A ceiling or wall type light fixture shall be present and working in the bathroom and kitchen area. At least two electric outlets, one of which may be an overhead light, shall be present and operable in the living area, kitchen area, and each bedroom area.

(f) *Structure and materials*—(1) *Performance requirement.* The dwelling unit shall be structurally sound so as not to pose any threat to the health and safety of the occupants and so as to protect the occupants from the environment.

(2) *Acceptability criteria.* Ceilings, walls and floors shall not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling or noticeable movement under walking stress, missing parts or other serious damage. The roof structure shall be firm and the roof shall be weathertight. The exterior wall structure and exterior wall surface shall not have any serious defects such as serious leaning, buckling, sagging, cracks or holes, loose siding, or other serious damage. The condition and equipment of interior and exterior

stairways, halls, porches, walkways, etc. shall be such as not to present a danger of tripping or falling. Elevators shall be maintained in safe and operating condition.

(i) In the case of a mobile home, the home shall be securely anchored by a tiedown device which distributes and transfers the loads imposed by the unit to appropriate ground anchors so as to resist wind overturning and sliding.

(g) *Interior air quality*—(1) *Performance requirement.* The dwelling unit shall be free of pollutants in the air at levels which threaten the health of the occupants.

(2) *Acceptability criteria.* The dwelling unit shall be free from dangerous levels of air pollution from carbon monoxide, sewer gas, fuel gas, dust and other harmful air pollutants. Air circulation shall be adequate throughout the unit. Bathroom areas shall have at least one operable window or other adequate exhaust ventilation.

(h) *Water supply*—(1) *Performance requirement.* The water supply shall be free from contamination.

(2) *Acceptability criteria.* The unit shall be served by an approved public or private sanitary water supply.

(i) *Lead-based paint*—(1) *Performance requirement.* (i) The dwelling unit shall be in compliance with HUD lead-based paint regulations, 24 CFR Part 35, issued pursuant to the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. 4801, and the owner shall provide a certification that the dwelling is in accordance with such HUD regulations.

(ii) If the property was constructed prior to 1950, the family upon occupancy shall have been furnished the notice required by HUD lead-based paint regulations and procedures regarding the hazards of lead-based paint poisoning, the symptoms and treatment of lead poisoning and the precautions to be taken against lead poisoning.

(2) *Acceptability criteria.* Same as performance requirement.

(j) *Access*—(1) *Performance requirement.* The dwelling unit shall be usable and capable of being maintained without unauthorized use of other private properties; and the building shall provide an alternate means of egress in case of fire.

(2) *Acceptability criteria.* The dwelling unit shall be usable and capable of being maintained without unauthorized use of other private properties. The building shall provide an alternate means of egress in case of fire (such as fire stairs or egress through windows).

(k) *Site and neighborhood.* Where a project is sold with an insured mortgage the site selection criteria of the insurance program shall be utilized in lieu of the requirements and criteria in this paragraph.

(1) *Performance requirement.* The site and neighborhood shall be reasonably free from disturbing noises and vibrations and other hazards to the health, safety, and general welfare of the occupants.

(2) *Acceptability criteria.* The site and neighborhood shall not be subject to serious adverse environmental conditions, natural or manmade, such as dangerous walks, steps, instability, flooding, poor drainage, septic tank backups, sewage hazards or mudslides, abnormal air pollution, smoke or dust, excessive noise, vibration or vehicular traffic, excessive accumulations of trash, vermin or rodent infestation or fire hazards.

(l) *Sanitary condition*—(1) *Performance requirement.* The unit and its equipment shall be in sanitary condition.

(2) *Acceptability criteria.* The unit and its equipment shall be free of vermin and rodent infestation.

(m) *Congregate housing.* The foregoing standards shall apply except for paragraph (b) of this section and the requirement in paragraph (c)(2) of this section for a kitchen area. In addition, the following standards shall apply:

(1) The unit shall contain and have ready access to a flush toilet which can be used in privacy, a fixed basin with hot and cold running water, and a shower and/or tub equipped with hot and cold running water all in proper operating condition and adequate for personal cleanliness and the disposal of human wastes. These facilities shall utilize an approved public or private disposal system, and shall be

sufficient in number so that they need not be shared by more than four occupants. These units' accommodating physically handicapped occupants with wheelchairs or other special equipment shall provide access to all sanitary facilities and shall provide, as appropriate to needs of the occupants, basins and toilets, of appropriate height, grab bars to toilets, showers and/or bathtubs, shower seats and adequate space for movement.

(l) The unit shall contain suitable space to store, prepare and serve foods in a sanitary manner. A cooking stove or range, a refrigerator(s) of appropriate size and in sufficient quantity for the number of occupants, and a kitchen sink with hot and cold running water shall be present in proper operating condition. The sink shall drain into an approved private or public system. Adequate space for the storage, preparation and serving of food shall be provided. There shall be adequate facilities and services for the sanitary disposal of food wastes and refuse, including facilities for temporary storage where necessary (e.g., garbage cans).

(m) The dwelling unit shall afford the family adequate space and security. A living room, kitchen, dining area, bathroom, and other appropriate social and/or recreational community space shall be within the unit, and the dwelling unit shall contain at least one sleeping room of appropriate size for each two persons. Exterior doors and windows accessible from outside each unit shall be capable of being locked. An emergency exit plan shall be developed and occupants shall be apprised of the details of the plan. Regular fire inspections shall be conducted by appropriate local officials. Readily accessible first aid supplies and fire extinguishers shall be provided throughout the unit, smoke detectors shall be provided and emergency phone numbers (police, ambulance, fire department, etc.) shall be available at every phone and individual copies shall be provided to each occupant. All emergency and safety features and procedures shall meet applicable State and local standards.

(n) *Independent group residence.* The foregoing standards shall apply except for [illegible] of this section. In addition, [illegible] and (m) of this section, Section 882.109(n) shall apply. [illegible]

(o) *Energy Efficiency—Performance Requirement.* Appropriate energy conservation improvements such as insulation, service improvements and caulking, weatherstripping and [illegible] must be accomplished by HUD or the purchaser as part of any rehabilitation under this Subpart. In addition, energy conserving improvements such as storm doors and windows must be considered by HUD and accomplished by HUD or the purchaser provided that these improvements are determined by HUD to be cost-effective. See 24 CFR Part 39.

Pingree Apartments
Detroit, Mich.

EXHIBIT 7

Lots 175 thru 178 inclusive - William L. Holmes Subdivision of Lots 10, 11, 12, 13, 14, and 15 of Montclair Subdivision of part of ¼ Sections 48, and 53, 10,000 Acre Tract, Greenfield Twp., now City of Detroit, Wayne County, Michigan.

Recorded in Liber 18 of Plats, Page 18, Wayne County Records.

and

Lots 186, 187, 188, 189, 190 - Austins Subdivision of part of ¼ Section 47, 10,000 Acre Tract, Greenfield, now City of Detroit, Wayne County, Michigan.

Recorded in Liber 30 of Plats, Page 45, Wayne County Records.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM

PART II OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

By and between Department of Housing & Urban Development (CA) and
Ben and Shaki Alli (Owner).

Check Type of Project: Private-Owner/HUD X or FHA-Owner/HUD ____
(HUD is the Contract Administrator or "CA.")

or Private-Owner/PHA ____
(The PHA is the CA)

NEW CONSTRUCTION Part 880 ____ Part 885 ____ or SUBSTANTIAL REHABILITATION Part 881 ____ Part 885 ____ or PREVIOUSLY HUD-OWNED Part 886, Subpart C X

SECTION 8 PROJECT NUMBER: MI28-E000-037

FHA PROJECT NUMBER (if applicable): 044-44110-PD

2.1 OWNER'S WARRANTIES; AMENDMENTS.

(a) Legal Capacity. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

(b) Completion of Work. The Owner warrants that the project as described in section 1.1 is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract (Agreement) or will be completed in accordance with the Special Conditions for Acceptance (see attached exhibit, where applicable). The Owner further warrants that it will remedy any defects or omissions covered by this warranty if called to its attention within 12 months of the affective date of this Contract. The Owner and the CA agree that the continuation of this Contract shall be subject to the Owner meeting any Special Conditions for Acceptance.

2.2 FAMILIES TO BE HOUSED; CONTRACT ADMINISTRATOR (CA) ASSISTANCE.

(a) Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower-Income Families (Families) for occupancy by such Families solely as private dwellings and as their principal place of residence. (See also section 2.10.)

(b) CA Assistance.

(1) The CA hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable the Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act.

(2) If there is a Utility Allowance and if the Allowance exceeds the total Family contribution, the Owner shall pay the Family the amount of the excess. The CA will pay funds to the Owner in trust solely for the purpose of making this payment. Any pledge by the Owner of payments properly payable under this Contract shall not be construed to include payments covered by this paragraph (b)(2). (See 24 CFR section 880.501(e), 881.501(e), or 886.309(a).)

2.3 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

(a) Maximum Annual Contract Commitment. Notwithstanding any other provisions of this Contract (other than paragraph (b)(2) of this section) or any provisions of any other contract between the CA and the Owner, the CA shall not be obligated to make and shall not make any housing

assistance payments (or pay any fees where a PHA is a party to this Contract for the purpose of authorizing terminations in the case of previously HUD-owned projects) under this Contract in excess of the amount identified in section 1.1(c). However, this amount may be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

(b) Project Account.

(1) A project account will be established and maintained by HUD, consistent with its responsibilities under section 8(c)(6) of the Act, as a specifically identified and segregated account for the project. The account will be established and maintained, in an amount determined by HUD, out of the amounts by which the Maximum Annual Contract Commitment under section 1.1(c) (for Private-Owner/HUD or PHA-Owner/HUD Projects) or Maximum ACC Commitment (for Private-Owner/PHA Projects) exceeds the amount actually paid out under the Contract or ACC each fiscal year. Payments will be made from the account for housing assistance payments (and fees for PHA administration) when needed to cover increases in Contract Rents or decreases in tenant rents and for other costs specifically approved by the Secretary.

(2) If funds are available in the project account, the maximum annual contribution payable for any fiscal year will be increased by the amount, if any, as may be required for housing assistance payments (and fees where the CA is a PHA) to cover increases in Contract Rents or decreases in rents payable by Families and other costs approved by HUD.

(3) Whenever a HUD-approved estimate of the required annual contribution for a fiscal year exceeds the maximum annual commitment and would cause the amount in the project account to be less than 40 percent of the maximum annual commitment, HUD will, within a reasonable period of time, take such additional steps authorized by section 8(c)(6) of the U.S. Housing Act of 1937 as may be necessary to assure that payments under the Contract and ACC (if applicable) will be adequate to cover increases in Contract Rents and decreases in rents payable by Families, including (as provided in that section of the Act) "the reservation of annual contributions authority for the purpose of amending housing assistance contracts, or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts."

(4) Any amount remaining in the account after payment of the last Annual Contribution with respect to the project shall be applied by HUD in accordance with law.

2.4 HOUSING ASSISTANCE PAYMENTS TO OWNERS.

(a) Housing Assistance Payments on Behalf of Families.

(1) Housing assistance payments shall be paid to the Owner for units under lease for occupancy by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of the rent payable by the Family as determined in accordance with the HUD-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by the Family shall be subject to change by reason of changes in Family Income, Family composition, extent of exceptional medical or other unusual expenses or program rules in accordance with the HUD-established schedules and criteria; or by reason of a change in any applicable Utility Allowance approved or required by the CA. Any such change shall be effective as of the date stated in a notification of the change to the Family, which need not be at the end of the Lease term.

(b) Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract (or within 15 days of the effective date of this Contract in the case of previously HUD-owned projects), the Owner is entitled to housing assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period

not exceeding 60 days from the effective date of the Contract, provided that the Owner (1) commenced marketing and otherwise complied with section 2.2(d) of the Agreement, (2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on its waiting list, if any, requesting the PHA and other appropriate sources to refer eligible applicants, and advertising the availability of the unit in a manner specifically designed to reach eligible families, and (3) has not rejected any eligible applicant, except for good cause acceptable to the CA.

(c) Vacancies after Rent-Up. If an eligible family vacates a unit, the owner is entitled to housing assistance payments in the amount (except as provided in paragraph (d) of this section) of 80 percent of the Contract Rent for the first 60 days of vacancy if the Owner:

(1) Certifies that it did not cause the vacancy by violating the lease, the Contract or any applicable law or by moving a Family to another unit;

(2) Notified the CA of the vacancy or prospective vacancy and the reasons for it immediately upon learning of the vacancy or prospective vacancy;

(3) Has fulfilled and continues to fulfill the requirements specified in paragraphs (b)(1), (2), and (3) of this section; and

(4) Certifies that any eviction resulting in a vacancy was carried out in compliance with section 2.9.

(d) Payments for Vacancies after Initial Occupancy in Previously HUD-Owned Projects. In the case of previously HUD-owned projects, the Owner may receive housing assistance payments for so much of the month in which the Family vacates the unit as the unit remains vacant. Should the unit remain vacant, the Owner may receive from HUD a housing assistance payment in the amount of 80 percent of the Contract Rent for a vacancy period not exceeding an additional month. However, if the Owner collects any of the Family's share of the rent for this period, the payment for the vacancy period must be reduced to an amount which, when added to the Family's payments, does not exceed 80 percent of the Contract Rent. Any such excess shall be reimbursed by the Owner to HUD or as HUD may direct. Paragraphs (c)(1) through (4) apply.

(e) Vacancies for Longer than 60 Days. Except for previously HUD-owned projects not requiring substantial rehabilitation, if an assisted unit continues to be vacant after the period specified in paragraph (b), (c) or (d) of this section, the Owner may apply to receive additional payments for the vacancy period in an amount equal to the principal and interest payments required to amortize that portion of the debt service attributable to the vacant unit (see Exhibit 2) for up to 12 additional months for the unit if:

(1) The unit was in decent, safe and sanitary condition during the vacancy period for which payments are claimed;

(2) The owner has fulfilled and continues to fulfill the requirements specified in paragraph (b), (c) or (d) of this section, as appropriate; and

(c) The owner has demonstrated to the satisfaction of HUD that:

(i) For the period of vacancy, the project is not providing the owner with revenues at least equal to project expenses (exclusive of depreciation), and the amount of payments requested is not more than the portion of the deficiency attributable to the vacant unit, and

(ii) The project can achieve financial soundness within a reasonable time.

(f) Prohibition of Double Compensation for Vacancies. The owner is not entitled to payments for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, payments from the CA under section 2.8(b), and governmental payments under other programs). If the Owner collects any of the Family's share of the rent for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Contract Rent, the excess must be reimbursed as HUD directs.

(g) CA Not Obligated for Family Rent. The CA has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with section 2.8(b) of this Contract.

The financial obligation of the CA is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

(h) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the CA or as directed by the CA for housing assistance payments. Each request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit 1 for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with section 2.2(b)(2)); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive any payments or other consideration from the Family, the PHA, HUD, or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, the CA (or HUD where the CA is a PHA), in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(i) Payments to Trustee by PHA Where It Is the Lender. (See section 1.4 for applicability of this paragraph.) The amount of the housing assistance payment determined in accordance with the provisions of this Contract, up to the amount of the mortgage repayments due the PHA from the Owner pursuant to the mortgage loan made by the PHA for the project, shall be credited to the Owner and transferred monthly by the PHA from the account maintained under the General Depositary Agreement pursuant to the ACC to the trustee under the note or bond resolution of the PHA under which the notes or bonds to provide the mortgage loan were issued. Any amount of the housing assistance payment in excess of such credit shall be paid by the PHA directly to the Owner.

2.5 MAINTENANCE, OPERATION AND INSPECTION.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe, and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). The Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 35. If the CA determines that the Owner is not meeting one or more of these obligations, the CA shall have the right to take action under section 2.21(b).

(b) Inspection.

(1) Prior to occupancy of any Contract Unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed or approved by the CA, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(2) The CA shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times (including prior to initial occupancy and rerenting of any unit) as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition including the provision of the agreed-upon utilities and other services. The CA shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

(c) Units Not Decent, Safe, and Sanitary. If the CA notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the CA may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the CA does not have other section 8 funds for such purposes, the CA may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of rent payable by the Family.

(d) Notification of Abatement. Any reduction or suspension of housing assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family of any such abatement.

(e) Overcrowded and Underoccupied Units. Where the CA determines a unit is larger or smaller than appropriate for an eligible family, the Owner agrees to correct the situation in accordance with HUD regulations and requirements in effect at the time of the determination.

2.6 FINANCIAL REQUIREMENTS.

(a) Submission of Financial and Operating Statements.

The Owner must submit to the CA:

(1) Within 60 days after the end of each fiscal year of the project, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(2) Other statements as to project operation, financial conditions and occupancy as HUD may require pertinent to administration of the Contract and monitoring of project operations.

(b) Use of Project Funds. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) Project funds must be used for the benefit of the project, to make mortgage payments, to pay operating expenses, to make required deposits to the replacement reserve in accordance with paragraph (c) of this section and to provide distributions

to the Owner as provided in paragraph (d). To the extent HUD determines that project funds are more than needed for these purposes, the surplus project funds must be deposited with the mortgagee or other HUD-approved depositary in an interest-bearing residual receipts account. Withdrawals from this account will be made only with the approval of HUD and for project purposes, including the reduction of housing assistance payments. Upon termination of the Contract, any excess funds must be remitted to HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (b) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(c) Replacement Reserve. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) The Owner shall establish and maintain a replacement reserve in an interest-bearing account to aid in funding extraordinary maintenance and repair and replacement of capital items in accordance with applicable regulations.

(i) The obligation of the Owner to deposit into the replacement reserve shall commence upon the effective date of the Contract. For staged projects, the obligation shall commence on a pro rata basis for units in each stage on the effective date of the Contract for that stage. The amount of the deposit to the replacement reserve will be adjusted each year by the amount of the automatic annual adjustment factor. See 24 CFR Part 888.

(ii) The reserve must be built up to and maintained at a level determined by HUD to be sufficient to meet projected requirements. Should the reserve achieve that level, the rate of deposit to the reserve may be reduced with the approval of HUD.

(iii) All earnings including interest on the reserve must be added to the reserve.

(iv) Funds will be held by the mortgagee or trustee for the bondholders, and may be drawn from the reserve and used only in accordance with HUD guidelines and with the approval of, or as directed by, HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (c) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially-assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(d) Limitation on Distributions. (Paragraphs (d)(2)-(4) are not applicable to Small, Partially Assisted or Previously HUD-Owned Projects.)

(1) Nonprofit owners are not entitled to distributions of project funds.

(2) For the life of the Contract, project funds may only be distributed to profit-motivated owners at the end of each fiscal year of project operation following the effective date of the Contract after all project expenses have been paid, or funds have been set aside for payment, and all reserve requirements have been met. The first year's distribution may not be made until cost certification, where applicable, is completed. Distributions may not exceed the following maximum returns:

(i) For projects for elderly families, the first year's distribution will be limited to 6 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(ii) For projects for nonelderly families, the first year's distribution will be limited to 10 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(3) For the purpose of determining the allowable distribution, an Owner's equity investment shall be computed in accordance with HUD regulations and requirements.

(4) Any short-fall in return may be made up from surplus project funds (see paragraph (b)(1)) in future years.

(5) In the case of HUD-insured projects, the provisions of this section will apply instead of the otherwise applicable mortgage insurance program regulations, except in the case of small, partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance regulations.

2.7 RENT ADJUSTMENTS.

(a) Funding of Adjustments. Housing assistance payments will be made in amounts commensurate with Contract Rent adjustments under this section up to the maximum amount authorized under section 2.3(a) of this Contract.

(b) Annual Adjustments.

(1) Upon request from the Owner to the CA, Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 CFR 888 and this Contract. See, however, paragraph (d).

(2) In the case of previously HUD-owned projects, the Contract Rents shall be adjusted in accordance with 24 CFR 886, Subpart C and this Contract.

(3) Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the annual adjustment result in Contract Rents less than the Contract Rents on the effective date of the Contract.

(c) Special Additional Adjustments. Special additional adjustments shall be granted, when approved by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, assessments, and utilities not covered by regulated rates. The Owner must demonstrate that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by annual adjustments. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase. See, however, paragraph (d).

(d) Overall Limitation. Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that the differences existed with respect to the Contract Rents set at Contract execution or cost certification, where applicable.

(e) Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit 1 by a dated addendum to the exhibit establishing the effective date of the adjustment.

(f) Adjustment of Contract Rents based on Cost Certification. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner. Within 60 days after HUD accepts the project (or accepts the last stage, where applicable), or any extensions approved by HUD for good cause, the Owner will certify the actual costs estimated in the Final Proposal or Purchase and Use Plan of the replacement cost, operating expenses, income, and debt service, and submit a cost certification including the certificate of an Independent Public Accountant to HUD in the manner and form prescribed by HUD, based on the following guidelines:

(i) Projects which involve HUD mortgage insurance will be subject to the cost certification requirements of the applicable insurance program;

(ii) For projects not insured by HUD, a simplified form of cost certification as prescribed by HUD will be completed and submitted.

(2) HUD Review. Cost certifications will be subject to review by HUD. As part of this review, the Owner and/or contractor may be required to submit additional documentation.

(3) Reduction of Contract Rents. If the Owner's certified costs provided in accordance with paragraph (f)(1) of this section, as approved by HUD, are less than the cost estimates provided in the Final Proposal or Purchase and Use Plan, the Contract Rents will be reduced accordingly.

(4) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (f)(3) of this section, the maximum annual Contract commitment (and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA.

(g) Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Obligations Issued by a Participating State Agency Not Subject to Part 811 (See section 1.4 for applicability of this paragraph.) After the project is permanently financed, the financing agency shall submit a certification to HUD specifying the actual financing terms. If the actual debt service to the Owner under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the initial Contract Rents or the Contract Rents then in effect shall be reduced commensurately and the amount of savings credited to the project account. The maximum annual Contract commitment (and the maximum annual ACC commitment, in the case of Private-Owner/PHA projects) will not be reduced.

(h) Adjustment of Contract Rents to Reflect Actual Cost for Projects Subject to Part 811. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner and Financing Agency. The Owner and the financing agency shall submit certified statements as to the financing and other costs as required by Part 811 prior to final endorsement. Based on the certified statements, HUD will determine whether any reduction in initial Contract Rents is required under Part 811. Promptly after HUD notification, the Owner and the financing agency agree to amend the Contract to reduce the ~~initial Contract Rents to the extent required by HUD.~~ See sections 2.3(b)(5) and (6) of the Agreement, as appropriate.

(2) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (h)(1) of this section, the maximum annual Contract commitment(and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA.

(i) Adjustment of Contract Rents Due to Property Tax Exemption or Similar Savings. The Contract Rents may be reduced to reflect real property tax exemption or similar savings where the initial Contract Rents were approved on the assumption that the project would not receive the benefit of tax abatement or similar savings. The Owner agrees to notify the CA in the event such a project begins to receive such an exemption or similar savings so that the initial Contract Rents or the Contract Rents then in effect may be reduced.

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, sex, handicap, or national origin and in the case of previously HUD-owned projects in accordance with the tenant selection factors shown as Exhibit 6.

(b) Security Deposits. The Owner agrees to comply with applicable section 8 regulations and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) Except for those families in previously HUD-owned projects determined by HUD at the time of the sale of the project to be eligible for section 8, the Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, computation of the amount of housing assistance payments on behalf of each selected Family and of total Family contributions and recordkeeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) In the initial renting of the Contract Units, the Owner must lease at least 30 percent to Very Low-Income Families (determined in accordance with HUD-established schedules and criteria). However, if this requirement cannot be met for substantial rehabilitation or previously HUD-owned projects because of families already residing in the project, HUD may permit the leasing of less than 30 percent of the units to Very Low-Income Families. Thereafter the Owner shall exercise best efforts to maintain (or achieve and maintain) at least 30 percent occupancy of the Contract Units by Very Low-Income Families. In addition, at all times, the Owner will use its best efforts to achieve leasing to Families with a range of incomes so that the average of incomes of all Families in occupancy is at or above 40 percent of the median income in the area.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD.

(5) (i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least as often as required by HUD regulations or other requirements, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with applicable HUD regulations and requirements.

(ii) If a family reports a change in income or other circumstances that would result in a decrease of total family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total family contribution. The Owner may require in its lease that families report increases in income or other changes between scheduled reexaminations.

(iii) In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families and what the average Family income is. If there are fewer than 30 percent Very Low-Income Families in occupancy, or the average income is below 40 percent of the median, the Owner shall report the fact to HUD and shall adopt appropriate changes in its admission policies.

(iv) A Family's eligibility for housing assistance payments continues until its total Family contribution equals the total housing expense for the unit it occupies. The termination of

eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) Where fewer than 100 percent of the units in the project are covered by this Contract, assisted Families shall be dispersed throughout. At initial rent-up, the Owner shall lease the units identified in Exhibit 1 to eligible Families. Thereafter, the Owner may lease other units of appropriate size and type to eligible Families in accordance with Exhibit 1. For projects with units for both elderly and non-elderly Families, the respective family types may be grouped together.

(7) The Owner shall maintain as confidential all information relating to section 8 applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Rent Redetermination after Adjustment in Utility Allowance. In the event that the Owner is notified of a CA determination approving or requiring an adjustment in the Utility Allowance applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

(e) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD and PHA regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD or the PHA.

(f) Review: Incorrect Payments. In making housing assistance payments to Owners, the PHA or HUD will review the Owner's determinations under this section. If as a result of this review, or other reviews, audits or information received by the PHA or HUD at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the PHA or HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery.

2.9 TERMINATION OF TENANCY OR SECTION 8 ASSISTANCE BY THE OWNER.

The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements in effect at the time of the termination, and any State and local law.

2.10 REDUCTION OF NUMBER OF UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

(a) Limitation on Leasing to Ineligible Families. Except in the case of previously HUD-owned projects, the Owner may not at any time during the term of this Contract lease more than 10 percent of the assisted units in the project to families which are ineligible under section 8 requirements at initial occupancy without the prior approval of HUD. Failure on the part of the Owner to comply with this prohibition is a violation of the Contract and grounds for all available legal remedies, including specific performance of the Contract, suspension or debarment from HUD programs and reduction of the number of units under the Contract, as set forth in paragraph (b) of this section. (See also Section 2.21.)

(b) Reduction for Failure to Lease to Eligible Families - New and Rehab Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have at least 90 percent of the assisted units leased or available for leasing by families eligible under section 8 requirements at initial occupancy, HUD (or the PHA at the direction of HUD, as appropriate) may, on at least 30 days' notice, reduce the number of units covered by the Contract. HUD or the PHA may reduce the number of units to the number of units actually leased or available for leasing plus 10 percent (rounded up). This reduction, however, will not be made if the failure to lease units to eligible families is permitted in writing by HUD under paragraph (a) of this section.

(c) Reduction --Previously HUD-Owned Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have all of the assisted units leased or available for leasing by families eligible under section 8 requirements at initial occupancy, HUD may, on 30 calendar days' notice, reduce the number of Contract units to not less than the number of Contract units under lease, plus 10 percent of such number if the number is 10 or more, rounded up. Failure by the Owner to make a reasonable effort to lease the units to eligible Families shall be a violation of the Contract and grounds for all legal remedies including those specified in paragraph (a) and section 2.21.

(d) Restoration. HUD will agree to an amendment of the ACC or the Contract, as appropriate, to provide for subsequent restoration of any reduction made pursuant to paragraph (b) or (c) of this section if:

(1) HUD determines that the restoration is justified by demand,

(2) The Owner otherwise has a record of compliance with its obligations under the Contract, and

(3) Contract authority is available. (HUD will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out its agreement.)

2.11 NONDISCRIMINATION.

(a) General. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, national origin, or handicap.

(b) Members of Certain Classes. The Owner shall not automatically exclude anyone from participation in, or deny anyone the benefits of, the Housing Assistance Payments Program because of membership in a class, such as unmarried mothers, recipients of public assistance, handicapped persons.

(c) Title VIII of the Civil Rights Act of 1968. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, which prohibits discrimination in the sale, rental, financing and advertising of housing on the basis of race, color, religion, sex, or national origin, and any related rules and regulations.

(d) Title VI of the Civil Rights Act of 1964 and Executive Order 11063. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. et seq.; the HUD Regulations issued thereunder, 24 CFR, Subtitle A, Part 1; the HUD requirements pursuant to these regulations; and Executive Order 11063 and any regulations and requirements issued thereunder, to the end that, in accordance with that Act, Executive Order 11063, and the regulations and requirements of HUD, no person in the United States shall, on the grounds of race, color, creed, or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of HUD, 24 CFR, Subtitle A, Part 1 issued under Title VI of the Civil Rights Act of 1964, HUD regulations issued pursuant to Executive Order 11063 and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply therewith inures to the benefit of the United States of America, HUD, and the PHA (where the CA is a PHA), any of which shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by the Owner.

(e) Section 504 of the Rehabilitation Act of 1973. The Owner shall comply with all the requirements imposed by section 504 of the Rehabilitation Act of 1973, as amended, and any related rules and regulations. Section 504 provides that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance. Accordingly, the Owner (1) shall not discriminate against any qualified handicapped person on the basis of handicap and (2) shall

(c) Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders issued by HUD thereunder prior to execution of this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors, and assigns to the sanctions specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

(d) The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Agreement in excess of $50,000 cost, the following clause:

EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from HUD and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area, and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B The parties to this Contract will comply with the provisions of section 3 and the regulations issued pursuant thereto by HUD as set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontractor is in violation of regulations issued by HUD, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

"E Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of the Housing Assistance Payments Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors, and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors, and assigns to those sanctions specified by the Housing Assistance Payments Contract, and to such sanctions as are specified by 24 CFR, Section 135.135."

(e) The Owner agrees that it will be bound by the above section 3 clause with respect to its own employment practices when it participates in federally assisted work.

2.14 FLOOD INSURANCE. (See section 1.4 for applicability.)

The Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.15 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT. (See section 1.4 for applicability of this section.)

In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees:

(a) Not to utilize any facility in the performance of this Contract or any nonexempt subcontractor which is listed on the EPA List of Violating Facilities pursuant to section 15.20 of the regulations;

(b) Promptly to notify the CA of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

(c) To comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 of the Air Act and section 308 of the Water Act, and all regulations and guidelines issued thereunder; and

(d) To include or cause to be included the provisions of this Contract in every nonexempt subcontract and take such action as HUD may direct as a means of enforcing such provisions.

2.16 REPORTS AND ACCESS TO PREMISES AND RECORDS.

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD and the PHA (where the CA is a PHA).

(b) The Owner shall permit HUD and the PHA (where the CA is a PHA) or any of their duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.17 DISPUTES.

(a) For Private-Owner/PHA Projects:

(1) Any dispute concerning a question of fact arising under this Contract which cannot be resolved by the PHA and the Owner may be submitted by either party to the HUD Field Office which will promptly make a decision and furnish a written copy to the Owner and the PHA.

(2) The decision of the Field Office will not be reviewable unless, within 30 calendar days from the date of receipt of the Field Office's determination, either party mails or otherwise furnishes to HUD a written appeal with written justification addressed to the Secretary of Housing and Urban Development. Both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office pending resolution of the appeal.

(b) For Private-Owner/HUD or PHA-Owner/HUD Projects:

Any dispute concerning a question of fact arising under this Contract which cannot be resolved by agreement between the HUD Field Office and the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. Both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office, pending resolution of the appeal.

2.18 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY, OR OTHER PUBLIC OFFICIALS.

(a) No person or entity in the following classes shall have an interest, direct or indirect, in this Agreement or in any proceeds or benefits arising from it, during his or her tenure or for one year thereafter.

(1) any member or officer of the PHA (where it is the CA or the Owner), except where his or her interest is as tenant;

(2) (i) any employee of the PHA (where it is the CA or the Owner) who formulates policy or influences decisions with respect to the section 8 project;

(ii) any other employee of the PHA (where it is the CA or the Owner), except where his or her interest is as a tenant;

(3) any member of the governing body or the executive officer of the locality (city or county) in which the project is situated;

(4) any member of the governing body or executive officer of the locality (city or county) in which the PHA (where it is the CA or the Owner) was activated;

(5) any other State or local public official (including State legislators), who exercises any functions or responsibilities with respect to the section 8 project;

(6) any PHA (which is not the CA), where any of its members, officers, or employees has a personal interest in the project, including an interest by reason of membership on the board of the PHA which is the CA (except an employee who does not formulate policy or influence decisions with respect to the section 8 project may have an interest as a tenant).

(b) Members of the classes described in paragraph (a) who involuntarily acquire an interest in the section 8 program or in a section 8 project, or who had acquired prior to the beginning of their tenure any such interest, must disclose any interest or prospective interest to the PHA (where it is the CA or the Owner) and the HUD Field Office, and may, with appropriate justification, if consistent with State law, apply to the HUD Field Office (through the PHA where it is the CA) for a waiver. Any other requests for waivers of paragraph (a) must be referred to the HUD Headquarters, with appropriate recommendations from the Field Office, for a determination of whether a waiver will be granted.

(c) No person to whom a waiver is granted shall be permitted (in his or her capacity as member of a class described in paragraph (a)) to exercise responsibilities or functions with respect to an Agreement or a Contract executed, or to be executed, on his or her behalf, or with respect to an Agreement or a Contract to which this person is a party.

(d) The Owner shall insert in all contracts, subcontracts, and arrangements entered into in connection with the project or any property included or planned to be included in the project, and shall require its contractors and subcontractors to insert in each of the subcontracts, the provisions of paragraphs (a) through (d).

(e) The provisions of paragraphs (a) through (d) of this section shall not apply to a utility service if the rates are fixed or controlled by a governmental agency or applicable to the Depositary Agreement.

2.19 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

2.20 ASSIGNMENT, SALE OR FORECLOSURE.

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, the ACC (if applicable), or the project or any part of them or any of its interest in them, without the prior written consent of HUD (and the PHA where it is the CA). However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD (and the PHA where it is the CA) shall consent in writing if HUD has approved the terms of the financing.

(b) The Owner agrees to notify HUD (and the PHA where it is the CA) promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD (and the PHA where it is the CA).

(c) (1) For purposes of this section, a sale, assignment, conveyance, or transfer includes but is not limited to one or more of the following:

(i) A transfer by the Owner, in whole or in part,

(ii) A transfer by a party having a substantial interest in the Owner,

(iii) Transfers by more than one party of interests aggregating a substantial interest in the Owner,

(iv) Any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution of interests by any other method or means, and

(v) Any refinancing by the Owner of the project.

(2) An assignment by the Owner to a limited partnership, in which the Owner is the sole general partner, and of which no limited partner has a 25 percent or more interest, shall not be considered an assignment, conveyance, or transfer. An assignment by one or more general or limited partners of a limited partnership interest to a limited partner, who will have no more than a 25 percent interest, shall not be considered an assignment, conveyance, or transfer.

(3) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(d) The Owner and the party signing this Contract on behalf of the Owner represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect to it.

(e) Except where otherwise approved by HUD, this Contract, the Agreement, and the ACC (if applicable) shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event:

(1) Of assignment, sale, or other disposition of the project or this Contract, the Agreement, or the ACC,

(2) Of foreclosure, including foreclosure by HUD,

(3) Of assignment of the mortgage or deed in lieu of foreclosure,

(4) The PHA or HUD takes over possession, operation or ownership,

(5) The Owner prepays the mortgage.

2.21 DEFAULTS BY PHA AND/OR OWNER.

(a) Rights of Owner if PHA Defaults under Contract (for Private-Owner/PHA Projects).

(1) Events of Default. The occurrence of any of the following events, if the Owner is not in default, is defined as a default under the ACC:

(i) If the PHA fails to perform or observe any term or condition of this Contract;

(ii) If the Contract is held to be void, voidable, or ultra vires;

(iii) If the power or right of the PHA to enter into the Contract is drawn into question in any legal proceeding; or

(iv) If the PHA asserts or claims that the Contract is not binding upon the PHA for any such reason.

(2) Owner Request for HUD Determination of Default.

If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event:

(i) Notify HUD of the occurrence of the event;

(ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and

(iii) Request HUD to determine whether there has been a default.

(3) HUD Determination of Default and Curing of Default.

HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines tha the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Contract, including any funds. HUD shall continue to pay annual contributions with respect to the units covered by this Contract in accordance with the ACC and this Contract until reassigned to the PHA. All rights and obligations of the PHA assumed by HUD will be returned as constituted at the time of the return:

(i) When HUD is satisfied that all defaults have been cured and that the project will thereafter be administered in accordance with all applicable requirements, or

(ii) When the Contract is at an end, whichever occurs sooner.

(4) Enforcement by Owner. The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

(b) Rights of PHA and HUD if Owner Defaults under Contract.

(1) Events of Default.

A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies

identified by the CA in connection with any annual or other inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii) For projects with mortgages insured by HUD or loans made by HUD, the Owner has violated or failed to comply with the regulations for the applicable insurance or loan program, with the insured mortgage, or with the regulatory agreement; or the Owner has filed any false statement or misrepresentation with HUD in connection with the mortgage insurance or loan.

(2) CA Determination of Default.

Upon a determination by the CA that a default has occurred, the CA shall notify the Owner and the lender, with a copy to HUD where the CA is a PHA, of

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

(iii) The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.

If the Owner and/or lender fail to respond or take action to the satisfaction of the CA (and HUD where the CA is a PHA), the CA shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD (where the CA is a PHA).

(3) Corrective Actions.

Pursuant to paragraph (b)(2) of this section the CA, in its discretion or as directed by HUD (where the CA is a PHA), may take the following corrective actions either directly or in conjunction with or acting through a PHA:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If the CA takes possession, housing assistance payments shall continue in accordance with the Contract.

(ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other loan documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to the PHA and/or HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

(iv) Reduce or suspend housing assistance payments.

(v) Recover any overpayments.

(4) HUD Rights.

(For Private-Owner/PHA projects where the PHA is the lender.)

(i) Notwithstanding any other provisions of this Contract, in the event HUD determines that the Owner is in default of its obligations under the Contract, HUD shall have the right, after notice to the Owner, the trustee, if any, and the PHA giving them a reasonable opportunity to take corrective action, to proceed in accordance with paragraph (b)(3).

(ii) In the event HUD takes any action under this section, the Owner and the PHA hereby expressly agree to recognize the rights of HUD to the same extent as if the action were taken by the PHA. HUD shall not have the right to terminate the Contract except by proceeding in accordance with paragraphs (b)(1), (2), and (3) of this section and with the ACC.

(c) Remedies Not Exclusive and Non-Waiver of Remedies. The availability of any remedy under this Contract or the ACC, where applicable, shall not preclude the exercise of any other remedy under this Contract or the ACC or under any provisions of Law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

2.22 RELATIONSHIP OF PARENT ENTITY PHA AS OWNER TO AGENCY OR INSTRUMENTALITY PHA UNDER PART 811.

The Parent Entity PHA agrees to perform the functions with regard to the Agency or Instrumentality PHA required by the HUD regulations pursuant to which the relationship between the two PHAs was established and to which HUD approved the Agency or Instrumentality PHA.

HAP AGREEMENT: EXHIBIT C
SCHEDULE OF COMPLETION IN STAGES

| | No. of units | Bedroom/Unit | Household Type | Estimated Date of Completion |
|---|---|---|---|---|
| ıge 1 | 19 | 1 BR | elderly | 8/25/83 |
| | 29 | 1 BR | non-elderly | 8/25/83 |
| | 10 | 2 BR | non-elderly | 8/25/83 |
| | 3 | 2 BR | non-elderly | 8/25/83 |
| | 61 | | | |
| age 2 | 10 | 1 BR | non-elderly | 10/1/83 |
| age 3 | 5 | 1 BR | elderly | 11/1/83 |
| age 4 | 3 | 1 BR | elderly | 2/1/84 |
| | 1 | 2 BR | non-elderly | 2/1/84 |

EXHIBIT D

HUD Standards For Decent, Safe and
Sanitary Housing, 24 CFR 886.307

§ 886.307 Housing quality standards.

Housing used in this program not re-
quiring substantial rehabilitation at
the time of sale shall meet the per-
formance requirements set forth in
this section. In addition, the housing
shall meet the acceptability criteria

set forth in this section except for
such variations as are approved by
HUD. Local climatic conditions and ge-
ographic features and local housing
and building codes are examples which
may justify such variations.

(a) *Sanitary facilities*. (1) Perform-
ance requirement. The dwelling unit
shall include its own sanitary facilities
which are in proper operating condi-
tion, can be used in privacy, and are
adequate for personal cleanliness and
the disposal of human waste.

(2) *Acceptability criteria*. A flush
toilet in a separate, private room, a
fixed basin with hot and cold running
water, and a shower or tub with hot
and cold running water shall be pres-
ent in the dwelling unit, all in proper
operating condition. These facilities
shall utilize an approved public or pri-
vate disposal system.

(b) *Food preparation and refuse dis-
posal*—(1) *Performance requirement*.
The dwelling unit shall contain suit-
able space and equipment to store,
prepare, and serve foods in a sanitary
manner. There shall be adequate facil-
ities and services for the sanitary dis-
posal of food wastes and refuse, in-
cluding facilities for temporary stor-
age where necessary.

(2) *Acceptability criteria*. The unit
shall contain the following equipment
in proper operating condition: Cooking
stove or range and a refrigerator of ap-
propriate size for the unit, supplied by
either the owner or the family, and a
kitchen sink with hot and cold run-
ning water. The sink shall drain into
an approved public or private system.
Adequate space for the storage, prepa-
ration, and serving of food shall be
provided. There shall be adequate
facilities and services for the sanitary
disposal of food wastes and refuse, in-
cluding facilities for temporary stor-
age where necessary (e.g., garbage
cans).

(c) *Space and security*—(1) *Perform-
ance requirement*. The dwelling unit
shall afford the family adequate space
and security.

(2) *Acceptability criteria*. A living
room, kitchen area, and bathroom
shall be present; and the dwelling unit
shall contain at least one sleeping or
living/sleeping room of appropriate
size for each two persons. Exterior

doors and windows accessible from
outside the unit shall be lockable.

(d) *Thermal environment*—(1) *Per-
formance requirement*. The dwelling
unit shall have and be capable of
maintaining a thermal environment
healthy for the human body.

(2) *Acceptability criteria*. The dwell-
ing unit shall contain safe heating
and/or cooling facilities which are in
proper operating condition and can
provide adequate heat and/or cooling
to each room in the dwelling unit ap-
propriate for the climate to assure a
healthy living environment. Unvented
room heaters which burn gas, oil, or
kerosene are unacceptable.

(e) *Illumination and electricity*—(1)
*Performance requirement*. Each room
shall have adequate natural or artifi-
cial illumination to permit normal
indoor activities and to support the
health and safety of occupants. Suffi-
cient electrical sources shall be pro-
vided to permit use of essential electri-
cal appliances while assuring safety
from fire.

(2) *Acceptability criteria*. Living and
sleeping rooms shall include at least
one window. A ceiling or wall type
light fixture shall be present and
working in the bathroom and kitchen
area. At least two electric outlets, one
of which may be an overhead light,
shall be present and operable in the
living area, kitchen area, and each
bedroom area.

(f) *Structure and materials*—(1) *Per-
formance requirement*. The dwelling
unit shall be structurally sound so as
not to pose any threat to the health
and safety of the occupants and so as
to protect the occupants from the en-
vironment.

(2) *Acceptability criteria*. Ceilings,
walls and floors shall not have any se-
rious defects such as severe bulging or
leaning, large holes, loose surface ma-
terials, severe buckling or noticeable
movement under walking stress, miss-
ing parts or other serious damage. The
roof structure shall be firm and the
roof shall be weathertight. The exteri-
or wall structure and exterior wall sur-
face shall not have any serious defects
such as serious leaning, buckling, sag-
ging, cracks or holes, loose siding, or
other serious damage. The condition
and equipment of interior and exterior

stairways, halls, porches, walkways, etc., shall be such as not to present a danger of tripping or falling. Elevators shall be maintained in safe and operating condition.

(1) In the case of a mobile home, the home shall be securely anchored by a tiedown device which distributes and transfers the loads imposed by the unit to appropriate ground anchors so as to resist wind overturning and sliding.

(g) *Interior air quality*—(1) *Performance requirement.* The dwelling unit shall be free of pollutants in the air at levels which threaten the health of the occupants.

(2) *Acceptability criteria.* The dwelling unit shall be free from dangerous levels of air pollution from carbon monoxide, sewer gas, fuel gas, dust, and other harmful air pollutants. Air circulation shall be adequate throughout the unit. Bathroom areas shall have at least one openable window or other adequate exhaust ventilation.

(h) *Water supply*—(1) *Performance requirement.* The water supply shall be free from contamination.

(2) *Acceptability criteria.* The unit shall be served by an approved public or private sanitary water supply.

(i) *Lead-based paint*—(1) *Performance requirement.* (i) The dwelling unit shall be in compliance with HUD lead-based paint regulations, 24 CFR Part 35, issued pursuant to the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. 4801, and the owner shall provide a certification that the dwelling is in accordance with such HUD regulations.

(ii) If the property was constructed prior to 1950, the family upon occupancy shall have been furnished the notice required by HUD lead-based paint regulations and procedures regarding the hazards of lead-based paint poisoning, the symptoms and treatment of lead poisoning and the precautions to be taken against lead poisoning.

(2) *Acceptability criteria.* Same as performance requirement.

(j) Access—(1) *Performance requirement.* The dwelling unit shall be usable and capable of being maintained without unauthorized use of other private properties, and the building shall provide an alternate means of egress in case of fire.

(2) *Acceptability criteria.* The dwelling unit shall be usable and capable of being maintained without unauthorized use of other private properties. The building shall provide an alternate means of egress in case of fire (such as fire stairs or egress through windows).

(k) *Site and neighborhood.* Where a project is sold with an insured mortgage, the site selection criteria of the insurance program shall be utilized in lieu of the requirements and criteria in this paragraph.

(1) *Performance requirement.* The site and neighborhood shall be reasonably free from disturbing noises and vibrations and other hazards to the health, safety, and general welfare of the occupants.

(2) *Acceptability criteria.* The site and neighborhood shall not be subject to serious adverse environmental conditions, natural or manmade, such as dangerous walks, steps, instability, flooding, poor drainage, septic tank backups, sewage hazards or mudslides, abnormal air pollution, smoke or dust, excessive noise, vibration or vehicular traffic, excessive accumulations of trash, vermin or rodent infestation or fire hazards.

(l) *Sanitary condition*—(1) *Performance requirement.* The unit and its equipment shall be in sanitary condition.

(2) *Acceptability criteria.* The unit and its equipment shall be free of vermin and rodent infestation.

(m) *Congregate housing.* The foregoing standards shall apply except for paragraph (b) of this section and the requirement in paragraph (c)(2) of this section for a kitchen area. In addition, the following standards shall apply:

(1) The unit shall contain and have ready access to a flush toilet which can be used in privacy, a fixed basin with hot and cold running water, and a shower and/or tub equipped with hot and cold running water all in proper operating condition and adequate for personal cleanliness and the disposal of human wastes. These facilities shall utilize an approved public or private disposal system, and shall be

sufficient in number so that they need
not be shared by more than four occu-
pants. Those units accommodating
physically handicapped occupants
with wheelchairs or other special
equipment shall provide access to all
sanitary facilities and shall provide, as
appropriate to needs of the occupants,
basins and toilets of appropriate
heights, grab bars to toilets, showers
and/or bathtubs, shower seats and
adequate space for movement.
(2) The unit shall contain suitable
space to store, prepare and serve foods
in a sanitary manner. A cooking stove
or range, a refrigerator(s) of appropri-
ate size and in sufficient quantity for
the number of occupants, and a kitch-
en sink with hot and cold running
water shall be present in proper oper-
ating condition. The sink shall drain
into an approved private or public
system. Adequate space for the stor-
age, preparation and serving of food
shall be provided. There shall be ade-
quate facilities and services for the
sanitary disposal of food wastes and
refuse, including facilities for tempo-
rary storage where necessary (e.g. gar-
bage cans).
(3) The dwelling unit shall afford
the Family adequate space and secu-
rity. A living room, kitchen, dining
area, bathroom, and other appropriate
social and/or recreational community
space shall be within the unit and the
dwelling unit shall contain at least one
sleeping room of appropriate size for
each two persons. Exterior doors and
windows accessible from outside each
unit shall be capable of being locked.
An emergency exit plan shall be devel-
oped and occupants shall be apprised
of the details of the plan. Regular fire
inspections shall be conducted by ap-
propriate local officials. Readily acces-
sible first aid supplies and fire extin-
guishers shall be provided throughout
the unit, smoke detectors shall be pro-
vided and emergency phone numbers
(police, ambulance, fire department,
etc.) shall be available at every phone
and individual copies shall be provided
to each occupant. All emergency and
safety features and procedures shall
meet applicable State and local stand-
ards.
(n) *Independent group residences.*
The foregoing standards shall apply

and (m) of this section. In addition
Section 882.109(n) shall apply.
(o) *Energy Efficiency—Performance*
*Requirement.* Appropriate energy con-
serving improvements such as insula-
tion, weatherstripping, and caulking
must be accomplished by HUD or the
purchaser as part of any rehabilitation
under this Subpart. In addition,
energy conserving improvements such
as storm doors and windows must be
considered by HUD and accomplished
by HUD or the purchaser provided
that these improvements are deter-
mined by HUD to be cost-effective.
See 24 CFR Part 39.

Exhibit E

SUPERSEDEAS DECISION

STATE: MICHIGAN

AREA: MACOMB, MONROE, OAKLAND, WASHTENAW, & WAYNE COUNTIES

DECISION NUMBER: MI83-2007

DATE: DATE OF PUBLICATION

Supersedes Decision Number MI81-2032, dated July 6, 1981, in 46 FR 34998.

DESCRIPTION OF WORK: BUILDING CONSTRUCTION PROJECTS, RESIDENTIAL CONSTRUCTION PROJECTS (consisting of single family homes and apartments up to and including four stories), & HEAVY CONSTRUCTION PROJECTS PROJECTS (excluding Bridge, Airport, and Sewer & Water Lines Projects).

| | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| ASBESTOS WORKERS: | | |
| Monroe County | $16.85 | $ 2.42 |
| Washtenaw County (Twps. of Bridgewater, Dexter, Freedom, Lima, Lydon, Manchester, Sharon, & Sylvan) | 15.93 | 4.00 |
| Remainder of Area | 16.32 | 3.02 |
| BOILERMAKERS: | | |
| Monroe County | 19.15 | 3.155 |
| Remainder of Area | 18.54 | 3.35 |
| BRICKLAYERS & STONE MASONS: | | |
| Monroe County (West of Hwy. #23) | 15.21 | 1.83 |
| Washtenaw County | 18.47 | 1.52 |
| Remainder of Area | 17.28 | 3.81 |
| CARPENTERS & PILEDRIVERMEN: | | |
| * Washtenaw County | ~~15.64~~ | ~~1.90~~ |
| Remainder of Area | 15.50 | 5.11 |
| CEMENT MASONS: | | |
| Monroe County (South of Hwy. 151) | 15.40 | 2.20 |
| Washtenaw County | 18.47 | 1.52 |
| Remainder of Area | 15.46 | 3.94 |
| ELECTRICIANS: | | |
| Monroe County: | | |
| Building Work | 19.30 | 1.80+3.3% |
| Residential Work | 9.14 | 1.80+3.3% |
| Washtenaw County | 16.19 | 2.24+2% |
| * Remainder of Area | ~~[illegible]~~ | ~~[illegible]~~ |
| ELECTRONIC TECHNICIANS: | | |
| Sound & Communication Work in Macomb, Wayne, & Oakland Counties | 13.14 | |
| ELEVATOR CONSTRUCTORS: | | |
| Monroe County | | |
| Mechanics | 17.37 | 2.69+a |
| Helpers | 70%JR. | 2.69+a |
| Probationary helpers | 50%JR. | |
| Washtenaw County | | |
| Mechanics | 17.01 | 2.69+a |
| Helpers | 70%JR. | 2.69+a |
| Probationary helpers | 50%JR. | |
| Remainder of Area: | | |
| Mechanics | 17.15 | 2.465+a |
| Helpers | 70%JR. | 2.465+a |
| Probationary helpers | 50%JR. | |

| | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| GLAZIERS: | | |
| Building Work | $14.69 | 2.70+b |
| Residential Work | 9.00 | 2.70+b |
| IRONWORKERS: | | |
| Monroe County | 18.02 | 3.13 |
| Remainder of Area: | | |
| Structural & Ornamental | 15.26 | 47%+.09 |
| Reinforcing | 13.08 | 38.64% + 1.98 |
| Fence Erectors | 14.26 | 47%+.09 |
| Riggers & Machinery Erectors | 14.99 | 6.23 |
| LABORERS: RESIDENTIAL WORK ONLY | 6.95 | 1.69 |
| LANDSCAPE LABORERS: | | |
| Class A - Landscape Specialist, including air, gas, diesel, electric tools and equipment | 8.60 | |
| Class B - Landscape Laborers, Truck drivers, Material Haulers, & Small power equipment | 6.56 | |
| LATHERS: | | |
| Oakland (Northern Portion including Twps. of Holly & Oxford) & Washtenaw (West ½) Counties | 15.02 | 2.37 |
| Remainder of Area | 16.32 | 3.84 |
| MILLWRIGHTS | 15.19 | 1.73+37% |
| MARBLE MASONS | 13.93 | 3.43 |
| MARBLE MASONS' FINISHERS | 12.40 | 2.80 |
| PAINTERS: | | |
| Brush, roller, drywall taper/finisher, & paperhanger | 13.25 | 4.00 |
| Spray & sandblast | 13.75 | 4.00 |
| PLASTERERS: | | |
| Monroe (South of Hwy. #151) County | 18.02 | .71 |
| Washtenaw County | 18.47 | 1.52 |
| Remainder of Area | 16.26 | 3.10 |
| PLUMBERS & PIPEFITTERS: | | |
| Monroe County: | | |
| Building Work | 17.04 | 3.80 |
| Residential Work | 14.56 | 1.38 |
| Washtenaw County | 14.93 | 4.23 |

DECISION NO. MI83-2007

| PLUMBERS & PIPEFITTERS (Cont'd) | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Remainder of Area: | | |
| Plumbers | $14.54 | 6.92 |
| Pipefitters | 15.00 | 6.12 |
| Refrigeration mechanics (All types over 7½ H.P.) | 15.00 | 6.12 |
| Refrigeration mechanics (All types 7½ H.P. & under) | 14.80 | 6.12 |
| ROOFERS: | | |
| Monroe County | 16.50 | 3.09 |
| Washtenaw County | 15.02 | 3.30 |
| Remainder of Area: | | |
| Composition | 15.78 | 4.35 |
| Slate | 16.78 | 4.35 |
| *** SHEET METAL WORKERS: | | |
| Monroe County | ~~16.44~~ | ~~3.315~~ |
| Remainder of Area: | | |
| Light Commercial Work - Jobs consisting of 10 tons of of air conditioning and/or 200,000 B.T.U.'s of heating and architectural sheet metal work on such projects | ~~[illegible]~~ | ~~1.83~~ |
| All Other Commercial Work | ~~14.09~~ | ~~7.18~~ |
| Residential Work | ~~10.11~~ | ~~[illegible]~~ |
| * SOFT FLOOR LAYERS: | | |
| Washtenaw County | ~~18.64~~ | ~~1.90~~ |
| Remainder of Area | 15.07 | 1.80+1% |
| SPRINKLER FITTERS: | | |
| Monroe County | 17.17 | 2.83 |
| Remainder of Area | 18.435 | 3.05 |
| TERRAZZO WORKERS | 14.77 | 3.45 |
| TERRAZZO WORKERS' FINISHERS | 14.43 | 2.00 |
| TILE SETTERS | 15.32 | 3.47 |
| TILE SETTERS' FINISHERS | 12.40 | 2.30 |
| TRUCK DRIVERS - BUILDING, HEAVY, & RESIDENTIAL WORK: | | |
| Pole trailer, low boy, straddle carrier, double bottom, fuel trucks, & special load permit vehicles | 13.55 | *90.50 |
| Semi or tractor trailer | 13.45 | *90.50 |
| All other trucks | 13.30 | *90.50 |
| *Per Week, Per Employee. | | |
| TRUCK DRIVERS - UNDERGROUND WORK: | | |
| Trucks under 8 cubic yards | 13.37 | *94.50 |
| Trucks 8 cubic yards or over, pole trailer, semi, & fuel trucks | 13.50 | *94.50 |
| Low boy, Euclid, & double-bottom trucks | 13.70 | *94.50 |
| *Per Week, Per Employee. | | |

FOOTNOTES:

a. SEVEN PAID HOLIDAYS: New Year's Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Friday after Thanksgiving Day; Christmas Day; VACATION PAY CREDIT: Employer contribution of 8% of the Regular Hourly Rate of employees with 5 years or more of service, and 6% for those employees with 6 months to 5 years of service.

b. FOUR PAID HOLIDAYS: New Year's Day; Decoration Day; Labor Day; Christmas Day.

WELDERS: Receive rate prescribed for craft performing operation to which welding is incidental.

Unlisted Classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR, 5.5 (a) (1) (ii)).

PAGE 2

| Basic Hourly Rates | Fringe Benefits |
|---|---|
| | |

* SEE MOD #1 DATED 4-8-83
** SEE MOD #2 DATED 4-29-83
*** SEE MOD #3 DATED 5-27-83

DECISION NO. MI83-2007 PAGE 3

| LABORERS - BUILDING & HEAVY WORK: | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| WASHTENAW COUNTY: | | |
| GROUP 1 - General laborers | $12.23 | 2.54 |
| GROUP 2 - Mortar mixer, material mixer, air/gas/electric tool operators, power buggie operator, scaffold builder or dismantler, windlass operator, tar & kettle operator | 12.45 | 2.54 |
| GROUP 3 - Crock or pipe layer, & caisson worker | 12.55 | 2.54 |
| MONROE COUNTY: | | |
| GROUP 1 - General laborers | 14.28 | 1.69 |
| GROUP 2 - Mason tender, plasterer tender, mortar mixer, portable mixer operator, air/diesel/electric/gas tool operators, concrete vibrator, acetylene torch, caisson worker, signal man on concrete pour. | 14.48 | 1.69 |
| MACOMB, OAKLAND, & WAYNE COUNTIES: | | |
| GROUP 1 - General laborers | 13.44 | 2.59 |
| GROUP 2 - Mortar mixer, scaffold builder | 13.82 | 2.59 |
| GROUP 3 - Air/gas/electric tool operators, windlass or tugger operator, jackhammer, vibrator operator, & signal man | 13.49 | 2.59 |
| GROUP 4 - Crock grade man | 13.67 | 2.59 |
| GROUP 5 - Windlass & tugger operators on caisson work | 13.63 | 2.59 |
| GROUP 6 - Crock & pipe layer | 13.77 | 2.59 |
| GROUP 7 - Caisson worker | 13.82 | 2.59 |
| GROUP 8 - Lancing burner, blaster, & powderman | 14.19 | 2.59 |
| GROUP 9 - Plasterer tender | 13.19 | 2.44 |
| LABORERS - OPEN CUT WORK: | | |
| WASHTENAW COUNTY: | | |
| GROUP 1 | 11.86 | 2.29 |
| GROUP 2 | 11.94 | 2.29 |
| GROUP 3 | 11.99 | 2.29 |
| GROUP 4 | 12.04 | 2.29 |
| GROUP 5 | 12.09 | 2.29 |

| LABORERS - OPEN CUT WORK (Cont'd) | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| MACOMB, OAKLAND, & WAYNE COS.: | | |
| GROUP 1 | $11.56 | 4.44 |
| GROUP 2 | 11.64 | 4.44 |
| GROUP 3 | 11.69 | 4.44 |
| GROUP 4 | 11.74 | 4.44 |
| GROUP 5 | 11.79 | 4.44 |
| MONROE COUNTY: | | |
| GROUP 1 | 11.89 | 2.29 |
| GROUP 2 | 11.99 | 2.29 |
| GROUP 3 | 12.09 | 2.29 |
| GROUP 4 | 12.14 | 2.29 |
| GROUP 5 | 12.24 | 2.29 |

CLASSIFICATIONS DEFINITIONS:

GROUP 1 - Construction laborer
GROUP 2 - Mortar & material mixer, concrete form man, signal man, wheel point man, manhole, headwall & catch basin builder, guardrail builder, & fence erector
GROUP 3 - Air/gas/electric tool operators, vibrator operator, driller, pump man, tar & kettle operator, bracer, rodder, reinforced steel or mesh (under 40 H.P.), windlass & tugger man
GROUP 4 - Trench excavating grade man
GROUP 5 - Pipe layer

| LABORERS - TUNNEL, SHAFT, & CAISSON WORK: | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| WASHTENAW COUNTY & MONROE COUNTY: | | |
| GROUP 1 | 12.81 | 2.29 |
| GROUP 2 | 12.89 | 2.29 |
| GROUP 3 | 12.94 | 2.29 |
| GROUP 4 | 13.09 | 2.29 |
| GROUP 5 | 13.29 | 2.29 |
| GROUP 6 | 13.54 | 2.29 |
| REMAINDER OF COUNTIES: | | |
| GROUP 1 | 11.68 | 4.44 |
| GROUP 2 | 11.76 | 4.44 |
| GROUP 3 | 11.81 | 4.44 |
| GROUP 4 | 11.96 | 4.44 |
| GROUP 5 | 12.16 | 4.44 |
| GROUP 6 | 12.41 | 4.44 |

DECISION NO. MI83-2007 PAGE 4

LABORERS - TUNNEL, SHAFT, & CAISSON WORK:

CLASSIFICATIONS DEFINITIONS:

GROUP 1 - Tunnel, shaft, & caisson laborer, dump man, shanty man, hog house tender, testing man on gas;
GROUP 2 - Manhole, headwall & catch basin builder, bricklayers' tender, mortar man, material mixer, fence erector, & guardrail builder;
GROUP 3 - Air tool operator, jackhammer, bush hammer, & grinding man, bottom man, cage tender, car pusher, carrier man, concrete man, concrete form man, concrete repair man, cement invert laborer, concrete shoveler, conveyor man, floor man, gasoline & electric tool operators, gunnite man, grout operator, dinky man, inside lock tender, vibrator man, pea gravel operator, pump man, outside lock tender, top signal man, switch man, track man, tugger man, utility man, winch operator, concrete saw operator (under 40 H.P.)
GROUP 4 - Tunnel, shaft, & caisson muckers, bracer man, under plate man, long haul dinky driver, & well point man;
GROUP 5 - Tunnel, shaft, & caisson miner, driller runner, key board operator, power knife operator, reinforced steel or mesh man (wire mesh, steel mats, dowel bars, etc.);
GROUP 6 - Dynamite man & powder man

| LINE CONSTRUCTION: | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Monroe (Twps. of Bedford, Erie LaSalle & Whiteford), Oakland (Twp. of Holly), & Washtenaw (Twps. of Lyndon, Manchester, Sharon, & Sylvan) Counties: | | |
| Linemen & technicians | $15.00 | .65+3½% 4c |
| Cable splicers | 15.81 | " |
| Combination digger operator & tractor operator groundmen | 11.68 | " |
| Light equipment operator groundmen; distribution line truck driver operator groundmen | 10.25 | " |
| Combination winch truck driver groundmen | 9.77 | " |
| Combination truck driver & groundmen | 8.27 | " |
| * Remainder of Area: | | |
| Linemen & technicians | ~~13.35~~ | ~~[illegible]~~ |
| Cable splicers | ~~16.12~~ | ~~"~~ |
| Combination equipment operators & groundmen | ~~15.94~~ | ~~"~~ |
| Combination truck driver & groundmen | ~~13.12~~ | ~~"~~ |
| Groundmen | 12.09 | " |

FOOTNOTE:

a. SEVEN PAID HOLIDAYS: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday after Thanksgiving Day, & Christmas Day provided the employee works the scheduled workday preceeding and following the day observed.

DECISION NO. MI83-5007

PAGE 3

| POWER EQUIPMENT OPERATORS - BUILDING, RESIDENTIAL, & HEAVY WORK: | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| CLASS A - Crane with boom & jib or leads 220' or longer | ~~$16.34~~ | ~~3.35+13%~~ |
| CLASS B - Crane with boom & jib or leads 140' or longer | ~~16.12~~ | ~~3.35+13%~~ |
| CLASS C - Crane with boom & jib 120' or longer | ~~[illegible]~~ | ~~3.35+13%~~ |
| CLASS D - Regular crane operator | ~~[illegible]~~ | ~~3.35+13%~~ |
| CLASS E - Regular engineer | ~~14.71~~ | ~~3.35+13%~~ |
| CLASS F - Engineer when operating compressor or welding machine | ~~12.46~~ | ~~3.35+13%~~ |
| CLASS G Fireman or oiler | ~~[illegible]~~ | ~~3.35+13%~~ |
| **POWER EQUIPMENT OPERATORS - STEEL ERECTION:** | | |
| CLASS A - Engineer when operating combination of boom & jib 220' or longer | 11.52 | 3.35+13% |
| CLASS B - Engineer when operating combination of boom & jib 140' or longer | 18.24 | 3.35+13% |
| CLASS C - Crane operator, job mechanic | 17.25 | 3.35+13% |
| CLASS D - Hoisting operator | 17.02 | 3.35+13% |
| CLASS E - Compressor or welder operator | 13.95 | 3.35+13% |
| CLASS F - Oiler or fireman | 12.63 | 3.35+13% |
| **POWER EQUIPMENT OPERATORS - UNDERGROUND WORK:** | | |
| CLASS A | 14.80 | 3.65+13% |
| CLASS B | 14.42 | 3.65+13% |
| CLASS C | 13.77 | 3.65+13% |
| CLASS D | 13.27 | 3.65+13% |

**CLASSIFICATIONS DEFINITIONS:**

CLASS A - Backfiller tamper, backhoe, batch plant operator (concrete), clamshell, concrete paver (2 drums or larger), conveyor loader (Euclid type), crane (crawler, truck type), piledriver, bulldozer (9' blade & over), dragline, elevating grader, front end loader (over 1½ cubic yards capacity), gradall & similar type equipment, mechanic, power shovel, roller (asphalt), scraper self-propelled or tractor

| POWER EQUIPMENT OPERATORS - UNDERGROUND WORK: (Cont'd.): | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| drawn), side boom tractor (type D-4 or larger), slip-form paver, slope paver, trencher (over 8' digging capacity), & well drilling rig: | | |
| CLASS B - Boom truck (power swing type boom), crusher, dozer (less than 9' blade), endloader (1½ cu. yds. or smaller), hoist, pump (one or more, 6" discharge or larger, 300 AMPS or more), side boom tractor (smaller than D-4 type or equivalent), sweeper, tractor (Pneu-tired, other than backhoe or front end loader), trencher (8' digging capacity) | | |
| CLASS C - Air compressors (600 CFM), boom truck (non-swinging, non-powered type boom), concrete breaker (self-propelled or truck mounted, includes compressor), concrete paver (one drum, 1½ yds. or larger), elevator, mechanic helper, pump (2 or more, 4" to 6" discharge), pumpcrete machine, wagon drill (multiple), welding machine or generator (2 or more, 300 AMPS, or larger). | | |
| CLASS D - Boiler, concrete saw (40 h.p. or over), curing machine (self-propelled), farm tractor (with attachment), finishing machine (concrete), fireman, hydraulic pipe pushing machine, mulching equipment, oiler, pumps (2 or more up to 4" discharge), roller (other than asphalt), stump remover, trencher (service), vibrating compaction equipment (self-propelled, 6' wide or over). | | |

age 5

DISION MI83-2007 - Mod. #1 (48 FR 6454 - February 11, 983)
acomb, Monroe, Oakland, Washtenaw, & Wayne Counties, Michigan

| CHANGE: | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Carpenters, Piledrivermen: | | |
| Washtenaw County: | | |
| Building Work | $15.82 | 2.15 |
| Residential Work | 11.87 | 2.15 |
| Soft floor layers: | | |
| Washtenaw County: | | |
| Building Work | 15.82 | 2.15 |
| Residential Work | 11.87 | 2.15 |
| Electricians: | | |
| Remainder of Area: | | |
| Building Work | 17.80 | 3%+3.71 |
| Residential Work | 14.40 | 3%+2.90 |
| Line Construction: | | |
| Remainder of Area: | | |
| Linemen & technicians | 17.38 | 11¾% + 2.05 |
| Cable splicers | 18.12 | " |
| Combination equipment operators & groundmen | 13.94 | " |
| Combination truck driver | | |

Modification Page 8

| Basic | Fringe |
|---|---|

MOO #1

Modification Page 1

Modification Page 2

| DECISION MI83-2007 - Mod. #2 (48 FR 6454 - February 11, 1983) Macomb, Monroe, Oakland, Washtenaw, & Wayne Counties, Michigan | Basic Hourly Rates | Fringe Benefits |
| --- | --- | --- |
| CHANGE: | | |
| Power Equipment Operators - Building, Residential, & Heavy Work: | | |
| Class A | $16.03 | 4.10+13 |
| Class B | 15.81 | " |
| Class C | 15.95 | " |
| Class D | 14.77 | " |
| Class E | 14.48 | " |
| Class F | 18.15 | " |
| Class G | 11.33 | " |

MOD #2

MODIFICATION P. 5

| Decision No. IN83-2033 Mod # 1 (48 FR 19564 - April 29, 1983) Brown, Clark, Crawford, Dearborn, Decatur, Fayette, Floyd, Franklin, Harrison, Henry, Jackson, Jefferson, Jennings, Lawrence, Ohio, Orange, Randolph, Ripley, Rush, Scott, Switzerland, Union Washington & Wayne Cos. Indiana | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| CHANGE: | | |
| PAINTERS: | | |
| Area 6: | | |
| New Construction | | |
| Brush | $11.07c | 1.18 |
| Spray | 11.52c | 1.18 |
| Repaint | | |
| Brush | 10.32c | |
| Spray | 10.77c | |

FOOTNOTES:
c - All work outside a 25 mile radius of Jefferson County, Kentucky Courthouse- Add $ .35 per hour to Basic Hourly Rate for all Classifications

| DECISION #NM83-4032-Mod. #2 (48 FR 16413 - April 15, 1983) Statewide, New Mexico | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Change: | | |
| Glaziers | 11.99 | 1.55 |
| Soft Floor Layers | 11.20 | 1.90 |
| Commercial Line Work (Area 4) | | |
| Equipment Operator (Includes Helicopter Operator) | | |
| Zone IV | 29.23 | F |

Omit:
Painters Wage rates; Zone and classification Definitions for Zones I, And II

| DECISION #NM83-4032 (Cont'd) | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Add: | | |
| Painters: Zones I and II: | | |
| Class A | $11.50 | $1.90 |
| Class B | 12.[illegible] | 1.90 |
| Class C | [illegible].03 | 1.90 |

Classification Definitions:
Class A - Painters Brush, Roller and Hand Texture
Class B - Painters, Spray, Sandblasting, Painters on Steel bridges, tanks, towers, pipe and structural
Class C - Paperhangers; Drywall Finisher; Ames Tool Operator

| DECISION #MI83-2007 - Mod. #3 (48 FR 6454 - February 11, 1983) Macomb, Monroe, Oakland, Washtenaw, and Wayne Counties, Michigan | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Change: | | |
| Sheet Metal Workers: | | |
| Monroe County | $16.305 | $3.64 |
| Remainder of Area: | | |
| Light Commercial Work - Jobs consisting of 10 tons or air conditioning and/or 200,000 B.T.U.'s of heating and architectural sheet metal work on such projects | 10.11 | 1.09 |
| All Other Commercial Work | 16.41 | 7.58 |
| Residential Work | 10.11 | 1.09 |

MODIFICATION P. 6

| DECISION NO. OR83-5109 - Mod #2 (48 FR 7319 Feb. 18, 1983) Statewide Oregon | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| CHANGE: | | |
| PAINTERS: | | |
| Area 2: | | |
| Brush | $15.59 | $3.09 |
| Spray | 16.24 | 3.09 |
| Bridges, High Work Over 50 ft (Brush) | 17.14 | 3.09 |
| Bridges, High Work Over 50 ft (Spray) | 17.79 | 3.09 |
| PLUMBERS: | | |
| Area 1 | 16.30 | 4.01 |
| ROOFERS: | | |
| Area 3 | 13.44 | 2.03 |
| SHEET METAL WORKERS: | | |
| Area 2 | 17.36 | 3%+1.95 |
| SOFT FLOOR LAYERS: | | |
| Area 1 | 14.02 | 2.38+b |
| Area 2 | 13.66 | 1.19 |
| TILE SETTERS: | | |
| Area 1 | 17.11 | 3.43 |
| TILE AND TERRAZZO HELPERS: | | |
| Area 1 | 13.37 | 2.10 |

ADD:
FOOTNOTE:
b. 4% of all gross wages to be credited to employees with less than one year of service, 6% with more than one year of service. Seven paid Holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Friday after, and Christmas Day.

| DECISION NO. UT83-5108 - Mod. #5 (48 FR 12651 - March 25, 1983) Statewide, Utah | Basic Hourly Rates | Fringe Benefits |
|---|---|---|
| Omit: | | |
| Cement Masons; Heavy and Highway Schedule and Zone Descriptions as originally issued | | |
| Add: | | |
| Cement Masons; Heavy and Highway to same Zone Descriptions as Operating Engineers, Laborers and Truck Drivers Heavy and Highway | | |
| Cement Masons; | | |
| Heavy and Highway Construction; | | |
| Zone 1: | | |
| Cement Masons | $13.14 | $1.90 |
| Machine Operator; Mastic Floor Materials | 13.39 | 1.90 |
| Zone 2: | | |
| Cement Masons | 15.64 | 1.90 |
| Machine Operator; Mastic Floor Materials | 15.89 | 1.90 |

Mod #3

U.S. Department of Housing and Urban Development

Michigan State Office
Office of Housing
Patrick V. McNamara Federal Building
477 Michigan Avenue
Detroit, MI 48226-2592
Tel. (313) 226-6280

AUG 31 1998

Mr. Ben Alli
Pingree Apartments
P.O. Box 36081
Grosse Pointe, MI 48236

Dear Mr. Alli:

Subject: Project No. : 044-44110
Section 8 Contract # : MI28E000037
Project Name: Pingree Apartments

We have executed the Section 8 Loan Management Set Aside Contract on the above property. The effective date of the HAP Contract is August 25, 1998. A copy of the HAP contract is enclosed.

The HAP Contract identifies your responsibilities for the property.

If you have any question, please contact Carrie A. Johnson at (313) 226-4900 x 8140.

Sincerely,

Robert M Brown

Robert M. Brown
Director, Detroit
Multifamily Housing Hub

Enclosure: Lease Addendum

FILE COPY

cc: Copies
fhma: Official Record File ✓
fhma: Chrono
fhma: FAD/ENCLOSURE
fhma: TRAC
fhma: Johnson x 8140

FILE COPY

concur:
Johnson
Johnson 8/26/98

Russie
8/27/98

Ownes
8/28/98

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**Office of Housing, Federal Housing Commissioner**

**HOUSING ASSISTANCE PAYMENTS**
**RENEWAL CONTRACT**

**HUD as Contract Administrator**

SECTION 8 CONTRACT NUMBER: MI28-E000037

SECTION 8 PROJECT NUMBER OF EXPIRING CONTRACT (if different): ______

FHA PROJECT NUMBER: (if applicable) 044-44110

TYPE OF PROJECT:
New Construction: ______
Substantial Rehabilitation: ______
Loan Management Set Aside: ______
Property Disposition: X

This HOUSING ASSISTANCE PAYMENTS CONTRACT ("Contract") is entered into between the U.S. Department of Housing and Urban Development ("HUD") and Pingree Apartments ("Owner") pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437, *et seq* and the VA/HUD/ Independent Agencies Appropriation Act for FY 1998 Pub. L. 105-65, 111 Stat. 1344,approved 10/27/97 ("FY 1998 HUD Appropriations Act") The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Previously, HUD and the Owner entered into a Housing Assistance Payments Contract ( **"MI28-E000037"**) to provide section 8 assistance to the Owner for eligible families living in Pingree Apartments.

This Expiring Contract expires on August 24, 1998.

Since the FY 1998 HUD Appropriations Act gives HUD the authority to renew Housing Assistance Payments Contracts for a period of not more than one year, HUD and the Owner desire to renew for the term specified below the Expiring Contract Except for the Contract Rent and Rent Adjustment Provisions.

**THEREFORE, HUD and the Owner hereby agree as follows:**

1. This Contract provides Housing Assistance Payments to the Owner for the term specified (see #4 & #5 below) at the contract rent levels listed in Exhibit A.

2. All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.

3. There will be no rent adjustments during the term of this Contract.

4. The effective date of this Contract is August 25, 1998.

   (The date inserted must be the date of the Renewal Contract. For example, if the Expiring Contract expires on February 21, 1997, the date inserted must be February 22, 1997).

5. This Contract terminates on August 24, 1999.

6. ✓ The maximum amount of the commitment for housing assistance payments under this Contract is $ 225,120.

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in good and tenantable condition and are in decent, safe and sanitary condition.

This Contract is hereby executed with respect to the contract units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

By: [signature]
Robert M. Brown
Director, Detroit
Multifamily Hub

Date: 8/28/98

OWNER

By: [signature] Ben Hall
(Official Title)

Date: 8/12/98

EXHIBIT A

IDENTIFICATION OF UNITS ("CONTRACT UNITS")
BY SIZE AND APPLICABLE CONTRACT RENTS

| Number of Units | Number of Bedrooms | Contract Rent |
|---|---|---|
| 66 | 1 Bedroom | 340 |
| 4 | 2 Bedroom | 443 |
| 10 | 2 Bedroom LR | 484 |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of Housing, Federal Housing Commissioner

HOUSING ASSISTANCE PAYMENTS
RENEWAL CONTRACT

**HUD as Contract Administrator**

SECTION 8 PROJECT NUMBER: 044-44110

SECTION 8 PROJECT NUMBER OF EXPIRING CONTRACT
(if different): MI28E000037

FHA PROJECT NUMBER: (if applicable) MI28E000037

This HOUSING ASSISTANCE PAYMENTS CONTRACT MI28E000037 is entered into between the U.S. Department of Housing and Urban Development ("HUD") and Pingree Apartments ("Owner"). pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437 et seq. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Previously, HUD and the Owner entered into a Housing Assistance Payments Contract (MI28E000011) to provide section 8 assistance to the Owner for eligible families living in Pingree Apartments.

This Expiring Contract expires on August 24, 1999.

HUD and the Owner desire to renew for the term specified below the Expiring Contract **EXCEPT for the Contract Rent and Rent Adjustment Provisions.**

**THEREFORE, HUD and the Owner hereby agree as follows:**

1. This Contract provides Housing Assistance Payments to the Owner for the term specified (see #4 & #5 below) at the contract rent levels listed in Exhibit A.

2. All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.

3. There will be no rent adjustments during the term of this Contract.

4. The effective date of this Contract is August 25, 1999.

5. This Contract expires on February 24, 2000.

6. The maximum amount of the commitment for housing assistance payments under this Contract is $ 86,000.

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in decent, safe and sanitary condition, as defined by HUD.

9. Notwithstanding any provision to the contrary, HUD, by executing this contract, does not make any warranty and/or representation as to the condition of the rental units. Execution of this Contract by HUD is not an endorsement by HUD that the rental units are in decent, safe and sanitary condition, as defined by HUD.

10. It is a crime to knowingly make false statements to HUD on this form or any other similar form. Penalties upon conviction can include a fine and imprisonment. 18 U.S.C. 1001, 1010.

This Contract is hereby executed with respect to the contract units described in Exhibit A.

UNITED STATES OF AMERICA
SECRETARY OF HOUSING AND
URBAN DEVELOPMENT

By: ______________________

Date: ______________________

OWNER

By: [signature] BSA Co-President

Date: 8/9/99

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of Housing, Federal Housing Commissioner

HOUSING ASSISTANCE PAYMENTS
RENEWAL CONTRACT

**HUD as Contract Administrator**

SECTION 8 PROJECT NUMBER: 044-44110

SECTION 8 PROJECT NUMBER OF EXPIRING CONTRACT
(if different): MI28E000037

FHA PROJECT NUMBER: (if applicable):044-44110

This HOUSING ASSISTANCE PAYMENTS CONTRACT **MI28E000037** is entered into between the U.S. Department of Housing and Urban Development ("HUD") and Pingree Apartments("Owner") pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437 et seq. and section 524(a)(1) of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1998, Pub. L. 105-65, 111 Stat. 1344, approved 10/27/97. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Previously, HUD and the Owner entered into a Housing Assistance Payments Contract **MI28E000037**("Expiring Contract") to provide section 8 assistance to the Owner for eligible families living in **Pingree Apartments** ("Project").

This Expiring Contract expires on February 24, 2000.

HUD and the Owner desire to renew for the term specified below the Expiring Contract **EXCEPT for the Contract Rent and Rent Adjustment Provisions.**

**THEREFORE, HUD and the Owner hereby agree as follows:**

1. This Contract provides Housing Assistance Payments to the Owner for the term specified (see #4 & #5 below) at the contract rent levels listed in Exhibit A.

2. All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.

3. There will be no rent adjustments during the term of this contract.

4. The effective date of this Contract is February 25,2000.

5. This Contract expires on June 24, 2000.

6. The maximum amount of the commitment for housing assistance payments under this Contract is $58,400.

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in decent, safe and sanitary condition, as defined by HUD.

9. Notwithstanding any provision to the contrary, HUD, by executing this contract, does not make any warranty and/or representation as to the condition of the rental units. Execution of this Contract by HUD is not an endorsement by HUD that the rental units are in decent, safe and sanitary condition, as defined by HUD.

10. It is a crime to knowingly make false statements to HUD on this form. Penalties upon conviction can include a fine and imprisonment. 18 U.S.C. 1001,1010.

This Contract is hereby executed with respect to the contract units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

By: ______________________
Robert M. Brown
Director
Detroit Multifamily Hub

Date: ______________________

OWNER

By: [signature]
(Official Title)

Date: 2-23-00

# EXHIBIT A

## IDENTIFICATION OF UNITS ("CONTRACT UNITS") BY SIZE AND APPLICABLE CONTRACT RENTS

| Number of Units | Number of Bedrooms | Contract Rent |
|---|---|---|
| 68 | 1 Bedroom | 359 |
| 4 | 2 Bedroom | 465 |
| 10 | 3 Bedroom | 465.00 |

FEDERAL HOUSING ADMINISTRATION
REGULATORY AGRE[illegible]NT FOR INSURED MULTI-FAMI[illegible] [illegible]OUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

Project No.: 044-44110-PD HAP CONTRACT NO. MI28-E000-037

Mortgagee Secretary of Housing and Urban Development

Amount of Mortgage Note $353,300.00 Date August 24, 198[illegible]

Mortgage: Recorded: State Michigan County Wayne Date

Book Page

A Secretary-held Purchase Money Mortgage

This Agreement entered into this 24th day of August, 19 83, between Ben Alli, a married man, and Shaki Alli, his wife whose address is 3715 Balfour Rd. Detroit, Michigan 48236 their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*. whose address is 451 Seventh St., S.W., Washington, D.C. 20410

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 583.33 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. ~~Except as provided in Paragraph 5 hereof:~~

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts ~~as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or~~

~~services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services inclu[illegible] in the approved rental schedule.~~

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

~~(ii) Deny the increase stating the reasons therefor.~~

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwishstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distributi[illegible] funds of the project, which the party [illegible]ving such funds is not entitled to retain hereunder, shal[l be] held in trust separate and apart from any oth[er fun]ds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 3(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in-trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) "If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners shall comply with the provisions of any Federal, State or local law prohibiting discrimination in the sale, rental, disposition, or occupancy of housing or related facilities, including, but not limited to, Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), Title VIII of the Civil Rights Act of 1968 (Public Law 90-284, 82 Stat. 73), Executive Order 11063, and any regulations *

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

* implementing such authorities, including, but not limited to, 24 CFR, Part 1 and 24 CFR Part 107. Failure or refusal to comply with these requirements shall be a proper basis for declaring a default of this Agreement and for applying the sanctions and penalties set forth in the implementing regulations.

HUD-92465 (5-77)

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held:

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice:

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representativ executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: Ben Alli, a married man and Shaki Alli, his wife

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

21. Owner agrees not to refuse unreasonably to lease a vacant dwelling unit, or otherwise discriminate in the terms of tenancy because such person is the holder of Certificate of Family Participation under Section 8 of the United States Housing Act of 1937 (42 USC 1437f), or any successor legislation (hereinafter referred to as Section 8); Provided, that this provision is limited to those units which rent for an amount not greater than the Section 8 fair market rent for a comparable unit in the area as determined by the Grantor.

22. Owner agrees that the oject must be maintained as al housing for a period of fifteen (15) years and may not market any units f any other purpose without the Grantor's prior written approval.

It is expressly agreed that upon failure to strictly keep and observe, any of the provisions of the foregoing conditions, by the Grantee, its successors and assigns, the Grantor, his successors and assigns, may enter and terminate the estate hereby conveyed.

23. Owner agrees that the property will be rehabilitated within six (6) months from the date of this agreement in accordance with all applicable codes.

It is expressly agreed that upon failure to strictly keep and observe, any of the provisions of the foregoing conditions, by the Grantee, its successors and assigns, the Grantor, his successors and assigns, may enter and terminate the estate hereby conveyed. Said right will expire four (4) years from the date of this Deed.

IN WITNESS WHEREOF, the parties hereto have set their hands on the date first hereinabove written.

WITNESSES

Ann M Semaan
ANN M SEMAAN

Saul A. Green
SAUL A. GREEN

Ben Alli, MD
Ben Alli

Shaki Alli
Shaki Alli

Jean Nash
Jean Nash

Barbara Smith
BARBARA SMITH

SECRETARY OF HOUSING AND URBAN DEVELOPME[NT]
acting by and through the FEDERAL HOUSIN[G]
COMMISSIONER

By John G. Terranella
Authorized Agent
John G. Terranella

STATE OF MICHIGAN)
) SS.
COUNTY OF WAYNE )

On this 24th day of August, 1983, before me appeared John G. Terranella, who being duly sworn did say that he is the duly appointed Authorized Agent and the person who executed the foregoing instrument by virtue of the authority vested in him by 24 C.F.R. 200.118, and acknowledged the same to be his free and voluntary act and deed as Authorized Agent for and on behalf of the Secretary of Housing and Urban Development.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal on the day and year last above written.

ELIZABETH A. DUNCAN
Notary Public, Wayne County, Michigan
My Commission Expires July 3, 1984

Notary Public, Wayne County, Michigan

My Commission Expires:

STATE OF MICHIGAN)
) SS.
COUNTY OF WAYNE )

The above and foregoing instrument was duly acknowledged before me this 24th day of August, 1983, by Ben Alli and Shaki Alli.

ELIZABETH A. DUNCAN
Notary Public, Wayne County, Michigan
My Commission Expires July 3, 1984

Notary Public, Wayne County, Michigan

My Commission Expires:

Drafted By and Return to:

Dona Tracey
Attorney-Advisor
Department of Housing and Urban Development
McNamara Federal Building, 17th Floor
477 Michigan Avenue
Detroit, MI 48226
(313) 226-7955

SCHEDULE "A"

Lots 175 thru 178 inclusive - William L. Holmes Subdivision of Lots 10, 11, 12, 13, 14, and 15 of Montclair Subdivision of part of ¼ Sections 48, and 53, 10,000 Acre Tract, Greenfield Twp., now City of Detroit, Wayne County, Michigan.

Recorded in Liber 18 of Plats, Page 18,Wayne County Records.

and

Lots 186, 187, 188, 189, 190 - Austins Subdivision of part of ¼ Section 47, 10,000 Acre Tract, Greenfield, now City of Detroit, Wayne County, Michigan.

Recorded in Liber 30 of Plats, Page 45, Wayne County Records.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of Housing, Federal Housing Commissioner

HOUSING ASSISTANCE PAYMENTS CONTRACT

HUD as Contract Administrator

This Housing Assistance Payments Contract ("Contract") is entered into between the U.S. Department of Housing and Urban Development ("HUD") and BSA CORPORATION ("Owner") pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437, *et seq.* ("Act") and the Balanced Budget Downpayment Act, I, also known as the Continuing Resolution ("CR") passed by Congress on January 26, 1996, (Pub. Law 104-99, See H.R. 2880, Sec. 405). The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Project Name: Collingwood-Kirkwoood
Street Address: 1601 Collingwood
Section 8 No: MI28-E000011
FHA Project No 044-44017

City: Detroit

County: Wayne
State: Michigan

1. Commencement Date, Term, Contract Units, and Contract Rents.

(a) Commencement Date of Contract. The effective date of this Contract is January 16, 1998
The date inserted must be the day after the Expiring Contract expires. For example, if the Expiring Contract expires on February 21, 1996, the date inserted must be February 22, 1996.

(b) Term of Contract. The term of this Contract is for FIVE MONTHS beginning on the Commencement Date.

(c) Contract Units, and Contract Rents. This Contract is hereby executed with respect to the units ("Contract Units") described in Exhibit A listed by size and their applicable rents ("Contract Rents").

2. Owner's Warranties.

The Owner warrants that the rental units listed in Exhibit A are in good and tenantable condition and meet HUD's Housing Quality Standards.

3. Families To Be Housed; HUD Assistance.

(a) Families To Be Housed. The Contract Units are to be leased by the Owner to eligible families ("Families") for occupancy by such Families solely as private dwellings and as their principal place of residence.

(b) HUD Assistance.

(1) HUD will be the Contract Administrator.

(2) HUD hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable the Families to lease decent, safe, and sanitary housing pursuant to section 8 of the Act.

(3) If there is a Utility Allowance and if the Allowance exceeds the total Family contribution, the Owner shall pay the Family the amount of the excess. HUD will pay funds to the Owner in trust solely for the purpose of making this payment. Any pledge by the Owner of payments properly payable under this Contract shall not be construed to include payments covered by this paragraph.

4. Maximum Housing Assistance Commitment; Project Account.

(a) Maximum Contract Commitment. The maximum amount of the commitment for housing assistance payments under this Contract is $ 207,000 . However, this amount may be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

5. Housing Assistance Payments To Owners.

(a) Housing Assistance Payments on Behalf of Families.

(1) Housing assistance payments shall be paid to the Owner for units under lease for occupancy by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of the rent payable by the Family as determined in accordance with the HUD-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by the Family shall be subject to change by reason of changes in Family Income, Family composition, extent of exceptional medical or other unusual expenses or program rules in accordance with the HUD-established schedules and criteria; or by reason of a change in any applicable Utility Allowance approved or required by HUD. Any such change shall be effective as of the date stated in a notification of the change to the Family, which need not be at the end of the Lease term.

(b) Vacancies. If an occupied unit becomes vacant, HUD will pay the Owner 80 percent of the contract rent for up to the lesser of 60 calendar days following the date the unit became vacant or the actual number of days the unit remained vacant. Such payments will be made only in accordance with the following conditions and limitations:

(1) The Owner shall be entitled to vacancy payments under this paragraph (b) if the Owner:

(a) immediately upon learning of the vacancy or prospective vacancy (i) notified the CA of the vacancy and the reasons for the vacancy; and (ii) took and continued to take all feasible actions to fill the vacancy including, but not limited, contacting applicants on the waiting list and advising them of the availability of the unit;

(b) has not rejected any eligible applicant except for good cause acceptable to HUD;

(c) when the vacancy was created by the Owner action, administered the termination of the tenancy, eviction and all related notices in accordance with State and local law, the lease and HUD regulations and administrative procedures.

(2) HUD will pay vacancy payments only for those days on which the unit was in decent, safe, and sanitary condition and available for occupancy.

(3) If the Owner collects other payments towards the rent due for the period HUD pays vacancy payments, the Owner shall pay to the CA, or pay as the CA directs, any amount by which the sum of the HUD vacancy payments exceeds the contract rent. "Other payments" will include rent collected from or on behalf of the former tenant, security deposit applied toward the rent, and payments from any other source.

(c) Prohibition of Double Compensation for Vacancies. The Owner is not entitled to payments for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, and governmental payments under other programs). If the Owner collects any of the Family's share of the rent for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Contract Rent, the excess must be reimbursed as HUD directs.

(d) HUD Not Obligated for Family Rent. HUD has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family. The financial obligation of HUD is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

(e) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to HUD or as directed by HUD for housing assistance payments. Each request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit; and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in decent, safe, and sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive any payments or other consideration from the Family, the PHA, HUD, or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, HUD in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

6. Maintenance, Operation and Inspection.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities. The Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 35. If HUD determines that the Owner is not meeting one or more of these obligations, HUD shall have the right to take action under section 20.

(b) Inspection.

(1) Prior to occupancy of any Contract Unit by a Family or to receipt of payments hereunder, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed or approved by HUD, that they have inspected the unit and have determined it to be decent, safe, and sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(2) HUD shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligation to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services. HUD shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

(c) Units Not Decent, Safe, and Sanitary. If HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, HUD may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and HUD does not have other section 8 funds for such purposes, HUD may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of rent payable by the Family.

(d) Notification of Abatement. Any reduction or suspension of housing assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family

of any such abatement.

(e) Overcrowded and Underoccupied Units. The Owner agrees to rent units to eligible tenants in accordance with HUD occupancy guidelines, instructions, regulations, and requirements in effect at the time of the determination.

7. Submission of Financial and Operating Statements. The Owner must submit to HUD:

(a) Within 60 days after the end of the project's fiscal year, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(b) Other statements as to project operation, financial conditions and occupancy as HUD may require pertinent to administration of the Contract and monitoring of project operations.

8. Rent Adjustments.

(a) Initial Rents. In accordance with HUD Notice H 96-74, entitled Project-Based Section 8 Contracts Expiring in Fiscal Year 1997 (Notice), issued by HUD on August 28, 1996, the initial rents shall be set forth in Exhibit A.

(b) Adjustments. The Owner may request a budget-based rental increase during the term of this Contract of 5% of the initial rents set forth in Exhibit A. The Owner must demonstrate to HUD sufficient need for this rental adjustment according to the instructions set forth in the Notice. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase.

(c) Limitation. In no case shall the adjusted rent exceed 120% of the HUD published Fair Market Rent for the area on the Effective Date of this contract.

(d) Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

9. Marketing and Leasing of Units.

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations and procedures relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, sex, handicap, familial status or national origin and in the case of previously HUD-owned projects in accordance with approved tenant selection factors.

(b) Security Deposits. The Owner agrees to comply with applicable section 8 regulations, instructions, procedures, and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) The Owner shall be responsible for determination of eligibility of applicants, selection of Families from among those determined to be eligible, computation of the amount of housing assistance payments on behalf of each selected Family and of total Family contributions and recordkeeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) In renting of the Contract Units, the Owner must lease them to Very Low-Income Families (determined in accordance with HUD established schedule and criteria). Exceptions may be made and the units leased to Low Income Families under such circumstances as where the project viability is being endangered by the lack of sufficient number of potential applicants who are Very Low-Income Families, but only after the prior approval of HUD.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD.

(5) (i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least as often as required by HUD regulations or other requirements, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with applicable HUD regulations and requirements.

(ii) If a Family reports a change in income or other circumstances that would result in a decrease of total Family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total Family contribution. The Owner may require in its lease that Families report increases in income or other changes between scheduled reexaminations.

(iii) A Family's eligibility for housing assistance payments continues until its total Family contribution equals the total housing expense for the unit it occupies. The termination of eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) The Owner shall maintain as confidential all information relating to section 8 applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD and PHA regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD or the PHA.

(e) Review: Incorrect Payments. In making housing assistance payments to Owners, the PHA or HUD will review the Owner's determinations under this section. If as a result of this review, or other reviews, audits or information received by the PHA or HUD at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the PHA or HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery.

10. Termination of Tenancy or Section 8 Assistance by the Owner; Tenant Notice.

(a) The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements, in effect at the time of the termination, and any Federal, State and local law.

(b) The Owner agrees, that as a project owner participating in the Section 8 Program, the Owner is required under Section 8(c)(9) of the U.S. Housing Act of 1937 to provide, at minimum, a one year notice to HUD and the affected tenants about the termination or expiration of this Contract. The term "termination" means the expiration of the assistance contract or an owner's refusal to renew the assistance contract. The Owner acknowledges that if the Owner does not give proper notice under 8(c)(9) of the Act, the Owner must permit the tenants to remain in their unit for the one year notice period without an increase in the tenants' portion of the rent they were paying under the expiring contract.

11. Reduction of Number of Units for Failure to Lease to Eligible Families.

(a) Limitation on Leasing to Ineligible Families. The Owner may not at any time during the term of this Contract lease more than 10 percent of the assisted units in the project to families which are ineligible under section 8 requirements at initial occupancy without the prior approval of HUD. Failure on the part of the Owner to comply with this prohibition is a violation of the Contract and

grounds for all available legal remedies, including specific performance of the Contract, suspension or debarment from HUD programs and reduction of the number of units under the Contract, as set forth in paragraph (b) of this section. (See also section 20.)

(b) Reduction for Failure to Lease to Eligible Families--New and Rehab Projects. If, at any time beginning sixty days after the effective date of the Contract, the Owner fails for a continuous period of sixty days to have at least 90 percent of the assisted units leased or available for leasing by Families eligible under section 8 requirements at initial occupancy, HUD (or the PHA at the direction of HUD, as appropriate) may, on at least 30 days' notice, reduce the number of units covered by the Contract. HUD or the PHA may reduce the number of units to the number of units actually leased or available for leasing plus 10 percent (rounded up). This reduction, however, will not be made if the failure to lease units to eligible Families is permitted in writing by HUD under paragraph (a) of this section.

(c) Reduction--Previously HUD-Owned Projects. If, at any time beginning sixty days after the effective date of the Contract, the Owner fails for a continuous period of sixty days to have all of the assisted units leased or available for leasing by Families eligible under section 8 requirements at initial occupancy, HUD may, on 30 calendar days' notice, reduce the number of Contract units to not less than the number of Contract units under lease, plus 10 percent of such number if the number is 10 or more, rounded up. Failure by the Owner to make a reasonable effort to lease the units to eligible Families shall be a violation of the Contract and grounds for all legal remedies including those specified in paragraph (a) and section 20.

(d) Restoration. HUD will agree to an amendment of the ACC or the Contract, as appropriate, to provide for subsequent restoration of any reduction made pursuant to paragraph (b) or (c) of this section if:

(1) HUD determines that the restoration is justified by demand,

(2) The Owner otherwise has a record of compliance with its obligations under the Contract, and

(3) Contract authority is available. HUD will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out its agreement.

12. Nondiscrimination.

(a) General. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, handicap, familial status, or national origin.

(b) Members of Certain Classes. The Owner shall not automatically exclude anyone from participation in, or deny anyone the benefits of, the Housing Assistance Payments Program because of membership in a class, such as unmarried mothers, recipients of public assistance, and handicapped persons.

(c) The Fair Housing Act. The Owner shall comply with all requirements imposed by the Fair Housing Act, which prohibits discrimination in the sale, rental, financing and advertising of housing on the basis of race, color, religion, sex, handicap, familial status, or national origin, and any related rules and regulations.

(d) Title VI of the Civil Rights Act of 1964 and Executive Order 11063. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. et seq.; the HUD Regulations issued thereunder, 24 CFR, Subtitle A, Part 1; the HUD requirements pursuant to these regulations; and Executive Order 11063 and any regulations and requirements issued thereunder, to the end that, in accordance with that Act, Executive Order 11063, and the regulations and requirements of HUD, no person in the United States shall, on the grounds of race, color, creed, or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of HUD, 24 CFR, Subtitle A, Part 1 issued under Title VI of the Civil Rights Act of 1964, HUD regulations issued pursuant to Executive Order 11063 and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply therewith inures to the benefit of the United States of America and HUD any of which shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by the Owner.

(e) Section 504 of the Rehabilitation Act of 1973. The Owner shall comply with all the requirements

imposed by section 504 of the Rehabilitation Act of 1973, as amended, and any related rules and regulations. Section 504 provides that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance. Accordingly, the Owner (1) shall not discriminate against any qualified handicapped person on the basis of handicap and (2) shall cause to be incorporated into all contracts executed in connection with this project a provision requiring compliance with rules and regulations issued pursuant to section 504. See also paragraph (f)(3) through (8) concerning Section 504 protections to employees with handicaps.

(f) Employees of Owner.

(1) In carrying out the obligations under this Contract, the Owner will not discriminate against any employee or applicant for employment because of race, color, creed, religion, sex, handicap, familial status, or national origin. The Owner will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, creed, religion, sex, handicap, familial status, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

(2) The Owner agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by HUD setting forth the provisions of this nondiscrimination clause. The Owner will in all solicitations or advertisements for employees placed by or on behalf of the Owner state that all qualified applicants will receive consideration for employment without regard to race, color, creed, religion, sex, handicap, familial status, or national origin. The Owner will incorporate the foregoing requirements of this paragraph in all of its contracts for project work, except contracts for standard commercial supplies or raw materials, and will require all of its contractors for such work to incorporate such requirements in all subcontracts for project work.

(3) The Owner agrees not to limit, segregate, or classify applicants or employees in any way that adversely affects their opportunities or status because of handicap.

(4) The Owner agrees not to participate in a contractual or other relationship that has the effect of subjecting qualified applicants with handicaps or employees with handicaps to discrimination.

(5) The Owner agrees to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant with handicaps or employee with handicaps, unless the Owner can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(6) The Owner agrees not to use any employment test or other selection criterion that screens out or tends to screen out individuals with handicaps unless:

(i) The Owner demonstrates that the test score or other selection criterion, as used by the Owner, is job-related for the position in question; and

(ii) The appropriate HUD official demonstrates that alternative job-related tests or criteria that tend to screen out fewer individuals with handicaps are unavailable.

(7) The Owner agrees to comply with 24 CFR 8.12 and related HUD instructions when selecting and administering tests to avoid discrimination against individuals with handicaps.

(8) The Owner agrees to comply with 24 CFR 8.13 an any related HUD instructions concerning preemployment inquiries.

(g) Age Discrimination Act of 1975. The Owner shall comply with any rules and regulations issued or adopted by HUD under the Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs and activities receiving Federal financial assistance.

13. Cooperation in Equal Opportunity Compliance Reviews.

The Owner agrees to cooperate with HUD in the conducting of compliance reviews and complaint

investigations pursuant to or permitted by all applicable civil rights statutes, Executive Orders, and rules and regulations.

14. Flood Insurance.

The Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

15. Clean Air Act and Federal Water Pollution Control Act.

(a) Definition. "Facility" means any building, plant, installation, structure, mine, vessel, or other floating craft, location, or site of operations, owned, leased, or supervised by the Owner or any subcontractor, used in the performance of the contract or any subcontract. When a location or site of operations includes more than one building, plant, installation, or structure, the entire location or site shall be deemed a facility except when the Administrator, or a designee, of the Environmental Protection Agency (EPA) determines that independent facilities are collocated in one geographical area.

(b) In compliance with regulations issued by the United States Environmental Protection Agency (EPA), 40 CFR Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees to:

(1) Not utilize any facility in the performance of this contract or any subcontract which is listed on the EPA List of Violating Facilities pursuant to Part 15 of the regulations for the duration of time that the facility remains on the list;

(2) Promptly notify HUD if a facility the Owner intends to use in the performance of this contract is on the EPA List of Violating Facilities or the Owner knows that it has been recommended to be placed on the List;

(3) Comply with all requirements of the Air Act and the Water Act, including the requirements of Section 114 of the Air Act and Section 308 of the Water Act, and all applicable clean air and clean water standards; and

(4) Include or cause to be included the provisions of this clause in every subcontract, and take such action as HUD may direct as a means of enforcing such provisions.

16. Reports and Access to Premises and Records.

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD.

(b) The Owner shall permit HUD or any of their duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

17. Interest of Local Public Officials and Employees when PHA has an Interest in the Contract.

If a PHA is a party to or has an interest in this contract, no member, officer, or employee of the PHA; no member of the governing body of the locality (city or county) in which the project is situated or in which the PHA was activated; and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising from it during his/her tenure or for one year thereafter. This provision may be waived by HUD for good cause.

18. Interest of Member of or Delegate to Congress.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

19. Assignment, Sale or Foreclosure.

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, the ACC (if applicable), or the project or any part of them or any of its interest in them, without the prior written consent of HUD. However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD shall consent in writing if HUD has approved the terms of the financing.

(b) The Owner agrees to notify HUD promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD.

(c) (1) For purposes of this section, a sale, assignment, conveyance, or transfer includes but is not limited to one or more of the following:

(i) A transfer by the Owner, in whole or in part,

(ii) A transfer by a party having a substantial interest in the Owner,

(iii) Transfers by more than one party of interests aggregating a substantial interest in the Owner,

(iv) Any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution of interests by any other method or means, and

(v) Any refinancing by the Owner of the project.

(2) An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer. An assignment by one or more general or limited partners of a limited partnership interest to a limited partner, who will have no more than a 25 percent interest, shall not be considered an assignment, conveyance, or transfer.

(3) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(d) The Owner and the party signing this Contract on behalf of the Owner represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect to it.

(e) Except where otherwise approved by HUD, this Contract, the Agreement, and the ACC (if applicable) shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event:

(1) Of assignment, sale, or other disposition of the project or this Contract, the Agreement, or the ACC,

(2) Of foreclosure, including foreclosure by HUD,

(3) Of assignment of the mortgage or deed in lieu of foreclosure,

(4) The PHA or HUD takes over possession, operation or ownership,

(5) The Owner prepays the mortgage.

20. Defaults by PHA and/or Owner.

(a) Rights of Owner if PHA Defaults under Contract (for Private-Owner/PHA Projects).

(1) Events of Default. The occurrence of any of the following events, if the Owner is not in default, is defined as a default under the ACC:

(i) If the PHA fails to perform or observe any term or condition of this Contract;

(ii) If the Contract is held to be void, voidable, or ultra vires;

(iii) If the power or right of the PHA to enter into the Contract is drawn into question in any legal proceeding; or

(iv) If the PHA asserts or claims that the Contract is not binding upon the PHA for any such reason.

(2) Owner Request for HUD Determination of Default. If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event:

(i) Notify HUD of the occurrence of the event;

(ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and

(iii) Request HUD to determine whether there has been a default.

(3) HUD Determination of Default and Curing of Default. HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines that the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Contract, including any funds. HUD shall continue to pay annual contributions with respect to the units covered by this Contract in accordance with the ACC and this Contract until reassigned to the PHA. All rights and obligations of the PHA assumed by HUD will be returned as constituted at the time of the return:

(i) When HUD is satisfied that all defaults have been cured and that the project will thereafter be administered in accordance with all applicable requirements, or

(ii) When the Contract is at an end, whichever occurs sooner.

(4) Enforcement by Owner. The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

(b) Rights of PHA and HUD if Owner Defaults under Contract.

(1) Events of Default. A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii) For projects with mortgages insured by HUD or loans made by HUD, the Owner has violated or failed to comply with the regulations for the applicable insurance or loan program, with the insured mortgage, or with the regulatory agreement; or the Owner has filed any false statement or misrepresentation with HUD in connection with the mortgage insurance or loan.

(2) HUD Determination of Default. Upon a determination by HUD that a default has occurred, HUD shall notify the Owner of

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and

(iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

If the Owner fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD.

(3) Corrective Actions. Pursuant to paragraph (b)(2) of this section, HUD may take the following corrective actions:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If HUD takes possession, housing assistance payments shall continue in accordance with the Contract.

(ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other loan documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to the PHA and/or HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

(iv) Reduce or suspend housing assistance payments.

(v) Recover any overpayments.

(c) Remedies Not Exclusive and Non-Waiver of Remedies. The availability of any remedy under this Contract or the ACC, where applicable, shall not preclude the exercise of any other remedy under this Contract or the ACC or under any provisions of law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

21. Entire Agreement.

This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD. The Agreement and Contract must be interpreted and implemented in accordance with HUD requirements.

Warnings:

There are fines and imprisonment -- $10,000/5 years -- for anyone who makes false, fictitious, or fraudulent statements or entries in any matter within the jurisdiction of the Federal Government (18 U.S.C. 1001).

There are fines and imprisonment --$250,000/5 years -- for anyone who misuses rents and proceeds in violation of HUD regulations relative to this project. This applies when the mortgage note is in default or when the project is in a nonsurplus cash position (12 U.S.C. 1715z-9).

HUD may seek a "double damages" civil remedy for the use of assets or income in violation of any Regulatory Agreement or any applicable HUD regulations (12 U.S.C. 1715z-4a).

HUD may seek additional civil money penalties to be paid by the mortgagor through personal funds for:

(1) Violation of an agreement with HUD to use nonproject funds for certain specified purposes as a condition of receiving transfers of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms or workout. The penalties could be as much as the HUD Secretary's loss at foreclosure sale or sale after foreclosure.

(2) Certain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15).

This Contract is hereby executed with respect to the Contract Units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

By: Robert M. Brown

Robert M. Brown, Director
Multifamily Housing Division
Date: 3/24/98

OWNER

By: [signature]

(Official Title) BSA CO
Date: 3-11-98

<u>Warning</u>: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, must be fined not more than $10,000 or imprisoned for not more than five years, or both.

# EXHIBIT A

## IDENTIFICATION OF UNITS ("CONTRACT UNITS") BY SIZE AND APPLICABLE CONTRACT RENTS

| Number of Units | Number of Bedrooms | Contract Rent ** |
|---|---|---|
| 3 | 1 Bedroom | 400 |
| 12 | 1 Bedroom | 390 |
| 11 | 2 Bedroom | 437 |
| 16 | 2 Bedroom | 427 |

** Use this form or Exhibit B (Form HUD-52537, 6/92 entitled Schedule of Units, Rents, Equipment and Services) set froth in Appendix 2 to Handbook 4350.2 REV-1.

** To compute Contract Rents, use policy set forth in Notice 96-74 issued on August 28, 1996 .

| | |
|---|---|
| **Project Name/REMS ID: (*)** COLLINGWOOD/KIRKWOOD / 800010025 | |
| **Project (FHA) Number:** 044-44017 | |
| **Section 8 Number:** | |
| **Document Category: (*)** SUBSIDY | |
| **Document Title: (*)** SEC. 8 HAP CONTRACT | |
| **Effective Date: (*)** 1-16-98 | |
| **Special Process Type:** | |
| **To-Do List?** Yes ☐ | |
| **Analysts initials: (*)** JLP | |

(*) *Critical data elements (mandatory).*

*NOTE: Use original for scanning.*

# Document Header Page

**Department of Housing and Urban Development**
**Enforcement Center - Chicago Satellite office**
**Document Imaging System Document Separator**

## Special Processing Requirements

____ **# Documents** ☐ **Duplex** ☐ **Hard copy?**

____ **# Pages** ☐ **Legal**

☐ **Other** ____________________________



Date Revised 1/22/99

U.S. Department of Housing and Urban Development

Michigan State Office
Office of Housing
Patrick V. McNamara Federal Building
477 Michigan Avenue
Detroit, MI 48226-2592
Tel. (313) 226-6280

MAR 24 1998

Dr. Ben Alli
BSA Management Co., Inc.
P.O. Box 36081
Grosse Pointe, MI 48236

Dear Mr. Alli:

Subject: Project No : 044-44017
Section 8 Contract # : MI28-E000011
Project Name: Collingwood/Kirkwood

We have executed the Section 8 Loan Management Set Aside Contract on the above property. The effective date of the HAP Contract is January 16, 1998. A copy of the HAP Contract is enclosed.

The HAP Contract identifies your responsibilities for the property.

If you have any question, please contact Carrie A. Johnson at (313) 226-4900 x 8140.

Sincerely,

Robert M. Brown
Director, Detroit
Multifamily Hub

Enclosure: * Lease Addendum
- Owners Certification
- Instruction for Processing Rental Adjustments

cc: Copies
fhma: Official Record File
fhma: Chrono
fhma: FAD/ENCLOSURE
fhma: TRAC
fhma: Johnson x 8140

FILE COPY

concur:
Johnson

Johnson
3/24/98

Russie

3-24-98

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of Housing, Federal Housing Commissioner

HOUSING ASSISTANCE PAYMENTS
RENEWAL CONTRACT

**HUD as Contract Administrator**

SECTION 8 PROJECT NUMBER: *044-44017*

SECTION 8 PROJECT NUMBER OF EXPIRING CONTRACT
(if different): MI28E000011

FHA PROJECT NUMBER: (if applicable) 044-44017

This HOUSING ASSISTANCE PAYMENTS CONTRACT MI28E000011 is entered into between the U.S. Department of Housing and Urban Development ("HUD") and Collingwood-Kirkwood ("Owner") pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437 et seq. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Previously, HUD and the Owner entered into a Housing Assistance Payments Contract (MI28E000011) *to provide section 8 assistance* to the Owner for eligible families living in Collingwood-Kirkwood Apartments.("Project").

This Expiring Contract expires on September 15, 1999.

HUD and the Owner desire to renew for the term specified below the Expiring Contract **EXCEPT for the Contract Rent and Rent Adjustment Provisions.**

**THEREFORE, HUD and the Owner hereby agree as follows:**

1. This Contract provides Housing Assistance Payments to the Owner for the term specified (see #4 & #5 below) at the contract rent levels listed in Exhibit A.

2. All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.

3. There will be no rent adjustments during the term of this Contract.

SF ASSET MANAGEMENT PAGE 03/03



4. The effective date of this Contract is September 16, 1999.

5. This Contract expires on March 15, 2000.

6. The maximum amount of the commitment for housing assistance payments under this Contract is $ 90,000.

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in decent, safe and sanitary condition, as defined by HUD.

9. Notwithstanding any provision to the contrary, HUD, by executing this contract, does not make any warranty and/or representation as to the condition of the rental units. Execution of this Contract by HUD is not an endorsement by HUD that the rental units are in decent, safe and sanitary condition, as defined by HUD.

10. It is a crime to knowingly make false statements to HUD on this form or any other similar form. Penalties upon conviction can include a fine and imprisonment. 18 U.S.C. 1001, 1010.

This Contract is hereby executed with respect to the contract units described in Exhibit A.

UNITED STATES OF AMERICA
SECRETARY OF HOUSING AND
URBAN DEVELOPMENT

By: ____________________

Date: ____________________

OWNER

By: [signature] BSA Co. [illegible]

Date: 8/9/99

SIGN HERE

90132976

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

L:24774PA093

**Project No.:** 044-44017-330 **HAP CONTRACT NO.:** MI28-E000-011

**Mortgagee** Secretary of Housing and Urban Development
451 Seventh St., S.W., Washington, D.C. 20410

**Amount of Mortgage Note** **Date** June 18, 1981

**Mortgage: Recorded:** **State** Michigan **County** Wayne **Date** June 18, 1981

**Book** Liber 21182 **Page** 561

Originally endorsed for insurance under Section of the National Housing Act.

90 AUG 15 AM 9:28
REGISTER OF DEEDS
FOREST E. YOUNGBLOOD
WAYNE COUNTY, MI

This Agreement entered into this 6th day of July, 1990, between BSA Corporation, a Michigan corporation whose address is P.O. Box 36081, Grosse Pointe, Michigan 48236

their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*, whose address is 451 Seventh St., S.W., Washington D.C. 20410

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 208.33 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

This Replaces HUD-9412, Dated April 1976. HUD-92466 (6-77)

33K1

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services included in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwithstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

L12477 PG094

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

L12477 PG0085
FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(h) If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national orgin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284,82 Stat. 73)* Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts 1, 100, and 110, and Subparts I and M of Part 200)*.

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

HUD-92466 (6-77)

L12477 PAGE 096

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(i) An amount equal to the aggregate of all special funds required to be maintained by the project.

(ii) All tenant security deposits held:

L124774PA097

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representati- executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: BSA Corporation, a Michigan corporation

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

IN WITNESS WHEREOF, the parties set their hand and seal the day and year first above written.

L24774PA098

IN THE PRESENCE OF:

BSA CORPORATION, a Michigan corporation,

By: [signature]

Its: President

"PURCHASER"

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, BY AND THROUGH THE FEDERAL HOUSING COMMISSIONER,

By: [signature]
John G. Terranella
Its: Director, Housing Management Division

[signature]
Jean Nash

[signature]
Tamara Price

STATE OF MICHIGAN }
} SS
COUNTY OF OAKLAND }

On this 9 day of June, 1990, before me, a Notary Public in and for said County, personally appeared B.A. ALLI, on behalf of BSA CORPORATION, a Michigan corporation, who acknowledged that he did sign the foregoing instrument on behalf of the corporation.

MARGARET M. MESSINA
Notary Public, Wayne County, MI
My Commission Expires 10-26-92

[signature] Margaret M. Messina
Notary Public, ________ County, Michigan. My commission expires:

STATE OF MICHIGAN }
} SS
COUNTY OF }

On this 6th day of July, 1990, before me, a Notary Public in and for said County, personally appeared John G. Terranella, to me personally known and known to me to be the duly Authorized Agent, and the person who executed the aforementioned instrument by virtue of the authority vested in him by 24 C.F.R. 200.119 and acknowledged that he executed the foregoing instrument for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for the purpose stated.

JOHN JOSEPH NIEBIESZCZANSKI
Notary Public, Macomb County
Acting in Wayne County, State Of Michigan
My Commission Expires 09-15-92

[signature]
Notary Public, ________ County, Michigan. My commission expires:

DRAFTED BY AND WHEN RECORDED, RETURN TO:

David S. Snyder, Esq.
Snyder and Handler, P.C.
1365 American Center
27777 Franklin Road
Southfield, Michigan 48034

M
33
V

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

L!24774PA099

Land in CITY OF DETROIT WAYNE County, Michigan

Parcel I, Lots 63, 64 and Westerly 27.40 feet of Lot 62 and Easterly 15 feet of Lot 65 RANNEY'S BOULEVARD SUBDIVISION, as recorded in Liber 28, Page 72 of Plats, Wayne County Records.

Parcel II, Lots 24 and 25 SULLIVAN-CAMPBELL SUBDIVISION, as recorded in Liber 31, Page 60 of Plats, Wayne County Records.
1610 Collingwood
1635 Calvert

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

APPENDIX "A"

L 24774 PA 100

A. Regulatory Agreement

The Regulatory Agreement shall include the following additional language:

1. Requirement to Rent to Section 8 Tenants Provision Applicable During Term of the Housing Assistance Payments Contract.

The Owner agrees that, during the term of the Housing Assistance Payments Contract executed between the Secretary and the Owner (hereafter referred to as "HAP Contract"), which contract shall not be cancellable by the Owner, the Owner shall (a) select tenants to fill vacancies from applicants who are eligible for assistance under Section 8 of the United States Housing Act of 1937 (42 USC 1437f), or any successor legislation (hereafter referred to as "Section 8"), subject to the provisions on eligibility, selection and admission in the HAP Contract and (b) not evict any such person or otherwise discriminate in the terms of a tenancy because such person is receiving such assistance.

If the Owner is unable to fill said vacancies with persons eligible for Section 8 Assistance within 90 days after a vacancy of a previously subsidized Section 8 unit occurs, then the Owner may rent such unit to a tenant not eligible for Section 8 Assistance with the approval of the Secretary.

The Owner agrees to keep such records as may be required by the Secretary to show its affirmative efforts to fill such vacancies with tenants eligible for Section 8 Assistance.

If the number of units receiving Section 8 tenants falls below 47 , then the Owner may not rent any units, to other than those eligible for Section 8 Assistance, without the written approval of the Secretary.

2. Non-Discrimination Provision Applicable during Term of Regulatory Agreement.

This provision applies to those dwelling units not covered by the preference provision of paragraph 1, both during the term of the HAP Contract and after its expiration. The Owner agrees not to refuse unreasonably to lease a vacant dwelling unit, evict any person or otherwise discriminate in the terms of tenancy because such person is the holder of, or eligible to hold, a Certificate of Family Participation under Section 8 of the United States Housing Act of 1937 (42 USC 1437f), or any successor legislation; Provided, that this provision is limited to those units which rent for an amount not greater than the fair market rent for a comparable unit in the area as determined by the Secretary under Section 8.

BERNARD J. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

3. Renewal of HAP Contract.

So long as the mortgage covering the project is insured or held by the Secretary, the Owner agrees to accept (1) any offer by the Secretary to renew the HAP Contract or (2) an offer by the Secretary to provide any other rental housing assistance, in lieu of Housing Assistance Payments, designed to provide families decent, safe and sanitary housing pursuant to Section 8 of the Housing Act of 1937 or any successor legislation.

4. Evictions

The eviction regulations at 24 CFR Part 450, and any successor regulations shall be binding on the Owner in management and operation of the project.

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

DEED 33'00

EXHIBIT
Fanning 1
2-3-05 JS

Marcus & Millichap

# REAL ESTATE PURCHASE AGREEMENT

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. THIS DOCUMENT IS INTENDED TO BE A LEGALLY BINDING CONTRACT. READ IT CAREFULLY.

Marcus & Millichap Real Estate Investment Brokerage Company of Detroit ("Agent") will on offer acceptance receive from Cory Fanning ("Buyer") the sum of $ 5,000 in the form of check. This sum is a deposit ("Deposit") to be applied to the purchase price of that certain real property and improvements referred to as Collingwood/Kirkwood Apartments (the "Property") generally located at 1610 Collingwood/1635 Calvert in the City of Detroit, County of Wayne, State of Michigan, and more particularly described as follows:

LEGAL TO BE ATTACHED

The Property shall also include Seller's interests in:

1. Any and all privileges and appurtenances pertaining to the Property, including any right, title and interest of Seller in or to adjacent streets, alleys or right(s)-of-way;
2. Any and all leases, licenses, occupancy agreements, permits, rents, warranties, guarantees or security deposits with respect to the Property, or any portion thereof;
3. Any and all tradenames used in connection with the Property.

## TERMS AND CONDITIONS

For the mutual covenants contained in this Real Estate Purchase Agreement ("Agreement"), Seller agrees to convey the Property to Buyer, and Buyer agrees to purchase the Property from Seller, on the following terms and conditions:

1) PURCHASE PRICE: The total purchase price for the Property ("Purchase Price") is $675,000.

2.1) DEPOSIT: The Deposit shall be credited to the Purchase Price of the Property at the Closing Date (as defined in paragraph 4 below) of this Agreement, and shall be held by Agent (as defined in paragraph 4 below) in trust for the benefit of the parties in a non-interest-bearing account (the "Deposit Account") at a banking institution designated by Agent, unless otherwise instructed by the Buyer and Seller in writing.

2.2) DEPOSIT INCREASE: With the removal of the contingencies set forth in paragraph(s) 8 - 9 hereof, Buyer shall increase the total Deposit in the Deposit Account to $20,000 dollars. Buyer's failure to timely increase the total Deposit as required hereunder shall be a material breach of this Agreement. The entire Deposit shall be credited to the Purchase Price at the Closing Date, unless otherwise provided herein.

2.3) DEPOSIT TRANSFER: Buyer's Deposit shall remain in trust until removal of the contingencies set forth in paragraph(s) 8 -9 hereof. Upon removal of said contingencies: (1) Buyer's Deposit shall be non-refundable,subject to paragraph 7.1; (2) the Deposit Account shall remain subject to the remaining terms and conditions of this Agreement; and, (3) upon the written instruction of Seller, the Deposit Account shall be transferred to the Seller. However, if the Property is made unmarketable by Seller, or by acts of God, then Buyer's entire Deposit shall be returned to Buyer.

3) ADDITIONAL CASH DOWN PAYMENT: Buyer shall make an additional cash down payment (in addition to the Deposit) to bring the total down payment amount to 15% of purchase price including financeable loan cost at the Closing Date.

4) CLOSING DATE: The completion of this Agreement and close of the transaction hereunder shall take place at the office of ("Closing Agent") located at TBD, unless otherwise agreed in writing by Buyer and Seller. Within 100 calendar days of the Effective Date of this Agreement, as defined in paragraph 33 below, Seller and Buyer agree to prepare, execute and cause to be delivered to the Closing Agent such instructions and other documents as may be necessary and appropriate to complete this Agreement and close the transaction. Should the instructions or other closing documents, if any, fail to be executed or delivered as required, Closing Agent shall, and hereby is, directed to close the transaction pursuant to the terms and conditions of this Agreement. "Closing Date" shall mean the date on which the document(s) transferring title to the Property to Buyer or Buyer's designee is recorded. All fees of the Closing Agent to close this transaction shall be paid equally by buyer and seller. All other closing costs shall be paid in accordance with the custom and practice in the county in which the Property is located.

5) PRORATIONS: Rents, real property taxes and assessments, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other income or expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. Prepaid real estate taxes shall be prorated.

6) TITLE: Within 20 calendar days after the Effective Date of this Agreement, Seller shall furnish or cause to be furnished to Buyer a commitment for an A.L.T.A. fee owner's policy of title insurance ("Commitment") to be issued at the Closing Date by TBD (the "Title Company") for the Property. Within 5 calendar days following receipt thereof, Buyer shall either approve in writing the exceptions contained in said Commitment or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within [illegible] calendar days after receipt of Buyer's objections, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s). If Seller fails to so notify Buyer or is unwilling or unable to remove any such exception by the Closing Date, Buyer may either (i) elect to terminate this Agreement and receive back the entire Deposit, in which event Buyer and Seller shall have no further obligations under this Agreement; or, alternatively, (ii) Buyer may elect to purchase the Property hereunder subject to such exception(s).

THE PARTIES ARE ADVISED TO CONSULT WITH THEIR RESPECTIVE ATTORNEYS CONCERNING THE LEGAL EFFECT AND VALIDITY OF THIS AGREEMENT PRIOR TO ITS EXECUTION. The undersigned Buyer hereby offers and agrees to acquire the Property for the Purchase Price and upon the terms and conditions of this Agreement. This offer is made by Buyer to Seller on this 14 day of July, 19 99. Buyer hereby acknowledges receipt of an executed copy of this Agreement.

BUYER: Cory Fanning ADDRESS: ______

TELEPHONE: ______

SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing Buyer's offer, and agrees to convey the Property to Buyer or Buyer's designee for the Purchase Price and upon the terms and conditions of this Agreement. Seller hereby acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller hereby reaffirms Seller's agreement to pay Agent a real estate brokerage commission ("Commission") pursuant to the terms and conditions of that certain Representation Agreement between Agent and Seller dated which shall remain in full force and effect. Said Commission is payable to Agent in full by cash, certified check or cashier's check on or before the Closing Date. The Title Company is directed to make such payment to Agent from Seller's proceeds of the sale or exchange. The provisions concerning Agent's Commission may not be amended or modified without the written consent of Agent. Seller hereby grants to Agent the right to file a lien against the Property in the nature of a mechanic's lien to secure any amounts due to Agent.

SELLER: [signature] ADDRESS: ______

TELEPHONE: ______

DATE: 15 Jul 99

Agent accepts and agrees to the foregoing.

AGENT: MARCUS & MILLICHAP REAL ESTATE INVESTMENT BROKERAGE COMPANY OF DETROIT

BY: [signature] ADDRESS: ______

DATE: ______

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL, FINANCIAL, TAX OR OTHER EFFECTS, OR THE VALIDITY OF, ANY PROVISION OF THIS AGREEMENT. AS A REAL ESTATE BROKER, AGENT IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS ONLY. IF YOU DESIRE LEGAL, FINANCIAL, TAX OR OTHER PROFESSIONAL ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT, TAX OR OTHER PROFESSIONAL ADVISOR.



ML1 - Copyright Marcus & Millichap 1998

CHAPTER 13. CHANGE IN OWNERSHIP: TRANSFER OF PHYSICAL ASSETS

INTRODUCTION

The sale and conveyance by deed of title to a property covered by an insured mortgage necessitates a substitution of mortgagors. HUD approval of the substitution is required in every case where HUD exercises control over the mortgagor either as preferred stockholder, by regulatory agreement, or by certificate of beneficial interest. This chapter has a broader application than above, and the instructions, requirements and procedures outlined within cover not only transactions which result in the substitution of a mortgagor, but in any change in the control of a mortgagor.

SECTION 1. DELEGATIONS OF AUTHORITY AND EXCEPTIONS

13-1. Field Office Delegations

Field Offices are authorized to grant Preliminary and Final approval to all transfer proposals. However, there are two sets of exceptions, as noted in Section 1, Paragraph 13-3 and Paragraph 13-2 where Regional Office or Headquarters approval must be sought prior to Field Office granting preliminary approval of TPAs.

13-2. Requirement for Regional Office Prior Approval

The Regional Office must approve, prior to the Field Office granting preliminary approval, any proposal exhibiting the following characteristics:

A. The project's physical and/or financial needs will not be met within 36 months from the date of the transfer. (This is expected to be a rare occurrence.);

B. The transfer provides for secondary financing secured by the project and not meeting the requirements of Section 3, Paragraph 13-15 of this Notice. In any case involving secondary financing, all secondary financing secured by a lien against the project must be approved in writing by the first mortgagee. HUD will not approve any transfer including a lien against the project without written mortgagee approval;





C. The transfer provides for secondary financing which is either unsecured or secured by collateral other than the project (e.g., partnership interests), and does not meet the requirements of Section 3, Paragraph 13-15 of this Notice;

D. The transfer provides for a land contract which does not satisfy the requirements of Section 3,

Paragraph 13-15 of this Notice;



E. The transfer requires approval of a workout designed to meet the physical and financial needs of the project which is not in compliance with all outstanding workout instructions;

F. The transaction involves a transfer from nonprofit to profit motivated or limited distribution ownership and calls for remuneration to the seller; or

G. The transfer documents include a plan which contemplates repayment of a flexible subsidy loan over a period of more than 24 months, in the case of a transfer from a nonprofit to a profit motivated or limited dividend owner.

13-3. Requirement for Headquarters Prior Approval
Headquarters must approve, prior to the Field Office granting preliminary approval of the application, any transfer involving any of the following circumstances:

A. Use of the Low Income Housing Tax Credit (LIHTC) when combined with other forms of HUD assistance such as flexible subsidy loans, additional Section 8 assistance, 241 supplemental loans, etc.; or

B. TPAs requiring a regulatory agreement waiver or exception of any type, if the authority to approve the waiver or exception has not been delegated to the Region or Field Office.

13-4. Documentation Required for Regional and Headquarters Reviews
In every case where Regional Office or Headquarters approval must be obtained prior to Field Office preliminary approval of a TPA, the Field Office must:





A. Ensure the TPA meets all criteria for approval under outstanding instructions and will be approved if authorization to proceed is obtained;

B. Provide a summary of the transaction;

C. Provide form HUD-9575 and the parts of the TPA which are required to ensure an informed review, and;

D. Provide a recommendation.

13-5. Preliminary and Final Approval Actions
In every case, Preliminary and Final Approval authority rests with the Field Office. However, the Field Office is not authorized to issue either of these approvals until the Regional and/or Headquarters have approved the particular aspects of the TPA for which they have retained authority, as described in Section 1, Paragraph 13-2 and Section 1, Paragraph 13-3 above.

Field Offices may not grant preliminary approval if the TPA is dependent on other commitments or approvals that have not occurred. For example, the Field Office may not grant preliminary approval if the TPA depends on some other type of assistance (e.g., flexible subsidy loan, 241 supplemental loan, additional Section 8 assistance, etc.) from HUD and the Department has not issued the appropriate approval letter or firm commitment to insure. Similarly, the Field Office may not grant preliminary approval if the TPA depends on:

- o assistance from some other unit of government (Federal, state or local);
- o an allocation of LIHTC; or
- o the proceeds of a tax credit syndication, until the appropriate commitment has been issued by the responsible unit of government or company.

Field Offices may not grant preliminary approvals that are conditioned upon other commitments being issued, but may provide an applicant with a letter stating that all other TPA requirements have been satisfied, if the unit of government/company responsible for issuing the other commitment(s) requests such a letter.

After the preliminary approval letter is issued, the real estate transaction can close and all of the documents approved by HUD can be executed and recorded. The full review TPA transaction may be completed based upon a certification by the applicant's attorney that





the documents to be executed and recorded are exactly as approved by HUD. The Form of the required certification is in Appendix A, Procedures for Processing Full Review TPAs.

The Field Office may grant final approval of a full review TPA after it has reviewed and approved the executed and recorded documents.

SECTION 2. TRANSACTIONS REQUIRING REVIEW (CATEGORIES OF REVIEW)

Transactions involving the transfer of all or a controlling interest in the ownership of a HUD-insured or HUD-held project from one individual, group of individuals or entity to another individual, group of individuals or entity constitute a Transfer of Physical Assets (TPA). This definition is broad enough to incorporate modified TPAs within the purview of this discussion. For certain of these transactions, as described below, the Department requires a Full Review. For certain other transactions only a Modified Review is required.

The review procedures do not apply to corporate restructuring mergers if there is no change in control, or first user syndications prior to final endorsement.

13-6. Transactions Not Requiring an Application Fee:

A. Substitution of individual general partners of a

partnership/mortgagor; or



B. Assignment of 100 percent of the beneficial interest in a passive land trust that holds title to the project, if the assignment does not result in a change in the control of the project.

Certain complex transactions involve multiple transfers and may be subject to more than one TPA fee, such as transactions involving two transfers of title by deed. In such cases, the Field Office manager will determine whether a second fee is required after consulting with Field Counsel. If the Field Office manager determines that a transaction or series of transactions have been structured to avoid paying the application fee, the TPA application will be rejected and new application(s) will not be accepted until the required application fee(s) have been paid.





13-7. Full Review

Transactions requiring HUD's Full Review include, but are not limited to properties encumbered by HUD-insured or HUD-held mortgages demonstrating the following characteristics:

A. Transfer of title from the mortgagor/seller to the buyer including conveyance by installment sales contract, land contract and wrap-around mortgage;

B. Transfer of any interest in a partnership mortgagor which causes a dissolution of the partnership/mortgagor under applicable state law; or

C. Transfer of 100 percent of the beneficial interest in a passive trust, which results in a change in control of the asset.

The procedures for processing a Full Review TPA are set forth in Appendix A. Transactions subject to Full Review will be evaluated under the Department's Determinative Criteria set forth in Section 3. below.

13-8. Modified Review

The Department requires a Modified Review, which is a limited review, of certain transactions involving transfers of interests in entities owning properties encumbered by HUD-insured, or HUD-held mortgages. Transactions subject to HUD Modified Review include, but are not limited to the following:

A. A single transfer of in excess of 50 percent of the interest of a partnership/mortgagor which does not cause a dissolution of the existing partnership/mortgagor under state law, as certified by an attorney who has no identity of

interest with the partnership/mortgagor and is licensed to practice in that state;



B. Substitution of one or more of the general partners;

C. A single transfer of an amount in excess of 50 percent of the corporate stock of the corporate mortgagor or a single transfer of an amount less than 50 percent of the total corporate stock of





the corporate mortgagor where such transfer results in a change in control of the corporate mortgagor;

D. An assignment/transfer of a portion of or all of the beneficial interest in a passive trust when there is no change in control of the project; or

E. A single transfer of an amount in excess of 50 percent of the corporate stock of a corporate General Partner or a single transfer of an amount less than 50 percent of the corporate stock of a corporate General Partner where such transfer results in a change in control of the corporate General Partner.

F. Any transaction which does not fall within any of the other categories but which, nevertheless, results in a change of control of the mortgagor.

Certain transactions subject to a Modified Review will be evaluated under the Department's Determinative Criteria set forth in Section 3. below. For example, transactions in which a significant change in control will occur or in which a large sum of money will change hands, not only through a single transfer but also a series of transfers which have the same result, may trigger review under the Determinative Criteria. In addition, where there is an indication of subsidy layering in a TPA, a complete evaluation under the Determinative Criteria is required. See discussion under questionable transactions and subsidy layering.

Transactions subject to Modified Review will be reviewed pursuant to the procedures set forth in Appendix B.

13-9. Questionable Transactions

The Department periodically receives proposals involving novel transactions. These transactions should be brought to the attention of the Regional Office. Whenever a Field Office is in doubt as to whether a transaction requires a full or modified TPA review, the Regional Office may be contacted for guidance.

When faced with a transaction which does not fall clearly into the full or modified review category, but which the Field Office believes may warrant HUD review, the following questions should be asked: Will there be a significant change in the control of the project? Will a significant sum of money change hands in conjunction with the transaction? If either of these inquiries are answered affirmatively, a Transfer of Physical Assets Application, either Full or Modified, depending upon the nature of the transaction, should be required by the Field Office.

SECTION 3. DETERMINATIVE CRITERIA FOR REVIEW OF TPAs

The following are criteria employed by HUD to evaluate Full Review and certain Modified Review proposals:

13-10. Requirement that a Proposed Owner/Managing General Partner Obtain Previous Participation Clearance.

The proposed principal(s) must obtain previous participation clearance:

A. Proposed principal(s) must file form HUD-2530, Previous Participation Certificate; and

B. Prospective owner/managing general partner must also satisfy the Field Office that he/she has sufficient experience to operate the particular project which he/she intends to purchase. A troubled project may require an owner/managing general partner who has demonstrated the ability to successfully own and manage troubled multifamily projects.

13-11. Field Office Requirement for Management Review and Physical Inspection and a Requirement For Proposed Management Agent Previous Participation Clearance.

Management Reviews, Physical Inspections and approvals of existing or new management agents are interrelated determinations required prior to Field Office preliminary approval of a TPA.

A. Existing Management Agent

The TPA process provides the Field Office with an opportunity to influence the selection of a management agent. Field Offices should use the





flexibility provided by Handbook 4381.5 to impose necessary performance standards on a new

Case 1:01-cv-00669-FMA Document 60-5 Filed 08/15/2005 Page 18 of 31

management agent, particularly when troubled projects are involved. This requirement is directly related to ratings on management review and physical inspection reports. Management Reviews and Physical Inspections are to be conducted in a schedule required in the following sections.

B. Management Review

If the Field Office has not completed a management review of the project within one year of the date of the TPA application, it must do so prior to granting preliminary approval of a TPA, whether or not a change in management agent is proposed. The level (comprehensive or limited) and intensity of the management review is based on factors identified in this Handbook in Chapter 6, entitled Project Monitoring, and the Field Office must exercise discretion in making this determination.

If the TPA proposes to retain the existing management agent, the Field Office must review the past performance of the agent and determine whether or not the agent is performing at a satisfactory level.

C. Physical Inspection

If the Field Office has not performed a physical inspection of the project within the past year, it must do so prior to granting preliminary approval of a TPA, whether or not the mortgagee has performed an acceptable inspection.

D. A proposed new management agent must obtain previous participation clearance and must abide by other requirements:

1. Proposed management agents must file form HUD-2530, Previous Participation Certificate,

2. Proposed management agent must satisfy the Field Office that he/she has sufficient experience to enable him/her to successfully





manage the project. The type and length of experience required will vary depending upon the degree of difficulty of managing the particular project;

3. A new or replacement agent is required to abide by the instructions contained in Handbook 4381.5, Management Agents, Documents and Fees. This includes the filing of a Management Certification and an Agent Profile.

13-12. Determination by Field Office that a Project's Physical

Repair/Replacement Needs Will Be Met.



In order to approve the proposed transfer, the Director of Housing Management must determine that the project will be restored to sound physical condition within 24 months from the date of transfer. Additionally, he/she must be satisfied that requisite energy-related alterations will be completed within an acceptable time frame. (See Handbook 4350.1, Chapter 12, for a discussion of energy-related items.)

A. Extension of Time Requirements

Under certain well documented circumstances, the Field Office Manager may extend this period for up to an additional 12 months. The decision to allow additional time must be documented in the project file. The time period cannot be extended, if the sources and uses statement shows one of the following:

- o remuneration to the seller; or
- o fees to participants having priority over the needs of the project.

B. Determination of Project Physical Condition

The physical condition of the project may be determined in one of two ways:

1. If the project is ranked as a troubled or potentially troubled project, the Field Office must perform its own inspection if such an inspection had not been performed within the past year; or





2. The transfer applicant may submit to HUD at the time of application a physical inspection report and cost analysis of needed repairs for the project, prepared by an architect or engineer who is professionally designated and licensed in the jurisdiction where the project is located.

The inspector will provide a certification as to his/her qualifications and as to the accuracy of the report and cost estimates based on his/her professional opinion.

The Chief of Loan Management will decide which approach is appropriate. In certain situations, the Field Office may also elect to do an inspection, the results of which will suggest the need for a follow-up inspection by an expert in a particular functional area, such as a structural or HVAC engineer. This follow-up inspection will clearly be the responsibility of the applicant.

C. Requirements for Acceptable Physical Inspection.

The following are minimum requirements for an acceptable physical inspection:

1. The inspection report must be in sufficient detail to list all required repairs and provide line item cost estimates for repairs;

2. The report should mandate all those repairs that are necessary to ensure that the project is structurally sound and that dwelling units and living conditions are decent, safe and sanitary. The repair listing must be complete and deal with 100 percent of the units;

3. The report should specify that the project is energy efficient, or that repairs will make it so;

4. The report must describe how the inspection was performed and any assumptions that were made by the engineer. For example, if all





the units were not inspected, what units were inspected and how were those units selected? How did the engineer go about making the final repair list?; and

5. The engineers and architects should also provide comments on the remaining useful life of major equipment and fixtures at the project (this analysis will be important in judging the appropriateness of Reserve for Replacement funding).

The goal of a quality physical inspection and subsequent repair/replacement recommendations is not to return the project to the original condition when initially insured, but rather to ensure the long-term viability of the project.

The Field Office will have the responsibility for reviewing the applicant's inspection report and affirmatively judging its adequacy. This will require a Field Office inspector verifying the applicant's report with an on-site visit.

D. Availability of Physical Repair/Replacement Funds

Because the financial viability of the project is a critical determination in approving a TPA, the following criteria for use and availability of repair/replacement funds must be met:

1. The Field Office must be satisfied that adequate funds will be available to complete needed physical improvements/repairs. The purchaser should accomplish the repairs

pursuant to a repair schedule (e.g., a MIO plan) approved by the Field Office. The repair schedule should be specific as to objectives and timing so that the progress of the repairs can be judged by the Field Office.

The Field Office may require the purchaser to obtain a letter of credit, a bond, or place in an escrow account acceptable to the Field Office, the funds needed to complete the proposed improvements/repairs.

2. If a project is transferred within the first twelve months from the date of final





endorsement and if there are latent construction defects, HUD's first remedy for correction of these defects is to use the bond that was posted for this purpose during the construction period. Only if the bond cannot be used or will not cover all of the latent defects should correction of these defects be addressed as part of the transfer proposal.

13-13. Determination by Field Office that a Project's Operating Financial Needs Will Be Met.

A. HUD-Insured Projects

An application for transfer of a HUD-insured project will be accepted only if the project mortgage is current or the Field Office determines it will be brought fully current as a result of the TPA at preliminary approval.

B. HUD-Held Projects

In order to approve a proposed transfer of a HUD-held project, the Field Office must establish that either the mortgage will be brought current at the time of transfer or that an acceptable workout will be executed. Any workout, in conjunction with a transfer, must be executed upon preliminary approval of the transfer. Workouts that exist prior to the TPA approval must be reviewed and modified as necessary. For example, if repairs are required as part of the TPA, the repair schedule will be included in a modified or new workout.

C. All Projects

For all projects, Field Offices must assess the financial situation and make certain determinations and require certain actions be taken, as follows:

1. All accounts payable will be cleared at the time of the transfer or shortly thereafter. If deemed necessary by the Field Office, a satisfactory escrow or letter of credit may be required to ensure that this requirement is met;





2. Make a determination that the Reserve for Replacement Account is adequately funded, and will continue to be adequately funded in the foreseeable future. To determine the level of funding for the Reserve for Replacement Account, the Field Office must consider the project's present and anticipated needs. It should review the remaining useful life of major equipment and structural components and make a determination that the Reserve for Replacement is funded at a level to meet the most immediate project needs;

3. The Field Office may require lump sum contributions as part of the TPA or a plan to increase deposits to the Reserve until it is funded to an appropriate level. For both full and modified TPAs, if escrowed funds remain after completion of the required repair program, these remaining monies should be used to fund the Reserve for Replacement Account at an appropriate level. Although there are no hard and fast rules, the Field Office should follow common sense rules of thumb. For example, a 15 year old project, which has not replaced stoves, refrigerators, air conditioning, roofs, kitchen cabinets, common area and apartment amenities, such as carpeting, etc., should have a Reserve for Replacement Account balance of $1,200 to $1,500 a unit. The above yardstick is meant for reference only, and naturally jurisdictions may determine what funding level of Replacement Reserves per unit is considered appropriate and adequate for projects within their localities based on local environment, custom and practice.

4. The Field Office should review the other mortgagee controlled accounts (real estate and property insurance escrow), to make sure present balances together with monthly deposits will be sufficient to pay near term billings. Frequently, TPAs lead to reassessments that result in property tax increases the property cannot easily manage. The Field Office may decide to require an

increased deposit to these escrows, if it has reason to believe the property will be facing a substantial increase in its property tax or property insurance bills; and

5. Field Offices should review the source and use statement provided by the applicant as a possible source of additional funds, if there is a cash shortfall in meeting the project's financial needs.

13-14. Field Office Determination Concerning HUD Legislative, Regulatory and Administrative Requirements.

The transfer of physical assets proposal must comply with HUD regulations, handbooks, administrative and legal requirements as of the date of this Notice. Relevant HUD documents include but are not limited to the following:

| HUD HANDBOOKS | TITLE/CHAPTER |
|---|---|
| HUD Handbook 4350.1 REV-1 | Chapter 4, Section 11<br>Chapter 6<br>Chapter 12 |
| HUD Handbook 4065.1 | Previous Participation |
| HUD Handbook 4355.1 REV-1 | Flexible Subsidy |
| HUD Handbook 4370.1 REV-2 | Reviewing Annual and Monthly Financial Reports |
| HUD Handbook 4370.2 REV-1 | Financial Operations and Accounting Procedures for Insured Multifamily Projects |
| HUD Handbook 4370.4 REV-1 | Basic Accounting Desk Reference for Loan Servicers |
| HUD Handbook IG 2000.4 | Consolidated Audit Guide for Audits of HUD Programs |
| HUD Handbook 4381.5 REV-1 | Management Documents, Agents and Fees |

| HUD REGULATIONS/SECTION | TITLE/CHAPTER |
|---|---|
| 24 CFR 265 | Transfer from Nonprofit to Profit-Motivated Ownership for Multifamily Housing Projects |
| 24 CFR 207.1(h) | Transfer Fee |





| MULTIFAMILY NOTICES | TITLE/CHAPTER |
|---|---|
| Notice 84-34 | Revised Policy for Projects with HUD-Held Mortgages |
| Notice 89-1 | Reinstating Defaulted Mortgages |
| Notice 90-17 | Combining Low Income Housing Tax Credits (LIHTC) with HUD Programs |
| Notice 90-18 | New Restrictions on Funding Actions |

Notice 91-22 Comprehensive Multifamily Servicing Program

Notice 84-37 Appendix G: Memorandum from Charles J. Bartlett, Legal Review of Transfer of Physical Assets Proposals

13-15. Special Circumstance Determination: Secondary Financing

Any portion of the purchase price which is not paid in cash at the time of purchase is understood to be secondary financing. Secondary financing includes all deferred financing: financing secured by the project, financing secured by collateral other than the project, or unsecured financing.

Field Offices must make certain specific determinations when secondary financing is an element. The legal and administrative requirements for approval of a TPA with secondary financing include the following:

A. HUD policy permits the use of secondary financing in connection with transfers of projects only in those situations in which the Field Office determines that the proposal does not jeopardize HUD's security, conflict with HUD's legal or programmatic interests, or unduly burden the project with financial debt.

B. If HUD-insured secondary financing is proposed as part of the TPA, it must meet the underwriting criteria of the applicable section of the Act (241 supplemental loan, operating loss loan, etc.).

C. The legal requirements controlling the use of secondary financing are set forth in the opinion of the Assistant General Counsel for Multifamily Mortgage Insurance in Appendix G of this Chapter.





Area Counsel must review all secondary financing in connection with a TPA and determine that it meets the requirements of Appendix G prior to the Field Office granting preliminary TPA approval.

D. Field Office will approve the use of secondary financing in a TPA only when the following conditions are met:

1. When the first mortgagee approves in writing any secondary financing secured by a lien against the project. Field Offices must not approve any transfer that includes a lien against the project without this written mortgagee approval;

2. When approval of the secondary financing will not increase HUD's exposure to financial risk or loss; and

3. When approval of the proposal would not violate the Department's obligation to provide housing at the least cost to the Federal government.

E. Where the consent of the first mortgagee to allow secondary financing is obtained, the original signed document must be transmitted immediately to the Office of Multifamily Housing Management at HUD Headquarters for inclusion in the project's safe instruments file.

13-16. Special Circumstance Determination: Condominium/Cooperative Conversions

Every proposal involving conversion to the cooperative form of ownership must include either the express consent of the mortgagee to the conversion or an indemnity agreement acceptable to HUD. The HUD Office of General Counsel has developed a master Indemnification Agreement, Guaranty Agreement and Letter of Credit for use in conversions to cooperative ownership without mortgagee consent. In the case of a transfer transaction involving conversion, Field Offices are referred to OGC's Multifamily Mortgage Division "at Headquarters" for relevant forms and consultation. The Housing Management Division retains responsibility for the programmatic and policy review of proposed conversions to condominiums and





cooperatives but may not grant preliminary approval without Field Counsel's legal opinion as to the legality of the proposed conversion. When conversion to condominium or cooperative ownership is an element of the transfer, Field Counsel must review the proposed transaction.

SECTION 4. TPA INVOLVING NONPROFIT TRANSFER TO LIMITED DIVIDEND ENTITY

13-17. Field Office Statement of Necessity for TPA. The Regulations at 24 CFR Section 265.7, entitled Director's analysis and findings on the need for a transfer, require that the Field Office, before accepting an application for a transfer of physical assets, make a finding that a transfer of ownership to a profit-motivated owner is necessary to resolve the problems of the project based on one or both of the following factors:

A. The nonprofit (NP) owner is no longer capable or willing to own or operate the project successfully; or

B. There is a need for additional cash contributions to satisfy the present physical and financial needs of the project as determined by the review conducted pursuant to Section 265.6 because

assistance for the project from HUD, considering other uses of this assistance, is not available in amounts necessary to satisfy these needs.

13-18. Field Office Analysis of TPA.

A. First Criterion

In making the determination in 4.I.A. that the NP owner is no longer capable or willing to own or operate the project successfully, the Field Office may use information such as, for example, the troubled or potentially troubled ranking of the project (4350.1, Chapter 6) or a signed statement by the NP owner that they are unwilling to continue to operate the project. Such determinations are the responsibility of the Housing Management Director.

If the sole basis for a proposed transfer is lack of capability or willingness of the existing nonprofit sponsor to own and operate the project





successfully, the Field Office must determine that there is no capable, nonprofit sponsor in the area which is interested in assuming ownership of the project. This may be accomplished by obtaining from the nonprofit seller a certification that the seller has offered the project to other nonprofit entities presently operating in close proximity to the project, and has not received an offer to purchase the project.

B. Second Criterion

To determine whether there is a need for additional cash contribution the Field Office must schedule the reviews required prior to preliminary approval of any TPA in order to identify the present physical, financial, management and tenant needs, including energy-related needs of the project. Also, the Field Office must take into consideration information provided by the seller/purchaser when making this determination. This means that a Field Office may accept and review, for the purpose of making the above decision, a transfer application.

In developing the required findings for these criteria, Field Offices must make certain determinations. For the first criterion, if another nonprofit owner is found, the Field Office must determine whether this applicant has the skills and financial capacity to properly manage the project. If a nonprofit entity is willing to accept a TPA, they must be found qualified. In order to be considered qualified, an NP owner must:

- Have the proven ability to operate a multifamily housing project;

- Be in a position to make a contribution to the project equal to the present physical and financial needs of the project without utilizing any of the present resources of the project, i.e., reserve for replacement or operating accounts; and

- Have the financial capacity and willingness to execute a written pledge for an amount equal to 10 percent of the outstanding





mortgage balance. The applicant may not rely upon the receipt of federal subsidies in making this pledge.

For Field Offices to make a determination on the second criterion, they must analyze the long-term needs of the project and consider whether the project will require costly repairs and replacements that can only be funded through increased tenant rents, government rent subsidies, government grants or loans, or contributions from the nonprofit owner, all in the near future. If the investigation discloses that the project revenues will be insufficient to meet project needs, and that these needs can only be met with the foregoing funds, the second criterion set forth above will be satisfied.

The Field Office must have demonstrated that there is need for additional cash contributions to satisfy the physical and financial needs of the project. The Field Office must provide the nonprofit owner with the results of the review in writing, including a complete physical inspection report and management review report, indicating HUD's recommended corrective actions. The Field Office should augment, but not duplicate, the material generated to meet the requirements of the Paragraph 13-20.

13-19. Remuneration to Nonprofit Sellers.

A nonprofit owner/seller will be permitted to receive remuneration in connection with the transfer of a property only upon Headquarters consideration of circumstances. Section 106 of the HUD Reform Act of 1989 supersedes any previous authority granted to a Field Office/Regional Administrator regarding waiver of regulations under 24 CFR 265.4. Requests for waiver of regulations must be forwarded with good cause documentation to Headquarters, Office of Multifamily Housing Management, Director, Operations Division, for final disposition.

A nonprofit owner/seller may be allowed to receive

monies associated with a TPA provided that:



A. Upon transfer, the purchaser contributes to the project an amount equal to the greater of 10 percent of the unpaid mortgage principal balance,





or an amount sufficient to meet the present physical and financial needs of the project, in addition to any assistance provided by HUD;

B. All funds required by subparagraph A, above, have been paid to the project;

C. Any remuneration accruing to the nonprofit seller must be placed in trust with a third party trustee. The trust funds must be disbursed in accordance with the terms of a trust agreement which has been approved by the HUD Field Office, for a public purpose approved by the HUD Field Office that promotes the expansion of the supply of low and moderate income housing; and

D. No remuneration may pass to any individuals connected with the nonprofit seller. This requirement applies even where the remuneration flowing to the nonprofit seller will be paid several years after the transfer.

If payments are made to a nonprofit under the terms of an installment sales contract solely for purpose of making payment on the first mortgage, these payments are not considered remuneration to the seller. This situation does not require a waiver of 24 CFR 265.13.

If it is unclear how much will be paid to the nonprofit seller, how these future payments will be disbursed, and/or for what purposes the funds will be used, HUD will approve a Trust Agreement under Paragraph 13-19C above only if the Department has the right under the Trust Agreement to approve all distributions from the Trust.

13-20. Recruited Minimum Cash Contributions.

A purchasing profit-motivated or limited distribution mortgagor must agree to minimum funding levels. The minimum contribution of the acquiring owner is the greater of 10 percent of the unpaid principal mortgage balance, or an amount sufficient to meet the present physical and financial needs of the project, in addition to any assistance provided by HUD.

13-21. Transfer Prior to Final Endorsement.

If a request is received to approve a nonprofit to

limited dividend transfer prior to final endorsement of the mortgage, the mortgage should be reprocessed, if possible, using a limited dividend mortgagor. If this is not possible or appropriate, Loan Management staff must conduct a transfer review in accordance with this Handbook Chapter. Prior to endorsing the mortgage, the field office must make certain that all statutory and regulatory requirements relating to limited dividend mortgagors have been satisfied.

13-22. Prepayment Restrictions.

Transfers from nonprofit to limited dividend mortgagor entities do not remove the 40 year prepayment restrictions in the original mortgages.

13-23. Distributions/Rent Formula.

The transfer to a limited dividend or profit-motivated mortgagor does not change the formula used in processing rents for the project. The original nonprofit rent formula is used, without including a return on equity. This does not preclude the owner from receiving a distribution as permitted by the new regulatory agreement but it is limited in any one year to six percent of the actual cash contribution.

SECTION 5. DISPOSITION OF FLEXIBLE SUBSIDY UPON TRANSFER

The following guidelines must be applied to determine the disposition of Flexible Subsidy in conjunction with the transfer of a project:

13-24. Nonprofit to Nonprofit Transfer.

The Flexible Subsidy, whether in the form of a grant or a loan, does not have to be repaid. However, an assignment of the Flexible Subsidy loan to the new nonprofit purchaser must be required in conjunction with preliminary approval. Even though the loan does not have to be repaid, the Field Office should carefully review all Sources and Uses of funds and assure that there are no funds available to repay or reduce the Flexible Subsidy loan. If the Field Office determines funds are available, a portion or all of a loan should be repaid.

13-25. Limited Dividend/Profit Motivated to Limited Dividend/Profit Motivated Transfer.





The Flexible Subsidy loan must be repaid in full at the time of transfer of the beneficial interest in the project. However, if the limited dividend entity originally received a Flexible Subsidy grant, HUD

cannot require prepayment of that grant as a condition of TPA approval. Field staff should discuss the conversion of the grant to a loan as part of the TPA negotiation process or as a condition for any additional assistance from HUD. A guiding principle to aid Field staff in the negotiation process is that conversion is required unless the purchaser can demonstrate, to the satisfaction of the Field Office, that circumstances exist which would make such a conversion infeasible.

13-26. Nonprofit to Limited Dividend Transfer.

The Flexible Subsidy must be repaid in full at the time of transfer. Where the physical and financial condition of the property makes it impossible for the purchaser to repay the Flexible Subsidy at the time of transfer, HUD may approve repayment of the Flexible Subsidy assistance over a specific period, provided a minimum of one-third of the Flexible Subsidy is repaid at the time of transfer. The remaining Flexible Subsidy must be repaid according to a plan negotiated with the Field Office, and approved by the Regional Office.

The Field Office may approve Flexible Subsidy loan repayment plans which contemplate repayment of the remaining Flexible Subsidy within 24 months of preliminary approval of the transfer. Any repayment plan for a term of more than 24 months must be thoroughly documented and referred to the Regional Office for review prior to granting approval. This does not require review by the Regional Office of the full TPA application, only the Flexible Subsidy repayment plan. Any referral to the Regional Office must be accompanied by an analysis of the proposal and the Field Office's recommendation.

When reviewing transfer proposals, it should be understood that repayment of the Flexible Subsidy does not remove the low and moderate income use restrictions in the Use Agreement recorded against the project when the Flexible Subsidy assistance was originally awarded. The Use Agreement should be reviewed by Field Counsel to ensure the use restrictions are enforceable.





SECTION 6. SUBSIDY LAYERING AND EXCESS COMPENSATION

A TPA, full or modified, may involve subsidy layering, which results from combining various forms of relief or assistance within the jurisdiction of the Department with assistance from other governmental sources. Subsidy layering may result in excess compensation to some or all of the parties to a TPA. The presence of subsidy layering is not, by itself, a problem; it may reflect a wise and efficient use of scarce resources. However, subsidy layering, when combined with the Low-Income Housing Tax Credit (LIHTC) can result in excess compensation. If there is excess compensation, the Department is obligated by law to reduce the amount of assistance it will provide.

The Department has published policies and procedures governing the relationship of subsidy layering to excess compensation in the utilization of the LIHTC. All applicants are urged to read and understand these policies and how they may impact a TPA. (See Notice H-90-17 and 56 Fed. Reg. 14436, Administrative Guidelines; Limitations on Combining Other Assistance with HUD Housing Assistance.)

Generally, if the TPA involves the LIHTC but does not require any additional assistance within the jurisdiction of the Department (e.g., 241 supplemental loan, additional Section 8 units, etc.), the issues associated with excess compensation will not be present.

On the other hand, if the TPA contemplates the use of the LIHTC in conjunction with other additional assistance from HUD, the Department will address excess compensation as part of the TPA review process. If HUD determines excess compensation is present, the Department will provide a lower level of assistance.

Applicants should meet with appropriate Field Office staff prior to submitting a TPA application if the transfer involves the layering of federal subsidies and the use of the LIHTC.

SECTION 7. RELATIONSHIP TO OTHER COMMITMENTS

13-27. HUD Commitments

If the requirements HUD imposes as part of the TPA review process cannot be met without the resources produced by other independent commitments, the Field Office may not issue a preliminary approval letter until the other commitments have been made. For example, if the project's financial and physical needs cannot be met without a Flexible Subsidy loan, 241 supplemental loan, additional Section 8 assistance,





etc., the Field Office may not grant preliminary approval until the other necessary commitments have been made. In the case of a HUD-insured loan, this requirement will be satisfied with the issuance of a firm commitment; in the case of a Flexible Subsidy loan or additional Section 8 assistance, the requirement will be met at the time the Field Office receives the signed 185.1.

13-28. Other Governmental Commitments

If the requirements HUD is imposing will be satisfied from assistance provided by another governmental agency (Federal, state or local), a letter from that agency indicating its decision to provide that assistance is required, prior to the Field Office issuing preliminary approval. This includes the agency allocating the tax credits.

13-29. Low Income Housing Tax Credits (LIHTC)

If the TPA relies on the use of the proceeds of a LIHTC syndication to meet HUD imposed requirements, a letter of commitment from the syndicating group is required prior to the Field Office issuing a preliminary approval letter.

SECTION 8. RELATIONSHIP TO PRESERVATION OF LOW INCOME-HOUSING

13-30. Prepayment Restrictions

Title II of the Housing and Community Development Act of 1987 ("Title II" or "ELIHPA") and Title VI of the Cranston-Gonzalez National Affordable Housing Act ("Title VI" or "LIHPRHA") impose restrictions on the prepayment of subsidized mortgages that could otherwise be prepaid without HUD's consent. The primary categories of projects subject to Title II and Title VI are (1) section 221(d)(3) market rate projects with Section 8 project-based assistance; (2) Section 221(d)(3) BMIR projects; and (3) Section 236 projects. Title II or Title VI is applicable only if, under applicable contract or program regulations in effect prior to February 5, 1988, the mortgage is or will within 12 months or 24 months respectively become eligible for prepayment without HUD's consent. An owner who is prevented by Title II or Title VI from prepaying the mortgage may apply for "incentives" in exchange for agreeing to restrictions designed to





preserve the low-income use of the project. Such incentives are negotiated as part of a Plan of Action. Transfers of Physical Assets that are contemplated as part of a Plan of Action must be reviewed for compliance with Title II or Title VI, as applicable. Owners of such properties should consult with the Regional Director of Housing or the field office's Director of Housing Management concerning applicable Plan of Action requirements.

13-31. TPA Restrictions Applicable to Certain Subsidized Projects

Section 203(h) of the Housing and Community Development Amendments of 1978, as amended by Section 181(g) of the Housing and Community Development Act of 1987, provides that the Secretary may not approve the sale of any subsidized project that is subject to a mortgage held by the Secretary or if the TPA involves the provision of any additional subsidy funds by the Secretary or the recasting of the mortgage unless the transaction will ensure that such project will continue to operate at least until the maturity date of the mortgage in a manner that will provide rental housing on terms at least as advantageous to existing and future tenants as the terms required by the program under which the mortgage was made. A "subsidized" project includes a project receiving any of the following forms of assistance:

Section 221(d)(3) BMIR loan
Section 236 interest reduction payments
rent supplement assistance
Section 202 or 312 programs
project-based assistance under Section 23 or Section 8 regardless of the number of units assisted

Whenever a project falls into the defined category, the purchaser must agree either to execute a use agreement to maintain the project in accordance with the tenant-related provisions of the applicable mortgage program until the maturity date, or to extend the prepayment prohibition to the maturity date.

SECTION 9. MONITORING AND REPORTING

The Field Office manager/supervisor must ensure that each project is monitored after preliminary approval, or where applicable, final approval, to ensure that the conditions of approval are satisfied.





13-32. Monitoring Schedule

Monitoring should begin at the point at which preliminary approval is issued, and continue until such time as all of the terms and conditions of the transfer have been satisfied, or for a period of at least three years following preliminary approval, whichever is longer. During this period, the physical and financial condition of the project should be monitored. It is suggested that transfers be reviewed, at a minimum, every six months during the monitoring period. The Field Office manager/supervisor is charged with responsibility for monitoring each transfer of physical assets, as well as determining the frequency of such monitoring. He/she may delegate to a subordinate the task of tracking the actions of the owner to determine whether the conditions of the transfer have been fulfilled. However, the ultimate responsibility for ascertaining whether the purchaser has satisfied the conditions of the transfer rests with the manager/supervisor.

Each transfer remains in a monitored posture until such time as the manager/supervisor certifies in writing:

- o That all of the terms and conditions agreed to at the time of preliminary approval and final approval have been satisfied, and;
- o That the project is in sound physical and financial condition.

13-33. Monitoring Procedures for Completed TPAs

A. Establish Monitoring File.
A monitoring file should be developed for each project at the time of preliminary approval of the transfer. The monitoring file should contain a

copy of the preliminary approval letter and a working copy of the MIO plan or repair program. All actions taken by the Field Office to assure compliance with the TPA approval will be filed in the monitoring file. A copy of the reports or site visits, etc. should also be filed with the regular project file.





B. Areas to be Monitored

1. Cash contributions
2. Physical improvements/repairs
3. Management improvements or changes
4. Disposition of Flexible Subsidy assistance
5. All other changes to be implemented at the project.

13-34. Location and Maintenance of Monitoring File. The monitoring files should be located in one central place in the Field Office. A tickler system should be established to ensure that each project is reviewed during the month in which a contribution, change, or improvement is scheduled. Periodic site visits are necessary to determine the acceptability of physical repairs. Management changes, cash contributions, etc., can be reviewed remotely through required reports.

13-35. Non-Compliance with Transfer. If a scheduled payment or repair, etc., is not made as agreed under the terms of the transfer, the servicer assigned to monitor the transfer must provide the owner with written notice of non-compliance, and direct that appropriate corrective action be taken within the reasonable period of time specified in the written notice of non-compliance.

If the deficiency is not corrected within the period of time specified in the written notice of non-compliance, the situation should be reported to the Director of the Office of Participation and Compliance and the Director of the Office of Regional Housing. The Field Office should immediately consider all options available to it to enforce compliance. Field and Regional Counsel may be consulted and, if necessary, the office of General Counsel may be requested to participate in developing a plan of enforcement. The available remedies include Administrative Sanctions such as the use of Form HUD-2530 previous participation procedures, LDP, suspensions, etc., and affirmative litigation to enforce the conditions of the TPA.

13-36. Operational Difficulties Unrelated to Transfer Conditions. Where HUD review reveals no specific violations of the conditions for transfer, but does disclose that the project is experiencing operational difficulty, the servicer must negotiate with the project owner a plan for restoring the project to sound condition.

APPENDIX A

PROCEDURES FOR PROCESSING A FULL REVIEW TRANSFER

CONTENTS OF APPENDIX A


I. TRANSFERS REQUIRING FULL REVIEW

II. FULL REVIEW-OVERVIEW

A. Preliminary Approval

B. Final Approval

III. FULL REVIEW PROCESSING - DETAILS

A. Preliminary Approval

1. Step (1): Submission of TPA Application/Required Documentation

2. Step (2): Review of Application for Completeness

3. Step (3): Review of Application and HUD required Reports to Determine Acceptability of Transfer

4. Step (4): Issuance of Preliminary Approval OR Denial of TPA

B. Final Approval

1. Step (1): Certification of Changes

2. Step (2): Submission and Review of Executed and Recorded Documents

3. Step (3): Issue Final Approval






I. TRANSFERS REQUIRING FULL REVIEW: The following types of transfers require a Full Review and payment of a transfer fee. The Department imposes a fee of $0.50 per $1,000 of the original face amount of the mortgage to cover the costs of administrative, legal, and fiscal actions that a review entails. Applications received for Full Review, which are not accompanied by the proper fee will be returned unreviewed. For applications which are reviewed by HUD and subsequently withdrawn, the fee paid to HUD will be considered earned and nonrefundable.

A. Transfer of title from the mortgagor-seller to buyer including conveyance by installment sales contract, land contract and wrap-around mortgage.

B. Transfer of any interest in a partnership which causes a dissolution of the partnership under applicable state law.

C. Transfer of 100 percent of the beneficial interest in a passive trust, if the assignment results in a change in control of the project.

D. Transfers requiring Full Review will be examined in accordance with HUD's established Determinative Criteria.

II. Full Review-Overview. A Full Review of a transfer proposal is conducted in two phases:

A. Application for Preliminary Approval: The Field Office will review the Application for Transfer of Physical Assets, form HUD-92266, and all accompanying documentation as set forth in Section III below. At the end of the review process, if the transfer proposal is acceptable, HUD issues a letter granting Preliminary Approval of the application. It is at this point that the parties to the transaction are authorized to transfer possession of and beneficial interest in the project. THE PURCHASER IS NOT AUTHORIZED TO TRANSFER ANY INTEREST IN, TAKE POSSESSION OF, OR ASSUME THE BURDENS AND BENEFITS OF OWNERSHIP OF THE SUBJECT PROJECT WITHOUT THE PRIOR WRITTEN APPROVAL OF HUD. If this requirement is violated, the Department will pursue all administrative, legal, civil and criminal remedies.





B. Final Approval: Processing: Review documents approved at Preliminary Approval to make sure that they have been executed and changed.

III. FULL REVIEW PROCESSING - DETAILS

Upon learning that a TPA is being considered, the Field Office should schedule a meeting with the proposed purchaser. At this meeting the requirements for TPAs may be briefly reviewed.

HUD recommends that a purchaser contact the Field Office early, before submitting the TPA application to discuss the Field Office's requirements for submission. Delays due to incomplete packages or inadequate number of application packages may be avoided.

The purchaser should use the meeting to explain the TPA transaction and the Field Office should take advantage of the opportunity to explain the review process and any

expectations it may have.

A. Preliminary Approval

1. Step 1: Submission of TPA Application/Required Documentation - commences with the submission of a minimum of two copies of the - TPA Application (form HUD-92266) and the required documentation, as applicable and described more fully below. The Field Office may require additional copies of the entire application. At least one set of documents must show original signatures.

The application must also be accompanied by the information required by Housing Notice H 90-17, Combining Low Income Housing Tax Credits (LIHTC) with Other HUD Programs, or any modification or substitute Notice.

The contents of the Application for Preliminary Approval are listed below:

1. TPA Application (form HUD-92266)
2. Purchaser's Letter
3. Purchaser's Certificate of Previous Participation (form HUD-2530)
4. Purchaser's Resume





5. Source and Application of Funds
6. Executed but unrecorded Sale Contract, Option Contract or Land Contract
7. Executed Seller/Purchaser Affidavit
8. Executed But Unrecorded Regulatory Agreement
9. Executed But Unrecorded Modification Agreement
10. Executed But Unrecorded Secondary Financing Documents
11. Interim Financial Statement
12. Pro-forma Balance Sheet
13. Mortgagee's Statement of Escrow and Reserve Account
14. MIO Plan
15. Proposed But Unrecorded Deed
16. Proposed Bill of Sale and Assignment
17. Proposed Management Certification, and Entity Profile, if applicable, and form HUD-2530 for Management Agent
18. Title Report
19. Mortgagor's Oath
20. Proposed Rental Schedule (form HUD-92458)
21. Executed Organizational Documents of Purchaser
22. Attorney's Certification
23. Byrd Amendment Certification
24. Purchaser's Personal Financial Statement (FHA Form 2417)

A discussion of each of these items follows:

1. TPA Application consists of a properly executed form HUD-92266. Note that if a lien is being created, the mortgagee must sign the application.

2. Purchaser's Letter - "Purchaser" is defined to include all individuals purchasing as individuals or as principals in a joint venture, all general partners in a purchasing partnership, or a corporation. The letter must be signed by an authorized principal of the purchasing entity.

The Purchaser's letter must describe in detail all financial consideration flowing to the project and the mortgagor/seller as a result of the transfer. This letter must detail all funds allocated to project operations as well





as those funds designated for use in correcting the physical needs of the project.

The letter should describe the entire transaction, including but not limited to:

- how the transaction complies with the Determinative Criteria;
- an explanation of the organization and structure of the purchasing entity;
- an explanation of the business transaction reflected in the Source and Use of Funds Statement;
- the Purchaser's motivation for acquiring the project;
- an explanation of its relationship to the management agent and whether it expects to make changes in the management of the project, particularly within the first year following preliminary approval;
- an explanation of why it believes the proposed repair program and/or deposit to the reserve for replacement account will be adequate to maintain the project in safe, decent and sanitary condition; and
- an explanation of how it will correct any financial deficiencies reflected in the interim financial statement, including eliminating payables at closing and making sure the various escrows (property tax, insurance) and trust accounts (tenant security deposit) will be properly funded as a result of the TPA.

The letter must state that if the project is

HUD-insured the project mortgage is current or will be brought current as a result of the transfer approval. If the mortgage is held by HUD, the letter must state that the mortgage is either current or it must describe a plan for bringing the mortgage current.

All workout plans must comply with HUD workout policies in effect at the time the TPA application is submitted for Preliminary Approval.





3. Purchaser's Certificate of Previous Participation (HUD Form 2530) - A Certificate of Previous Participation (HUD Form 2530) must be filed for all general partners and all individuals and/or entities who own an interest in the project of 25 percent or more or who own 10 percent or more of the corporate stock of the corporation purchasing the project.

4. Purchaser's Resume - This is to be submitted where the purchaser has no previous participation with the HUD Field Office where the application for transfer is submitted. The Resumes for each principal of the purchaser should be submitted and should be in sufficient detail for HUD to understand the nature of their real estate experience.

5. Sources and Uses of Funds - This shows ALL expected sources of funds and ALL expected uses of these funds. A suggested format is in Appendix F. The applicant may modify this format to suit the particular transaction, but the modification may not be less detailed or combine items to avoid specificity.

   ALL PURCHASERS ARE REQUIRED TO INCLUDE A SOURCES AND APPLICATION OF FUNDS. THERE ARE NO EXCEPTIONS.

6. Executed but Unrecorded Sale Contract, Option Contract or Land Contract - Submit the applicable sale document in its entirety.

7. Executed Seller/Purchaser Affidavit - The parties must submit with the sale contract a sworn statement to the effect that the sale contract recites all of the consideration moving to the seller or any person identified therewith.

8. Executed but Unrecorded Regulatory Agreement Proposed Regulatory Agreement executed by the Purchaser, as appropriate.

9. Executed but Unrecorded Modification Agreement or Release and Assumption Agreement - Proposed Modification Agreement, Proposed Release and Assumption Agreement, as appropriate.

10. Unexecuted Secondary Financing Documents - If the proposed secondary financing involved creates a lien against the project or personalty thereof a consent statement from the holder of the first mortgage must be submitted. See Appendix H, Legal Review of Transfer of Physical Assets Proposals.

11. Interim Financial Statement - Unaudited interim financial statement (prepared period from the date of the last audited financial statement to the date of application.

12. Pro Forma Balance Sheet - Pro forma balance sheet (prepared according to Handbook 4370.2). This Balance Sheet will show how the project accounts are expected to appear the day after the expected date of closing.

13. Mortgagee's Statement of Escrow and Reserve Account. The mortgagee should provide an opinion as to the adequacy of the present escrow balances (taxes, property insurance) and present monthly deposits to meet the next anticipated tax and insurance bills.

14. Management Improvement and Operating (MIO) Plan - Where the project will have physical, management, or financial needs or changes at the time of the transfer, a MIO plan or another plan acceptable to HUD must be submitted, which describes the timing and extent of planned repairs and financial contribution and the timing for all management or procedural changes.

15. Proposed but Unrecorded Deed

16. Proposed Bill of Sale and Assignment - See form HUD-92266a, Instructions for Preparation of the Application for Transfer of Physical Assets, for fuller explanation.

17. Proposed Management Certification and Form HUD-2530 - Where a change of management is contemplated by the transfer, a copy of the proposed new management certification must be included. This certification must be completed in conformity with HUD Handbook 4381.5 REV-1. If not already on file with the Field Office, a Management Agent Profile must also be submitted. If the proposed agent has not previously managed properties in the jurisdiction where the project is located, a brief summary or resume of the agency and its principals should be included. Also, the new management company must receive previous participation clearance by filing Form HUD 2530.

18. Title Report - See FHA Form 2226 or equivalent

19. Mortgagor's Oath - See FHA Form 2478 or equivalent

20. Proposed Rental Schedule (Form HUD-92458) - original and completed form. NOTE: The approval of this rental schedule in conjunction with a TPA is not an approval to raise the rents at the project. All rent increases must be processed under existing procedures.

21. Executed Organizational Documents of Purchaser - See form HUD-92266a, Instructions for Preparation of the Application for Transfer of Physical Assets, for fuller explanation.

22. Attorney's Certification - The Purchaser's attorney must certify that, following HUD's preliminary approval, all documents requiring execution and/or recordation will be executed and, as required, recorded in the form reviewed and approved by HUD. The attorney must use the form entitled Attorney's Certification, (Appendix A-12).

23. Byrd Amendment Certification - Regarding disclosure to report lobbying. HUD will provide statement and accompanying form, if necessary, to be completed for this purpose.





24. Purchaser's Personal Financial Statement HUD will provide the form to be completed for this purpose (FHA Form 2417).

The above documentation must be complete and accurate. The documentation must be submitted directly to the appropriate Field Office.

Upon receipt of this initial package, the Field Office immediately provides the applicant with a letter acknowledging receipt of the application (See Handbook 4350.1, Chapter 13). This acknowledgement does not indicate acceptance of the application as to form or content.

2. Step (2): Review of Application for Completeness

a. The Field Office logs in the application and reviews the submission for completeness. Following the initial review a deficient application may be returned to the applicant. (The sample found at Appendix A-2 entitled, Return of Deficient Submission, should be used for this task.) Alternatively, if the deficiencies are not serious, the Field Office should alert the applicant as to the missing documents (see Appendix A-3 Request for Correction of Deficient Submission). The Field Office has the responsibility to determine if a TPA application should be returned or if the missing pieces should be requested and processing delayed.

b. When a complete application is obtained, the Field Office:

(1) Dates the application. (The date a complete package is received by the Field Office.)

(2) Forwards the application to the appropriate servicer for review.

(3) Forwards one copy to the Field Counsel or other division or branch having been designated as part of the review process. Use the sample in Appendix A-4 to request the other office's review.





c. Processes Form 2530 pursuant to Handbook 4065.1.

d. Request necessary inspections and reports (e.g., physical inspection, management review).

e. Initiate other inquiries needed.

f. Complete form HUD-9575, entitled Transfer of Physical Assets Information Sheet (Appendix E).

3. Step (3): Review of Application and HUD Reports to Determine Acceptability of Transfer

a. During this step the Field Office servicer, field counsel, or other division/branch simultaneously review the application, the results of all HUD inspections and reports, the physical inspection and cost analysis, if applicable, submitted by the applicant. Meetings and negotiations are held, if necessary, among HUD and the purchaser and seller.

The Field Office may seek guidance from regional housing at any point during Step 3. However, the Field Office is urged to contact regional housing as soon as it determines that guidance is necessary. All requests for guidance or review by the regional office (except requests from field counsel) should be made to the Regional Director of Housing. The Field Office should use the sample entitled Request for Guidance from Regional Housing, Appendix A-6 in transmitting this request. The servicer should provide all attachments required for ease of review.

If field counsel desires regional counsel to review an aspect of the transaction requiring legal review, it should request this review using the sample at Appendix A-7. Copies of the request should be provided to the Chief, Loan Management Branch.





b. During Step 3, the reviews not delegated to the Field Office or the aspects of the transaction requiring regional and Headquarters approval take place. The Field Office cannot proceed to Step 4 until it has received these approvals.

4. Step (4): Issuance of Preliminary Approval, OR Denial of TPA

a. The office prepares the preliminary approval letter. Use the sample entitled, Preliminary Approval at Appendix A-8. The letter should state all terms and conditions of the approval, including the requirements imposed by the Regional Office or Headquarters, and, where applicable, should include as a requirement, receipt of the applicant's attorney's additional certification (see paragraph B, 1 below and Appendix A-13). The letter should also include a disclaimer stating that

> "This approval should in no way be construed as evidence that HUD has approved or reviewed the entire contents of the Preliminary Prospectus of ________________________, dated

__________. Said Prospectus is
c[illegible]ly [illegible] and
not a required TPA document subject to
HUD approval".

b. If the office denies the transfer proposal, use the sample letter entitled, Letter Transmitting Decision to Deny TPA Proposal at Appendix A-9.

B. Final Approval

1. Step (1): Certification of Change in Documents Prior to Final Execution and Recordation - if HUD required any changes to the documents submitted during the Preliminary Approval review, the applicant's attorney must certify to HUD that the required changes have been made. (See Appendix A-13).





2. Step (2): Submission and Review of Executed and Recorded Documents and other Phase II Documents - The applicant has 45 working days from the date of preliminary approval to submit all executed and recorded documentation to the Field Office. The preliminary approval shall be the date on the letter. Where the applicant finds that he/she is unable to submit the appropriate documentation within the required time period, he/she should submit a written request for an extension of time to the Field Office. Such extension must explain the reason for the delay.

Phase II documentation consists of the following:

(1) All recorded documents; (2) unrecorded executed documents; (3) audited interim financial statement; (4) purchaser's balance sheet; (5) mortgage statement; (6) title policy; (7) original regulatory agreement; (8) attorney's opinion; (9) rental schedule. These documents are discussed below:

a. All Executed Recorded Documents - One certified (by the recording officer) and one conformed copy of all recorded documents -- except the recorded Regulatory Agreement, which is dealt with below.

b. All Unrecorded Executed Documents - Copies, certified by the purchaser, trustee or other responsible person to be true copies, of all unrecorded executed documents used in connection with the transfer.

c. Original Regulatory Agreement - Where applicable, the original executed and recorded Regulatory Agreement and one copy.

Interim Financial Statements must cover the period from the date of the last audited report furnished to HUD to date of transfer.





e. Purchaser's Balance Sheet - Actual Condition Purchaser's Balance Sheet, as of the date of the transfer of title to the purchaser, along with copies of any deferred payment notes approved by the Secretary and certified to be true copies by the holder thereof.

f. Mortgagee's Statement - Mortgagee Statement of all trust and escrow accounts as of date of transfer of title to the purchaser.

g. Title Policy - Title Policy or endorsement, as appropriate. If the mortgagor-seller is to be released, a proposed title binder or letter from the company issuing the original mortgagee's policy shall show that after the transfer the mortgage will remain a first lien on the property and the mortgagee will still be protected by a mortgagee's title policy.

h. Attorney's Opinion - Attorney's Opinion stating that the transaction has been legally consummated and that the purchaser is legally authorized to operate the project and is obligated to abide by the terms of the Regulatory Agreement. The opinion must also state that the documents that were executed and/or recorded are the same, in form and content, as those approved by HUD in the preliminary review process. The attorney shall not have an identity of interest with the purchaser or seller.

i. Rental Schedule -Rental Schedule and or Budget Worksheet if Applicable (form HUD-92458) dated after the date of transfer of the project. The Rental Schedule must show the names of all principals for which HUD approved a 2530 in connection with the TPA. The rental schedule may not exceed the current rents most recently approved by the Field Office, if the rents have not been deregulated.

3. Step (3) - Field Office Review of Final Approval Submission:

If the documentation is acceptable, final approval of the transfer is issued and the sample letter

entitled Final Approval is forwarded to the applicant (Handbook 4350.1, Chapter 13).

When recording or other deficiencies are discovered during Phase II, the purchaser will be notified to immediately correct the deficiencies and resubmit the corrected documents for review.





Acknowledgement of Receipt of Submission

ADDRESSEE

Dear: ______________________

Subject: Project Name: ______________________
Project No: ______________________

We have received your application for a transfer of physical assets on the subject project. Your application will be processed pursuant to our standardized procedures for the review of such transactions.

During the course of the review, HUD staff may find it necessary to contact you for further information or for an explanation of information you have already provided as part of your application. Your cooperation and immediate attention to our inquiries will help assure expeditious processing of your application.

Please be advised that you are not authorized to transfer, take possession of, or assume the burdens or benefits of ownership of the subject property until such time as you receive a letter signed by (Manager or Supervisor or Deputy Manager) authorizing you to do so. Such letter will constitute preliminary approval of the transfer. Verbal authorization to transfer or written authorization signed by other than (the Office Manager, Supervisor or Deputy Manager) is NOT sufficient.

I look forward to working with you in this matter and assure you that every effort will be made by my staff to provide you with prompt and courteous service. Inquiries which you may have concerning your submission should be directed (name of loan servicer) at (phone number).

Sincerely,

NAME
Chief,
Loan Management Branch

Return of Seriously Deficient Submission

ADDRESSEE

Dear: ________________

Subject: Project Name: ____________________________
Project No: ____________________________

The transfer of physical assets proposal involving the subject property which you submitted to our office on ____________________ is being returned to you inasmuch as the submission is seriously deficient. No further review of your proposal will be conducted by our staff at this time. The deficiencies found in your submission are as follows:

List all missing, incomplete or improperly prepared documentation. Indicate the deficiency.

1.
2.
3.
4.
5.

Should you wish to resubmit your application in complete and properly prepared form, my staff and I will be pleased to accept and review your application. Please submit the application in its entirety; do not submit only the missing or improperly prepared exhibits.

All inquiries concerning this matter should be directed to (name of loan servicer) at (phone number).

Sincerely,

NAME
Director,
Housing Management Division





Request for Correction of Deficient Submission

ADDRESSEE

Dear: ______________________

Subject: Project Name: ____________________________



Project No:

The transfer of physical assets proposal involving the subject project, which you submitted to our office on ________________________ is found to be deficient in the following manner:

1.
2.
3.
4.

Due to the nature of the deficiencies HUD is retaining your original submission at our office. If we do not receive the above documentation within the next 30 calendar days, we will assume you do not wish to pursue this proposal and shall return your documentation to you.

If there are any questions concerning this matter, please contact (name of loan servicer) at (Telephone number).

Sincerely,

NAME
Director,
Housing management Division





Request for Legal or Other Review

MEMORANDUM FOR: (Chief Counsel, Valuation Chief, etc.)

FROM: NAME, Director, Housing Management Division,

SUBJECT: Transfer of Physical Assets
Project Name: ______________________
Project No: ____________________

Attached please find one copy of the (identify contents of the attachment; e.g. one copy of the transfer proposal, etc.) submitted to our office for review. Preliminary review of the proposal indicates that the submission is complete.

Please review the enclosed pursuant to outstanding instructions relating to the processing of transfers of physical assets. Questions regarding this matter should be addressed to (name of loan servicer).

MEMORANDUM FOR: Name, Regional Director of Housing

FROM: Name, Director, Housing Management Division

SUBJECT: Transfer of Physical Assets
Project Name:_________________________
Project No:_____________________

An application for the transfer of the subject property has been received by our office. A copy of the proposal is attached to this memorandum.

____ While our office is reviewing the proposal, we request your assistance in resolving the following issue(s) pertaining to the proposal.

Describe in full the issue(s) and provide the Field office analysis and recommendations.

____ The entire proposal should be reviewed by your office because of the following:

Provide the reasons why Regional Office review is required and the Field Office recommendation for action and analysis.

Attached is copy of form HUD-9575, which provides basic information about the project and the proposal. If there are questions regarding this matter, please contact (name of loan servicer) at (phone number).

Attachments





Form Memo to Regional Counsel

MEMORANDUM FOR: Name, Regional Counsel

FROM: Name, Chief Counsel

SUBJECT: Transfer of Physical Assets
Project Name: ______________________
Project No: __________________

This is to request your review of the transfer of physical assets for the subject property. Our review of the transfer proposal indicates the following:

____ The proposal, except to the extent it involves standard documents or pertains to local law should be reviewed by your office because the transfer involves the following matters:

Describe in full all areas which need Regional Counsel review and provide recommendations and analysis

____ While our office is reviewing the proposal, we request your assistance in resolving the following issue(s) which have been previously discussed with your office.

Summarize the issue(s) and provide analysis and recommendations

If you have questions, please call (attorney adviser) at (phone).

---



---



---

Preliminary Approval

ADDRESSEE

Dear: ____________________

Subject: Project Name: ____________________
Project No: ____________________

Please be advised that the transfer of physical assets proposal which you submitted to our office on _________________ is hereby granted preliminary approval subject to the following terms and conditions:

Specify all requirements, actions, changes, etc. that are conditions to the approval. REMEMBER, include the requirement for an attorney's opinion in the event changes to the documents are a condition of approval.

This approval should in no way be construed as evidence that HUD has approved or reviewed the entire contents of the Preliminary Prospectus of ______________________________, dated _________. Said Prospectus is considered merely a selling aid and is not a required TPA document subject to HUD approval.

You have 45 working days from the date of this letter in which to conform all relevant documentation and activity to the terms and conditions recited above, to execute and record that documentation, and to submit such documentation and/or evidence of required activity to our office. Preliminary approval authorizes you to take possession of and assume the burdens and benefits of ownership of the project, provided you comply with all the conditions set forth in this approval letter.

I look forward to receipt of your Final approval submission within 45 days. If you find that you are unable to provide the required documentation to our office within the prescribed period, a request for extension of this period must be made, in writing, prior to the expiration of the 45 day period, but as soon as possible after you learn of a delay. Provide specific reasons for the delay and a target date for completion.

If there are questions, please call (loan servicer) at (phone).

Sincerely,

NAME
Manager

Rejection of Proposed TPA

ADDRESSEE

Dear: ____________________

Subject: Project Name: ______________________
Project No: _____________________

Please be advised that the transfer of physical assets application which you submitted to our office on (date) is denied for the following reasons:

List the reasons for rejection.

If there are questions, please call (loan servicer) at (phone).

Sincerely,

NAME
Manager





Request for Full Regional or Headquarters Review

MEMORANDUM FOR: Name, Director, Office of Regional Housing

FROM: Name, Director, Housing Management Division

SUBJECT: Transfer of Physical Assets
Project Name: _____________________
Project No: _________________

A proposal for the transfer of the subject property was received on (date) by our office. We have attached a copy of the proposal to this memorandum.

The entire proposal needs review by your office for the reasons discussed below:

Our recommendations regarding this transaction are discussed below:

Attachment

Final Approval

ADDRESSEE

Dear: ____________________

Subject: Project Name ____________________
Project No. ____________________

Final Approval of your proposal for the transfer of the subject property, which was submitted to our office on (date) is herewith granted by HUD inasmuch as the terms and conditions of the transaction and the documentation supporting such terms and conditions are found to be acceptable to HUD. This approval is conditioned upon strict compliance with the terms and conditions of this transfer as agreed by HUD.

Sincerely,

NAME
Manager





Attorney's Certification on Execution and Recordation

U. S. Department of Housing and Urban Development

Subject: Project Name
Project Number
Project Location

Dear: (insert name of Field Office manager)

This firm represents the purchaser of the above referenced project. This letter is submitted in connection with an application for transfer of physical assets of the project.

I hereby certify that the following documents submitted for review (list all documents) are in the form in which they will be executed and, if appropriate, recorded. I certify that these documents will not be changed in any way following HUD review and prior to execution and/or recordation without HUD's prior specific approval. As to any document changes required by HUD following its review, I agree to submit an additional letter within ten working days of receipt of preliminary approval by HUD in which I will certify that: (1) the documents have been changed precisely as required by HUD, (2) no additional changes will be made prior to execution and/or recordation of the revised documents.

I further certify that I have advised my client that the

following events will cause HUD to seek a reconveyance to the seller and to seek administrative sanctions for an unauthorized transfer of physical assets: (1) execution and/or recordation (without HUD's prior approval) of documents which vary in any degree from the documents submitted for HUD review with this letter, and (2) execution and/or recordation of the documents submitted for HUD review prior to HUD approval of the transfer of physical assets application.

Sincerely,

Attachments





## Attorney's Certification of Changes

U. S. Department of Housing and Urban Development

Subject: Project Name:
Project Number:
Project Location:

Dear: ____________________________

This firm represents the purchaser of the above referenced project. This letter is submitted in connection with the application for transfer of physical assets of the project.

During HUD's review of the TPA application, HUD required changes to the following transfer documents (list all documents). Regarding those changes, I certify that: (1) the documents have been changed precisely as required by HUD and (2) no additional changes will be made prior to execution and/or recording of the revised documents.

Sincerely,





## PROCEDURES FOR PROCESSING A MODIFIED REVIEW TRANSFER

CONTENTS OF APPENDIX B

I. TYPES OF TRANSFERS REQUIRING A MODIFIED REVIEW

II. DOCUMENTATION REQUIRED FOR A MODIFIED REVIEW

III. PROCESSING A MODIFIED REVIEW

I. Types of Transfers Recruiting a Modified Review:
The following types of transfers require a limited review. A transfer fee of $0.50 per $1,000 of the face amount of the original mortgage is charged for transactions covered by A or C below, as required by 24 CFR 207.1(h). TPA applications that do not include the fee will be returned unprocessed.

A. A single transfer of in excess of 50 percent of the interests of a partnership/mortgagor which does not cause a dissolution of the partnership under applicable state law.

B. Substitution of one or more general partners of a partnership/mortgagor.

C. A single transfer of an amount in excess of 50 percent of the corporate stock of a corporate mortgagor or a single transfer of an amount less than 50 percent of the total corporate stock of a corporate mortgagor where such transfer results in a change in control of the corporate mortgagor.

D. A single transfer of an amount in excess of 50 percent of the corporate stock of a corporate General Partner or a single transfer of an amount less than 50 percent of the corporate stock of a corporate General Partner where such transfer results in a change of control of the corporate General Partner.

E. Any transaction which does not fall within any of the other categories but which, nevertheless, results in a change of control of the mortgagor.

These categories include not only a single transfer, but a series of transfers which have the same result.

II. Documentation recruited for a modified review:
The following documentation must be submitted by the purchaser to the HUD Field Office when a Modified Review is required.

A. Documentation required for ALL transfers subject to modified review:





1. The mortgagor must notify the Field Office in writing that the transaction is imminent. A synopsis of the transaction must be provided;

2. Previous Participation (form HUD-2530) application must be submitted for individuals and/or legal entities who will own 25 percent or more of the partnership interests, or 10 percent or more of the corporate stock and for all incoming general partners;

3. A completed form HUD-92458, Rental Schedule and Information on Rental Project must be submitted. The rents may not exceed those last approved by the Field Office, unless the rents have been deregulated;

4. The certification and information required by Notice H 90-17, Combining Low Income Housing Tax Credits (LIHTC) with HUD Programs, as modified by any subsequent HUD notices or requirements; and

5. Sources and Uses of Funds Statement showing ALL funds and ALL expected uses of funds (See Appendix F for a sample format).

   The purchaser must submit a letter addressing the Determinative Criteria of the Notice for all modified TPA's where a significant amount of money will change hands.

6. A copy of the amended partnership agreement for all transactions involving transfers of interests in the owning entity, including the substitution of one or more general partners.

B. Additional Documentation required only for a transfer of 50 percent or more of the corporate entity, corporate General Partner, Partnership or Beneficial trust.

1. The applicant must provide a letter addressing the determinative criteria.





2. The applicant must provide copies of any proposed amendments to the existing partnership agreement and/or additional financing documents.

3. A partnership applicant must submit an attorney's opinion that the transfer does not cause a dissolution of the partnership under applicable state law.

C. Documentation required only for the substitution or addition of one or more general partners.

- A resume of the incoming general partner(s) must be provided.

D. Additional documentation required only for the

transfer of less than 50 percent of the corporate stock, which results in a change in control of the corporate mortgagor or corporate general partner.

1. A meeting between the stock purchaser(s) and the HUD staff in which the following is discussed.

   a. The projects physical and financial condition. If the project is suffering physical, management or financial deficiencies, a plan for remedying the deficiencies will be discussed. A target date for delivery of a written plan for correcting all physical and financial problems will be agreed to by all parties.

   b. The duties of the owner (stockholders) under the Regulatory Agreement and the mortgage documents.

III. Processing a Modified Review. If the Field Office determines that the applicant opted for a modified review to avoid the more stringent requirements of the full review process, the Field Office should impose the appropriate full review requirements, including the preliminary and final approval processing sequences. The Field Office may wish to require interim financial statements, a detailed purchaser's letter, satisfaction of the determinative criteria, (including meeting the project's physical and financial needs) etc. in such cases.





INSTRUCTIONS FOR PREPARATION OF THE APPLICATION OF TRANSFER OF PHYSICAL ASSETS

These instructions are for the preparation of the application for the transfer of physical assets. The application and instructions have been developed to facilitate the expeditious processing of proposals to transfer projects encumbered by HUD-held and HUD-insured mortgages. Parties are cautioned against introducing amendments or deviating from the instructions unless such measures are absolutely necessary to make the entire transaction effective. Nonconforming documents and deficient information will, at best, result in delays and added expense. The final paragraph of this application must be signed by the mortgagee in every instance where the transfer will result in the creation of a lien against the project.

A formal application must be executed by the purchaser, the seller, and normally by the mortgagee. If the mortgagee refuses to execute the application, the reason for such refusal must be known to HUD in writing. Copies of any correspondence to or from the mortgagee must be attached to the application. If the mortgage has not been finally endorsed for insurance, the application will not be accepted without the mortgagee's execution. In instances in which the proposal to transfer involves the creation of a lien against the property, the

mortgagee must consent to the transfer.



The Department of Housing and Urban Development, under 24 CFR 207.1(h), imposes a fee of $0.50 per $1,000 of the original face amount of the mortgage to cover the cost of legal, administrative, and fiscal actions which such a transfer entails. The fee is to be paid with the filing of the application. For applications reviewed by HUD and subsequently withdrawn, the fee paid to HUD will be considered earned and nonrefundable.

The Application of Transfer of Physical assets must be used in connection with transfers of properties encumbered by mortgages insured by HUD as well as by mortgages owned by the Secretary of HUD.

---



---



---

Instructions for Preparation of Required Instruments for Application for Preliminary Approval.

Below is a brief description of the more routine requirements of the TPA application. Please see Appendix A for a more complete description of these and other TPA requirements.

1. Purchaser's Letter Describing Financial Considerations Flowing to Project and to HUD -- This must be a letter from the purchaser describing in full detail all of the financial considerations to flow to the project and to HUD as a result of the transfer. This letter must detail all funds allocated to project operations as well as those funds designated for use in correcting the physical needs of the project. See Appendix A, Purchaser's Letter, for the complete list of items the letter must address.

2. Form HUD-2530 for All Appropriate Parties -- This form must be filed for all general partners, proposed management agents, and individuals and/or entities who own an interest in the project of 25% or more or who own 10% or more of the corporate stock of the corporation owning the project. It must also be filed for new management agents and certain categories of consultants (see HUD Handbook 4065.1).

3. Purchaser's Resume -- This is a self-styled resume which describes the purchaser's background and qualifications to own the project. It should at a minimum, reference all of the purchaser's previous experience in the multifamily housing industry.

4. Purchaser's Personal Financial Statement -- HUD will provide the form to be completed for this purpose (FHA Form 2417).

5. Sources and Application of Funds -- This is to be provided in all cases. See Appendix F for a suggested format.

6. Executed but UNRECORDED Sale Contract, Option Contract, or Land Contract -- All consideration moving to the seller must be recited.

7. Executed Seller/Purchaser Affidavit -- This is a sworn statement to the effect that the sale contract recites all of the consideration moving to the seller or any person identified therewith.

8. Proposed Release and Assumption, and Modification Agreements -- These are to be provided only when the purchaser is assuming the existing Note and Mortgage. These forms are provided by HUD. They are to be completed and signed by the mortgagor and mortgagee and submitted to HUD for execution in preparation for preliminary approval. If the transaction requires the execution of a new Regulatory Agreement, e.g., NP-LD transfer, the purchaser must submit a proposed New Regulatory Agreement. Furthermore, the Modification Agreement, the instrument that incorporates the regulatory agreement into the existing mortgage, should be used in any case where there is a new regulatory agreement. If the transaction does not require the execution of a new Regulatory Agreement, the purchaser must submit a proposed Release and Assumption Agreement.

9. New Proposed Regulatory Agreement -- This is to be provided where the parties are taking subject to the existing Note and Mortgage or as explained at 8 above. The appropriate agreement will be provided by HUD. It must be executed by the Purchaser.

10. Unexecuted Secondary Financing Documents -- These include all notes, deeds of trust, mortgages, financing statements, agreements creating interests in personalty and/or all other agreements evidencing deferred financing except Land Contracts. These documents must conform with outstanding administrative and legal requirements and must be UNEXECUTED.

11. Interim Financial Statement -- The statement of the seller is to be prepared in accordance with HUD Handbook 4370.2 and cover the period from the date of the last annual report furnished to HUD to the date of the application.

12. Pro forma Balance Sheet -- The pro forma balance sheet must reflect the proposed financial structure of the purchaser immediately following the transfer, including all current and fixed assets and liabilities, and all classes of capital stock or shares in the mortgagor entity. The balance sheet must show that the expected

cash on hand will equal or exceed current liabilities and prepaid income. Cash representing security deposits shall be shown in a separate fund as required by the Regulatory Agreement. The balance sheet shall be substantially as prescribed in HUD Handbook 4370.2 and reflect the financial structure as it relates to this property only.

13. Mortgagee Statement of Escrow and Reserve Accounts -- This must be a statement certified by the mortgagee which reflects the balance in the escrow and reserve accounts at the time of application. This is not required where the mortgage is held by HUD.

14. MIO Plan -- This is to be submitted in every instance in which the project to be transferred has physical or financial needs. The purchaser can either use the HUD forms developed for evidencing an improvement plan (Forms HUD-9835, -9835A, -9835B) or the purchaser can develop a form of its own which clearly indicates the improvements and/or contributions to be made and the dates such improvements and/or contributions are to be made.

15. Proposed Management Certification -- This is to be provided where a change of management is proposed.

Preliminary Approval

If upon examination the application and the attached instruments are found in order, preliminary approval will be given to the transaction by the appropriate official at the Area or Multifamily Service Office responsible for processing the application. This approval will be conditioned upon necessary changes in the submitted documents and will authorize the execution of all remaining instruments required.

The mortgagor-seller and purchaser have agreed by the terms of the application to take any steps necessary to reconvey the property to the mortgagor-seller if the terms of the preliminary approval are not met within 45 working days from the date of the issuance of preliminary approval, unless further time is granted by the Commissioner in writing. Until HUD give preliminary approval of the TPA in writing, the transaction may not take place. HUD will prosecute to the fullest extent possible, any unauthorized TPAs.





Application for Final Approval

1. Executed HUD Approved Sale Contract -- This contract must reflect the amendments required at preliminary approval. This contract must be resubmitted with the application for final approval.

2. Executed Secondary Financing Documents -- These documents must reflect the amendments required at preliminary approval.

3. Executed Deed -- Self-explanatory.

4. Executed Bill of Sale and Assignment -- Proposed Bill of Sale and Assignment shall describe all personal property conveyed and should be on the form provided by HUD.

5. Executed Release and Assumption Agreement -- This must be submitted where the mortgagee has consented to the transfer and the purchaser is assuming the mortgage. This must reflect all amendments required at preliminary approval.

6. Executed Modification Agreement -- This must reflect the amendments required at preliminary approval.

7. Title Policy -- If the mortgagor-seller is to be released, a proposed title binder or letter from the company issuing the original mortgagee's policy shall show that after the transfer the mortgage will remain a first lien on the property and the mortgagee will still be protected by a mortgagee's title policy.

8. Mortgagor's Oath - (Use Form FHA-2478.) Not required for projects insured under Sections 231 or 232 of the National Housing Act.

9. Proposed Rental Schedule (Form HUD-92458) -- A copy of the proposed Rental Schedule and information on Rental Project shall be submitted by purchaser. It shall show the names of all owners, including beneficiaries, stockholders, or general partners. If stock is held by a purchasing corporation, principal stockholders of that corporation shall be shown. The Rental Schedule shall not exceed the





maximum allowable rents approved for the project by the service office director for projects subject to rent regulation. In nursing home and elderly housing cases, use Form HUD-92458-A, appropriately adapted, giving the same information and, in addition, an operating budget.

10. Organizational Documents of Purchaser -- Unless the purchaser is an individual, full details on the entity acquiring the project shall be provided. If the purchaser is a corporation, trust, or partnership, two certified copies of the charter, trust, or partnership agreement should be furnished. In all such cases, the charter or agreement shall show that the corporation, partnership, or trust is authorized to operate the project and execute and be bound by the Regulatory Agreement. The charter, agreement, or other proper document or minutes of meetings should establish clearly the authority of persons executing the Regulatory Agreement and other papers for the purchaser.

11. Regulatory Agreement Executed by Purchaser -- This is to be submitted again with the Application for final approval.

12 Executed Management Certification -- This is to be submitted where a change of management is proposed.





APPLICATION FOR TRANSFER OF PHYSICAL ASSETS

Project Number:____________________ Date:________

Project Name:______________________________

Mortgagor-Seller:______________________________

Project Purchaser (includes Form of Ownership, e.g., Individual, Partnership, Corporation, Trust:____________________

Mortgagee of Record:______________________________
Address:______________________________

Servicing Agent:______________________________
Address:______________________________

Mortgage Recorded:__________ State:________ County:________
Date:__________ Book:__________ Page:________

To the Secretary, Department of Housing and Urban Development:

The above-named mortgagor-seller and the project purchaser submit herewith the required fee of $________ and apply to the Department of Housing and Urban Development for permission to transfer the project from the mortgagor to purchaser and, in support of said request represent to the Secretary as follows:

I. All real and personal property of the mortgagor-seller will be conveyed to the purchaser.

II. After the transfer purchaser will own said real and personal property free and clear of all liens, encumbrances or project obligations except the insured mortgagor and those expressly approved by you in writing as to form, content, terms and amount.





In further support of this request there are attached:

Application for Preliminary Approval
1. Purchaser's Letter (See Appendix A for requirements).
2. Form HUD-2530 for all appropriate parties (Certificate of

Previous Participation).

3. Purchaser's Resume.
4. Purchaser's Personal Financial Statement.
5. Sources and Application of Funds.
6. Executed but Unrecorded Sale Contract, Option Contract, or Land Contract.
7. Executed Seller's/Purchaser's Affidavit.
8. If Parties Assume Existing Notes and Mortgage:
   Where change in the Regulator Agreement is required,
   Proposed New Regulatory Agreement
   Proposed Modification Agreement
   Where no change in the Regulatory Agreement is required,
   Release and Assumption Agreement
9. If Parties Take Subject to Existing Note and Mortgage:
   New Proposed Regulatory Agreement
10. Where Secondary Financing is Involved:
    All unexecuted secondary financing documents (notes, deeds of trust, mortgages)
11. Interim Financial Statements.
12. Pro forma Balance Sheet.
13. Mortgagee Statement of Escrow and Reserve Accounts.
14. MIO Plan, as Appropriate.
15. Proposed Management Certification and 2530 for Management Agent (and Entity Profile, if appropriate).
16. Proposed but Unrecorded Deed.
17. Proposed Bill of Sale and Assignment.
18. Title Report.
19. Proposed Mortgagor's Oath.
20. Proposed Rental Schedule.
21. Executed Organizational Documents of Purchaser.
22. Attorney's Certification.
23. Byrd Amendment Certification

It is understood and agreed that within 45 working days of the issuance of preliminary approval the following attachments will, with such changes as you may require and no others, be delivered to you. Unless said documentation is delivered to HUD within the specified (45 working days) or unless further time for completing the transaction is granted in writing by you. HUD may require that the TPA be unwound and any interest already conveyed in the property be reconveyed to the above-named mortgagor.





Application for Final Approval

1. The following executed, or executed and recorded, documents must be submitted as previously approved by HUD for execution and recordation:

   (1) Executed HUD-approved Sale Contract.
   (2) Executed secondary financing documents (e.g. notes, deeds of trust, security instruments, etc.).
   (3) Executed Deed.
   (4) Executed Bill of Sale and Assignment.
   (5) Executed Release and Assumptions Agreement.
   (6) Executed Modification Agreement.
   (7) Title Policy.
   (8) Mortgagor's Oath.

(9) Executed Rental Schedule.
(10) Organizational Documents of Purchaser (executed partnership agreement, recorded certificate of limited partnership, etc.)
(11) Regulatory Agreement as executed by purchaser (amended or new), as approved by HUD.
(12) Executed Management Agent Certification.

2. One certified (by the recording officer) and one conformed copy of all recorded documents except recorded Regulatory Agreement. The original and one copy of recorded Regulatory Agreements, if applicable.

3. A copy, certified by the Purchaser, trustee, or other responsible person, to be a true copy of all unrecorded, executed documents used in connection with the transfer.

4. An audited interim Financial Statement of the seller covering the period between the date of the Application and the date of the actual transfer of the project to the owner.

5. An actual balance sheet of the purchaser as of the date of the transfer of title to the purchaser, along with copies of any deferred payment notes approved by the Secretary and certified to be true copies by the holder thereof.

6. Mortgagee's statement of all trust and escrow accounts as of the date of transfer of title to the purchaser.





7. If the mortgagor-seller is to be released from the note obligation, a new title policy or a letter from the title company issuing the original title policy showing that after the transfer the insured mortgage will remain a valid first lien on the property and that the existing title policy is still in full force and effect.

8. Attorney's comprehensive opinion showing that the transaction has been fully consummated and that the purchaser is legally authorized to operate the project and abide by the terms of the Regulatory Agreement.

9. Form HUD-92458, Rental Schedule and information of Rental Project or Form HUD-92458a, dated after date of transfer of project to Purchaser.

Mortgagee's Statement

If the above transfer is approved by the Secretary, Department of Housing and Urban Development, the mortgagee agrees to execute a Release and Assumption Agreement or a Mortgage Modification Agreement incorporating the Regulatory Agreement in the mortgage. It is understood that the mortgagee's consent to this transfer will in no way prejudice its rights under its contract of insurance with HUD.

Executed this ______ day of _____________, 19___.

Mortgagee

By ______________________________
Name/Title

In the event the consent of the mortgagee to the transfer is not evidenced by endorsement of this application, please provide the following information:

Date Consent Requested: ______________________________

Party to whom Request Directed: ______________________________





Reason for Refusal to Consent: ______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

Mortgagee's Consent to the Creation of a Lien Against the Project

Mortgagee hereby consents to the creation of a lien(s) against the real property known as (project no.) __________________, (project name) ______________________________ in connection with this transfer. Mortgagee waives its right to assign the mortgage and claim insurance benefits by the reason of the creation of such lien(s).

Executed this _________ day of _________________, 19___.

______________________________ Mortgagee

By ______________________________
Name/Title

______________________________
Mortgagor-Seller Date

______________________________
By

______________________________
Purchaser Date

______________________________
By

TPA SUBMISSION CHECKLIST
PRELIMINARY REVIEW

| | YES | NO | NA |
|---|---|---|---|
| 1. TPA Application (form HUD-92266) | | | |
| filled out completely | ____ | ____ | ____ |
| signed by purchaser | ____ | ____ | ____ |
| signed by seller | ____ | ____ | ____ |
| signed by mortgagee | ____ | ____ | ____ |
| 2. Consent by Mortgagee (required only where the proposal involves conversion to condominium or cooperative or where a lien against the property is created in connection with the transfer --- FORWARD ORIGINAL DOCUMENT TO HUD, WASHINGTON HQ-- OFFICE OF MULTIFAMILY HOUSING MANAGEMENT) | ____ | ____ | ____ |
| 3. Fee submitted | ____ | ____ | ____ |
| correct amount | ____ | ____ | ____ |
| 4. Purchasers letter describing financial considerations flowing to project and to HUD. (See Appendix A, Purchaser's Letter for additional checklist items.) | | | |
| Shows: Funds to project operations | ____ | ____ | ____ |
| Funds for repairs | ____ | ____ | ____ |

mortgage status
____ current ___ workout ___ restoration plan

| | YES | NO | NA |
|---|---|---|---|
| 5. Completed HUD 2530 for: | | | |
| all general partners | ____ | ____ | ____ |
| limited partners > 24% | ____ | ____ | ____ |
| holders of common stock with an interest 10% | ____ | ____ | ____ |
| new management agent | | | |
| all principals as defined in 2530 instructions | ____ | ____ | ____ |
| all consultants and/or packagers for profit | ____ | ____ | ____ |





| | YES | NO | NA |
|---|---|---|---|
| 6. Purchaser's resume | ____ | ____ | ____ |
| 7. Purchaser's personal financials | ____ | ____ | ____ |
| 8. Purchaser's credit information | ____ | ____ | ____ |
| 9. Sources and uses of funds | ____ | ____ | ____ |

10. Executed sale or land contract

11. Executed seller's/purchaser's affidavit

12. If parties assume existing note and mortgage - Proposed Release and Assumption Agreement

    Proposed Modif'n Agreement

13. If parties take subject to the existing note and mortgage New proposed Regulatory Agrmt

14. Where secondary financing is involved:
    A. all unexecuted secondary financing documents (notes, deeds of trust, mortgages)

    B. written consent of mortgagee (where a lien against the property is created)
    FORWARD ORIGINAL WRITTEN CONSENT TO OFFICE OF MULTIFAMILY HOUSING MANAGEMENT IN HEADQUARTERS

15. Interim financial statements

16. Pro forma balance sheet

17. Mortgagee statement of escrow and reserve accounts





| | YES | NO | NA |
|---|---|---|---|
| 18. MIO plan, as appropriate | | | |
| 19. Management certification and profile | | | |
| 20. Proposed unrecorded deed | | | |
| 21. Proposed bill of sale and assignment | | | |
| 22. Title report | | | |
| 23. Mortgagor's oath | | | |
| 24. New rental schedule (form HUD-92458) | | | |
| 25. Organizational documents of the purchaser | | | |
| 26. Attorneys certification of execution and recording | | | |

4350.1 REV-1

APPENDIX E

FINAL REVIEW

| | YES | NO | NA |
|---|---|---|---|
| 1. Copies of all executed and recorded documents | | | |
| Deed | ____ | ____ | ____ |
| Assumption agreement | ____ | ____ | ____ |
| Modification agreement | ____ | ____ | ____ |
| Release agreement | ____ | ____ | ____ |
| Secondary financing documents | ____ | ____ | ____ |
| 2. Original Regulatory Agreement Executed and Recorded | ____ | ____ | ____ |
| 3. Interim audited financial statements | ____ | ____ | ____ |
| 4. Purchasers balance sheet | ____ | ____ | ____ |
| 5. Mortgagee's statement of escrows and reserves | ____ | ____ | ____ |
| 6. Title Policy | ____ | ____ | ____ |
| 7. Attorney's opinion | ____ | ____ | ____ |



4350.1 REV 1

APPENDIX F

SOURCES AND USES OF FUNDS STATEMENT

Click Here to Download/Open Appendix F (PDF File)



4350.1 REV 1

APPENDIX F

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON D.C. 20410

OFFICE OF THE GENERAL COUNSEL

MEMORANDUM FOR: All Regional Counsel
All Chief Counsel
All Chief Attorneys

FROM: Charles J. Bartlett, Assistant General Counsel
Multifamily Mortgage Division, GHM

SUBJECT: Legal Review of Transfer of Physical Assets Proposals

This memorandum is intended to be the new primary source of guidelines for field counsel on the legal review of transfer of physical assets proposals. In this memorandum, we have revised and updated our legal requirements to adapt to the most recent administrative procedures (to be issued in a separate memorandum.) This Division's prior memorandum dated December 6, 1982 entitled "Review of Transfer of Physical Assets Proposals" is cancelled.

In revising our legal requirements, we have taken into account new developments in the sales of multifamily projects subject to HUD-insured or HUD-held mortgages. Furthermore, we have adopted new legal requirements designed to assist field counsel in the review of the new "expedited" TPA's such as transfers in escrow. (Therefore, this memorandum should be read in conjunction with the forthcoming memorandum on administrative requirements for TPA's.) Although we have made some changes in the arrangement of required language in secondary financing documents, this memorandum adopts the format used in our December 6, 1982 memorandum and contains three Sections: (I) Transfer of Physical Assets Review; (II) Secondary Financing; and (III) Other Transfer Related Issues.

I. REVIEW OF TRANSFER OF PHYSICAL ASSETS

A. Definition. A transfer of physical assets is a change in the ownership of a project upon which there is a mortgage loan insured or held by HUD. Although a conveyance of title from the mortgagor-seller to the buyer is a transfer of physical assets, the Department also treats the sale of a project by means of a land contract as a transfer of physical assets even though legal title remains in the mortgagor-seller. Similarly, where a passive trust holds title to a project, an assignment of 100 percent of the beneficial interest in that trust, resulting in a significant change in the control and management of the

project, is subject to transfer of physical assets review although legal title remains in the trustee. Moreover, the transfer of 50 percent or more of the interests in a partnership to a separate entity constitutes a transfer of physical assets whether or not the assignment causes the dissolution of the partnership. Once a particular proposal is determined to be a transfer of physical assets, applicable requirements set forth in Form HUD-92266, Application for Transfer of Physical Assets hereinafter Application , and Form HUD-92266A, Instructions for Preparation of HUD-92266-Application for Transfer of Physical Assets, hereinafter Instructions , will be utilized in processing the proposal. (We anticipate that the Application and instructions will be revised and supplemented with checklists, worksheets, etc.) Background information regarding transfer procedures is found in Chapter 4, Section 11 of HUD Handbook 4350.1. Insured Project Servicing, and Chapter 3 of HUD Handbook 4360.1 Supp 1, HUD-Held Project Servicing. (The HUD Handbook procedures for TPA's are in the process of being revised to reflect changes in Departmental policy.)

In addition, significant changes in a mortgagor which are less than a full transfer of physical assets may require administrative review by Housing. Housing has developed a "modified review" for the transfer at any one time of an amount in excess of 50 percent and up to 100 percent of the interest of the partnership mortgagor provided such transfer does not constitute a dissolution of the partnership under state law. (Dissolution of the partnership would be subject to a full review.) The issue of whether such 100 percent transfer would cause a dissolution under state law should be resolved by field counsel. Other transfers which require modified review procedures include: Substitution of one or more of the general partners; transfer at any one time of an amount in excess of 50 percent of the corporate stock of the corporate mortgagor and transfer of an amount less than 50 percent of the total corporate stock of the corporate mortgagor where such transfer results in a change in the control of the corporate mortgagor. Field counsel should be aware of the current administrative requirements with respect to "modified review", procedures.

Finally, a transfer of physical assets is possible prior to final endorsement. A transfer of the project during this period would necessitate the execution of both HUD transfer and development forms. In general, all transfer of physical assets requirements established in the Application should be followed. However, a reprocessing of the application for mortgage loan





insurance using revised information set forth by the buyer in FHA Form No. 2013, Application for Project mortgage insurance, may be required in lieu of a transfer. Because

a reprocessing usually results in a change in the mortgage amount, certain development documents (e.g., Building Loan Agreement, Construction Contract) also must be revised to reflect the change. Other development documents executed by the mortgagor may also require an assignment or reexecution if the transfer occurs during the construction period.

The transfer of physical assets procedure is not applicable to first user syndications (i.e. the sale of interest units in an existing limited dividend partnership mortgagor which occurs at or prior to final endorsement.) First user syndications should be reviewed in accordance with the administrative requirements for substitution of partners. Furthermore, some transactions which involve changes in the mortgagor entity are not transfers of physical assets. Field counsel should contact this Division with questions concerning whether certain changes in a mortgagor entity constitutes a transfer of physical assets. (Note, that 24 C.F.R. 5207.1(h) requires payment of a transfer fee in all cases involving substitution of mortgagors.)

B. Review of Field Counsel. All proposals should first be substantively reviewed by field counsel regardless of whether legal review by this Division is required.

This Division will review all transfers which are forwarded to Central Office under outstanding administrative criteria or which present legal issues which this Division should examine. For example, transfers involving conversions to the cooperative form of ownership; long-term leases with options to purchase; and conversions from the cooperative form of ownership to operation as a rental project each require review by this Division.

Generally, multiple transfers and transfers involving land contracts no longer require review by this Division. However, if necessary, field counsel should contact this Division for assistance in reviewing these proposals.

Occasionally, this Division approves standard TPA documents in connection with a particular purchaser. Any substantive changes to these previously approved documents should be discussed via telephone with a Division attorney in order to expedite field office review.



---



C. Review of Application. The following legal issues frequently arise during the review of the TPA application:

1. Regulatory Agreements. A new Regulatory Agreement should be executed whenever the transfer is "subject to" the existing note and mortgage. In Cases where the purchaser is assuming the existing note and mortgage, the purchaser may also assume the existing Regulatory Agreement. A new Regulatory Agreement must be executed in connection with any transaction which involves a change in the type of a mortgagor entity (i.e. a NP-LD transfer or cooperative or rental

conversion) or in cases where the existing Regulatory Agreement has been superseded by a more recent version. Where the project subsidy is converted to Section 8, a new type of Regulatory Agreement may be required which combines parts of the original Regulatory Agreement with the Section 8 Regulatory Agreement. Please contact this Division for assistance in formulating such a "hybrid" Regulatory Agreement.

Regulatory Agreements executed in connection with a transfer by land contract should be executed by both the seller and the purchaser. Additionally, the Regulatory Agreement should contain "Rider A" to the Regulatory Agreement.

2. Mortgagee Consent. Mortgagee consent to the TPA is required whenever the purchaser is assuming the existing note and mortgage. This consent is evidenced by the mortgagee's execution of the TPA application. In such cases the mortgagee must also execute an Assumption Agreement and a Modification Agreement. A "subject to" transfer does not require mortgagee consent. However, present administrative procedures require evidence of the mortgagee's failure to consent to the transfer. (See TPA application instruction form.) Where a "subject to" transfer involves any of the following, mortgagee consent is required: Secondary financing secured by a lien against the project, land contracts, and long-term leases with options to purchase. (Mortgagee consent is discussed in greater detail in Part II of this memorandum.)

3. Secondary Financing. If the transfer involves financing creating a lien against the project and the mortgagee consents to the creation of this lien, the phrase in clause II of the Application which states





that the buyer will "own said real and personal property free and clear of all liens or encumbrances except the insured mortgagee . . ." should be deleted.

4. Organizational Documents. Field counsel review of the buyer's organizational documents submitted with the Application should be similar to the review of the mortgagor's documents submitted in connection with an FHA initial closing.

In general, the organizational documents should expressly indicate that the duration of the acquiring entity is at least coextensive with the remaining term of the mortgage. Furthermore, the documents must include a provision stating that the terms of the Regulatory Agreement take precedence in the event of any conflict with the terms of the organizational documents. In addition, it should be clear from the documents that the buyer has authority to enter into the transaction.

With respect to the review of a limited partnership agreement, it has come to our attention

that the form language required by the Regulatory Agreement Instructions may have to be modified in jurisdictions adopting the Uniform Limited Partnership Act or Revised Uniform Limited Partnership Act. The Regulatory Agreement instructions currently provide that " a ny incoming partner shall as a condition of receiving an interest in the partnership property agree to be bound by the note, mortgage, and Regulatory Agreement . . . ." The Uniform Acts provide that a partner does not own an interest in the property of the partnership, but in the partnership itself.

FIELD COUNSEL SHOULD REVIEW THE ORGANIZATIONAL DOCUMENTS OF ANY ACQUIRING PARTNERSHIP TO MAKE CERTAIN THAT THEY CONTAIN THE REQUIRED LANGUAGE SET OUT AT SECTION II, SUBSECTION G. infra ("Secondary Financing Secured by Assets of the Acquiring Partnership") AND DO NOT OTHERWISE CONFLICT WITH ANY HUD REQUIREMENTS.

5. Deed. The form of deed shall be reviewed by field counsel for compliance with local law. The form of deed must be a special warranty deed or its equivalent (i.e. a deed which includes a covenant against the acts of the grantor.)



---



II. SECONDARY FINANCING

Secondary Financing is used when the mortgagor-seller does not receive the full purchase price at the time of the transfer and agrees to its payment over a period of time. The method of securing payment of the deferred purchase price may create a lien against the project. HUD reviews all financing in connection with the transfer although HUD requirements differ between secondary financing which creates a lien against the project and that which does not. The following legal requirements controlling the use of secondary financing must be satisfied before approval of the use of secondary financing may be permitted for subsidized and unsubsidized projects:

A. Deferred Cash Payments Many transfers which involve syndication of the project provide for mandatory deferred cash payments to the mortgagor-seller of the project to be made within the first five years of the transfer. This arrangement is legally acceptable provided that the sales agreement or other documents expressly states that these payments are to be derived from the capital contributions of the syndicating limited partnership and not from project income.

B. Mortgagee Consent -- Secured Secondary Financing. The holder of the first mortgage must consent in writing to all financing secured by the project (i.e., where a lien is created against the project by the secondary financing.)

C. Mortgagee Consent -- Unsecured Secondary Financing. If the secondary financing is not secured by the project, the purchaser should try to obtain consent to the financing from the holder of the first mortgage. Failure to obtain mortgagee consent when the secondary financing is not secured by the project, however, does not mean that HUD

will not consent to the transfer. If the mortgagee does not respond to the request for consent, the purchaser or purchaser's attorney must certify that an attempt was made to obtain mortgagee consent. The purchaser is not required to produce a letter from the mortgagee.

D. Subordination of Secondary Financing. The second mortgage or security agreement must be subordinate to the HUD-held or HUD-insured mortgage. The following language, as appropriate, must be included:

Security Agreement: Secured Party, for itself and its successors and assigns, covenants and agrees that all of its rights and powers under this security agreement are subordinate and subject to the rights





of (identify mortgagee) under that certain mortgage (deed of trust) dated __________ and recorded (date, office of recordation) and under that certain Security Agreement dated ______________, and the rights of the Secretary of Housing and Urban Development under that certain Regulatory Agreement dated ________________ and incorporated by reference in the above described mortgage.

Second or Wrap-Around Mortgages: Mortgagee, for itself and its successors and assigns, covenants and agrees that all of its rights and powers under this mortgage are subordinate and subject to the rights of (identify first mortgagee) under that certain mortgage (deed of trust) dated _____________ and recorded (date, office of recordation) and under that certain Security Agreement dated ___________, and the rights of the Secretary of Housing and Urban Development under that certain Regulatory Agreement dated _________________ and incorporated by reference in the above described mortgage.

E. Prohibition Against Attaching or Assigning Rents and Other Income. Assignment of rents or other income of the project subject to a HUD-insured or HUD-held mortgage to any party other than the HUD mortgagee is prohibited by the terms of the first mortgage unless there is written mortgagee consent to the assignment. Furthermore, the attachment of rents or other project income in the event of foreclosure of a second or wrap-around mortgage also is prohibited. The following language must be included in the second or wrap-around mortgage;

Mortgagee, for itself and its successors and assigns, further covenants and agrees that in the event of the appointment of a receiver or of the appointment of the mortgagee as mortgagee-in-possession, in any action by the mortgagee, its successors or assigns, to foreclose the mortgage, nc

rents, revenue or other income of the project collected by the receiver or by the mortgagee-in-possession shall be utilized for the payment of interest, principal or any other charges due and payable under this mortgage, except from surplus cash available for distribution, if any, as the term is defined in the Regulatory





Agreement; and further, the receiver or mortgagee-in-possession shall operate the project in accordance with all the provisions of the first mortgage and the Regulatory Agreement.

F. Payment Only from Surplus Cash. Notes evidencing secondary (deferred) financing must provide that any payments from project income can only be made from surplus cash (if the project has a profit-motivated mortgagor) and permissible distributions from surplus cash - - e.g., 6, 8 or 10% (if the project has a limited distribution mortgagor.) The following language must be in the Note or Wrap-Around Note:

1. Note Secured by a Lien Against the Project: As long as the Secretary of Housing and Urban Development, or his success or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments due from project income under this Note shall be payable only from permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash of the said project, as that term is defined in the Regulatory Agreement dated ____________________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note.

2. Note Not Secured by a Lien Against the Project: As long as the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments due from project income under this Note shall be payable only from permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash of the said project, as that term is defined in the Regulatory Agreement dated ________________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). The restriction on payment imposed by this

paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note. Holder has no claim, and will not later assert any claim for payment against the mortgaged property, the mortgage proceeds, any reserve or deposit made with the mortgagee or another required by the Secretary in connection with the mortgage transaction, or against the rents or other income from the mortgaged property.

3. Wrap-Around Note Secured by a Lien Against The Project: As long as the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No), any payments under this Wrap-Around Note will be made in the following manner. First, the maker of this Note (insert name of buyer) will segregate all project income as required under the Regulatory Agreement dated ________________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). Second, the maker of this Note will deliver to the holder of this Note all sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Holder, in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash as that term is defined in the aforesaid Regulatory Agreement, the maker will deliver to the holder of this Note permissible distributions from (omit "Permissible distributions from" if a profit-motivated mortgagor) surplus cash to the extent available to satisfy any current or deferred amounts to be paid under this Note. The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note.

4. Wrap-Around Note Not Secured by a Lien Against the Project. As long as the





Secretary of Housing and Urban Development,

or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments under this Wrap-Around Note will be made in the following manner. First, the maker of this Note (insert name of buyer) will segregate all project income as required under the Regulatory Agreement dated __________________ between the secretary of Housing and Urban Development and (insert name of mortgagor-seller). Second, the maker of this Note will deliver to the holder of this Note all sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Holder, in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash as that term is defined in the aforesaid Regulatory Agreement, the maker will deliver to the holder of this Note permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash, to the extent available to satisfy any current or deferred amounts to be paid under this Note. The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note. Holder has no claim for payment and will not later assert any claim against the mortgaged property, the mortgage proceeds, any reserve or deposits made with the mortgagee or another requited by the Secretary in connection with mortgage transactions, or against the rents or other income from the mortgaged property.

G. Secondary Financing Secured by Assets of the Acquiring Partnership. Proposals involving secondary financing secured by pledges of the assets of the acquiring partnership should include the following language in the partnership's organizational documents:

1. If the partnership will assume the HUD note and mortgage:





The partnership is bound, to the same extent as the original executing party, by the mortgage note, mortgage, Regulatory Agreement and other documents that have been executed in connection with the HUD insured mortgage loan affecting the partnership property. Upon any dissolution, no title or right to possession and

control of the partnership property financed under such HUD-insured mortgage loan, and no right to collect the rents therefrom, shall pass to any person who is not so bound in a manner satisfactory to the Secretary of Housing and Urban Development.

2. If the partnership will not assume the HUD note and Mortgage:

The Partnership, and any incoming General Partners or Limited Partners, shall, as a condition of receiving an interest in the Partnership or its property, agree to be bound to the same extent as the original executing party (except as to obligations for payments) by the terms of the HUD mortgage and Regulatory Agreement and any other documents that have been executed in connection with the HUD-insured mortgage loan on the project. Upon any dissolution, no title or right to possession and control of the partnership property financed under such HUD-insured mortgage loan, and no right to collect the rents therefrom, shall pass to any person who is not bound in a manner satisfactory to the Secretary of Housing and Urban Development.

3. The organizational documents of the partnership should provide for HUD approval of an amendment thereto:

As long as the Secretary of Housing and Urban Development, or his successors or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), no amendment to this (name of the document) which





results in any of the following shall be of force or effect without the prior written consent of HUD: (1) any amendment which modifies the duration of the (partnership agreement) (corporate charter); (2) any amendment which results in the requirement that a HUD prior participation certification be obtained for any additional party; and (3) any amendment which in any way impacts or affects the HUD mortgage or Regulatory Agreement.

H. Acquisition by Deed-in-Lieu of Foreclosure. In the event the Secretary acquires title by deed-in-lieu of foreclosure, the second lien created by a second or wrap-around mortgage will terminate. The following language must be included in the second or wrap-around mortgage:

"In the event the Secretary acquires title to the project by a deed-in-lieu of foreclosure, the lien of the second wrap-around mortgage will automatically terminate subject to the conditions hereinafter described. The holder of the second wrap-around mortgage may cure a default under the first mortgage prior to a conveyance by deed-in-lieu of foreclosure. The Secretary shall give written notice to the holder of the second wrap-around mortgage of a proposed tender of title in the event (1) the Secretary decides to accept a deed-in-lieu of foreclosure or (2) the Secretary receives notice from the holder of the HUD-insured mortgage of its election to accept a deed-in-lieu of foreclosure. The Secretary will give such written notice if, at the time of the placing of the subordinate lien against the project, the Secretary receives a copy of an endorsement to the title policy of the mortgagor or holder of the HUD mortgage which indicates that (1) the second wrap-around mortgage has been recorded; and (2) the Secretary is required to give notice of any proposed election to or tender of a deed-in-lieu of foreclosure. Such notice shall be given at the address stated herein or such other address as may subsequently, upon written notice to the Secretary, be designated by the holder of the second





wrap-around mortgage as its legal business address. The second mortgage holder shall have thirty (30) days to cure the default after the notice of intent to accept a deed-in-lieu of foreclosure is mailed."

I. Secondary Financing with Balloon Payments Provisions In all TPA's, field counsel may approve unsecured notes evidencing secondary financing which contain balloon payment provisions. This policy is limited by the following: (1) The balloon second note shall not result in the creation of an earlier maturity date for the HUD note and mortgage. (Under the National Housing Act, an insured multifamily mortgage must provide for full amortization. See e.g., 12 U.S.C. 1713(c)(3). Thus, a balloon mortgage which wrapped an existing HUD-insured mortgage and which became due prior to prepayment or maturity of the HUD mortgage or the termination of mortgage insurance would not be permissible because it would have the effect of decreasing the term of the HUD mortgage. Under Section 446 of of the Housing and Urban-Rural Recovery Act of 1983 (HURRA), however, the National Housing Act was amended to authorize the Secretary to insure mortgages that do not provide for full amortization. Regulations implementing this statutory

provision presently are being drafted by the Office of Regulations for publication in 24 C.F.R. Parts 207, 220 and 231. Until the "Insurance of Partially Amortizing Mortgages and Mortgages with Call Provisions" regulations become effective, however, the Department will continue to implement its present policy.) (2) The balloon payment second note shall not create an equitable lien against the project which could result in the mortgagee's assignment of the mortgage. Field Counsel shall review the default remedies of the note to determine if such equitable lien is created under state law and shall advise the purchaser to obtain the mortgagee's consent if necessary. THIS IS OF UTMOST IMPORTANCE. If field counsel cannot ascertain that a lien is not created, this office should be contacted immediately. (3) The standard language that the Department utilizes in protecting its interest when approving secondary financing in connection with a transfer of physical assets must be used. (See Section II. F. supra).

Case 1:01-cv-00669-FMA Document 60-7 Filed 08/15/2005 Page 17 of 31

J. Conflict with Mortgage and Regulatory Agreement. The proposed documents must not conflict with the HUD-held or HUD insured first mortgage or the Regulatory Agreement.

K. Requirements for Sales Involving Land Contracts. Proposals involving a Land Contract (i.e., Installment Sale Contract or Contract for Deed) must comply with the following requirements:





1. The insured mortgagee must consent in writing.

2. The purchaser must sign a new Regulatory Agreement.

3. The seller must remain on the existing Regulatory Agreement and agree to be bound by the new Regulatory Agreement to the extent it differs from the existing Regulatory Agreement.

4. The Land Contract must be subordinate to the mortgage. The following language must be included in the Land Contract:

   > Buyer and Mortgagor-Seller agree that the land contract is subordinate to the HUD-held or HUD-insured mortgage.

5. The seller must agree not to attach project income for failure of the purchaser to make payments under the contract. The following language must be included in the Land Contract:

   > Mortgagor-Seller agrees not to file a lien against the project income for the failure of Buyer to make the required payments under the land contract.

6. The mortgagor-seller must remain bound to its obligations under the mortgage, mortgage note, and Regulatory Agreement until such time as there is a

release executed, as well as an assumption of these obligations by the purchaser, with the necessary acquiescence of all principals. The following language must be included in the Land Contract:



> Buyer and Mortgagor-Seller agree that in the event of a monetary default by Mortgagor-Seller under the HUD-held or HUD-insured mortgage, Buyer may cure such default and elect to take title to the project. In the event of such an election by Buyer , Mortgagor-Seller will execute a release and deed to the project and Buyer will concurrently execute an assumption of the HUD mortgage, note, and the Regulatory Agreement.





7. The Land Contract must clearly reflect that the mortgagor's obligation to continue making payments on the underlying mortgage is not contingent on the receipt of the installment payments from the purchaser under the Land Contract. The following language must be included in the Land Contract:

> The obligation of Mortgagor-Seller to continue to make payments and comply with all covenants under the HUD-held or HUD-insured mortgage is not contingent on the receipt of the installment payments from Buyer under this land contract.

8. The Land Contract along with the new Regulatory Agreement must be recorded. (Any alternative arrangement must be approved by HUD.)

9. The Land Contract must contain a provision that forbids the purchaser's assigning, mortgaging, or in any other way encumbering its interest without the prior written approval of the Secretary. The following language must be included in the Land Contract:

> Buyer must not assign, mortgage, or in any way encumber its interest without the prior written approval of the Secretary of Housing and Urban Development.

10. There must be a provision in the Land Contract that obligates the purchaser to operate and maintain the transferred property in accordance with the Department's regulations and procedures while the property remains subject to a HUD-held or HUD-insured mortgage. The following language must be included in the Land Contract:

> Buyer and Mortgagor-Seller agree that the project will be operated strictly in accordance with the

Regulatory Agreement, the HUD-held or HUD-insured mortgage, the National Housing Act, and the regulations promulgated thereunder while HUD is the insurer or holder of the mortgage. In the event of any conflict between the land contract and the HUD-insured mortgage documents and HUD regulations, such HUD documents and regulations





shall control as long as HUD holds the mortgage or as long as the HUD contract of mortgage insurance remains in effect.

11. There must be a provision in the contract whereby the parties agree to inform the Secretary in advance of any action they propose to take against the property; of any adverse action taken by any party of which they have knowledge; or of any other event that affects the property or that may affect the Secretary's interest therein. The following language must be included in the Land Contract:

 Buyer and Mortgagor-Seller agree to inform the Secretary in advance of any action they propose to take against the property, or of any adverse action of which they have knowledge taken by any party, or of a default, or of any other event that affects the property or that may affect the Secretary's interest therein.

12. The following payment provision must be included in the Land Contract:

 While the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the first mortgage on (insert project name and FHA Project No.) payments under this land contract will be made in the following manner. First, Buyer will segregate all project income as required under the Regulatory Agreement dated____________________ between the Secretary of Housing and Urban Development and Mortgagor-Seller . Second, Buyer will deliver to Mortgagor-Seller all the sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Mortgagor-Seller , in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash, as that term is defined

in the aforesaid Regulatory Agreement, Buyer will deliver to the Mortgagor-Seller permissible distributions (omit "permissible distributions from" with profit-motivated mortgagor) from surplus cash to the extent available to satisfy any current or deferred amounts to be paid under this land contract.

III. OTHER LEGAL ISSUES RELATING TO TRANSFER OF PHYSICAL ASSETS

The following issues frequently arise in connection with an application for approval of a transfer of physical assets:

A. Conversion from Non-Profits to Profit-Motivated Ownership. Many proposed transfers involve the transfer of ownership from non-profit owners to such profit-motivated owners as limited dividend mortgagors. A common arrangement, which is acceptable to the Department, involves the non-profit mortgagor retaining an ownership interest in the project as a managing general partner in the partnership purchasing the project.

The review of non-profit to profit-motivated transfers will involve the application of 24 C.F.R. Part 265 if the project is assisted under Sections 236 or 221(d) (3) of the National Housing Act, Section 101 of the Housing and Urban Development Act of 1965, or Section 8 of the United States Housing Act of 1937. See 24 C.F.R. 265.2 (1982). If 24 C.F.R. Part 265 is applicable, it is our understanding that Housing will consider waiving the current 24 C.F.R. 265.13 prohibition against remuneration to the non-profit seller. For example, Housing has allowed remuneration in the form of secondary financing to the non-profit owner provided that a trust agreement in a form acceptable to the Department is used. Inasmuch as a waiver of the Part 265 regulations requires an administrative determination of acceptability from Central Office, field counsel should advise that any recommendation with respect to a requested regulatory waiver should be thoroughly documented in writing.

B. Cooperative Conversion. Present HUD administrative procedure requires Central Office approval of all projects converting to ownership by a cooperative corporation. Such TPA's are approved on a project-by-project basis. HUD does not consider a TPA to a cooperative mortgagor as a "change of use," as that term is used in the HUD form mortgage or deed of trust. Therefore, mortgagee approval for cooperative conversions is not a prerequisite to TPA approval by HUD. However, this issue is currently being litigated. (Note, however, that on October 26, 1984 the





United States District Court in Massachusetts granted

summary judgment in favor of HUD in Boston Five Cents Savings Bank v. Samuel J. Pierce, Jr. et al. and agreed with HUD's defense on several issues including that a change in the form of ownership of a project is not a "change in use." We do not now know whether or not an appeal will be taken. In the event that the Department's policy regarding cooperative conversions is changed, we will notify field counsel immediately.) In view of this litigation, in cases where mortgagee consent to the TPA is not obtained, HUD requires a letter of credit under an indemnification agreement in a form acceptable to HUD to protect HUD from any loss because of its approval of this conversion. A copy of the current approved form of indemnification agreement is available from this Division. This Division's review of cooperative conversion TPA's is limited to review of the indemnification agreement and to review of any unusual legal issues which are raised in field counsel review.

Central Office administrative policy also requires review of cooperative projects which are converting to rentals. Such TPA applications should be forwarded to Central Office for approval. The TPA package must include a substantive legal review by field counsel.

Some field offices are approving rental conversions where the project will continue to operate as a cooperative and the tenants will be required to execute occupancy agreements and become Members of the cooperative. Such "rental/cooperative" conversions require written administrative approval from the Office of Multifamily Housing Management. Field counsel review of such "hybrid" conversions should also include an opinion concerning whether such an arrangement is permissible under state law. Additionally, field counsel should analyze the flow of project funds under such a hybrid conversion.

C. Assignment or Transfer of Subsidy Contracts. Certain legal problems are presented by assignments of rent supplement or rental assistance payments (RAP) contracts to purchasers that do not assume the HUD mortgage and take the property under a deed conveyance. The "project owner" of a project with a RAP subsidy and a "housing owner" of a project with rent supplement subsidy are the mortgagors of the project for purposes of eligibility for such subsidies. Therefore, "subject to" TPA's and TPA's involving land contracts can not include an assignment of the rent supplement contract or RAP contract because the new owners are not mortgagors and consequently, are not eligible to execute or assume rent supplement or RAP





contracts. Field counsel should contact this Division in order to resolve legal issues raised by the assignment of such subsidy contracts.

In "subject to" TPA's or TPA's involving land contracts, it is legally permissible for the mortgagor-seller of a rent supplement or RAP project to designate a financial institution as trustee and the mortgagor's agent for receipt of such subsidy payments. The trustee would

then credit such payments to the account of the buyer. Any questions concerning the form of the trustee agreement should be referred to this Division.



Unlike the rent supplement and RAP contracts, a Section 8 housing assistance payments contract may be legally transferred from the original owner to a buyer even though the buyer has taken the project subject to, rather than assuming, the HUD mortgage. However, if the housing assistance payments contract was assigned to the mortgagee to secure the financing, the consent of the mortgagee to the transfer must be obtained.

Field Counsel also should review the transfer to assure that all rights and obligations under the housing assistance payments contract have been effectively transferred to the buyer and that all requirements of state and local law have been met. (Questions arising in connection with the transfer of the housing assistance payments contract to a buyer should be addressed to the Assistant General Counsel for Assisted Housing.)

Transfers involving conversions of RAP or Rent Supplement subsidies to Section 8 should follow the instructions in Section I.C.1. of this memorandum concerning the need for a new "hybrid" Regulatory Agreement to be executed by the Purchaser.

D. Waiver of Sole Asset Mortgagor Requirement. Frequently, a prospective buyer of a project requests a waiver of the sole asset mortgagor requirement found in Section 6(f) of FHA Form 2466, Regulatory Agreement. Such waiver request should be forwarded to Central Office for administrative review and approval.

E. Transfer in Escrow. The Department has changed its policy and will now permit escrow closings on projects prior to full or modified review by HUD of an application for a TPA. (Note, however, that escrow closings will not be permitted for transfers from nonprofit to limited distribution owners.) The following legal requirements apply to transfers in escrow:





1. The deed may not be recorded.

2. For projects subject to a HUD-insured mortgage:

   (a) The purchaser or the seller must provide HUD with a title policy :

      (i) which declares that no lien has been created by the transfer in escrow, and

      (ii) which insures HUD directly against any loss HUD might suffer by paying mortgage insurance proceeds due to the creation of any unauthorized lien resulting from the escrow closing.

   (b) The purchaser or the seller must provide HUD with

an opinion of counsel which states that the transfer in escrow does not create a lien inferior or superior to the lien of the HUD) mortgage.

3. The escrow agreement must provide that the escrow can be broken only with written approval by HUD (after review and preliminary approval by HUD of the TPA.)

4. The escrow agreement must provide that HUD may instruct the escrow agent in writing to cancel the escrowed deed of conveyance from seller to buyer and to take all other actions necessary to "unwind" the transaction in the event the TPA does not comply with all of HUD's requirements.

5. All funds held in escrow for payment of mortgage delinquencies, repairs, or prepayment of Flexible Subsidy, must be either in cash or in a letter of credit naming HUD as payee. (Note, that Use Agreements executed in connection with Flexible Subsidy loans or grants must remain in effect until the date on which the HUD mortgage would mature.)

6. The escrow agent is prohibited from having any interest in the transfer other than as escrow agent.

7. The Sale Agreement for a transfer in escrow must contain the following language:

> Transfer of ownership of the property which is the subject of this Agreement is subject to an escrow agreement requiring preliminary approval by HUD of the sale prior to the release of any





> documents or any other action by the escrow agent. In the event that preliminary approval is not obtained from HUD, buyer and seller agree that the escrow agent shall cancel the deed and buyer agrees to reconvey to seller all of buyer's other interest in and to the property immediately upon notification of disapproval by HUD of the transfer of the project. In the event that preliminary approval is not obtained from HUD, buyer and seller hereby waive any other action or defenses they may have against the cancellation of the deed, termination of the escrow, and the "unwinding" of the sale.

F. Multiple Transfers. Parties frequently structure their proposals as multiple project transfers. A series of simultaneous project transfers is legally acceptable provided the parties have submitted all relevant documents with respect to each transfer. A separate review of each transfer must be performed to determine the acceptability of the entire proposal. Unless there is a specific amendment to 24 C.F.R. 207.1(h) to provide for separate

fees for each transfer, only one transfer fee need be paid for an application involving a multiple transfer. In some situations, however, more than one transfer fee may be in order. For example, we have recently analyzed several proposals involving corporate mergers and acquisitions (between parents and subsidiaries) prior to the transfer to the purchaser. Because two transfers of title by deed are involved, two fees are required. However, the two transactions can be combined in one application with minimal review required of the first (2530 clearance, for example) in order to expedite the HUD review process. This same rationale is also applicable to any other interim "status" transfers by deed. To expedite the review of particularly complex multiple transfers, field counsel should contact this Division with questions. In particular, questions often arise with respect to the amount of time between transfers.

G. Unauthorized Transfers. In the past, several projects have been transferred without HUD approval. An unauthorized transfer of physical assets violates Section 6(a) of the Regulatory Agreement, which provides that " o wners shall not without the prior written approval of the Commissioner ... c onvey, transfer or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.. ." This broad prohibition includes the transfer of the beneficial or





equitable interest in the project to the buyer prior to HUD approval except in a transfer in escrow. If field counsel learn of any unauthorized transfer of physical assets, the Office of Multifamily Housing Management should be advised. This office will then make a determination whether to approve such transfer. Furthermore, field offices must follow the procedures for dealing with unauthorized TPA's set forth in the May 4, 1983 joint memorandum "Enforcement Remedies for Unauthorized Transfers of Physical Assets" by the Associate General Counsel for Program Enforcement, John P. Kennedy, and by then-Deputy Assistant Secretary for Multifamily Housing Programs, Maurice L. Barksdale. All unauthorized TPA's which are submitted to Central Office must include the results of a substantive review by field counsel, as well as the results of field counsel review for compliance with the joint memorandum on unauthorized TPA's.

For all TPA's other than transfers in escrow and to preclude the mortgagor-seller from transferring beneficial interest in future cases, the Department will require the following language to be included in the sales agreement establishing the terms and conditions of the proposed transfer:

> "This (describe document) is expressly conditioned upon preliminary approval by HUD of the transaction as set forth in Form HUD 92266, Application for Transfer of Physical Assets, and supporting documents submitted to HUD. No transfer of any interest in

the project under this sale agreement shall be effective prior to such HUD approval. Buyer will not take possession of the project nor assume benefits of project ownership prior to such approval by HUD. The Buyer, his heirs, executors, administrators or assigns, shall have no right upon any breach by Seller hereunder to seek damages, directly or indirectly, from the FHA Project which is the subject of this transaction, including from any assets, rents, issues or profits thereof, and Buyer shall have no right to effect a lien upon this project or the assets, rents, issues, or profits thereof."

If the transfer is by means of a land contract, the following sentence should be added to the above





language: "Buyer will not take possession or control of the project prior to approval by HUD."

H. Workout Agreements. In general, the terms and conditions of a workout agreement with the new buyer must be established prior to submission of the transfer package. All transfer documents must be consistent with the workout agreement executed by HUD.

I. Prepayment Restrictions on Multifamily Rental Housing. In the event that a transfer involves the prepayment of the underlying HUD-insured or HUD-held mortgage subsequent to the time of the transfer, field counsel should contact this Division immediately for advice.

If you have any questions regarding this memorandum, please contact Gains Hopkins, Chief Attorney, Financing, Origination and Development Unit, at FTS 755-7090, Roberta Beary, at FTS 755-6975, Michael Bylsma or Millicent Potts of his staff at FTS 755-7067.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN and SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,

vs. Case No. 01-669C
Judge Allegra

THE UNITED STATES,
Defendants.

---

The Deposition of GARY HOPKINS,
Taken at 211 Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 9:13 a.m.,
Wednesday, February 2, 2005,
Before Angela D. Eitzman, RPR.

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiff.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the United States.

THOMAS G. MASSOURAS
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of HUD.

ALSO PRESENT:
Benjamin Alli

Detroit, Michigan
Wednesday, February 2, 2005
9:13 a.m.

GARY HOPKINS

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Gary Hopkins taken pursuant to notice and subpoena and to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:

Q. Mr. Hopkins, you and I have talked before but never met, my name is Eric Stempien and I represent Benjamin Alli and his wife and a corporation in a lawsuit brought against the United States Government. I'll be asking you a series of questions today.

Have you ever given a deposition before?

A. Yes.

Q. Just to refresh your recollection about how to -- how this goes, when you give an answer please be sure to verbalize it, particularly yes or no because uh-huh

and huh-uh are real hard to read on a written transcript, also if you don't understand anything I ask you, let me know I'll be happy to rephrase it or repeat it until you and I are on the same page, okay?
A. Yes.
Q. Could I get your address?
A. 17700 Northland Park Court, Southfield, 48076.
Q. What do you do for a living?
A. Various aspects of real estate, brokerage, investment, that type of stuff.
Q. Do you have a real estate brokers license?
A. Yes.
Q. You're licensed through the State of Michigan?
A. Yes.
Q. When did you first receive your real estate brokers license?
A. It's been a while, going from memory probably around '87, roughly, '87, '88, I don't know exactly.
Q. Are you active in the real estate brokerage industry right now?
A. Yes.
Q. In what aspects, commercial, residential, both?
A. Combination, primarily residential.
Q. Are you employed with any agency?
A. No.

Q. You're self-employed?
A. Yes.
Q. Is there a name of a company?
A. The company is His Instead, H-I-S, Instead, I-N-S-T-E-A-D.
Q. That's two words, right?
A. Two words.
Q. His Instead?
A. His Instead.
Q. How long have you been actively working in the real estate brokerage industry?
A. Since around that time, about '86 or so.
Q. Do you know Dr. Benjamin Alli?
A. Yes.
Q. Do you know how you first met him?
A. I'm sure it was real estate, some real estate interaction, probably around the time that I was with another brokerage company.
Q. What brokerage company was that?
A. Marcus and Mellenchamp.
Q. Where are their offices located or where were they at the time?
A. Southfield, Michigan.
Q. Did you -- was your relationship with Dr. Alli professional or personal?

A. Professional.
Q. Do you know how he came to know about your services?
A. With Marcus and Mellenchamp we actively solicited apartment owners in the metropolitan area. I was an apartment specialist for them so we actively solicited to various apartment owners in the metro area, and I concentrated primarily in Detroit and he was one of the owners we solicited.
Q. Was this government subsidized housing or some nonsubsidized and some subsidized?
A. Both.
Q. When you first spoke to Dr. Alli what was the -- what was it he was looking for, do you know, do you remember?
A. I don't recall if he was looking for anything, we were looking to list property to sell, and I guess he was convinced that we'd be able to market for him.
Q. Do you know what year that was?
A. That's going back aways because I haven't been with them quite some time, probably late '90s I'm guessing roughly.
Q. Did Dr. Alli express some interest in having your agency list any of his properties?
A. Yes.
Q. Did you eventually enter into a listing agreement with

him?
A. Yes.
Q. And which property was that for?
A. We listed the Collingwood, I'm trying to think of the name of that property, it was like a 52-unit or 54-unit building.
Q. Collingwood/Kirkwood?
A. I believe that's right, that's the name we used.
Q. And one of the buildings was located on Collingwood Street?
A. One was on Collingwood.
Q. And one was located on Calvert?
A. Calvert, yes.
Q. Were they marketed as one property?
A. They were marketed as a package.
Q. And you were the agent for that listing?
A. Yes.
Q. Were there any other agents for that listing?
A. No, I was the agent for that listing.
Q. Do you remember what the asking price was?
A. 6 -- 675 I believe, this is going back aways for me but I believe it was 675 or so, it was above 600 for sure.
Q. Did you receive any offers on that property?
A. Yes.

Q. Let me back up, what did you do with regard to marketing the property?
A. In addition to marketing or soliciting owners we also solicited potential buyers, and once we get a listing, we would of course market that listing to those buyers, and we would also advertise the listing.
Q. Having been an apartment specialist and dealt with some subsidized housing you were familiar with Section VIII contracts and HUD health -- mortgages, I presume?
A. Familiar with the contracts, yes.
Q. Was it your understanding in this particular project that -- that the sale of this building would have required some approval or approvals from HUD?
A. Yes.
Q. Would that have been communicated to any potential buyer, I presume?
A. Yes.
Q. Were you familiar at all with the process by which HUD -- well, strike that.
Were you familiar at all with the approval process with HUD --
A. No, I don't know the details of their approval.
Q. -- or what forms had to be filed or what needed to be done in order to get the approval?
A. I knew of one, I didn't know about all of the forms.

Q. Would that be -- as the listing agent would that have been something you would have done in attempting to get the approvals from HUD or would that have been somebody on behalf of the buyer?
A. I believe that would be on behalf of the buyer or the lender would do that.
Q. How is this property advertised, or was it advertised?
A. You mean --
Q. Were there -- are there -- was it put out on, you know, those free real estate booklets that are found in restaurants or --
A. No, we actually sent out information to buyers and we advertised in the local papers, that's the standard multi-family advertising listing.
Q. And you sent out flyers to people who you knew were interested in buying multi-family housing?
A. Right, people who profile for that type of property.
Q. Was it advertised as subsidized housing?
A. Yes.
Q. You indicated earlier that you did receive an offer on this property, correct?
A. Yes.
Q. Was there only one offer, was there more than one?
A. There may have been others but we basically settled on one offer.

Q. Do you remember who the buyer was?
A. Fanning.
Q. F-A-N-N-I-N-G, does that sound right?
A. That sounds right.
Q. Corey Fanning?
A. Corey Fanning, yes.
Q. Do you remember what the purchase price was for that offer?
A. I know it was a full-price offer.
Q. Was that offer accepted by the seller?
A. Yes.
Q. There was a written purchase offer signed by both buyer and seller?
A. Yes.
Q. Was there earnest money deposit received from the buyer?
A. Yes, I'm sure there was, we wouldn't have taken the offer without earnest money so probably so, yes.
Q. Do you remember who the lender was or the potential lender was on the property -- well, strike that.
Who the potential lender was for Corey Fanning?
A. I believe it was GMAC.
Q. With regard to this purchase did you take any steps to receive HUD approvals for the sale and purchase of the

property?
A. Did I personally?
Q. Right.
A. I did not personally.
Q. Do you know if anyone did?
A. I believe GMAC did or Corey did.
Q. Do you know what steps they took?
A. I don't know HUD's procedure on that but I would assume they contacted -- they would have had to contact HUD to alert them to the effect that the property was being considered for sale and whatever approvals they would need from HUD to proceed, they would solicit that from HUD.
Q. Did you -- were you in contact with GMAC?
A. Yes.
Q. Did this property ever close?
A. No, it did not -- well, it never closed with me, I was not involved in the closing.
Q. As far as you know it was never closed on that purchase offer?
A. It was never closed on this purchase offer.
Q. At some point the purchase offer either expired by its own terms or the parties withdrew from it?
A. Right, correct.
Q. Do you know what the time frame was between when the

purchase offer was first signed to when it was either
expired on its own terms or the parties withdrew?
A. This is going back aways, probably 60, 90 days,
somewhere in that range. I don't remember exactly
what time frame but somewhere in that range.
Q. During those, and I know it's approximately, but
during those approximately 60 to 90 days were you
talking to representatives from GMAC about the
attempts to get HUD approval?
A. Yes.
Q. Do you remember what they told you about that?
A. The only thing I remember is things seemed -- things
were -- seemed to have been along fairly
satisfactorily, fairly smooth, and then there was
abruptness to them and it kind of fickled, it just
kind of went away.
Q. So that purchase offer, there was never a closing on
that purchase offer?
A. Never closed.
Q. Do you know why?
A. I don't, I'm trying to remember exactly what stifled,
and it seems as though there was some dialogue between
GMAC, Corey and HUD, there was like uncooperation on
somebody's part, and I think either HUD did not want
to proceed with the deal -- it was a significant

Q. Did you speak with him on the phone?
A. On the phone, yes.
Q. Did you talk about anything else?
A. Just that I would be deposed.
Q. Did he tell you any specifics about the case?
A. No, he did not.
Q. Do you know whether Dr. Alli followed the appropriate procedures in order to request approval of the sale of Collingwood from HUD?
A. I do not know because I wasn't directly involved in seeking that approval, that was between borrower and the seller.
Q. Do you know whether Dr. Alli submitted the appropriate paperwork to HUD requesting the approval of the sale of Collingwood?
A. I do not know.
Q. Are you being paid to be here today?
A. No.
Q. You mentioned to Mr. Stempien that you visited the Collingwood apartments when you put them on the market, do you remember that?
A. Yes.
Q. Do you remember about when you visited those apartments?
A. That's going back aways, it would have been -- it

Q. Are you still doing any business with Dr. Alli today?
A. No.
Q. Have you ever received any payments from Dr. Alli?
A. On this, no.
Q. On anything?
A. No.
Q. Why did you leave Marcus and Mellenchamp?
A. Voluntarily, it was just time consuming and I wanted to move my interest in another direction.
Q. You mentioned that when you approached Dr. Alli about selling some of his buildings he was interested in selling his Collingwood building, did he express interest in selling any of his other buildings to you?
A. Yeah, in fact, we -- you asked -- let me clarify, we did have another one of his buildings that we -- that I assisted him with another transaction on, a different building.
Q. When was that?
A. Probably around the same time frame.
Q. Which building was it?
A. A building I think he had, Riverside, I believe they call it Riverside.
Q. Did you ever put Riverside on the market?
A. Yes.
Q. And what happened?

A. That building was ultimately sold.
Q. The building was sold?
A. Was sold, yes.
Q. Do you remember when it was sold?
A. I think that was sold late '90s also, late '90ss, '99, 2000, somewhere in that area, somewhere in that time frame.
Q. Was it sold before Collingwood was listed, do you remember?
A. I believe it was sold after Collingwood was listed, I mean, it was sold before but probably closed after Collingwood was listed, I believe.
Q. Do you remember who that building sold to?
A. I don't remember the -- who took title on the building, I don't remember his name now, Feans Construction (phonetic), Castle Construction.
Q. Do you remember how much that building listed for?
A. That's going back aways, somewhere around a million, somewhere around a million.
Q. What was your fee on that sale?
A. 25 or 30,000, somewhere in that range, I don't know exactly but I believe ballpark it was --
Q. I'm sorry, is 1 million what was the listing price or what was the selling price?
A. I don't remember exactly what the selling price --

A. I do not know.
Q. You mentioned earlier that you believe it is the responsibility of the buyer or the lender to seek HUD's approval of the sale of the Collingwood apartments, do you remember that?
A. Yes.
Q. Why do you think that?
A. Why do I think it's the buyer -- I mean, it's the owner and the buyer.
Q. Correct, why do you think that it is the responsibility of the buyer or the lender to attain HUD's approval of the sale?
A. Oh, because I -- I believe it's my understanding that if the building is going to continue in its present subsidized state, subsidized income state, that it requires HUD's approval of the new buyer to -- to transfer that contract, so that's something that the buyer has to run -- provide HUD with a certain amount of information, and that's something that the lender wants to make sure it's done before they finance the transaction.
Q. Do you know whether those were the requirements in Dr. Alli's contract with HUD on the Collingwood apartments?
A. I do not know, I don't know how much the buyer had to

do, I know -- I mean, how much the seller had to do, but it primarily was an effort of the lender and the buyer to contact HUD and work with HUD, and whatever HUD sought from the seller I don't know, but I know that it required that interface.

Q. Do you know whether the contract Dr. Alli had with HUD regarding the Collingwood apartments required Dr. Alli to request approval from HUD?

A. I don't know if it required Dr. Alli to request approval, but I'm sure it required -- the lender had to get that approval from HUD in order to -- to approve the loan.

Q. Did Dr. Alli provide to you a copy of his agreements -- strike that.

Did Dr. Alli provide to you copies of his contracts with HUD regarding the Collingwood apartments?

A. I did not see those contracts.

Q. You also mentioned that you didn't -- you didn't know all of the forms that were required for HUD's approval but you did know of one form; is that correct?

A. I did know of one form.

Q. What form is that?

A. That's the previous participation form, that would be for the buyer to provide if they've had previous

participation in a HUD-related project, so that would have been Mr. Fanning's responsibility to provide -- to complete that form and provide it to HUD.

Q. Did you ever see a copy of that form filled out by Mr. Fanning for the Collingwood properties?

A. I don't recall if I did or not, I'm trying to remember. We usually use a little reference sheet, I'm sure he did, that form was not unusual so I'm sure he did, you know, I do not recall seeing the form because I didn't provide the form, but I believe he did.

Q. Have you -- have you handled a sale of a building that has been subsidized by HUD before that requires HUD's approval before the sale as the Collingwood apartments did?

A. I have been involved with -- as a co-broker but not myself totally directly.

Q. Were you representing the seller or the buyer?

A. We were representing the seller.

Q. Would it have been typical for you to have received copies of forms filled out by the buyer and submitted to HUD in relation to that sale?

A. No, they went directly to HUD.

Q. So it was not typical for the buyer to also send a copy to you as a seller's agent, is that what you're

saying?
A. I did not see them, no.
Q. You mentioned that the listing price for the Collingwood apartments was 675,000, and that is what Corey Fanning offered; is that correct?
A. It was a full-price offer, I'm trying to remember exactly the price but that price seemed familiar, 675, but that was what Corey offered.
Q. So it's correct that Corey Fanning offered the listing price?
A. Yes.
Q. Was there any negotiation with the price?
A. I don't think so, I don't believe it was.
Q. So Mr. Fanning's initial bid was the listing price; is that correct?
A. I'm trying to remember if there was any -- any offers that went back and forth on this, I'm not sure, but we -- it ultimately ended up being the full price, there may have been some dialogue with the lower price but I don't recall if there was or not, the -- the final price, I believe, happened to be the listing price.
Q. Did Corey Fanning have an agent?
A. An agent?
Q. Correct, did he have a broker representing him on this

potential sale?
A. He did not, no.
Q. So you dealt with him directly?
A. Yes.
Q. You mentioned earlier that you believed Mr. Fanning and his lender, GMAC, took steps to get approval from HUD, how do you know that?
A. Because periodically in conversations with Mr. Fanning and with the representative at GMAC, that dialogue was discussed.
Q. Did they ever show you any paperwork that they submitted to HUD?
A. No, I did not see the paperwork.
Q. Were you ever provided with copies of any paperwork from Dr. Alli regarding -- requesting HUD's approval of the sale of Collingwood?
A. Any paperwork from Dr. Alli?
Q. Correct.
A. No, I don't recall getting any, I'm not sure if he had to submit anything or not, if the seller had to submit anything to him or not.
Q. You mentioned earlier that the agreement -- the purchase agreement that was entered into between Dr. Alli and Mr. Fanning was set to expire within 60 or 90 days; is that correct?

A. No.
Q. Is that what you said?
A. No, I said -- I think the question was something along the lines of how long was the process, that the best I can remember it was a 60-to-90-day process in terms -- we were in that transaction for about 60 to 90 days.
Q. How did you hear that the sale of the Collingwood apartments to Mr. Fanning was not going to go through?
A. As best I remember it was either Mr. Fanning mentioned it to me, or my contact at GMAC mentioned that the transaction would not move forward.
Q. Do you remember who your contact at GMAC was?
A. There was two people I talked to there and I don't remember their names now, you'll have to excuse me, it was a lady and a gentleman I believe, they used to have an office in Southfield at the time, but I don't recall their name.
Q. Did you ask them why the sale wasn't going to go through?
A. I believe there was some problems in terms of getting the approvals needed from HUD for the sale.
Q. Did they provide you with any written documentation from HUD denying --
A. No, they did not.
Q. Let me finish my question first just so it can be

clear on the record.
A. I'm sorry.
Q. Did anyone from GMAC or Mr. Fanning or Dr. Alli provide you with any written documentation from HUD denying approval of the sale of Collingwood to Mr. Fanning?
A. I do not recall seeing a written document.
Q. When -- when the person at GMAC called to tell you -- I think you mentioned that you couldn't remember if it was someone at GMAC or Mr. Fanning himself?
A. Who made the initial contact.
Q. Did either Mr. Fanning or someone at GMAC tell you the name of the person they were dealing with at HUD in order to get approval of the sale?
A. I do not recall the name.
Q. After you received notice that the sale of the Collingwood apartments to Mr. Fanning was not going to go through, did you immediately take the property off the market?
A. It seems -- somehow it seems -- if memory serves me, things just started to rapidly unravel around that time frame when the GMAC sale fell through, and it was enough that I see -- I stopped marketing the property.
Q. Did you decide to stop marketing the property on your own or did Dr. Alli ask you to?

CORY FANNING
February 3, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI
ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

ORIGINAL

---

The Deposition of CORY FANNING,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 11:30 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.

APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236
Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

CORY FANNING
February 3, 2005

ALSO PRESENT:
Dr. Benjamin Alli

CORY FANNING
February 3, 2005

Detroit, Michigan
Thursday, February 3, 2005
11:30 a.m.

CORY FANNING,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:
Q. Good morning, Mr. Fanning. How are you today?
A. Fine, thanks.
Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case brought against it by Benjamin Alli and BSA Corporation.
Would you please state your name and address for the record?
A. My name is Cory Fanning. I live at 1949 Devonshire in Bloomfield Hills.
Q. Have you had your deposition taken before?
A. One time.
Q. When was that?
A. I would say ten years ago.

Q. Why do you say that?

A. I needed to put more lighting in the hallways, I needed to -- There was just some work that needed to be done. I don't recall everything. But I needed -- I would have needed to put, you know, some money into the building. I don't -- I can't tell you -- I just don't have my notes. I don't have my reports.

Q. Do you remember about how much money you estimated would need to be put into the building?

A. I'm really sorry. I just don't. I don't remember. Is there anything that you guys have that -- I mean you have -- I don't know. I don't know.

Q. Did you know that there were units in the Collingwood/Kirkwood Apartments that were under HUD Section 8 program?

A. Yes.

Q. How did you know that?

A. It was disclosed in the, in the sale, sale of the building.

Q. Were you specifically looking for an apartment building that had units that were under HUD's program?

A. I wasn't specifically looking for a building with that, but I wasn't opposed to buying a building with Section 8.

Q. Did you know that HUD needed to approve the sale of

the Collingwood/Kirkwood -- Strike that. Did you know whether HUD needed to approve the sale of the Collingwood/Kirkwood buildings?
A. No. I don't -- I don't know that I knew that there was anything -- I guess I didn't know that.
Q. Did you take any steps in order to receive HUD's approval for the sale of the Collingwood's Kirkwood buildings from Dr. Alli to yourself?
A. I don't think I would have if I didn't know that I needed to.
Q. I'm going to refer you back to Exhibit Number 1. What is this document?
A. A purchase agreement for the Collingwood/Kirkwood buildings.
Q. Why did you decide to put in a bid for the Collingwood/Kirkwood Apartments as opposed to the other apartment buildings that were shown to you?
A. Well, I thought this made financial sense and I was interested in taking on the project.
Q. Do you remember whether the other buildings that were shown to you, besides the Collingwood/Kirkwood Apartments were -- Strike that. Let me rephrase it. Do you know whether the asking price for the other apartments, beside the Collingwood/Kirkwood Apartments, was higher than the asking price of the

## COLLECTION REGISTER

U.S. Department of Housing and Urban Development

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 139

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT DATE | RECEIVED AT MAIL OPENING POINT NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| | NAT'L CHURCH RES | CK | 169.34 | 10/26/98 | Kathy Szymczak | | | # 00300888 EH166 |
| 10-27-98 | PICKWICK PARK | SUB FEE | 6.00 | 10/29/98 | Kathy Szymczak | K. Szymczak | 10/30/98 | #118655 |
| 11-3-98 | P. Kuykendall | SUB FEE | 12.00 | 11/4/98 | Kathy Szymczak | K. Szymczak | 11/4/98 | CK# 5240 WITNESS FEE |
| 11-11-98 | Record Copy Services | SUB FEE | 6.00 | 11-19-98 | Kathy Szymczak | K. Szymczak | 11/20/98 | CK#E 769473 |
| 12-8-98 | Independence Square | | 10,000.29 | 12-10-98 | Kathy Szymczak | L. DeMorado | 12/1/98 | ck 2837 |
| 1/14/99 | Three Oaks | TPA | 2442.30 | 1/14/99 | Kathy Szymczak | D. Plowdon | 2/7/99 | Ck 002073 |
| 1/28/99 | Sycamore Meadows | Rent Reim. | 30944.00 | 1/28/99 | Kathy Szymczak | B. Kimbell | 1/10/2000 | Ck # 5725 To LOCK BOX |
| 2/16/99 | LUTH. HSG CORP - ANN ARBOR 044-EE013 | final closing | 303522.15 | 2/22/99 | Kathy Szymczak | K. Szymczak | 3/8/99 | CK # 2038573324108 |
| 3/15/99 | Eden Manor | water damage | 7287.18 | 3/17/99 | Kathy Szymczak | | 3/17/99 | CK#1-04-028535 |
| 3/16/99 | NORTH HILL FARMS | FIRE | 23583.34 | 3/17/99 | Kathy Szymczak | D. Plowdon | 5/7/99 | CK-1005695 |
| 3/16/99 | Ukrainian Village | | 13556.86 | 3/18/99 | Kathy Szymczak | L. DeMorado | 3/19/99 | CK#5-01-414684 |
| 3/22/99 | DORIS ALSUP | | 50.00 | 3/22/99 | Kathy Szymczak | K. Szymczak | 3/23/99 | MO 910 2523549 |
| 4/5/99 | UKRAINIAN VILLAGE | ICE | 9618.47 | 4/8/99 | Kathy Szymczak | L. DeMorado | 4/12/99 | ck 419957 |
| | NEXT PAGE | | | | | | | |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

U.S. Department of Housing and Urban Development

# COLLECTION REGISTER

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 140

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT: DATE | RECEIVED AT MAIL OPENING POINT: NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 4-14-99 | University TH Coop | SNOW STORM | 7091.80 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04-830022 |
| 4-14-99 | " | " | 9175.66 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck 1-04-830017 |
| 4-14-99 | " | " | 7763.82 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04 830031 |
| 4-14-99 | " | " | 8788.55 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04 830021 |
| 4-26-99 | Eden Manor | water damage | 1138.51 | 4/28/99 | Kathy Szymczak | A. Leach | 5/25/99 | ck 504871 979 |
| 5-3-99 | Ukrainian Village | FREEZE DAMAGE | 350.00 | 5/5/99 | Kathy Szymczak | L. DeMercado | 5-6-99 | ck 1-04-832241 J |
| 4-29-99 | Watry & Mercieca | SUB FEE | 12.00 | 5/12/99 | Kathy Szymczak | K. Szymczak | 5/14/99 | ck# 0124 |
| 5-26-99 | Ukrainian Village | | 16413.95 | 6/2/99 | Kathy Szymczak | L. DeMercado | 6/4/99 | ck#504-41 7664 |
| 6-1-99 | North Hill Farms | | 23583.34 | 6/3/99 | Kathy Szymczak | A. Plowden | 6/11/99 | ck# 1008142 |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/4/99 | Kathy Szymczak | K. Szymczak | 6/7/99 | ck 013038 Ranked |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/7/99 | Kathy Szymczak | K. Szymczak | 6/8/99 | ck 012747 RET'D-Sent in error |
| 6-8-99 | Eden Manor | | 2718.62 | 6/9/99 | Kathy Szymczak | Andy Leach | 7/13/99 | ck 5-04-872-966 |
| 6-10-99 | Cobbie Creek | FIRE | 407718.00 | 6/11/99 | Kathy Szymczak | L. Suvoy | 6/24/99 | ck# 11597347 |
| 6-21-99 | Wellesley T.H. | water | 16500.81 | 6/24/99 | Kathy Szymczak | W. Kamill | 11/15/99 | ck 1-8587635 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) ____________ (Signature of Collection Officer) ____________

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form H[illegible]
ref. handbook[illegible]

U.S. Department of Housing and Urban Development

# COLLECTION REGISTER

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 141

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT: DATE | RECEIVED AT MAIL OPENING POINT: NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 6-25-99 | CHURCH OF CHRIST | FIRH | 29771.70 | 6-25-99 | Kathy Szymczak | K Szymczak | 6/28/99 | ck #014473 |
| 7-9-99 | Ukrainian Village | Water Damage | 2026.20 | 7-13-99 | Kathy Szymczak | K Hernando | 7/14/99 | ck#1-04-798649 |
| 7-2-99 | West Genesee INITIAL CLOSING | closing | 137,907.50 | 7-14-99 | Kathy Szymczak | L. Hornaby | 7/15/99 | ck#2049-0075231 |
| 7-30-99 | Westwick Square | fire | 407.00 | 7-30-99 | Kathy Szymczak | B Hambill | 10/1/99 | ck-1-04-777260 |
| 7-30-99 | Westwick Square | fire | 12395.00 | 7-30-99 | Kathy Szymczak | B Hambill | 10/1/99 | ck 1-04-777262 |
| 8-2-99 | Bethany Pres | closing | 200969.00 | 8-5-99 | Kathy Szymczak | K. Maloney GHC | 5/8/00 | ck 2049-51166497 |
| 9-7-99 | Nat'l Church Res EE016 | closing | 286265.00 | 9-10-99 | Kathy Szymczak | L. Hornaby | 9/29 | ck 2049 01467740 |
| 9-10-99 | CobbleCreek | fire | 89195.00 | 9-10-99 | Kathy Szymczak | | 9/10/99 | ck #11604019 |
| 9-22-99 | Oakbrook Villa | firm app | 3220.20 | 9/24/99 | Kathy Szymczak | Kelly Allen | 9-27-99 | ck# 023159 |
| 10-4-99 | Townhouse Green | fire | 11360.14 | 10-6-99 | Kathy Szymczak | A. Leach | 11/2/99 | ck #1031760 |
| 12-9-99 | FM ONE - St. Sarkis | | 3678.93 | 12-10-99 | Kathy Szymczak | K. Nelson | 12/14/99 | ck# 5020443 |
| 12-30-99 | Oakridge | Closing | 35908.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck#0026889 |
| 12-30-99 | Oakridge | inspect fee | 1920.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck# 0026885 |
| 1-6-00 | Spring Lake Village | Storm damage | 161338.22 | 1/10/00 | Kathy Szymczak | Henry Lauder | 4/21 | ck#5021354 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date)

(Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HUD-235 (5/89)
rel. handbooks 1911.1 & 4310.5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
THE UNITED STATES, Judge Allegra
Defendant.

---

The Deposition of BENJAMIN ALLI,
Taken at 315 North Center Street, Suite 200,
Northville, Michigan 48167,
Commencing at 10:07 a.m.,
Tuesday, January 5, 2005,
Before Angela D. Eitzman, RPR.

BENJAMIN ALLI
January 5, 2005

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

Thomas G. Massouras
Regional Office of Housing & Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.

ALSO PRESENT:
Shaki Alli

Northville, Michigan
Tuesday, January 5, 2005
10:07 a.m.

BENJAMIN ALLI

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Please state your full name and address for the record.

A. Benjamin Alli, 970 Lakeshore Road, Grosse Pointe, Michigan, 48236.

Q. Good morning, Dr. Alli, how are you today?

A. Fine. Thank you.

Q. My name is Marla Conneely. I'm an attorney for the United States of America, and I'm representing my client in a case that you've brought against them in docket number 01-669. Before I start with my questions, I want to set forth some groundrules for you.

First of all, if you don't understand the question, ask me to repeat it or clarify it. If you

then he called me back and said I'm very sorry, we just don't have it. And I said can we get -- Malone told me that. He said if you don't have it, Doctor --
Q. Just a minute.
A. I'm sorry. I apologize.
Q. You said that Mr. Brown called you back?
A. Yes.
Q. And what did Mr. Brown say?
A. He said what the people have told me is true.
Q. Did you tell him about your conversation with Mr. Malone?
A. Initially I talked to Mr. Malone, but he did not tell me what Malone told me. I didn't want to create animosity between him and Malone.
Q. What did Mr. Brown say when you talked to Mr. Malone?
A. He said, well, it depends on availability because that's what the people told me, two other people. So when Mr. Brown told me I'm going to call you back, in between, something happened, kind of talk or whatever, right, between Mr. Brown. And I told him I talked to those other people I talked to, so he had emphatically restated what the people already told me, not to step in their way. He affirmed what the people already told me, that the flexible loan is exhausted, it's not available in Detroit.

BENJAMIN ALLI
January 5, 2005

Q. Did you then speak -- strike that.
After speaking with Mr. Brown, did you then speak with Mr. Malone again?
A. Yes, ma'am.
Q. And what did you say?
A. I told him that Mr. Brown said this, and he said, yeah, that Mr. Malone told me, he said, Doctor, you are dealing with one of the worst HUD office in the country. They're not supposed to treat you like that. I swear on my hand he told me that. He said what you need to do, try to get a local bank to loan you the money, and deduct it from the -- from the particular account and get a copy of the financial operation management handbook from the local office and look at the code so, so, so. It allow you to make the deduction. So then I called them. I talked to Mr. Hill. I spoke to somebody, but I'm not sure it's a composite. I asked for the handbook. The handbook is -- do you want me to look for it? I've got it here, do you want me to get it out here for you?
Q. No, that's all right.
A. So I called them. I wanted a copy of the handbook. It got in the flexible loan alternative that allows us to deduct the money to get the loan. So they said that I should go to the basement, supply room

downstairs, so they're, like, the man said they don't have any of that copy with them.

Q. Who was the man that you spoke with?

A. At the office downstairs, oh, there would be too many names to remember. I can't remember his name.

Q. He told you they didn't have any?

A. He's the one in charge of the supply room. If you want HUD form, you go there. If you want HUD book, you go there, if you want this, you go there.

Q. And he told you they were out of the forms for the flexible loans?

A. No, the handbook.

Q. Oh, he said they were out of the handbook?

A. Yeah, I think it's handbook 4530.2R-1.

Q. Did you ever apply for a HUD flexible loan in writing?

A. They did not give me the form. They didn't want me to apply for it.

Q. Is that no? I'll ask it again.

Did you ever apply for a HUD flexible loan in writing?

A. They will not give me the opportunity to do that.

Q. Did you ever ask HUD for a form to apply for a flexible loan?

A. Yes, ma'am, because Mr. Malone told me to ask them for the forms and the handbook. The handbook details my

responsibility and what code had approval of the flexible loan or alternative to flexible loan, give the code to me. Code, I think it's a three digit code. I have it in my handbook. I can give it to you.

Q. Who at HUD refused to give you the application for a flexible loan?

A. Mr. Roger Hill and the other guy that I talked to.

Q. Do you remember his name?

A. Maybe if I search my records somewhere.

Q. Dr. Alli?

A. Yes, ma'am.

Q. How many Deeds of Trust did you enter into encumbering the Collingwood apartments during the time that you owned and managed the Collingwood apartments?

A. I do not remember now, because each time they came and they give us this list of what I have to repair in the building, and we have to need money. We cannot afford the money from our own personal savings, we have to loan money because it's a business.

Q. How many Deeds of Trust did you enter into encumbering the Collingwood apartments -- strike that.

How many Deeds of Trust did you enter into with your mother-in-law encumbering the Collingwood apartments?

A. I do not remember.
Q. Was there more than one?
A. Possible one, two, I don't remember.
Q. Did you receive a written approval from HUD to enter into a Deed of Trust encumbering the Collingwood apartments?
A. HUD don't issue anything approval. You talk to them on the phone. They will not give it to you in writing. They just tell you on the phone, and that's the maximum you can go to, not only me, anyone dealing with them.
Q. Is your answer no, that you did not receive approval?
A. What that comes to, I'm just telling you that question cannot be answered by no. They don't response in writing to anything at all.
Q. I'll ask it again. Did you receive an approval from HUD in writing approving your entering into a Deed of Trust with your mother-in-law encumbering the Collingwood apartments?
MR. STEMPIEN: Before you answer, I'm going to put an objection on the record that there's nothing been established that it was required that he receive written approval before entering into this document. With that objection, go ahead and answer.
A. Yeah, I was not provided any written information, but

BENJAMIN ALLI
January 5, 2005

to catch it or a glue tip. We have glue tip, we buy in dozens from Home Depot, one of the big outlet here. We put a glue tip around so they have children, so to make sure that the kids don't get their hands into the trap.
Q. Referring back to Exhibit Number 20, the Deed of Trust?
A. Yeah.
Q. Did you ever make any payments on this Deed of Trust to Ms. Abegby?
A. Well, maybe couple of, maybe couple of payments. We never make all the payments because we have a hard time with payments.
Q. Where did the money from the payments come from?
A. It comes from the project account.
Q. Did you say the project account?
A. Uh-huh.
Q. You mentioned that there were also Deeds of Trusts with Ms. Abegby's encumbering the Riverside apartments; is that correct?
A. Yes, ma'am.
Q. On those Deed of Trusts, did you make any payments on those?
A. A few payments, yeah.
Q. Where did the money come from for those payments?

A. Project account.
Q. You also mentioned that there were Deeds of Trusts with Ms. Abegby that you entered into encumbering the Pingree apartments; is that correct?
A. Yes, ma'am.
Q. Did you make payments on those Deeds of Trust?
A. Few payments, yes.
Q. Where did the money come from for those payments?
A. Project account.
Q. When you say the project account, what are you referring to?
A. Yes, ma'am. Go ahead.
Q. What are -- when you say the project accounts, what account are you referring to?
A. Well, on the HUD handbook, the handbook is 4317.2 revision. The quote that Mr. Malone gave me on the phone for the payment of Ms. Abegbe is code number 2320 and also code number 2310 and said we can pay for those code allowed by HUD.

MS. CONNEELY: I need to have the court reporter mark as Exhibit 21 the following two-page document.

MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 21
1:30 P.M.

BENJAMIN ALLI
January 5, 2005

Q. It says enclosed is a copy of the physical inspection report, do you see that?

MR. STEMPIEN: Second sentence on the first paragraph.

A. Yes.

BY MS. CONNEELY:

Q. So you do not know whether or not you received a copy of this letter or this -- did you receive a copy of this document?

A. I said more than likely I received it. I said that three times. I said more than likely I received it. I'm only -- the picture you asked me to look at.

Q. What did you do after you received this letter?

A. After I received the letter, the same way I do every time, I go back to the site, because sometimes when they come to the site, they go there. Or before they send it to me, so I have a notebook, I compare with what is sent to me with my notebook, even it be forgery, even misstates it, which they do all the time. So anything that is not here that I do not believe it, I write back to them, and they get upset. But if it's really, really there, we fix it. Because we have people that do work there.

Q. An what is this notebook that you are referring to?

A. My special notebook. Any time I go with them, I got

the special notebook. And a lot of time the HUD procedural handbook states that they must call landlord to be there. 60 percent of the time they don't do that. They go behind my -- then after they come, you see on the tape that I've given to you, you will see where Salazar called me for inspection for next day, that's tomorrow, you don't call somebody for inspection the next day. And if I thought he did that, he deny on the tape that inspection be placed the day before. He tell himself on the same tape, oh, yes, I wasn't, so I saw it came -- they come -- they come not to trust them. So they will call me when they say that, and I say, sir, did you inspect any place yesterday? He said no. Later on, oh, the lady in 104 say you come to her unit. Oh, yes, I did. I said why do you deny before? They're not supposed to be on the premises without me. That's a handbook regulation. Sometimes they just go there behind my back because they want to set me up.

Q. Did you accompany every HUD inspector that inspected the Collingwood Kirkwood apartments on their inspection of the buildings?

A. I don't understand your question.

Q. When a HUD inspector would schedule an inspection of the Collingwood Kirkwood apartments --

A. Uh-huh.
Q. -- would you accompany him?
A. That's what the law said. All handbooks say that, but they don't do that, only for me only. Only for me. Other times they don't, they go behind me first, they did before. I set some up. They call me, they say tomorrow meet us there. HUD regulation does say it has to be mutually agreeable time. That's what the comment said. But they have their own personal handbook in their pocket, and they come in with their own handbook that they give to me, I give to them --
Q. Are you saying the government has a different handbook that they give to you?
A. The one that's manufactured -- that they manufacture, they implement different policy for different people, government don't do that. Government give me handbook, one for everybody.
Q. Who implements different policies for different people?
A. Local HUD. If you don't like someone, they make up stuff.
Q. Who at the local HUD office are you referring to?
A. A lot of the inspectors, except few of them don't do that.
Q. Which?

Q. Do you remember when they inspected the apartments?
A. No.
Q. Which apartment buildings did they inspect?
A. Got to be Riverside Collingwood.
Q. Did Roland Samaroo prepare a written report of his inspection of the Collingwood Kirkwood apartments or the Riverside apartments?
A. Very likely.
Q. Did you turn over a copy of that report to your counsel in this case?
A. I don't know.
Q. I'd like to ask the court reporter to mark this as Exhibit 31.

MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 31
3:21 P.M.

BY MS. CONNEELY:
Q. Have you seen this letter before?
A. Yes, ma'am.
Q. Did you receive a copy of this letter?
A. Yes.
Q. Please refer to the paragraph marked as number two on the first page of the letter.
A. Uh-huh.
Q. That paragraph talks about a second loan --

A. Uh-huh.
Q. -- that was taken encumbering the Collingwood Kirkwood apartments?
A. Uh-huh.
Q. The letter from HUD then asks you to provide evidence that a certain amount of money is repaid to the Collingwood Kirkwood operating account?
A. Uh-huh.
Q. Was that money ever repaid to the account -- strike that.
Did you ever repay this money to the Collingwood Kirkwood operating account?
A. No.
Q. Why?
A. Because the letter's an extortion, it's not true. It's a violation of HUD regulation.
Q. If I can refer you now to the paragraph marked as number three.
A. Uh-huh.
Q. That paragraph talks about a car --
A. Uh-huh.
Q. -- that the Collingwood Kirkwood apartments leased from you --
A. Uh-huh.
Q. -- for a monthly payment of $420. The letter then

states that this was not an eligible project expense and asked you to reimburse the project for a total of $15,120. Did you reimburse the project this amount of money?
A. No.
Q. Did you receive reports from tenants -- strike that.
Did you receive reports of mice from tenants at the Riverside apartments?
A. Reports of mice? What kind of report? Can you elaborate?
Q. Did a tenant at the Riverside apartments ever report to you that they had seen a mouse in the building?
A. No.
Q. Did you ever see any mice at the Riverside apartments?
A. No.
Q. Did you ever exterminate for mice at the Riverside apartments?
A. Yes.
Q. Why?
A. Why? I see holes, we plug the holes, that's what we do. That's the holes anywhere that mice can come, maybe when they're moving, tenants moving the furniture in or the kid playing hard in their room, they break wall. We just ask to repair the wall, that's how we did it.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-669C (Judge Allegra) |

DECLARATION OF KATHLEEN SZYMCZAK

I, Kathleen Szymczak, hereby declare as follows:

1. I currently work as an administrative staff specialist for the United States Department of Housing and Urban Development ("HUD") in Detroit, Michigan. I have held this position since 2003.

2. I have been employed by HUD for over thirty years.

3. Throughout 1999, I worked as a program assistant for HUD's Office of Insured Multi-family in Detroit, Michigan.

4. My job duties as a program assistant included depositing and recording checks submitted to pay fees for various HUD-related applications, including fees for transfer of physical asset applications ("TPA applications").

5. In 1999, when TPA applications were received, it was official office procedure for program managers to forward TPA application fee checks to me.

6. When I received a TPA application fee check, I would follow official office procedures by depositing the check and recording the payment in my check registry.

7. My check registry for 1999, a copy of which is attached to my declaration, shows all HUD-related application fee checks received in connection with TPA applications.

8. My check registry for 1999 shows that no TPA application fee check was ever received by HUD's Detroit office in connection with a TPA application for the transfer of the Collingwood/Kirkwood apartments.

9. My duties as an administrative staff specialist still include depositing and recording checks submitted to pay fees for various HUD-related applications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12 day of August, 2005.

Kathleen Szymczak
Kathleen Szymczak
Administrative Staff Specialist
Office of Insured Multi-Family
United States Department of Housing
and Urban Development

## COLLECTION REGISTER

U.S. Department of Housing and Urban Development

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 139

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT | | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| | | | | DATE | NAME | | | |
| | NAT'L CHURCH RES | CK | 169.34 | 10/26/98 | Kathy Szymczak | | | # 00300888 EH166 |
| 10-27-98 | PICKWICK PARK | SUB FEE | 6.00 | 10/29/98 | Kathy Szymczak | K. Szymczak | 10/30/98 | #118655 |
| 11-3-98 | P. Kuykendall | SUB FEE | 12.00 | 11/4/98 | Kathy Szymczak | K. Szymczak | 11/4/98 | CK# 5240 WITNESS FEE |
| 11-11-98 | Record Copy Services | SUB FEE | 6.00 | 11-19-98 | Kathy Szymczak | K. Szymczak | 11/20/98 | CK# E 769473 |
| 12-8-98 | Independence Square | | 10,000.29 | 12-10-98 | Kathy Szymczak | L. DeMorrow | 12/1/98 | ck 2837 |
| 1/14/99 | Three Oaks | TPA | 2442.30 | 1/14/99 | Kathy Szymczak | D. Plowden | 2/17/99 | ck 002073 |
| 1/28/99 | Sycamore Meadows | Rent Reim. | 30944.00 | 1/28/99 | Kathy Szymczak | B. Kimbell | 1/10/2000 | ck # 5725 To LOCK BOX |
| 2/16/99 | LUTH. HSG CORP - ANN ARBOR 044-EE013 | final closing | 303522.15 | 2/22/99 | Kathy Szymczak | K. Szymczak | 3/18/99 | ck # 20385 1324108 |
| 3/15/99 | Eden Manor | water damage | 7287.18 | 3/17/99 | Kathy Szymczak | | 3/17/99 | ck#1-04-028535 |
| 3/16/99 | NORTH HILL FARMS | FIRE | 23583.34 | 3/17/99 | Kathy Szymczak | D. Plowden | 5/7/99 | CK-1005695 |
| 3/16/99 | Ukrainian Village | | 13556.86 | 3/18/99 | Kathy Szymczak | L. DeMorrow | 3/19/99 | ck#5-04-419684 |
| 3/22/99 | DORIS ALSUP | | 50.00 | 3/22/99 | Kathy Szymczak | K. Szymczak | 3/23/99 | MO 910 2523549 |
| 4/5/99 | UKRAINIAN VILLAGE | ICE | 9618.47 | 4/8/99 | Kathy Szymczak | L. DeMorrow | 4/12/99 | ck 419957 |
| | NEXT PAGE | | | | | | | |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HUD-235 (5/89)
ref. handbooks 1911.1 & 4310.5

# COLLECTION REGISTER

U.S. Department of Housing and Urban Development

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 140

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT DATE | RECEIVED AT MAIL OPENING POINT NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 4-14-99 | UNIVERSITY TH COOP | SNOW STORM | 7091.80 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | CK #1-04-830022 |
| 4-14-99 | " | " | 9175.66 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | CK 1-04-830017 |
| 4-14-99 | " | " | 7763.82 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | CK #1-04 830031 |
| 4-14-99 | " | " | 8788.55 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | CK #1-04 830021 |
| 4-26-99 | Eden Manor | water damage | 1138.51 | 4/28/99 | Kathy Szymczak | A. Leach | 5/25/99 | CK 504871 979 |
| 5-3-99 | UKRAINIAN VILLAGE | FREEZE DAMAGE | 350.00 | 5/5/99 | Kathy Szymczak | L. DeMerando | 5-6-99 | CK 1-04-832241 J |
| 4-29-99 | WATRY & MERCIECA | SUB FEE | 12.00 | 5/12/99 | Kathy Szymczak | K. Szymczak | 5/14/99 | CK# 0124 |
| 5-26-99 | Ukrainian Village | | 11443.95 | 6/2/99 | Kathy Szymczak | L. DeMerando | 6/4/99 | CK#504-41 7664 |
| 6-1-99 | NORTH HILL FARMS | | 23583.34 | 6/3/99 | Kathy Szymczak | H. Clawder | 6/11/99 | CK# 1008142 |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/4/99 | Kathy Szymczak | K. Szymczak | 6/7/99 | CK 013038 Banked |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/7/99 | Kathy Szymczak | K. Szymczak | 6/8/99 | CK 012747 RET'D-Sent in error |
| 6-8-99 | EDEN MANOR | | 2718.62 | 6/9/99 | Kathy Szymczak | Annie Leach | 7/13/99 | CK 5-04-872-966 |
| 6-10-99 | COBBLE CREEK | FIRE | 407718.00 | 6/11/99 | Kathy Szymczak | L. Surby | 6/24/99 | CK# 11597347 |
| 6-21-99 | Wellesley T.H. | water | 16500.81 | 6/24/99 | Kathy Szymczak | W. Hamill | 11/15/99 | CK 1-8587635 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date)

(Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HU
ref. handbook

## COLLECTION REGISTER

U.S. Department of Housing and Urban Development

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 141

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT — DATE | RECEIVED AT MAIL OPENING POINT — NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 6-25-99 | Church of Christ | FIRM | 29777.70 | 6-25-99 | Kathy Szymczak | B. Szymczak | 6/28/99 | ck #014473 |
| 7-9-99 | Ukrainian Village | Water Damage | 2026.20 | 7-13-99 | Kathy Szymczak | K. Alvarado | 7/14/99 | ck#1-04-798649 |
| 7-2-99 | West Genesee INITIAL CLOSING | closing | 137,907.50 | 7-14-99 | Kathy Szymczak | L. Hornaby | 7/15/99 | ck# 2049-0075237 |
| 7-30-99 | Westwick Square | fire | 407.00 | 7-30-99 | Kathy Szymczak | B. Hambill | 10/1/99 | ck. 1-04-777260 |
| 7-30-99 | Westwick Square | fire | 12395.00 | 7-30-99 | Kathy Szymczak | B. Hambill | 10/1/99 | ck 1-04-777262 |
| 8-2-99 | Bethany Pres | closing | 200 969.00 | 8-5-99 | Kathy Szymczak | K. Maloney GMC | 5/8/00 | ck 2049 - 51166497 |
| 9-7-99 | Nat'l Church Res EE016 | closing | 286 265.00 | 9-10-99 | Kathy Szymczak | L. Hornaby | 9/29 | ck 2049 01467740 |
| 9-10-99 | Cobble Creek | fire | 89195.00 | 9-10-99 | Kathy Szymczak | | 9/10/99 | ck #11604019 |
| 9-22-99 | Oakbrook Villa | firm app | 3220.20 | 9/24/99 | Kathy Szymczak | Kelly Allen | 9-27-99 | ck# 023159 |
| 10-4-99 | Townhouse Green | fire | 11360.14 | 10-6-99 | Kathy Szymczak | A. Leach | 11/2/99 | ck #1031766 |
| 12-9-99 | FM ONE - ST. Sarkis | | 3678.83 | 12-10-99 | Kathy Szymczak | R. Nelson | 12/14/99 | ck# 5020443 |
| 12-30-99 | Oakridge | Closing | 35908.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck#0026889 |
| 12-30-99 | Oakridge | inspect fee | 1920.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck# 0026885 |
| 1-6-00 | Spring Lake Village | storm damage | 161338.22 | 1/10/00 | Kathy Szymczak | Henry Plauder | 4/21 | ck#5621354 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HUD-235 (5/89)
rel. handbooks 1911.1 & 4310.5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 01-669C<br>(Judge Allegra) |

DECLARATION OF PATRICK BERRY

I, Patrick Berry, hereby declare as follows:

1. I currently work as a supervisory project manager for the United States Department of Housing and Urban Development ("HUD") in Detroit, Michigan.

2. Throughout 1999, I worked as a project manager for HUD's Office of Insured Multi-family in Detroit, Michigan.

3. My job duties as a project manager included processing transfer of physical asset applications ("TPA applications") for the properties that I supervised.

4. One of the properties that I supervised throughout 1999 was the Collingwood/Kirkwood apartments.

5. Pursuant to official office procedure, any TPA application for the Collingwood/Kirkwood apartments submitted in 1999 would have either been sent or forwarded to me for review.

6. As a project manager, I followed the procedures in the HUD

handbook for TPA applications. Accordingly, upon receipt of a complete TPA application, I would distribute a letter to the applicant either acknowledging receipt of a complete application or informing the applicant that his or her application was deficient. When I sent such letters, I would make a copy and include it in HUD's official files.

7. I never received a complete or deficient TPA application for the Collingwood/Kirkwood apartments in 1999.

8. I checked HUD's official files and did not find any record that a TPA application for the Collingwood/Kirkwood apartments was submitted in 1999. I also did not find any record that a letter acknowledging receipt of a completed TPA application or acknowledging receipt of a deficient TPA application was ever sent regarding the Collingwood/Kirkwood apartments in 1999.

9. If HUD had denied a TPA application for the Collingwood/Kirkwood apartments in 1999, I would have followed official office procedures and the HUD handbook by writing a letter to the applicant informing him or her of HUD's denial.

10. I did not write or send a letter to an applicant denying a TPA application for the Collingwood/Kirkwood apartments in 1999.

11. I checked HUD's official files and did not find any record that a letter denying a TPA application for the

Collingwood/Kirkwood apartments was ever sent in 1999.

12. The only document I found in HUD's official files relating to any sale of the Collingwood/Kirkwood apartments in 1999 was a copy of an executed purchase agreement between Benjamin Alli and Cory Fanning.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15 day of August, 2005.

Patrick Berry
Supervisory Project Manager
Office of Insured Multi-family
United States Department of Housing
and Urban Development