90132976

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

L124774PA093

Project No.: 044-44017-330 HAP CONTRACT NO.: MI28-E000-011

Mortgagee Secretary of Housing and Urban Development
451 Seventh St., S.W., Washington, D.C. 20410

Amount of Mortgage Note Date June 18, 1981

Mortgage: Recorded: State Michigan County Wayne Date June 18, 1981

Book Liber 21182 Page 561

Originally endorsed for insurance under Section of the National Housing Act.

90 AUG 15 AM 9:28
REGISTER OF DEEDS
FOREST E. YOUNGBLOOD
FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI
90132976

This Agreement entered into this 6th day of July, 1990, between BSA Corporation, a Michigan corporation whose address is P.O. Box 36081, Grosse Pointe, Michigan 48236

their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*, whose address is 451 Seventh St., S.W., Washington D.C. 20410

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 208.33 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

This Replaces HUD-9412, Dated April 1976. HUD-92466 (6-77)

33K(1)

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services included in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwithstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;





L12477 PG094

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

L12477 PA0095

FOREST CO. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(h) If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284,82 Stat. 73)* Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts 1, 100, and 110, and Subparts I and M of Part 200)*.

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

HUD-92466 (6-77)

L12477 PA096

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

(i) An amount equal to the aggregate of all special funds required to be maintained by the project.

(ii) All tenant security deposits held:

L1 24774 PA 097

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representati- executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: BSA Corporation, a Michigan corporation

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

IN WITNESS WHEREOF, the parties set their hand and seal the day and year first above written.

L124774PA098

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

IN THE PRESENCE OF:

BSA CORPORATION, a Michigan corporation,

By: ____________________

Its: President

"PURCHASER"

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, BY AND THROUGH THE FEDERAL HOUSING COMMISSIONER,

By: ____________________
John G. Terranella
Its: Director, Housing Management Division

Jean Nash

Tamara Price

STATE OF MICHIGAN }
} SS
COUNTY OF OAKLAND }

On this 9 day of June, 1990, before me, a Notary Public in and for said County, personally appeared B.A. ALLI, on behalf of BSA CORPORATION, a Michigan corporation, who acknowledged that he did sign the foregoing instrument on behalf of the corporation.

MARGARET M. MESSINA
Notary Public, Wayne County, MI
My Commission Expires 10-26-92

Margaret M. Messina
Notary Public, __________ County, Michigan. My commission expires:

STATE OF MICHIGAN }
} SS
COUNTY OF }

On this 6th day of July, 1990, before me, a Notary Public in and for said County, personally appeared John G. Terranella, to me personally known and known to me to be the duly Authorized Agent, and the person who executed the aforementioned instrument by virtue of the authority vested in him by 24 C.F.R. 200.119 and acknowledged that he executed the foregoing instrument for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for the purpose stated.

JOHN JOSEPH NIEBIESZCZANSKI
Notary Public, Macomb County
Acting in Wayne County, State Of Michigan
My Commission Expires 09-15-92

John Joseph Niebieszczanski
Notary Public, __________ County, Michigan. My commission expires:

DRAFTED BY AND WHEN RECORDED, RETURN TO:

David S. Snyder, Esq.
Snyder and Handler, P.C.
1365 American Center
27777 Franklin Road
Southfield, Michigan 48034

M
33
V

L:24774PA099

Land in CITY OF DETROIT WAYNE County, Michigan

Parcel I, Lots 63, 64 and Westerly 27.40 feet of Lot 62 and Easterly 15 feet of Lot 65 RANNEY'S BOULEVARD SUBDIVISION, as recorded in Liber 28, Page 72 of Plats, Wayne County Records.

Parcel II, Lots 24 and 25 SULLIVAN-CAMPBELL SUBDIVISION, as recorded in Liber 31, Page 60 of Plats, Wayne County Records.
1610 Collingwood
1635 Calvert

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

APPENDIX "A"

L 24774 PA 100

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

A. Regulatory Agreement

The Regulatory Agreement shall include the following additional language:

1. Requirement to Rent to Section 8 Tenants Provision Applicable During Term of the Housing Assistance Payments Contract.

The Owner agrees that, during the term of the Housing Assistance Payments Contract executed between the Secretary and the Owner (hereafter referred to as "HAP Contract"), which contract shall not be cancellable by the Owner, the Owner shall (a) select tenants to fill vacancies from applicants who are eligible for assistance under Section 8 of the United States Housing Act of 1937 (42 USC 1437f), or any successor legislation (hereafter referred to as "Section 8"), subject to the provisions on eligibility, selection and admission in the HAP Contract and (b) not evict any such person or otherwise discriminate in the terms of a tenancy because such person is receiving such assistance.

If the Owner is unable to fill said vacancies with persons eligible for Section 8 Assistance within 90 days after a vacancy of a previously subsidized Section 8 unit occurs, then the Owner may rent such unit to a tenant not eligible for Section 8 Assistance with the approval of the Secretary.

The Owner agrees to keep such records as may be required by the Secretary to show its affirmative efforts to fill such vacancies with tenants eligible for Section 8 Assistance.

If the number of units receiving Section 8 tenants falls below 47 , then the Owner may not rent any units, to other than those eligible for Section 8 Assistance, without the written approval of the Secretary.

2. Non-Discrimination Provision Applicable during Term of Regulatory Agreement.

This provision applies to those dwelling units not covered by the preference provision of paragraph 1, both during the term of the HAP Contract and after its expiration. The Owner agrees not to refuse unreasonably to lease a vacant dwelling unit, evict any person or otherwise discriminate in the terms of tenancy because such person is the holder of, or eligible to hold, a Certificate of Family Participation under Section 8 of the United States Housing Act of 1937 (42 USC 1437f), or any successor legislation; Provided, that this provision is limited to those units which rent for an amount not greater than the fair market rent for a comparable unit in the area as determined by the Secretary under Section 8.

3. Renewal of HAP Contract.

So long as the mortgage covering the project is insured or held by the Secretary, the Owner agrees to accept (1) any offer by the Secretary to renew the HAP Contract or (2) an offer by the Secretary to provide any other rental housing assistance, in lieu of Housing Assistance Payments, designed to provide families decent, safe and sanitary housing pursuant to Section 8 of the Housing Act of 1937 or any successor legislation.

4. Evictions

The eviction regulations at 24 CFR Part 450, and any successor regulations shall be binding on the Owner in management and operation of the project.

FOREST E. YOUNGBLOOD REGISTER OF DEEDS WAYNE COUNTY, MI

DEED 33.00

EXHIBIT
Fanning 1
2-3-05 JS

Marcus & Millichap

# REAL ESTATE PURCHASE AGREEMENT

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. THIS DOCUMENT IS INTENDED TO BE A LEGALLY BINDING CONTRACT. READ IT CAREFULLY.

Marcus & Millichap Real Estate Investment Brokerage Company of Detroit ("Agent") will on offer acceptance receive from Cory Fanning ("Buyer") the sum of $ 5,000 in the form of check. This sum is a deposit ("Deposit") to be applied to the purchase price of that certain real property and improvements referred to as Collingwood/Kirkwood Apartments (the "Property") generally located at 1610 Collingwood/1635 Calvert in the City of Detroit, County of Wayne, State of Michigan, and more particularly described as follows:

LEGAL TO BE ATTACHED

The Property shall also include Seller's interests in:

1. Any and all privileges and appurtenances pertaining to the Property, including any right, title and interest of Seller in or to adjacent streets, alleys or right(s)-of-way;
2. Any and all leases, licenses, occupancy agreements, permits, rents, warranties, guarantees or security deposits with respect to the Property, or any portion thereof;
3. Any and all tradenames used in connection with the Property.

## TERMS AND CONDITIONS

For the mutual covenants contained in this Real Estate Purchase Agreement ("Agreement"), Seller agrees to convey the Property to Buyer, and Buyer agrees to purchase the Property from Seller, on the following terms and conditions:

1) PURCHASE PRICE: The total purchase price for the Property ("Purchase Price") is $675,000.

2.1) DEPOSIT: The Deposit shall be credited to the Purchase Price of the Property at the Closing Date (as defined in paragraph 4 below) of this Agreement, and shall be held by Agent (as defined in paragraph 4 below) in trust for the benefit of the parties in a non-interest-bearing account (the "Deposit Account") at a banking institution designated by Agent, unless otherwise instructed by the Buyer and Seller in writing.

2.2) DEPOSIT INCREASE: With the removal of the contingencies set forth in paragraph(s) 8 - 9 hereof, Buyer shall increase the total Deposit in the Deposit Account to $20,000 dollars. Buyer's failure to timely increase the total Deposit as required hereunder shall be a material breach of this Agreement. The entire Deposit shall be credited to the Purchase Price at the Closing Date, unless otherwise provided herein.

2.3) DEPOSIT TRANSFER: Buyer's Deposit shall remain in trust until removal of the contingencies set forth in paragraph(s) 8 -9 hereof. Upon removal of said contingencies: (1) Buyer's Deposit shall be non-refundable,subject to paragraph 7.1; (2) the Deposit Account shall remain subject to the remaining terms and conditions of this Agreement; and, (3) upon the written instruction of Seller, the Deposit Account shall be transferred to the Seller. However, if the Property is made unmarketable by Seller, or by acts of God, then Buyer's entire Deposit shall be returned to Buyer.

3) ADDITIONAL CASH DOWN PAYMENT: Buyer shall make an additional cash down payment (in addition to the Deposit) to bring the total down payment amount to 15% of purchase price including financeable loan cost at the Closing Date.

4) CLOSING DATE: The completion of this Agreement and close of the transaction hereunder shall take place at the office of ("Closing Agent") located at TBD, unless otherwise agreed in writing by Buyer and Seller. Within 100 calendar days of the Effective Date of this Agreement, as defined in paragraph 33 below, Seller and Buyer agree to prepare, execute and cause to be delivered to the Closing Agent such instructions and other documents as may be necessary and appropriate to complete this Agreement and close the transaction. Should the instructions or other closing documents, if any, fail to be executed or delivered as required, Closing Agent shall, and hereby is, directed to close the transaction pursuant to the terms and conditions of this Agreement. "Closing Date" shall mean the date on which the document(s) transferring title to the Property to Buyer or Buyer's designee is recorded. All fees of the Closing Agent to close this transaction shall be paid equally by buyer and seller. All other closing costs shall be paid in accordance with the custom and practice in the county in which the Property is located.

5) PRORATIONS: Rents, real property taxes and assessments, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other income or expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. Prepaid real estate taxes shall be prorated.

6) TITLE: Within 20 calendar days after the Effective Date of this Agreement, Seller shall furnish or cause to be furnished to Buyer a commitment for an A.L.T.A. fee owner's policy of title insurance ("Commitment") to be issued at the Closing Date by TBD (the "Title Company") for the Property. Within 5 calendar days following receipt thereof, Buyer shall either approve in writing the exceptions contained in said Commitment or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within [illegible] calendar days after receipt of Buyer's objections, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s). If Seller fails to so notify Buyer or is unwilling or unable to remove any such exception by the Closing Date, Buyer may either (i) elect to terminate this Agreement and receive back the entire Deposit, in which event Buyer and Seller shall have no further obligations under this Agreement; or, alternatively, (ii) Buyer may elect to purchase the Property hereunder subject to such exception(s).



MLI - Copyright Marcus & Millichap 1998

THE PARTIES ARE ADVISED TO CONSULT WITH THEIR RESPECTIVE ATTORNEYS CONCERNING THE LEGAL EFFECT AND VALIDITY OF THIS AGREEMENT PRIOR TO ITS EXECUTION. The undersigned Buyer hereby offers and agrees to acquire the Property for the Purchase Price and upon the terms and conditions of this Agreement. This offer is made by Buyer to Seller on this 14 day of July, 1999. Buyer hereby acknowledges receipt of an executed copy of this Agreement.

BUYER: Cory Fanning ADDRESS: ______________________

______________________

TELEPHONE: ______________________

SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing Buyer's offer, and agrees to convey the Property to Buyer or Buyer's designee for the Purchase Price and upon the terms and conditions of this Agreement. Seller hereby acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller hereby reaffirms Seller's agreement to pay Agent a real estate brokerage commission ("Commission") pursuant to the terms and conditions of that certain Representation Agreement between Agent and Seller dated which shall remain in full force and effect. Said Commission is payable to Agent in full by cash, certified check or cashier's check on or before the Closing Date. The Title Company is directed to make such payment to Agent from Seller's proceeds of the sale or exchange. The provisions concerning Agent's Commission may not be amended or modified without the written consent of Agent. Seller hereby grants to Agent the right to file a lien against the Property in the nature of a mechanic's lien to secure any amounts due to Agent.

SELLER: [signature] ADDRESS: ______________________

______________________

TELEPHONE: ______________________

DATE: 15 Jul 99

Agent accepts and agrees to the foregoing.

AGENT: MARCUS & MILLICHAP REAL ESTATE INVESTMENT BROKERAGE COMPANY OF DETROIT

BY: [signature] ADDRESS: ______________________

DATE: ______________________ ______________________

| |
|---|
| NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL, FINANCIAL, TAX OR OTHER EFFECTS, OR THE VALIDITY OF, ANY PROVISION OF THIS AGREEMENT. AS A REAL ESTATE BROKER, AGENT IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS ONLY. IF YOU DESIRE LEGAL, FINANCIAL, TAX OR OTHER PROFESSIONAL ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT, TAX OR OTHER PROFESSIONAL ADVISOR. |



ML1 - Copyright Marcus & Millichap 1998

CHAPTER 13. CHANGE IN OWNERSHIP: TRANSFER OF PHYSICAL ASSETS

INTRODUCTION

The sale and conveyance by deed of title to a property covered by an insured mortgage necessitates a substitution of mortgagors. HUD approval of the substitution is required in every case where HUD exercises control over the mortgagor either as preferred stockholder, by regulatory agreement, or by certificate of beneficial interest. This chapter has a broader application than above, and the instructions, requirements and procedures outlined within cover not only transactions which result in the substitution of a mortgagor, but in any change in the control of a mortgagor.

SECTION 1. DELEGATIONS OF AUTHORITY AND EXCEPTIONS

13-1. Field Office Delegations

Field Offices are authorized to grant Preliminary and Final approval to all transfer proposals. However, there are two sets of exceptions, as noted in Section 1, Paragraph 13-3 and Paragraph 13-2 where Regional Office or Headquarters approval must be sought prior to Field Office granting preliminary approval of TPAs.

13-2. Requirement for Regional Office Prior Approval

The Regional Office must approve, prior to the Field Office granting preliminary approval, any proposal exhibiting the following characteristics:

A. The project's physical and/or financial needs will not be met within 36 months from the date of the transfer. (This is expected to be a rare occurrence.);

B. The transfer provides for secondary financing secured by the project and not meeting the requirements of Section 3, Paragraph 13-15 of this Notice. In any case involving secondary financing, all secondary financing secured by a lien against the project must be approved in writing by the first mortgagee. HUD will not approve any transfer including a lien against the project without written mortgagee approval;





C. The transfer provides for secondary financing which is either unsecured or secured by collateral other than the project (e.g., partnership interests), and does not meet the requirements of Section 3, Paragraph 13-15 of this Notice;

D. The transfer provides for a land contract which does not satisfy the requirements of Section 3,

Paragraph 13-15 of this Notice;



E. The transfer requires approval of a workout designed to meet the physical and financial needs of the project which is not in compliance with all outstanding workout instructions;

F. The transaction involves a transfer from nonprofit to profit motivated or limited distribution ownership and calls for remuneration to the seller; or

G. The transfer documents include a plan which contemplates repayment of a flexible subsidy loan over a period of more than 24 months, in the case of a transfer from a nonprofit to a profit motivated or limited dividend owner.

13-3. Requirement for Headquarters Prior Approval
Headquarters must approve, prior to the Field Office granting preliminary approval of the application, any transfer involving any of the following circumstances:

A. Use of the Low Income Housing Tax Credit (LIHTC) when combined with other forms of HUD assistance such as flexible subsidy loans, additional Section 8 assistance, 241 supplemental loans, etc.; or

B. TPAs requiring a regulatory agreement waiver or exception of any type, if the authority to approve the waiver or exception has not been delegated to the Region or Field Office.

13-4. Documentation Required for Regional and Headquarters Reviews
In every case where Regional Office or Headquarters approval must be obtained prior to Field Office preliminary approval of a TPA, the Field Office must:





A. Ensure the TPA meets all criteria for approval under outstanding instructions and will be approved if authorization to proceed is obtained;

B. Provide a summary of the transaction;

C. Provide form HUD-9575 and the parts of the TPA which are required to ensure an informed review, and;

D. Provide a recommendation.

13-5. Preliminary and Final Approval Actions
In every case, Preliminary and Final Approval authority rests with the Field Office. However, the Field Office is not authorized to issue either of these approvals until the Regional and/or Headquarters have approved the particular aspects of the TPA for which they have retained authority, as described in Section 1, Paragraph 13-2 and Section 1, Paragraph 13-3 above.

Field Offices may not grant preliminary approval if the TPA is dependent on other commitments or approvals that have not occurred. For example, the Field Office may not grant preliminary approval if the TPA depends on some other type of assistance (e.g., flexible subsidy loan, 241 supplemental loan, additional Section 8 assistance, etc.) from HUD and the Department has not issued the appropriate approval letter or firm commitment to insure. Similarly, the Field Office may not grant preliminary approval if the TPA depends on:

- o assistance from some other unit of government (Federal, state or local);
- o an allocation of LIHTC; or
- o the proceeds of a tax credit syndication, until the appropriate commitment has been issued by the responsible unit of government or company.

Field Offices may not grant preliminary approvals that are conditioned upon other commitments being issued, but may provide an applicant with a letter stating that all other TPA requirements have been satisfied, if the unit of government/company responsible for issuing the other commitment(s) requests such a letter.

After the preliminary approval letter is issued, the real estate transaction can close and all of the documents approved by HUD can be executed and recorded. The full review TPA transaction may be completed based upon a certification by the applicant's attorney that





the documents to be executed and recorded are exactly as approved by HUD. The Form of the required certification is in Appendix A, Procedures for Processing Full Review TPAs.

The Field Office may grant final approval of a full review TPA after it has reviewed and approved the executed and recorded documents.

SECTION 2. TRANSACTIONS REQUIRING REVIEW (CATEGORIES OF REVIEW)

Transactions involving the transfer of all or a controlling interest in the ownership of a HUD-insured or HUD-held project from one individual, group of individuals or entity to another individual, group of individuals or entity constitute a Transfer of Physical Assets (TPA). This definition is broad enough to incorporate modified TPAs within the purview of this discussion. For certain of these transactions, as described below, the Department requires a Full Review. For certain other transactions only a Modified Review is required.

The review procedures do not apply to corporate restructuring mergers if there is no change in control, or first user syndications prior to final endorsement.

13-6. Transactions Not Requiring an Application Fee:

A. Substitution of individual general partners of a

partnership/mortgagor; or



B. Assignment of 100 percent of the beneficial interest in a passive land trust that holds title to the project, if the assignment does not result in a change in the control of the project.

Certain complex transactions involve multiple transfers and may be subject to more than one TPA fee, such as transactions involving two transfers of title by deed. In such cases, the Field Office manager will determine whether a second fee is required after consulting with Field Counsel. If the Field Office manager determines that a transaction or series of transactions have been structured to avoid paying the application fee, the TPA application will be rejected and new application(s) will not be accepted until the required application fee(s) have been paid.





13-7. Full Review

Transactions requiring HUD's Full Review include, but are not limited to properties encumbered by HUD-insured or HUD-held mortgages demonstrating the following characteristics:

A. Transfer of title from the mortgagor/seller to the buyer including conveyance by installment sales contract, land contract and wrap-around mortgage;

B. Transfer of any interest in a partnership mortgagor which causes a dissolution of the partnership/mortgagor under applicable state law; or

C. Transfer of 100 percent of the beneficial interest in a passive trust, which results in a change in control of the asset.

The procedures for processing a Full Review TPA are set forth in Appendix A. Transactions subject to Full Review will be evaluated under the Department's Determinative Criteria set forth in Section 3. below.

13-8. Modified Review

The Department requires a Modified Review, which is a limited review, of certain transactions involving transfers of interests in entities owning properties encumbered by HUD-insured, or HUD-held mortgages. Transactions subject to HUD Modified Review include, but are not limited to the following:

A. A single transfer of in excess of 50 percent of the interest of a partnership/mortgagor which does not cause a dissolution of the existing partnership/mortgagor under state law, as certified by an attorney who has no identity of

interest with the partnership/mortgagor and is licensed to practice in that state;

B. Substitution of one or more of the general partners;

C. A single transfer of an amount in excess of 50 percent of the corporate stock of the corporate mortgagor or a single transfer of an amount less than 50 percent of the total corporate stock of





the corporate mortgagor where such transfer results in a change in control of the corporate mortgagor;

D. An assignment/transfer of a portion of or all of the beneficial interest in a passive trust when there is no change in control of the project; or

E. A single transfer of an amount in excess of 50 percent of the corporate stock of a corporate General Partner or a single transfer of an amount less than 50 percent of the corporate stock of a corporate General Partner where such transfer results in a change in control of the corporate General Partner.

F. Any transaction which does not fall within any of the other categories but which, nevertheless, results in a change of control of the mortgagor.

Certain transactions subject to a Modified Review will be evaluated under the Department's Determinative Criteria set forth in Section 3. below. For example, transactions in which a significant change in control will occur or in which a large sum of money will change hands, not only through a single transfer but also a series of transfers which have the same result, may trigger review under the Determinative Criteria. In addition, where there is an indication of subsidy layering in a TPA, a complete evaluation under the Determinative Criteria is required. See discussion under questionable transactions and subsidy layering.

Transactions subject to Modified Review will be reviewed pursuant to the procedures set forth in Appendix B.

13-9. Questionable Transactions

The Department periodically receives proposals involving novel transactions. These transactions should be brought to the attention of the Regional Office. Whenever a Field Office is in doubt as to whether a transaction requires a full or modified TPA review, the Regional Office may be contacted for guidance.

When faced with a transaction which does not fall clearly into the full or modified review category, but which the Field Office believes may warrant HUD review, the following questions should be asked: Will there be a significant change in the control of the project? Will a significant sum of money change hands in conjunction with the transaction? If either of these inquiries are answered affirmatively, a Transfer of Physical Assets Application, either Full or Modified, depending upon the nature of the transaction, should be required by the Field Office.

SECTION 3. DETERMINATIVE CRITERIA FOR REVIEW OF TPAs

The following are criteria employed by HUD to evaluate Full Review and certain Modified Review proposals:

13-10. Requirement that a Proposed Owner/Managing General Partner Obtain Previous Participation Clearance.

The proposed principal(s) must obtain previous participation clearance:

A. Proposed principal(s) must file form HUD-2530, Previous Participation Certificate; and

B. Prospective owner/managing general partner must also satisfy the Field Office that he/she has sufficient experience to operate the particular project which he/she intends to purchase. A troubled project may require an owner/managing general partner who has demonstrated the ability to successfully own and manage troubled multifamily projects.

13-11. Field Office Requirement for Management Review and Physical Inspection and a Requirement For Proposed Management Agent Previous Participation Clearance.

Management Reviews, Physical Inspections and approvals of existing or new management agents are interrelated determinations required prior to Field Office preliminary approval of a TPA.

A. Existing Management Agent

The TPA process provides the Field Office with an opportunity to influence the selection of a management agent. Field Offices should use the





flexibility provided by Handbook 4381.5 to impose necessary performance standards on a new

management agent, particularly when troubled projects are involved. This requirement is directly related to ratings on management review and physical inspection reports. Management Reviews and Physical Inspections are to be conducted in a schedule required in the following sections.

B. Management Review

If the Field Office has not completed a management review of the project within one year of the date of the TPA application, it must do so prior to granting preliminary approval of a TPA, whether or not a change in management agent is proposed. The level (comprehensive or limited) and intensity of the management review is based on factors identified in this Handbook in Chapter 6, entitled Project Monitoring, and the Field Office must exercise discretion in making this determination.

If the TPA proposes to retain the existing management agent, the Field Office must review the past performance of the agent and determine whether or not the agent is performing at a satisfactory level.

C. Physical Inspection

If the Field Office has not performed a physical inspection of the project within the past year, it must do so prior to granting preliminary approval of a TPA, whether or not the mortgagee has performed an acceptable inspection.

D. A proposed new management agent must obtain previous participation clearance and must abide by other requirements:

1. Proposed management agents must file form HUD-2530, Previous Participation Certificate,

2. Proposed management agent must satisfy the Field Office that he/she has sufficient experience to enable him/her to successfully





manage the project. The type and length of experience required will vary depending upon the degree of difficulty of managing the particular project;

3. A new or replacement agent is required to abide by the instructions contained in Handbook 4381.5, Management Agents, Documents and Fees. This includes the filing of a Management Certification and an Agent Profile.

13-12. Determination by Field Office that a Project's Physical

Repair/Replacement Needs Will Be Met.



In order to approve the proposed transfer, the Director of Housing Management must determine that the project will be restored to sound physical condition within 24 months from the date of transfer. Additionally, he/she must be satisfied that requisite energy-related alterations will be completed within an acceptable time frame. (See Handbook 4350.1, Chapter 12, for a discussion of energy-related items.)

A. Extension of Time Requirements

Under certain well documented circumstances, the Field Office Manager may extend this period for up to an additional 12 months. The decision to allow additional time must be documented in the project file. The time period cannot be extended, if the sources and uses statement shows one of the following:

- o remuneration to the seller; or
- o fees to participants having priority over the needs of the project.

B. Determination of Project Physical Condition

The physical condition of the project may be determined in one of two ways:

1. If the project is ranked as a troubled or potentially troubled project, the Field Office must perform its own inspection if such an inspection had not been performed within the past year; or





2. The transfer applicant may submit to HUD at the time of application a physical inspection report and cost analysis of needed repairs for the project, prepared by an architect or engineer who is professionally designated and licensed in the jurisdiction where the project is located.

The inspector will provide a certification as to his/her qualifications and as to the accuracy of the report and cost estimates based on his/her professional opinion.

The Chief of Loan Management will decide which approach is appropriate. In certain situations, the Field Office may also elect to do an inspection, the results of which will suggest the need for a follow-up inspection by an expert in a particular functional area, such as a structural or HVAC engineer. This follow-up inspection will clearly be the responsibility of the applicant.

C. Requirements for Acceptable Physical Inspection.

The following are minimum requirements for an acceptable physical inspection:

1. The inspection report must be in sufficient detail to list all required repairs and provide line item cost estimates for repairs;

2. The report should mandate all those repairs that are necessary to ensure that the project is structurally sound and that dwelling units and living conditions are decent, safe and sanitary. The repair listing must be complete and deal with 100 percent of the units;

3. The report should specify that the project is energy efficient, or that repairs will make it so;

4. The report must describe how the inspection was performed and any assumptions that were made by the engineer. For example, if all





the units were not inspected, what units were inspected and how were those units selected? How did the engineer go about making the final repair list?; and

5. The engineers and architects should also provide comments on the remaining useful life of major equipment and fixtures at the project (this analysis will be important in judging the appropriateness of Reserve for Replacement funding).

The goal of a quality physical inspection and subsequent repair/replacement recommendations is not to return the project to the original condition when initially insured, but rather to ensure the long-term viability of the project.

The Field Office will have the responsibility for reviewing the applicant's inspection report and affirmatively judging its adequacy. This will require a Field Office inspector verifying the applicant's report with an on-site visit.

D. Availability of Physical Repair/Replacement Funds

Because the financial viability of the project is a critical determination in approving a TPA, the following criteria for use and availability of repair/replacement funds must be met:

1. The Field Office must be satisfied that adequate funds will be available to complete needed physical improvements/repairs. The purchaser should accomplish the repairs

pursuant to a repair schedule (e.g., a MIO plan) approved by the Field Office. The repair schedule should be specific as to objectives and timing so that the progress of the repairs can be judged by the Field Office.

The Field Office may require the purchaser to obtain a letter of credit, a bond, or place in an escrow account acceptable to the Field Office, the funds needed to complete the proposed improvements/repairs.

2. If a project is transferred within the first twelve months from the date of final





endorsement and if there are latent construction defects, HUD's first remedy for correction of these defects is to use the bond that was posted for this purpose during the construction period. Only if the bond cannot be used or will not cover all of the latent defects should correction of these defects be addressed as part of the transfer proposal.

13-13. Determination by Field Office that a Project's Operating Financial Needs Will Be Met.

A. HUD-Insured Projects

An application for transfer of a HUD-insured project will be accepted only if the project mortgage is current or the Field Office determines it will be brought fully current as a result of the TPA at preliminary approval.

B. HUD-Held Projects

In order to approve a proposed transfer of a HUD-held project, the Field Office must establish that either the mortgage will be brought current at the time of transfer or that an acceptable workout will be executed. Any workout, in conjunction with a transfer, must be executed upon preliminary approval of the transfer. Workouts that exist prior to the TPA approval must be reviewed and modified as necessary. For example, if repairs are required as part of the TPA, the repair schedule will be included in a modified or new workout.

C. All Projects

For all projects, Field Offices must assess the financial situation and make certain determinations and require certain actions be taken, as follows:

1. All accounts payable will be cleared at the time of the transfer or shortly thereafter. If deemed necessary by the Field Office, a satisfactory escrow or letter of credit may be required to ensure that this requirement is met;





2. Make a determination that the Reserve for Replacement Account is adequately funded, and will continue to be adequately funded in the foreseeable future. To determine the level of funding for the Reserve for Replacement Account, the Field Office must consider the project's present and anticipated needs. It should review the remaining useful life of major equipment and structural components and make a determination that the Reserve for Replacement is funded at a level to meet the most immediate project needs;

3. The Field Office may require lump sum contributions as part of the TPA or a plan to increase deposits to the Reserve until it is funded to an appropriate level. For both full and modified TPAs, if escrowed funds remain after completion of the required repair program, these remaining monies should be used to fund the Reserve for Replacement Account at an appropriate level. Although there are no hard and fast rules, the Field Office should follow common sense rules of thumb. For example, a 15 year old project, which has not replaced stoves, refrigerators, air conditioning, roofs, kitchen cabinets, common area and apartment amenities, such as carpeting, etc., should have a Reserve for Replacement Account balance of $1,200 to $1,500 a unit. The above yardstick is meant for reference only, and naturally jurisdictions may determine what funding level of Replacement Reserves per unit is considered appropriate and adequate for projects within their localities based on local environment, custom and practice.

4. The Field Office should review the other mortgagee controlled accounts (real estate and property insurance escrow), to make sure present balances together with monthly deposits will be sufficient to pay near term billings. Frequently, TPAs lead to reassessments that result in property tax increases the property cannot easily manage. The Field Office may decide to require an

increased deposit to these escrows, if it has reason to believe the property will be facing a substantial increase in its property tax or property insurance bills; and

5. Field Offices should review the source and use statement provided by the applicant as a possible source of additional funds, if there is a cash shortfall in meeting the project's financial needs.

13-14. Field Office Determination Concerning HUD Legislative, Regulatory and Administrative Requirements.

The transfer of physical assets proposal must comply with HUD regulations, handbooks, administrative and legal requirements as of the date of this Notice. Relevant HUD documents include but are not limited to the following:

| HUD HANDBOOKS | TITLE/CHAPTER |
|---|---|
| HUD Handbook 4350.1 REV-1 | Chapter 4, Section 11<br>Chapter 6<br>Chapter 12 |
| HUD Handbook 4065.1 | Previous Participation |
| HUD Handbook 4355.1 REV-1 | Flexible Subsidy |
| HUD Handbook 4370.1 REV-2 | Reviewing Annual and Monthly Financial Reports |
| HUD Handbook 4370.2 REV-1 | Financial Operations and Accounting Procedures for Insured Multifamily Projects |
| HUD Handbook 4370.4 REV-1 | Basic Accounting Desk Reference for Loan Servicers |
| HUD Handbook IG 2000.4 | Consolidated Audit Guide for Audits of HUD Programs |
| HUD Handbook 4381.5 REV-1 | Management Documents, Agents and Fees |

| HUD REGULATIONS/SECTION | TITLE/CHAPTER |
|---|---|
| 24 CFR 265 | Transfer from Nonprofit to Profit-Motivated Ownership for Multifamily Housing Projects |
| 24 CFR 207.1(h) | Transfer Fee |





| MULTIFAMILY NOTICES | TITLE/CHAPTER |
|---|---|
| Notice 84-34 | Revised Policy for Projects with HUD-Held Mortgages |
| Notice 89-1 | Reinstating Defaulted Mortgages |
| Notice 90-17 | Combining Low Income Housing Tax Credits (LIHTC) with HUD Programs |
| Notice 90-18 | New Restrictions on Funding Actions |

| | |
|---|---|
| Notice 91-22 | Comprehensive Multifamily Servicing Program |
| Notice 84-37 | Appendix G: Memorandum from Charles J. Bartlett, Legal Review of Transfer of Physical Assets Proposals |

13-15. Special Circumstance Determination: Secondary Financing

Any portion of the purchase price which is not paid in cash at the time of purchase is understood to be secondary financing. Secondary financing includes all deferred financing: financing secured by the project, financing secured by collateral other than the project, or unsecured financing.

Field Offices must make certain specific determinations when secondary financing is an element. The legal and administrative requirements for approval of a TPA with secondary financing include the following:

A. HUD policy permits the use of secondary financing in connection with transfers of projects only in those situations in which the Field Office determines that the proposal does not jeopardize HUD's security, conflict with HUD's legal or programmatic interests, or unduly burden the project with financial debt.

B. If HUD-insured secondary financing is proposed as part of the TPA, it must meet the underwriting criteria of the applicable section of the Act (241 supplemental loan, operating loss loan, etc.).

C. The legal requirements controlling the use of secondary financing are set forth in the opinion of the Assistant General Counsel for Multifamily Mortgage Insurance in Appendix G of this Chapter.





Area Counsel must review all secondary financing in connection with a TPA and determine that it meets the requirements of Appendix G prior to the Field Office granting preliminary TPA approval.

D. Field Office will approve the use of secondary financing in a TPA only when the following conditions are met:

1. When the first mortgagee approves in writing any secondary financing secured by a lien against the project. Field Offices must not approve any transfer that includes a lien against the project without this written mortgagee approval;

2. When approval of the secondary financing will not increase HUD's exposure to financial risk or loss; and

3. When approval of the proposal would not violate the Department's obligation to provide housing at the least cost to the Federal government.

E. Where the consent of the first mortgagee to allow secondary financing is obtained, the original signed document must be transmitted immediately to the Office of Multifamily Housing Management at HUD Headquarters for inclusion in the project's safe instruments file.

13-16. Special Circumstance Determination: Condominium/Cooperative Conversions

Every proposal involving conversion to the cooperative form of ownership must include either the express consent of the mortgagee to the conversion or an indemnity agreement acceptable to HUD. The HUD Office of General Counsel has developed a master Indemnification Agreement, Guaranty Agreement and Letter of Credit for use in conversions to cooperative ownership without mortgagee consent. In the case of a transfer transaction involving conversion, Field Offices are referred to OGC's Multifamily Mortgage Division "at Headquarters" for relevant forms and consultation. The Housing Management Division retains responsibility for the programmatic and policy review of proposed conversions to condominiums and





cooperatives but may not grant preliminary approval without Field Counsel's legal opinion as to the legality of the proposed conversion. When conversion to condominium or cooperative ownership is an element of the transfer, Field Counsel must review the proposed transaction.

SECTION 4. TPA INVOLVING NONPROFIT TRANSFER TO LIMITED DIVIDEND ENTITY

13-17. Field Office Statement of Necessity for TPA. The Regulations at 24 CFR Section 265.7, entitled Director's analysis and findings on the need for a transfer, require that the Field Office, before accepting an application for a transfer of physical assets, make a finding that a transfer of ownership to a profit-motivated owner is necessary to resolve the problems of the project based on one or both of the following factors:

A. The nonprofit (NP) owner is no longer capable or willing to own or operate the project successfully; or

B. There is a need for additional cash contributions to satisfy the present physical and financial needs of the project as determined by the review conducted pursuant to Section 265.6 because

assistance for the project from HUD, considering other uses of this assistance, is not available in amounts necessary to satisfy these needs.

13-18. Field Office Analysis of TPA.

A. First Criterion

In making the determination in 4.I.A. that the NP owner is no longer capable or willing to own or operate the project successfully, the Field Office may use information such as, for example, the troubled or potentially troubled ranking of the project (4350.1, Chapter 6) or a signed statement by the NP owner that they are unwilling to continue to operate the project. Such determinations are the responsibility of the Housing Management Director.

If the sole basis for a proposed transfer is lack of capability or willingness of the existing nonprofit sponsor to own and operate the project





successfully, the Field Office must determine that there is no capable, nonprofit sponsor in the area which is interested in assuming ownership of the project. This may be accomplished by obtaining from the nonprofit seller a certification that the seller has offered the project to other nonprofit entities presently operating in close proximity to the project, and has not received an offer to purchase the project.

B. Second Criterion

To determine whether there is a need for additional cash contribution the Field Office must schedule the reviews required prior to preliminary approval of any TPA in order to identify the present physical, financial, management and tenant needs, including energy-related needs of the project. Also, the Field Office must take into consideration information provided by the seller/purchaser when making this determination. This means that a Field Office may accept and review, for the purpose of making the above decision, a transfer application.

In developing the required findings for these criteria, Field Offices must make certain determinations. For the first criterion, if another nonprofit owner is found, the Field Office must determine whether this applicant has the skills and financial capacity to properly manage the project. If a nonprofit entity is willing to accept a TPA, they must be found qualified. In order to be considered qualified, an NP owner must:

- Have the proven ability to operate a multifamily housing project;

- Be in a position to make a contribution to the project equal to the present physical and financial needs of the project without utilizing any of the present resources of the project, i.e., reserve for replacement or operating accounts; and

- Have the financial capacity and willingness to execute a written pledge for an amount equal to 10 percent of the outstanding





mortgage balance. The applicant may not rely upon the receipt of federal subsidies in making this pledge.

For Field Offices to make a determination on the second criterion, they must analyze the long-term needs of the project and consider whether the project will require costly repairs and replacements that can only be funded through increased tenant rents, government rent subsidies, government grants or loans, or contributions from the nonprofit owner, all in the near future. If the investigation discloses that the project revenues will be insufficient to meet project needs, and that these needs can only be met with the foregoing funds, the second criterion set forth above will be satisfied.

The Field Office must have demonstrated that there is need for additional cash contributions to satisfy the physical and financial needs of the project. The Field Office must provide the nonprofit owner with the results of the review in writing, including a complete physical inspection report and management review report, indicating HUD's recommended corrective actions. The Field Office should augment, but not duplicate, the material generated to meet the requirements of the Paragraph 13-20.

13-19. Remuneration to Nonprofit Sellers.

A nonprofit owner/seller will be permitted to receive remuneration in connection with the transfer of a property only upon Headquarters consideration of circumstances. Section 106 of the HUD Reform Act of 1989 supersedes any previous authority granted to a Field Office/Regional Administrator regarding waiver of regulations under 24 CFR 265.4. Requests for waiver of regulations must be forwarded with good cause documentation to Headquarters, Office of Multifamily Housing Management, Director, Operations Division, for final disposition.

A nonprofit owner/seller may be allowed to receive

monies associated with a TPA provided that:

A. Upon transfer, the purchaser contributes to the project an amount equal to the greater of 10 percent of the unpaid mortgage principal balance,





or an amount sufficient to meet the present physical and financial needs of the project, in addition to any assistance provided by HUD;

B. All funds required by subparagraph A, above, have been paid to the project;

C. Any remuneration accruing to the nonprofit seller must be placed in trust with a third party trustee. The trust funds must be disbursed in accordance with the terms of a trust agreement which has been approved by the HUD Field Office, for a public purpose approved by the HUD Field Office that promotes the expansion of the supply of low and moderate income housing; and

D. No remuneration may pass to any individuals connected with the nonprofit seller. This requirement applies even where the remuneration flowing to the nonprofit seller will be paid several years after the transfer.

If payments are made to a nonprofit under the terms of an installment sales contract solely for purpose of making payment on the first mortgage, these payments are not considered remuneration to the seller. This situation does not require a waiver of 24 CFR 265.13.

If it is unclear how much will be paid to the nonprofit seller, how these future payments will be disbursed, and/or for what purposes the funds will be used, HUD will approve a Trust Agreement under Paragraph 13-19C above only if the Department has the right under the Trust Agreement to approve all distributions from the Trust.

13-20. Recruited Minimum Cash Contributions.

A purchasing profit-motivated or limited distribution mortgagor must agree to minimum funding levels. The minimum contribution of the acquiring owner is the greater of 10 percent of the unpaid principal mortgage balance, or an amount sufficient to meet the present physical and financial needs of the project, in addition to any assistance provided by HUD.

13-21. Transfer Prior to Final Endorsement.

If a request is received to approve a nonprofit to

limited dividend transfer prior to final endorsement of the mortgage, the mortgage should be reprocessed, if possible, using a limited dividend mortgagor. If this is not possible or appropriate, Loan Management staff must conduct a transfer review in accordance with this Handbook Chapter. Prior to endorsing the mortgage, the field office must make certain that all statutory and regulatory requirements relating to limited dividend mortgagors have been satisfied.

13-22. Prepayment Restrictions.

Transfers from nonprofit to limited dividend mortgagor entities do not remove the 40 year prepayment restrictions in the original mortgages.

13-23. Distributions/Rent Formula.

The transfer to a limited dividend or profit-motivated mortgagor does not change the formula used in processing rents for the project. The original nonprofit rent formula is used, without including a return on equity. This does not preclude the owner from receiving a distribution as permitted by the new regulatory agreement but it is limited in any one year to six percent of the actual cash contribution.

SECTION 5. DISPOSITION OF FLEXIBLE SUBSIDY UPON TRANSFER

The following guidelines must be applied to determine the disposition of Flexible Subsidy in conjunction with the transfer of a project:

13-24. Nonprofit to Nonprofit Transfer.

The Flexible Subsidy, whether in the form of a grant or a loan, does not have to be repaid. However, an assignment of the Flexible Subsidy loan to the new nonprofit purchaser must be required in conjunction with preliminary approval. Even though the loan does not have to be repaid, the Field Office should carefully review all Sources and Uses of funds and assure that there are no funds available to repay or reduce the Flexible Subsidy loan. If the Field Office determines funds are available, a portion or all of a loan should be repaid.

13-25. Limited Dividend/Profit Motivated to Limited Dividend/Profit Motivated Transfer.





The Flexible Subsidy loan must be repaid in full at the time of transfer of the beneficial interest in the project. However, if the limited dividend entity originally received a Flexible Subsidy grant, HUD

cannot require prepayment of that grant as a condition of TPA approval. Field staff should discuss the conversion of the grant to a loan as part of the TPA negotiation process or as a condition for any additional assistance from HUD. A guiding principle to aid Field staff in the negotiation process is that conversion is required unless the purchaser can demonstrate, to the satisfaction of the Field Office, that circumstances exist which would make such a conversion infeasible.

13-26. Nonprofit to Limited Dividend Transfer.

The Flexible Subsidy must be repaid in full at the time of transfer. Where the physical and financial condition of the property makes it impossible for the purchaser to repay the Flexible Subsidy at the time of transfer, HUD may approve repayment of the Flexible Subsidy assistance over a specific period, provided a minimum of one-third of the Flexible Subsidy is repaid at the time of transfer. The remaining Flexible Subsidy must be repaid according to a plan negotiated with the Field Office, and approved by the Regional Office.

The Field Office may approve Flexible Subsidy loan repayment plans which contemplate repayment of the remaining Flexible Subsidy within 24 months of preliminary approval of the transfer. Any repayment plan for a term of more than 24 months must be thoroughly documented and referred to the Regional Office for review prior to granting approval. This does not require review by the Regional Office of the full TPA application, only the Flexible Subsidy repayment plan. Any referral to the Regional Office must be accompanied by an analysis of the proposal and the Field Office's recommendation.

When reviewing transfer proposals, it should be understood that repayment of the Flexible Subsidy does not remove the low and moderate income use restrictions in the Use Agreement recorded against the project when the Flexible Subsidy assistance was originally awarded. The Use Agreement should be reviewed by Field Counsel to ensure the use restrictions are enforceable.





SECTION 6. SUBSIDY LAYERING AND EXCESS COMPENSATION

A TPA, full or modified, may involve subsidy layering, which results from combining various forms of relief or assistance within the jurisdiction of the Department with assistance from other governmental sources. Subsidy layering may result in excess compensation to some or all of the parties to a TPA. The presence of subsidy layering is not, by itself, a problem; it may reflect a wise and efficient use of scarce resources. However, subsidy layering, when combined with the Low-Income Housing Tax Credit (LIHTC) can result in excess compensation. If there is excess compensation, the Department is obligated by law to reduce the amount of assistance it will provide.

The Department has published policies and procedures governing the relationship of subsidy layering to excess compensation in the utilization of the LIHTC. All applicants are urged to read and understand these policies and how they may impact a TPA. (See Notice H-90-17 and 56 Fed. Reg. 14436, Administrative Guidelines; Limitations on Combining Other Assistance with HUD Housing Assistance.)

Generally, if the TPA involves the LIHTC but does not require any additional assistance within the jurisdiction of the Department (e.g., 241 supplemental loan, additional Section 8 units, etc.), the issues associated with excess compensation will not be present.

On the other hand, if the TPA contemplates the use of the LIHTC in conjunction with other additional assistance from HUD, the Department will address excess compensation as part of the TPA review process. If HUD determines excess compensation is present, the Department will provide a lower level of assistance.

Applicants should meet with appropriate Field Office staff prior to submitting a TPA application if the transfer involves the layering of federal subsidies and the use of the LIHTC.

SECTION 7. RELATIONSHIP TO OTHER COMMITMENTS

13-27. HUD Commitments

If the requirements HUD imposes as part of the TPA review process cannot be met without the resources produced by other independent commitments, the Field Office may not issue a preliminary approval letter until the other commitments have been made. For example, if the project's financial and physical needs cannot be met without a Flexible Subsidy loan, 241 supplemental loan, additional Section 8 assistance,





etc., the Field Office may not grant preliminary approval until the other necessary commitments have been made. In the case of a HUD-insured loan, this requirement will be satisfied with the issuance of a firm commitment; in the case of a Flexible Subsidy loan or additional Section 8 assistance, the requirement will be met at the time the Field Office receives the signed 185.1.

13-28. Other Governmental Commitments

If the requirements HUD is imposing will be satisfied from assistance provided by another governmental agency (Federal, state or local), a letter from that agency indicating its decision to provide that assistance is required, prior to the Field Office issuing preliminary approval. This includes the agency allocating the tax credits.

13-29. Low Income Housing Tax Credits (LIHTC)