(9) Executed Rental Schedule.
(10) Organizational Documents of Purchaser (executed partnership agreement, recorded certificate of limited partnership, etc.)
(11) Regulatory Agreement as executed by purchaser (amended or new), as approved by HUD.
(12) Executed Management Agent Certification.

2. One certified (by the recording officer) and one conformed copy of all recorded documents except recorded Regulatory Agreement. The original and one copy of recorded Regulatory Agreements, if applicable.

3. A copy, certified by the Purchaser, trustee, or other responsible person, to be a true copy of all unrecorded, executed documents used in connection with the transfer.

4. An audited interim Financial Statement of the seller covering the period between the date of the Application and the date of the actual transfer of the project to the owner.

5. An actual balance sheet of the purchaser as of the date of the transfer of title to the purchaser, along with copies of any deferred payment notes approved by the Secretary and certified to be true copies by the holder thereof.

6. Mortgagee's statement of all trust and escrow accounts as of the date of transfer of title to the purchaser.





7. If the mortgagor-seller is to be released from the note obligation, a new title policy or a letter from the title company issuing the original title policy showing that after the transfer the insured mortgage will remain a valid first lien on the property and that the existing title policy is still in full force and effect.

8. Attorney's comprehensive opinion showing that the transaction has been fully consummated and that the purchaser is legally authorized to operate the project and abide by the terms of the Regulatory Agreement.

9. Form HUD-92458, Rental Schedule and information of Rental Project or Form HUD-92458a, dated after date of transfer of project to Purchaser.

Mortgagee's Statement

If the above transfer is approved by the Secretary, Department of Housing and Urban Development, the mortgagee agrees to execute a Release and Assumption Agreement or a Mortgage Modification Agreement incorporating the Regulatory Agreement in the mortgage. It is understood that the mortgagee's consent to this transfer will in no way prejudice its rights under its contract of insurance with HUD.

Executed this ______ day of _____________, 19___.

Mortgagee

By ______________________________
Name/Title

In the event the consent of the mortgagee to the transfer is not evidenced by endorsement of this application, please provide the following information:

Date Consent Requested: ______________________

Party to whom Request Directed: ______________________





Reason for Refusal to Consent: ______________________

Mortgagee's Consent to the Creation of a Lien Against the Project

Mortgagee hereby consents to the creation of a lien(s) against the real property known as (project no.) ______________, (project name) ______________________ in connection with this transfer. Mortgagee waives its right to assign the mortgage and claim insurance benefits by the reason of the creation of such lien(s).

Executed this ________ day of ______________, 19___.

______________________________ Mortgagee

By ______________________________
Name/Title

______________________________
Mortgagor-Seller Date

______________________________
By

______________________________
Purchaser Date

______________________________
By

TPA SUBMISSION CHECKLIST
PRELIMINARY REVIEW

| | YES | NO | NA |
|---|---|---|---|
| 1. TPA Application (form HUD-92266) | | | |
| filled out completely | _____ | _____ | _____ |
| signed by purchaser | _____ | _____ | _____ |
| signed by seller | _____ | _____ | _____ |
| signed by mortgagee | _____ | _____ | _____ |
| 2. Consent by Mortgagee | _____ | _____ | _____ |

(required only where the proposal involves conversion to condominium or cooperative or where a lien against the property is created in connection with the transfer --- FORWARD ORIGINAL DOCUMENT TO HUD, WASHINGTON HQ-- OFFICE OF MULTIFAMILY HOUSING MANAGEMENT)

| | YES | NO | NA |
|---|---|---|---|
| 3. Fee submitted | _____ | _____ | _____ |
| correct amount | _____ | _____ | _____ |

4. Purchasers letter describing financial considerations flowing to project and to HUD. (See Appendix A, Purchaser's Letter for additional checklist items.)

| | YES | NO | NA |
|---|---|---|---|
| Shows: Funds to project operations | _____ | _____ | _____ |
| Funds for repairs | _____ | _____ | _____ |

mortgage status
______ current ___ workout ___ restoration plan

| | YES | NO | NA |
|---|---|---|---|
| 5. Completed HUD 2530 for: | | | |
| all general partners | _____ | _____ | _____ |
| limited partners > 24% | _____ | _____ | _____ |
| holders of common stock with an interest 10% | _____ | _____ | _____ |
| new management agent | | | |
| all principals as defined in 2530 instructions | _____ | _____ | _____ |
| all consultants and/or packagers for profit | _____ | _____ | _____ |





| | YES | NO | NA |
|---|---|---|---|
| 6. Purchaser's resume | _____ | _____ | _____ |
| 7. Purchaser's personal financials | _____ | _____ | _____ |
| 8. Purchaser's credit information | _____ | _____ | _____ |
| 9. Sources and uses of funds | _____ | _____ | _____ |

10. Executed sale or land contract ______ ______ ______

11. Executed seller's/purchaser's affidavit ______ ______ ______

12. If parties assume existing note and mortgage - Proposed Release and Assumption Agreement ______ ______ ______

Proposed Modif'n Agreement ______ ______ ______

13. If parties take subject to the existing note and mortgage New proposed Regulatory Agrmt ______ ______ ______

14. Where secondary financing is involved:
   A. all unexecuted secondary financing documents (notes, deeds of trust, mortgages) ______ ______ ______

   B. written consent of mortgagee (where a lien against the property is created) ______ ______ ______

FORWARD ORIGINAL WRITTEN CONSENT TO OFFICE OF MULTIFAMILY HOUSING MANAGEMENT IN HEADQUARTERS

15. Interim financial statements ______ ______ ______

16. Pro forma balance sheet ______ ______ ______

17. Mortgagee statement of escrow and reserve accounts ______ ______ ______





| | YES | NO | NA |
|---|---|---|---|
| 18. MIO plan, as appropriate | ______ | ______ | ______ |
| 19. Management certification and profile | ______ | ______ | ______ |
| 20. Proposed unrecorded deed | ______ | ______ | ______ |
| 21. Proposed bill of sale and assignment | ______ | ______ | ______ |
| 22. Title report | ______ | ______ | ______ |
| 23. Mortgagor's oath | ______ | ______ | ______ |
| 24. New rental schedule (form HUD-92458) | ______ | ______ | ______ |
| 25. Organizational documents of the purchaser | ______ | ______ | ______ |
| 26. Attorneys certification of execution and recording | ______ | ______ | ______ |

FINAL REVIEW

| | YES | NO | NA |
|---|---|---|---|
| 1. Copies of all executed and recorded documents | | | |
| Deed | ____ | ____ | ____ |
| Assumption agreement | ____ | ____ | ____ |
| Modification agreement | ____ | ____ | ____ |
| Release agreement | ____ | ____ | ____ |
| Secondary financing documents | ____ | ____ | ____ |
| 2. Original Regulatory Agreement Executed and Recorded | ____ | ____ | ____ |
| 3. Interim audited financial statements | ____ | ____ | ____ |
| 4. Purchasers balance sheet | ____ | ____ | ____ |
| 5. Mortgagee's statement of escrows and reserves | ____ | ____ | ____ |
| 6. Title Policy | ____ | ____ | ____ |
| 7. Attorney's opinion | ____ | ____ | ____ |





SOURCES AND USES OF FUNDS STATEMENT

Click Here to Download/Open Appendix F (PDF File)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON D.C. 20410

OFFICE OF THE GENERAL COUNSEL

MEMORANDUM FOR: All Regional Counsel
All Chief Counsel
All Chief Attorneys

FROM: Charles J. Bartlett, Assistant General Counsel
Multifamily Mortgage Division, GHM

SUBJECT: Legal Review of Transfer of Physical Assets Proposals

This memorandum is intended to be the new primary source of guidelines for field counsel on the legal review of transfer of physical assets proposals. In this memorandum, we have revised and updated our legal requirements to adapt to the most recent administrative procedures (to be issued in a separate memorandum.) This Division's prior memorandum dated December 6, 1982 entitled "Review of Transfer of Physical Assets Proposals" is cancelled.

In revising our legal requirements, we have taken into account new developments in the sales of multifamily projects subject to HUD-insured or HUD-held mortgages. Furthermore, we have adopted new legal requirements designed to assist field counsel in the review of the new "expedited" TPA's such as transfers in escrow. (Therefore, this memorandum should be read in conjunction with the forthcoming memorandum on administrative requirements for TPA's.) Although we have made some changes in the arrangement of required language in secondary financing documents, this memorandum adopts the format used in our December 6, 1982 memorandum and contains three Sections: (I) Transfer of Physical Assets Review; (II) Secondary Financing; and (III) Other Transfer Related Issues.

I. REVIEW OF TRANSFER OF PHYSICAL ASSETS

A. Definition. A transfer of physical assets is a change in the ownership of a project upon which there is a mortgage loan insured or held by HUD. Although a conveyance of title from the mortgagor-seller to the buyer is a transfer of physical assets, the Department also treats the sale of a project by means of a land contract as a transfer of physical assets even though legal title remains in the mortgagor-seller. Similarly, where a passive trust holds title to a project, an assignment of 100 percent of the beneficial interest in that trust, resulting in a significant change in the control and management of the

project, is subject to transfer of physical assets review although legal title remains in the trustee. Moreover, the transfer of 50 percent or more of the interests in a partnership to a separate entity constitutes a transfer of physical assets whether or not the assignment causes the dissolution of the partnership. Once a particular proposal is determined to be a transfer of physical assets, applicable requirements set forth in Form HUD-92266, Application for Transfer of Physical Assets hereinafter Application , and Form HUD-92266A, Instructions for Preparation of HUD-92266-Application for Transfer of Physical Assets, hereinafter Instructions , will be utilized in processing the proposal. (We anticipate that the Application and instructions will be revised and supplemented with checklists, worksheets, etc.) Background information regarding transfer procedures is found in Chapter 4, Section 11 of HUD Handbook 4350.1. Insured Project Servicing, and Chapter 3 of HUD Handbook 4360.1 Supp 1, HUD-Held Project Servicing. (The HUD Handbook procedures for TPA's are in the process of being revised to reflect changes in Departmental policy.)

In addition, significant changes in a mortgagor which are less than a full transfer of physical assets may require administrative review by Housing. Housing has developed a "modified review" for the transfer at any one time of an amount in excess of 50 percent and up to 100 percent of the interest of the partnership mortgagor provided such transfer does not constitute a dissolution of the partnership under state law. (Dissolution of the partnership would be subject to a full review.) The issue of whether such 100 percent transfer would cause a dissolution under state law should be resolved by field counsel. Other transfers which require modified review procedures include: Substitution of one or more of the general partners; transfer at any one time of an amount in excess of 50 percent of the corporate stock of the corporate mortgagor and transfer of an amount less than 50 percent of the total corporate stock of the corporate mortgagor where such transfer results in a change in the control of the corporate mortgagor. Field counsel should be aware of the current administrative requirements with respect to "modified review", procedures.

Finally, a transfer of physical assets is possible prior to final endorsement. A transfer of the project during this period would necessitate the execution of both HUD transfer and development forms. In general, all transfer of physical assets requirements established in the Application should be followed. However, a reprocessing of the application for mortgage loan





insurance using revised information set forth by the buyer in FHA Form No. 2013, Application for Project mortgage insurance, may be required in lieu of a transfer. Because

a reprocessing usually results in a change in the mortgage amount, certain development documents (e.g., Building Loan Agreement, Construction Contract) also must be revised to reflect the change. Other development documents executed by the mortgagor may also require an assignment or reexecution if the transfer occurs during the construction period.

The transfer of physical assets procedure is not applicable to first user syndications (i.e. the sale of interest units in an existing limited dividend partnership mortgagor which occurs at or prior to final endorsement.) First user syndications should be reviewed in accordance with the administrative requirements for substitution of partners. Furthermore, some transactions which involve changes in the mortgagor entity are not transfers of physical assets. Field counsel should contact this Division with questions concerning whether certain changes in a mortgagor entity constitutes a transfer of physical assets. (Note, that 24 C.F.R. 5207.1(h) requires payment of a transfer fee in all cases involving substitution of mortgagors.)

B. Review of Field Counsel. All proposals should first be substantively reviewed by field counsel regardless of whether legal review by this Division is required.

This Division will review all transfers which are forwarded to Central Office under outstanding administrative criteria or which present legal issues which this Division should examine. For example, transfers involving conversions to the cooperative form of ownership; long-term leases with options to purchase; and conversions from the cooperative form of ownership to operation as a rental project each require review by this Division.

Generally, multiple transfers and transfers involving land contracts no longer require review by this Division. However, if necessary, field counsel should contact this Division for assistance in reviewing these proposals.

Occasionally, this Division approves standard TPA documents in connection with a particular purchaser. Any substantive changes to these previously approved documents should be discussed via telephone with a Division attorney in order to expedite field office review.





C. Review of Application. The following legal issues frequently arise during the review of the TPA application:

1. Regulatory Agreements. A new Regulatory Agreement should be executed whenever the transfer is "subject to" the existing note and mortgage. In Cases where the purchaser is assuming the existing note and mortgage, the purchaser may also assume the existing Regulatory Agreement. A new Regulatory Agreement must be executed in connection with any transaction which involves a change in the type of a mortgagor entity (i.e. a NP-LD transfer or cooperative or rental

conversion) or in cases where the existing Regulatory Agreement has been superseded by a more recent version. Where the project subsidy is converted to Section 8, a new type of Regulatory Agreement may be required which combines parts of the original Regulatory Agreement with the Section 8 Regulatory Agreement. Please contact this Division for assistance in formulating such a "hybrid" Regulatory Agreement.

Regulatory Agreements executed in connection with a transfer by land contract should be executed by both the seller and the purchaser. Additionally, the Regulatory Agreement should contain "Rider A" to the Regulatory Agreement.

2. Mortgagee Consent. Mortgagee consent to the TPA is required whenever the purchaser is assuming the existing note and mortgage. This consent is evidenced by the mortgagee's execution of the TPA application. In such cases the mortgagee must also execute an Assumption Agreement and a Modification Agreement. A "subject to" transfer does not require mortgagee consent. However, present administrative procedures require evidence of the mortgagee's failure to consent to the transfer. (See TPA application instruction form.) Where a "subject to" transfer involves any of the following, mortgagee consent is required: Secondary financing secured by a lien against the project, land contracts, and long-term leases with options to purchase. (Mortgagee consent is discussed in greater detail in Part II of this memorandum.)

3. Secondary Financing. If the transfer involves financing creating a lien against the project and the mortgagee consents to the creation of this lien, the phrase in clause II of the Application which states





that the buyer will "own said real and personal property free and clear of all liens or encumbrances except the insured mortgagee . . ." should be deleted.

4. Organizational Documents. Field counsel review of the buyer's organizational documents submitted with the Application should be similar to the review of the mortgagor's documents submitted in connection with an FHA initial closing.

In general, the organizational documents should expressly indicate that the duration of the acquiring entity is at least coextensive with the remaining term of the mortgage. Furthermore, the documents must include a provision stating that the terms of the Regulatory Agreement take precedence in the event of any conflict with the terms of the organizational documents. In addition, it should be clear from the documents that the buyer has authority to enter into the transaction.

With respect to the review of a limited partnership agreement, it has come to our attention

that the form language required by the Regulatory Agreement Instructions may have to be modified in jurisdictions adopting the Uniform Limited Partnership Act or Revised Uniform Limited Partnership Act. The Regulatory Agreement instructions currently provide that " a ny incoming partner shall as a condition of receiving an interest in the partnership property agree to be bound by the note, mortgage, and Regulatory Agreement . . . ." The Uniform Acts provide that a partner does not own an interest in the property of the partnership, but in the partnership itself.

FIELD COUNSEL SHOULD REVIEW THE ORGANIZATIONAL DOCUMENTS OF ANY ACQUIRING PARTNERSHIP TO MAKE CERTAIN THAT THEY CONTAIN THE REQUIRED LANGUAGE SET OUT AT SECTION II, SUBSECTION G. infra ("Secondary Financing Secured by Assets of the Acquiring Partnership") AND DO NOT OTHERWISE CONFLICT WITH ANY HUD REQUIREMENTS.

5. Deed. The form of deed shall be reviewed by field counsel for compliance with local law. The form of deed must be a special warranty deed or its equivalent (i.e. a deed which includes a covenant against the acts of the grantor.)



---



II. SECONDARY FINANCING

Secondary Financing is used when the mortgagor-seller does not receive the full purchase price at the time of the transfer and agrees to its payment over a period of time. The method of securing payment of the deferred purchase price may create a lien against the project. HUD reviews all financing in connection with the transfer although HUD requirements differ between secondary financing which creates a lien against the project and that which does not. The following legal requirements controlling the use of secondary financing must be satisfied before approval of the use of secondary financing may be permitted for subsidized and unsubsidized projects:

A. Deferred Cash Payments Many transfers which involve syndication of the project provide for mandatory deferred cash payments to the mortgagor-seller of the project to be made within the first five years of the transfer. This arrangement is legally acceptable provided that the sales agreement or other documents expressly states that these payments are to be derived from the capital contributions of the syndicating limited partnership and not from project income.

B. Mortgagee Consent -- Secured Secondary Financing. The holder of the first mortgage must consent in writing to all financing secured by the project (i.e., where a lien is created against the project by the secondary financing.)

C. Mortgagee Consent -- Unsecured Secondary Financing. If the secondary financing is not secured by the project, the purchaser should try to obtain consent to the financing from the holder of the first mortgage. Failure to obtain mortgagee consent when the secondary financing is not secured by the project, however, does not mean that HUD

will not consent to the transfer. If the mortgagee does not respond to the request for consent, the purchaser or purchaser's attorney must certify that an attempt was made to obtain mortgagee consent. The purchaser is not required to produce a letter from the mortgagee.

D. Subordination of Secondary Financing. The second mortgage or security agreement must be subordinate to the HUD-held or HUD-insured mortgage. The following language, as appropriate, must be included:

Security Agreement: Secured Party, for itself and its successors and assigns, covenants and agrees that all of its rights and powers under this security agreement are subordinate and subject to the rights





of (identify mortgagee) under that certain mortgage (deed of trust) dated __________ and recorded (date, office of recordation) and under that certain Security Agreement dated ______________, and the rights of the Secretary of Housing and Urban Development under that certain Regulatory Agreement dated ________________ and incorporated by reference in the above described mortgage.

Second or Wrap-Around Mortgages: Mortgagee, for itself and its successors and assigns, covenants and agrees that all of its rights and powers under this mortgage are subordinate and subject to the rights of (identify first mortgagee) under that certain mortgage (deed of trust) dated _____________ and recorded (date, office of recordation) and under that certain Security Agreement dated ___________, and the rights of the Secretary of Housing and Urban Development under that certain Regulatory Agreement dated _________________ and incorporated by reference in the above described mortgage.

E. Prohibition Against Attaching or Assigning Rents and Other Income. Assignment of rents or other income of the project subject to a HUD-insured or HUD-held mortgage to any party other than the HUD mortgagee is prohibited by the terms of the first mortgage unless there is written mortgagee consent to the assignment. Furthermore, the attachment of rents or other project income in the event of foreclosure of a second or wrap-around mortgage also is prohibited. The following language must be included in the second or wrap-around mortgage;

Mortgagee, for itself and its successors and assigns, further covenants and agrees that in the event of the appointment of a receiver or of the appointment of the mortgagee as mortgagee-in-possession, in any action by the mortgagee, its successors or assigns, to foreclose the mortgage, nc

rents, revenue or other income of the project collected by the receiver or by the mortgagee-in-possession shall be utilized for the payment of interest, principal or any other charges due and payable under this mortgage, except from surplus cash available for distribution, if any, as the term is defined in the Regulatory





Agreement; and further, the receiver or mortgagee-in-possession shall operate the project in accordance with all the provisions of the first mortgage and the Regulatory Agreement.

F. Payment Only from Surplus Cash. Notes evidencing secondary (deferred) financing must provide that any payments from project income can only be made from surplus cash (if the project has a profit-motivated mortgagor) and permissible distributions from surplus cash - - e.g., 6, 8 or 10% (if the project has a limited distribution mortgagor.) The following language must be in the Note or Wrap-Around Note:

1. Note Secured by a Lien Against the Project: As long as the Secretary of Housing and Urban Development, or his success or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments due from project income under this Note shall be payable only from permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash of the said project, as that term is defined in the Regulatory Agreement dated ____________________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note.

2. Note Not Secured by a Lien Against the Project: As long as the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments due from project income under this Note shall be payable only from permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash of the said project, as that term is defined in the Regulatory Agreement dated ________________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). The restriction on payment imposed by this

paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note. Holder has no claim, and will not later assert any claim for payment against the mortgaged property, the mortgage proceeds, any reserve or deposit made with the mortgagee or another required by the Secretary in connection with the mortgage transaction, or against the rents or other income from the mortgaged property.

3. Wrap-Around Note Secured by a Lien Against The Project: As long as the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No), any payments under this Wrap-Around Note will be made in the following manner. First, the maker of this Note (insert name of buyer) will segregate all project income as required under the Regulatory Agreement dated _______________ between the Secretary of Housing and Urban Development and (insert name of mortgagor-seller). Second, the maker of this Note will deliver to the holder of this Note all sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Holder, in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash as that term is defined in the aforesaid Regulatory Agreement, the maker will deliver to the holder of this Note permissible distributions from (omit "Permissible distributions from" if a profit-motivated mortgagor) surplus cash to the extent available to satisfy any current or deferred amounts to be paid under this Note. The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note.

4. Wrap-Around Note Not Secured by a Lien Against the Project. As long as the





Secretary of Housing and Urban Development,

or his successor or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), any payments under this Wrap-Around Note will be made in the following manner. First, the maker of this Note (insert name of buyer) will segregate all project income as required under the Regulatory Agreement dated ________________ between the secretary of Housing and Urban Development and (insert name of mortgagor-seller). Second, the maker of this Note will deliver to the holder of this Note all sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Holder, in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash as that term is defined in the aforesaid Regulatory Agreement, the maker will deliver to the holder of this Note permissible distributions from (omit "permissible distributions from" if a profit-motivated mortgagor) surplus cash, to the extent available to satisfy any current or deferred amounts to be paid under this Note. The restriction on payment imposed by this paragraph shall not excuse any default caused by the failure of the maker to pay the indebtedness evidenced by this Note. Holder has no claim for payment and will not later assert any claim against the mortgaged property, the mortgage proceeds, any reserve or deposits made with the mortgagee or another requited by the Secretary in connection with mortgage transactions, or against the rents or other income from the mortgaged property.

G. Secondary Financing Secured by Assets of the Acquiring Partnership. Proposals involving secondary financing secured by pledges of the assets of the acquiring partnership should include the following language in the partnership's organizational documents:

1. If the partnership will assume the HUD note and mortgage:





The partnership is bound, to the same extent as the original executing party, by the mortgage note, mortgage, Regulatory Agreement and other documents that have been executed in connection with the HUD insured mortgage loan affecting the partnership property. Upon any dissolution, no title or right to possession and

control of the partnership property financed under such HUD-insured mortgage loan, and no right to collect the rents therefrom, shall pass to any person who is not so bound in a manner satisfactory to the Secretary of Housing and Urban Development.

2. If the partnership will not assume the HUD note and Mortgage:

The Partnership, and any incoming General Partners or Limited Partners, shall, as a condition of receiving an interest in the Partnership or its property, agree to be bound to the same extent as the original executing party (except as to obligations for payments) by the terms of the HUD mortgage and Regulatory Agreement and any other documents that have been executed in connection with the HUD-insured mortgage loan on the project. Upon any dissolution, no title or right to possession and control of the partnership property financed under such HUD-insured mortgage loan, and no right to collect the rents therefrom, shall pass to any person who is not bound in a manner satisfactory to the Secretary of Housing and Urban Development.

3. The organizational documents of the partnership should provide for HUD approval of an amendment thereto:

As long as the Secretary of Housing and Urban Development, or his successors or assigns, is the insurer or holder of the mortgage on (insert project name and FHA Project No.), no amendment to this (name of the document) which





results in any of the following shall be of force or effect without the prior written consent of HUD: (1) any amendment which modifies the duration of the (partnership agreement) (corporate charter); (2) any amendment which results in the requirement that a HUD prior participation certification be obtained for any additional party; and (3) any amendment which in any way impacts or affects the HUD mortgage or Regulatory Agreement.

H. Acquisition by Deed-in-Lieu of Foreclosure. In the event the Secretary acquires title by deed-in-lieu of foreclosure, the second lien created by a second or wrap-around mortgage will terminate. The following language must be included in the second or wrap-around mortgage:

"In the event the Secretary acquires title to the project by a deed-in-lieu of foreclosure, the lien of the second wrap-around mortgage will automatically terminate subject to the conditions hereinafter described. The holder of the second wrap-around mortgage may cure a default under the first mortgage prior to a conveyance by deed-in-lieu of foreclosure. The Secretary shall give written notice to the holder of the second wrap-around mortgage of a proposed tender of title in the event (1) the Secretary decides to accept a deed-in-lieu of foreclosure or (2) the Secretary receives notice from the holder of the HUD-insured mortgage of its election to accept a deed-in-lieu of foreclosure. The Secretary will give such written notice if, at the time of the placing of the subordinate lien against the project, the Secretary receives a copy of an endorsement to the title policy of the mortgagor or holder of the HUD mortgage which indicates that (1) the second wrap-around mortgage has been recorded; and (2) the Secretary is required to give notice of any proposed election to or tender of a deed-in-lieu of foreclosure. Such notice shall be given at the address stated herein or such other address as may subsequently, upon written notice to the Secretary, be designated by the holder of the second





wrap-around mortgage as its legal business address. The second mortgage holder shall have thirty (30) days to cure the default after the notice of intent to accept a deed-in-lieu of foreclosure is mailed."

I. Secondary Financing with Balloon Payments Provisions In all TPA's, field counsel may approve unsecured notes evidencing secondary financing which contain balloon payment provisions. This policy is limited by the following: (1) The balloon second note shall not result in the creation of an earlier maturity date for the HUD note and mortgage. (Under the National Housing Act, an insured multifamily mortgage must provide for full amortization. See e.g., 12 U.S.C. 1713(c)(3). Thus, a balloon mortgage which wrapped an existing HUD-insured mortgage and which became due prior to prepayment or maturity of the HUD mortgage or the termination of mortgage insurance would not be permissible because it would have the effect of decreasing the term of the HUD mortgage. Under Section 446 of of the Housing and Urban-Rural Recovery Act of 1983 (HURRA), however, the National Housing Act was amended to authorize the Secretary to insure mortgages that do not provide for full amortization. Regulations implementing this statutory

provision presently are being drafted by the Office of Regulations for publication in 24 C.F.R. Parts 207, 220 and 231. Until the "Insurance of Partially Amortizing Mortgages and Mortgages with Call Provisions" regulations become effective, however, the Department will continue to implement its present policy.) (2) The balloon payment second note shall not create an equitable lien against the project which could result in the mortgagee's assignment of the mortgage. Field Counsel shall review the default remedies of the note to determine if such equitable lien is created under state law and shall advise the purchaser to obtain the mortgagee's consent if necessary. THIS IS OF UTMOST IMPORTANCE. If field counsel cannot ascertain that a lien is not created, this office should be contacted immediately. (3) The standard language that the Department utilizes in protecting its interest when approving secondary financing in connection with a transfer of physical assets must be used. (See Section II. F. supra).

J. Conflict with Mortgage and Regulatory Agreement. The proposed documents must not conflict with the HUD-held or HUD insured first mortgage or the Regulatory Agreement.

K. Requirements for Sales Involving Land Contracts. Proposals involving a Land Contract (i.e., Installment Sale Contract or Contract for Deed) must comply with the following requirements:





1. The insured mortgagee must consent in writing.

2. The purchaser must sign a new Regulatory Agreement.

3. The seller must remain on the existing Regulatory Agreement and agree to be bound by the new Regulatory Agreement to the extent it differs from the existing Regulatory Agreement.

4. The Land Contract must be subordinate to the mortgage. The following language must be included in the Land Contract:

   > Buyer and Mortgagor-Seller agree that the land contract is subordinate to the HUD-held or HUD-insured mortgage.

5. The seller must agree not to attach project income for failure of the purchaser to make payments under the contract. The following language must be included in the Land Contract:

   > Mortgagor-Seller agrees not to file a lien against the project income for the failure of Buyer to make the required payments under the land contract.

6. The mortgagor-seller must remain bound to its obligations under the mortgage, mortgage note, and Regulatory Agreement until such time as there is a

release executed, as well as an assumption of these obligations by the purchaser, with the necessary acquiescence of all principals. The following language must be included in the Land Contract:

> Buyer and Mortgagor-Seller agree that in the event of a monetary default by Mortgagor-Seller under the HUD-held or HUD-insured mortgage, Buyer may cure such default and elect to take title to the project. In the event of such an election by Buyer , Mortgagor-Seller will execute a release and deed to the project and Buyer will concurrently execute an assumption of the HUD mortgage, note, and the Regulatory Agreement.



---



7. The Land Contract must clearly reflect that the mortgagor's obligation to continue making payments on the underlying mortgage is not contingent on the receipt of the installment payments from the purchaser under the Land Contract. The following language must be included in the Land Contract:

   > The obligation of Mortgagor-Seller to continue to make payments and comply with all covenants under the HUD-held or HUD-insured mortgage is not contingent on the receipt of the installment payments from Buyer under this land contract.

8. The Land Contract along with the new Regulatory Agreement must be recorded. (Any alternative arrangement must be approved by HUD.)

9. The Land Contract must contain a provision that forbids the purchaser's assigning, mortgaging, or in any other way encumbering its interest without the prior written approval of the Secretary. The following language must be included in the Land Contract:

   > Buyer must not assign, mortgage, or in any way encumber its interest without the prior written approval of the Secretary of Housing and Urban Development.

10. There must be a provision in the Land Contract that obligates the purchaser to operate and maintain the transferred property in accordance with the Department's regulations and procedures while the property remains subject to a HUD-held or HUD-insured mortgage. The following language must be included in the Land Contract:

    > Buyer and Mortgagor-Seller agree that the project will be operated strictly in accordance with the

Regulatory Agreement, the HUD-held or HUD-insured mortgage, the National Housing Act, and the regulations promulgated thereunder while HUD is the insurer or holder of the mortgage. In the event of any conflict between the land contract and the HUD-insured mortgage documents and HUD regulations, such HUD documents and regulations





shall control as long as HUD holds the mortgage or as long as the HUD contract of mortgage insurance remains in effect.

11. There must be a provision in the contract whereby the parties agree to inform the Secretary in advance of any action they propose to take against the property; of any adverse action taken by any party of which they have knowledge; or of any other event that affects the property or that may affect the Secretary's interest therein. The following language must be included in the Land Contract:

    Buyer and Mortgagor-Seller agree to inform the Secretary in advance of any action they propose to take against the property, or of any adverse action of which they have knowledge taken by any party, or of a default, or of any other event that affects the property or that may affect the Secretary's interest therein.

12. The following payment provision must be included in the Land Contract:

    While the Secretary of Housing and Urban Development, or his successor or assigns, is the insurer or holder of the first mortgage on (insert project name and FHA Project No.) payments under this land contract will be made in the following manner. First, Buyer will segregate all project income as required under the Regulatory Agreement dated____________________ between the Secretary of Housing and Urban Development and Mortgagor-Seller . Second, Buyer will deliver to Mortgagor-Seller all the sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of Housing and Urban Development and all amounts required to be deposited in the Reserve Fund for Replacements. Mortgagor-Seller , in turn, will apply these funds as required under the aforesaid first mortgage and Regulatory Agreement. Third, in the event of surplus cash, as that term is defined

in the aforesaid Regulatory Agreement, Buyer will deliver to the Mortgagor-Seller permissible distributions (omit "permissible distributions from" with profit-motivated mortgagor) from surplus cash to the extent available to satisfy any current or deferred amounts to be paid under this land contract.

III. OTHER LEGAL ISSUES RELATING TO TRANSFER OF PHYSICAL ASSETS

The following issues frequently arise in connection with an application for approval of a transfer of physical assets:

A. Conversion from Non-Profits to Profit-Motivated Ownership. Many proposed transfers involve the transfer of ownership from non-profit owners to such profit-motivated owners as limited dividend mortgagors. A common arrangement, which is acceptable to the Department, involves the non-profit mortgagor retaining an ownership interest in the project as a managing general partner in the partnership purchasing the project.

The review of non-profit to profit-motivated transfers will involve the application of 24 C.F.R. Part 265 if the project is assisted under Sections 236 or 221(d) (3) of the National Housing Act, Section 101 of the Housing and Urban Development Act of 1965, or Section 8 of the United States Housing Act of 1937. See 24 C.F.R. 265.2 (1982). If 24 C.F.R. Part 265 is applicable, it is our understanding that Housing will consider waiving the current 24 C.F.R. 265.13 prohibition against remuneration to the non-profit seller. For example, Housing has allowed remuneration in the form of secondary financing to the non-profit owner provided that a trust agreement in a form acceptable to the Department is used. Inasmuch as a waiver of the Part 265 regulations requires an administrative determination of acceptability from Central Office, field counsel should advise that any recommendation with respect to a requested regulatory waiver should be thoroughly documented in writing.

B. Cooperative Conversion. Present HUD administrative procedure requires Central Office approval of all projects converting to ownership by a cooperative corporation. Such TPA's are approved on a project-by-project basis. HUD does not consider a TPA to a cooperative mortgagor as a "change of use," as that term is used in the HUD form mortgage or deed of trust. Therefore, mortgagee approval for cooperative conversions is not a prerequisite to TPA approval by HUD. However, this issue is currently being litigated. (Note, however, that on October 26, 1984 the





United States District Court in Massachusetts granted

summary judgment in favor of HUD in Boston Five Cents Savings Bank v. Samuel J. Pierce, Jr. et al. and agreed with HUD's defense on several issues including that a change in the form of ownership of a project is not a "change in use." We do not now know whether or not an appeal will be taken. In the event that the Department's policy regarding cooperative conversions is changed, we will notify field counsel immediately.) In view of this litigation, in cases where mortgagee consent to the TPA is not obtained, HUD requires a letter of credit under an indemnification agreement in a form acceptable to HUD to protect HUD from any loss because of its approval of this conversion. A copy of the current approved form of indemnification agreement is available from this Division. This Division's review of cooperative conversion TPA's is limited to review of the indemnification agreement and to review of any unusual legal issues which are raised in field counsel review.

Central Office administrative policy also requires review of cooperative projects which are converting to rentals. Such TPA applications should be forwarded to Central Office for approval. The TPA package must include a substantive legal review by field counsel.

Some field offices are approving rental conversions where the project will continue to operate as a cooperative and the tenants will be required to execute occupancy agreements and become Members of the cooperative. Such "rental/cooperative" conversions require written administrative approval from the Office of Multifamily Housing Management. Field counsel review of such "hybrid" conversions should also include an opinion concerning whether such an arrangement is permissible under state law. Additionally, field counsel should analyze the flow of project funds under such a hybrid conversion.

C. Assignment or Transfer of Subsidy Contracts. Certain legal problems are presented by assignments of rent supplement or rental assistance payments (RAP) contracts to purchasers that do not assume the HUD mortgage and take the property under a deed conveyance. The "project owner" of a project with a RAP subsidy and a "housing owner" of a project with rent supplement subsidy are the mortgagors of the project for purposes of eligibility for such subsidies. Therefore, "subject to" TPA's and TPA's involving land contracts can not include an assignment of the rent supplement contract or RAP contract because the new owners are not mortgagors and consequently, are not eligible to execute or assume rent supplement or RAP





contracts. Field counsel should contact this Division in order to resolve legal issues raised by the assignment of such subsidy contracts.

In "subject to" TPA's or TPA's involving land contracts, it is legally permissible for the mortgagor-seller of a rent supplement or RAP project to designate a financial institution as trustee and the mortgagor's agent for receipt of such subsidy payments. The trustee would

Any questions concerning the form of the trustee agreement should be referred to this Division.



Unlike the rent supplement and RAP contracts, a Section 8 housing assistance payments contract may be legally transferred from the original owner to a buyer even though the buyer has taken the project subject to, rather than assuming, the HUD mortgage. However, if the housing assistance payments contract was assigned to the mortgagee to secure the financing, the consent of the mortgagee to the transfer must be obtained.

Field Counsel also should review the transfer to assure that all rights and obligations under the housing assistance payments contract have been effectively transferred to the buyer and that all requirements of state and local law have been met. (Questions arising in connection with the transfer of the housing assistance payments contract to a buyer should be addressed to the Assistant General Counsel for Assisted Housing.)

Transfers involving conversions of RAP or Rent Supplement subsidies to Section 8 should follow the instructions in Section I.C.1. of this memorandum concerning the need for a new "hybrid" Regulatory Agreement to be executed by the Purchaser.

D. Waiver of Sole Asset Mortgagor Requirement. Frequently, a prospective buyer of a project requests a waiver of the sole asset mortgagor requirement found in Section 6(f) of FHA Form 2466, Regulatory Agreement. Such waiver request should be forwarded to Central Office for administrative review and approval.

E. Transfer in Escrow. The Department has changed its policy and will now permit escrow closings on projects prior to full or modified review by HUD of an application for a TPA. (Note, however, that escrow closings will not be permitted for transfers from nonprofit to limited distribution owners.) The following legal requirements apply to transfers in escrow:





1. The deed may not be recorded.

2. For projects subject to a HUD-insured mortgage:

   (a) The purchaser or the seller must provide HUD with a title policy :

      (i) which declares that no lien has been created by the transfer in escrow, and

      (ii) which insures HUD directly against any loss HUD might suffer by paying mortgage insurance proceeds due to the creation of any unauthorized lien resulting from the escrow closing.

   (b) The purchaser or the seller must provide HUD with

an opinion of counsel which states that the transfer in escrow does not create a lien inferior or superior to the lien of the HUD) mortgage.

3. The escrow agreement must provide that the escrow can be broken only with written approval by HUD (after review and preliminary approval by HUD of the TPA.)

4. The escrow agreement must provide that HUD may instruct the escrow agent in writing to cancel the escrowed deed of conveyance from seller to buyer and to take all other actions necessary to "unwind" the transaction in the event the TPA does not comply with all of HUD's requirements.

5. All funds held in escrow for payment of mortgage delinquencies, repairs, or prepayment of Flexible Subsidy, must be either in cash or in a letter of credit naming HUD as payee. (Note, that Use Agreements executed in connection with Flexible Subsidy loans or grants must remain in effect until the date on which the HUD mortgage would mature.)

6. The escrow agent is prohibited from having any interest in the transfer other than as escrow agent.

7. The Sale Agreement for a transfer in escrow must contain the following language:

> Transfer of ownership of the property which is the subject of this Agreement is subject to an escrow agreement requiring preliminary approval by HUD of the sale prior to the release of any





> documents or any other action by the escrow agent. In the event that preliminary approval is not obtained from HUD, buyer and seller agree that the escrow agent shall cancel the deed and buyer agrees to reconvey to seller all of buyer's other interest in and to the property immediately upon notification of disapproval by HUD of the transfer of the project. In the event that preliminary approval is not obtained from HUD, buyer and seller hereby waive any other action or defenses they may have against the cancellation of the deed, termination of the escrow, and the "unwinding" of the sale.

F. Multiple Transfers. Parties frequently structure their proposals as multiple project transfers. A series of simultaneous project transfers is legally acceptable provided the parties have submitted all relevant documents with respect to each transfer. A separate review of each transfer must be performed to determine the acceptability of the entire proposal. Unless there is a specific amendment to 24 C.F.R. 207.1(h) to provide for separate

fees for each transfer, only one transfer fee need be paid for an application involving a multiple transfer. In some situations, however, more than one transfer fee may be in order. For example, we have recently analyzed several proposals involving corporate mergers and acquisitions (between parents and subsidiaries) prior to the transfer to the purchaser. Because two transfers of title by deed are involved, two fees are required. However, the two transactions can be combined in one application with minimal review required of the first (2530 clearance, for example) in order to expedite the HUD review process. This same rationale is also applicable to any other interim "status" transfers by deed. To expedite the review of particularly complex multiple transfers, field counsel should contact this Division with questions. In particular, questions often arise with respect to the amount of time between transfers.

G. Unauthorized Transfers. In the past, several projects have been transferred without HUD approval. An unauthorized transfer of physical assets violates Section 6(a) of the Regulatory Agreement, which provides that " o wners shall not without the prior written approval of the Commissioner ... c onvey, transfer or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.. ." This broad prohibition includes the transfer of the beneficial or





equitable interest in the project to the buyer prior to HUD approval except in a transfer in escrow. If field counsel learn of any unauthorized transfer of physical assets, the Office of Multifamily Housing Management should be advised. This office will then make a determination whether to approve such transfer. Furthermore, field offices must follow the procedures for dealing with unauthorized TPA's set forth in the May 4, 1983 joint memorandum "Enforcement Remedies for Unauthorized Transfers of Physical Assets" by the Associate General Counsel for Program Enforcement, John P. Kennedy, and by then-Deputy Assistant Secretary for Multifamily Housing Programs, Maurice L. Barksdale. All unauthorized TPA's which are submitted to Central Office must include the results of a substantive review by field counsel, as well as the results of field counsel review for compliance with the joint memorandum on unauthorized TPA's.

For all TPA's other than transfers in escrow and to preclude the mortgagor-seller from transferring beneficial interest in future cases, the Department will require the following language to be included in the sales agreement establishing the terms and conditions of the proposed transfer:

> "This (describe document) is expressly conditioned upon preliminary approval by HUD of the transaction as set forth in Form HUD 92266, Application for Transfer of Physical Assets, and supporting documents submitted to HUD. No transfer of any interest in

the project under this sale agreement shall be effective prior to such HUD approval. Buyer will not take possession of the project nor assume benefits of project ownership prior to such approval by HUD. The Buyer, his heirs, executors, administrators or assigns, shall have no right upon any breach by Seller hereunder to seek damages, directly or indirectly, from the FHA Project which is the subject of this transaction, including from any assets, rents, issues or profits thereof, and Buyer shall have no right to effect a lien upon this project or the assets, rents, issues, or profits thereof."

If the transfer is by means of a land contract, the following sentence should be added to the above





language: "Buyer will not take possession or control of the project prior to approval by HUD."

H. Workout Agreements. In general, the terms and conditions of a workout agreement with the new buyer must be established prior to submission of the transfer package. All transfer documents must be consistent with the workout agreement executed by HUD.

I. Prepayment Restrictions on Multifamily Rental Housing. In the event that a transfer involves the prepayment of the underlying HUD-insured or HUD-held mortgage subsequent to the time of the transfer, field counsel should contact this Division immediately for advice.

If you have any questions regarding this memorandum, please contact Gains Hopkins, Chief Attorney, Financing, Origination and Development Unit, at FTS 755-7090, Roberta Beary, at FTS 755-6975, Michael Bylsma or Millicent Potts of his staff at FTS 755-7067.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN and SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,

vs. Case No. 01-669C
Judge Allegra

THE UNITED STATES,
Defendants.

---

The Deposition of GARY HOPKINS,
Taken at 211 Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 9:13 a.m.,
Wednesday, February 2, 2005,
Before Angela D. Eitzman, RPR.

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiff.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the United States.

THOMAS G. MASSOURAS
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of HUD.

ALSO PRESENT:
Benjamin Alli

Detroit, Michigan
Wednesday, February 2, 2005
9:13 a.m.

GARY HOPKINS

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Gary Hopkins taken pursuant to notice and subpoena and to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:

Q. Mr. Hopkins, you and I have talked before but never met, my name is Eric Stempien and I represent Benjamin Alli and his wife and a corporation in a lawsuit brought against the United States Government. I'll be asking you a series of questions today.

Have you ever given a deposition before?

A. Yes.

Q. Just to refresh your recollection about how to -- how this goes, when you give an answer please be sure to verbalize it, particularly yes or no because uh-huh

and huh-uh are real hard to read on a written transcript, also if you don't understand anything I ask you, let me know I'll be happy to rephrase it or repeat it until you and I are on the same page, okay?
A. Yes.
Q. Could I get your address?
A. 17700 Northland Park Court, Southfield, 48076.
Q. What do you do for a living?
A. Various aspects of real estate, brokerage, investment, that type of stuff.
Q. Do you have a real estate brokers license?
A. Yes.
Q. You're licensed through the State of Michigan?
A. Yes.
Q. When did you first receive your real estate brokers license?
A. It's been a while, going from memory probably around '87, roughly, '87, '88, I don't know exactly.
Q. Are you active in the real estate brokerage industry right now?
A. Yes.
Q. In what aspects, commercial, residential, both?
A. Combination, primarily residential.
Q. Are you employed with any agency?
A. No.

Q. You're self-employed?
A. Yes.
Q. Is there a name of a company?
A. The company is His Instead, H-I-S, Instead, I-N-S-T-E-A-D.
Q. That's two words, right?
A. Two words.
Q. His Instead?
A. His Instead.
Q. How long have you been actively working in the real estate brokerage industry?
A. Since around that time, about '86 or so.
Q. Do you know Dr. Benjamin Alli?
A. Yes.
Q. Do you know how you first met him?
A. I'm sure it was real estate, some real estate interaction, probably around the time that I was with another brokerage company.
Q. What brokerage company was that?
A. Marcus and Mellenchamp.
Q. Where are their offices located or where were they at the time?
A. Southfield, Michigan.
Q. Did you -- was your relationship with Dr. Alli professional or personal?

A. Professional.
Q. Do you know how he came to know about your services?
A. With Marcus and Mellenchamp we actively solicited apartment owners in the metropolitan area. I was an apartment specialist for them so we actively solicited to various apartment owners in the metro area, and I concentrated primarily in Detroit and he was one of the owners we solicited.
Q. Was this government subsidized housing or some nonsubsidized and some subsidized?
A. Both.
Q. When you first spoke to Dr. Alli what was the -- what was it he was looking for, do you know, do you remember?
A. I don't recall if he was looking for anything, we were looking to list property to sell, and I guess he was convinced that we'd be able to market for him.
Q. Do you know what year that was?
A. That's going back aways because I haven't been with them quite some time, probably late '90s I'm guessing roughly.
Q. Did Dr. Alli express some interest in having your agency list any of his properties?
A. Yes.
Q. Did you eventually enter into a listing agreement with