him?
A. Yes.
Q. And which property was that for?
A. We listed the Collingwood, I'm trying to think of the name of that property, it was like a 52-unit or 54-unit building.
Q. Collingwood/Kirkwood?
A. I believe that's right, that's the name we used.
Q. And one of the buildings was located on Collingwood Street?
A. One was on Collingwood.
Q. And one was located on Calvert?
A. Calvert, yes.
Q. Were they marketed as one property?
A. They were marketed as a package.
Q. And you were the agent for that listing?
A. Yes.
Q. Were there any other agents for that listing?
A. No, I was the agent for that listing.
Q. Do you remember what the asking price was?
A. 6 -- 675 I believe, this is going back aways for me but I believe it was 675 or so, it was above 600 for sure.
Q. Did you receive any offers on that property?
A. Yes.

Q. Let me back up, what did you do with regard to marketing the property?
A. In addition to marketing or soliciting owners we also solicited potential buyers, and once we get a listing, we would of course market that listing to those buyers, and we would also advertise the listing.
Q. Having been an apartment specialist and dealt with some subsidized housing you were familiar with Section VIII contracts and HUD health -- mortgages, I presume?
A. Familiar with the contracts, yes.
Q. Was it your understanding in this particular project that -- that the sale of this building would have required some approval or approvals from HUD?
A. Yes.
Q. Would that have been communicated to any potential buyer, I presume?
A. Yes.
Q. Were you familiar at all with the process by which HUD -- well, strike that.
Were you familiar at all with the approval process with HUD --
A. No, I don't know the details of their approval.
Q. -- or what forms had to be filed or what needed to be done in order to get the approval?
A. I knew of one, I didn't know about all of the forms.

Q. Would that be -- as the listing agent would that have been something you would have done in attempting to get the approvals from HUD or would that have been somebody on behalf of the buyer?
A. I believe that would be on behalf of the buyer or the lender would do that.
Q. How is this property advertised, or was it advertised?
A. You mean --
Q. Were there -- are there -- was it put out on, you know, those free real estate booklets that are found in restaurants or --
A. No, we actually sent out information to buyers and we advertised in the local papers, that's the standard multi-family advertising listing.
Q. And you sent out flyers to people who you knew were interested in buying multi-family housing?
A. Right, people who profile for that type of property.
Q. Was it advertised as subsidized housing?
A. Yes.
Q. You indicated earlier that you did receive an offer on this property, correct?
A. Yes.
Q. Was there only one offer, was there more than one?
A. There may have been others but we basically settled on one offer.

Q. Do you remember who the buyer was?
A. Fanning.
Q. F-A-N-N-I-N-G, does that sound right?
A. That sounds right.
Q. Corey Fanning?
A. Corey Fanning, yes.
Q. Do you remember what the purchase price was for that offer?
A. I know it was a full-price offer.
Q. Was that offer accepted by the seller?
A. Yes.
Q. There was a written purchase offer signed by both buyer and seller?
A. Yes.
Q. Was there earnest money deposit received from the buyer?
A. Yes, I'm sure there was, we wouldn't have taken the offer without earnest money so probably so, yes.
Q. Do you remember who the lender was or the potential lender was on the property -- well, strike that.
Who the potential lender was for Corey Fanning?
A. I believe it was GMAC.
Q. With regard to this purchase did you take any steps to receive HUD approvals for the sale and purchase of the

property?
A. Did I personally?
Q. Right.
A. I did not personally.
Q. Do you know if anyone did?
A. I believe GMAC did or Corey did.
Q. Do you know what steps they took?
A. I don't know HUD's procedure on that but I would assume they contacted -- they would have had to contact HUD to alert them to the effect that the property was being considered for sale and whatever approvals they would need from HUD to proceed, they would solicit that from HUD.
Q. Did you -- were you in contact with GMAC?
A. Yes.
Q. Did this property ever close?
A. No, it did not -- well, it never closed with me, I was not involved in the closing.
Q. As far as you know it was never closed on that purchase offer?
A. It was never closed on this purchase offer.
Q. At some point the purchase offer either expired by its own terms or the parties withdrew from it?
A. Right, correct.
Q. Do you know what the time frame was between when the

purchase offer was first signed to when it was either expired on its own terms or the parties withdrew?
A. This is going back aways, probably 60, 90 days, somewhere in that range. I don't remember exactly what time frame but somewhere in that range.
Q. During those, and I know it's approximately, but during those approximately 60 to 90 days were you talking to representatives from GMAC about the attempts to get HUD approval?
A. Yes.
Q. Do you remember what they told you about that?
A. The only thing I remember is things seemed -- things were -- seemed to have been along fairly satisfactorily, fairly smooth, and then there was abruptness to them and it kind of fickled, it just kind of went away.
Q. So that purchase offer, there was never a closing on that purchase offer?
A. Never closed.
Q. Do you know why?
A. I don't, I'm trying to remember exactly what stifled, and it seems as though there was some dialogue between GMAC, Corey and HUD, there was like uncooperation on somebody's part, and I think either HUD did not want to proceed with the deal -- it was a significant

Q. Did you speak with him on the phone?
A. On the phone, yes.
Q. Did you talk about anything else?
A. Just that I would be deposed.
Q. Did he tell you any specifics about the case?
A. No, he did not.
Q. Do you know whether Dr. Alli followed the appropriate procedures in order to request approval of the sale of Collingwood from HUD?
A. I do not know because I wasn't directly involved in seeking that approval, that was between borrower and the seller.
Q. Do you know whether Dr. Alli submitted the appropriate paperwork to HUD requesting the approval of the sale of Collingwood?
A. I do not know.
Q. Are you being paid to be here today?
A. No.
Q. You mentioned to Mr. Stempien that you visited the Collingwood apartments when you put them on the market, do you remember that?
A. Yes.
Q. Do you remember about when you visited those apartments?
A. That's going back aways, it would have been -- it

Q. Are you still doing any business with Dr. Alli today?
A. No.
Q. Have you ever received any payments from Dr. Alli?
A. On this, no.
Q. On anything?
A. No.
Q. Why did you leave Marcus and Mellenchamp?
A. Voluntarily, it was just time consuming and I wanted to move my interest in another direction.
Q. You mentioned that when you approached Dr. Alli about selling some of his buildings he was interested in selling his Collingwood building, did he express interest in selling any of his other buildings to you?
A. Yeah, in fact, we -- you asked -- let me clarify, we did have another one of his buildings that we -- that I assisted him with another transaction on, a different building.
Q. When was that?
A. Probably around the same time frame.
Q. Which building was it?
A. A building I think he had, Riverside, I believe they call it Riverside.
Q. Did you ever put Riverside on the market?
A. Yes.
Q. And what happened?

A. That building was ultimately sold.
Q. The building was sold?
A. Was sold, yes.
Q. Do you remember when it was sold?
A. I think that was sold late '90s also, late '90ss, '99, 2000, somewhere in that area, somewhere in that time frame.
Q. Was it sold before Collingwood was listed, do you remember?
A. I believe it was sold after Collingwood was listed, I mean, it was sold before but probably closed after Collingwood was listed, I believe.
Q. Do you remember who that building sold to?
A. I don't remember the -- who took title on the building, I don't remember his name now, Feans Construction (phonetic), Castle Construction.
Q. Do you remember how much that building listed for?
A. That's going back aways, somewhere around a million, somewhere around a million.
Q. What was your fee on that sale?
A. 25 or 30,000, somewhere in that range, I don't know exactly but I believe ballpark it was --
Q. I'm sorry, is 1 million what was the listing price or what was the selling price?
A. I don't remember exactly what the selling price --

A. I do not know.
Q. You mentioned earlier that you believe it is the responsibility of the buyer or the lender to seek HUD's approval of the sale of the Collingwood apartments, do you remember that?
A. Yes.
Q. Why do you think that?
A. Why do I think it's the buyer -- I mean, it's the owner and the buyer.
Q. Correct, why do you think that it is the responsibility of the buyer or the lender to attain HUD's approval of the sale?
A. Oh, because I -- I believe it's my understanding that if the building is going to continue in its present subsidized state, subsidized income state, that it requires HUD's approval of the new buyer to -- to transfer that contract, so that's something that the buyer has to run -- provide HUD with a certain amount of information, and that's something that the lender wants to make sure it's done before they finance the transaction.
Q. Do you know whether those were the requirements in Dr. Alli's contract with HUD on the Collingwood apartments?
A. I do not know, I don't know how much the buyer had to

do, I know -- I mean, how much the seller had to do, but it primarily was an effort of the lender and the buyer to contact HUD and work with HUD, and whatever HUD sought from the seller I don't know, but I know that it required that interface.

Q. Do you know whether the contract Dr. Alli had with HUD regarding the Collingwood apartments required Dr. Alli to request approval from HUD?

A. I don't know if it required Dr. Alli to request approval, but I'm sure it required -- the lender had to get that approval from HUD in order to -- to approve the loan.

Q. Did Dr. Alli provide to you a copy of his agreements -- strike that.

Did Dr. Alli provide to you copies of his contracts with HUD regarding the Collingwood apartments?

A. I did not see those contracts.

Q. You also mentioned that you didn't -- you didn't know all of the forms that were required for HUD's approval but you did know of one form; is that correct?

A. I did know of one form.

Q. What form is that?

A. That's the previous participation form, that would be for the buyer to provide if they've had previous

participation in a HUD-related project, so that would have been Mr. Fanning's responsibility to provide -- to complete that form and provide it to HUD.

Q. Did you ever see a copy of that form filled out by Mr. Fanning for the Collingwood properties?

A. I don't recall if I did or not, I'm trying to remember. We usually use a little reference sheet, I'm sure he did, that form was not unusual so I'm sure he did, you know, I do not recall seeing the form because I didn't provide the form, but I believe he did.

Q. Have you -- have you handled a sale of a building that has been subsidized by HUD before that requires HUD's approval before the sale as the Collingwood apartments did?

A. I have been involved with -- as a co-broker but not myself totally directly.

Q. Were you representing the seller or the buyer?

A. We were representing the seller.

Q. Would it have been typical for you to have received copies of forms filled out by the buyer and submitted to HUD in relation to that sale?

A. No, they went directly to HUD.

Q. So it was not typical for the buyer to also send a copy to you as a seller's agent, is that what you're

saying?
A. I did not see them, no.
Q. You mentioned that the listing price for the Collingwood apartments was 675,000, and that is what Corey Fanning offered; is that correct?
A. It was a full-price offer, I'm trying to remember exactly the price but that price seemed familiar, 675, but that was what Corey offered.
Q. So it's correct that Corey Fanning offered the listing price?
A. Yes.
Q. Was there any negotiation with the price?
A. I don't think so, I don't believe it was.
Q. So Mr. Fanning's initial bid was the listing price; is that correct?
A. I'm trying to remember if there was any -- any offers that went back and forth on this, I'm not sure, but we -- it ultimately ended up being the full price, there may have been some dialogue with the lower price but I don't recall if there was or not, the -- the final price, I believe, happened to be the listing price.
Q. Did Corey Fanning have an agent?
A. An agent?
Q. Correct, did he have a broker representing him on this

potential sale?
A. He did not, no.
Q. So you dealt with him directly?
A. Yes.
Q. You mentioned earlier that you believed Mr. Fanning and his lender, GMAC, took steps to get approval from HUD, how do you know that?
A. Because periodically in conversations with Mr. Fanning and with the representative at GMAC, that dialogue was discussed.
Q. Did they ever show you any paperwork that they submitted to HUD?
A. No, I did not see the paperwork.
Q. Were you ever provided with copies of any paperwork from Dr. Alli regarding -- requesting HUD's approval of the sale of Collingwood?
A. Any paperwork from Dr. Alli?
Q. Correct.
A. No, I don't recall getting any, I'm not sure if he had to submit anything or not, if the seller had to submit anything to him or not.
Q. You mentioned earlier that the agreement -- the purchase agreement that was entered into between Dr. Alli and Mr. Fanning was set to expire within 60 or 90 days; is that correct?

A. No.
Q. Is that what you said?
A. No, I said -- I think the question was something along the lines of how long was the process, that the best I can remember it was a 60-to-90-day process in terms -- we were in that transaction for about 60 to 90 days.
Q. How did you hear that the sale of the Collingwood apartments to Mr. Fanning was not going to go through?
A. As best I remember it was either Mr. Fanning mentioned it to me, or my contact at GMAC mentioned that the transaction would not move forward.
Q. Do you remember who your contact at GMAC was?
A. There was two people I talked to there and I don't remember their names now, you'll have to excuse me, it was a lady and a gentleman I believe, they used to have an office in Southfield at the time, but I don't recall their name.
Q. Did you ask them why the sale wasn't going to go through?
A. I believe there was some problems in terms of getting the approvals needed from HUD for the sale.
Q. Did they provide you with any written documentation from HUD denying --
A. No, they did not.
Q. Let me finish my question first just so it can be

clear on the record.
A. I'm sorry.
Q. Did anyone from GMAC or Mr. Fanning or Dr. Alli provide you with any written documentation from HUD denying approval of the sale of Collingwood to Mr. Fanning?
A. I do not recall seeing a written document.
Q. When -- when the person at GMAC called to tell you -- I think you mentioned that you couldn't remember if it was someone at GMAC or Mr. Fanning himself?
A. Who made the initial contact.
Q. Did either Mr. Fanning or someone at GMAC tell you the name of the person they were dealing with at HUD in order to get approval of the sale?
A. I do not recall the name.
Q. After you received notice that the sale of the Collingwood apartments to Mr. Fanning was not going to go through, did you immediately take the property off the market?
A. It seems -- somehow it seems -- if memory serves me, things just started to rapidly unravel around that time frame when the GMAC sale fell through, and it was enough that I see -- I stopped marketing the property.
Q. Did you decide to stop marketing the property on your own or did Dr. Alli ask you to?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI
ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

ORIGINAL

---

The Deposition of CORY FANNING,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 11:30 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.

APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236
Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

ALSO PRESENT:

Dr. Benjamin Alli

Detroit, Michigan
Thursday, February 3, 2005
11:30 a.m.

CORY FANNING,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Good morning, Mr. Fanning. How are you today?

A. Fine, thanks.

Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case brought against it by Benjamin Alli and BSA Corporation.

Would you please state your name and address for the record?

A. My name is Cory Fanning. I live at 1949 Devonshire in Bloomfield Hills.

Q. Have you had your deposition taken before?

A. One time.

Q. When was that?

A. I would say ten years ago.

Q. Why do you say that?
A. I needed to put more lighting in the hallways, I needed to -- There was just some work that needed to be done. I don't recall everything. But I needed -- I would have needed to put, you know, some money into the building. I don't -- I can't tell you -- I just don't have my notes. I don't have my reports.
Q. Do you remember about how much money you estimated would need to be put into the building?
A. I'm really sorry. I just don't. I don't remember. Is there anything that you guys have that -- I mean you have -- I don't know. I don't know.
Q. Did you know that there were units in the Collingwood/Kirkwood Apartments that were under HUD Section 8 program?
A. Yes.
Q. How did you know that?
A. It was disclosed in the, in the sale, sale of the building.
Q. Were you specifically looking for an apartment building that had units that were under HUD's program?
A. I wasn't specifically looking for a building with that, but I wasn't opposed to buying a building with Section 8.
Q. Did you know that HUD needed to approve the sale of

the Collingwood/Kirkwood -- Strike that. Did you know whether HUD needed to approve the sale of the Collingwood/Kirkwood buildings?
A. No. I don't -- I don't know that I knew that there was anything -- I guess I didn't know that.
Q. Did you take any steps in order to receive HUD's approval for the sale of the Collingwood's Kirkwood buildings from Dr. Alli to yourself?
A. I don't think I would have if I didn't know that I needed to.
Q. I'm going to refer you back to Exhibit Number 1. What is this document?
A. A purchase agreement for the Collingwood/Kirkwood buildings.
Q. Why did you decide to put in a bid for the Collingwood/Kirkwood Apartments as opposed to the other apartment buildings that were shown to you?
A. Well, I thought this made financial sense and I was interested in taking on the project.
Q. Do you remember whether the other buildings that were shown to you, besides the Collingwood/Kirkwood Apartments were -- Strike that. Let me rephrase it. Do you know whether the asking price for the other apartments, beside the Collingwood/Kirkwood Apartments, was higher than the asking price of the

U.S. Department of Housing and Urban Development

# COLLECTION REGISTER

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 139

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT – DATE | RECEIVED AT MAIL OPENING POINT – NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| | NAT'L CHURCH RES | CK | 169.34 | 10/26/98 | Kathy Szymczak | | | # 00300888 EH166 |
| 10-27-98 | PICKWICK PARK | SUB FEE | 6.00 | 10/29/98 | Kathy Szymczak | K. Szymczak | 10/30/98 | #118655 |
| 11-3-98 | P. Kuykendall | SUB FEE | 12.00 | 11/4/98 | Kathy Szymczak | K. Szymczak | 11/4/98 | CK# 5240 WITNESS FEE |
| 11-11-98 | Record Copy Services | SUB FEE | 6.00 | 11-19-98 | Kathy Szymczak | K. Szymczak | 11/20/98 | CK#E 769473 |
| 12-8-98 | Independence Square | | 10,000.29 | 12-10-98 | Kathy Szymczak | L. DeMorrow | 12/1/98 | ck 2837 |
| 1/14/99 | Three Oaks | TPA | 2442.30 | 1/14/99 | Kathy Szymczak | D. Plowden | 2/7/99 | ck 002073 |
| 1/28/99 | Sycamore Meadows | Rent Reim. | 30944.00 | 1/28/99 | Kathy Szymczak | B. Campbell | 1/10/2000 | ck # 5725 To LOCK BOX |
| 2/16/99 | LUTH. HSG CORP - ANN ARBOR 044-EED13 | final closing | 303522.15 | 2/22/99 | Kathy Szymczak | K. Szymczak | 3/8/99 | ck # 2038573324108 |
| 3/15/99 | Eden Manor | water damage | 7287.18 | 3/17/99 | Kathy Szymczak | | 3/17/99 | ck#1-04-028535 |
| 3/16/99 | NORTH HILL FARMS | FIRE | 23583.34 | 3/17/99 | Kathy Szymczak | D. Plowden | 5/7/99 | CK-1005695 |
| 3/16/99 | Ukrainian Village | | 13556.86 | 3/18/99 | Kathy Szymczak | L. DeMorrow | 3/19/99 | ck#5-01-414684 |
| 3/22/99 | DORIS ALSUP | | 50.00 | 3/22/99 | Kathy Szymczak | K. Szymczak | 3/23/99 | MO 910 2523549 |
| 4/5/99 | UKRAINIAN VILLAGE | ICE | 9618.47 | 4/8/99 | Kathy Szymczak | L. DeMorrow | 4/12/99 | ck 419957 |
| | NEXT PAGE | | | | | | | |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HUD-235 (5/89)
ref. handbooks 1911.1 & 4310.5

U.S. Department of Housing and Urban Development

## COLLECTION REGISTER

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 140

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT: DATE | RECEIVED AT MAIL OPENING POINT: NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 4-14-99 | University TH Coop | SNOW STORM | 7091.80 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04-830022 |
| 4-14-99 | " | " | 9175.66 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck 1-04-830017 |
| 4-14-99 | " | " | 7763.82 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04 830031 |
| 4-14-99 | " | " | 8788.55 | 4/16/99 | Kathy Szymczak | P. Wildfong | 4/27/99 | ck #1-04 830021 |
| 4-26-99 | Eden Manor | water damage | 1138.51 | 4/28/99 | Kathy Szymczak | A. Leach | 5/25/99 | ck 504871 979 |
| 5-3-99 | Ukrainian Village | FREEZE DAMAGE | 350.00 | 5/5/99 | Kathy Szymczak | L. DeMerado | 5-6-99 | ck 1-04-832241 J |
| 4-29-99 | Watry & Mercieca | SUB FEE | 12.00 | 5/12/99 | Kathy Szymczak | K. Szymczak | 5/14/99 | ck # 0124 |
| 5-26-99 | Ukrainian Village | | 16413.95 | 6/2/99 | Kathy Szymczak | L. DeMerado | 6/4/99 | ck #504-41 7664 |
| 6-1-99 | North Hill Farms | | 23583.34 | 6/3/99 | Kathy Szymczak | A. Pleader | 6/11/99 | ck # 1008142 |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/4/99 | Kathy Szymczak | K. Szymczak | 6/7/99 | ck 013038 Banked |
| 6-4-99 | GMAC | PROC FEE | 5694.90 | 6/7/99 | Kathy Szymczak | K. Szymczak | 6/8/99 | ck 012747 RET'D-Sent in error |
| 6-8-99 | Eden Manor | | 2718.62 | 6/9/99 | Kathy Szymczak | [illegible] Leach | 7/13/99 | ck 5-04-872-966 |
| 6-10-99 | Cobbie Creek | FIRE | 407718.00 | 6/11/99 | Kathy Szymczak | L. Suvoy | 6/24/99 | ck # 11597347 |
| 6-21-99 | Wellesley T.H. | water | 16500.81 | 6/24/99 | Kathy Szymczak | W. Kamill | 11/15/99 | ck 1-8587635 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form H[illegible]
ref. handbook[illegible]

U.S. Department of Housing and Urban Development

# COLLECTION REGISTER

REGION OR OFFICE: MICHIGAN

REGISTER PAGE NUMBER: 141

| DATE OF REMITTANCE | NAME OF REMITTER | TYPE[1] | AMOUNT | RECEIVED AT MAIL OPENING POINT: DATE | RECEIVED AT MAIL OPENING POINT: NAME | FUND SYMBOL OR DISPOSITION | C.D. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 6-25-99 | Church of Christ | FIRH | 29771.70 | 6-25-99 | Kathy Szymczak | K Szymczak | 6/28/99 | ck #014473 |
| 7-9-99 | Ukrainian Village | Water Damage | 2026.20 | 7-13-99 | Kathy Szymczak | K. [illegible] | 7/14/99 | ck# 1-04-798649 |
| 7-2-99 | West Genesee INITIAL CLOSING | closing | 137,907.50 | 7-14-99 | Kathy Szymczak | L. Hornaby | 7/15/99 | ck# 2049-0075231/7 |
| 7-30-99 | Westwick Square | fire | 407.00 | 7-30-99 | Kathy Szymczak | B Hambill | 10/1/99 | ck 1-04-777260 |
| 7-30-99 | Westwick Square | fire | 12395.00 | 7-30-99 | Kathy Szymczak | B Hambill | 10/1/99 | ck 1-04-777262 |
| 8-2-99 | Bethany Pres | closing | 200969.00 | 8-5-99 | Kathy Szymczak | K. Maloney GHC | 5/8/00 | ck 2049-51166497 |
| 9-7-99 | Nat'l Church Res EE016 | closing | 286265.00 | 9-10-99 | Kathy Szymczak | L. Hornaby | 9/29 | ck 2049 01467740 |
| 9-10-99 | Cobble Creek | fire | 89195.00 | 9-10-99 | Kathy Szymczak | | 9/10/99 | ck #11604019 |
| 9-22-99 | Oakbrook Villa | firm app | 3220.20 | 9/24/99 | Kathy Szymczak | Kelly Allen | 9-27-99 | ck# 023159 |
| 10-4-99 | Townhouse Green | fire | 11360.14 | 10-6-99 | Kathy Szymczak | A. Leach | 11/2/99 | ck #1031766 |
| 12-9-99 | FM ONE - St. Sarkis | | 3678.83 | 12-10-99 | Kathy Szymczak | K. Nelson | 12/14/99 | ck# 5020443 |
| 12-30-99 | Oakridge | Closing | 35908.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck# 0026889 |
| 12-30-99 | Oakridge | inspect fee | 1920.00 | 12-30-99 | Kathy Szymczak | Kelly Allen | 1/3/00 | ck# 0026885 |
| 1-6-00 | Spring Lake Village | Storm damage | 161338.22 | 1/10/00 | Kathy Szymczak | Henry Plauder | 4/21 | ck# 5021354 |

COLLECTIONS RECEIVED AS SHOWN ABOVE

(Date) (Signature of Collection Officer)

[1] C - Cash
CK - Check
MO - Money Order
CCK - Certified Check
CACK - Cashiers Check

form HUD-235 (5/89)
ref. handbooks 1911.1 & 4310.5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
THE UNITED STATES, Judge Allegra
Defendant.

---

The Deposition of BENJAMIN ALLI,
Taken at 315 North Center Street, Suite 200,
Northville, Michigan 48167,
Commencing at 10:07 a.m.,
Tuesday, January 5, 2005,
Before Angela D. Eitzman, RPR.

BENJAMIN ALLI
January 5, 2005

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

Thomas G. Massouras
Regional Office of Housing & Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.

ALSO PRESENT:
Shaki Alli

BENJAMIN ALLI
January 5, 2005

Northville, Michigan
Tuesday, January 5, 2005
10:07 a.m.

BENJAMIN ALLI

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Please state your full name and address for the record.

A. Benjamin Alli, 970 Lakeshore Road, Grosse Pointe, Michigan, 48236.

Q. Good morning, Dr. Alli, how are you today?

A. Fine. Thank you.

Q. My name is Marla Conneely. I'm an attorney for the United States of America, and I'm representing my client in a case that you've brought against them in docket number 01-669. Before I start with my questions, I want to set forth some groundrules for you.

First of all, if you don't understand the question, ask me to repeat it or clarify it. If you

then he called me back and said I'm very sorry, we just don't have it. And I said can we get -- Malone told me that. He said if you don't have it, Doctor --
Q. Just a minute.
A. I'm sorry. I apologize.
Q. You said that Mr. Brown called you back?
A. Yes.
Q. And what did Mr. Brown say?
A. He said what the people have told me is true.
Q. Did you tell him about your conversation with Mr. Malone?
A. Initially I talked to Mr. Malone, but he did not tell me what Malone told me. I didn't want to create animosity between him and Malone.
Q. What did Mr. Brown say when you talked to Mr. Malone?
A. He said, well, it depends on availability because that's what the people told me, two other people. So when Mr. Brown told me I'm going to call you back, in between, something happened, kind of talk or whatever, right, between Mr. Brown. And I told him I talked to those other people I talked to, so he had emphatically restated what the people already told me, not to step in their way. He affirmed what the people already told me, that the flexible loan is exhausted, it's not available in Detroit.

Q. Did you then speak -- strike that.
After speaking with Mr. Brown, did you then speak with Mr. Malone again?
A. Yes, ma'am.
Q. And what did you say?
A. I told him that Mr. Brown said this, and he said, yeah, that Mr. Malone told me, he said, Doctor, you are dealing with one of the worst HUD office in the country. They're not supposed to treat you like that. I swear on my hand he told me that. He said what you need to do, try to get a local bank to loan you the money, and deduct it from the -- from the particular account and get a copy of the financial operation management handbook from the local office and look at the code so, so, so. It allow you to make the deduction. So then I called them. I talked to Mr. Hill. I spoke to somebody, but I'm not sure it's a composite. I asked for the handbook. The handbook is -- do you want me to look for it? I've got it here, do you want me to get it out here for you?
Q. No, that's all right.
A. So I called them. I wanted a copy of the handbook. It got in the flexible loan alternative that allows us to deduct the money to get the loan. So they said that I should go to the basement, supply room

downstairs, so they're, like, the man said they don't have any of that copy with them.
Q. Who was the man that you spoke with?
A. At the office downstairs, oh, there would be too many names to remember. I can't remember his name.
Q. He told you they didn't have any?
A. He's the one in charge of the supply room. If you want HUD form, you go there. If you want HUD book, you go there, if you want this, you go there.
Q. And he told you they were out of the forms for the flexible loans?
A. No, the handbook.
Q. Oh, he said they were out of the handbook?
A. Yeah, I think it's handbook 4530.2R-1.
Q. Did you ever apply for a HUD flexible loan in writing?
A. They did not give me the form. They didn't want me to apply for it.
Q. Is that no? I'll ask it again.
Did you ever apply for a HUD flexible loan in writing?
A. They will not give me the opportunity to do that.
Q. Did you ever ask HUD for a form to apply for a flexible loan?
A. Yes, ma'am, because Mr. Malone told me to ask them for the forms and the handbook. The handbook details my