IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION, | ) | |
| Plaintiff, | ) | OCT 07 2002 |
| v. | ) | No. 01-669C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S ANSWER AND COUNTERCLAIMS

For its answer to plaintiff's second amended complaint, defendant admits, denies, and alleges as follows:

Count I

Common Allegations

1. Denies the allegations contained in paragraph 1 for lack of knowledge or information sufficient to form a belief as to their truth.

2. Denies the allegations contained in paragraph 2 for lack of knowledge or information sufficient to form a belief as to their truth.

3. The allegations contained in paragraph 3 are conclusions of law to which no response is required; to the extent they may be deemed allegations of fact, they are denied.

4. Admits.

5. Admits the allegations contained in paragraph 5 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 5.

12. Admits the allegations contained in paragraph 12 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 12.

13. Admits the allegations contained in paragraph 13 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 13.

14. Denies.

15. Denies.

16. Admits the allegations contained in paragraph 16 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 16.

17. Denies.

18. Denies.

Count III

Breach of Contract with Regard to
Mortgage for Collingwood/Kirkwood Property

19. Defendant incorporates by reference its responses contained in paragraphs 1 through 18 of its answer as though fully set forth here.

20. Admits the allegations contained in paragraph 20 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in

6. Admits the allegations contained in paragraph 6 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 6.

7. Admits the allegations contained in paragraph 7 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 7.

8. Admits.

Count II

Breach of Contract With Regard to
Section 8 Contract For the Riverside Property

9. Defendant incorporates by reference its responses contained in paragraphs 1 through 8 of its answer as though fully set forth here.

10. Admits the allegations contained in paragraph 10 that Alli acquired the property through a HUD Federal auction and that a 15 year Federal Housing Assistance Subsidy contract was executed; otherwise denies the allegations contained in paragraph 10 for lack of knowledge or information sufficient to form a belief as to their truth.

11. Admits the allegations contained in paragraph 11 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 11.

paragraph 20.

21. Admits the allegations contained in paragraph 21 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 21.

22. Denies.

23. Denies.

24. Admits the allegations contained in paragraph 24 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 24.

25. Denies.

26. Denies.

Count IV

Breach of Contract with Regard to the
Section 8 Contract for Pingree Property

27. Defendant incorporates by reference its responses contained in paragraphs 1 through 26 of its answer as though fully set forth here.

28. Admits the allegations contained in paragraph 28 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 28.

29. Admits the allegations contained in paragraph 29 to the extent supported by the exhibit cited, which is the best evidence

of its contents; otherwise denies the allegations contained in paragraph 29.

30. Admits the allegations contained in paragraph 30 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 30.

31. Admits the allegations contained in paragraph 31 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained paragraph 31.

32. Admits the allegation contained in paragraph 32 that the Pingree mortgage was prepaid; avers that the Pingree mortgage was prepaid after HUD declared a default of its business agreements; otherwise denies the allegations contained in paragraph 32.

33. Denies.

34. Denies.

35. Denies.

36. Denies.

37. Denies.

Count V

Breach of Contract with Regard to the Section 8 Contract for the Collingwood/Kirkwood Property

38. Defendant incorporates by reference its responses contained in paragraphs 1 through 37 of its answer as though

fully set forth here.

39. Admits the allegations contained in paragraph 39 to the extent supported by the contracts cited, which are the best evidence of their contents; otherwise denies the allegations contained in paragraph 39.

40. Denies.

41. Denies.

42. Denies.

43. Denies.

Count VI

Breach of Contract With Regard to the Sale Upon Approval Clause for the Collingwood/Kirkwood Property

44. Defendant incorporates by reference its responses contained in paragraphs 1 through 43 of its answer as though fully set forth here.

45. Denies the allegations contained in paragraph 45 for lack of knowledge or information sufficient to form a belief as to their truth.

46. Admits the allegations contained in paragraph 46 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 46.

47. Admits the allegations contained in paragraph 47 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 47.

48. Admits the allegation contained in paragraph 48 that HUD received a copy of the purchase contract; otherwise denies the allegations contained in paragraph 48.

49. Denies.

50. Denies.

51. Denies each and every allegation not previously admitted or otherwise qualified.

52. Denies that plaintiff is entitled to the relief requested in its prayer for relief, or to any relief whatsoever.

DEFENDANT'S COUNTERCLAIMS

53. The United States' counterclaims seek damages for breach of several express contracts executed by the parties to this action. This Court possesses jurisdiction to entertain the counterclaims asserted herein pursuant to 28 U.S.C. §§ 1491, 1503, and 2508.

PARTIES

54. At all times pertinent to this action, Benjamin Alli and Shaki Alli were principals of BSA Corporation ("BSA"), a Michigan Corporation.

55. Upon information and belief, Benjamin Alli and Shaki Alli are residents of the state of Michigan.

56. Benjamin Alli and Shaki Alli, jointly and severally, as principals of BSA, and at all times pertinent to this action, did not observe business formalities between themselves and BSA, and otherwise acted without proper regard for business character.

57. At all times pertinent to this action, Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, owned the projects identified in the complaint at paragraphs 5, 6, and 7 as the Riverside Property ("Riverside"), Collingwood-Kirkwood Property ("Collingwood") and Pingree Property ("Pingree").

## FACTUAL BACKGROUND

### RIVERSIDE

58. BSA executed a 15-year Housing Assistance Payments ("HAP") Contract with HUD effective June 8, 1989, for Riverside. The HAP Contract required BSA to maintain and operate the property so as to provide decent, safe and sanitary housing.

59. Pursuant to its HAP contract, BSA was required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if BSA failed to correct the deficiencies.

60. On May 15 and 16, 1997, HUD conducted an inspection of Riverside. The property failed the inspection. The findings of the inspection included, among others things, roach infestation; inoperable smoke detectors; inoperable and unsecured toilets; leaking basement sanitary line; and inoperable stove burners.

61. On June 27, 1997, HUD issued a "30 Day Notice for Termination of HAP Contract" to BSA that provided it 30 days from

receipt of the letter to correct the contractual violation.

62. HUD conducted a follow-up inspection on August 12, 1997, which showed that BSA failed to correct the physical deficiencies cited within 30 days. The findings of the inspection included, among other things, inoperable smoke detectors; improper wiring; roach infestation; and inoperable stoves.

63. On January 23, 1998, a further HUD inspection of Riverside found deficiencies still outstanding, including, but not limited to, roach infestation; inoperable electrical outlets and stoves; broken kitchen cabinets; and crumbling building exteriors.

64. On March 16, 1998, HUD sent BSA a Notice of Abatement for 28 units that failed HUD's physical inspection.

65. On December 11, 1998, HUD sent BSA a Notice of Violation for physical conditions found at the property, including sewer backup to one of the Riverside buildings; unsecured and deteriorated concrete on the exterior of another Riverside building; exposed metal ground poles; and broken concrete.

66. On December 16, 1998, HUD found that, of 18 units inspected, none passed HUD's physical conditions standards. Among the findings were roach infestation; inoperative stove burners; inoperative smoke detectors; and broken windows.

67. On December 18, 1998, HUD issued to BSA a Notice of

Section 8 Suspension and Abatement for those remaining units at Riverside for which HUD had not suspended and abated HAP payments on March 16, 1998.

68. On December 23, 1998, HUD issued a Notice of Relocation to Benjamin Alli and Shaki Alli, advising them that the property was no longer in conformance with HUD quality standards, and was no longer safe for residents, and that accordingly, HUD would relocate eligible residents to suitable replacement housing.

69. HUD met with residents at Riverside to advise them of relocation efforts, assist them in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

70. HUD completed the relocation of tenants on or before June 29, 1999.

71. The total cost to HUD for the relocation of the Riverside tenants was $79,675.00.

COLLINGWOOD

72. On June 8, 1989, BSA acquired ownership of Collingwood from HUD through a Transfer of Physical Assets ("TPA").

73. A Warranty Deed subject to a mortgage held by the Secretary was executed in favor of BSA and recorded with the Wayne County Register of Deeds as part of the TPA. Collingwood's 15-year HAP Contract with HUD was also assigned to BSA, incidental to the TPA.

74. The HAP Contract required the maintenance of the

property so as to provide "decent, safe and sanitary housing." Upon the HAP Contract's expiration in 1996, HUD executed a new HAP contract with BSA that continued to require BSA to maintain Collingwood in decent, safe and sanitary condition.

75. Pursuant to its HAP contracts, BSA was required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if BSA failed to correct the deficiencies.

76. On July 6, 1990, BSA and the Secretary executed a Regulatory Agreement that required BSA to maintain Collingwood in good repair and condition. Failure to maintain the property in good repair and condition would constitute a violation of the Regulatory Agreement, and could result in a declaration of default if BSA failed to correct the violation within 30 days.

77. Upon a declaration of default of the Regulatory Agreement, the Secretary may declare a note held by HUD to be due and payable, and proceed to foreclosure.

78. On October 29, 1997, 48 of Collingwood's 52 units failed a HUD inspection. Among the findings of the inspection were roach infestation; inoperable smoke detectors and exit lighting; and unclean conditions of common areas and individual units.

79. On December 15, 1997, HUD advised BSA to take corrective action. HUD further advised BSA that failure to comply would result in abatement of the HAP Contract.

80. On April 28, 1998, 19 of 21 units failed reinspection. As a result, HUD abated the HAP subsidy for the failed units.

81. On November 9, 1998, HUD conducted another physical inspection, and found, among other things, excessive leaks and water damage; blocked egress; exposed glass; inoperable smoke detectors; and exposed rebar.

82. On June 4, 1999, HUD issued a Notice of Violation of Regulatory Agreement and HAP Contract to BSA. HUD provided BSA 30 days to cure the cited deficiencies.

83. BSA failed to submit an acceptable corrective plan or cure the deficiencies cited within the 30-day period.

84. On July 23, 1999, HUD personnel confirmed that no project repairs had been undertaken, and that no repairs appeared to be underway.

85. On September 30, 1999, HUD issued to BSA a Notice of Default of the Regulatory Agreement, and a Notice of HAP Abatement.

86. On October 5, 1999, HUD advised BSA of its intent to foreclose Collingwood. HUD provided BSA 21 days to respond.

87. BSA contested the foreclosure, and a hearing was held on October 25, 1999. HUD determined that BSA presented no legal reason at the hearing to prevent foreclosure, and the Decision to

Proceed was issued to BSA on October 26, 1999.

88. On December 14, 1999, HUD issued a Notice To Vacate to the tenants of Collingwood, advising them that the property was no longer in conformance with HUD standards, and that eligible residents would receive tenant-based vouchers to relocate to suitable replacement housing.

89. On the morning of January 25, 2000, HUD received complaints from residents at one of the two Collingwood buildings that heat and hot water were not available. HUD repeatedly attempted to contact Benjamin Alli and Shaki Alli throughout the day, but was unable to do so.

90. HUD personnel arrived at the effected Collingwood building on January 25, 2000, and confirmed that the heating systems were shut down, no management agent or staff was on site, and that the project appeared abandoned.

91. Pursuant to records maintained by the National Climate Data Center, the high and low temperatures in the Detroit metropolitan area on January 25, 2000, were 21.2 degrees Fahrenheit and 1.4 degrees Fahrenheit, respectively.

92. As a result of BSA's abdication of its management responsibilities for Collingwood, HUD issued a Declaration of Involuntary Mortgagee-In-Possession ("MIP") to BSA, citing BSA's unavailability, confirmation that no heat or hot water was available in the building, the sub-freezing weather conditions, and failure to find any building or maintenance personnel on the

premises to assist the residents.

93. As MIP, HUD retained security guards to patrol the premises, repaired many of the physical deficiencies to provide an acceptable standard of health and safety to the tenants, and paid Collingwood's operational expenses, including maintaining utility and management services.

94. HUD continued as MIP, assuming management responsibilities, during the relocation of the Collingwood tenants, and the subsequent securing of the property.

95. HUD met with residents at Collingwood to advise them of relocation efforts, assist them in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

96. The last family was relocated from Collingwood in June of 2000.

97. A foreclosure sale was held on March 13, 2000, pursuant to the Multifamily Mortgage Foreclosure Act, 12 U.S.C. § 3701 et seq., and 24 C.F.R. Part 27, Subpart A. Because HUD was the sole bidder for the property, HUD became the owner of Collingwood.

98. The cost to HUD of the foreclosure for Collingwood was $18,128.80.

99. The cost to HUD of taking MIP for the project from the period of January 25, 1999 until February 23, 2001, was $1,112,173.45.

100. The cost to HUD of relocating families to decent, safe

and sanitary housing was $90,646.40.

PINGREE

101. In August of 1983, Benjamin Alli and Shaki Alli purchased Pingree from the Secretary through a property disposition sale.

102. A purchase money mortgage and promissory note were executed by Benjamin Alli and Shaki Alli with the Secretary on August 24, 1983.

103. Incidental to the purchase, Benjamin Alli and Shaki Alli, doing business as BSA, entered into a 15-year HAP Contract with HUD for all 80 units of Pingree. The HAP Contract required the owner to maintain the property in decent, safe and sanitary condition.

104. Upon its expiration, the HAP contract was renewed, for periods not exceeding one year, with the same substantive requirements, including maintaining the property in decent, safe and sanitary condition.

105. Pursuant to its HAP contracts, Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, were required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if they failed to correct the deficiencies.

106. On August 24, 1983, Benjamin Alli and Shaki Alli, doing business as BSA, entered into a Regulatory Agreement with the Secretary that required them to maintain Pingree in good repair and condition. Pursuant to the Regulatory Agreement, failure to maintain the property is a violation, and may result in a declaration of default if the owner fails to correct the violation within 30 days.

107. Upon a declaration of default of the Regulatory Agreement, the Secretary may declare a note held by HUD to be due and payable, and proceed to foreclosure.

108. On June 2 and 4, 1998, HUD inspected the conditions at Pingree. Twenty-four of the 38 units HUD inspected failed, for among other reasons, inoperable smoke detectors; brick walls that were "falling apart;" kitchen cabinets in need of repair or replacement; and roof drains "in need of repair."

109. In October of 1998, the owners represented to HUD that many of the deficiencies noted in its June inspection had been repaired.

110. On March 16, 1999, HUD conducted a follow-up inspection, which revealed that the owners had failed to insure that the property was in decent, safe and sanitary condition. The findings of the follow-up inspection included roach infestation; inoperable smoke detectors; water damage to the unit interiors; and damaged or deteriorated windows.

111. On May 7, 1999, a HUD inspection found numerous

outstanding deficiencies, including inoperable smoke detectors; units and common areas showing water damage; and damaged/ inoperable windows and screens.

112. On November 18, 1999, a HUD inspection found, among other things, damaged windows; deteriorated wall masonry; deteriorated ceilings; inoperable smoke detectors; and inoperable lighting.

113. On March 2, 2000, HUD issued a Notice of Regulatory Agreement Violations and a separate Notice of HAP Contract Default to Benjamin Alli and Shaki Alli. The notice provided them 30 days to cure the deficiencies.

114. Benjamin Alli and Shaki Alli failed to submit an acceptable corrective plan or cure the deficiencies cited within the 30-day period.

115. On May 4, 2000, HUD issued a Declaration of Default of the Regulatory Agreement, and referred the project for foreclosure.

116. On May 28, 2000, HUD issued a Notice of Suspension and Abatement of the HAP Contract.

117. On June 16, 2000, HUD advised Benjamin Alli and Shaki Alli that the property would be foreclosed.

118. Prior to foreclosure sale, Benjamin Alli and Shaki Alli prepaid the balance of the mortgage.

119. On July 31, 2000, HUD issued a Notice to the tenants of Pingree, advising them that HUD was taking enforcement action

against the owner for failure to maintain the buildings in accordance with HUD standards, and that HUD was in the process of relocating all eligible residents.

120. HUD met with tenants at Pingree to advise them of relocation efforts, assist residents in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

121. On or about June 23, 2000, HUD began relocating families from Pingree to property that was in decent, safe and sanitary condition.

122. The last family was moved from Pingree on or about October 16, 2000.

123. The cost to HUD of relocating families from Pingree to decent, safe and sanitary housing was $110,096.45.

<u>FIRST COUNTERCLAIM</u>
(Breach of Contract for Riverside)

124. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 123, as though fully set forth herein.

125. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a HAP Contract with HUD for Riverside.

126. The HAP contract required BSA to maintain the property in decent, safe and sanitary condition.

127. Benjamin Alli and Shaki Alli, jointly and severally

and doing business as BSA, breached the HAP Contract by failing to maintain Riverside in good repair and condition so as to provide decent, safe and sanitary housing.

128. As a result of this breach of the HAP Contract, HUD abated and suspended the HAP Contract for Riverside, and HUD was forced to relocate the eligible tenants to suitable replacement housing.

129. As a result of this breach of the HAP Contract, HUD incurred damages in the amount of $79,675.00, for the cost of moving families from Riverside to decent, safe and sanitary housing.

130. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $79,675.00.

SECOND COUNTERCLAIM
(Breach of Contract for Collingwood)

131. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 130, as though fully set forth herein.

132. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a Regulatory Agreement with HUD pertaining to Collingwood, and a HAP Contract with HUD pertaining to Collingwood. The Regulatory Agreement and the HAP Contract required Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, to maintain the mortgaged

premises in good repair and condition.

133. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, breached the Regulatory Agreement and the HAP Contract by failing to maintain Collingwood in good repair and condition so as to provide decent, safe and sanitary housing.

134. As a result of the aforementioned breach of the Regulatory Agreement and the HAP Contract, HUD was forced to abate and suspend the HAP for Collingwood, and to relocate the eligible families to suitable replacement housing.

135. Further, as a result of the aforementioned breach of the Regulatory Agreement and the HAP Contract, HUD was forced to take MIP of Collingwood so as to ensure the provision of needs and services to the residents of the property as they awaited relocation.

136. As a result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages in the amount of $90,646.40, for the cost of moving families from Collingwood to decent, safe and sanitary housing.

137. As a further result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages in the amount of $18,128.80, for the cost of foreclosure of Collingwood.

138. As a further result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages of $1,112,173.45, for the cost to HUD of providing basic services,

security, and repairs to Collingwood as MIP.

139. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $1,220,948.65.

THIRD COUNTERCLAIM
(Breach of Contract for Pingree)

140. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 139, as though fully set forth herein.

141. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a Regulatory Agreement and HAP Contract with HUD for Pingree.

142. The Regulatory Agreement and HAP Contract required Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, to maintain Pingree in good repair and condition.

143. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, breached their Regulatory Agreement and HAP Contract by failing to maintain Pingree in good repair and condition so as to provide decent, safe and sanitary housing.

144. As a result of this breach of the Regulatory Agreement and HAP Contract, HUD abated and suspended the HAP for Pingree, and was forced to relocate the eligible families to suitable replacement housing.

145. As a result of this breach of the Regulatory Agreement

and HAP Contract, HUD incurred damages in the amount of $110,096.45, for the cost of moving families from Pingree to decent, safe and sanitary housing.

146. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $110,096.45.

WHEREFORE, The United States requests that plaintiff's complaint be dismissed and the United States be granted judgment in its favor upon its counterclaims as follows:

A. On its First Counterclaim, in the amount of $79,675.00, which amount is the actual damages sustained by HUD as a result of the breach of the HAP Contract for Riverside;

B. On its Second Counterclaim, in the amount of $1,220,948.65, which amount is the actual damages sustained by HUD as a result of the breach of the Regulatory Agreement and HAP Contract for Collingwood;

C. On its Third Counterclaim, in the amount of $110,096.45 which amount is the actual damages sustained by HUD as a result of the breach of the Regulatory Agreement and HAP Contract for Pingree;

D. Prejudgment Interest; and

E. Judgment granting the United States such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

Mark A. Melnick /by Deborah A. Bynum
MARK A. MELNICK
Assistant Director

Gerald M. Alexander /by Virginia McLean
GERALD M. ALEXANDER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street
Washington, D.C. 20530
Telephone: (202) 307-0361
Fax: (202) 514-7965

October 2, 2002

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on the 2nd day of October, 2002, I caused to be served by United States mail (first class, postage prepaid) copies of "DEFENDANT'S ANSWER AND COUNTERCLAIMS" addressed as follows:

ERIC STEMPIEN, ESQ.
Stempien & Stempien, PLLC
315 North Center Street
Suite 200
Northville, Michigan 48167

[signature]