NO. 01-669C
(Judge Allegra)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND BSA COPORATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-1011
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:
Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing
& Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

August 29, 2005

**TABLE OF CONTENTS**


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 1

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . 1

II. Statement Of Facts . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Standard Of Review . . . . . . . . . . . . . . . . . . . 4

II. Plaintiffs Are Not Entitled To Judgment Because A Genuine Issue Of Material Fact Exists Regarding Whether Benjamin Alli, Shaki Alli, BSA And Associates And BSA Corporation Are All The Same Entity . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Plaintiffs Benjamin And Shaki Alli Cannot Seek To Enforce Contracts They Are Now Claiming They Were Not Parties To . . . . . . . . . . . . . . . . . . . . 8

IV. Plaintiffs' Argument That Defendant Is Not Entitled To Relocation Expenses Is An Issue Regarding Damages And Is Inappropriate At This Stage Of The Case . . . . . . . . . . . . . . . . . . . . . . . . 10

V. The Plain Language Of The HAP And Regulatory Contracts Do Not Preclude Defendant From Recovering Its Claimed Damages . . . . . . . . . . . . . . . . . . 11

VI. If Defendant Is Successful On Its Counterclaims, It Is Entitled To Recover Damages That Were Foreseeable At The Time of Contracting Regardless Of Whether Such Damages Were Explicitly Provided For In The Breached Contracts . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . 4, 5

Bighorn Lumber Co., Inc. v. United States, 49 Fed. Cl. 768 (2001) . . . . . . . . . . . . . . . . . 14, 16

Erickson Air Crane Co. v. United States, 731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . 9

Foodland Distributors v. Al-Naimi, 559 N.W.2d 379 (Mich. Ct. App. 1996) . . . . . . . . . . Passim

Frazier v. United States, No. 04-1481C, 2005 WL 1793417 (Fed. Cl. July 28, 2005) . 12

Globe Ref. Co. v. Landa Cotton Oil Co., 190 U.S. 540 (1903)) . . . . . . . . . . . . . . . . . . . 11

Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854) . . . . . . . . . . . 14

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . 14, 16

Landmark Land Co., Inc. v. Federal Deposit Ins. Corp. v. United States, 256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . 14

Merritt v. United States, 267 U.S. 338 (1925) . . . . . . . . . . . . . . . . . . . 9, 10

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 4

NVT Techs. Inc. v. United States, 370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . 11, 13

Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989) . . . . . . . . . . . . . . . . . . . . 4

San Carlos Irrigation & Drainage Dist. v. United States, 111 F.2d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . 13, 14

San Carlos Irrigation & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . 10

United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed. Cir. 1983) . . . . . . . . . . . . . . 11, 13

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION, Plaintiffs, | |
| v. | No. 01-669C (Judge Allegra) |
| THE UNITED STATES, Defendant. | |

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rules 7.1(c) and 56(h) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this opposition to the motion for partial summary judgment filed by plaintiffs Benjamin and Shaki Alli and BSA Corporation.

STATEMENT OF THE CASE

I. Nature Of The Case

As we established in our motion for partial summary judgment, this case involves breach of contract claims relating to three multi-family housing projects owned and managed by plaintiffs in Detroit, Michigan. Specifically, plaintiffs allege the United States breached the contracts at issue when the Department of Housing and Urban Development ("HUD") suspended monthly subsidy payments after plaintiffs failed to maintain their buildings in decent, safe and sanitary conditions.

Plaintiffs further allege HUD refused to approve the sale of one of its buildings to a prospective buyer. On October 2, 2002, the United States filed counterclaims against plaintiffs for breach of contract. On August 15, 2005, the United States filed a motion for partial summary judgment on plaintiffs' claims.

II. Statement Of Facts

For our statement of facts, we rely primarily upon our motion for partial summary judgment and our proposed findings of uncontroverted fact, filed concurrently with our motion. Briefly stated, HUD and plaintiffs entered into housing assistance payment contracts ("HAP contracts") for three apartment buildings owned and operated by plaintiffs: the Riverside apartments, the Collingwood apartments, and the Pingree apartments. App. 1, 27, 86.[1] HUD and plaintiffs also entered into regulatory agreements for the Collingwood and Pingree apartments because HUD held mortgages on those buildings.[2] Id. at 78, 104. Moreover, because public funds were used to secure those mortgages, certain

---

[1] Defendant's motion for partial summary judgment filed on August 15, 2005 will be cited as "Def. Mot. Summ. J." followed by the specific page reference. The appendix filed concurrently with defendant's motion will be cited as "App." followed by the specific page reference. Plaintiffs' second amended complaint filed on August 8, 2002 will be cited as "Compl." followed by the specific page reference. Plaintiffs' motion for partial summary judgment filed on August 15, 2005 will be cited as "Pl. Mot." followed by the specific page reference.

[2] The parties did not enter into a regulatory agreement for the Riverside apartments.

transfers of interest in those properties had to be approved by HUD pursuant to the procedures for a transfer of physical assets ("TPA"). Def. Mot. Summ. J. 6-7.

The HAP contracts required plaintiffs to keep the apartment buildings in decent, safe and sanitary conditions. App. 11, 44, 94. When plaintiffs failed to meet this standard, HUD suspended its payments to plaintiffs and eventually exercised its rights to terminate the contracts. Furthermore, due to the conditions of the buildings, HUD was forced to undertake substantial efforts and incur significant expenses in relocating tenants to other decent, safe, and sanitary housing. Accordingly, the United States brought counterclaims against plaintiffs for breaches of the HAP and regulatory contracts applicable to the three buildings.

Plaintiffs claim HUD breached the contracts when it suspended its payments and terminated the contracts. Compl. 1-6. Plaintiffs further claim that HUD allegedly refused to approve the sale of the Collingwood apartments, upon which HUD held a mortgage. Id. The prospective buyer of that building, Cory Fanning, is a church pastor who had never owned or managed an apartment building before the proposed sale. See Exhibit 1, attached hereto.

In the interests of judicial efficiency, the issues of liability and damages have been bifurcated in this case.

Accordingly, the parties have not yet conducted any discovery regarding the issues of damages in this matter.

ARGUMENT

I. Standard Of Review

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. RCFC 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989). A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A court may consider a motion for summary judgment in stages. The initial inquiry should be whether the movant has presented an adequate legal basis for its motion. E.g., Ralph Larson, 17 Cl. Ct. at 43. If the legal support is insufficient, then the inquiry is at an end and the motion must be denied. E.g., Anderson, 477 U.S. at 250 ("There is no requirement that the trial judge make findings of fact."). Once a movant has established an adequate legal basis for its motion, the Court must consider whether the opposing party has identified any

genuine issues of material fact. The first step is to determine whether the issues raised are truly factual issues, or are issues of law. The second step is to determine what subset of the truly factual issues are material to the decision of the case. The third step is to examine the evidence presented by the parties to determine whether there is any genuine issue concerning any material factual issue. Ralph Larson, 17 Cl. Ct. at 43 (describing three steps); accord Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

## II. Plaintiffs Are Not Entitled To Judgment Because A Genuine Issue Of Material Fact Exists Regarding Whether Benjamin Alli, Shaki Alli, BSA And Associates And BSA Corporation Are All The Same Entity

Generally, the law treats a corporation as a separate entity from its stockholders. Foodland Distributors v. Al-Naimi, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996). However, when the corporate form is invoked to subvert justice, it may be ignored by the courts. Id. The following standard applies for piercing the corporate veil under Michigan law:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

Id. Here, Mr. and Mrs. Alli used the corporate form to breach the HAP and regulatory contracts for the Collingwood apartments. As a result, HUD incurred substantial expenses from its relocation efforts. Therefore, the remaining issue is whether BSA Corporation was a mere instrumentality of Mr. and Mrs. Alli.

Mr. and Mrs. Alli claim that they never had any ownership interests in the Collingwood apartments. Pl. Mot. 7. According to plaintiffs, the Collingwood apartments were bought from HUD by BSA Corporation, an allegedly separate legal entity, and that the Collingwood HAP and regulatory contracts were entered into only by BSA Corporation, an allegedly separate legal entity, and HUD. Id.

However, evidence obtained in discovery supports otherwise. For example, Shaki and Benjamin Alli, as individuals, entered into one or more deeds of trust encumbering the Collingwood apartments in exchange for loans from Mrs. Alli's mother, Alhadja Abegbe.[3] See Exhibit 2, attached hereto.

Moreover, Mr. and Mrs. Alli commingled their personal funds with the funds of BSA Corporation. See Ex. 2; 3, attached hereto. They also made periodic payments from the operating accounts for the Collingwood apartments to themselves and their

[3] While the Collingwood HAP and regulatory contracts required HUD's approval before entering into these deeds of trusts encumbering property secured by a HUD-held mortgage, plaintiffs did not seek or obtain HUD's permission as required.

three children. See Exhibit 4, attached hereto. While plaintiffs allege that the payments were in exchange for working at the buildings, Shaki Alli's description of her job duties and the duties of her children included completing routine HUD paperwork and other tasks of a building manager. Id. However, the Collingwood apartments already had their own separate building managers, and tenants from the buildings testified that they rarely saw Shaki Alli on the premises. See Ex. 3; Exhibit 5, attached hereto. They also testified that they had never seen Mr. and Mrs. Alli's children at the buildings, and one of them did not even know Mr. and Mrs. Alli had any children.[4] Id. In addition, Mr. Alli received payments of over four hundred dollars a month from the buildings' operating accounts, claiming that the apartments were "leasing" his car from him.[5] See Ex. 3.

Mrs. Alli further alleges that she never had any ownership interests in the Riverside apartments. Id. However, evidence obtained in discovery shows that Mrs. Alli did business as BSA and Associates and had an ownership interest in the Riverside

[4] Mr. and Mrs. Alli's three children were each paid approximately $50 an hour from the operating accounts for their alleged work. See Ex. 4.

[5] These lease payments were not approved by HUD, and HUD demanded that the payments cease and the monies be repaid to the operating account. Neither Benjamin Alli, Shaki Alli, BSA and Associates nor BSA Corporation ever returned the funds to the account. See Ex. 3

apartments.[6] Deeds of trust were entered into by Mr. and Mrs. Alli encumbering the Riverside apartments. See Ex. 3. Moreover, Mrs. Alli claims she was paid to perform managerial tasks at the Riverside apartments but the Riverside apartments had their own separate building managers. Finally, throughout her sworn deposition testimony, Shaki Alli repeatedly refers to the Collingwood and Riverside apartments as properties she owns with her husband. See Ex. 4.

For these reasons, there exist genuine issues of material fact and plaintiffs are not entitled to judgment as a matter of law.

## III. Plaintiffs Benjamin And Shaki Alli Cannot Seek To Enforce Contracts They Are Now Claiming They Were Not Parties To

The Collingwood HAP and regulatory contracts were executed by HUD and Benjamin Alli on behalf of BSA Corporation. App. 97, 109. BSA Corporation was incorporated under the laws of the state of Michigan. Compl. 2. The Riverside HAP contract was executed by HUD and Benjamin Alli doing business as BSA and Associates. App. 4. BSA and Associates was never incorporated. Pl. Mot. 5. In plaintiffs' motion for partial summary judgment, Benjamin Alli claims he could not have breached the Collingwood HAP contract because he was not a party to the contract. Id. at

[6] BSA and Associates was never incorporated under the laws of any State, and, therefore, is not considered a separate, legal entity.

7. Plaintiff Shaki Alli claims she could not have breached the Collingwood and Riverside HAP contracts because she was not a party to either of those contracts. Id. at 6.

The only parties who may maintain an action in this Court for breach of contract are those who have entered into a contract with the United States. Merritt v. United States, 267 U.S. 338, 340 (1925); see also Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984)(finding that the United States consents to be sued upon contract claims only by those with whom it has privity of contract).

Incredibly, while Benjamin and Shaki Alli now claim that they are not parties to the Collingwood HAP contract and the Collingwood and Riverside HAP contracts, respectively, they have not sought to voluntarily dismiss their claims against the United States for breach of those same contracts. If the Court determines that Benjamin Alli is not a party to the Collingwood HAP and regulatory contracts and enters judgment for Mr. Alli upon defendant's counterclaims regarding those contracts, then the Court should also enter judgment for defendant upon Benjamin Alli's claim that defendant breached the Collingwood HAP and regulatory contracts for lack of privity. Merritt, 267 U.S. at 340.

Likewise, if the Court determines that Shaki Alli is not a party to the Collingwood HAP and regulatory contracts and the

Riverside HAP contract and enters judgment for Mrs. Alli upon defendant's counterclaims regarding those contracts, then the Court should also enter judgment for defendant upon Shaki Alli's claim that defendant breached the Collingwood HAP and regulatory contracts and the Riverside HAP contract for lack of privity. Id.

## IV. Plaintiffs' Argument That Defendant Is Not Entitled To Relocation Expenses Is An Issue Regarding Damages And Is Inappropriate At This Stage Of The Case

Plaintiffs claim that summary judgment should be entered as to all of defendant's counterclaims because the HAP contracts do not provide for reimbursement of relocation expenses. Pl. Mot. 7-9. Plaintiffs' motion for partial summary judgment should be denied because it is premature.

To establish liability for breach of contract, defendant must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).

In this case, defendant has alleged and can support at trial that there were valid HAP and regulatory contracts between HUD and plaintiffs; that under those contracts, plaintiffs had a duty to keep the buildings in decent, safe and sanitary conditions; that plaintiffs failed to maintain their buildings to that

standard; and that, as a result, defendant incurred damages in having to relocate tenants to alternative housing.

Whether defendant is entitled to recover specific damages is an issue of damages, not liability. See Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996) ("[N]ot every injury resulting from a breach of contract is remediable in damages.") (citing Globe Ref. Co. v. Landa Cotton Oil Co., 190 U.S. 540 (1903)). In this case, the issues of liability and damages have been bifurcated. Therefore, plaintiffs' argument that it is entitled to judgment as a matter of law because defendant is barred from recovering its relocation costs is premature.

V. The Plain Language Of The HAP And Regulatory Contracts Do Not Preclude Defendant From Recovering Its Claimed Damages

The plain language of the HAP and regulatory contracts allow the Government to recover it relocation expenses in the event of plaintiffs' breach. Therefore, regardless of whether plaintiffs' argument is properly presented at this stage of the case, it is meritless.

Contract interpretation begins with the plain language of the agreement. NVT Techs. Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983).

Where the language of a contract is clear and unambiguous, the provisions of the contract must be given the meaning that would be understood by a reasonably intelligent person acquainted with the contemporaneous circumstances. Frazier v. United States, No. 04-1481C, 2005 WL 1793417 at *3 (Fed. Cl. July 28, 2005). A contract provision is unambiguous where a plain reading of the provision results in only one reasonable interpretation. Id.

In their motion, plaintiffs claim "[t]he HAP contracts do not provide for reimbursement of relocation expenses. They very specifically provide the remedies available to HUD in the case of a breach . . . ." Pl. Mot. 10. However, section 2.21(b)(3) of the Riverside and Pingree HAP contracts and section 20(b)(3) of the Collingwood HAP contract, which are all quoted in plaintiffs' motion, provide that in the event of a breach HUD may

> [a]pply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with this Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to [HUD] arising from a default under any of the terms of this Contract could be irreparable and amount of damage would be difficult to ascertain.

App. 24, 56, 96 (emphasis added). The same language is found in the Collingwood and Pingree regulatory agreements. Id. at 81, 107.

Accordingly, the plain language of the HAP and regulatory contracts do not bar defendant from recovering relocation expenses as plaintiffs assert. See NVT Techs. Inc., 370 F.3d at 1159. Moreover, plaintiffs' argument that the HAP contracts limit HUD to injunctive relief is a narrow reading of the contracts and renders the phrase "or for such other relief as may be appropriate" meaningless. Pl. Mot. 10; see also Johnson Controls, Inc., 713 F.2d at 1555.

Because the plain language of the HAP and regulatory contracts do not explicitly limit HUD from recovering its relocation expenses, plaintiffs' motion for partial summary judgment should be denied.

## VI. If Defendant Is Successful On Its Counterclaims, It Is Entitled To Recover Damages That Were Foreseeable At The Time of Contracting Regardless Of Whether Such Damages Were Explicitly Provided For In The Breached Contracts

Plaintiffs argue that defendant may not recover any money damages because it failed to explicitly reserve the right to such damages in the HAP contracts. Pl. Mot. 10. Even if the contract provision that explicitly allows HUD to seek "any other relief as may be appropriate" were disgarded, plaintiffs' argument remains unsound.

"The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos Irrigation & Drainage Dist. v.

United States, 111 F.2d 1557, 1562-63 (Fed. Cir. 1997). The injured party must show that but for the breach, the damages would not have been suffered. Id. Moreover, it is well-established that a party injured by a contract breach shall be awarded damages resulting from the breach that were foreseeable at the time of contracting. Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854); see also Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001); Bighorn Lumber Co., Inc. v. United States, 49 Fed. Cl. 768, 773 (2001). Damages are foreseeable at the time of contracting if they were the natural and proximate result of the breach. Hughes Communications, 271 F.3d at 1066. In other words, the injury that occurs must be one that a prudent man would realize to be a probable result of his breach. Landmark Land Co., Inc. v. Federal Deposit Ins. Corp. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001). Therefore, only a reason to foresee the damages is required, not actual foresight.

Here, the HAP contracts required plaintiffs to keep the apartment buildings in decent, safe and sanitary conditions. App. 11, 44, 88. The reasons for this requirement are obvious. A HAP contract may cover an entire building and all its tenants or a portion of a building and those tenants that live in the covered units. See Exhibit 7, attached hereto. These are known as project-based HAP contracts. Id. Under a project-based HAP

contract, HUD directly sends subsidy payments to the owner of the building. Id. Tenants in buildings covered by HAP contracts are low-income or very low-income and depend upon HUD's assistance in obtaining suitable housing. Id.

When the term of a HAP contract expires and the owner chooses to opt out of the contract instead of renewing it, HUD's assistance changes from project-based assistance to tenant-based assistance. Id. This means that the subsidy payments attach to the assisted tenant's household, not to the housing project itself. Id. As a result, the tenant has the option to stay in its current building so long as the building is deemed safe, decent and sanitary by HUD or to relocate to other appropriate housing at the tenant's expense. Id. When a building under a project-based HAP contract is deemed by HUD to be not decent, safe and sanitary, HUD may relocate the tenants to other suitable housing and will use public funds to conduct that relocation. Id.

In this case, it was plainly foreseeable at the time of contracting that if plaintiffs failed to maintain the apartment buildings in decent, safe and sanitary conditions, HUD could not simply stop its payments and leave the tenants, who depended upon HUD's assistance, in housing that was indecent, unsafe and not sanitary. HUD clearly would have to evacuate those tenants and incur the expenses in doing so. This was especially the case for

the Collingwood apartments, where HUD was required to take over the building after several tenants reported that the building had absolutely no heat in the middle of January in Detroit and neither plaintiffs nor a building manager could be reached all day. See Ex. 6, attached hereto.

Moreover, the fact that the contracts do not explicitly list relocation expenses as a remedy for plaintiffs' breach does not preclude defendants from recovering relocation expenses. Defendant is entitled to damages that were foreseeable at the time of contracting regardless of whether they are specifically provided for in the contracts. Hughes Communications, 271 F.3d at 1066; Bighorn Lumber, 49 Fed. Cl. at 773. Moreover, section 2.21(c) of the Riverside and Pingree HAP contracts and section 20(c) of the Collingwood HAP contract provide that

> [t]he availability of any remedy under this Contract . . . where applicable, shall not preclude the exercise of any other remedy under this Contract . . . or under any provisions of law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

App. 25, 57, 96.

Therefore, plaintiffs' argument that HUD may not recover its relocation expenses in this case is without merit, and their motion for partial summary judgment should be denied.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny plaintiffs' motion for partial summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s Mark A. Melnick by Frank E. White, Jr.
MARK A. MELNICK
Assistant Director

/s Marla T. Conneely
MARLA T. CONNEELY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel. (202) 307-1011
Fax. (202) 307-0972

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing & Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

August 29, 2005

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI
ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

ORIGINAL

---

The Deposition of CORY FANNING,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 11:30 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.

APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200

Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236

Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011

Appearing on behalf of the Defendant.

ALSO PRESENT:

Dr. Benjamin Alli

Detroit, Michigan
Thursday, February 3, 2005
11:30 a.m.

CORY FANNING,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Good morning, Mr. Fanning. How are you today?

A. Fine, thanks.

Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case brought against it by Benjamin Alli and BSA Corporation.

Would you please state your name and address for the record?

A. My name is Cory Fanning. I live at 1949 Devonshire in Bloomfield Hills.

Q. Have you had your deposition taken before?

A. One time.

Q. When was that?

A. I would say ten years ago.

Q. What kind of case was it?
A. It was a -- I'd bought a company and the guy that I bought it from did some things that he didn't come through on and so I sued him.
Q. So you were the plaintiff in that case?
A. Yes.
Q. Other than that time, had you been deposed before?
A. No.
Q. Let me go through some ground rules with you to kind of help things along today for this deposition. First of all, if you don't understand a question that I ask you, please ask me to repeat it or to clarify it. If you answer my question, I will assume that you understood what I was asking.
A. Okay.
Q. Secondly, please answer the question that you are asked. Third and most importantly, let me finish a question before you answer it so the court reporter doesn't have to record us talking over each other.
A. Okay.
Q. If you need to break at any time, let me know and I'll be happy to accommodate you. Are you prepared to give full and accurate testimony today?
A. Yes.
Q. Are you on any medications or suffering from any

medical condition that affects your ability to give full and accurate testimony today?

A. No.

Q. Did you prepare for your deposition today?

A. No.

Q. Have you met with or spoke to Dr. Alli's attorney in this case, Eric Stempien, before today?

A. Just after I spoke with you.

Q. Had you spoken or met with him before that?

A. No.

Q. When was the last time you spoke with or met with Dr. Alli before today?

A. I never have.

Q. You've never spoken or met with him?

A. Only his real estate broker.

Q. I left out one ground rule. If you could answer all questions verbally because the court reporter can't record shakes of the head.

A. Yeah.

Q. So please try to say yes or no or something --

A. Okay.

Q. -- verbal. Are you currently employed?

A. Yes.

Q. Where?

A. At Hazel Park Lutheran Church.

Q. What is your position there?
A. I'm a pastor.
Q. What do your duties include as a pastor?
A. Everything. Caring for the congregation, conducting worship services, teaching spiritual classes.
Q. Are you employed anywhere else?
A. No.
Q. How long have you been a pastor at this church?
A. At this church?
Q. Yes.
A. Two years.
Q. Where were you a pastor before?
A. At Holy Cross Lutheran Church in Jenison, Michigan.
Q. How long were you a pastor there?
A. For two years also.
Q. And before that where were you employed?
A. At Cross of Christ Lutheran Church in Bloomfield Hills.
Q. How long were you there?
A. For four years.
Q. Have you had any other career other than that of a pastor?
A. I worked for Marriott for seven years before that.
Q. What was your position with Marriott?
A. Management.

Q. What did your duties include?
A. Checking people into the hotel and out of the hotel and insuring that it's cleaned and providing reports to owners.
Q. Other than your experience with Marriott, have you had any other career other than that of pastor?
A. I owned an office building for a while. Does that count as a career?
Q. It does. When did you own this office building?
A. I sold it about a year and a half ago and I owned it for three years.
Q. Where was this office building located?
A. In Grand Rapids, Michigan.
Q. Why did you sell it?
A. Because I couldn't manage it. I moved to Detroit and I couldn't manage it from a distance.
Q. How big was this office building?
A. Fifteen thousand square feet.
Q. Why did you buy it?
A. To make money.
Q. How much did you pay for it?
A. $650,000.
Q. How much did you sell it for?
A. $650,000. Didn't make money.
Q. Who was leasing from you in this office building while

you owned it?
A. Oh, I don't have the list of people. Pittsburgh Paint was one of them. A trucking company. I'd have to go look their name. Accountants and some insurance people.
Q. Did you go to high school?
A. Yes.
Q. Did you graduate?
A. Yes.
Q. Did you attend college?
A. Yes.
Q. Where?
A. At Concordia College in Ann Arbor, Michigan.
Q. What did you study there?
A. Business administration.
Q. Did you graduate?
A. Yes.
Q. What was your degree in?
A. Business administration.
Q. What year did you graduate?
A. In 1986.
Q. Did you continue your schooling after you graduated from there?
A. Yes.
Q. Where?

A. At Concordia Theological Seminary.
Q. Did you graduate from there?
A. Yes.
Q. When?
A. In 1997, I think.
Q. Did you continue your schooling after you graduated from Concordia Theological Seminary?
A. No.
Q. How big is your current congregation?
A. Two hundred members.
Q. Do you get paid for your work there?
A. Yes.
Q. How much do you get paid?
A. $34,000 a year.
Q. Was Holy Cross the church you worked at before you worked at the church you're working at now?
A. Yes.
Q. Did you get paid for your work at Holy Cross?
A. Yes.
Q. How much did you get paid there?
A. 56,000.
Q. Do you know the plaintiff in this case, Dr. Benjamin Alli?
A. No.
Q. Had you ever heard of him before?

CORY FANNING
February 3, 2005

A. Yes.
Q. When?
A. When I was trying to buy Collingwood.
Q. When you say Collingwood, are you referring to the Collingwood/Kirkwood Apartments?
A. Yes.
Q. What year was that?
A. I'm not sure.
Q. Would it refresh your recollection if I showed you a copy of the real estate purchase agreement?
A. Yeah, I imagine.
MS. CONNEELY: Would you mark this as Exhibit 1.
MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBER 1
11:40 a.m.
BY MS. CONNEELY:
Q. Mr. Fanning, I'm handing to you what has been marked as Exhibit Number 1. Will you take a look at that document? Just let me know when you're finished.
A. Okay.
Q. After reviewing that, do you now remember what year you were trying to buy the Collingwood/Kirkwood Apartments?
A. The date on here is 1999 and it makes sense to me.

Q. How did you first hear that the Collingwood Apartments were for sale?
A. From a broker at Marcus and Millichap.
Q. Do you remember the name of that broker?
A. I don't.
Q. Had you ever owned or managed a building before?
A. No. Let me say that again. I managed hotels but I hadn't owned an apartment building or managed apartment buildings before.
Q. Why were you looking to buy an apartment building at that time?
A. To make money.
Q. How did the agent at Marcus and Millichap get your contact information, if you know?
A. To get my -- I contacted him.
Q. You contacted him?
A. (Indicating in the affirmative).
Q. Did he -- Did this agent at Marcus and Millichap tell you about the Collingwood/Kirkwood Apartments when you, when you first contacted him?
A. Oh, gosh. I don't know. We probably explored lots of properties.
Q. Did you have a price range within which you wanted to purchase an apartment building at that time?
A. Yes. I wanted something more than 500,000 and less

EXHIBIT NO. 2
Alli
DATE: 1-3-05
KATHRYN L. JANES, CSR, RMR, CRR

**This** DEED OF TRUST IS CREATED THIS DAY OF JUNE 30, 1992 REGARDING REAL ESTATE LOAN FOR PROPERTY KNOWN AS COLLINGWOOD/KIRKWOOD APARTMENT AS COLLATERAL ,IN DETROIT,MICHIGAN,USA, BETWEEN:

Alhadja Barikisu Abegbe,a business woman of No.6 Moshalasi street, Obalende,Lagos and Dr and Mrs Ben and Shaki Alli of P.O.Box 36081 Grossepointe,Michigan 48236,USA.

WHEREAS:

(1) Under the DEED OF TRUST immediately convey to Dr.Ben and Shaki Alli whose signature are as signed below received the sum of $250, 000.00( twohundred and fifty thousands before and prior in January 1991 to meet certain repairs required by HUD and for the proper maintenance and Housing quality standard for the above named real estate property located in the City of Detroit ,viz 1610 Collingwood and 1635 Calvert,known as Collingwood/Calvert Apartments,a 52 units section 8 buildings.

(2)That such amount was to be used for repairs which includes but not limited to : electrical conversion from circular to florescent fixtures and lamps,reinforcement of wood underlayments,replacement of windows to energy efficient windows,doors,hallway ceilings,installation of security doors( where necessary) and any other repairs as maybe necessary.

(3) Payment to begin September 1992 at interest rate of 12.5% for 60 months on $250,000.

AND WHEREAS":

(1) A second loan under this DEED OF TRUST created on the same real estate property as specified above for $75,000 toward specific repaired requirement per notice from the HUD office dated June 15, 1992 Physical inspection report ,to be used specifically for the whole tuckpointing around the 4 quadrant of the building where the deterioration of bricks,morter separating from the concrete and the bricks,belt and ledging.This work must be done and a-v pictures taken and submit to lender within 90 days.A letter dated June 28, 1991 from Cagle and Son and two others bid are acknowledged.

(2) The Sum of $75,000 required for this complete work becomes a lien on the property at interest rates of $12.5% for 60 months, payment may not be commenced until January 30,1993 or extension granted for further deferred,while interest acrued.

(3) While total lien created on these properties are sumed to be $325,000.00,one payment to begins as noted above while defer is allowed for the $75,000 only.

THEREFORE :

Dr and Mrs Ben Alli will save and keep indemnify the lender Alhadja Barikisu Abegbe at all times during the course of this loan,from all proceddings,liabilities and claims forever.

IN WITNESS WHEREOF Lender and the lendee set their hands as their signatures as noted below,after fully consented and attested to.

Alhadja Barikisu Abegbe

Dr.Ben Alli

Dated: June 30,1992
Lagos State.

Shaki Alli,his

DOJ-J-000348

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
THE UNITED STATES, Judge Allegra
Defendant.

---

The Deposition of BENJAMIN ALLI,
Taken at 315 North Center Street, Suite 200,
Northville, Michigan 48167,
Commencing at 10:07 a.m.,
Tuesday, January 5, 2005,
Before Angela D. Eitzman, RPR.

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

Thomas G. Massouras
Regional Office of Housing & Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.

ALSO PRESENT:
Shaki Alli

Northville, Michigan
Tuesday, January 5, 2005
10:07 a.m.

BENJAMIN ALLI

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Please state your full name and address for the record.

A. Benjamin Alli, 970 Lakeshore Road, Grosse Pointe, Michigan, 48236.

Q. Good morning, Dr. Alli, how are you today?

A. Fine. Thank you.

Q. My name is Marla Conneely. I'm an attorney for the United States of America, and I'm representing my client in a case that you've brought against them in docket number 01-669. Before I start with my questions, I want to set forth some groundrules for you.

First of all, if you don't understand the question, ask me to repeat it or clarify it. If you

me, so it's generic question.
Q. From 199 -- from 1990 to now, how many companies do you currently own?
A. I cannot remember that, because sometimes -- just for operation because of the name, I keep it in case somebody might need it. The actual one that I own that I form for operation is the B.S.A Operation.
Q. How many companies do you own that you do not use just for their name?
A. That could be several.
Q. One hundred?
A. One hundred, oh, no, no.
Q. Twenty?
A. No, it's less than that.
Q. Less than 20?
A. Yeah.
Q. Less than ten?
A. Maybe about ten.
Q. About ten companies?
A. Uh-huh.
Q. Can you name them?
A. Not right now.
Q. Can you name all of the companies that you own that you can remember?
A. Yeah, I own MVP.

Q. What do they do?
A. MVP just a name that I kept, was used for real estate acquisition.
Q. Any other company?
A. Well, I am part of the B.S.A and Associates.
Q. What does that company do?
A. Real estate management.
Q. When was that company incorporated?
A. I don't think it's a corporation, it's a dba.
Q. What is it doing business as?
A. Me doing business as B.S.A and Associates, Benjamin Alli d/b/a B.S.A Associates.
Q. Do you have a company named Benjamin Alli?
A. Now?
Q. (Nonverbal response)
A. It's in defunct.
Q. B.S.A and Associates is in default?
A. No, no. We used to have Benjamin Alli and Company. I think that one is not active, it's non active, it's expired.
Q. Did you incorporate B.S.A and Associates?
A. If I remember correctly, I don't think so.
Q. Where is the money for B.S.A and Associates kept?
A. Kept?
Q. (Nonverbal response)

A. Money for B.S.A and Associates?
Q. Let me rephrase the question.
A. Okay.
Q. Does B.S.A and Associates have any bank accounts?
A. At those times when we are doing businesses, yes, but it's been long time doing business.
Q. B.S.A and Associates is no longer doing business today; is that correct?
A. Yeah, because we use, as for the issue of the business, and we're no longer in business.
Q. When B.S.A was in business, did it have any bank accounts?
A. Yes.
Q. Where were these bank accounts?
A. If I remember correctly, possible Michigan -- Michigan National Bank, if I remember correctly, it's been such a long time.
Q. Is that the only bank account B.S.A and Associates had?
A. Could be some more, but I don't remember.
Q. When B.S.A and Associates stopped doing business, where did the money in the bank accounts for B.S.A and Associates, where did the money go to?
A. Who does it go to?
Q. Yes.

A. Possible zero, possibly there's no money in the account because we have to write the expenses.
Q. Was there any money in the accounts of B.S.A and Associates when it stopped doing business?
A. I don't think so.
Q. You mentioned MVP, B.S.A and Associates and Benjamin Alli and Associates, were there any companies that you had owned or incorporated between 1990 and today?
A. It's very likely, but I don't recall now.
Q. Do you recall any of them?
A. Not right now.
Q. Did you have a company called Alli and Associates?
A. No. Remember I said Benjamin Alli Corporation is no longer -- I do not have any company specifically called Alli and Associates, I don't have that.
Q. Did you have a company called B.S.A Corporation?
A. Yes.
Q. What did that company do?
A. Own real estate properties and managing real estate.
Q. Is B.S. -- strike that.
Is B.S.A Corporation currently doing business?
A. Yes.
Q. What is it currently doing?
A. What it did before, own and operate real estate,

apartment buildings.
Q. What real estate does B.S.A Corporation currently own and operate?
A. 2211 Pingree, 2987 Gladstone.
Q. Any other properties?
A. No.
Q. Does B.S.A Corporation have any bank accounts?
A. Yeah.
Q. Where?
A. I think maybe Republic Bank, maybe Republic Bank or Comerica Bank.
Q. Does B.S.A Corporation have monies kept in anything other than a bank account?
A. Like what?
Q. In a trust account?
A. No.
Q. In a certificate?
A. No.
Q. Are all of the monies owned by B.S.A. Corporation kept in bank accounts?
A. Uh-huh. Yes.
Q. Was all of the monies owned by B.S.A. and Associates kept in bank accounts?
A. Now?
Q. From 1990 until now?

A. Yes.
Q. Did you ever deposit your personal monies into bank accounts owned by B.S.A and Associates?
A. A lot of times.
Q. Did you ever take out money from the accounts of B.S.A and Associates for your own personal use?
A. No.
Q. Did you ever take out money from bank accounts owned by B.S.A. Corporation for your own personal use?
A. Never.
Q. Did you ever deposit your own personal monies into bank accounts for B.S.A. Corporation?
A. Yes.
Q. Did you ever take out monies from bank accounts owned by B.S. A and Associates for purposes -- strike that.
Did you ever take out monies from bank accounts of B.S.A. and Associates for any other purpose than purposes for B.S.A. and Associates?
A. Never.
Q. Did you ever take out monies from bank accounts owned by B.S.A. Corporation for purposes other than purposes for B.S.A. Corporation?
A. No, except when I loan money to the corporation, I have to get refund from it, reimbursement from it.
Q. How much interest would you charge the corporation --

strike that.

How much interest would you charge B.S.A. Corporation when you loaned money to it?

A. Zero.

Q. Did you ever loan money from any of your corporations?

A. From my personal --

Q. Strike that. I'll rephrase it.

Did you ever loan money from any of your own companies?

A. For doing what?

Q. For any personal purpose?

A. No.

Q. For any purpose regarding your other companies?

A. No.

Q. Did you ever loan money from B.S.A. and Associates for any purpose?

A. No.

Q. Did you ever loan money from B.S.A. Corporation for any purpose?

A. No.

Q. Does your wife loan money from B.S.A. and Associates for any purpose?

A. No.

Q. Did your wife loan any money from B.S.A. Corporation for any purpose?

A. No.
Q. Does your wife loan monies from any companies that either you or she owned for any purpose?
A. I didn't understand the --
Q. I'll state it again. Did you or your wife loan any monies from companies either you or she owned for any purpose?
A. No.
MR. STEMPIEN: Hold on. Before you answer, I think it's just not real clear, because you're asking if he loaned money from a company. Only the company could actually loan the money. I just -- I'm not sure that's real clear. I mean, he could withdraw the money, I suppose, but he wouldn't be actually giving the loan. It's the corporation that would be giving the loan. That's just my objection.
MS. CONNEELY: I'll rephrase it.
A. Okay.
BY MS. CONNEELY:
Q. Did B.S.A. and Associates ever loan you or your wife any monies?
A. No, never.
Q. Did B.S.A. Corporation ever loan any monies to you or your wife?
A. No.

Q. Did B.S.A. and Associates ever loan money to any of your other companies?
A. No.
Q. Did B.S.A. Corporation ever loan any monies to any of your other companies?
A. No.
Q. You mentioned earlier that you saw an ad in the paper regarding buildings being sold by HUD; is that correct?
A. Yes, ma'am.
Q. What did you do after you saw that ad?
A. Well, I first went to the address, they have an address and phone number. So I went downtown, the building right in the heart of the city. When I got there, that was about two or three days later at the time. I saw a lot of people line up, a long line. So I asked them what they are doing. They said, oh, the company selling the apartment building.
Q. So you saw the ad in the paper, and a few days later you went to the address listed in the paper; is that correct?
A. Yes, ma'am.
Q. And when you went to that address there was a long line of people; is that correct?
A. Yes, ma'am.

you otherwise.
A. Okay.
Q. Do you understand?
A. Yes.
MR. STEMPIEN: Off the record a moment.
(Discussion off the record at 12:13 p.m.
(Back on the record at 12:14 p.m.)
BY MS. CONNEELY:
Q. Who was the building manager of the Collingwood apartments from 1997 through 2002?
A. Oh, my God, we have several people that we hire, we let go, often normal stuff like that.
Q. Did you have more than one building manager at the Collingwood apartments?
A. Very likely, very, very likely, because sometimes just let them go, we hire somebody else, stuff like that.
Q. Did you have more than one building manager at the Collingwood apartments at a time?
A. Very likely, yeah.
Q. How many building managers did you have at the Collingwood apartments between 1997 and 2002?
A. I don't remember, but usually we have minimum of two people. Then we have a supportive team from outside. We have assistants, and sometimes we also have some tenants that we just pay for stuff so they can also

keep us aware of anyone that commit crime. There's some tenants we also pay for some minor work, cleaning work, painting, sometimes to keep them busy, you know.
Q. Was there someone -- strike that.
Who was in charge of the -- strike that.
You mentioned that there were at least two building managers; is that correct?
A. No, one manager and assistant, and support person from outside.
Q. Who was the manager in 1997?
A. I cannot remember that.
Q. Who was the manager in 1998?
A. I cannot remember that.
Q. Who was the manager in 1999?
A. You say in Collingwood?
Q. In Collingwood apartments?
A. Collingwood Kirkland or just one apartment because there are two apartments for --
Q. Let's start with Collingwood. Who was the building manager in 1991 for Collingwood?
A. I think I have a guy named Laird, L-A-I-R-D. He worked for me there. And I have another lady, another lady, and there was two or three that we just call for supportive work on the premises.
Q. Were there areas of the Collingwood Kirkwood

apartments that were locked?
A. Oh, all the secure -- all the storage areas were locked. The front door is locked, the mail room is locked.
Q. Were there areas of the Collingwood apartments that were locked and not accessible to tenants?
A. All the areas that we locked are not subject to tenants.
Q. Who had keys to those areas?
A. Myself, the manager.
Q. One manager?
A. Oh, yeah, only one person.
Q. Anyone else?
A. Maybe my wife.
Q. Who was the one manager that had keys to these locked areas of the Collingwood Kirkwood apartments in 1999?
A. Whoever that might be the manager, he would have the key.
Q. Who was the manager at that time?
A. I don't remember.
Q. Do you have records that would identify the manager of the -- Collingwood Kirkwood apartments at that time?
A. Possible.
Q. When you -- strike that.
During the time you owned and managed the

Collingwood Kirkwood apartments --
A. Yes, ma'am.
Q. -- were you employed in any other capacity other than as owner and manager of those apartments?
A. No.
Q. What were your duties with respect to the Collingwood Kirkwood apartments during the time that you owned and managed them?
A. To oversee the management, day-to-day management of the building.
Q. What does that mean?
A. It means that the impression of the building, whatever is necessary to sustain the smooth operation, keep the place well; repairs, get plumbers, get supplies that necessary for repairs and ensure that the work is done by the contractor and by the resident that we hired, and some other stuff. Whatever is involved, you know, that's what I do.
Q. Did you receive reports from tenants regarding repairs that needed to be done in their units?
A. Report from tenants? Tenants don't report. We have to do inspection before we know what needs to be done.
Q. During the time that you owned and managed the Collingwood Kirkwood apartments, did any tenant in the Collingwood or Kirkwood apartments report a problem or

repair that needed to be done to you?
A. Once in a while they do, but not all the time. They would have point -- punch list inspection that we do every six months or periodical. It depends on what type of tenants.
Q. During the time that you owned and managed the Collingwood Kirkwood apartments, how did a tenant report a problem in their unit?
A. They call our phone number, talk to the manager on the premises. If they don't get it done, we advise them to call the office. Our phone number is right on the -- on the outside wall, not very far away, so they can call us 24 hours for any work that need to be done.
Q. Where were your offices located?
A. We have an office inside the building, and also one in Grosse Pointe.
Q. Did you have an office in the Collingwood Kirkwood apartments?
A. Yes, ma'am.
Q. In both buildings?
A. In all the buildings we have where we have to meet tenants, you know.
Q. Did the Collingwood apartments have a -- have one building manager?

A. Collingwood apartments, they'd have two buildings for Collingwood. Remember I just said that there's one on Calvert, one on Collingwood, they have separate people.

Q. Did each building have its own building manager?

A. We just have Calvert because there's only 17 units. So according to Detroit Housing Court, if you are not 20 or more, you're not supposed to have a business manager, but we have a lady on Calvert that we refer to as the building manager, she performed the daily function of the daily --

Q. So there was one building manager for both buildings at the Collingwood Kirkwood apartments; is that correct?

A. No, it's wrong.

Q. There were two building managers?

A. Yes, ma'am. I just said that on Calvert, C-A-L-V-E-R-T, because 17 units, we have a lady that live there who performs the functions of building manager, but we fired the manager.

Q. What was her name?

A. Crystal.

Q. Did you keep a record of the building managers under your employ for the Collingwood Kirkwood apartments?

A. During the time?

Q. Yes.
A. Yes. Now, no.
Q. What happened to those records?
A. I don't know where I put them.
Q. You don't know? Can you say that again?
A. I don't know what I have done with it. The time limitation expired on them, so I don't know what I have done with them.
Q. When you received a report from a tenant at the Collingwood Kirkwood apartments of a repair that was needed, what would you do?
A. The first thing I would do, I would ask them have they talked to the manager, because sometimes maybe they just came in, break the window, break the door, they said they don't know who did it, and they would try to avoid the manager. So I get a name, phone number and apartment number and I contact the manager, so he gave me the details of what happened. They would dispatch whoever would have that, specialize in the area, if it's a leak, if it's a dub with key, kind of split, we have people that go there, or when I'm around there, I fix it once in a while. You've -- it's got to be done right away. I make them sign a work order that shows that work was performed. And I acknowledge that we don't charge for it, but if they do again, we charge

to catch it or a glue tip. We have glue tip, we buy in dozens from Home Depot, one of the big outlet here. We put a glue tip around so they have children, so to make sure that the kids don't get their hands into the trap.
Q. Referring back to Exhibit Number 20, the Deed of Trust?
A. Yeah.
Q. Did you ever make any payments on this Deed of Trust to Ms. Abegby?
A. Well, maybe couple of, maybe couple of payments. We never make all the payments because we have a hard time with payments.
Q. Where did the money from the payments come from?
A. It comes from the project account.
Q. Did you say the project account?
A. Uh-huh.
Q. You mentioned that there were also Deeds of Trusts with Ms. Abegby's encumbering the Riverside apartments; is that correct?
A. Yes, ma'am.
Q. On those Deed of Trusts, did you make any payments on those?
A. A few payments, yeah.
Q. Where did the money come from for those payments?

A. Project account.
Q. You also mentioned that there were Deeds of Trusts with Ms. Abegby that you entered into encumbering the Pingree apartments; is that correct?
A. Yes, ma'am.
Q. Did you make payments on those Deeds of Trust?
A. Few payments, yes.
Q. Where did the money come from for those payments?
A. Project account.
Q. When you say the project account, what are you referring to?
A. Yes, ma'am. Go ahead.
Q. What are -- when you say the project accounts, what account are you referring to?
A. Well, on the HUD handbook, the handbook is 4317.2 revision. The quote that Mr. Malone gave me on the phone for the payment of Ms. Abegbe is code number 2320 and also code number 2310 and said we can pay for those code allowed by HUD.
MS. CONNEELY: I need to have the court reporter mark as Exhibit 21 the following two-page document.
MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 21
1:30 P.M.

Q. Do you remember when they inspected the apartments?
A. No.
Q. Which apartment buildings did they inspect?
A. Got to be Riverside Collingwood.
Q. Did Roland Samaroo prepare a written report of his inspection of the Collingwood Kirkwood apartments or the Riverside apartments?
A. Very likely.
Q. Did you turn over a copy of that report to your counsel in this case?
A. I don't know.
Q. I'd like to ask the court reporter to mark this as Exhibit 31.

MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 31
3:21 P.M.

BY MS. CONNEELY:
Q. Have you seen this letter before?
A. Yes, ma'am.
Q. Did you receive a copy of this letter?
A. Yes.
Q. Please refer to the paragraph marked as number two on the first page of the letter.
A. Uh-huh.
Q. That paragraph talks about a second loan --

A. Uh-huh.
Q. -- that was taken encumbering the Collingwood Kirkwood apartments?
A. Uh-huh.
Q. The letter from HUD then asks you to provide evidence that a certain amount of money is repaid to the Collingwood Kirkwood operating account?
A. Uh-huh.
Q. Was that money ever repaid to the account -- strike that.
Did you ever repay this money to the Collingwood Kirkwood operating account?
A. No.
Q. Why?
A. Because the letter's an extortion, it's not true. It's a violation of HUD regulation.
Q. If I can refer you now to the paragraph marked as number three.
A. Uh-huh.
Q. That paragraph talks about a car --
A. Uh-huh.
Q. -- that the Collingwood Kirkwood apartments leased from you --
A. Uh-huh.
Q. -- for a monthly payment of $420. The letter then

states that this was not an eligible project expense and asked you to reimburse the project for a total of $15,120. Did you reimburse the project this amount of money?

A. No.

Q. Did you receive reports from tenants -- strike that.

Did you receive reports of mice from tenants at the Riverside apartments?

A. Reports of mice? What kind of report? Can you elaborate?

Q. Did a tenant at the Riverside apartments ever report to you that they had seen a mouse in the building?

A. No.

Q. Did you ever see any mice at the Riverside apartments?

A. No.

Q. Did you ever exterminate for mice at the Riverside apartments?

A. Yes.

Q. Why?

A. Why? I see holes, we plug the holes, that's what we do. That's the holes anywhere that mice can come, maybe when they're moving, tenants moving the furniture in or the kid playing hard in their room, they break wall. We just ask to repair the wall, that's how we did it.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
Hon. Allegra
THE UNITED STATES,
Defendant.

ORIGINAL

The Deposition of SHAKI C. ALLI,
Taken at 315 North Center Street, Suite 200,
Northville, Michigan,
Commencing at 8:57 a.m.,
Monday, January 3, 2005,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.

APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien, P.L.L.C.
315 North Center Street
Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street NW
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

ALSO PRESENT:
Benjamin Alli

Northville, Michigan
Monday, January 3, 2005
8:57 a.m.

SHAKI C. ALLI,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Good morning, Ms. Alli.
A. Good morning.
Q. Please state your name, your full name, and address for the record, please?
A. Shaki, and my last name is Alli. My address, I use my counsel's address for any mail address.
Q. Okay. And what is the address?
A. My address? Oh, you mean the counsel address? I say I'm going to use his address for my mailing in case of any -- is that the reason?
MR. STEMPIEN: She's entitled to know what your address is, yes, she's entitled to know.
A. Okay. 970 Lake Shore Road, Grosse Pointe, Michigan 48236.

A. No.
Q. Are you currently employed?
A. Yes, I'm still running the apartment left.
Q. And which apartments are those?
A. The Pingree and Gladstone, I'm still running it.
Q. When you say you're running it, what do you mean?
A. I'm managing it, yeah. I rent it out. I'm still doing what I'm doing to rent it, to make sure it still in good condition, to rent to the tenant, to make sure the tenant, when they call, I answer the phone to make sure, just the same thing I've been doing before, I'm still doing it.
Q. How long have you been doing this?
A. Since '82.
Q. And have you been employed by BSA & Associates since 1982?
A. Yes.
Q. Managing apartments?
A. Yes.
Q. Have you ever managed any other apartments besides the Pingree and Gladstone apartments?
A. Yes. I manage Collingwood/Kirkwood, I manage Riverside apartments.
Q. And how long did you manage the Riverside apartments?
A. Since we bought it up to the time that we sold it.

Q. How long did you manage the Collingwood/Kirkwood apartment?
A. Since we bought it until they took it from us.
Q. What was your salary when you were managing the Collingwood/Kirkwood apartments?
A. Was no salary. I get paid based on what I'm doing, not just a salary, it's not really a salary, but I don't remember exact amount that I got paid here.
MS. CONNEELY: I would like to ask the court reporter to mark this as Exhibit 1?
MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBER 1
9:12 a.m.
BY MS. CONNEELY:
Q. If you could take a look at this and let me know when you're finished?
A. Yes, I do all this.
Q. Have you seen this document before?
A. Yes, is very likely. I mean, I don't remember it, yes, it's very likely that I have.
Q. Do you know what this is?
A. I am doing it as my job description.
Q. This is your job description for what?
A. For managing, for administration for apartments, administration for the apartments, apartment

management of all the three projects.
Q. This is your job description for?
A. All of the three projects.
Q. Collingwood/Kirkwood, Riverside and Pingree/Gladstone?
A. Yeah.
Q. Okay. Let's start with the first paragraph?
A. Uh-huh.
Q. The project-based accounting certification/recertification worksheet and monthly subsidy buildings?
A. Yes.
Q. Did you do that?
A. Yes.
Q. Can you describe what you did based on this -- strike that.
Can you tell me a little bit more what this means?
A. Well, when the tenants, when we approve the application for renting, in order for the government to subsidize the tenant rent, they have to submit all the birth certificate, so we require that the tenants submit the birth certificate for the children. They need income of the tenant, whatever income they have, we have to request for it, I have to computerize in the HUD paper, and then the tenant, after I prepare

it, the tenant has to sign it. That copy, I have to submit that to the HUD, I have to keep a copy in my file and they have to -- before the advent of the computer. When the computer comes, we have to fit it into the computer.

Q. Were you the only one who performed this task?

A. No, I have other -- my three kids help.

Q. Could you name your three children that helped?

A. Ade, Bisi and Remi.

Q. Did they help you throughout the entire time that you performed these services for --

A. Yes.

Q. -- these apartments?

A. Yes.

Q. Were they paid also for their services?

A. Yes.

Q. How much were they paid?

A. I don't have it in my head, but we do pay them.

Q. Were they paid salary or hourly?

A. They just paid them set amount every month.

Q. And how is that amount determined?

A. Before we retained their service, I called the different places and I talked to the people who are doing the same thing, how much they were going to charge me. Some says $75 an hour, some $50 an hour.

You know, the cheapest anyway is $50 an hour, so -- and I realize that, and there is not a job that he can finish like in two hour, three hour, four hour, and I realized that my children can do the same thing. If they can do the same thing, why can't I use them, and they are available to me for 24 hours? They can be useful so -- and I take their service.
Q. Do you remember the companies you called inquiring about the similar services and how much they would charge?
A. I saw it in the newspaper, that's how I called. I didn't have it in my head, but I called not just one people, different people.
Q. How many people?
A. I think about four or five people in the newspaper, yeah.
Q. Do you remember any of their names?
A. No, I don't.
Q. Let's move on to the second paragraph. If you could read it to yourself? Can you explain in more detail what this means?
A. All the papers the government required has to be fit in the computer. All this certification, all the billings, it has to be in the computer. That's where they at. After I write them out, what I need to

write, I give it to my children to do that in all the projects.
Q. Did you always delegate the work to your children or did you do this yourself sometimes?
A. I do everything myself because they don't know how to do all this billings. I have to do it and they have to put it in the computer.
Q. Do you remember what program you used to put the information into the computer?
A. We have a -- I forgot the name. There is a booklet about this volume big from the government that they try to send it to all the Section 8 people to make sure that they read it. That's the guidance for the recertification. We have to read it to make sure that we were able to -- owner manual for certification.
Q. Let's move on to --
A. So I have to use that.
Q. Let's move on to the next one. Occupancy clerical project management delinquency notices, what does that mean?
A. Okay. Occupancy clerical, this I did, clerical like I have to make sure that every month you have to recertify, you have to send a letter out like three months ahead of the time to give them enough time to submit all this informations. We try -- we have to

follow up either with the Social Service to make sure the Social Service able to get these papers available to recertify the tenant so the government do not hold the tenant off from their Section 8. I have to make sure that all this paper are collated after it is submitted, completed. I have to submit the hard copy to the local office. At the same time I have to feed it to the computer, so all those things have to be done every month. It's not just one thing, it has to be continuous.

Q. Let's get down to the paragraph that says, travel to and from project meeting with contractors, investigating work done or performed and others?

A. Yes.

Q. What contractors are being referred to there?

A. Our contractor, the one we retained, the one we hired, because sometimes they want to get paid, so to make sure everything is done, we have to make sure before we pay them to make sure everything is done like they say it is done.

Q. Can you give me an example?

A. Because when we hire someone to fix the -- put a new window or put a new toilet or put a new carpet, I have to make sure whatever they said is done, make sure it is done.

Q. Did you ever hire a contractor to put in new windows?
A. I never did it by myself. He always do it, my husband always do it.
Q. Did you ever hire a contractor to put in new carpets?
A. I never did it by myself. He is the one that makes sure they write the contract. They have to make sure that it is done before I paid it.
Q. Can you give me an example of when you met with a contractor and investigated the work he or she had done?
A. I have to do what, say it again?
Q. Can you give me a specific example of one time that you met with a contractor that you had hired to investigate -- and then investigated the work that was done or performed?
A. Not just one time, as many times as possible, not just one time.
Q. Okay. Can you give me an example of one time that you did this?
A. I don't think I understand because I needed -- between 9:00 and 5:00, they pick a time, they call me and I go there and deal with them. Sometimes I go with him too.
Q. Can you give me the name of one contractor that you met with?

A. I remember I met with Mark Slaughter. I meet with -- I met with a lot of people.
Q. Who is Mark Slaughter?
A. Is one of the contractor, maintenance, yeah, he's the maintenance and also he do everything.
Q. Did you have a long-term contract with Mark Slaughter?
A. I don't have a long time, we always call them as needed. I meet with Blue Ray. I meet with a lot of people, Blue Rays also.
Q. Who is Blue Ray?
A. He is a contractor for heating and cooling.
Q. Did you ever meet with Blue Ray?
A. Yes.
Q. And what did you discuss when you met with them?
A. There is nothing to discuss, just to make sure, what did you do after you doing this, to test it and to make sure the job is done right.
Q. So you never hired a contractor to put in new windows?
A. No, I do not, not that I recall, because I let him do all the contract because they have to put it in writing to make sure that there is no discrepancy and work to be done or not to be done, so I let him do the handling of that.
Q. Did BSA & Associates ever hire a contractor to put in new windows?

EXHIBIT NO. 1
Alli
DATE: 1-3-05
KATHRYN L. JANES, CSR, RMR, CRR

JOB DESRCIPTION

SHAKI ALLI- OFFICE ADMINISTRATOR/TECHNICIAN

Project based accounting --certification and recertification, worksheet and monthly subsidy billings

Prepare computerized ready to input documents for computer expert and prepare hard copy of required forms, including HUD-50059. Monthly accounting reports and other reports

Occupancy clerical, project management deliquency notices.

Prepare all worksheets and monthly subsidy billings and review.

Travel to-and-from project--meeting with contractors, investigating work done or performed, and others.

Technical skill and supports necessary for performing frontline activities of the projects .

Taking application, screening tenants, maintain the project and accounti for project income and expenses

Laundromat contact and meeting with repair person and decide and formulate action for effectiveness.

Other responsibilities as needed including but not limited to providing social services ,socialwork and Counseling as needed, =Boi referral to Agencies and follow-up per need basis.

# ALLI, ET AL v. THE UNITED STATES

## ROLAND SAMAROO

February 3, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI
ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

The Deposition of ROLAND SAMAROO,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 8:40 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236
Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.



ALSO PRESENT:
Dr. Benjamin Alli



Detroit, Michigan
Thursday, February 3, 2005
8:40 a.m.

ROLAND SAMAROO,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBERS 1 - 21
8:40 a.m.

EXAMINATION

BY MS. CONNEELY:

Q. Good morning, Mr. Samaroo.
A. Good morning.
Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case that has been brought against it by Benjamin and Shaki Alli and BSA Corporation. Have you -- Let me step back.
Would you please state your full name and address for the record, please?
A. Roland Samaroo. My address is 18530 Mack Avenue, Grosse Pointe 48236.

Q. Mr. Samaroo, have you had your deposition taken before?
A. No.
Q. Let me go through some ground rules that will help today's deposition go along more smoothly for both of us and for the court reporter. First of all, if you don't understand a question that I ask, please ask me to repeat it or clarify it. If you answer my question, I will assume that you have understood what I'm asking.
A. All right.
Q. Secondly, please answer the question that you are asked. Next and most importantly, let me finish a question before you answer it. It just is a lot easier for the court reporter. It's difficult for the court reporter to try to, to try to get down what's going if we're talking over each other. Next, if you need a break at any time, just let me know and I'll be happy to accommodate you.
A. All right.
Q. Are you prepared to give full and accurate testimony today?
A. Yes, I am, to the best of my knowledge.
Q. Are you on any medications or suffering from any medical condition that could affect your ability to



give full and accurate testimony today?
A. No.
Q. Did you prepare for your deposition today?
A. Well, I gathered documents and I went over them, read them over.
Q. What documents did you gather?
A. Some of the inspection reports that I did and I followed it to -- some of the documents -- some of the documents of inspections that I did, you know, in the past, I followed it to Dr. Alli's mailbox.
Q. These inspections that you did in the past that you're talking about, what inspections are these?
A. Inspecting various properties of BSA and Associates for HUD. You know, when HUD, subsequent to HUD doing or giving a report, I would take the report and I would go and inspect the property for, you know, the violations, to correlate it and to give my report to Dr. Alli so he can have contractors come in and repair if there were violations that needed to be repair.
Q. Would you draft your own separate report?
A. I would just write it on the HUD report. Just write it right on there as I made the inspection, as I go around the building.
Q. So you would make notes on the HUD report itself and then send that HUD report with your notes to Dr. Alli;



is that correct?
A. Yes, I'd send -- I'll have, you know, a copy for my, a copy for myself, and I would send HUD, give HUD, the HUD report to Dr. Alli. What he gave me, the one that I got from him, I would write on that. I'd make a copy for myself and I would give him the one that he gave me, the one that I wrote on.
Q. And these are the inspection reports that you reviewed before your deposition today; is that correct?
A. Yes.
Q. Okay. Did you review anything else besides those reports?
A. Well, I looked at some of the pictures that I took in the past. The reports and the pictures.
Q. Have you spoken with Dr. Alli's attorney in this case, Mr. Eric Stempien, before today?
A. Yes. A couple of times. Once I've been to his office and twice, I think, three times, maybe not three times -- then I went to, waited for the subpoena person the other day. And then I -- but I could not make it on Tuesday and -- When I wasn't able to make it on Tuesday, I called Monday afternoon.
Q. The two or three times that you visited his office before, why did you visit his office?
A. When I got the call that, you know, he wanted to see



me, I wanted to know what for, and basically he told me it was a HUD inspection, for HUD inspections, and he wanted me to bring any documents and so I could and so I had set up an appointment with him. I wasn't able to find the documents then but I wanted to basically know what it was about so I went, I went up to his office in Northville. And he told me that there was a case involving HUD and Dr. Alli regarding inspections, inspections I did, inspections I did, HUD inspection from BSA essentially, and he asked me if I had deposition, you know, before, you know. But I told him not that I remembered. And he basically said I am a neutral party, not for or whatever, and that I should just tell them whatever question that I was asked of me by the HUD attorney and also to gather as much documents as I could find relating to my inspections and if I can get those to him.
Q. Did you get those documents to him?
A. Well, eventually. I got them -- I left them in the Dr. Alli's mailbox, mailbox, because I had a really tough time finding them. You know, it was a while ago, and I imagine he got them.
Q. Are you currently employed?
A. Yes.
Q. Where?

Page 9

A. State of Michigan Department of Corrections.
Q. What is your position there?
A. Clinical and forensic psychologist.
Q. What does your position entail?
A. Basically doing therapy with inpatients, prisoners. Crisis situations. If someone wants to commit suicide, is depressed, I'd see the prisoner and make an intervention. Essentially attending to the psychological needs of inmates from the Michigan Department of Corrections.
Q. Have you had any other position with the Michigan Department of Corrections other than the position you hold now?
A. No.
Q. How long have you worked for the State of Michigan?
A. About four years. About four years now.
Q. Where did you work before?
A. I worked for my own company.
Q. What was the name of that company?
A. Residential Provider Services.
Q. What did that company do?
A. Basically provided care and supervision, including housing, for developmentally disabled, mentally ill patients.
Q. What was your position with that company?

Page 10

A. I was the director of the company.
Q. How many employees did that company have?
A. It would vary. I want to say off the top of my head, maybe about 40, as far as I could remember, approximately.
Q. And you were the one that incorporated that company; is that correct?
A. Yes.
Q. When did you incorporate that company?
A. I think -- It might be in the '80s. I want to say maybe early, mid-'80s, off the top of my head.
Q. Did you work for that company from its incorporation until you started with the State of Michigan Department of Corrections?
A. For the most part, yes. The company was not like up and full running immediately after when it was incorporated. I remember that. It didn't have as many homes and clients, but yes.
Q. Did you have any other jobs at the same time as when you were working for the Residential Provider Services?
A. Well, I worked for Dr. Alli's company, you know, doing inspections, primarily. See what else I did. No. No. I didn't work for anyone, any other companies.
Q. What eventually happened to Residential Provider

Page 11

Services? Is it still operating now?
A. It's not operating now. I -- I basically stopped running the company around 2000.
Q. Why?
A. The stress wasn't worth it. Too much stress.
Q. Did you sell the company or did you just dismantle it?
A. Dismantle it.
Q. Do you own any companies today?
A. Well, Residential Provider Services might be still on the book but, no, I don't have any other companies.
Q. Do you own or manage any properties?
A. Right now I don't. Not since my employment. Around the time of my employment with the State of Michigan, no.
Q. Are you paid for your position with the State of Michigan?
A. Yes, I am.
Q. How much are you paid?
A. About $30 an hour, approximately.
Q. How many hours a week do you work?
A. Full time. It's full-time employment.
Q. Are you still working for Dr. Alli today?
A. No, I'm not.
Q. Were you paid by Residential Provider Services when you were employed by them?

Page 12

A. Yes.
Q. About how much were you being paid?
A. I really don't remember exactly. I mean I really don't. That varied with the number of properties that I had.
Q. Were you paid hourly or salaried?
A. No, it was -- It was salaried but contingent upon how many homes I had. That's why I'm not able to give out an accurate figure.
Q. Before you incorporated, incorporated Residential Provider Services, where did you work?
A. Let's see. I worked for an organization called Our Neighborhood Service Organization.
Q. What was your position there?
A. Case manager/supervisor.
Q. What did this company do?
A. Provided psychiatric services for the mentally ill.
Q. What did you do as a case manager/supervisor?
A. Well, I basically supervised other -- I was responsible for checking on the care of the residents, the patients, making sure that the staff essentially was doing what it was supposed to do, that the needs of the residents were being met.
Q. Did you have any other position other than case manager/supervisor while you worked for this

Page 41

answer, say what was on his mind. Basically, that was my kind of interpretation. He sounded as though, hey, you better get your money. He didn't say it in those words, but basically that's the impression I got from the communicating with him. That this might not be a good place to keep on doing stuff for because HUD was going to take it over.
Q. Do you remember what year this was?
A. I want to say -- I think late '98, I would say, because the weather -- it wasn't winter yet but it wasn't hot summer. So if I had to make a guess, as far as I remember, I would say around maybe early fall, I would say.
Q. Was anyone else present at this conversation you had with Mr. Salazar?
A. No. I got there -- I got there on Saturday. It was Saturday. Kind of mid-morning or so. And, you know, I saw him coming out to the building.
Q. Why were you there on a Saturday?
A. To do inspections and to meet with tenants that I couldn't catch during the week.
Q. So when you would do these inspections of checking the HUD reports, would you check every item on the report?
A. For the most part, yes, and I said for the most part. There are a couple of reports that I did when I

Page 42

started going through the pages and after, if I did some initial inspections, and I saw that, that it was contradictory, I didn't find the things that were in the report, I did, I went through a few pages, then I went to some other apartments and, you know, just essentially those that I could get into. When I saw it was inconsistent, you know, I'd let Dr. Alli know. But essentially I would go through the list and do everything on the list. But I know for a report or two, as far as I can remember, one time telling him, "I can't find a whole host of these things. It's basically a waste of my time and your money, you know, have someone see what I'm not seeing."
Q. Do you know Dr. Alli's wife, Mrs. Shaki Alli?
A. Yeah, I know who she is.
Q. Did you ever see her at the Collingwood Apartments?
A. I can't say exactly what apartments I saw her, but I have seen her there at the apartments before at times I went to do inspections when I was there. I've seen her.
Q. How often would you see her?
A. I would see her -- I can't give you a number of times. I don't know, I don't remember, but fairly, fairly frequently.
Q. Would you see her every day?

Page 43

A. No, I wasn't there every day. Not every day that I was there I would see her.
Q. From 1997 through 2000, about how many hours a week did you spend at one of Dr. Alli's properties?
A. I really can't tell you. I don't remember. When I have -- I know when I had like sizeable jobs, a long list of inspections, or at the time I had to do a cleanup of a basement or so, that time I may go several days in a row, you know. And other times, it varied. I really can't say.
Q. Okay. Let's look at it as a totality then. From 1997 through 2000, how much of your time would you say you spent there?
A. I really can't answer your question. I really don't know.
Q. Do you know Dr. Alli's children?
A. Children? I don't know -- No. I don't think he had children. We never discussed anything personal. All I saw, him, his wife. I knew she was his wife because I went to the office, they said Mrs. Alli.
Q. Have you ever seen or met his children?
A. No. I'm not even aware if he has children or how many children he has. I don't.
Q. When you were doing repairs of the Collingwood/Kirkwood Apartment, did you ever have to

Page 44

run errands related to those repairs?
A. Well, sometimes I'd go get some small supplies and so by, you know, Home Depot or something, yeah.
Q. Would you use your own vehicle?
A. I would use my own vehicle most of the time. Occasionally I would use one of the company vehicles if I had to get something like a sheet of drywall or something.
Q. When you say one of the company vehicles, what company are you referring to?
A. BSA and Associates, Dr. Alli's company. Not my company.
Q. How many company cars did BSA Company have?
A. I really don't know. I can't for sure. I know I've used a pickup truck at one time, a little red pickup truck, and I believe at Magnolia, at Magnolia the one time, I had to pick up some extra supplies. I didn't want to use my vehicle. I used a gray Jeep, one of the Chryslers, a gray Jeep. I remember that, too.
Q. What kind of materials were they that you didn't want to put in your car?
A. Sometimes if I had to get toxic, any type of toxic stuff, sprays, spray stuff -- I didn't have to do that too much because he mixed the stuff. If I had to get things that I know that would crumble. Sometimes the

# ALLI, ET AL v. UNITED STATES

# MARK SCHLOTTER

February 2, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN and SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,

vs. Case No. 01-669C
Judge Allegra
THE UNITED STATES,
Defendants.

---

The Deposition of MARK SCHLOTTER,
Taken at 211 Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 1:51 p.m.,
Wednesday, February 2, 2005,
Before Angela D. Eitzman, RPR,



APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiff.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the United States.

THOMAS G. MASSOURAS
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of HUD.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Wednesday, Febuary 2, 2005
1:51 p.m.

MARK SCHLOTTER
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Mark Schlotter taken pursuant to notice to be used for all purposes allowed under the Federal Court Rules and the Rules of Evidence.

Mr. Schlotter, we met before, my name is Eric Stempien, I'm an attorney and I represent Benjamin Alli, his wife, Shaki Alli and B.S.A. Corporation in a lawsuit brought against the United States government. I'm going to be asking you a series of questions today. Have you ever given a deposition before?

THE WITNESS: No.

MR. STEMPIEN: Okay. Let me give you some of the groundrules. When you give an answer please be sure to verbalize the answer, no nods of the head or shakes of the head or uh-huh or huh-uh, we have to say



yes or not because it's hard to read it when it's written out.

THE WITNESS: True.

MR. STEMPIEN: And also if I ask anything that you don't understand please let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page.

EXAMINATION

BY MR. STEMPIEN:
Q. Okay. Could I get your full name?
A. Mark D. middle initial, Schlotter.
Q. And your address?
A. 515 Mount Vernon, Detroit.
Q. What do you do for a living?
A. I used to be a licensed realtor so I used to have property. Right now I make repairs for other people around the city when they call me, on their properties.
Q. Do you have a company?
A. I just work independently.
Q. When you say you do repairs for other people, are you referring to landlords or are you talking for individual homeowners or both?
A. Probably both.
Q. When you say around the city, are you talking about

the City of Detroit?
A. Yes.
Q. Do you practice -- well, strike that.
Are you active in real estate industry right now?
A. Not really.
Q. Are you still licensed?
A. No.
Q. Do you have any formal training with regard to construction or any of the trades?
A. Not by license.
Q. How did you get into the field of doing repair work for people around the city?
A. My family managed a 300-unit building downtown Detroit for 23 years.
Q. You said 300 units?
A. More or less.
Q. Which building?
A. Maddison-Lennox Hotel (phonetic), it has about -- it's consolidated into about 180 units when they turned into apartments.
Q. And you said that's what got you into the business of doing repairs, but how are the two related, I presume --
A. We used to run a hotel building.



Q. When did you start doing handyman work around the hotel?
A. 1973.
Q. Did anyone train you or show you how to do things?
A. The maintenance crew there.
Q. What type of work did you do at the hotel?
A. The basic electrical and plumbing type of repairs.
Q. Any type of rough carpentry?
A. Yes.
Q. Finish carpentry?
A. Nothing to any great degree, just cosmetic work and so forth.
Q. How about drywall work?
A. Some, oh, yes.
Q. Plaster?
A. Some, kept the boiler going.
Q. Is there air conditioning in this unit --
A. No.
Q. -- in this building?
A. (Nonverbal response.)
Q. Have you ever received any training on air conditioning?
A. Not to any schooling.
Q. Any other work other than at the Madison-Lennox Hotel related to repair handyman work?



A. Like I said, individuals around town.
Q. I meant before you started doing that, between the hotel and when you started doing this for individuals?
A. Property that I owned had three apartment buildings and two rental houses.
Q. Do you own any of these rental units anymore?
A. No, I got rid of them.
Q. It was three apartment buildings and two individual homes?
A. Yes, about 10 to 15 years, depending which one you're talking about.
Q. You did all of your own repair work on those?
A. Yes.
Q. Was it the same type of work we talked about with regard to the hotel?
A. Yes.
Q. Were any of the properties you owned subsidized?
A. No.
Q. Were they all in the City of Detroit?
A. All but one, that was in Highland Park technically.
Q. Do you do repair work for B.S.A. Corporation currently?
A. Quite often.
Q. When did you first start doing work for B.S.A. Corporation?



A. I believe it was 1998.
Q. Are you an employee of B.S.A. Corporation?
A. Not -- not a direct employee, I'm not on payroll.
Q. Are you an independent contractor?
A. Yes.
Q. What buildings do you -- or have you worked on on behalf of B.S.A. Corporation?
A. It's part of a building on Pingree and there's a building on Gladstone Street.
Q. Are those the only two?
A. Yes.
Q. Do you know -- well, strike that.
Did you contact B.S.A. Corporation about doing work for them, or did they contact you?
A. Probably contacted them originally, and he had an ad in the paper and I just called and told him I was available, and I worked for him for a while and then I didn't hear from him for about a year, and then he called me one day and needed me, I was working for somebody else and I told him it would be about a month before I could finish up with them, and that was probably the end of '99.
Q. Had you been with him, when I say him, referring to Dr. Alli who runs B.S.A. Corporation, as far as you know, right?

A. Yes.
Q. Since 1999 until now, 2005, have you been working with B.S.A. Corporation continuously in that time?
A. Quite often tenants will call me if they need something, I'm only about ten minutes away from his buildings so I can go there pretty fast, or, you know, he'll call me probably once a month and tell me things he needs done, so unless it's an emergency, I just put it in with the rest of my work.
Q. In the last five or six years, have you worked for other companies other than B.S.A. Corporation?
A. Oh, yes.
Q. For the work you do on the Pingree and Gladstone buildings, who pays you?
A. B.S.A.
Q. Do you provide billings to him?
A. Yeah, I send him an invoice every two weeks with the time, dates and what was done so he has a record of it, and he can question me if there's anything he needs to know.
Q. Does he pay you regularly?
A. Yes, well, probably a week or so after I send the bill, I usually get a check from B.S.A.
Q. During the time that you've worked on the Pingree and Gladstone buildings, can you just describe, in



general, the types of work you do there?
A. Basic plumbing, electrical, locks, carpentry, repairs like the doors, I've laid quite a bit of carpet for him and kept the boilers going and some minor roofing, most -- a whole array of basic repairs you can think of in an apartment building.
Q. You indicated earlier that sometimes you get calls directly from tenants; is that correct?
A. Yes.
Q. Are you --
A. Just emergency, you know.
Q. In the last six years, as far as you know, are you the only non B.S.A. Corporation employee that's provided maintenance to Pingree and Gladstone buildings?
A. Well, he's probably called contractors to come in to do things, I wouldn't, you know, know for sure.
Q. On a typical week how many hours would you spend doing maintenance at either Pingree or Gladstone?
A. It would be 5 to 20, varies quite a bit.
Q. When you receive calls from tenants, is that from the manager or do you get calls from individual tenants?
A. Usually from the manager, but if there's an emergency and they can't get them they might leave a message on my answering machine if they can't get me, have a water pipe break or something that needs to be taken



care of right away, you just can't leave it set, I usually respond as soon as I get the message.
Q. Do you know if every tenant is provided with your direct dial number?
A. No, no, but some of them do have it, but maybe they'll get it from the manager or something, if, you know, she doesn't call me. There's always a few tenants there if the manager isn't there that's familiar with me and my number, so, you know, they might call me or, you know, like say their neighbor's got the problem or something, there's probably only a few there that have it, but they -- they can get it pretty easy, it's in the phone book, you know, my name.
Q. What happens if a tenant or the building manager calls you with a problem, what would you do?
A. Depends, if it's not an emergency, I put it in my books to be done since I'm in that area. If it's an emergency, I try to get there right away.
Q. And what do you mean by right away?
A. Probably from my house it's about ten minute drive, so I usually leave as soon as I can and try to get there. If there's lights out or plumbing or something important that you have to go take care of it, you can't just leave it that way.
Q. If it's a nonemergency?



A. Well, that's just written down and I just put it on my list of things to do that week when I'm over that way.
Q. What's the longest something might have to wait to get done on a nonemergency?
A. If it's a dripping faucet, that can wait until later in the week probably, it's no big problem, but it will usually be done before the week's up, so --
Q. Have you ever performed any extermination work at either building?
A. Yeah, some.
Q. And what type of --
A. I've got a tank and sometimes I'll buy a gallon of insecticide and go up to some of the units, and then I'll leave it there for the management if they need it.
Q. Do you do that for maintenance purposes or for specific complaints of bugs or both?
A. Probably both, if -- I think the manager will go through probably, I think about every four months or three months probably, but if somebody -- there's always a tenant has a complaint, so, you know, then me or usually the manager just go to that individual unit and go through it again so it keeps the problem, you know, in check from becoming one really.
Q. Have you ever had a tenant complain about the burners

that, then no, generally speaking the rest of the units weren't a problem.
Q. At what point would roaches be a problem in an apartment building?
A. If you didn't do anything about it and you just let that person stay or those few people and the place got infested with them, that would be different, but those people usually were kicked out in a month or two. They usually had problems in other areas too, their rent and things like that, when you're a deadbeat -- you're always going to get a deadbeat, if you just want to talk about them, nobody has an apartment building without a deadbeat, so I don't really need to emphasize those people too much, I think you know what I'm saying, excluding them, everything else I can't really complain about.
Q. Whose responsibility is it to evict these tenants that you're referring to as deadbeats?
A. Mr. Alli's.
Q. Did you ever see a mouse in the Pingree apartments?
A. To be honest I haven't.
Q. Have you ever seen a mouse in the Gladstone apartments?
A. To be honest I haven't.
Q. Were there times that the elevator in the Pingree



apartments was not working properly?
A. There would -- there's a few times it had to be shut down, the contractor had to make repairs like any building, but it runs most of the time with no trouble.
Q. What about -- strike that.
You mentioned that -- to Mr. Stempien that you had made some repairs on the elevators in the Pingree/Gladstone building; is that correct?
A. (Nonverbal response.)
Q. Do you have a license to make repairs to elevators?
A. No, that's why a contractor has to do most of the work, but if a door's jammed or something, it's just a matter of freeing it up, that type of thing, it's part of the job.
Q. Do you know how to align an elevator?
A. No, that's not my job, that would be the contractor.
Q. That would be for the contractor to do?
A. Yeah. He had some company come in, I don't know what their name was, elevator company.
Q. You mentioned that sometimes you would stop by the Pingree/Gladstone apartments on your own to see if any work needed to be done, did you do this in 1998?
A. No.
Q. 1999?



A. (Nonverbal response.)
Q. 2000?
A. From then on.
Q. From then on, would you -- strike that.
When you would make these stops, would you enter into the individual apartment units?
A. No, not unless somebody told me there was a problem, sometimes they leave a note there and I'd see it and I go check it out, but usually when I went through it was to make sure the elevator was running and the heat was working and, you know, I didn't see any leaks, the basement, you know, the doors were locking, just your, you know, basic, you know, things you expect, you know, putting the units aside in a building. I might check with the manager, they might say so and so asked me to tell you this or that, and I would put it in the basement and remind me when I was there to fix something, you know, unless they say it was an emergency, but they would -- usually somebody would call me anyway if it was really bad.
Q. Other than the income you received as an independent handyman, do you have any other income?
A. No.
Q. Have you ever met Dr. Alli's wife, Shaki Alli?
A. Yes, I've seen her in the building a few times, talked



to her.
Q. How often would you see her at the building?
A. I met her maybe four or five times at one of the buildings, and I don't remember which one or anything, just met her.
Q. What would she be doing?
A. Probably taking care of some paperwork, you know, getting leases or something that had been filled out or applications and that type of thing for the manager.
Q. Did she have an office in the buildings?
A. No, she just go to the managers, the manager would take care of everything, keep everything there.
Q. She would go to the manager's apartment?
A. Yes.
Q. Who is the manager?
A. Gladstone, a lady named Darlene.
Q. Was she the manager in 2000?
A. No.
Q. Who was the manager in 2000?
A. Dorothy, it was Griggins, and she left a year or so later I think, Darlene, I don't remember her last name, took over.
Q. Who was the manager of the Pingree apartments?
A. That was about a year ago, a lady named Pat, and I

Page 45

forget her last name. There was another lady named Linda Hamilton, she was kind of a caretaker, but, you know, like I said, I'm through the building quite a bit in and out, so she usually let's me know what's going on.
Q. Do you know Dr. Alli's children?
A. No, I met one daughter once a year ago, so -- but I don't know any of them.
Q. Did you ever see them at either the Pingree or Gladstone buildings?
A. No.
Q. Did you ever have to run errands in relation to the work that you were doing at either the Pingree or Gladstone buildings?
A. Just if I was going to like the hardware or something, but that would be it.
Q. Whose vehicle would you use?
A. My truck.
Q. Were there vehicles at the Pingree/Gladstone building that were available for you to use?
A. No.
Q. Did Dr. Alli ever tell you that there were vehicles that he was leasing that were available for you to use to run errands on behalf of the buildings?
A. He never told me that.

Page 46

Q. Have you ever lived in a building that was owned or managed by Dr. Alli or any of his family members --
A. Huh-uh.
Q. -- or B.S.A. Corporation?
A. No.
Q. Did you do anything to prepare for your deposition today?
A. No.
Q. Did you meet with Eric -- strike that.
Have you met with Eric Stempien or talked with him on the phone any time before today?
A. I've met him before, but he just came and told me, gave me this subpoena and asked me to come in here, and that was all.
Q. When did you meet with him?
A. Benjamin's building, he called me and asked me to come over to the building, so I went over there, and Mr. Alli was there and he just handed me a subpoena and just asked me to stop by here and talk about these violations from years ago, and I said well, it's kind of vague, but I'll tell them what I can remember.
Q. Which building did you meet at?
A. Pingree.
Q. Was anyone else at this meeting besides you, Dr. Alli and Mr. Stempien?

Page 47

A. He gave the subpoena to the two ladies that were here before, that was left, that was about it.
Q. Did you discuss this case with either the two ladies, Dr. Alli or Mr. Stempien?
A. Not really, not in any kind of detail, he never suggested I should say anything other than what I'm telling you, just to tell you what I knew or can remember.
Q. How long did this meeting last?
A. Oh, we just met long enough to get the subpoenas and told me what it was about, all this and that was it, what, 20 minutes or something, we stood there while he just stated what -- just to come here and say what you can remember and so forth, and that was about it, all of us split up and left.
Q. You mentioned that there were -- that he gave you two subpoenas to give to the two ladies that were here before?
A. He handed them personally to them.
Q. So you all met --
A. For a few moments in the lobby of the building.
Q. Other than at that meeting, have you met or spoken with Dr. Alli before regarding this case?
A. No, ma'am.
Q. You mentioned earlier that there were new and

Page 48

refurbished stoves and refrigerators in the basement of the Pingree and Gladstone buildings, do you remember that?
A. Yes.
Q. Was that the case in 1998, do you know?
A. I don't remember then, but I know that was the case before -- just before 2000 when he'd call me to come and look at a building and had this list of repairs from HUD or whatever, the truck had already delivered all this, the new ones, so they were there, I don't know about '98, but '99, yeah, they were there.
Q. So the new stoves were already there before you were there?
A. Yes.
Q. Let me rephrase that, when you arrived to help Dr. Alli with repairs at the end of 1999, the new stoves were already there in the basement?
A. Yeah, the truck come back and brought another load when I was there, there was always some there, and then I remember a truck came and unloaded the back door with new stoves.
Q. How do you know the stoves were new?
A. Well, he bought them by -- just -- I don't know if he got a discount or not but buying quite a few at one time, but you can tell when they came in they weren't

# ALLI, ET AL v. THE UNITED STATES

## DOROTHY RIGGINS

January 31, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
Hon. Allegra
THE UNITED STATES,
Defendant.
_______________________

The Deposition of DOROTHY RIGGINS,
Taken at 211 West Fort, Suite 2100,
Detroit, Michigan,
Commencing at 10:22 a.m.,
Monday, January 31, 2005,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien, P.L.L.C.
315 North Center Street
Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

TOM MASSOURAS
HUD Chicago Regional Counsel
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 355-6236
Appearing on behalf of the Defendant.



SOL TERENCE KIM
U.S. Department of Housing and Urban Development
477 Michigan Avenue
Detroit, Michigan 48226
(313) 226-7900
Appearing on behalf of the Defendant.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Monday, January 31, 2005
10:22 a.m.

DOROTHY RIGGINS,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Dorothy Riggins taken pursuant to notice to be used for all purposes allowed under the Court of Federal Claim Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:
Q. Ms. Riggins, my name is Eric Stempien, and we've met before, right?
A. Yes.
Q. And I'm going to be asking you a series of questions today regarding the two buildings that you lived in that were owned by Dr. Alli.
Okay. Have you ever given a deposition before?
A. No.

Q. Let me give you some of the rules so this goes a little bit easier for you and I, but especially for the court reporter. When you give an answer, please be sure to make sure it's verbal as opposed to uh-huh, huh-huh, because we're going to have a written transcript of all this, and it's real hard to understand what uh-huhs and huh-huhs mean when they're in writing, okay?
A. Okay.
Q. And also, if I ask you something you don't understand, let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page, okay?
A. Yes.
Q. There you go, perfect.
Could I get your full name?
A. Dorothy Dean Riggins.
Q. And how do you spell Riggins?
A. R-I-G-G-I-N-S.
Q. And could I have your current address?
A. 1672 Blaine.
Q. How do you spell that?
A. B-L-A-I-N-E.
Q. Okay. Is that Detroit?
A. Detroit, Michigan.
Q. And what's the ZIP code?



A. 48206.
Q. You used to be a tenant in two of Dr. Alli's buildings; isn't that right?
A. Yes.
Q. Which buildings?
A. On Calvert.
Q. And what was the other one?
A. And the other one was Gladstone.
Q. Do you know when you moved into the building -- well, which one did you live in first?
A. Calvert.
Q. Do you know when you moved in there?
A. I can't remember exactly, you know, the date --
Q. Approximately?
A. -- and everything.
All I remember, it was in the summertime.
Q. Okay. How long did you live on Calvert?
A. I think about two and a half years.
Q. And right from Calvert, did you move to the Gladstone building?
A. Yes, I did.
Q. How long did you live in the Gladstone building?
A. About seven or eight years.
Q. Why did you move from the Calvert location to the Gladstone location?



A. Because I have a disability in my knee, and the stairs was just a little bit too much for me going up and down every day, and being on, you know, it would be better if I was on the first floor. There was an opening over on Gladstone on the first floor.
Q. Let's talk about the Calvert building first. Did you see any evidence of roaches at the Calvert building?
A. No, I did not.
Q. How about mice?
A. No.
Q. Did you feel safe in terms of your personal physical safety while you were living in the Calvert building?
A. Yes, I did.
Q. How did the -- how did people get in and out of that building?
A. With a key, they had to have a key to come in the inside, the first door. Then once you're on the inside, then the other door, you had to have another key.
Q. Were they two different keys?
A. Yes, they were.
Q. Was there a buzzer system for guests or if people coming to visit, was there a buzzer system for them to get in?
A. I think it used to be one, but it wasn't anymore



because they had to use a key. If you didn't have a key to get in, you couldn't get in unless somebody came down and opened the door.
Q. Did you know at any time where the -- strike that.
Do you remember there being any time when the locks were broken on the building on Calvert for the main doors coming in and out?
A. I don't think it was broken. I think they changed them, because they put up a whole new -- they put up a whole other door.
Q. Was there a lot of criminal activity in the Calvert building?
A. No, there wasn't, that I seen.
Q. What about the cleanliness of the building, in general, on Calvert?
A. It was -- it was fairly clean, because I even got out and put my service in.
Q. What do you mean by that?
A. I did a little bit, you know, help on the floor. I stayed on the third floor. On the third floor, hey, if I seen something out there on the floor, a little trash or something, I got out there and cleaned, sweep the floor myself. I didn't wait on nobody else to do that.
Q. Did other residents do that as well?

Page 9

A. Yes, they did.
Q. Did people generally seem to take pride in the Calvert building in living there?
A. Yes, they did.
Q. When you were living in Gladstone, you were more than just a resident; is that right?
A. Yes, I was.
Q. You were the manager; is that right?
A. Yes.
Q. As a manager -- well, first of all, were you the only manager during the time that you were manager?
A. Yes, I was.
Q. What did that entail? What did being a manager entail? What did you have to do?
A. Keep up the maintenance -- the maintaining of the building, show apartments, did the applications, made sure everything was in order around the building, kept it clean.
Q. What was the maintenance procedure, if there was a problem, something that had to be fixed in the building on Gladstone, what would happen?
A. If it ever was in a tenant's apartment, the tenants will come to me.
Q. And what would you do?
A. And then I would get in touch with -- if I couldn't

Page 10

handle it, then I would get in touch with the maintenance guy.
Q. Who was that?
A. And that was Mark.
Q. Mark Schlotter, S-C-H-L-O-T-T-E-R?
A. Yes.
Q. What would happen after you called Mark?
A. Mark would come, and I assumed he probably would let Mr. Alli know because I also let him know too.
Q. So if there is a problem, you would call both Mark and Dr. Alli?
A. Yes, but Mark come and do the job.
Q. Was Mark reliable?
A. Yes, he was, very reliable.
Q. Did he always come and fix the problem?
A. Yes, he did, regardless of when it was I called him. If a pipe bust in the middle of the night, I was able to call him and he came.
Q. Did you see any evidence of roach infestation at the Gladstone building?
A. No.
Q. How about mice?
A. (Witness shakes head negatively.)
Q. Is that no?
A. No.

Page 11

Q. Did you feel safe at the Gladstone building?
A. Yes, I did.
Q. Explain to me what the method was for people getting in and out of that building.
A. Keys.
Q. Same as the Calvert?
A. Yes.
Q. Was there a buzzer system there?
A. No.
Q. Same thing, if a visitor came, you would have to go down and let them in?
A. Right.
Q. As the manager, did you look out for people who weren't supposed to be there?
A. Hum?
Q. Would you try to keep your eye out to see who was coming and going from the building?
A. Yes, I did.
Q. And what would you do if you saw somebody who you didn't know?
A. I would -- first of all I would ask them who are they here to see. If they're not there to see any certain person and the person did not come down to the door, whoever they were coming in, because everybody have a doorbell, and if the person didn't come down, then

Page 12

you're not supposed to be in the building.
Q. Okay. So there was a doorbell, so when I said buzzer system, I guess I wasn't specific enough. There was a way -- there was an intercom system for people to call up to the apartments?
A. Right.
Q. So if I were there to visit somebody, I could push their apartment number, talk to them, and they could come down and let me in?
A. Right.
Q. What about the general cleanliness of the common areas of the Gladstone building, how was that?
A. I kept it clean.
Q. Did you ever receive any complaints from tenants about the cleanliness of the building?
A. No, I didn't.
Q. Did you receive any complaints from any of the tenants there about the safety?
A. No, no complaints.
Q. Did there appear to be criminal activity going on in that building --
A. No, there were --
Q. -- while you were -- hold on, let me stop you. One of the other rules is you got to make sure you let me finish my questions --

Page 49

list, you know. We all have a whole list that, hey, if there's a problem. And if there's nothing wrong, there's a place where, hey, everything is okay, sign your name, turn it into the office. All of them goes into the office.
Q. How many apartment units were at the Calvert building?
A. At the Calvert, I don't know, let's see -- I'm not sure how many, because I only -- over there on Calvert, I, you know, I basically, like I say, them stairs killed me by the time I get to the third floor so.
Q. Could you estimate about approximately how many?
A. About five on each floor.
Q. And how many floors were there?
A. Three, and I don't know how many in the basement. There was two -- is it two or three apartments in the basement, I'm not sure.
Q. So there were more apartment units in Gladstone than in Calvert?
A. Yes, Gladstone is a bigger building, a whole lot bigger building.
Q. Do you know if the building manager at Calvert was the only building manager at the building at the time?
A. I believe she was.
Q. Do you know whether she inspected all of the units in

Page 50

that building in the same manner that she inspected yours?
A. I don't know.
Q. Did you ever socialize with your neighbors at the Calvert building?
A. No, I speak and, hey, basically stay to myself, you know, as far as doing a lot of socializing in the building.
Q. Did you ever see anyone else's apartment at the Calvert building other than your own?
A. You say at Calvert?
Q. At Calvert.
A. No, I just stayed in my apartment.
Q. Did you socialize with your neighbors at the Gladstone building?
A. I didn't socialize with them, but, hey, you know, I went into a lot of apartments on Gladstone because with me being the manager, hey, I had to go in there and do a lot of work in different apartments. I watched a few kids and helped a lot of people on Gladstone as far as, you know, hey, in the apartment.
Q. Did you ever see -- strike that.
Did you know Dr. Alli's wife, Shaki Alli?
A. I met her.
Q. Did you ever see her at the Calvert apartments?

Page 51

A. That, I didn't pay no attention to because, you know, I didn't know her then.
Q. What about at the Gladstone building, did you ever see her at the Gladstone building?
A. Yes.
Q. How often would you see her there?
A. I seen her there quite frequently, you know.
Q. Once a month?
A. Yeah, maybe once or twice a month.
Q. What would she be doing when you saw her there?
A. I guess they had their inspections that they had to do too.
Q. So she was doing inspections?
A. I would assume that she was.
Q. Why did you assume that she was doing inspections?
A. Because I know they have to come and see how things is going too, you know, as well as you can't just sit and depend on somebody else's word all the time, you know. It's always good to come look at your own property, you know, so.
Q. Did you actually see her --
A. Yes, I did.
Q. -- inspecting units?
A. You know, and, hey, if she needed a key, she came to me.

Page 52

Q. She didn't have her own keys?
A. Well, no, the keys stayed in the building. You know, hey, didn't nobody take, you know, if a tenant, you know -- they have their own keys, right, but then there's also the keys, duplicates to all the apartments, all those keys stays in the building. They do not leave the building.
Q. Where do they stay in the building?
A. There is a room for them in the basement.
Q. When you lived at the Calvert apartments, did you -- strike that.
Did you know Dr. Alli's children?
A. No.
Q. Had you ever seen any of his children before?
A. I'm trying to think, did I? No -- or did I? I can't remember.
Q. Did you ever see them at the Gladstone building?
A. I don't remember.
(Discussion off the record at 11:36 a.m.)
(Back on the record at 11:41 a.m.)
BY MS. CONNEELY:
Q. Did you ever speak with a HUD inspector while he was performing an inspection? Let me rephrase that.
When you lived at the Gladstone building and you were the building manager, did you accompany

# ALLI, ET AL v. THE UNITED STATES

# LINDA HAMILTON

January 31, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
Judge Allegra
THE UNITED STATES,
Defendant.

---

The Deposition of LINDA HAMILTON,
Taken at 211 West Fort, Suite 2100,
Detroit, Michigan,
Commencing at 12:45 p.m.,
Monday, January 31, 2005,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien, P.L.L.C.
315 North Center Street
Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

TOM MASSOURAS
HUD Chicago Regional Counsel
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.



SOL TERENCE KIM
U.S. Department of Housing and Urban Development
477 Michigan Avenue
Detroit, Michigan 48226
(313) 226-7900
Appearing on behalf of the Defendant.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Monday, January 31, 2005
12:45 p.m.

LINDA HAMILTON,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Linda Hamilton taken pursuant to notice to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:
Q. Ms. Hamilton, my name is Eric Stempien, we've met before.
A. Yeah.
Q. And I represent Benjamin Alli in a lawsuit that's been brought against the United States with regards to the buildings that he owns, one of which you're a resident of.
A. Uh-huh.
Q. Have you ever given a deposition before?

A. No.
Q. So this goes a little bit easier for you and I and especially for the court reporter, I'm going to give you a few ground rules. And the first one is: When you give an answer, please be sure to verbalize it in terms of yes or no, as opposed to uh-huh, huh-huh, because we can't really -- this is going to be typed out, we can't really read that very well.
A. Okay.
Q. Also, if you don't understand anything I ask you, let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page. And the last one is: You may anticipate halfway through my question what my question's going to be, I would ask that you refrain from jumping in and answering because if two of us are talking at the same time, it's hard to understand, okay?
A. Okay.
Q. Can I get your full name?
A. Linda Hamilton.
Q. And what's your address?
A. 2211 Pingree, Apartment B2, Detroit 48206.
Q. How long have you lived at the Pingree Apartments?
A. Over ten years.
Q. At some point in time, did you have Section 8


assistance?
A. Yes.
Q. Did that start as soon as you moved in?
A. Yes.
Q. What do you do for a living?
A. Now I'm a nurse.
Q. Is that an RN?
A. LPN.
Q. And where do you work?
A. Northwest Dialysis.
Q. Northwest Dialysis?
A. Yes, Northwest Dialysis.
Q. And that's dialysis for kidney patients?
A. Right.
Q. You no longer have Section 8 assistance; is that correct?
A. Right.
Q. How many apartments have you lived in in that Pingree building?
A. Two.
Q. Right now you're in B2, what was the first apartment?
A. Apartment 410.
Q. Do you know how long you lived in Apartment 410?
A. A few years, I don't know exactly how long it was.
Q. When did you lose the Section 8 assistance?


A. You mean what year?
Q. Yeah, do you know?
A. No, I don't know for sure.
Q. Do you know how long it's been?
A. Several years now.
Q. Why did you lose it?
A. The apartment lost their Section 8 status.
Q. Were you offered a voucher to move to another building with Section 8 assistance?
A. Well, I was offered through the manager. She informed me that the people from HUD had the vouchers and that I was qualified to get one.
Q. Did you choose not to get a voucher?
A. Yes.
Q. Why not?
A. Well, the apartment -- the place where I was staying was convenient for me, because I didn't have a car at the time. It was near a bus stop, near the store, and near where I was working, so.
Q. Do you know how much money a month you would save if you chose to get a voucher and go to another apartment?
A. No.
Q. Do you like living in the Pingree Apartments?
A. Yes.


Q. Why?
A. I like my apartment, and I like the location.
Q. Have you ever seen any evidence of a roach infestation?
A. No.
Q. Mice?
A. No.
Q. What about the safety, do you feel safe there?
A. Yes.
Q. Do you know how people can get in and out of the building?
A. People let them in.
Q. Well, let me strike that.
How do you get in and out, is it a key, or is it a buzzer, is it a pass card?
A. We have keys, we don't have buzzers. We don't have the buzzers to unlock the door.
Q. Have you always felt safe at the Pingree Apartments?
A. I've never felt not safe there. I've never had any problems since I've been there.
Q. In the over ten years that you've lived there, did you ever -- did there ever appear to be a lot of criminal activity going on there?
A. No.
Q. What about the cleanliness of the building over the

Page 37

Q. You had one?
A. Yes.
Q. Why did you put one in?
A. Because I was by myself.
Q. Did you feel unsafe?
A. No, I actually saw the ad at the gate on the door and I went and bought me a gate.
Q. Did you feel safer with the gate on?
A. Well, I guess because when my gate was taken away from me, I kind of felt naked without my gate up there, because I had gotten used to it being there. So it was -- I guess it did make me feel a little secure.
Q. Who took the gate away from you?
A. I had -- I lost the key, and the guy had to take it away to repair it for me, so he had to take the gate in order to get the lock loose.
Q. Did Dr. Alli or the building manager ever tell you that you couldn't have that gate on your door?
A. Never.
Q. Do you know Dr. Alli's wife, Mrs. Alli, Shaki Alli?
A. Yes.
Q. Have you seen her before?
A. Yes.
Q. Did you ever see her at the Pingree building?
A. Yes.

Page 38

Q. How often would you see her there?
A. I saw her maybe twice.
Q. During the ten years you lived there?
A. Yes.
Q. What would she be doing when you saw her?
A. They was in the lobby talking.
Q. She would be in the lobby talking?
A. They was in the lobby talking the day I saw her.
Q. Who was she talking with; do you remember?
A. The manager and a lady, a few -- one of the tenants.
Q. Have you ever seen Dr. Alli's children?
A. At the building, no.
Q. Do you know what they look like?
A. No.
Q. Are you being paid to be here today?
A. No.
Q. Have you ever received payments from Dr. Alli?
A. For?
Q. For anything?
A. During the ten years -- I don't know what time you're talking about.
Q. From when you met him until now?
A. Yes.
Q. When did you receive payments from him?
A. After the people moved out from the HUD building, I

Page 39

started helping out. After we had lost the HUD contract, I started helping Pat do some repair work on the apartments. I mean, clean up some of the apartments with the manager.
Q. Would you just clean up the apartments, or would you also do repairs?
A. No, I don't do repairs.
Q. You don't do repairs?
A. No, I just -- we just -- I help her clean up. In fact, I asked her did she need me to help her, and I volunteered to help her.
Q. Would you do this in addition to your job as a nurse?
A. Yes. After -- on the days that I was off, I would help her.
Q. And what would you do?
A. Clean up the bathroom, kitchen, shampoo apartments.
Q. Were these occupied apartments or vacant apartments?
A. No, vacant. It was after the people had moved out of those buildings. We had a lot of vacant apartments, so I volunteered to help her -- help clean the building.
Q. Do you help keep the common areas clean as well?
A. Yes.
Q. And who showed you how to do the task that you do now for Dr. Alli in the Pingree building?

Page 40

A. You mean clean up apartments?
Q. Right.
A. Nobody, I just, you know, I know how to clean up a kitchen, and she showed me some tips on how to do some of the things, but basically I know how to clean up, so.
Q. How much would Dr. Alli pay you to do this work?
A. During that time because I was helping her, I really wasn't working for him, I was helping her, and she paid me $30.
Q. Per apartment?
A. No, it depends on what I did to the apartment, if I cleaned the kitchen and bathroom, if I did the shampoo, that was extra.
Q. How much extra?
A. $10 per rug, per carpet per room.
Q. Per carpet?
A. Per room, right.
Q. So you would get $30 for -- is this correct, you would get $30 for general cleaning, and then if you did extra things like shampooing the rug --
A. If I do it all, for the carpet, I think she told me it was -- she charged -- she paid me $10 per room.
Q. How did she know how much to pay you, would you report to her how many carpets you cleaned?

UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and BSA CORPORATION, a Michigan corporation,

Plaintiffs,

Case No. 01669C
Hon. Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.

_______________________________/

The deposition of ROBERT BROWN, taken before Hope M. Markowitz, CSR-3900, Notary Public in and for the County of Oakland, acting in the County of Wayne, Michigan, at 477 Michigan Avenue, Suite 895, Detroit, Michigan, on Monday, September 27, 2004, at or about 9:50 a.m.

APPEARANCES:

STEMPIEN & STEMPIEN, PLLC
BY: ERIC STEMPIEN, ESQ.
315 N. Center, Suite 200
Northville, Michigan 48167

On behalf of the Plaintiffs.

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
BY: GERALD ALEXANDER, ESQ.
1100 L Street N.W., Room 11054
Washington, DC 20005

On behalf of the Defendant.

(Appearance continued on Page 2)







APPEARANCES (CONTINUED):

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT
BY: THOMAS G. MASSOURAS, ESQ. and
MARIA BAGUIO, ESQ.
77 West Jackson Boulevard, Suite 2629
Chicago, Illinois 60604

On behalf of the Secretary for the U.S. Department of Housing & Urban Development.

AlSO PRESENT:

Benjamin Alli







I N D E X


| Witness: | Page |
|---|---|
| ROBERT BROWN | |
| Examination by Mr. Stempien | 6 |
| Examination by Mr. Alexander | 102 |
| Re-Examination by Mr. Stempien | 103 |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| Deposition 1 | Documents | 13 |
| Deposition 2 | Documents | 17 |
| Deposition 3 | Documents | 21 |
| Deposition 4 | Documents | 30 |
| Deposition 5 | Documents | 30 |
| Deposition 6 | Documents | 32 |
| Deposition 7 | Documents | 51 |
| Deposition 8 | Documents | 56 |
| Deposition 9 | Documents | 56 |
| Deposition 10 | Documents | 59 |
| Deposition 11 | Documents | 67 |
| Deposition 12 | Documents | 70 |


(Exhibits continued on Page 4)







E X H I B I T S


| Number | Description | Page |
|---|---|---|
| Deposition 13 | Documents | 72 |
| Deposition 14 | Documents | 72 |
| Deposition 15 | Documents | 73 |
| Deposition 16 | Documents | 75 |
| Deposition 17 | Documents | 81 |
| Deposition 18 | Documents | 81 |
| Deposition 19 | Documents | 87 |
| Deposition 20 | Documents | 89 |
| Deposition 21 | Documents | 91 |
| Deposition 22 | Documents | 93 |
| Deposition 23 | Documents | 94 |

Detroit, Michigan
September 27, 2004
at or about 9:50 a.m.
--- --- ---

ROBERT BROWN,

was called as a witness and having been first duly sworn to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Robert Brown taken pursuant to Notice and to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

Mr. Brown, as I introduced myself earlier my name is Eric Stempien. I'm an attorney. I represent Benjamin Alli, Shaki Alli and BSA Corporation in the lawsuit that's been brought against the United States Government.

Have you ever given a deposition before?

THE WITNESS: I don't recall that I have.

MR. STEMPIEN: Just to give you a couple of ground rules and make it go a little bit easier for you and I and particularly the court reporter, who's sitting immediately to my right, when you give an answer, please be sure to verbalize it as opposed to







uh-huhs and uh-ums; things of that nature because they're real hard to read when it comes out on the written transcript.

Also, if you don't understand a question I've asked you, please let me know. I'll be happy to rephrase it or repeat it until you and are on the same page. Okay?

THE WITNESS: Uh-huh.

MR. STEMPIEN: Is that a yes?

THE WITNESS: Yes.

MR. STEMPIEN: Don't worry. People do it all the time. I'll probably be reminding you every once in awhile.

Please be sure to let me finish my questions before you give an answer. In our natural conversations you might anticipate what my question is going to be halfway through it. Refrain from trying to jump in because it's hard for the court reporter to take both of us talking at the same time.

EXAMINATION

BY MR. STEMPIEN:

Q Could I get your full name?
A Robert M. Brown.
Q M?
A M.





Q You're employed with the United States Government
A Yes.
Q In the Department of Housing & Urban Development?
A Yes.
Q In what capacity?
A I'm the Director of the Detroit Multi-Family Hub.
Q How long have you been employed with HUD?
A With HUD 34 years.
Q All within the Detroit office?
A No. I was at other offices as well.
Q How long have you been the Director in the Detroit Multi-Family -- I'm sorry. What was it?
A Hub.
Q -- Hub?
A Since 1997.
Q What position did you hold immediately before that?
A I was Director of the Multi-Family Division.
Q What's the difference?
A The hub has jurisdiction over the entire state and the division was under a previous organization of HUD where we had the eastern part of the state.
Q Who is your direct supervisor?
A Stillman Knight, who's a deputy assistant secretary for multi-family housing in Washington D.C.
Q Is that K-N-I-G-H-T?







A Uh-huh.
Q Is that yes?
A Yes.
Q Who is Robert Turner?
A Robert Turner was the Director of Housing when I was Multi-Family Division Director.
Q That was in the Detroit office?
A Yes.
Q Is he still in the Detroit office?
A No. He's retired.
Q Based on your previous response would I be correct in saying that you would be the highest ranking HUD official in the Detroit office?
A I -- no. I don't think so. I'm the highest ranking multi-family official in the Detroit office but there's also a Detroit office director/coordinator of all the program areas in Detroit and her name is Toni Schmeigelow.
Q Can you spell that?
A S-C-H-M-E-I-G-E-L-O-W.
Q Can you tell me what your job duties are as Director of the Multi-Family Hub?
A Yes. The hub has responsibility for administering Section 8 project based rental assistance contracts in Michigan. It has responsibility for all new loans and



CHERYL SALISBURY & ASSOCIATES (248) 349-4392

grants for assisted multi-family housing and it also has responsibility for managing the portfolio of all HUD assisted housing, HUD assisted either through a HUD mortgage or through a Section 8 contract based contract.

Q Does it involve the Section 8 vouchers that are given individually to people?

A No.

Q That's outside of your purview?

A Yes.

Q What's your educational background?

A I have a political science degree both a BA and MA from Indiana University.

Q You're familiar with Mr. and Mrs. Alli's purchase of three properties within the City of Detroit for which Section 8 contracts were provided as well as HUD mortgages?

A I have a general recollection, yes.

Q You know Mr. Alli and Mrs. Alli through your prior dealings through the multi-family office; is that correct?

A Yes. I recall that they were former owners in HUD assisted programs.

Q What we're dealing with in this particular litigation are three pieces of property. If I refer to those as





the Pingree property and the Collingwood property and the Riverside property, would you be familiar with the use of those terms?

A Yes.

Q If I refer to them that way, you'll understand what I'm talking about?

A Yes.

Q You understand the Pingree property -- when we say the Pingree project is probably a better term because it actually involves two separate buildings, correct?

A I don't recall.

Q The Collingwood property also had two separate buildings. Do you recall that?

A Yes. I do recall there was a Collingwood and Kirkwood.

Q I believe Riverside had just one property. There were four buildings for Riverside. Does that --

A There may have been four buildings. I think it was one project in our view but I'm not sure about that.

Q I'm just going through the litany just to make sure we all know exactly what we're talking about because I'm going to use more general terms so you understand when I say Riverside, I'm referring to all four buildings; when I say Collingwood, I'm referring to two buildings; and when I say Pingree, I'm referring to





those two buildings that fell under those projects or HUD contract numbers. Okay?

A Okay.

Q Some general background. If we're talking about a HUD mortgage -- someone says I've got a HUD mortgage, can you tell me what that means?

A It means that the owner has a mortgage that was insured by HUD. The owner is paying a premium for mortgage insurance and the mortgage insurance is -- the beneficiary of that insurance is the lender. It induces the lender to enter into the FHA loan program, which gives somewhat more favorable terms and conditions than conventional loans.

Q HUD is not a lender, though?

A No, generally not, not in general terms of a mortgage. There are situations where HUD may be the lender and, for example, we used to have a section 202 direct loan program for the elderly where we were the lender. There are situations where a loan is assigned by the lender to HUD and then HUD becomes the lender but in terms of the way FHA programs work HUD is not the lender.

Q You wouldn't provide purchase money in exchange for a mortgage, in other words? HUD wouldn't write the check to purchase money through a title company and





then in exchange become a mortgagee under that transaction?

A Well, I think a purchase money mortgage is a situation where HUD is a lender.

Q If someone were to buy a building with the intention of renting it out as apartments, we could come to HUD and request for a purchase money mortgage from HUD?

A No. It's a very rare occasion when that happens. It happened historically when we were selling certain HUD-owned properties that we had acquired through foreclosure. We were selling these in a market where financing was extremely hard to obtain. This might have been in the early '80s when interest rates were 12 and 14 percent and so for a period of time there we did sell some loans or some foreclosed property with purchase money mortgages but it's not a common program option. It's not available now.

Q What is -- you mentioned FHA a few moments ago. What is FHA?

A Federal Housing Administration.

Q What's the relationship between HUD and the Federal Housing Administration?

A HUD is their housing administration. My boss is a deputy assistant secretary both for FHA and for multi-family. His boss is the FHA commissioner and

marked for identification)
Q (By Mr. Stemplen): If you would, take a look at Exhibits 8 and 9 for me and let me know when you're finished.
A Okay. I've read it.
Q Have you ever seen any of those documents before?
A No, I haven't.
Q Exhibit 8 appears to be a letter sent by Mr. Alli to Frank Malone at the HUD office in Washington requesting a payoff approval, and Exhibit 9 appears to be a letter from Frank Malone approving the payoff as of February 23rd, 2000. Would that be the normal procedure for prepaying a HUD purchase money mortgage?
A I don't know. I haven't seen these before so I don't know what occurred.
Q I'm just talking about in the general terms.
A Well, I don't know what else there might be -- what other correspondence there may be so I can't say based on these two things what actually happened. It says that a payoff is approved. It doesn't say that a payoff occurred.
Q Correct.
All it says is payoff is approved as of February 23, 2000, correct?
A Yes. I can say this: That normally there is a







checklist sent to the field office where we comment on.-- we share information about the loan that's being prepaid and so forth. We fill out a checklist. That's normally what happens. And I just don't know any more than that just looking at these two letters.
Q It's a foreclosure checklist?
A Prepayment checklist.
Q You don't recall seeing one in this case of Collingwood?
A No. I normally don't fill them out so it wouldn't be unusual if I hadn't seen it.
Q Did Mr. Alli ever call you and request to prepay the mortgage?
A Not to my recollection but I wouldn't accept his prepayment anyway so if he called me, he would have been directed to the wrong place.
Q Would you have directed him to the proper place?
A Well, apparently he found where he needed to go, headquarters.
Q Where would the payment actually be tendered to? Do you know?
A All I can say it's a central location. I don't know the address or exactly where it is but it's -- I would guess the headquarters or some lock box that headquarters directs the payments to.







Q Did Mr. Alli ever attempt to tender payment for the mortgage to you?
A No.
(Deposition Exhibit No. 10 was marked for identification)
Q (By Mr. Stemplen): Do you recall sending this letter to Mr. Alli?
A Yes, I do.
Q That's your signature at the bottom?
A Yes.
Q In this letter HUD had declared an involuntary mortgagee in possession of the Collingwood project, correct?
A Correct. Well, I don't know that we declared -- yes. That's how it's labeled, yes.
Q The letter indicates in the first sentence it was due to the abandonment of the subject property by the owner, correct?
A Yes. That was our belief.
Q What occurred to lead you to the belief that the building had been abandoned?
A We had calls from residents who said the heat was shut off and had been, I believe, for some days. We tried to get in touch with the owner or with any representatives of the owner and could not do that,







could not get any response, and we determined since it was seven degrees that day or 10 degrees that the people who were in the building had to be protected so we decided that we had to get the heat on and keep it on until people could be relocated. So that's what we did. We took possession and turned on the furnace.
Q How many days had the furnace been off for?
A My recollection was that this -- it may not be precise but my recollection was that this letter was near the beginning of the week and the heat had been off over the weekend but not exactly certain.
Q What led you to that belief or how did you find out?
A Find out what?
Q That it had been several days that it had been off. Several days -- was that based on the statements of the tenants?
A That was my recollection, yeah. Based on the tenant complaints, yeah.
Q Did you talk to any of the tenants yourself?
A No.
Q Do you know how many called?
A No, I don't but we had people verify that the heat was off.
Q Do you know who went to the site?
A Some of -- either the project manager or the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 01-669C<br>(Judge Allegra) |

DECLARATION OF SILAS POLK

I, Silas Polk, hereby declare as follows:

1. I have been employed by the United States Department of Housing and Urban Development ("HUD") for over 15 years.

2. I currently work as a supervisory project manager for HUD in Detroit, Michigan.

3. From 1997 until approximately 2000, I worked as a project manager for HUD's Office of Multifamily Housing in Detroit, Michigan.

4. My job duties as a project manager included, without limitation, overseeing properties converted by Housing Assistance Payment contracts ("HAP contracts") and ensuring that those properties adhered to HUD guidelines.

5. A project-based HAP contract covers either a potion of the building or an entire building and those tenants that live in the covered units.

6. Under a project-based HAP contract, the tenant pays approximately 30% of their gross income to the owner and HUD pays the difference between the market-rate rent and the tenant payments directly to the building owner.

7. Tenants covered by HAP contracts are usually low-income or very low income and depend upon HUD's assistance in obtaining suitable housing.

8. When the term of a project-based HAP contract expires and the owner chooses to opt out of the contract instead of renewing it, HUD issues tenant-based housing assistance vouchers to qualified tenants residing in the project.

9. Under tenant-based assistance, Section 8 housing subsidies attach to the assisted tenant's household, not to the housing project.

10. Tenants who receive housing vouchers because the project owner opted out of renewing the HAP contract have the option to stay in the current building, as long as it is deemed safe, decent and sanitary by HUD, or to relocate to other appropriate housing at the tenant's expense.

11. When a building that is under a project-based HAP contract is not decent, safe and sanitary, HUD may relocate the tenants to other suitable housing and will use tax funds set aside for the HAP contract to conduct that relocation.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed on this 29 day of August, 2005.

Silas Polk
Supervisory Project Manager
Office of Insured Multi-family
United States Department of Housing
and Urban Development