IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI
ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

ORIGINAL

The Deposition of CORY FANNING,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 11:30 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.

APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236
Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

ALSO PRESENT:

Dr. Benjamin Alli

Detroit, Michigan
Thursday, February 3, 2005
11:30 a.m.

CORY FANNING,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Good morning, Mr. Fanning. How are you today?

A. Fine, thanks.

Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case brought against it by Benjamin Alli and BSA Corporation.

Would you please state your name and address for the record?

A. My name is Cory Fanning. I live at 1949 Devonshire in Bloomfield Hills.

Q. Have you had your deposition taken before?

A. One time.

Q. When was that?

A. I would say ten years ago.

Q. What kind of case was it?
A. It was a -- I'd bought a company and the guy that I bought it from did some things that he didn't come through on and so I sued him.
Q. So you were the plaintiff in that case?
A. Yes.
Q. Other than that time, had you been deposed before?
A. No.
Q. Let me go through some ground rules with you to kind of help things along today for this deposition. First of all, if you don't understand a question that I ask you, please ask me to repeat it or to clarify it. If you answer my question, I will assume that you understood what I was asking.
A. Okay.
Q. Secondly, please answer the question that you are asked. Third and most importantly, let me finish a question before you answer it so the court reporter doesn't have to record us talking over each other.
A. Okay.
Q. If you need to break at any time, let me know and I'll be happy to accommodate you. Are you prepared to give full and accurate testimony today?
A. Yes.
Q. Are you on any medications or suffering from any

medical condition that affects your ability to give full and accurate testimony today?
A. No.
Q. Did you prepare for your deposition today?
A. No.
Q. Have you met with or spoke to Dr. Alli's attorney in this case, Eric Stempien, before today?
A. Just after I spoke with you.
Q. Had you spoken or met with him before that?
A. No.
Q. When was the last time you spoke with or met with Dr. Alli before today?
A. I never have.
Q. You've never spoken or met with him?
A. Only his real estate broker.
Q. I left out one ground rule. If you could answer all questions verbally because the court reporter can't record shakes of the head.
A. Yeah.
Q. So please try to say yes or no or something --
A. Okay.
Q. -- verbal. Are you currently employed?
A. Yes.
Q. Where?
A. At Hazel Park Lutheran Church.

CORY FANNING
February 3, 2005

Q. What is your position there?
A. I'm a pastor.
Q. What do your duties include as a pastor?
A. Everything. Caring for the congregation, conducting worship services, teaching spiritual classes.
Q. Are you employed anywhere else?
A. No.
Q. How long have you been a pastor at this church?
A. At this church?
Q. Yes.
A. Two years.
Q. Where were you a pastor before?
A. At Holy Cross Lutheran Church in Jenison, Michigan.
Q. How long were you a pastor there?
A. For two years also.
Q. And before that where were you employed?
A. At Cross of Christ Lutheran Church in Bloomfield Hills.
Q. How long were you there?
A. For four years.
Q. Have you had any other career other than that of a pastor?
A. I worked for Marriott for seven years before that.
Q. What was your position with Marriott?
A. Management.

Q. What did your duties include?
A. Checking people into the hotel and out of the hotel and insuring that it's cleaned and providing reports to owners.
Q. Other than your experience with Marriott, have you had any other career other than that of pastor?
A. I owned an office building for a while. Does that count as a career?
Q. It does. When did you own this office building?
A. I sold it about a year and a half ago and I owned it for three years.
Q. Where was this office building located?
A. In Grand Rapids, Michigan.
Q. Why did you sell it?
A. Because I couldn't manage it. I moved to Detroit and I couldn't manage it from a distance.
Q. How big was this office building?
A. Fifteen thousand square feet.
Q. Why did you buy it?
A. To make money.
Q. How much did you pay for it?
A. $650,000.
Q. How much did you sell it for?
A. $650,000. Didn't make money.
Q. Who was leasing from you in this office building while

CORY FANNING
February 3, 2005

you owned it?
A. Oh, I don't have the list of people. Pittsburgh Paint was one of them. A trucking company. I'd have to go look their name. Accountants and some insurance people.
Q. Did you go to high school?
A. Yes.
Q. Did you graduate?
A. Yes.
Q. Did you attend college?
A. Yes.
Q. Where?
A. At Concordia College in Ann Arbor, Michigan.
Q. What did you study there?
A. Business administration.
Q. Did you graduate?
A. Yes.
Q. What was your degree in?
A. Business administration.
Q. What year did you graduate?
A. In 1986.
Q. Did you continue your schooling after you graduated from there?
A. Yes.
Q. Where?

A. At Concordia Theological Seminary.
Q. Did you graduate from there?
A. Yes.
Q. When?
A. In 1997, I think.
Q. Did you continue your schooling after you graduated from Concordia Theological Seminary?
A. No.
Q. How big is your current congregation?
A. Two hundred members.
Q. Do you get paid for your work there?
A. Yes.
Q. How much do you get paid?
A. $34,000 a year.
Q. Was Holy Cross the church you worked at before you worked at the church you're working at now?
A. Yes.
Q. Did you get paid for your work at Holy Cross?
A. Yes.
Q. How much did you get paid there?
A. 56,000.
Q. Do you know the plaintiff in this case, Dr. Benjamin Alli?
A. No.
Q. Had you ever heard of him before?

A. Yes.
Q. When?
A. When I was trying to buy Collingwood.
Q. When you say Collingwood, are you referring to the Collingwood/Kirkwood Apartments?
A. Yes.
Q. What year was that?
A. I'm not sure.
Q. Would it refresh your recollection if I showed you a copy of the real estate purchase agreement?
A. Yeah, I imagine.
MS. CONNEELY: Would you mark this as Exhibit 1.
MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBER 1
11:40 a.m.
BY MS. CONNEELY:
Q. Mr. Fanning, I'm handing to you what has been marked as Exhibit Number 1. Will you take a look at that document? Just let me know when you're finished.
A. Okay.
Q. After reviewing that, do you now remember what year you were trying to buy the Collingwood/Kirkwood Apartments?
A. The date on here is 1999 and it makes sense to me.

Q. How did you first hear that the Collingwood Apartments were for sale?
A. From a broker at Marcus and Millichap.
Q. Do you remember the name of that broker?
A. I don't.
Q. Had you ever owned or managed a building before?
A. No. Let me say that again. I managed hotels but I hadn't owned an apartment building or managed apartment buildings before.
Q. Why were you looking to buy an apartment building at that time?
A. To make money.
Q. How did the agent at Marcus and Millichap get your contact information, if you know?
A. To get my -- I contacted him.
Q. You contacted him?
A. (Indicating in the affirmative).
Q. Did he -- Did this agent at Marcus and Millichap tell you about the Collingwood/Kirkwood Apartments when you, when you first contacted him?
A. Oh, gosh. I don't know. We probably explored lots of properties.
Q. Did you have a price range within which you wanted to purchase an apartment building at that time?
A. Yes. I wanted something more than 500,000 and less