IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI and
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
THE UNITED STATES, Judge Allegra
Defendant.

The Deposition of BENJAMIN ALLI,
Taken at 315 North Center Street, Suite 200,
Northville, Michigan 48167,
Commencing at 10:07 a.m.,
Tuesday, January 5, 2005,
Before Angela D. Eitzman, RPR.

APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

Thomas G. Massouras
Regional Office of Housing & Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.

ALSO PRESENT:
Shaki Alli

Northville, Michigan
Tuesday, January 5, 2005
10:07 a.m.

BENJAMIN ALLI

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. CONNEELY:

Q. Please state your full name and address for the record.

A. Benjamin Alli, 970 Lakeshore Road, Grosse Pointe, Michigan, 48236.

Q. Good morning, Dr. Alli, how are you today?

A. Fine. Thank you.

Q. My name is Marla Conneely. I'm an attorney for the United States of America, and I'm representing my client in a case that you've brought against them in docket number 01-669. Before I start with my questions, I want to set forth some groundrules for you.

First of all, if you don't understand the question, ask me to repeat it or clarify it. If you

me, so it's generic question.
Q. From 199 -- from 1990 to now, how many companies do you currently own?
A. I cannot remember that, because sometimes -- just for operation because of the name, I keep it in case somebody might need it. The actual one that I own that I form for operation is the B.S.A Operation.
Q. How many companies do you own that you do not use just for their name?
A. That could be several.
Q. One hundred?
A. One hundred, oh, no, no.
Q. Twenty?
A. No, it's less than that.
Q. Less than 20?
A. Yeah.
Q. Less than ten?
A. Maybe about ten.
Q. About ten companies?
A. Uh-huh.
Q. Can you name them?
A. Not right now.
Q. Can you name all of the companies that you own that you can remember?
A. Yeah, I own MVP.

Q. What do they do?
A. MVP just a name that I kept, was used for real estate acquisition.
Q. Any other company?
A. Well, I am part of the B.S.A and Associates.
Q. What does that company do?
A. Real estate management.
Q. When was that company incorporated?
A. I don't think it's a corporation, it's a dba.
Q. What is it doing business as?
A. Me doing business as B.S.A and Associates, Benjamin Alli d/b/a B.S.A Associates.
Q. Do you have a company named Benjamin Alli?
A. Now?
Q. (Nonverbal response)
A. It's in defunct.
Q. B.S.A and Associates is in default?
A. No, no. We used to have Benjamin Alli and Company. I think that one is not active, it's non active, it's expired.
Q. Did you incorporate B.S.A and Associates?
A. If I remember correctly, I don't think so.
Q. Where is the money for B.S.A and Associates kept?
A. Kept?
Q. (Nonverbal response)

BENJAMIN ALLI
January 5, 2005

A. Money for B.S.A and Associates?
Q. Let me rephrase the question.
A. Okay.
Q. Does B.S.A and Associates have any bank accounts?
A. At those times when we are doing businesses, yes, but it's been long time doing business.
Q. B.S.A and Associates is no longer doing business today; is that correct?
A. Yeah, because we use, as for the issue of the business, and we're no longer in business.
Q. When B.S.A was in business, did it have any bank accounts?
A. Yes.
Q. Where were these bank accounts?
A. If I remember correctly, possible Michigan -- Michigan National Bank, if I remember correctly, it's been such a long time.
Q. Is that the only bank account B.S.A and Associates had?
A. Could be some more, but I don't remember.
Q. When B.S.A and Associates stopped doing business, where did the money in the bank accounts for B.S.A and Associates, where did the money go to?
A. Who does it go to?
Q. Yes.

A. Possible zero, possibly there's no money in the account because we have to write the expenses.
Q. Was there any money in the accounts of B.S.A and Associates when it stopped doing business?
A. I don't think so.
Q. You mentioned MVP, B.S.A and Associates and Benjamin Alli and Associates, were there any companies that you had owned or incorporated between 1990 and today?
A. It's very likely, but I don't recall now.
Q. Do you recall any of them?
A. Not right now.
Q. Did you have a company called Alli and Associates?
A. No. Remember I said Benjamin Alli Corporation is no longer -- I do not have any company specifically called Alli and Associates, I don't have that.
Q. Did you have a company called B.S.A Corporation?
A. Yes.
Q. What did that company do?
A. Own real estate properties and managing real estate.
Q. Is B.S. -- strike that.
Is B.S.A Corporation currently doing business?
A. Yes.
Q. What is it currently doing?
A. What it did before, own and operate real estate,

apartment buildings.
Q. What real estate does B.S.A Corporation currently own and operate?
A. 2211 Pingree, 2987 Gladstone.
Q. Any other properties?
A. No.
Q. Does B.S.A Corporation have any bank accounts?
A. Yeah.
Q. Where?
A. I think maybe Republic Bank, maybe Republic Bank or Comerica Bank.
Q. Does B.S.A Corporation have monies kept in anything other than a bank account?
A. Like what?
Q. In a trust account?
A. No.
Q. In a certificate?
A. No.
Q. Are all of the monies owned by B.S.A. Corporation kept in bank accounts?
A. Uh-huh. Yes.
Q. Was all of the monies owned by B.S.A. and Associates kept in bank accounts?
A. Now?
Q. From 1990 until now?

A. Yes.
Q. Did you ever deposit your personal monies into bank accounts owned by B.S.A and Associates?
A. A lot of times.
Q. Did you ever take out money from the accounts of B.S.A and Associates for your own personal use?
A. No.
Q. Did you ever take out money from bank accounts owned by B.S.A. Corporation for your own personal use?
A. Never.
Q. Did you ever deposit your own personal monies into bank accounts for B.S.A. Corporation?
A. Yes.
Q. Did you ever take out monies from bank accounts owned by B.S. A and Associates for purposes -- strike that.
Did you ever take out monies from bank accounts of B.S.A. and Associates for any other purpose than purposes for B.S.A. and Associates?
A. Never.
Q. Did you ever take out monies from bank accounts owned by B.S.A. Corporation for purposes other than purposes for B.S.A. Corporation?
A. No, except when I loan money to the corporation, I have to get refund from it, reimbursement from it.
Q. How much interest would you charge the corporation --

strike that.
How much interest would you charge B.S.A. Corporation when you loaned money to it?
A. Zero.
Q. Did you ever loan money from any of your corporations?
A. From my personal --
Q. Strike that. I'll rephrase it.
Did you ever loan money from any of your own companies?
A. For doing what?
Q. For any personal purpose?
A. No.
Q. For any purpose regarding your other companies?
A. No.
Q. Did you ever loan money from B.S.A. and Associates for any purpose?
A. No.
Q. Did you ever loan money from B.S.A. Corporation for any purpose?
A. No.
Q. Does your wife loan money from B.S.A. and Associates for any purpose?
A. No.
Q. Did your wife loan any money from B.S.A. Corporation for any purpose?

A. No.
Q. Does your wife loan monies from any companies that either you or she owned for any purpose?
A. I didn't understand the --
Q. I'll state it again. Did you or your wife loan any monies from companies either you or she owned for any purpose?
A. No.
MR. STEMPIEN: Hold on. Before you answer, I think it's just not real clear, because you're asking if he loaned money from a company. Only the company could actually loan the money. I just -- I'm not sure that's real clear. I mean, he could withdraw the money, I suppose, but he wouldn't be actually giving the loan. It's the corporation that would be giving the loan. That's just my objection.
MS. CONNEELY: I'll rephrase it.
A. Okay.
BY MS. CONNEELY:
Q. Did B.S.A. and Associates ever loan you or your wife any monies?
A. No, never.
Q. Did B.S.A. Corporation ever loan any monies to you or your wife?
A. No.

Q. Did B.S.A. and Associates ever loan money to any of your other companies?
A. No.
Q. Did B.S.A. Corporation ever loan any monies to any of your other companies?
A. No.
Q. You mentioned earlier that you saw an ad in the paper regarding buildings being sold by HUD; is that correct?
A. Yes, ma'am.
Q. What did you do after you saw that ad?
A. Well, I first went to the address, they have an address and phone number. So I went downtown, the building right in the heart of the city. When I got there, that was about two or three days later at the time. I saw a lot of people line up, a long line. So I asked them what they are doing. They said, oh, the company selling the apartment building.
Q. So you saw the ad in the paper, and a few days later you went to the address listed in the paper; is that correct?
A. Yes, ma'am.
Q. And when you went to that address there was a long line of people; is that correct?
A. Yes, ma'am.

you otherwise.
A. Okay.
Q. Do you understand?
A. Yes.
MR. STEMPIEN: Off the record a moment.
(Discussion off the record at 12:13 p.m.
(Back on the record at 12:14 p.m.)
BY MS. CONNEELY:
Q. Who was the building manager of the Collingwood apartments from 1997 through 2002?
A. Oh, my God, we have several people that we hire, we let go, often normal stuff like that.
Q. Did you have more than one building manager at the Collingwood apartments?
A. Very likely, very, very likely, because sometimes just let them go, we hire somebody else, stuff like that.
Q. Did you have more than one building manager at the Collingwood apartments at a time?
A. Very likely, yeah.
Q. How many building managers did you have at the Collingwood apartments between 1997 and 2002?
A. I don't remember, but usually we have minimum of two people. Then we have a supportive team from outside. We have assistants, and sometimes we also have some tenants that we just pay for stuff so they can also

keep us aware of anyone that commit crime. There's some tenants we also pay for some minor work, cleaning work, painting, sometimes to keep them busy, you know.
Q. Was there someone -- strike that.
Who was in charge of the -- strike that.
You mentioned that there were at least two building managers; is that correct?
A. No, one manager and assistant, and support person from outside.
Q. Who was the manager in 1997?
A. I cannot remember that.
Q. Who was the manager in 1998?
A. I cannot remember that.
Q. Who was the manager in 1999?
A. You say in Collingwood?
Q. In Collingwood apartments?
A. Collingwood Kirkland or just one apartment because there are two apartments for --
Q. Let's start with Collingwood. Who was the building manager in 1991 for Collingwood?
A. I think I have a guy named Laird, L-A-I-R-D. He worked for me there. And I have another lady, another lady, and there was two or three that we just call for supportive work on the premises.
Q. Were there areas of the Collingwood Kirkwood

apartments that were locked?
A. Oh, all the secure -- all the storage areas were locked. The front door is locked, the mail room is locked.
Q. Were there areas of the Collingwood apartments that were locked and not accessible to tenants?
A. All the areas that we locked are not subject to tenants.
Q. Who had keys to those areas?
A. Myself, the manager.
Q. One manager?
A. Oh, yeah, only one person.
Q. Anyone else?
A. Maybe my wife.
Q. Who was the one manager that had keys to these locked areas of the Collingwood Kirkwood apartments in 1999?
A. Whoever that might be the manager, he would have the key.
Q. Who was the manager at that time?
A. I don't remember.
Q. Do you have records that would identify the manager of the -- Collingwood Kirkwood apartments at that time?
A. Possible.
Q. When you -- strike that.
During the time you owned and managed the

Collingwood Kirkwood apartments --
A. Yes, ma'am.
Q. -- were you employed in any other capacity other than as owner and manager of those apartments?
A. No.
Q. What were your duties with respect to the Collingwood Kirkwood apartments during the time that you owned and managed them?
A. To oversee the management, day-to-day management of the building.
Q. What does that mean?
A. It means that the impression of the building, whatever is necessary to sustain the smooth operation, keep the place well; repairs, get plumbers, get supplies that necessary for repairs and ensure that the work is done by the contractor and by the resident that we hired, and some other stuff. Whatever is involved, you know, that's what I do.
Q. Did you receive reports from tenants regarding repairs that needed to be done in their units?
A. Report from tenants? Tenants don't report. We have to do inspection before we know what needs to be done.
Q. During the time that you owned and managed the Collingwood Kirkwood apartments, did any tenant in the Collingwood or Kirkwood apartments report a problem or

repair that needed to be done to you?
A. Once in a while they do, but not all the time. They would have point -- punch list inspection that we do every six months or periodical. It depends on what type of tenants.
Q. During the time that you owned and managed the Collingwood Kirkwood apartments, how did a tenant report a problem in their unit?
A. They call our phone number, talk to the manager on the premises. If they don't get it done, we advise them to call the office. Our phone number is right on the -- on the outside wall, not very far away, so they can call us 24 hours for any work that need to be done.
Q. Where were your offices located?
A. We have an office inside the building, and also one in Grosse Pointe.
Q. Did you have an office in the Collingwood Kirkwood apartments?
A. Yes, ma'am.
Q. In both buildings?
A. In all the buildings we have where we have to meet tenants, you know.
Q. Did the Collingwood apartments have a -- have one building manager?

A. Collingwood apartments, they'd have two buildings for Collingwood. Remember I just said that there's one on Calvert, one on Collingwood, they have separate people.
Q. Did each building have its own building manager?
A. We just have Calvert because there's only 17 units. So according to Detroit Housing Court, if you are not 20 or more, you're not supposed to have a business manager, but we have a lady on Calvert that we refer to as the building manager, she performed the daily function of the daily --
Q. So there was one building manager for both buildings at the Collingwood Kirkwood apartments; is that correct?
A. No, it's wrong.
Q. There were two building managers?
A. Yes, ma'am. I just said that on Calvert, C-A-L-V-E-R-T, because 17 units, we have a lady that live there who performs the functions of building manager, but we fired the manager.
Q. What was her name?
A. Crystal.
Q. Did you keep a record of the building managers under your employ for the Collingwood Kirkwood apartments?
A. During the time?

Q. Yes.
A. Yes. Now, no.
Q. What happened to those records?
A. I don't know where I put them.
Q. You don't know? Can you say that again?
A. I don't know what I have done with it. The time limitation expired on them, so I don't know what I have done with them.
Q. When you received a report from a tenant at the Collingwood Kirkwood apartments of a repair that was needed, what would you do?
A. The first thing I would do, I would ask them have they talked to the manager, because sometimes maybe they just came in, break the window, break the door, they said they don't know who did it, and they would try to avoid the manager. So I get a name, phone number and apartment number and I contact the manager, so he gave me the details of what happened. They would dispatch whoever would have that, specialize in the area, if it's a leak, if it's a dub with key, kind of split, we have people that go there, or when I'm around there, I fix it once in a while. You've -- it's got to be done right away. I make them sign a work order that shows that work was performed. And I acknowledge that we don't charge for it, but if they do again, we charge

to catch it or a glue tip. We have glue tip, we buy in dozens from Home Depot, one of the big outlet here. We put a glue tip around so they have children, so to make sure that the kids don't get their hands into the trap.

Q. Referring back to Exhibit Number 20, the Deed of Trust?

A. Yeah.

Q. Did you ever make any payments on this Deed of Trust to Ms. Abegby?

A. Well, maybe couple of, maybe couple of payments. We never make all the payments because we have a hard time with payments.

Q. Where did the money from the payments come from?

A. It comes from the project account.

Q. Did you say the project account?

A. Uh-huh.

Q. You mentioned that there were also Deeds of Trusts with Ms. Abegby's encumbering the Riverside apartments; is that correct?

A. Yes, ma'am.

Q. On those Deed of Trusts, did you make any payments on those?

A. A few payments, yeah.

Q. Where did the money come from for those payments?

A. Project account.
Q. You also mentioned that there were Deeds of Trusts with Ms. Abegby that you entered into encumbering the Pingree apartments; is that correct?
A. Yes, ma'am.
Q. Did you make payments on those Deeds of Trust?
A. Few payments, yes.
Q. Where did the money come from for those payments?
A. Project account.
Q. When you say the project account, what are you referring to?
A. Yes, ma'am. Go ahead.
Q. What are -- when you say the project accounts, what account are you referring to?
A. Well, on the HUD handbook, the handbook is 4317.2 revision. The quote that Mr. Malone gave me on the phone for the payment of Ms. Abegbe is code number 2320 and also code number 2310 and said we can pay for those code allowed by HUD.
MS. CONNEELY: I need to have the court reporter mark as Exhibit 21 the following two-page document.
MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 21
1:30 P.M.

Q. Do you remember when they inspected the apartments?
A. No.
Q. Which apartment buildings did they inspect?
A. Got to be Riverside Collingwood.
Q. Did Roland Samaroo prepare a written report of his inspection of the Collingwood Kirkwood apartments or the Riverside apartments?
A. Very likely.
Q. Did you turn over a copy of that report to your counsel in this case?
A. I don't know.
Q. I'd like to ask the court reporter to mark this as Exhibit 31.
MARKED FOR IDENTIFICATION
DEFENDANT'S EXHIBIT 31
3:21 P.M.
BY MS. CONNEELY:
Q. Have you seen this letter before?
A. Yes, ma'am.
Q. Did you receive a copy of this letter?
A. Yes.
Q. Please refer to the paragraph marked as number two on the first page of the letter.
A. Uh-huh.
Q. That paragraph talks about a second loan --

A. Uh-huh.
Q. -- that was taken encumbering the Collingwood Kirkwood apartments?
A. Uh-huh.
Q. The letter from HUD then asks you to provide evidence that a certain amount of money is repaid to the Collingwood Kirkwood operating account?
A. Uh-huh.
Q. Was that money ever repaid to the account -- strike that.
Did you ever repay this money to the Collingwood Kirkwood operating account?
A. No.
Q. Why?
A. Because the letter's an extortion, it's not true. It's a violation of HUD regulation.
Q. If I can refer you now to the paragraph marked as number three.
A. Uh-huh.
Q. That paragraph talks about a car --
A. Uh-huh.
Q. -- that the Collingwood Kirkwood apartments leased from you --
A. Uh-huh.
Q. -- for a monthly payment of $420. The letter then

states that this was not an eligible project expense and asked you to reimburse the project for a total of $15,120. Did you reimburse the project this amount of money?

A. No.

Q. Did you receive reports from tenants -- strike that.

Did you receive reports of mice from tenants at the Riverside apartments?

A. Reports of mice? What kind of report? Can you elaborate?

Q. Did a tenant at the Riverside apartments ever report to you that they had seen a mouse in the building?

A. No.

Q. Did you ever see any mice at the Riverside apartments?

A. No.

Q. Did you ever exterminate for mice at the Riverside apartments?

A. Yes.

Q. Why?

A. Why? I see holes, we plug the holes, that's what we do. That's the holes anywhere that mice can come, maybe when they're moving, tenants moving the furniture in or the kid playing hard in their room, they break wall. We just ask to repair the wall, that's how we did it.