# ALLI, ET AL v. THE UNITED STATES

## ROLAND SAMAROO

February 3, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN ALLI and SHAKI ALLI and BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669c
Judge Allegra
THE UNITED STATES,
Defendant.

______________________________

The Deposition of ROLAND SAMAROO,
Taken at 211 West Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 8:40 a.m.,
Thursday, February 3, 2005,
Before Joanne Smith, CSR-3099.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

THOMAS G. MASSOURAS
Regional Office of Housing and
Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 253-6236
Appearing on behalf of the Defendant.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.



ALSO PRESENT:
Dr. Benjamin Alli



Detroit, Michigan
Thursday, February 3, 2005
8:40 a.m.

ROLAND SAMAROO,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBERS 1 - 21
8:40 a.m.

EXAMINATION

BY MS. CONNEELY:
Q. Good morning, Mr. Samaroo.
A. Good morning.
Q. My name is Marla Conneely. I'm an attorney representing the United States of America in a case that has been brought against it by Benjamin and Shaki Alli and BSA Corporation. Have you -- Let me step back.
Would you please state your full name and address for the record, please?
A. Roland Samaroo. My address is 18530 Mack Avenue, Grosse Pointe 48236.

Q. Mr. Samaroo, have you had your deposition taken before?
A. No.
Q. Let me go through some ground rules that will help today's deposition go along more smoothly for both of us and for the court reporter. First of all, if you don't understand a question that I ask, please ask me to repeat it or clarify it. If you answer my question, I will assume that you have understood what I'm asking.
A. All right.
Q. Secondly, please answer the question that you are asked. Next and most importantly, let me finish a question before you answer it. It just is a lot easier for the court reporter. It's difficult for the court reporter to try to, to try to get down what's going if we're talking over each other. Next, if you need a break at any time, just let me know and I'll be happy to accommodate you.
A. All right.
Q. Are you prepared to give full and accurate testimony today?
A. Yes, I am, to the best of my knowledge.
Q. Are you on any medications or suffering from any medical condition that could affect your ability to



give full and accurate testimony today?
A. No.
Q. Did you prepare for your deposition today?
A. Well, I gathered documents and I went over them, read them over.
Q. What documents did you gather?
A. Some of the inspection reports that I did and I followed it to -- some of the documents -- some of the documents of inspections that I did, you know, in the past, I followed it to Dr. Alli's mailbox.
Q. These inspections that you did in the past that you're talking about, what inspections are these?
A. Inspecting various properties of BSA and Associates for HUD. You know, when HUD, subsequent to HUD doing or giving a report, I would take the report and I would go and inspect the property for, you know, the violations, to correlate it and to give my report to Dr. Alli so he can have contractors come in and repair if there were violations that needed to be repair.
Q. Would you draft your own separate report?
A. I would just write it on the HUD report. Just write it right on there as I made the inspection, as I go around the building.
Q. So you would make notes on the HUD report itself and then send that HUD report with your notes to Dr. Alli;



is that correct?
A. Yes, I'd send -- I'll have, you know, a copy for my, a copy for myself, and I would send HUD, give HUD, the HUD report to Dr. Alli. What he gave me, the one that I got from him, I would write on that. I'd make a copy for myself and I would give him the one that he gave me, the one that I wrote on.
Q. And these are the inspection reports that you reviewed before your deposition today; is that correct?
A. Yes.
Q. Okay. Did you review anything else besides those reports?
A. Well, I looked at some of the pictures that I took in the past. The reports and the pictures.
Q. Have you spoken with Dr. Alli's attorney in this case, Mr. Eric Stempien, before today?
A. Yes. A couple of times. Once I've been to his office and twice, I think, three times, maybe not three times -- then I went to, waited for the subpoena person the other day. And then I -- but I could not make it on Tuesday and -- When I wasn't able to make it on Tuesday, I called Monday afternoon.
Q. The two or three times that you visited his office before, why did you visit his office?
A. When I got the call that, you know, he wanted to see



me, I wanted to know what for, and basically he told me it was a HUD inspection, for HUD inspections, and he wanted me to bring any documents and so I could and so I had set up an appointment with him. I wasn't able to find the documents then but I wanted to basically know what it was about so I went, I went up to his office in Northville. And he told me that there was a case involving HUD and Dr. Alli regarding inspections, inspections I did, inspections I did, HUD inspection from BSA essentially, and he asked me if I had deposition, you know, before, you know. But I told him not that I remembered. And he basically said I am a neutral party, not for or whatever, and that I should just tell them whatever question that I was asked of me by the HUD attorney and also to gather as much documents as I could find relating to my inspections and if I can get those to him.
Q. Did you get those documents to him?
A. Well, eventually. I got them -- I left them in the Dr. Alli's mailbox, mailbox, because I had a really tough time finding them. You know, it was a while ago, and I imagine he got them.
Q. Are you currently employed?
A. Yes.
Q. Where?

Page 9

A. State of Michigan Department of Corrections.
Q. What is your position there?
A. Clinical and forensic psychologist.
Q. What does your position entail?
A. Basically doing therapy with inpatients, prisoners. Crisis situations. If someone wants to commit suicide, is depressed, I'd see the prisoner and make an intervention. Essentially attending to the psychological needs of inmates from the Michigan Department of Corrections.
Q. Have you had any other position with the Michigan Department of Corrections other than the position you hold now?
A. No.
Q. How long have you worked for the State of Michigan?
A. About four years. About four years now.
Q. Where did you work before?
A. I worked for my own company.
Q. What was the name of that company?
A. Residential Provider Services.
Q. What did that company do?
A. Basically provided care and supervision, including housing, for developmentally disabled, mentally ill patients.
Q. What was your position with that company?

Page 10

A. I was the director of the company.
Q. How many employees did that company have?
A. It would vary. I want to say off the top of my head, maybe about 40, as far as I could remember, approximately.
Q. And you were the one that incorporated that company; is that correct?
A. Yes.
Q. When did you incorporate that company?
A. I think -- It might be in the '80s. I want to say maybe early, mid-'80s, off the top of my head.
Q. Did you work for that company from its incorporation until you started with the State of Michigan Department of Corrections?
A. For the most part, yes. The company was not like up and full running immediately after when it was incorporated. I remember that. It didn't have as many homes and clients, but yes.
Q. Did you have any other jobs at the same time as when you were working for the Residential Provider Services?
A. Well, I worked for Dr. Alli's company, you know, doing inspections, primarily. See what else I did. No. No. I didn't work for anyone, any other companies.
Q. What eventually happened to Residential Provider

Page 11

Services? Is it still operating now?
A. It's not operating now. I -- I basically stopped running the company around 2000.
Q. Why?
A. The stress wasn't worth it. Too much stress.
Q. Did you sell the company or did you just dismantle it?
A. Dismantle it.
Q. Do you own any companies today?
A. Well, Residential Provider Services might be still on the book but, no, I don't have any other companies.
Q. Do you own or manage any properties?
A. Right now I don't. Not since my employment. Around the time of my employment with the State of Michigan, no.
Q. Are you paid for your position with the State of Michigan?
A. Yes, I am.
Q. How much are you paid?
A. About $30 an hour, approximately.
Q. How many hours a week do you work?
A. Full time. It's full-time employment.
Q. Are you still working for Dr. Alli today?
A. No, I'm not.
Q. Were you paid by Residential Provider Services when you were employed by them?

Page 12

A. Yes.
Q. About how much were you being paid?
A. I really don't remember exactly. I mean I really don't. That varied with the number of properties that I had.
Q. Were you paid hourly or salaried?
A. No, it was -- It was salaried but contingent upon how many homes I had. That's why I'm not able to give out an accurate figure.
Q. Before you incorporated, incorporated Residential Provider Services, where did you work?
A. Let's see. I worked for an organization called Our Neighborhood Service Organization.
Q. What was your position there?
A. Case manager/supervisor.
Q. What did this company do?
A. Provided psychiatric services for the mentally ill.
Q. What did you do as a case manager/supervisor?
A. Well, I basically supervised other -- I was responsible for checking on the care of the residents, the patients, making sure that the staff essentially was doing what it was supposed to do, that the needs of the residents were being met.
Q. Did you have any other position other than case manager/supervisor while you worked for this

Page 41

answer, say what was on his mind. Basically, that was my kind of interpretation. He sounded as though, hey, you better get your money. He didn't say it in those words, but basically that's the impression I got from the communicating with him. That this might not be a good place to keep on doing stuff for because HUD was going to take it over.
Q. Do you remember what year this was?
A. I want to say -- I think late '98, I would say, because the weather -- it wasn't winter yet but it wasn't hot summer. So if I had to make a guess, as far as I remember, I would say around maybe early fall, I would say.
Q. Was anyone else present at this conversation you had with Mr. Salazar?
A. No. I got there -- I got there on Saturday. It was Saturday. Kind of mid-morning or so. And, you know, I saw him coming out to the building.
Q. Why were you there on a Saturday?
A. To do inspections and to meet with tenants that I couldn't catch during the week.
Q. So when you would do these inspections of checking the HUD reports, would you check every item on the report?
A. For the most part, yes, and I said for the most part. There are a couple of reports that I did when I

Page 42

started going through the pages and after, if I did some initial inspections, and I saw that, that it was contradictory, I didn't find the things that were in the report, I did, I went through a few pages, then I went to some other apartments and, you know, just essentially those that I could get into. When I saw it was inconsistent, you know, I'd let Dr. Alli know. But essentially I would go through the list and do everything on the list. But I know for a report or two, as far as I can remember, one time telling him, "I can't find a whole host of these things. It's basically a waste of my time and your money, you know, have someone see what I'm not seeing."
Q. Do you know Dr. Alli's wife, Mrs. Shaki Alli?
A. Yeah, I know who she is.
Q. Did you ever see her at the Collingwood Apartments?
A. I can't say exactly what apartments I saw her, but I have seen her there at the apartments before at times I went to do inspections when I was there. I've seen her.
Q. How often would you see her?
A. I would see her -- I can't give you a number of times. I don't know, I don't remember, but fairly, fairly frequently.
Q. Would you see her every day?

Page 43

A. No, I wasn't there every day. Not every day that I was there I would see her.
Q. From 1997 through 2000, about how many hours a week did you spend at one of Dr. Alli's properties?
A. I really can't tell you. I don't remember. When I have -- I know when I had like sizeable jobs, a long list of inspections, or at the time I had to do a cleanup of a basement or so, that time I may go several days in a row, you know. And other times, it varied. I really can't say.
Q. Okay. Let's look at it as a totality then. From 1997 through 2000, how much of your time would you say you spent there?
A. I really can't answer your question. I really don't know.
Q. Do you know Dr. Alli's children?
A. Children? I don't know -- No. I don't think he had children. We never discussed anything personal. All I saw, him, his wife. I knew she was his wife because I went to the office, they said Mrs. Alli.
Q. Have you ever seen or met his children?
A. No. I'm not even aware if he has children or how many children he has. I don't.
Q. When you were doing repairs of the Collingwood/Kirkwood Apartment, did you ever have to

Page 44

run errands related to those repairs?
A. Well, sometimes I'd go get some small supplies and so by, you know, Home Depot or something, yeah.
Q. Would you use your own vehicle?
A. I would use my own vehicle most of the time. Occasionally I would use one of the company vehicles if I had to get something like a sheet of drywall or something.
Q. When you say one of the company vehicles, what company are you referring to?
A. BSA and Associates, Dr. Alli's company. Not my company.
Q. How many company cars did BSA Company have?
A. I really don't know. I can't for sure. I know I've used a pickup truck at one time, a little red pickup truck, and I believe at Magnolia, at Magnolia the one time, I had to pick up some extra supplies. I didn't want to use my vehicle. I used a gray Jeep, one of the Chryslers, a gray Jeep. I remember that, too.
Q. What kind of materials were they that you didn't want to put in your car?
A. Sometimes if I had to get toxic, any type of toxic stuff, sprays, spray stuff -- I didn't have to do that too much because he mixed the stuff. If I had to get things that I know that would crumble. Sometimes the

# ALLI, ET AL v. UNITED STATES

## MARK SCHLOTTER

February 2, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN and SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,

vs. Case No. 01-669C
Judge Allegra
THE UNITED STATES,
Defendants.

______________________

The Deposition of MARK SCHLOTTER,
Taken at 211 Fort Street, Suite 2001,
Detroit, Michigan,
Commencing at 1:51 p.m.,
Wednesday, February 2, 2005,
Before Angela D. Eitzman, RPR,



APPEARANCES:

ERIC STEMPIEN
Law Offices of Stempien & Stempien
315 North Center Street, Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiff.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington D.C. 20530
(202) 307-1011
Appearing on behalf of the United States.

THOMAS G. MASSOURAS
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of HUD.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Wednesday, Febuary 2, 2005
1:51 p.m.

MARK SCHLOTTER
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Mark Schlotter taken pursuant to notice to be used for all purposes allowed under the Federal Court Rules and the Rules of Evidence.

Mr. Schlotter, we met before, my name is Eric Stempien, I'm an attorney and I represent Benjamin Alli, his wife, Shaki Alli and B.S.A. Corporation in a lawsuit brought against the United States government. I'm going to be asking you a series of questions today. Have you ever given a deposition before?

THE WITNESS: No.

MR. STEMPIEN: Okay. Let me give you some of the groundrules. When you give an answer please be sure to verbalize the answer, no nods of the head or shakes of the head or uh-huh or huh-uh, we have to say



yes or not because it's hard to read it when it's written out.

THE WITNESS: True.

MR. STEMPIEN: And also if I ask anything that you don't understand please let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page.

EXAMINATION

BY MR. STEMPIEN:

Q. Okay. Could I get your full name?
A. Mark D. middle initial, Schlotter.
Q. And your address?
A. 515 Mount Vernon, Detroit.
Q. What do you do for a living?
A. I used to be a licensed realtor so I used to have property. Right now I make repairs for other people around the city when they call me, on their properties.
Q. Do you have a company?
A. I just work independently.
Q. When you say you do repairs for other people, are you referring to landlords or are you talking for individual homeowners or both?
A. Probably both.
Q. When you say around the city, are you talking about

the City of Detroit?
A. Yes.
Q. Do you practice -- well, strike that.
Are you active in real estate industry right now?
A. Not really.
Q. Are you still licensed?
A. No.
Q. Do you have any formal training with regard to construction or any of the trades?
A. Not by license.
Q. How did you get into the field of doing repair work for people around the city?
A. My family managed a 300-unit building downtown Detroit for 23 years.
Q. You said 300 units?
A. More or less.
Q. Which building?
A. Maddison-Lennox Hotel (phonetic), it has about -- it's consolidated into about 180 units when they turned into apartments.
Q. And you said that's what got you into the business of doing repairs, but how are the two related, I presume --
A. We used to run a hotel building.


Q. When did you start doing handyman work around the hotel?
A. 1973.
Q. Did anyone train you or show you how to do things?
A. The maintenance crew there.
Q. What type of work did you do at the hotel?
A. The basic electrical and plumbing type of repairs.
Q. Any type of rough carpentry?
A. Yes.
Q. Finish carpentry?
A. Nothing to any great degree, just cosmetic work and so forth.
Q. How about drywall work?
A. Some, oh, yes.
Q. Plaster?
A. Some, kept the boiler going.
Q. Is there air conditioning in this unit --
A. No.
Q. -- in this building?
A. (Nonverbal response.)
Q. Have you ever received any training on air conditioning?
A. Not to any schooling.
Q. Any other work other than at the Madison-Lennox Hotel related to repair handyman work?


A. Like I said, individuals around town.
Q. I meant before you started doing that, between the hotel and when you started doing this for individuals?
A. Property that I owned had three apartment buildings and two rental houses.
Q. Do you own any of these rental units anymore?
A. No, I got rid of them.
Q. It was three apartment buildings and two individual homes?
A. Yes, about 10 to 15 years, depending which one you're talking about.
Q. You did all of your own repair work on those?
A. Yes.
Q. Was it the same type of work we talked about with regard to the hotel?
A. Yes.
Q. Were any of the properties you owned subsidized?
A. No.
Q. Were they all in the City of Detroit?
A. All but one, that was in Highland Park technically.
Q. Do you do repair work for B.S.A. Corporation currently?
A. Quite often.
Q. When did you first start doing work for B.S.A. Corporation?


A. I believe it was 1998.
Q. Are you an employee of B.S.A. Corporation?
A. Not -- not a direct employee, I'm not on payroll.
Q. Are you an independent contractor?
A. Yes.
Q. What buildings do you -- or have you worked on on behalf of B.S.A. Corporation?
A. It's part of a building on Pingree and there's a building on Gladstone Street.
Q. Are those the only two?
A. Yes.
Q. Do you know -- well, strike that.
Did you contact B.S.A. Corporation about doing work for them, or did they contact you?
A. Probably contacted them originally, and he had an ad in the paper and I just called and told him I was available, and I worked for him for a while and then I didn't hear from him for about a year, and then he called me one day and needed me, I was working for somebody else and I told him it would be about a month before I could finish up with them, and that was probably the end of '99.
Q. Had you been with him, when I say him, referring to Dr. Alli who runs B.S.A. Corporation, as far as you know, right?

Page 9

A. Yes.
Q. Since 1999 until now, 2005, have you been working with B.S.A. Corporation continuously in that time?
A. Quite often tenants will call me if they need something, I'm only about ten minutes away from his buildings so I can go there pretty fast, or, you know, he'll call me probably once a month and tell me things he needs done, so unless it's an emergency, I just put it in with the rest of my work.
Q. In the last five or six years, have you worked for other companies other than B.S.A. Corporation?
A. Oh, yes.
Q. For the work you do on the Pingree and Gladstone buildings, who pays you?
A. B.S.A.
Q. Do you provide billings to him?
A. Yeah, I send him an invoice every two weeks with the time, dates and what was done so he has a record of it, and he can question me if there's anything he needs to know.
Q. Does he pay you regularly?
A. Yes, well, probably a week or so after I send the bill, I usually get a check from B.S.A.
Q. During the time that you've worked on the Pingree and Gladstone buildings, can you just describe, in

Page 10

general, the types of work you do there?
A. Basic plumbing, electrical, locks, carpentry, repairs like the doors, I've laid quite a bit of carpet for him and kept the boilers going and some minor roofing, most -- a whole array of basic repairs you can think of in an apartment building.
Q. You indicated earlier that sometimes you get calls directly from tenants; is that correct?
A. Yes.
Q. Are you --
A. Just emergency, you know.
Q. In the last six years, as far as you know, are you the only non B.S.A. Corporation employee that's provided maintenance to Pingree and Gladstone buildings?
A. Well, he's probably called contractors to come in to do things, I wouldn't, you know, know for sure.
Q. On a typical week how many hours would you spend doing maintenance at either Pingree or Gladstone?
A. It would be 5 to 20, varies quite a bit.
Q. When you receive calls from tenants, is that from the manager or do you get calls from individual tenants?
A. Usually from the manager, but if there's an emergency and they can't get them they might leave a message on my answering machine if they can't get me, have a water pipe break or something that needs to be taken

Page 11

care of right away, you just can't leave it set, I usually respond as soon as I get the message.
Q. Do you know if every tenant is provided with your direct dial number?
A. No, no, but some of them do have it, but maybe they'll get it from the manager or something, if, you know, she doesn't call me. There's always a few tenants there if the manager isn't there that's familiar with me and my number, so, you know, they might call me or, you know, like say their neighbor's got the problem or something, there's probably only a few there that have it, but they -- they can get it pretty easy, it's in the phone book, you know, my name.
Q. What happens if a tenant or the building manager calls you with a problem, what would you do?
A. Depends, if it's not an emergency, I put it in my books to be done since I'm in that area. If it's an emergency, I try to get there right away.
Q. And what do you mean by right away?
A. Probably from my house it's about ten minute drive, so I usually leave as soon as I can and try to get there. If there's lights out or plumbing or something important that you have to go take care of it, you can't just leave it that way.
Q. If it's a nonemergency?

Page 12

A. Well, that's just written down and I just put it on my list of things to do that week when I'm over that way.
Q. What's the longest something might have to wait to get done on a nonemergency?
A. If it's a dripping faucet, that can wait until later in the week probably, it's no big problem, but it will usually be done before the week's up, so --
Q. Have you ever performed any extermination work at either building?
A. Yeah, some.
Q. And what type of --
A. I've got a tank and sometimes I'll buy a gallon of insecticide and go up to some of the units, and then I'll leave it there for the management if they need it.
Q. Do you do that for maintenance purposes or for specific complaints of bugs or both?
A. Probably both, if -- I think the manager will go through probably, I think about every four months or three months probably, but if somebody -- there's always a tenant has a complaint, so, you know, then me or usually the manager just go to that individual unit and go through it again so it keeps the problem, you know, in check from becoming one really.
Q. Have you ever had a tenant complain about the burners

Page 41

that, then no, generally speaking the rest of the units weren't a problem.
Q. At what point would roaches be a problem in an apartment building?
A. If you didn't do anything about it and you just let that person stay or those few people and the place got infested with them, that would be different, but those people usually were kicked out in a month or two. They usually had problems in other areas too, their rent and things like that, when you're a deadbeat -- you're always going to get a deadbeat, if you just want to talk about them, nobody has an apartment building without a deadbeat, so I don't really need to emphasize those people too much, I think you know what I'm saying, excluding them, everything else I can't really complain about.
Q. Whose responsibility is it to evict these tenants that you're referring to as deadbeats?
A. Mr. Alli's.
Q. Did you ever see a mouse in the Pingree apartments?
A. To be honest I haven't.
Q. Have you ever seen a mouse in the Gladstone apartments?
A. To be honest I haven't.
Q. Were there times that the elevator in the Pingree

Page 42

apartments was not working properly?
A. There would -- there's a few times it had to be shut down, the contractor had to make repairs like any building, but it runs most of the time with no trouble.
Q. What about -- strike that.
You mentioned that -- to Mr. Stempien that you had made some repairs on the elevators in the Pingree/Gladstone building; is that correct?
A. (Nonverbal response.)
Q. Do you have a license to make repairs to elevators?
A. No, that's why a contractor has to do most of the work, but if a door's jammed or something, it's just a matter of freeing it up, that type of thing, it's part of the job.
Q. Do you know how to align an elevator?
A. No, that's not my job, that would be the contractor.
Q. That would be for the contractor to do?
A. Yeah. He had some company come in, I don't know what their name was, elevator company.
Q. You mentioned that sometimes you would stop by the Pingree/Gladstone apartments on your own to see if any work needed to be done, did you do this in 1998?
A. No.
Q. 1999?

Page 43

A. (Nonverbal response.)
Q. 2000?
A. From then on.
Q. From then on, would you -- strike that.
When you would make these stops, would you enter into the individual apartment units?
A. No, not unless somebody told me there was a problem, sometimes they leave a note there and I'd see it and I go check it out, but usually when I went through it was to make sure the elevator was running and the heat was working and, you know, I didn't see any leaks, the basement, you know, the doors were locking, just your, you know, basic, you know, things you expect, you know, putting the units aside in a building. I might check with the manager, they might say so and so asked me to tell you this or that, and I would put it in the basement and remind me when I was there to fix something, you know, unless they say it was an emergency, but they would -- usually somebody would call me anyway if it was really bad.
Q. Other than the income you received as an independent handyman, do you have any other income?
A. No.
Q. Have you ever met Dr. Alli's wife, Shaki Alli?
A. Yes, I've seen her in the building a few times, talked

Page 44

to her.
Q. How often would you see her at the building?
A. I met her maybe four or five times at one of the buildings, and I don't remember which one or anything, just met her.
Q. What would she be doing?
A. Probably taking care of some paperwork, you know, getting leases or something that had been filled out or applications and that type of thing for the manager.
Q. Did she have an office in the buildings?
A. No, she just go to the managers, the manager would take care of everything, keep everything there.
Q. She would go to the manager's apartment?
A. Yes.
Q. Who is the manager?
A. Gladstone, a lady named Darlene.
Q. Was she the manager in 2000?
A. No.
Q. Who was the manager in 2000?
A. Dorothy, it was Griggins, and she left a year or so later I think, Darlene, I don't remember her last name, took over.
Q. Who was the manager of the Pingree apartments?
A. That was about a year ago, a lady named Pat, and I

forget her last name. There was another lady named Linda Hamilton, she was kind of a caretaker, but, you know, like I said, I'm through the building quite a bit in and out, so she usually let's me know what's going on.
Q. Do you know Dr. Alli's children?
A. No, I met one daughter once a year ago, so -- but I don't know any of them.
Q. Did you ever see them at either the Pingree or Gladstone buildings?
A. No.
Q. Did you ever have to run errands in relation to the work that you were doing at either the Pingree or Gladstone buildings?
A. Just if I was going to like the hardware or something, but that would be it.
Q. Whose vehicle would you use?
A. My truck.
Q. Were there vehicles at the Pingree/Gladstone building that were available for you to use?
A. No.
Q. Did Dr. Alli ever tell you that there were vehicles that he was leasing that were available for you to use to run errands on behalf of the buildings?
A. He never told me that.



Q. Have you ever lived in a building that was owned or managed by Dr. Alli or any of his family members --
A. Huh-uh.
Q. -- or B.S.A. Corporation?
A. No.
Q. Did you do anything to prepare for your deposition today?
A. No.
Q. Did you meet with Eric -- strike that.
Have you met with Eric Stempien or talked with him on the phone any time before today?
A. I've met him before, but he just came and told me, gave me this subpoena and asked me to come in here, and that was all.
Q. When did you meet with him?
A. Benjamin's building, he called me and asked me to come over to the building, so I went over there, and Mr. Alli was there and he just handed me a subpoena and just asked me to stop by here and talk about these violations from years ago, and I said well, it's kind of vague, but I'll tell them what I can remember.
Q. Which building did you meet at?
A. Pingree.
Q. Was anyone else at this meeting besides you, Dr. Alli and Mr. Stempien?



A. He gave the subpoena to the two ladies that were here before, that was left, that was about it.
Q. Did you discuss this case with either the two ladies, Dr. Alli or Mr. Stempien?
A. Not really, not in any kind of detail, he never suggested I should say anything other than what I'm telling you, just to tell you what I knew or can remember.
Q. How long did this meeting last?
A. Oh, we just met long enough to get the subpoenas and told me what it was about, all this and that was it, what, 20 minutes or something, we stood there while he just stated what -- just to come here and say what you can remember and so forth, and that was about it, all of us split up and left.
Q. You mentioned that there were -- that he gave you two subpoenas to give to the two ladies that were here before?
A. He handed them personally to them.
Q. So you all met --
A. For a few moments in the lobby of the building.
Q. Other than at that meeting, have you met or spoken with Dr. Alli before regarding this case?
A. No, ma'am.
Q. You mentioned earlier that there were new and



refurbished stoves and refrigerators in the basement of the Pingree and Gladstone buildings, do you remember that?
A. Yes.
Q. Was that the case in 1998, do you know?
A. I don't remember then, but I know that was the case before -- just before 2000 when he'd call me to come and look at a building and had this list of repairs from HUD or whatever, the truck had already delivered all this, the new ones, so they were there, I don't know about '98, but '99, yeah, they were there.
Q. So the new stoves were already there before you were there?
A. Yes.
Q. Let me rephrase that, when you arrived to help Dr. Alli with repairs at the end of 1999, the new stoves were already there in the basement?
A. Yeah, the truck come back and brought another load when I was there, there was always some there, and then I remember a truck came and unloaded the back door with new stoves.
Q. How do you know the stoves were new?
A. Well, he bought them by -- just -- I don't know if he got a discount or not but buying quite a few at one time, but you can tell when they came in they weren't

# ALLI, ET AL v. THE UNITED STATES

# DOROTHY RIGGINS

January 31, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
Hon. Allegra
THE UNITED STATES,
Defendant.
____________________________

The Deposition of DOROTHY RIGGINS,
Taken at 211 West Fort, Suite 2100,
Detroit, Michigan,
Commencing at 10:22 a.m.,
Monday, January 31, 2005,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien, P.L.L.C.
315 North Center Street
Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

TOM MASSOURAS
HUD Chicago Regional Counsel
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 355-6236
Appearing on behalf of the Defendant.



SOL TERENCE KIM
U.S. Department of Housing and Urban Development
477 Michigan Avenue
Detroit, Michigan 48226
(313) 226-7900
Appearing on behalf of the Defendant.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Monday, January 31, 2005
10:22 a.m.

DOROTHY RIGGINS,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Dorothy Riggins taken pursuant to notice to be used for all purposes allowed under the Court of Federal Claim Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:
Q. Ms. Riggins, my name is Eric Stempien, and we've met before, right?
A. Yes.
Q. And I'm going to be asking you a series of questions today regarding the two buildings that you lived in that were owned by Dr. Alli.
Okay. Have you ever given a deposition before?
A. No.

Page 5

Q. Let me give you some of the rules so this goes a little bit easier for you and I, but especially for the court reporter. When you give an answer, please be sure to make sure it's verbal as opposed to uh-huh, huh-huh, because we're going to have a written transcript of all this, and it's real hard to understand what uh-huhs and huh-huhs mean when they're in writing, okay?
A. Okay.
Q. And also, if I ask you something you don't understand, let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page, okay?
A. Yes.
Q. There you go, perfect.
Could I get your full name?
A. Dorothy Dean Riggins.
Q. And how do you spell Riggins?
A. R-I-G-G-I-N-S.
Q. And could I have your current address?
A. 1672 Blaine.
Q. How do you spell that?
A. B-L-A-I-N-E.
Q. Okay. Is that Detroit?
A. Detroit, Michigan.
Q. And what's the ZIP code?

Page 6

A. 48206.
Q. You used to be a tenant in two of Dr. Alli's buildings; isn't that right?
A. Yes.
Q. Which buildings?
A. On Calvert.
Q. And what was the other one?
A. And the other one was Gladstone.
Q. Do you know when you moved into the building -- well, which one did you live in first?
A. Calvert.
Q. Do you know when you moved in there?
A. I can't remember exactly, you know, the date --
Q. Approximately?
A. -- and everything.
All I remember, it was in the summertime.
Q. Okay. How long did you live on Calvert?
A. I think about two and a half years.
Q. And right from Calvert, did you move to the Gladstone building?
A. Yes, I did.
Q. How long did you live in the Gladstone building?
A. About seven or eight years.
Q. Why did you move from the Calvert location to the Gladstone location?

Page 7

A. Because I have a disability in my knee, and the stairs was just a little bit too much for me going up and down every day, and being on, you know, it would be better if I was on the first floor. There was an opening over on Gladstone on the first floor.
Q. Let's talk about the Calvert building first. Did you see any evidence of roaches at the Calvert building?
A. No, I did not.
Q. How about mice?
A. No.
Q. Did you feel safe in terms of your personal physical safety while you were living in the Calvert building?
A. Yes, I did.
Q. How did the -- how did people get in and out of that building?
A. With a key, they had to have a key to come in the inside, the first door. Then once you're on the inside, then the other door, you had to have another key.
Q. Were they two different keys?
A. Yes, they were.
Q. Was there a buzzer system for guests or if people coming to visit, was there a buzzer system for them to get in?
A. I think it used to be one, but it wasn't anymore

Page 8

because they had to use a key. If you didn't have a key to get in, you couldn't get in unless somebody came down and opened the door.
Q. Did you know at any time where the -- strike that.
Do you remember there being any time when the locks were broken on the building on Calvert for the main doors coming in and out?
A. I don't think it was broken. I think they changed them, because they put up a whole new -- they put up a whole other door.
Q. Was there a lot of criminal activity in the Calvert building?
A. No, there wasn't, that I seen.
Q. What about the cleanliness of the building, in general, on Calvert?
A. It was -- it was fairly clean, because I even got out and put my service in.
Q. What do you mean by that?
A. I did a little bit, you know, help on the floor. I stayed on the third floor. On the third floor, hey, if I seen something out there on the floor, a little trash or something, I got out there and cleaned, sweep the floor myself. I didn't wait on nobody else to do that.
Q. Did other residents do that as well?

A. Yes, they did.
Q. Did people generally seem to take pride in the Calvert building in living there?
A. Yes, they did.
Q. When you were living in Gladstone, you were more than just a resident; is that right?
A. Yes, I was.
Q. You were the manager; is that right?
A. Yes.
Q. As a manager -- well, first of all, were you the only manager during the time that you were manager?
A. Yes, I was.
Q. What did that entail? What did being a manager entail? What did you have to do?
A. Keep up the maintenance -- the maintaining of the building, show apartments, did the applications, made sure everything was in order around the building, kept it clean.
Q. What was the maintenance procedure, if there was a problem, something that had to be fixed in the building on Gladstone, what would happen?
A. If it ever was in a tenant's apartment, the tenants will come to me.
Q. And what would you do?
A. And then I would get in touch with -- if I couldn't



handle it, then I would get in touch with the maintenance guy.
Q. Who was that?
A. And that was Mark.
Q. Mark Schlotter, S-C-H-L-O-T-T-E-R?
A. Yes.
Q. What would happen after you called Mark?
A. Mark would come, and I assumed he probably would let Mr. Alli know because I also let him know too.
Q. So if there is a problem, you would call both Mark and Dr. Alli?
A. Yes, but Mark come and do the job.
Q. Was Mark reliable?
A. Yes, he was, very reliable.
Q. Did he always come and fix the problem?
A. Yes, he did, regardless of when it was I called him. If a pipe bust in the middle of the night, I was able to call him and he came.
Q. Did you see any evidence of roach infestation at the Gladstone building?
A. No.
Q. How about mice?
A. (Witness shakes head negatively.)
Q. Is that no?
A. No.



Q. Did you feel safe at the Gladstone building?
A. Yes, I did.
Q. Explain to me what the method was for people getting in and out of that building.
A. Keys.
Q. Same as the Calvert?
A. Yes.
Q. Was there a buzzer system there?
A. No.
Q. Same thing, if a visitor came, you would have to go down and let them in?
A. Right.
Q. As the manager, did you look out for people who weren't supposed to be there?
A. Hum?
Q. Would you try to keep your eye out to see who was coming and going from the building?
A. Yes, I did.
Q. And what would you do if you saw somebody who you didn't know?
A. I would -- first of all I would ask them who are they here to see. If they're not there to see any certain person and the person did not come down to the door, whoever they were coming in, because everybody have a doorbell, and if the person didn't come down, then



you're not supposed to be in the building.
Q. Okay. So there was a doorbell, so when I said buzzer system, I guess I wasn't specific enough. There was a way -- there was an intercom system for people to call up to the apartments?
A. Right.
Q. So if I were there to visit somebody, I could push their apartment number, talk to them, and they could come down and let me in?
A. Right.
Q. What about the general cleanliness of the common areas of the Gladstone building, how was that?
A. I kept it clean.
Q. Did you ever receive any complaints from tenants about the cleanliness of the building?
A. No, I didn't.
Q. Did you receive any complaints from any of the tenants there about the safety?
A. No, no complaints.
Q. Did there appear to be criminal activity going on in that building --
A. No, there were --
Q. -- while you were -- hold on, let me stop you. One of the other rules is you got to make sure you let me finish my questions --

Page 49

list, you know. We all have a whole list that, hey, if there's a problem. And if there's nothing wrong, there's a place where, hey, everything is okay, sign your name, turn it into the office. All of them goes into the office.
Q. How many apartment units were at the Calvert building?
A. At the Calvert, I don't know, let's see -- I'm not sure how many, because I only -- over there on Calvert, I, you know, I basically, like I say, them stairs killed me by the time I get to the third floor so.
Q. Could you estimate about approximately how many?
A. About five on each floor.
Q. And how many floors were there?
A. Three, and I don't know how many in the basement. There was two -- is it two or three apartments in the basement, I'm not sure.
Q. So there were more apartment units in Gladstone than in Calvert?
A. Yes, Gladstone is a bigger building, a whole lot bigger building.
Q. Do you know if the building manager at Calvert was the only building manager at the building at the time?
A. I believe she was.
Q. Do you know whether she inspected all of the units in

Page 50

that building in the same manner that she inspected yours?
A. I don't know.
Q. Did you ever socialize with your neighbors at the Calvert building?
A. No, I speak and, hey, basically stay to myself, you know, as far as doing a lot of socializing in the building.
Q. Did you ever see anyone else's apartment at the Calvert building other than your own?
A. You say at Calvert?
Q. At Calvert.
A. No, I just stayed in my apartment.
Q. Did you socialize with your neighbors at the Gladstone building?
A. I didn't socialize with them, but, hey, you know, I went into a lot of apartments on Gladstone because with me being the manager, hey, I had to go in there and do a lot of work in different apartments. I watched a few kids and helped a lot of people on Gladstone as far as, you know, hey, in the apartment.
Q. Did you ever see -- strike that.
Did you know Dr. Alli's wife, Shaki Alli?
A. I met her.
Q. Did you ever see her at the Calvert apartments?

Page 51

A. That, I didn't pay no attention to because, you know, I didn't know her then.
Q. What about at the Gladstone building, did you ever see her at the Gladstone building?
A. Yes.
Q. How often would you see her there?
A. I seen her there quite frequently, you know.
Q. Once a month?
A. Yeah, maybe once or twice a month.
Q. What would she be doing when you saw her there?
A. I guess they had their inspections that they had to do too.
Q. So she was doing inspections?
A. I would assume that she was.
Q. Why did you assume that she was doing inspections?
A. Because I know they have to come and see how things is going too, you know, as well as you can't just sit and depend on somebody else's word all the time, you know. It's always good to come look at your own property, you know, so.
Q. Did you actually see her --
A. Yes, I did.
Q. -- inspecting units?
A. You know, and, hey, if she needed a key, she came to me.

Page 52

Q. She didn't have her own keys?
A. Well, no, the keys stayed in the building. You know, hey, didn't nobody take, you know, if a tenant, you know -- they have their own keys, right, but then there's also the keys, duplicates to all the apartments, all those keys stays in the building. They do not leave the building.
Q. Where do they stay in the building?
A. There is a room for them in the basement.
Q. When you lived at the Calvert apartments, did you -- strike that.
Did you know Dr. Alli's children?
A. No.
Q. Had you ever seen any of his children before?
A. I'm trying to think, did I? No -- or did I? I can't remember.
Q. Did you ever see them at the Gladstone building?
A. I don't remember.
(Discussion off the record at 11:36 a.m.)
(Back on the record at 11:41 a.m.)
BY MS. CONNEELY:
Q. Did you ever speak with a HUD inspector while he was performing an inspection? Let me rephrase that.
When you lived at the Gladstone building and you were the building manager, did you accompany

# ALLI, ET AL v. THE UNITED STATES

# LINDA HAMILTON

January 31, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENJAMIN & SHAKI ALLI AND
BSA CORPORATION,
Plaintiffs,
vs. Case No. 01-669C
Judge Allegra
THE UNITED STATES,
Defendant.
________________________

The Deposition of LINDA HAMILTON,
Taken at 211 West Fort, Suite 2100,
Detroit, Michigan,
Commencing at 12:45 p.m.,
Monday, January 31, 2005,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.



APPEARANCES:

ERIC STEMPIEN
Stempien & Stempien, P.L.L.C.
315 North Center Street
Suite 200
Northville, Michigan 48167
(248) 735-9200
Appearing on behalf of the Plaintiffs.

MARLA T. CONNEELY
U.S. Department of Justice
Civil Division
1100 L Street Northwest
Washington, D.C. 20530
(202) 307-1011
Appearing on behalf of the Defendant.

TOM MASSOURAS
HUD Chicago Regional Counsel
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236
Appearing on behalf of the Defendant.



SOL TERENCE KIM
U.S. Department of Housing and Urban Development
477 Michigan Avenue
Detroit, Michigan 48226
(313) 226-7900
Appearing on behalf of the Defendant.

ALSO PRESENT:
Benjamin Alli



Detroit, Michigan
Monday, January 31, 2005
12:45 p.m.

LINDA HAMILTON,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Linda Hamilton taken pursuant to notice to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

EXAMINATION

BY MR. STEMPIEN:
Q. Ms. Hamilton, my name is Eric Stempien, we've met before.
A. Yeah.
Q. And I represent Benjamin Alli in a lawsuit that's been brought against the United States with regards to the buildings that he owns, one of which you're a resident of.
A. Uh-huh.
Q. Have you ever given a deposition before?

A. No.
Q. So this goes a little bit easier for you and I and especially for the court reporter, I'm going to give you a few ground rules. And the first one is: When you give an answer, please be sure to verbalize it in terms of yes or no, as opposed to uh-huh, huh-huh, because we can't really -- this is going to be typed out, we can't really read that very well.
A. Okay.
Q. Also, if you don't understand anything I ask you, let me know, I'll be happy to rephrase it or repeat it until you and I are on the same page. And the last one is: You may anticipate halfway through my question what my question's going to be, I would ask that you refrain from jumping in and answering because if two of us are talking at the same time, it's hard to understand, okay?
A. Okay.
Q. Can I get your full name?
A. Linda Hamilton.
Q. And what's your address?
A. 2211 Pingree, Apartment B2, Detroit 48206.
Q. How long have you lived at the Pingree Apartments?
A. Over ten years.
Q. At some point in time, did you have Section 8



assistance?
A. Yes.
Q. Did that start as soon as you moved in?
A. Yes.
Q. What do you do for a living?
A. Now I'm a nurse.
Q. Is that an RN?
A. LPN.
Q. And where do you work?
A. Northwest Dialysis.
Q. Northwest Dialysis?
A. Yes, Northwest Dialysis.
Q. And that's dialysis for kidney patients?
A. Right.
Q. You no longer have Section 8 assistance; is that correct?
A. Right.
Q. How many apartments have you lived in in that Pingree building?
A. Two.
Q. Right now you're in B2, what was the first apartment?
A. Apartment 410.
Q. Do you know how long you lived in Apartment 410?
A. A few years, I don't know exactly how long it was.
Q. When did you lose the Section 8 assistance?



A. You mean what year?
Q. Yeah, do you know?
A. No, I don't know for sure.
Q. Do you know how long it's been?
A. Several years now.
Q. Why did you lose it?
A. The apartment lost their Section 8 status.
Q. Were you offered a voucher to move to another building with Section 8 assistance?
A. Well, I was offered through the manager. She informed me that the people from HUD had the vouchers and that I was qualified to get one.
Q. Did you choose not to get a voucher?
A. Yes.
Q. Why not?
A. Well, the apartment -- the place where I was staying was convenient for me, because I didn't have a car at the time. It was near a bus stop, near the store, and near where I was working, so.
Q. Do you know how much money a month you would save if you chose to get a voucher and go to another apartment?
A. No.
Q. Do you like living in the Pingree Apartments?
A. Yes.



Q. Why?
A. I like my apartment, and I like the location.
Q. Have you ever seen any evidence of a roach infestation?
A. No.
Q. Mice?
A. No.
Q. What about the safety, do you feel safe there?
A. Yes.
Q. Do you know how people can get in and out of the building?
A. People let them in.
Q. Well, let me strike that.
How do you get in and out, is it a key, or is it a buzzer, is it a pass card?
A. We have keys, we don't have buzzers. We don't have the buzzers to unlock the door.
Q. Have you always felt safe at the Pingree Apartments?
A. I've never felt not safe there. I've never had any problems since I've been there.
Q. In the over ten years that you've lived there, did you ever -- did there ever appear to be a lot of criminal activity going on there?
A. No.
Q. What about the cleanliness of the building over the

Page 37

Q. You had one?
A. Yes.
Q. Why did you put one in?
A. Because I was by myself.
Q. Did you feel unsafe?
A. No, I actually saw the ad at the gate on the door and I went and bought me a gate.
Q. Did you feel safer with the gate on?
A. Well, I guess because when my gate was taken away from me, I kind of felt naked without my gate up there, because I had gotten used to it being there. So it was -- I guess it did make me feel a little secure.
Q. Who took the gate away from you?
A. I had -- I lost the key, and the guy had to take it away to repair it for me, so he had to take the gate in order to get the lock loose.
Q. Did Dr. Alli or the building manager ever tell you that you couldn't have that gate on your door?
A. Never.
Q. Do you know Dr. Alli's wife, Mrs. Alli, Shaki Alli?
A. Yes.
Q. Have you seen her before?
A. Yes.
Q. Did you ever see her at the Pingree building?
A. Yes.

Page 38

Q. How often would you see her there?
A. I saw her maybe twice.
Q. During the ten years you lived there?
A. Yes.
Q. What would she be doing when you saw her?
A. They was in the lobby talking.
Q. She would be in the lobby talking?
A. They was in the lobby talking the day I saw her.
Q. Who was she talking with; do you remember?
A. The manager and a lady, a few -- one of the tenants.
Q. Have you ever seen Dr. Alli's children?
A. At the building, no.
Q. Do you know what they look like?
A. No.
Q. Are you being paid to be here today?
A. No.
Q. Have you ever received payments from Dr. Alli?
A. For?
Q. For anything?
A. During the ten years -- I don't know what time you're talking about.
Q. From when you met him until now?
A. Yes.
Q. When did you receive payments from him?
A. After the people moved out from the HUD building, I started helping out. After we had lost the HUD contract, I started helping Pat do some repair work on the apartments. I mean, clean up some of the apartments with the manager.

Page 39

Q. Would you just clean up the apartments, or would you also do repairs?
A. No, I don't do repairs.
Q. You don't do repairs?
A. No, I just -- we just -- I help her clean up. In fact, I asked her did she need me to help her, and I volunteered to help her.
Q. Would you do this in addition to your job as a nurse?
A. Yes. After -- on the days that I was off, I would help her.
Q. And what would you do?
A. Clean up the bathroom, kitchen, shampoo apartments.
Q. Were these occupied apartments or vacant apartments?
A. No, vacant. It was after the people had moved out of those buildings. We had a lot of vacant apartments, so I volunteered to help her -- help clean the building.
Q. Do you help keep the common areas clean as well?
A. Yes.
Q. And who showed you how to do the task that you do now for Dr. Alli in the Pingree building?

Page 40

A. You mean clean up apartments?
Q. Right.
A. Nobody, I just, you know, I know how to clean up a kitchen, and she showed me some tips on how to do some of the things, but basically I know how to clean up, so.
Q. How much would Dr. Alli pay you to do this work?
A. During that time because I was helping her, I really wasn't working for him, I was helping her, and she paid me $30.
Q. Per apartment?
A. No, it depends on what I did to the apartment, if I cleaned the kitchen and bathroom, if I did the shampoo, that was extra.
Q. How much extra?
A. $10 per rug, per carpet per room.
Q. Per carpet?
A. Per room, right.
Q. So you would get $30 for -- is this correct, you would get $30 for general cleaning, and then if you did extra things like shampooing the rug --
A. If I do it all, for the carpet, I think she told me it was -- she charged -- she paid me $10 per room.
Q. How did she know how much to pay you, would you report to her how many carpets you cleaned?