UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and BSA CORPORATION, a Michigan corporation,

Plaintiffs,

Case No. 01669C
Hon. Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.

______________________________/

The deposition of ROBERT BROWN, taken before Hope M. Markowitz, CSR-3900, Notary Public in and for the County of Oakland, acting in the County of Wayne, Michigan, at 477 Michigan Avenue, Suite 895, Detroit, Michigan, on Monday, September 27, 2004, at or about 9:50 a.m.

APPEARANCES:

STEMPIEN & STEMPIEN, PLLC
BY: ERIC STEMPIEN, ESQ.
315 N. Center, Suite 200
Northville, Michigan 48167

On behalf of the Plaintiffs.

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
BY: GERALD ALEXANDER, ESQ.
1100 L Street N.W., Room 11054
Washington, DC 20005

On behalf of the Defendant.

(Appearance continued on Page 2)







APPEARANCES (CONTINUED):

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT
BY: THOMAS G. MASSOURAS, ESQ. and MARIA BAGUIO, ESQ.
77 West Jackson Boulevard, Suite 2629
Chicago, Illinois 60604

On behalf of the Secretary for the U.S. Department of Housing & Urban Development.

AlSO PRESENT:

Benjamin Alli







I N D E X

Witness:

| ROBERT BROWN | Page |
|---|---|
| Examination by Mr. Stempien | 6 |
| Examination by Mr. Alexander | 102 |
| Re-Examination by Mr. Stempien | 103 |

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Deposition 1 | Documents | 13 |
| Deposition 2 | Documents | 17 |
| Deposition 3 | Documents | 21 |
| Deposition 4 | Documents | 30 |
| Deposition 5 | Documents | 30 |
| Deposition 6 | Documents | 32 |
| Deposition 7 | Documents | 51 |
| Deposition 8 | Documents | 56 |
| Deposition 9 | Documents | 56 |
| Deposition 10 | Documents | 59 |
| Deposition 11 | Documents | 67 |
| Deposition 12 | Documents | 70 |

(Exhibits continued on Page 4)







E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Deposition 13 | Documents | 72 |
| Deposition 14 | Documents | 72 |
| Deposition 15 | Documents | 73 |
| Deposition 16 | Documents | 75 |
| Deposition 17 | Documents | 81 |
| Deposition 18 | Documents | 81 |
| Deposition 19 | Documents | 87 |
| Deposition 20 | Documents | 89 |
| Deposition 21 | Documents | 91 |
| Deposition 22 | Documents | 93 |
| Deposition 23 | Documents | 94 |



CHERYL SALISBURY & ASSOCIATES (248) 349-4392

Detroit, Michigan
September 27, 2004
at or about 9:50 a.m.
--- --- ---

R O B E R T   B R O W N ,

was called as a witness and having been first duly sworn to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:

MR. STEMPIEN: Let the record reflect this is the discovery deposition of Robert Brown taken pursuant to Notice and to be used for all purposes allowed under the Court of Federal Claims Rules and the Rules of Evidence.

Mr. Brown, as I introduced myself earlier my name is Eric Stempien. I'm an attorney. I represent Benjamin Alli, Shaki Alli and BSA Corporation in the lawsuit that's been brought against the United States Government.

Have you ever given a deposition before?

THE WITNESS: I don't recall that I have.

MR. STEMPIEN: Just to give you a couple of ground rules and make it go a little bit easier for you and I and particularly the court reporter, who's sitting immediately to my right, when you give an answer, please be sure to verbalize it as opposed to







uh-huhs and uh-ums; things of that nature because they're real hard to read when it comes out on the written transcript.

Also, if you don't understand a question I've asked you, please let me know. I'll be happy to rephrase it or repeat it until you and are on the same page. Okay?

THE WITNESS: Uh-huh.

MR. STEMPIEN: Is that a yes?

THE WITNESS: Yes.

MR. STEMPIEN: Don't worry. People do it all the time. I'll probably be reminding you every once in awhile.

Please be sure to let me finish my questions before you give an answer. In our natural conversations you might anticipate what my question is going to be halfway through it. Refrain from trying to jump in because it's hard for the court reporter to take both of us talking at the same time.

EXAMINATION

BY MR. STEMPIEN:

Q Could I get your full name?
A Robert M. Brown.
Q M?
A M.





Q You're employed with the United States Government
A Yes.
Q In the Department of Housing & Urban Development?
A Yes.
Q In what capacity?
A I'm the Director of the Detroit Multi-Family Hub.
Q How long have you been employed with HUD?
A With HUD 34 years.
Q All within the Detroit office?
A No. I was at other offices as well.
Q How long have you been the Director in the Detroit Multi-Family -- I'm sorry. What was it?
A Hub.
Q -- Hub?
A Since 1997.
Q What position did you hold immediately before that?
A I was Director of the Multi-Family Division.
Q What's the difference?
A The hub has jurisdiction over the entire state and the division was under a previous organization of HUD where we had the eastern part of the state.
Q Who is your direct supervisor?
A Stillman Knight, who's a deputy assistant secretary for multi-family housing in Washington D.C.
Q Is that K-N-I-G-H-T?







A Uh-huh.
Q Is that yes?
A Yes.
Q Who is Robert Turner?
A Robert Turner was the Director of Housing when I was Multi-Family Division Director.
Q That was in the Detroit office?
A Yes.
Q Is he still in the Detroit office?
A No. He's retired.
Q Based on your previous response would I be correct in saying that you would be the highest ranking HUD official in the Detroit office?
A I -- no. I don't think so. I'm the highest ranking multi-family official in the Detroit office but there's also a Detroit office director/coordinator of all the program areas in Detroit and her name is Toni Schmeigelow.
Q Can you spell that?
A S-C-H-M-E-I-G-E-L-O-W.
Q Can you tell me what your job duties are as Director of the Multi-Family Hub?
A Yes. The hub has responsibility for administering Section 8 project based rental assistance contracts in Michigan. It has responsibility for all new loans and



CHERYL SALISBURY & ASSOCIATES (248) 349-4392

grants for assisted multi-family housing and it also has responsibility for managing the portfolio of all HUD assisted housing, HUD assisted either through a HUD mortgage or through a Section 8 contract based contract.
Q Does it involve the Section 8 vouchers that are given individually to people?
A No.
Q That's outside of your purview?
A Yes.
Q What's your educational background?
A I have a political science degree both a BA and MA from Indiana University.
Q You're familiar with Mr. and Mrs. Alli's purchase of three properties within the City of Detroit for which Section 8 contracts were provided as well as HUD mortgages?
A I have a general recollection, yes.
Q You know Mr. Alli and Mrs. Alli through your prior dealings through the multi-family office; is that correct?
A Yes. I recall that they were former owners in HUD assisted programs.
Q What we're dealing with in this particular litigation are three pieces of property. If I refer to those as





the Pingree property and the Collingwood property and the Riverside property, would you be familiar with the use of those terms?
A Yes.
Q If I refer to them that way, you'll understand what I'm talking about?
A Yes.
Q You understand the Pingree property -- when we say the Pingree project is probably a better term because it actually involves two separate buildings, correct?
A I don't recall.
Q The Collingwood property also had two separate buildings. Do you recall that?
A Yes. I do recall there was a Collingwood and Kirkwood.
Q I believe Riverside had just one property. There were four buildings for Riverside. Does that --
A There may have been four buildings. I think it was one project in our view but I'm not sure about that.
Q I'm just going through the litany just to make sure we all know exactly what we're talking about because I'm going to use more general terms so you understand when I say Riverside, I'm referring to all four buildings; when I say Collingwood, I'm referring to two buildings; and when I say Pingree, I'm referring to





those two buildings that fell under those projects or HUD contract numbers. Okay?
A Okay.
Q Some general background. If we're talking about a HUD mortgage -- someone says I've got a HUD mortgage, can you tell me what that means?
A It means that the owner has a mortgage that was insured by HUD. The owner is paying a premium for mortgage insurance and the mortgage insurance is -- the beneficiary of that insurance is the lender. It induces the lender to enter into the FHA loan program, which gives somewhat more favorable terms and conditions than conventional loans.
Q HUD is not a lender, though?
A No, generally not, not in general terms of a mortgage. There are situations where HUD may be the lender and, for example, we used to have a section 202 direct loan program for the elderly where we were the lender. There are situations where a loan is assigned by the lender to HUD and then HUD becomes the lender but in terms of the way FHA programs work HUD is not the lender.
Q You wouldn't provide purchase money in exchange for a mortgage, in other words? HUD wouldn't write the check to purchase money through a title company and





then in exchange become a mortgagee under that transaction?
A Well, I think a purchase money mortgage is a situation where HUD is a lender.
Q If someone were to buy a building with the intention of renting it out as apartments, we could come to HUD and request for a purchase money mortgage from HUD?
A No. It's a very rare occasion when that happens. It happened historically when we were selling certain HUD-owned properties that we had acquired through foreclosure. We were selling these in a market where financing was extremely hard to obtain. This might have been in the early '80s when interest rates were 12 and 14 percent and so for a period of time there we did sell some loans or some foreclosed property with purchase money mortgages but it's not a common program option. It's not available now.
Q What is -- you mentioned FHA a few moments ago. What is FHA?
A Federal Housing Administration.
Q What's the relationship between HUD and the Federal Housing Administration?
A HUD is their housing administration. My boss is a deputy assistant secretary both for FHA and for multi-family. His boss is the FHA commissioner and

marked for identification)
Q (By Mr. Stemplen): If you would, take a look at Exhibits 8 and 9 for me and let me know when you're finished.
A Okay. I've read it.
Q Have you ever seen any of those documents before?
A No, I haven't.
Q Exhibit 8 appears to be a letter sent by Mr. Alli to Frank Malone at the HUD office in Washington requesting a payoff approval, and Exhibit 9 appears to be a letter from Frank Malone approving the payoff as of February 23rd, 2000. Would that be the normal procedure for prepaying a HUD purchase money mortgage?
A I don't know. I haven't seen these before so I don't know what occurred.
Q I'm just talking about in the general terms.
A Well, I don't know what else there might be -- what other correspondence there may be so I can't say based on these two things what actually happened. It says that a payoff is approved. It doesn't say that a payoff occurred.
Q Correct.
All it says is payoff is approved as of February 23, 2000, correct?
A Yes. I can say this: That normally there is a







checklist sent to the field office where we comment on -- we share information about the loan that's being prepaid and so forth. We fill out a checklist. That's normally what happens. And I just don't know any more than that just looking at these two letters.
Q It's a foreclosure checklist?
A Prepayment checklist.
Q You don't recall seeing one in this case of Collingwood?
A No. I normally don't fill them out so it wouldn't be unusual if I hadn't seen it.
Q Did Mr. Alli ever call you and request to prepay the mortgage?
A Not to my recollection but I wouldn't accept his prepayment anyway so if he called me, he would have been directed to the wrong place.
Q Would you have directed him to the proper place?
A Well, apparently he found where he needed to go, headquarters.
Q Where would the payment actually be tendered to? Do you know?
A All I can say it's a central location. I don't know the address or exactly where it is but it's -- I would guess the headquarters or some lock box that headquarters directs the payments to.







Q Did Mr. Alli ever attempt to tender payment for the mortgage to you?
A No.
(Deposition Exhibit No. 10 was marked for identification)
Q (By Mr. Stemplen): Do you recall sending this letter to Mr. Alli?
A Yes, I do.
Q That's your signature at the bottom?
A Yes.
Q In this letter HUD had declared an involuntary mortgagee in possession of the Collingwood project, correct?
A Correct. Well, I don't know that we declared -- yes. That's how it's labeled, yes.
Q The letter indicates in the first sentence it was due to the abandonment of the subject property by the owner, correct?
A Yes. That was our belief.
Q What occurred to lead you to the belief that the building had been abandoned?
A We had calls from residents who said the heat was shut off and had been, I believe, for some days. We tried to get in touch with the owner or with any representatives of the owner and could not do that,







could not get any response, and we determined since it was seven degrees that day or 10 degrees that the people who were in the building had to be protected so we decided that we had to get the heat on and keep it on until people could be relocated. So that's what we did. We took possession and turned on the furnace.
Q How many days had the furnace been off for?
A My recollection was that this -- it may not be precise but my recollection was that this letter was near the beginning of the week and the heat had been off over the weekend but not exactly certain.
Q What led you to that belief or how did you find out?
A Find out what?
Q That it had been several days that it had been off. Several days -- was that based on the statements of the tenants?
A That was my recollection, yeah. Based on the tenant complaints, yeah.
Q Did you talk to any of the tenants yourself?
A No.
Q Do you know how many called?
A No, I don't but we had people verify that the heat was off.
Q Do you know who went to the site?
A Some of -- either the project manager or the