UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and
BSA CORPORATION, a Michigan Corporation

Plaintiffs, Case No. 01-669C
Judge Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.
_______________________________________/

STEMPIEN & STEMPIEN, PLLC
By: Gregory J. Stempien
Eric Stempien
Attorney for Plaintiff
315 N. Center Street
Suite 200
Northville, MI 48167
(248) 735-9200

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
By: Marla Conneely
Attorney for Defendant
1100 L Street N.W., Room 11054
Washington, DC 20005
(202) 307-0318
_______________________________________/

# *PLAINTIFF'S ANSWER TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

## INTRODUCTION

On August 15, 2005, Defendant filed a Motion for Partial Summary Judgment, claiming that it is entitled to summary judgment pursuant to RFCF 56 on Count VI of Plaintiffs' Second Amended Complaint. Defendant presents two bases for its motion: (1) the language contained within the housing assistance payments contract grants it unfettered discretion to grant or refuse permission for a landowner to sell or transfer its property and (2) the parties to the proposed transaction failed to present the proper HUD forms for request for approval. Because the contract does not grant the government unfettered discretion and because HUD preemptively refused to consent to the sale of the property at issue, the Defendant's motion should be denied. Plaintiffs rely on the attached brief, their Response to Defendant's Proposed Findings of Uncontroverted Fact and Plaintiffs' Proposed Findings of Uncontroverted Fact in support of their Answer.

## FACTS[1]

On June 9, 1989 BSA Corporation (hereinafter "BSA") purchased the Collingwood property from a private party, L&R Realty Limited Partnership. As part of the purchase, BSA assumed the Collingwood housing assistance payments (hereinafter "HAP") contract between L&R Realty Limited Partnership and HUD. ***Exhibit 2*** *- Defendant's Counter Complaint, paragraph 73* HUD also held a purchase money mortgage for the Collingwood property. The HAP contract provides that

> The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD. However, in the case of an

[1] For a complete recitation of facts related to the parties' contractual relationships, please see Plaintiffs' Motion for Partial Summary Judgment. The facts stated in this section relate to Count VI of Plaintiffs' Second Amended Complaint.

> assignment as security for the purpose of obtaining financing of the project, HUD shall consent in writing if HUD has approved the terms of the financing.

When the initial HAP contract expired, BSA and HUD entered into an agreement to extend the contract March 15, 2000. Prior to the expiration of that contract, HUD suspended its obligations pursuant to the contract and ceased all payments to BSA. HUD declared an "involuntary mortgagee-in-possession" and denied BSA possession of its property. HUD further initiated foreclosure proceedings on October 5, 1999. ***Exhibit 2*** - *Defendant's Counterclaims, page 12, paragraph 86*

Prior to the foreclosure proceedings, BSA entered into a purchase agreement with Cory Fanning (hereinafter "Fanning") for a total sale price of $675,000.00. ***Exhibit 7*** - *Purchase Agreement* The purchase agreement was executed on July 15, 1999. The real estate broker who represented BSA was Gary Hopkins (hereinafter "Hopkins") who worked for Marcus & Millichamp, a company who specializes in marketing apartment buildings in the City of Detroit. ***Exhibit 6*** - *Deposition of Gary Hopkins, p. 6, lines 2-8* Fanning sought financing for the purchase from GMAC Commercial Mortgage Corporation (hereinafter "GMAC"). ***Exhibit 4***, *Deposition of Cory Fanning, p. 23, lines 3-7*

Fanning entered into an agreement with GMAC for the financing of the purchase of the Collingwood properties. ***Exhibit 1*** Paragraph 1 of the agreement provides that

> GMACCM is authorized to be the Borrower's exclusive Agent and HUD-approved mortgagee to negotiate, process and close an insured loan for the project with HUD.

GMAC was Fanning's representative with regard to obtaining the appropriate approvals from HUD. Further, it is clear that GMAC is experienced in obtaining HUD approval for financing the purchase of real estate, because it is a "HUD approved mortgagee". Despite the fact that both BSA and

Fanning wished to proceed with the purchase, HUD refused to approve the sale. ***Exhibit 6*** *- Deposition of Gary Hopkins, p. 12, lines 17-25, p. 13 lines 1-8;* ***Exhibit 4*** *- Deposition of Cory Fanning, p. 21, line 25, p. 22, lines 1-4;* ***Exhibit 8*** *- Affidavit of Benjamin Alli, paragraphs 6-9*

After refusing to approve the sale, HUD continued its foreclosure proceeding. On March 13, 2000 HUD sold the Collingwood properties by auction. ***Exhibit 3*** HUD received approximately $80,000.00 in proceeds from the sale, less than 15% of the purchase price offered by Fanning.

In the Second Amended Complaint, Count VI states that HUD violated the HAP contract by arbitrarily and without reason refusing to approve the sale to Fanning, thereby causing damages in the amount of $675,000.00. Because the evidence clearly indicates that the sale was not consummated only because of HUD's failure to consent due to its desire to foreclose the mortgage for Collingwood, summary judgment is not appropriate.

## ARGUMENT

### I. STANDARD OF REVIEW

Defendant brings this motion pursuant to Court of Federal Claims Rule 56, which provides, in pertinent part, that a party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". (See also *Cienega Gardens v. United States*, 194 F.3d 1231 (1998) Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, when ruling on a motion for summary judgment. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 US 242 (1986)

## II. THE CONTRACT AT ISSUE IN THIS MATTER DOES NOT GRANT THE GOVERNMENT UNFETTERED DISCRETION IN DETERMINING WHETHER TO APPROVE A SALE

In support of its Motion, the Defendant guides the Court to its HUD Handbook related to the administration of Section 8 assisted housing. In its Motion and Proposed Findings of Uncontroverted Fact, the government provides a detailed list of all of the steps that HUD must take in determining whether to approve or disapprove a proposed transfer of subsidized real property. The handbook makes clear that HUD must review each application based on the criteria. The reasonable implication of those provisions is that if the applicant(s) meet those criteria, then the sale should be approved. Therefore, the government does not have unfettered discretion to approve or disapprove a particular sale. Defendant states in its brief that "the plain language of the contracts did not impose any duty upon HUD to approve the sale". *Defendant's brief p.* 8 However, it follows this statement with a detailed argument discussing all of the criteria for approval.

Further, the government's position that it has unfettered discretion to approve the sale would render its obligation meaningless, creating an illusory promise. An illusory promise is "not a promise at all as that term has been herein defined. If the expression appears to have the form of a promise, this appearance is an illusion". *Mastaw v. Naiukow*, 105 Mich App 25, 29; 306 NW2d 378 (1981) This proposed interpretation of the contract language is improper. Clearly, the government's decision to so substantially interfere with an owner's property rights cannot be based on whim or caprice.

Of course, the government argues that BSA and Fanning failed to submit the proper documents and therefore did not meet the criteria set forth in the handbook. However, the applicant must be given the opportunity to submit the documents for proper review. Again, the government

cannot have unfettered discretion to simply deny a request for transfer by failing to consider it.. There must be some duty imposed on HUD, otherwise that provision of the contract would be illusory. As discussed in more below, HUD preemptively denied the request for sale and instead decided to proceed with the foreclosure. In doing so, HUD violated not only the HAP contract handbook, but also the Mortgage Servicing regulations. Failing to follow its own handbooks and regulations, which Defendant argues is part of the contract, creates, at a minimum, a question of fact as to whether HUD breached the HAP contract with BSA.

## II. HUD DENIED THE SALE TO FANNING AND IN DOING SO VIOLATED ITS OWN REGULATIONS AND BREACHED ITS CONTRACT WITH BSA

The government's second argument is that, if it did not have unfettered discretion, Plaintiffs' claim for breach of contract still fails because the proper documents were not filed and the criteria set forth in the handbook was not met. In fact, the government argues that HUD "never refused to approve the sale as plaintiffs [sic] allege" *Defendant's brief, p. 16* However, every other party to the sale (BSA, Fanning and Hopkins) have testified that the ***only*** reason that the sale was not consummated was HUD's failure to approve the purchase. Fanning testified:

Q Did you purchase the Collingwood/Kirkwood apartments pursuant to this agreement?

A No. It fell through.

Q Why?

A I think it was because it was repossessed by HUD.

Q Do you remember what time that was?

* * * *

A You know what, I was -- I was close….I know that I was getting really close to the end. Like -- And so -- Whenever that was, that's when it fell apart.

Q Were you surprised that the property was -- Were you surprised to hear that the property was repossessed by HUD?

A Oh, yeah.

Q Why?

A Well, I -- I didn't -- I mean thought that it was, you know, okay to sell.

Q Who told you that the property had been repossessed?

A My broker called me and said it had fallen through.

* * * *

Q Mr. Fanning, it was your intention to go through with this sale, is that correct?

A Oh, yes.

Deposition of Cory Fanning, pp.21-22, 36 ***Exhibit 4***

Hopkins, BSA's real estate broker, who was intimately involved in this sale, also testified about HUD's refusal to approve:

Q So that purchase offer, there was never a closing on that purchase offer?

A Never closed.

* * * *

Q Was it your understanding that HUD did not give the necessary approvals for this -- for the sale of this property?

A To my understanding, and this is going back aways, to my understanding there was not a HUD concurrence to the sale.

Deposition of Gary Hopkins, pp. 12-13, ***Exhibit 6***

Hopkins also recalled that GMAC, on behalf of Fanning, took steps to secure HUD's approval for the sale of Collingwood. ***Exhibit 6*** *- Deposition of Gary Hopkins, p. 10, lines 19-25, p. 11, lines 1-6* It is important to note that both Fanning and Hopkins are disinterested parties to this litigation. Their recollections are clear: the sale was not completed due to HUD's refusal to consent.

Further, Benjamin Alli, a plaintiff in this matter and president of BSA (hereinafter "Alli"), contacted Robert Brown, the Director of Multi-Family Housing for HUD's Detroit office (hereinafter "Brown"), upon learning that HUD had refused to approve the sale. During that conversation, Brown told Alli that HUD would not approve the sale because HUD would not allow Alli to make any more money from the government. When Alli asked for a reason for the refusal, Brown refused. During that conversation, Brown admitted that he had received and reviewed GMAC's submissions regarding the proposed sale. ***Exhibit 8*** *- Alli Affidavit, paragraphs 6-9*

In addition, the government admits that it received a copy of the Purchase Agreement. *Defendant's Brief p. 7, see also Affidavit of Patrick Berry, paragraph 12 (attached as page 245 of Defendant's Appendix to Motion)* Brown also acknowledged to Alli that he had received and reviewed documents from GMAC. Clearly, HUD had knowledge of the proposed sale and yet never sent any written acknowledgement to the purchaser or seller; not even a form letter, as required by its handbook.

It is clear that the sale was rejected by HUD. The issue then becomes whether the rejection is a breach of the HAP contract between BSA and the government. As stated above, and stressed in Defendant's Brief, the basis for approving or rejecting a proposed sale is contained within the HUD

handbook. In this case, HUD did not even provide a pretense as a reason for the rejection. It simply rejected the proposed sale and moved ahead with its foreclosure. Its regulations are made a part of the HAP contract both by implication (the handbook provides the exact requirements of the parties) and by admission of the Defendant. Its failure to follow those regulations, due to its admitted desire to stop any financial gain by BSA or Alli, is a breach of the HAP contract.

HUD's decision to foreclose instead of to allow the sale of the property is significant evidence of its motive. Its decision was based not on the written guidelines, but on its prejudice towards Alli and BSA. HUD's regulations regarding the servicing for a HUD mortgage contain a section on foreclosure. The regulations provide that prior to foreclosure, HUD must "encourage sale, by the mortgagor, as an alternative to foreclosure". Further, the regulations require that "encouragement of a sale …. Should be by active (if possible face-to-face) and direct methods rather than passively subsuming it in the text of a letter without explanation or elaboration." ***Exhibit 5*** - *HUD Mortgage Servicing Handbook, p. 5-1, paragraphs 5-1(A) and 5-1(C)* Even the government admits that it has a copy of the Purchase Agreement between Fanning and BSA in its possession. Therefore, it cannot deny that it had knowledge of a ready, willing and able purchaser. And yet, it continued with the foreclosure, sold the property (at less than 15% of its value) and kept the proceeds. The entire transaction is tainted and was clearly not based on proper considerations.

HUD's decision to reject the proposed sale to Fanning, without explanation, without documentation and in complete disregard to its own regulations, is a violation of the HAP contract between BSA and HUD. Therefore, Plaintiffs respectfully request that this Court deny Defendant's

Motion for Partial Summary Judgment with regard to Count VI of the Second Amended Complaint.

STEMPIEN & STEMPIEN, PLLC

By: Eric Stempien
Attorney for Plaintiffs

Dated: September 7, 2005

GMAC Commercial Mortgage Corporation
350 Franklin Center
29100 Northwestern Highway
Southfield, MI 48034
Tel. 248-208-3460
Fax 248-208-3472

September 23, 1999

Mr. Cory Fanning
4115 Meadow Way
Bloomfield Hills, Mi 48301

Re: Engagement Letter Agreement for Collingwood / Kirwood, Detroit, Michigan (the "Project")

Dear Mr. Fanning:

Cory Fanning, (The "Borrower(s)"), hereby authorizes GMAC Commercial Mortgage Corporation ("GMACCM") to serve as the mortgagee to prepare and submit the necessary application(s) (the "Application") to the U.S. Department of Housing and Urban Development ("HUD") to obtain a Commitment for Mortgage Insurance for the above captioned project, pursuant to Section 223(f) of the National Housing Act (the "Firm Commitment").

GMACCM currently contemplates providing funding for the insured loan (the "Insured Loan") through the issuance, sale and delivery of Government National Mortgage Association ("GNMA") Mortgage Backed Securities.

The Insured Loan amount is estimated at $790,900 with an amortization period of 30 years at the current market interest rate to be determined at rate lock, as described in Attachment A herewith, the preliminary analysis. These Insured Loan terms are initial estimates based upon information provided to GMACCM by the Borrower. These terms are subject to adjustment and are not to be construed as a commitment to make a loan.

The services, which GMACCM will provide, with respect to the Application shall include, but are not limited to, the following:

- Interact with the Borrower and HUD regarding any requirements that are necessary for mortgage underwriting such as obtaining all market, cost and other data relative to the underwriting of the property.

- Interact with the Borrower and the technical representatives regarding any comments or any future documentation, underwriting criteria needs or any other requirements identified by HUD.

- Facilitate the timely exchange of all documentation necessary for the issuance of the Firm Commitment.

- Facilitate placement of the permanent funding of the Insured Loan with an investor whose terms and conditions are acceptable to the Borrower.

- Assist in the preparation and submission of the insured loan's initial/final closing (the "Closing") documents.

Borrower and GMACCM declare that all statements contained in this agreement (the "Agreement") are complete and true to the best of their knowledge and agree to the following:

1. GMACCM is authorized to be the Borrower's exclusive Agent and HUD-approved mortgagee to negotiate, process, and close an insured loan for the project with HUD. Borrower represents and warrants that upon execution of this Agreement, it will not execute another HUD application to finance the project with any other HUD approved lender or lender's agent. Further, the Borrower hereby grants to GMACCM the exclusive right to arrange for placement of the construction and permanent financing of the Insured Loan, which placement shall be subject to the terms and conditions of a separate Financing Commitment between the parties.

2. Borrower will pay to GMACCM a financing fee ("Financing Fee") of two percent (2%) of the amount stated in the Firm Commitment for processing the Application and obtaining a Firm Commitment from HUD. Upon issuance of the Firm Commitment, substantially in accordance with the Application, or such other form and amount as shall be reasonably acceptable to the Borrower, the Financing Fee will be considered earned and payable. Payment of the Financing Fee shall occur not later than at the Closing of the Insured Loan or upon the expiration of the Firm Commitment, whichever occurs first.

3. Borrower agrees that GMACCM has no responsibility for payment of any brokerage fees relating to this transaction. Borrower agrees to indemnify GMACCM from any and all claims, demand and liability for brokerage commissions, assignment fees, finder's or other compensation arising from the issuance of this Agreement by GMACCM or the making of this Insured Loan.

4. Borrower will be responsible to pay to GMACCM any permanent lender/placement fee ("Permanent Lender/Placement Fee"). The Permanent Lender/Placement Fee will cover the marketing and placement of the Insured Permanent Loan. The Permanent Lender/Placement Fee will be considered earned and payable at the time the Insured Loan is placed (Rate Locked) with an investor upon terms and conditions acceptable to the Borrower. The Permanent Lender/Placement Fee shall also be paid no later than Closing of the Insured Loan or upon expiration of the Firm Commitment, whichever occurs first.

5. The Financing Fee and Permanent Lender/Placement Fee both outlined above, are exclusive of all other costs which are to be paid by Borrower, including any Insured Loan discounts, fees to extend the Insured Loan Commitment, fees to extend the Permanent Lender's closing/funding date, legal fees, HUD fee, GNMA securitization fees, Investor fee/deposits, or fees charged for the investment of the reserve for replacement funds. Borrower will also be responsible for initial funding of escrow deposits and any other fees due any other parties not identified herein, all of which are to be paid by Borrower.

6. The Borrower hereby deposits with GMACCM the sums of $3,000 as a retainer (the "Retainer") to be held in a non-interest bearing account. This Retainer shall be applied to pay GMACCM's costs for credit reports, and other reasonable out of pocket expenses of GMACCM in connection with the processing of the Application, to bring about the issuance of a Firm Commitment and arrange for the Closing of the Insured Loan. Any remaining portion of the deposit shall be credited to the Financing Fee at Closing, or, forfeited if the Application is not fully processed through issuance of the Firm Commitment and Closing of the Insured Loan. If expenses incurred by GMACCM exceed the amount deposited by Borrower, then the Borrower shall reimburse such expenses to GMCCM within ten (10) days of receipt of an invoice from GMACCM. The Borrower shall reimburse GMACCM for expenses regardless of whether or not a Firm Commitment is issued or closing is achieved.

7. Borrower hereby agrees that if at any time during processing of the Application, the Borrower elects to cancel or withdraw the Application, or intentionally fails to furnish GMACCM with that which is necessary to complete processing of the HUD Application, the Retainer outlined above, shall be forfeited to GMACCM.

8. Borrower further agrees to pay all expenses associated with any third party fees, reports and/or studies. These expenses include but are not limited to the HUD Application fee, appraisals, market study, architectural/engineering reports, environmental reports, Plans and Specifications; surveys, title reports, attorney fees or any other expenses necessary for the processing of the Application through the issuance of the Firm Commitment and Closing. Generally most of these costs can be included in the Insured Loan proceeds.

9. In addition, Borrower will pay for all legal and out of pocket expenses in connection with the Closing. GMACCM's typical outside counsel fee is $7,500.

10. Borrower acknowledges that: (a) GMACCM's analysis of the Project and its operations, including all appraisals, engineering reports and other investigations shall be done or have been done for the sole benefit of GMACCM in its preparation of the Application; (b) such analysis may not be relied upon for any other purpose whatsoever by the Borrower or other entities other than GMACCM, and (c) the analysis, appraisal, engineering report and other investigations are the property of GMACCM and will be held in confidence and not be provided to others without the prior written consent of GMACCM.

11. Borrower acknowledges that, while GMACCM will attempt to negotiate and obtain the Firm Commitment in general conformity with the terms in this Agreement and the Application, GMACCM has made no representations or promises that such a Firm Commitment will be issued by HUD and, GMACCM will not be responsible or liable to Borrower if such a Firm Commitment is not issued or should the Insured Loan not reach Closing in a manner or within the time desired.

12. Neither this agreement nor any statements contained herein or in the Application shall be deemed to obligate GMACCM directly or indirectly, to make an Insured Loan to the Borrower, or to otherwise render services to the Borrower in connection with the making of an Insured Loan. Any such commitment to make a loan shall be only upon terms and conditions agreed to by the parties in their sole discretion, and set forth in writing in a separate agreement between the parties.

13. Borrower also acknowledges that GMACCM is relying upon data and information provided by the Borrower in preparing and submitting the Application to HUD. Borrower agrees to defend, indemnify and hold GMACCM and its employees and agents forever harmless of and for all losses, costs or damages (including the costs and legal fees of attorneys selected by GMACCM) incurred by GMACCM as the result of any disputes between Borrower, HUD and other related parties in the transaction over the accuracy of the data, representations or information provided by the Borrower.

14. This Agreement may not be assigned by the Borrower or assumed by any other person or entity without the prior written consent of GMACCM.

15. By signing this Agreement, the Borrower is indicating that it is the Owner of the Project, or the Owner's agent, or contractually in control of the Project by way of a valid, existing contract, or option agreement, and is duly authorized to execute this Agreement for the purpose of obtaining financing for the ownership entity identified herein.

16. The scope of GMACCM services hereunder is wholly and expressly limited to comply with conditions, requirements or procedures imposed by HUD in connection with the Application and the issuance of the Firm Commitment. GMACCM shall not be obligated to engage in any activity which would be considered to be "lobbying" pursuant to 24 CFR Part 86 or 87.

17. GMACCM has the right to publicize the financing of this Insured Loan after Closing.

18. This Agreement and any future commitment by GMACCM are subject to any amendment, modification or change in HUD's statutory, regulatory, or administrative requirements.

Either GMACCM or the Borrower may terminate this Agreement upon the express written consent of the other party. Notwithstanding the foregoing, this Agreement may not be terminated while GMACCM or HUD is actively processing the Application. Both GMACCM and the Borrower warrant and represent that this Agreement is the entire Agreement with respect to the payment of fees and expenses, and no other representation, written or oral, or prior written agreement is in any manner binding.

Time is of the essence under this Agreement. Please sign and return one copy of this agreement along with your retainer by October 1, 1999.

**AGREED AND ACCEPTED:**

**Borrowing Entity:**

By: ______________________

Date: ______________________

**GMAC Commercial Mortgage Corporation**

By: ______________________

Date: ______________________

**Attachment A**

**To The Borrower Engagement Letter Agreement**

**SUMMARY OF ESTIMATED INSURED LOAN**

**Date: September 23, 1999**

The following is the targeted Insured Loan amount and terms for the above Project.

| | |
|---|---|
| Project Name: | Collingwood / Kirkwood |
| Location: | Detroit, Michigan |
| Client/Borrower: | Cory Fanning |
| Project Characteristics: | 52 Unit Apartment Buildings |
| HUD Insurance Program Section of the Act: | 223(f) |
| Estimated Insured Loan Amount: | $790,900 |
| Estimated Interest Rate: | 8.0% which includes Insured Loan servicing, but excludes the annual HUD Mortgage Insurance Premium (MIP). The final interest rate will be determined at the rate lock of the Insured Loan. |
| Amortization/Term: | Up to 35 years or 75% of the useful economic life of the Project as determined by FHA |
| Prepayment Options: | To be determined at time of rate lock of the interest. Typical options include a ten-year lockout or five-year lockout with penalty of 5% in the 6th year, declining 1% each year thereafter and reaching zero after the 10th year. A higher interest rate can be expected by the reduction of the call protection provision. The estimated interest rate above assumes a five-year lock out with the declining penalty. |
| Security: | The Insured Loan shall be secured by a first mortgage lien encumbering all land and improvements constituting the Project, and a security agreement and financing statements. |

| | |
|---|---|
| Non-Recourse: | The Insured Loan will be a non-recourse loan. |
| Assumption: | The Insured Loan is assumable with approval and an assumption fee. |
| HUD Application Fee: | $3.00 per thousand or 0.3% of the mortgage amount applied for at the Firm Commitment stage. The Borrower must advance the HUD Application Fee. It is included in loan proceeds and reimbursable at Closing. |
| HUD Inspection Fee: | $30 per unit and payable at Initial Closing from loan proceeds. |
| HUD Mortgage Insurance Premium: | .5% of the mortgage amount determined by HUD payable at Closing and included in loan proceeds. Thereafter, one half of one percent annually |
| Technical Fees and Charges: | Borrower will pay for any third party reports such as appraisal, environmental reviews, physical needs assessments, plans and specifications, survey, mortgage credit analysis, all costs, fees and expenses necessary to bring the Insured Loan to Closing. |
| Retainer: | $3,000 non-refundable retainer fee, payable to GMACCM at the time of execution of the Engagement Letter. |
| Financing Fee: | A fee equal to two percent (2.0%) of the HUD approved Insured mortgage amount. The fee is due to GMACCM as compensation for obtaining the HUD Firm Commitment. The fee shall be deemed earned and payable upon the issuance of the Firm Commitment. It shall be due at the earlier of the Initial Closing of the Insured Loan or expiration of the Firm Commitment and is included in Insured Loan proceeds. |
| Placement Fee: | Borrower will be responsible to pay GMACCM any Permanent Lender/Placement Fee. |
| Discounts: | This amount is required to buy down the interest rate or to place the Insured Loan at par based upon the then prevailing market interest rate and the prepayment option selected by the Borrower. |
| Closing Fee: | A fee will be payable to GMACCM for lender's legal expenses associated with Closing of the Insured Loan. |

| | |
|---|---|
| Good Faith Deposit: | An amount equal to one half percent (0.50%) of the Insured Loan amount set forth in the Firm Commitment required to secure the permanent financing at time of acceptance of the Financing Agreement. The good faith deposit will be held by GMACCM and refunded at the time of Closing. |
| Extension Fees: | A fee is required to extend the Initial and Final Closing dates if the Insured Loan does not close within the time frame agreed to by the Borrower when the Insured Loan was rate locked. This fee is determined at the time of the rate-lock. |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION, | ) | OCT 07 2002 |
| Plaintiff, | ) | |
| v. | ) | No. 01-669C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S ANSWER AND COUNTERCLAIMS

For its answer to plaintiff's second amended complaint, defendant admits, denies, and alleges as follows:

Count I

Common Allegations

1. Denies the allegations contained in paragraph 1 for lack of knowledge or information sufficient to form a belief as to their truth.

2. Denies the allegations contained in paragraph 2 for lack of knowledge or information sufficient to form a belief as to their truth.

3. The allegations contained in paragraph 3 are conclusions of law to which no response is required; to the extent they may be deemed allegations of fact, they are denied.

4. Admits.

5. Admits the allegations contained in paragraph 5 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 5.

12. Admits the allegations contained in paragraph 12 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 12.

13. Admits the allegations contained in paragraph 13 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 13.

14. Denies.

15. Denies.

16. Admits the allegations contained in paragraph 16 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 16.

17. Denies.

18. Denies.

Count III

Breach of Contract with Regard to
Mortgage for Collingwood/Kirkwood Property

19. Defendant incorporates by reference its responses contained in paragraphs 1 through 18 of its answer as though fully set forth here.

20. Admits the allegations contained in paragraph 20 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in

6. Admits the allegations contained in paragraph 6 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 6.

7. Admits the allegations contained in paragraph 7 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 7.

8. Admits.

Count II

Breach of Contract With Regard to
Section 8 Contract For the Riverside Property

9. Defendant incorporates by reference its responses contained in paragraphs 1 through 8 of its answer as though fully set forth here.

10. Admits the allegations contained in paragraph 10 that Alli acquired the property through a HUD Federal auction and that a 15 year Federal Housing Assistance Subsidy contract was executed; otherwise denies the allegations contained in paragraph 10 for lack of knowledge or information sufficient to form a belief as to their truth.

11. Admits the allegations contained in paragraph 11 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 11.

paragraph 20.

21. Admits the allegations contained in paragraph 21 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 21.

22. Denies.

23. Denies.

24. Admits the allegations contained in paragraph 24 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 24.

25. Denies.

26. Denies.

Count IV

Breach of Contract with Regard to the
Section 8 Contract for Pingree Property

27. Defendant incorporates by reference its responses contained in paragraphs 1 through 26 of its answer as though fully set forth here.

28. Admits the allegations contained in paragraph 28 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 28.

29. Admits the allegations contained in paragraph 29 to the extent supported by the exhibit cited, which is the best evidence

of its contents; otherwise denies the allegations contained in paragraph 29.

30. Admits the allegations contained in paragraph 30 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 30.

31. Admits the allegations contained in paragraph 31 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained paragraph 31.

32. Admits the allegation contained in paragraph 32 that the Pingree mortgage was prepaid; avers that the Pingree mortgage was prepaid after HUD declared a default of its business agreements; otherwise denies the allegations contained in paragraph 32.

33. Denies.

34. Denies.

35. Denies.

36. Denies.

37. Denies.

Count V

Breach of Contract with Regard to the Section 8 Contract for the Collingwood/Kirkwood Property

38. Defendant incorporates by reference its responses contained in paragraphs 1 through 37 of its answer as though

fully set forth here.

39. Admits the allegations contained in paragraph 39 to the extent supported by the contracts cited, which are the best evidence of their contents; otherwise denies the allegations contained in paragraph 39.

40. Denies.

41. Denies.

42. Denies.

43. Denies.

Count VI

Breach of Contract With Regard to the Sale Upon Approval Clause for the Collingwood/Kirkwood Property

44. Defendant incorporates by reference its responses contained in paragraphs 1 through 43 of its answer as though fully set forth here.

45. Denies the allegations contained in paragraph 45 for lack of knowledge or information sufficient to form a belief as to their truth.

46. Admits the allegations contained in paragraph 46 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 46.

47. Admits the allegations contained in paragraph 47 to the extent supported by the exhibit cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 47.

48. Admits the allegation contained in paragraph 48 that HUD received a copy of the purchase contract; otherwise denies the allegations contained in paragraph 48.

49. Denies.

50. Denies.

51. Denies each and every allegation not previously admitted or otherwise qualified.

52. Denies that plaintiff is entitled to the relief requested in its prayer for relief, or to any relief whatsoever.

DEFENDANT'S COUNTERCLAIMS

53. The United States' counterclaims seek damages for breach of several express contracts executed by the parties to this action. This Court possesses jurisdiction to entertain the counterclaims asserted herein pursuant to 28 U.S.C. §§ 1491, 1503, and 2508.

PARTIES

54. At all times pertinent to this action, Benjamin Alli and Shaki Alli were principals of BSA Corporation ("BSA"), a Michigan Corporation.

55. Upon information and belief, Benjamin Alli and Shaki Alli are residents of the state of Michigan.

56. Benjamin Alli and Shaki Alli, jointly and severally, as principals of BSA, and at all times pertinent to this action, did not observe business formalities between themselves and BSA, and otherwise acted without proper regard for business character.

57. At all times pertinent to this action, Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, owned the projects identified in the complaint at paragraphs 5, 6, and 7 as the Riverside Property ("Riverside"), Collingwood-Kirkwood Property ("Collingwood") and Pingree Property ("Pingree").

## FACTUAL BACKGROUND

### RIVERSIDE

58. BSA executed a 15-year Housing Assistance Payments ("HAP") Contract with HUD effective June 8, 1989, for Riverside. The HAP Contract required BSA to maintain and operate the property so as to provide decent, safe and sanitary housing.

59. Pursuant to its HAP contract, BSA was required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if BSA failed to correct the deficiencies.

60. On May 15 and 16, 1997, HUD conducted an inspection of Riverside. The property failed the inspection. The findings of the inspection included, among others things, roach infestation; inoperable smoke detectors; inoperable and unsecured toilets; leaking basement sanitary line; and inoperable stove burners.

61. On June 27, 1997, HUD issued a "30 Day Notice for Termination of HAP Contract" to BSA that provided it 30 days from

receipt of the letter to correct the contractual violation.

62. HUD conducted a follow-up inspection on August 12, 1997, which showed that BSA failed to correct the physical deficiencies cited within 30 days. The findings of the inspection included, among other things, inoperable smoke detectors; improper wiring; roach infestation; and inoperable stoves.

63. On January 23, 1998, a further HUD inspection of Riverside found deficiencies still outstanding, including, but not limited to, roach infestation; inoperable electrical outlets and stoves; broken kitchen cabinets; and crumbling building exteriors.

64. On March 16, 1998, HUD sent BSA a Notice of Abatement for 28 units that failed HUD's physical inspection.

65. On December 11, 1998, HUD sent BSA a Notice of Violation for physical conditions found at the property, including sewer backup to one of the Riverside buildings; unsecured and deteriorated concrete on the exterior of another Riverside building; exposed metal ground poles; and broken concrete.

66. On December 16, 1998, HUD found that, of 18 units inspected, none passed HUD's physical conditions standards. Among the findings were roach infestation; inoperative stove burners; inoperative smoke detectors; and broken windows.

67. On December 18, 1998, HUD issued to BSA a Notice of

Section 8 Suspension and Abatement for those remaining units at Riverside for which HUD had not suspended and abated HAP payments on March 16, 1998.

68. On December 23, 1998, HUD issued a Notice of Relocation to Benjamin Alli and Shaki Alli, advising them that the property was no longer in conformance with HUD quality standards, and was no longer safe for residents, and that accordingly, HUD would relocate eligible residents to suitable replacement housing.

69. HUD met with residents at Riverside to advise them of relocation efforts, assist them in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

70. HUD completed the relocation of tenants on or before June 29, 1999.

71. The total cost to HUD for the relocation of the Riverside tenants was $79,675.00.

COLLINGWOOD

72. On June 8, 1989, BSA acquired ownership of Collingwood from HUD through a Transfer of Physical Assets ("TPA").

73. A Warranty Deed subject to a mortgage held by the Secretary was executed in favor of BSA and recorded with the Wayne County Register of Deeds as part of the TPA. Collingwood's 15-year HAP Contract with HUD was also assigned to BSA, incidental to the TPA.

74. The HAP Contract required the maintenance of the

property so as to provide "decent, safe and sanitary housing." Upon the HAP Contract's expiration in 1996, HUD executed a new HAP contract with BSA that continued to require BSA to maintain Collingwood in decent, safe and sanitary condition.

75. Pursuant to its HAP contracts, BSA was required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if BSA failed to correct the deficiencies.

76. On July 6, 1990, BSA and the Secretary executed a Regulatory Agreement that required BSA to maintain Collingwood in good repair and condition. Failure to maintain the property in good repair and condition would constitute a violation of the Regulatory Agreement, and could result in a declaration of default if BSA failed to correct the violation within 30 days.

77. Upon a declaration of default of the Regulatory Agreement, the Secretary may declare a note held by HUD to be due and payable, and proceed to foreclosure.

78. On October 29, 1997, 48 of Collingwood's 52 units failed a HUD inspection. Among the findings of the inspection were roach infestation; inoperable smoke detectors and exit lighting; and unclean conditions of common areas and individual units.

79. On December 15, 1997, HUD advised BSA to take corrective action. HUD further advised BSA that failure to comply would result in abatement of the HAP Contract.

80. On April 28, 1998, 19 of 21 units failed reinspection. As a result, HUD abated the HAP subsidy for the failed units.

81. On November 9, 1998, HUD conducted another physical inspection, and found, among other things, excessive leaks and water damage; blocked egress; exposed glass; inoperable smoke detectors; and exposed rebar.

82. On June 4, 1999, HUD issued a Notice of Violation of Regulatory Agreement and HAP Contract to BSA. HUD provided BSA 30 days to cure the cited deficiencies.

83. BSA failed to submit an acceptable corrective plan or cure the deficiencies cited within the 30-day period.

84. On July 23, 1999, HUD personnel confirmed that no project repairs had been undertaken, and that no repairs appeared to be underway.

85. On September 30, 1999, HUD issued to BSA a Notice of Default of the Regulatory Agreement, and a Notice of HAP Abatement.

86. On October 5, 1999, HUD advised BSA of its intent to foreclose Collingwood. HUD provided BSA 21 days to respond.

87. BSA contested the foreclosure, and a hearing was held on October 25, 1999. HUD determined that BSA presented no legal reason at the hearing to prevent foreclosure, and the Decision to

Proceed was issued to BSA on October 26, 1999.

88. On December 14, 1999, HUD issued a Notice To Vacate to the tenants of Collingwood, advising them that the property was no longer in conformance with HUD standards, and that eligible residents would receive tenant-based vouchers to relocate to suitable replacement housing.

89. On the morning of January 25, 2000, HUD received complaints from residents at one of the two Collingwood buildings that heat and hot water were not available. HUD repeatedly attempted to contact Benjamin Alli and Shaki Alli throughout the day, but was unable to do so.

90. HUD personnel arrived at the effected Collingwood building on January 25, 2000, and confirmed that the heating systems were shut down, no management agent or staff was on site, and that the project appeared abandoned.

91. Pursuant to records maintained by the National Climate Data Center, the high and low temperatures in the Detroit metropolitan area on January 25, 2000, were 21.2 degrees Fahrenheit and 1.4 degrees Fahrenheit, respectively.

92. As a result of BSA's abdication of its management responsibilities for Collingwood, HUD issued a Declaration of Involuntary Mortgagee-In-Possession ("MIP") to BSA, citing BSA's unavailability, confirmation that no heat or hot water was available in the building, the sub-freezing weather conditions, and failure to find any building or maintenance personnel on the

premises to assist the residents.

93. As MIP, HUD retained security guards to patrol the premises, repaired many of the physical deficiencies to provide an acceptable standard of health and safety to the tenants, and paid Collingwood's operational expenses, including maintaining utility and management services.

94. HUD continued as MIP, assuming management responsibilities, during the relocation of the Collingwood tenants, and the subsequent securing of the property.

95. HUD met with residents at Collingwood to advise them of relocation efforts, assist them in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

96. The last family was relocated from Collingwood in June of 2000.

97. A foreclosure sale was held on March 13, 2000, pursuant to the Multifamily Mortgage Foreclosure Act, 12 U.S.C. § 3701 et seq., and 24 C.F.R. Part 27, Subpart A. Because HUD was the sole bidder for the property, HUD became the owner of Collingwood.

98. The cost to HUD of the foreclosure for Collingwood was $18,128.80.

99. The cost to HUD of taking MIP for the project from the period of January 25, 1999 until February 23, 2001, was $1,112,173.45.

100. The cost to HUD of relocating families to decent, safe

and sanitary housing was $90,646.40.

PINGREE

101. In August of 1983, Benjamin Alli and Shaki Alli purchased Pingree from the Secretary through a property disposition sale.

102. A purchase money mortgage and promissory note were executed by Benjamin Alli and Shaki Alli with the Secretary on August 24, 1983.

103. Incidental to the purchase, Benjamin Alli and Shaki Alli, doing business as BSA, entered into a 15-year HAP Contract with HUD for all 80 units of Pingree. The HAP Contract required the owner to maintain the property in decent, safe and sanitary condition.

104. Upon its expiration, the HAP contract was renewed, for periods not exceeding one year, with the same substantive requirements, including maintaining the property in decent, safe and sanitary condition.

105. Pursuant to its HAP contracts, Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, were required to meet the Physical Conditions Standards as set forth in 24 C.F.R. Part 5, Subpart G. Failure by BSA to maintain the property to those standards would be considered by HUD an event of default, and pursuant to the contract, could result in suspension of assistance payments if they failed to correct the deficiencies.

106. On August 24, 1983, Benjamin Alli and Shaki Alli, doing business as BSA, entered into a Regulatory Agreement with the Secretary that required them to maintain Pingree in good repair and condition. Pursuant to the Regulatory Agreement, failure to maintain the property is a violation, and may result in a declaration of default if the owner fails to correct the violation within 30 days.

107. Upon a declaration of default of the Regulatory Agreement, the Secretary may declare a note held by HUD to be due and payable, and proceed to foreclosure.

108. On June 2 and 4, 1998, HUD inspected the conditions at Pingree. Twenty-four of the 38 units HUD inspected failed, for among other reasons, inoperable smoke detectors; brick walls that were "falling apart;" kitchen cabinets in need of repair or replacement; and roof drains "in need of repair."

109. In October of 1998, the owners represented to HUD that many of the deficiencies noted in its June inspection had been repaired.

110. On March 16, 1999, HUD conducted a follow-up inspection, which revealed that the owners had failed to insure that the property was in decent, safe and sanitary condition. The findings of the follow-up inspection included roach infestation; inoperable smoke detectors; water damage to the unit interiors; and damaged or deteriorated windows.

111. On May 7, 1999, a HUD inspection found numerous

outstanding deficiencies, including inoperable smoke detectors; units and common areas showing water damage; and damaged/ inoperable windows and screens.

112. On November 18, 1999, a HUD inspection found, among other things, damaged windows; deteriorated wall masonry; deteriorated ceilings; inoperable smoke detectors; and inoperable lighting.

113. On March 2, 2000, HUD issued a Notice of Regulatory Agreement Violations and a separate Notice of HAP Contract Default to Benjamin Alli and Shaki Alli. The notice provided them 30 days to cure the deficiencies.

114. Benjamin Alli and Shaki Alli failed to submit an acceptable corrective plan or cure the deficiencies cited within the 30-day period.

115. On May 4, 2000, HUD issued a Declaration of Default of the Regulatory Agreement, and referred the project for foreclosure.

116. On May 28, 2000, HUD issued a Notice of Suspension and Abatement of the HAP Contract.

117. On June 16, 2000, HUD advised Benjamin Alli and Shaki Alli that the property would be foreclosed.

118. Prior to foreclosure sale, Benjamin Alli and Shaki Alli prepaid the balance of the mortgage.

119. On July 31, 2000, HUD issued a Notice to the tenants of Pingree, advising them that HUD was taking enforcement action

against the owner for failure to maintain the buildings in accordance with HUD standards, and that HUD was in the process of relocating all eligible residents.

120. HUD met with tenants at Pingree to advise them of relocation efforts, assist residents in submitting voucher applications, and coordinate move-out to decent, safe and sanitary housing.

121. On or about June 23, 2000, HUD began relocating families from Pingree to property that was in decent, safe and sanitary condition.

122. The last family was moved from Pingree on or about October 16, 2000.

123. The cost to HUD of relocating families from Pingree to decent, safe and sanitary housing was $110,096.45.

FIRST COUNTERCLAIM
(Breach of Contract for Riverside)

124. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 123, as though fully set forth herein.

125. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a HAP Contract with HUD for Riverside.

126. The HAP contract required BSA to maintain the property in decent, safe and sanitary condition.

127. Benjamin Alli and Shaki Alli, jointly and severally

and doing business as BSA, breached the HAP Contract by failing to maintain Riverside in good repair and condition so as to provide decent, safe and sanitary housing.

128. As a result of this breach of the HAP Contract, HUD abated and suspended the HAP Contract for Riverside, and HUD was forced to relocate the eligible tenants to suitable replacement housing.

129. As a result of this breach of the HAP Contract, HUD incurred damages in the amount of $79,675.00, for the cost of moving families from Riverside to decent, safe and sanitary housing.

130. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $79,675.00.

SECOND COUNTERCLAIM
(Breach of Contract for Collingwood)

131. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 130, as though fully set forth herein.

132. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a Regulatory Agreement with HUD pertaining to Collingwood, and a HAP Contract with HUD pertaining to Collingwood. The Regulatory Agreement and the HAP Contract required Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, to maintain the mortgaged

premises in good repair and condition.

133. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, breached the Regulatory Agreement and the HAP Contract by failing to maintain Collingwood in good repair and condition so as to provide decent, safe and sanitary housing.

134. As a result of the aforementioned breach of the Regulatory Agreement and the HAP Contract, HUD was forced to abate and suspend the HAP for Collingwood, and to relocate the eligible families to suitable replacement housing.

135. Further, as a result of the aforementioned breach of the Regulatory Agreement and the HAP Contract, HUD was forced to take MIP of Collingwood so as to ensure the provision of needs and services to the residents of the property as they awaited relocation.

136. As a result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages in the amount of $90,646.40, for the cost of moving families from Collingwood to decent, safe and sanitary housing.

137. As a further result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages in the amount of $18,128.80, for the cost of foreclosure of Collingwood.

138. As a further result of this breach of the Regulatory Agreement and HAP Contract, HUD incurred damages of $1,112,173.45, for the cost to HUD of providing basic services,

security, and repairs to Collingwood as MIP.

139. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $1,220,948.65.

THIRD COUNTERCLAIM
(Breach of Contract for Pingree)

140. The United States realleges and incorporates by reference each allegation in paragraphs 53 through 139, as though fully set forth herein.

141. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, entered into a Regulatory Agreement and HAP Contract with HUD for Pingree.

142. The Regulatory Agreement and HAP Contract required Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, to maintain Pingree in good repair and condition.

143. Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, breached their Regulatory Agreement and HAP Contract by failing to maintain Pingree in good repair and condition so as to provide decent, safe and sanitary housing.

144. As a result of this breach of the Regulatory Agreement and HAP Contract, HUD abated and suspended the HAP for Pingree, and was forced to relocate the eligible families to suitable replacement housing.

145. As a result of this breach of the Regulatory Agreement

and HAP Contract, HUD incurred damages in the amount of $110,096.45, for the cost of moving families from Pingree to decent, safe and sanitary housing.

146. The United States is entitled to payment by Benjamin Alli and Shaki Alli, jointly and severally and doing business as BSA, in the amount of $110,096.45.

WHEREFORE, The United States requests that plaintiff's complaint be dismissed and the United States be granted judgment in its favor upon its counterclaims as follows:

A. On its First Counterclaim, in the amount of $79,675.00, which amount is the actual damages sustained by HUD as a result of the breach of the HAP Contract for Riverside;

B. On its Second Counterclaim, in the amount of $1,220,948.65, which amount is the actual damages sustained by HUD as a result of the breach of the Regulatory Agreement and HAP Contract for Collingwood;

C. On its Third Counterclaim, in the amount of $110,096.45 which amount is the actual damages sustained by HUD as a result of the breach of the Regulatory Agreement and HAP Contract for Pingree;

D. Prejudgment Interest; and

E. Judgment granting the United States such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

Mark A. Melnick /by Deborah A. Bynum

MARK A. MELNICK
Assistant Director

Gerald M. Alexander /by Virginia McLean

GERALD M. ALEXANDER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street
Washington, D.C. 20530
Telephone: (202) 307-0361
Fax: (202) 514-7965

October 2, 2002

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on the 2nd day of October, 2002, I caused to be served by United States mail (first class, postage prepaid) copies of "DEFENDANT'S ANSWER AND COUNTERCLAIMS" addressed as follows:

ERIC STEMPIEN, ESQ.
Stempien & Stempien, PLLC
315 North Center Street
Suite 200
Northville, Michigan 48167

# NOTICE OF DEFAULT AND FORECLOSURE SALE

**WHEREAS**, on June 18, 1981, a certain Mortgage was executed by Roger S. Marable, d/b/a L & R Realty Company, as the General Partner of L & R Realty Limited Partners, Series I, as mortgagor, in favor of the State of Michigan and the Secretary of Housing and Urban Development, as mortgagee, and was recorded on June 30, 1981 in Liber 21182, Page 561 in the Office of the Register of Deeds of Wayne County, Michigan; and

**WHEREAS**, a default has been made in the covenants and conditions of the Mortgage in that the payment due was not made and remains wholly unpaid as of the date of this notice, and no payment has been made sufficient to restore the loan to currency; and

**WHEREAS**, by virtue of this default, the Secretary of the Department of Housing and Urban Development, an agency and instrumentality of the United States of America ("Secretary"), has declared the entire amount of the indebtedness secured by the Mortgage to be immediately due and payable;

**NOW THEREFORE**, pursuant to powers vested in me by the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. 3701 et seq., by 24 CFR Part 27, and by the Secretary's designation of me as Foreclosure Commissioner, notice is hereby given that on Monday March 13, 2000, at 3:00 p.m., Eastern Standard Time, all real and personal property at or used in connection with the following described premises located at 1610 Collingwood, in Detroit, Michigan (the "Property"), more particularly described in the attached Exhibit A, will be sold at public auction to the highest bidder, subject to conditions set forth in the bid package.

Additional information about this sale, including the terms under which the sale is being conducted, is provided in a bid package which is available from:

U.S. Department of Housing
and Urban Development
801 Cherry Street
Fort Worth, TX 76102
Telephone No. (817) 978-5822
(214) 905-0877

The sale will be held on the first floor of the Wayne County Courthouse, Detroit, State of Michigan, located at the City-County Building, Two Woodward Avenue, Detroit, Michigan 48226.

Also, the successful bidder (other than the Secretary) must receive previous participation clearance in accordance with procedures set out in 24 C.F.R. 200.210 et seq.

All parties in bidding at the sale must obtain a bid package. The bid package contains sample copies of documents that the purchaser must deliver at the sale and copies of documents that the purchaser must execute at closing. The bid package also describes, among other things, the procedure for prorating real estate taxes, and the purchaser's obligations after the sale. In addition, the bid package describes the specific repairs that the purchaser must perform.

When making their bid, all bidders except the Secretary must submit a deposit totaling $50,000 in the form of a certified check or cashier's check made out to the Secretary of HUD. The deposit must be made to the Foreclosure Commissioner prior to the start of the sale. The deposit is non-refundable. The remainder of the purchase price must be delivered within 30 days of the sale or at such other time as the Secretary may determine for good cause shown, time being of the essence. This amount, like the bid deposits, must be delivered in the form of a certified or cashier's check. If the Secretary is the highest bidder, he need not pay the bid amount in cash. The successful bidder will pay all conveyancing fees, all real estate and other taxes that are due on or after the date of closing and all other costs associated with the transfer of title.

Before being accepted as the purchaser, the highest bidder must deliver to the Commissioner, at the time of sale, an executed Acknowledgment by Bidder form. In this form, the highest bidder acknowledges that s/he understands the terms of the sale and the obligations to which s/he will be bound after the sale.

The Secretary may grant an extension of time within which to close. All extensions will be for 30 days, and a fee will be charged which is the greater of 1.5% of the purchase price or HUD's current holding cost. The extension fee shall be paid in the form of a certified or cashier's check made payable to the Secretary of Housing and Urban Development. If the highest bidder closes the sale prior to the expiration of any extension period, the unused portion of the extension fee shall be applied toward the amount due at closing.

If the highest bidder is unable to close the sale within the required period, or within any extensions of time granted by the Secretary, the highest bidder's deposit will be forfeited, and the Commissioner may offer the project to the second highest bidder for an amount equal to the highest price offered by that bidder. All other terms of the sale would remain the same. If the second highest bidder requests the Commissioner's offer, no further offers will be made and the sale will be canceled.

HUD will not provide Section 8 funds with the sale of this project.

WITNESSES:

L. Pahl Zinn, Esq.

Teresa Howard

Scott A. Steinhoff, Esq.
Foreclosure Commissioner

STATE OF MICHIGAN )
) SS:
COUNTY OF OAKLAND )

On this 14th day of February, 2000, before me, a notary public in and for said county, appeared Scott A. Steinhoff, who, being duly sworn, stated that he has executed the foregoing document as his own free act and deed.

SANDRA DILLAHA, Notary Public
WAYNE County, MI
My Commission Expires: 5-14-00

# ALLI, ET AL v. THE UNITED STATES

# CORY FANNING

February 3, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

Page 21

Collingwood/Kirkwood Apartments or lower?
A. Well, some of them were higher, that had more units, and some of them that were lower that had fewer units.
Q. If you can look on page 2. At the top of page 2 next to the line that says buyer, is that your signature there?
A. Yes, it is.
Q. If you look back on page 1, in the first paragraph it requires that you submit $5,000 in the form of a check as escrow money. Do you see that?
A. Yes, I do.
Q. Did you ever submit that $5,000 in the form of a check?
A. I assume that I did. I don't recall -- I mean -- I assume that I did.
Q. If you could look at the paragraph on that agreement marked as section 2.2, it requires that you submit an additional $15,000. Do you see that paragraph?
A. Yes, I do.
Q. Did you ever submit that additional $15,000?
A. I -- I'm going to say I assume I did also.
Q. But you don't know whether you did?
A. Is there a date on this? I was getting close, so I'm assuming that I did.
Q. Did you purchase the Collingwood/Kirkwood Apartments

Page 22

pursuant to this agreement?
A. No. It fell through.
Q. Why?
A. I think because it was repossessed by HUD.
Q. Do you remember about what time that was?
A. You mean how close I was to the end?
Q. No. I mean, do you know about what time the deal went through? I'm sorry. The deal fell apart?
A. The deal fell apart?
Q. Correct.
A. You know what, I was -- I was close. Is this the only documentation that we have? On this whole thing? I was close. I know that I was getting really close to the end. Like -- And so -- Whenever that was, that's when it all fell apart.
Q. Were you surprised that the property was -- Were you surprised to hear that the property was repossessed by HUD?
A. Oh, yeah.
Q. Why?
A. Well, I -- I didn't -- I mean I thought that it was, you know, it was okay to sell.
Q. Who told you that the property had been repossessed?
A. My broker called me and said it had fallen through.
Q. Did you get your deposited monies back when the deal

Page 23

fell through?
A. Yeah, I got my deposit money back.
Q. Were you working with the lenders to help finance this purchase of the Collingwood/Kirkwood Apartments?
A. Yes.
Q. What was the name of that lender?
A. GMAC.
Q. Do you know whether or not that lender knew that HUD's approval was required in order to complete the sale of the Collingwood/Kirkwood Apartments from Dr. Alli to you?
A. I don't know.
Q. Do you know whether your lender took any steps into getting HUD's approval to complete the sale of the Collingwood/Kirkwood Apartments from Dr. Alli to you?
A. You know, I'm not sure. I hate to answer. I'm not sure on everything.
Q. During the, as you call it, due diligence of the Collingwood/Kirkwood Apartments, were you provided with any documents by either the broker or Dr. Alli regarding the apartments?
A. Oh, yeah. The financials and tax returns and --
Q. Were you provided with any copies of agreements that Dr. Alli had with HUD regarding the apartments?
A. I believe I was. I believe that there was -- and I

Page 24

don't recall what they were but I, I know that there was, I wanted to know what was required of me to continue to be able to keep my Section 8 tenants, so I know there was some of that government paperwork involved with this whole thing.
Q. Did you read all of the paperwork that was provided to you?
A. I think I did. I mean, and tried to understand it to the best of my ability, but obviously I missed something here.
Q. When you've been to the Collingwood/Kirkwood Apartments, did you go in the basement?
A. Yes.
Q. Did you go in the furnace room?
A. Yes.
MS. CONNEELY: Can we go off the record?
(Recess taken at 12:06 p.m. )
(Back on the record at 12:15 p.m.)
MARKED BY THE REPORTER:
DEPOSITION EXHIBIT NUMBERS 2 - 9
12:15 p.m.
BY MS. CONNEELY:
Q. Mr. Fanning, I'm going to show you what's been marked as Exhibit 2 through 9. Will you look at these pictures and let me know when you're finished?

Q. Oh, you had a broker?
A. GMAC.
Q. Okay.
A. Was -- Well, I don't know -- No, they're not a broker. Well --
Q. Let me just clarify that, because there can be independent broker you deal with who then farms out your loan.
A. To GMAC.
Q. Or to banks.
A. No, I went right to GMAC.
Q. You went directly to GMAC?
A. Yes.
Q. The people you dealt with, as far as you knew, were employees of GMAC?
A. Yes, definitely.
Q. And they were your agent on your behalf in dealing with HUD?
A. Yes.
Q. This person who --
A. Well -- yeah. They were -- they were working -- they knew, evidently, they knew how to work with HUD on these transactions.
Q. Whoever told you that the deal was falling through because HUD was repossessing these buildings, did they



tell you how they knew that that's what was going on?
A. No. I mean -- I don't recall.
Q. Do you know what eventually happened to this property?
A. Yeah.
Q. What happened -- Well, first of all, what happened, as far as you know?
A. The deal fell through, and then, on the HUD website, I always look, and then I saw, I saw that they had sold it, you know, sometime later.
Q. Do you know how much it was sold for?
A. I think $80,000 is what they listed.
Q. And based on what you saw on the HUD website, it was sold by HUD?
A. I'm not sure how that works. All I know is that they just list the properties and, you know -- they just do them on auction.
Q. Do you recall who the purchaser was?
A. Oh, I have no idea.
Q. Have you attempted to purchase any multi-family housing units subsidized by HUD since this purchase agreement?
A. No.
MR. STEMPIEN: I don't have anything further.
MS. CONNEELY: I just have a few more



questions to follow up.

RE-EXAMINATION

BY MS. CONNEELY:
Q. You mentioned to Mr. Stempien that you offered $675,000 for the Collingwood/Kirkwood Apartments; is that correct?
A. Yes.
Q. And you couldn't remember what the listed price was; is that correct?
A. Yes. I don't know.
Q. Do you remember if there were any negotiations regarding the price?
A. There always is. So I don't -- I assume there was.
Q. Was $675,000 your initial bid?
A. I assume that it wasn't. I've never -- I've never gone into a deal and just -- not bantered back and forth some. So -- I don't recall the details on this.
Q. You mentioned that when you visited Collingwood/Kirkwood Apartments, there was one unit that was vacant that was being fixed and you were told that a pipe had broken upstairs?
A. Yes.
Q. Do you remember that discussion you just had?
A. Yes.



Q. Who told you that -- Who explained that situation to you, that the pipe upstairs had broken, causing the water damage?
A. The lady that was managing the building.
Q. Do you know how long that pipe had been broken before it was fixed?
A. No.
Q. Did you bid for the Collingwood/Kirkwood Apartments when they were being auctioned by HUD?
A. No. I wish I would have.
MS. CONNEELY: I have no further questions.

RE-EXAMINATION

BY MR. STEMPIEN:
Q. Mr. Fanning, it was your intention to go through with this sale; is that correct?
A. Oh, yes.
MR. STEMPIEN: I have nothing further.
(The deposition was concluded at 12:33 p.m. Signature of the witness was not requested by counsel for the respective parties hereto.)

# Handbook 4335.2 REV.

**U.S. Department of Housing and Urban Development**
Washington, D.C. 20410

## Departmental Staff

September 1986

# Secretary-Held Servicing Handbook

**HSS: Distribution** W-2(H), W-3(H), Wk-3(ADM), W-2(P), W-2(OGC), W-2(Z), W-3(ZAS), W-3(ZAOO), W-3-1, W-4(H), R-1, R-2, R-3, R-3-1(H), R-3-1(RC), R-6, R-6-1, R-6-2, R-7, R-7-1, R-7-2, R-8, R-8-1,

## CHAPTER 5 - FORECLOSURE

5-1. FIELD OFFICE RESPONSIBILITIES BEFORE RECOMMENDING FORECLOSURE

Foreclosure, or the threat of foreclosure, should not be used unless the office intends to foreclose. Foreclosure is the last resort after it is evident that the mortgagor cannot, or will not, meet the mortgage obligation. Before recommending foreclosure:

A. Assure that all required and reasonable servicing actions have been undertaken and efforts exhausted.

B. Encourage sale, by the mortgagor, as an alternative to foreclosure (this includes sale by assumption of the mortgage), but do not delay foreclosure for this reason.

C. Suggest the offering of a deed-in-lieu of foreclosure by the mortgagor (see Paragraph 5-8 on deeds-in-lieu). (This does not apply to investors.)

The encouragement of a sale or the suggested offering of a deed-in-lieu of foreclosure should be by active (if possible face-to-face) and direct methods rather than passively subsuming it in the text of a letter without explanation or elaboration.

D. If the field office determines that the property has little, or no, residual value, the case should be placed on an inactive status and foreclosure avoided.

E. Where there are high municipal liens on a vacant/abandoned property, which would prove a major liability to anyone acquiring title, placement of a property on an inactive status may also be an appropriate alternative, though the property has substantial residual value.

5-2. PROCEEDING TOWARDS FORECLOSURE. Foreclosure actions start with the preparation of a Notice of Intention to Foreclose.

A. Before determining the amount required to bring the mortgage current:

1) On all accounts with account numbers beginning with 07, check Loan Screen 2 (LNS2) for the Code 12 indicating that a Post Audit has been completed. Call the Service Center to request a Post Audit if the Code 12 is missing.

# ALLI, ET AL v. UNITED STATES

# GARY HOPKINS

February 2, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

Q. You're self-employed?
A. Yes.
Q. Is there a name of a company?
A. The company is His Instead, H-I-S, Instead, I-N-S-T-E-A-D.
Q. That's two words, right?
A. Two words.
Q. His Instead?
A. His Instead.
Q. How long have you been actively working in the real estate brokerage industry?
A. Since around that time, about '86 or so.
Q. Do you know Dr. Benjamin Alli?
A. Yes.
Q. Do you know how you first met him?
A. I'm sure it was real estate, some real estate interaction, probably around the time that I was with another brokerage company.
Q. What brokerage company was that?
A. Marcus and Mellenchamp.
Q. Where are their offices located or where were they at the time?
A. Southfield, Michigan.
Q. Did you -- was your relationship with Dr. Alli professional or personal?



A. Professional.
Q. Do you know how he came to know about your services?
A. With Marcus and Mellenchamp we actively solicited apartment owners in the metropolitan area. I was an apartment specialist for them so we actively solicited to various apartment owners in the metro area, and I concentrated primarily in Detroit and he was one of the owners we solicited.
Q. Was this government subsidized housing or some nonsubsidized and some subsidized?
A. Both.
Q. When you first spoke to Dr. Alli what was the -- what was it he was looking for, do you know, do you remember?
A. I don't recall if he was looking for anything, we were looking to list property to sell, and I guess he was convinced that we'd be able to market for him.
Q. Do you know what year that was?
A. That's going back aways because I haven't been with them quite some time, probably late '90s I'm guessing roughly.
Q. Did Dr. Alli express some interest in having your agency list any of his properties?
A. Yes.
Q. Did you eventually enter into a listing agreement with



him?
A. Yes.
Q. And which property was that for?
A. We listed the Collingwood, I'm trying to think of the name of that property, it was like a 52-unit or 54-unit building.
Q. Collingwood/Kirkwood?
A. I believe that's right, that's the name we used.
Q. And one of the buildings was located on Collingwood Street?
A. One was on Collingwood.
Q. And one was located on Calvert?
A. Calvert, yes.
Q. Were they marketed as one property?
A. They were marketed as a package.
Q. And you were the agent for that listing?
A. Yes.
Q. Were there any other agents for that listing?
A. No, I was the agent for that listing.
Q. Do you remember what the asking price was?
A. 6 -- 675 I believe, this is going back aways for me but I believe it was 675 or so, it was above 600 for sure.
Q. Did you receive any offers on that property?
A. Yes.



Q. Let me back up, what did you do with regard to marketing the property?
A. In addition to marketing or soliciting owners we also solicited potential buyers, and once we get a listing, we would of course market that listing to those buyers, and we would also advertise the listing.
Q. Having been an apartment specialist and dealt with some subsidized housing you were familiar with Section VIII contracts and HUD health -- mortgages, I presume?
A. Familiar with the contracts, yes.
Q. Was it your understanding in this particular project that -- that the sale of this building would have required some approval or approvals from HUD?
A. Yes.
Q. Would that have been communicated to any potential buyer, I presume?
A. Yes.
Q. Were you familiar at all with the process by which HUD -- well, strike that.
Were you familiar at all with the approval process with HUD --
A. No, I don't know the details of their approval.
Q. -- or what forms had to be filed or what needed to be done in order to get the approval?
A. I knew of one, I didn't know about all of the forms.

Q. Would that be -- as the listing agent would that have been something you would have done in attempting to get the approvals from HUD or would that have been somebody on behalf of the buyer?
A. I believe that would be on behalf of the buyer or the lender would do that.
Q. How is this property advertised, or was it advertised?
A. You mean --
Q. Were there -- are there -- was it put out on, you know, those free real estate booklets that are found in restaurants or --
A. No, we actually sent out information to buyers and we advertised in the local papers, that's the standard multi-family advertising listing.
Q. And you sent out flyers to people who you knew were interested in buying multi-family housing?
A. Right, people who profile for that type of property.
Q. Was it advertised as subsidized housing?
A. Yes.
Q. You indicated earlier that you did receive an offer on this property, correct?
A. Yes.
Q. Was there only one offer, was there more than one?
A. There may have been others but we basically settled on one offer.



Q. Do you remember who the buyer was?
A. Fanning.
Q. F-A-N-N-I-N-G, does that sound right?
A. That sounds right.
Q. Corey Fanning?
A. Corey Fanning, yes.
Q. Do you remember what the purchase price was for that offer?
A. I know it was a full-price offer.
Q. Was that offer accepted by the seller?
A. Yes.
Q. There was a written purchase offer signed by both buyer and seller?
A. Yes.
Q. Was there earnest money deposit received from the buyer?
A. Yes, I'm sure there was, we wouldn't have taken the offer without earnest money so probably so, yes.
Q. Do you remember who the lender was or the potential lender was on the property -- well, strike that.
Who the potential lender was for Corey Fanning?
A. I believe it was GMAC.
Q. With regard to this purchase did you take any steps to receive HUD approvals for the sale and purchase of the



property?
A. Did I personally?
Q. Right.
A. I did not personally.
Q. Do you know if anyone did?
A. I believe GMAC did or Corey did.
Q. Do you know what steps they took?
A. I don't know HUD's procedure on that but I would assume they contacted -- they would have had to contact HUD to alert them to the effect that the property was being considered for sale and whatever approvals they would need from HUD to proceed, they would solicit that from HUD.
Q. Did you -- were you in contact with GMAC?
A. Yes.
Q. Did this property ever close?
A. No, it did not -- well, it never closed with me, I was not involved in the closing.
Q. As far as you know it was never closed on that purchase offer?
A. It was never closed on this purchase offer.
Q. At some point the purchase offer either expired by its own terms or the parties withdrew from it?
A. Right, correct.
Q. Do you know what the time frame was between when the



purchase offer was first signed to when it was either expired on its own terms or the parties withdrew?
A. This is going back aways, probably 60, 90 days, somewhere in that range. I don't remember exactly what time frame but somewhere in that range.
Q. During those, and I know it's approximately, but during those approximately 60 to 90 days were you talking to representatives from GMAC about the attempts to get HUD approval?
A. Yes.
Q. Do you remember what they told you about that?
A. The only thing I remember is things seemed -- things were -- seemed to have been along fairly satisfactorily, fairly smooth, and then there was abruptness to them and it kind of fickled, it just kind of went away.
Q. So that purchase offer, there was never a closing on that purchase offer?
A. Never closed.
Q. Do you know why?
A. I don't, I'm trying to remember exactly what stifled, and it seems as though there was some dialogue between GMAC, Corey and HUD, there was like uncooperation on somebody's part, and I think either HUD did not want to proceed with the deal -- it was a significant

Page 13

roadblock, and as best I remember I believe that roadblock involved HUD.
Q. Was it your understanding that HUD did not give the necessary approvals for this -- for the sale of this property?
A. To my understanding, and this is going back aways, to my understanding there was not a HUD concurrence to the sale.
Q. How long were you an apartment specialist for Marcus and Mellenchamp?
A. Roughly two years.
Q. Other than that experience with Marcus and Mellenchamp, do you have other experience with multi-family housing in the City of Detroit?
A. That's sort of been my background.
Q. Since 1987?
A. Since about 1987, right.
Q. Have you spent a lot of time in government subsidized multi-family housing units?
A. Not -- not a lot of time, that's not necessarily my specialty area, it's just one of the areas, but I do -- but I'm fairly comfortable with it.
Q. You're familiar with different types of multi-family housing in the City of Detroit?
A. Yes.

Page 14

Q. And you spend some time in those --
A. Yes.
Q. -- buildings?
A. Yes.
Q. And when you list a property for sale, what steps do you take to determine purchase price and all the factors that you have to take into account for the listing?
A. We look at the mix of the units, one bedroom, two bedroom, three bedroom, general size of the units, general condition of the units, we compare the units to similar units in the area, and we look at cost to build similar units, we look at three aspects; market, rebuild cost and income approach, and those issues determine how we come up with the selling price.
Q. Do you personally go through the buildings and look at them?
A. Yes.
Q. Do you go in every unit?
A. When we do the initial listing we look at a good representation of the units, probably 50 to 60 percent of the units, and then as we're showing units we basically just about get through all of them.
Q. Do you look at the common areas?
A. Oh, absolutely.

Page 15

Q. The mechanical room?
A. Yes.
Q. Based on your observations of all the various multi-family housing units that you've looked at, did you have an opinion with regard to the housing quality of the Collingwood/Kirkwood building -- buildings?
A. My assessment of the units compared to similar kind of units in Detroit, I would place those in the -- in the top one third.
Q. In terms of housing quality?
A. In terms of housing quality.
MR. STEMPIEN: Thank you, I don't have anything further.

EXAMINATION

BY MS. CONNEELY:
Q. I have a few questions.
A. Okay.
Q. Good morning, Mr. Hopkins, my name is Marla Conneely, I'm an attorney representing the United States of America in this case and I just have a few follow-up questions for you, I just need a few minutes.
A. No problem.
Q. Have you met or spoken with Dr. Alli within the last six months?
A. I received a contact from him regarding -- offered

Page 16

some information about the sale, the Collingwood/Kirkwood issue.
Q. When did you receive that information?
A. I'm going to guess probably about a week ago.
Q. Did you ask for that information or did he just send it to you?
A. No, not the information but the call to say would I -- I would probably be likely getting a deposition.
Q. Oh, okay. Did you speak with or meet with him any time before that?
A. No, I did not.
Q. Do you know whether Dr. Alli owns or manages any apartment buildings today?
A. I do not know.
Q. Other than speaking with Eric Stempien on the phone as you mentioned earlier a few weeks ago, have you spoken with or met with him before? Eric Stempien is the man seated next to me.
A. I have not.
Q. Do you know whether Dr. Alli followed the appropriate procedures?
A. I'm sorry, just one quick -- did I speak with him?
Q. Yes.
A. I spoke with him concerning that I would receive -- be deposed for this -- this particular deposition.

EXHIBIT
Fanning 1
2-3-05 JS

Marcus & Millichap

## REAL ESTATE PURCHASE AGREEMENT

**THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. THIS DOCUMENT IS INTENDED TO BE A LEGALLY BINDING CONTRACT. READ IT CAREFULLY.**

Marcus & Millichap Real Estate Investment Brokerage Company of Detroit ("Agent") will on offer acceptance receive from Cory Fanning ("Buyer") the sum of $ 5,000 in the form of check . This sum is a deposit ("Deposit") to be applied to the purchase price of that certain real property and improvements referred to as Collingwood/Kirkwood Apartments (the "Property") generally located at 1610 Collingwood/1635 Calvert in the City of Detroit , County of Wayne , State of Michigan , and more particularly described as follows:

LEGAL TO BE ATTACHED

The Property shall also include Seller's interests in:

1. Any and all privileges and appurtenances pertaining to the Property, including any right, title and interest of Seller in or to adjacent streets, alleys or right(s)-of-way;
2. Any and all leases, licenses, occupancy agreements, permits, rents, warranties, guarantees or security deposits with respect to the Property, or any portion thereof;
3. Any and all tradenames used in connection with the Property.

### TERMS AND CONDITIONS

For the mutual covenants contained in this Real Estate Purchase Agreement ("Agreement"), Seller agrees to convey the Property to Buyer, and Buyer agrees to purchase the Property from Seller, on the following terms and conditions:

1) **PURCHASE PRICE:** The total purchase price for the Property ("Purchase Price") is **$675,000.**

2.1) **DEPOSIT:** The Deposit shall be credited to the Purchase Price of the Property at the Closing Date (as defined in paragraph 4 below) of this Agreement, and shall be held by Agent (as defined in paragraph 4 below) in trust for the benefit of the parties in a non-interest-bearing account (the "Deposit Account") at a banking institution designated by Agent, unless otherwise instructed by the Buyer and Seller in writing.

2.2) **DEPOSIT INCREASE:** With the removal of the contingencies set forth in paragraph(s) 8 - 9 hereof, Buyer shall increase the total Deposit in the Deposit Account to $20,000 dollars. Buyer's failure to timely increase the total Deposit as required hereunder shall be a material breach of this Agreement. The entire Deposit shall be credited to the Purchase Price at the Closing Date, unless otherwise provided herein.

2.3) **DEPOSIT TRANSFER:** Buyer's Deposit shall remain in trust until removal of the contingencies set forth in paragraph(s) 8 -9 hereof. Upon removal of said contingencies: (1) Buyer's Deposit shall be non-refundable,subject to paragraph 7.1; (2) the Deposit Account shall remain subject to the remaining terms and conditions of this Agreement; and, (3) upon the written instruction of Seller, the Deposit Account shall be transferred to the Seller. However, if the Property is made unmarketable by Seller, or by acts of God, then Buyer's entire Deposit shall be returned to Buyer.

3) **ADDITIONAL CASH DOWN PAYMENT:** Buyer shall make an additional cash down payment (in addition to the Deposit) to bring the total down payment amount to 15% of purchase price including financeable loan cost at the Closing Date.

4) **CLOSING DATE:** The completion of this Agreement and close of the transaction hereunder shall take place at the office of ("Closing Agent") located at TBD , unless otherwise agreed in writing by Buyer and Seller. Within 100 calendar days of the Effective Date of this Agreement, as defined in paragraph 33 below, Seller and Buyer agree to prepare, execute and cause to be delivered to the Closing Agent such instructions and other documents as may be necessary and appropriate to complete this Agreement and close the transaction. Should the instructions or other closing documents. if any, fail to be executed or delivered as required, Closing Agent shall, and hereby is, directed to close the transaction pursuant to the terms and conditions of this Agreement. "Closing Date" shall mean the date on which the document(s) transferring title to the Property to Buyer or Buyer's designee is recorded. All fees of the Closing Agent to close this transaction shall be paid equally by buyer and seller. All other closing costs shall be paid in accordance with the custom and practice in the county in which the Property is located.

5) **PRORATIONS:** Rents, real property taxes and assessments, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other income or expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. Prepaid real estate taxes shall be prorated.

6) **TITLE:** Within 20 calendar days after the Effective Date of this Agreement, Seller shall furnish or cause to be furnished to Buyer a commitment for an A.L.T.A. fee owner's policy of title insurance ("Commitment") to be issued at the Closing Date by TBD (the "Title Company") for the Property. Within 5 calendar days following receipt thereof, Buyer shall either approve in writing the exceptions contained in said Commitment or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within 10 calendar days after receipt of Buyer's objections, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s). If Seller fails to so notify Buyer or is unwilling or unable to remove any such exception by the Closing Date, Buyer may either (i) elect to terminate this Agreement and receive back the entire Deposit, in which event Buyer and Seller shall have no further obligations under this Agreement; or, alternatively, (ii) Buyer may elect to purchase the Property hereunder subject to such exception(s).



MI 1 - Copyright Marcus & Millichap 1998

**THE PARTIES ARE ADVISED TO CONSULT WITH THEIR RESPECTIVE ATTORNEYS CONCERNING THE LEGAL EFFECT AND VALIDITY OF THIS AGREEMENT PRIOR TO ITS EXECUTION.** The undersigned Buyer hereby offers and agrees to acquire the Property for the Purchase Price and upon the terms and conditions of this Agreement. This offer is made by Buyer to Seller on this 14 day of July, 19 99. Buyer hereby acknowledges receipt of an executed copy of this Agreement.

**BUYER:** Cory Fanning **ADDRESS:** ______

**TELEPHONE:** ______

**SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION**

The undersigned Seller accepts the foregoing Buyer's offer, and agrees to convey the Property to Buyer or Buyer's designee for the Purchase Price and upon the terms and conditions of this Agreement. Seller hereby acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller hereby reaffirms Seller's agreement to pay Agent a real estate brokerage commission ("Commission") pursuant to the terms and conditions of that certain Representation Agreement between Agent and Seller dated which shall remain in full force and effect. Said Commission is payable to Agent in full by cash, certified check or cashier's check on or before the Closing Date. The Title Company is directed to make such payment to Agent from Seller's proceeds of the sale or exchange. The provisions concerning Agent's Commission may not be amended or modified without the written consent of Agent. Seller hereby grants to Agent the right to file a lien against the Property in the nature of a mechanic's lien to secure any amounts due to Agent.

**SELLER:** ______ **ADDRESS:** ______

**TELEPHONE:** ______

**DATE:** 15 Jul 99

Agent accepts and agrees to the foregoing.

**AGENT: MARCUS & MILLICHAP REAL ESTATE INVESTMENT BROKERAGE COMPANY OF DETROIT**

**BY:** ______ **ADDRESS:** ______

**DATE:** ______

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL, FINANCIAL, TAX OR OTHER EFFECTS, OR THE VALIDITY OF, ANY PROVISION OF THIS AGREEMENT. AS A REAL ESTATE BROKER, AGENT IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS ONLY. IF YOU DESIRE LEGAL, FINANCIAL, TAX OR OTHER PROFESSIONAL ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT, TAX OR OTHER PROFESSIONAL ADVISOR.



ML1 - Copyright Marcus & Millichap 1998

UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and
BSA CORPORATION, a Michigan Corporation

Plaintiffs,

Case No. 01669C
Judge Francis Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.

_______________________________________/

STEMPIEN & STEMPIEN, PLLC
By: Eric Stempien
Attorneys for Plaintiff
315 N. Center Street, Suite 200
Northville, MI 48167
(248) 735-9200

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
By: Marla Conneely
Attorneys for Defendant
1100 L Street N.W., Room 11054
Washington, DC 20005
(202) 307-0318

_______________________________________/

**AFFIDAVIT OF BENJAMIN ALLI**

STATE OF MICHIGAN )
)ss.
COUNTY OF WAYNE )

Benjamin Alli, being first duly sworn, deposes and states:

1. I am a Plaintiff in the above-captioned matter and am able to testify to the facts contained herein.

2. On July 15, 1999 I entered into a Purchase Agreement for the sale of the Collingwood/Kirkwood apartments to Cory Fanning for the purchase price of

$675,000.00.

3. At the time of the execution of the Purchase Agreement, I was the President of BSA Corporation, the owner of the Collingwood/Kirkwood apartments.

4. At the time of the execution of the Purchase Agreement, I was aware of the provisions within the Housing Assistance Payments contract between BSA Corporation and HUD which required HUD's written approval for any sale or transfer of the property.

5. GMAC Commercial Mortgage Corporation, Cory Fanning's proposed lender, was responsible for obtaining HUD's written approval for the sale.

6. In October 1999, my real estate broker, Gary Hopkins, informed me that the Purchase Agreement was null and void due to HUD's refusal to approve the sale to Cory Fanning.

7. Following my conversation with Gary Hopkins, I contacted Walter Gegneczak of GMAC Commercial Mortgage Corporation to inquire about the status of the Purchase Agreement. Mr. Gegneczak informed me that when the application was submitted to HUD, HUD indicated that it would meet to review the proposal. Mr. Gegneczak then received verbal notice from Robert Brown, Director for Multi-Family Housing for HUD's Detroit office, that the application was denied.

8. In that regard, I contacted Robert Brown.

9. When I asked Mr. Brown about the status of the sale of the Collingwood/Kirkwood apartments, he told me that HUD would not consent to the sale to Fanning because HUD would not allow me to "make more money from the U.S. government". He refused to give me any further reasoning or excuse for HUD's refusal to approve the sale. During the conversation, he admitted that he had reviewed GMAC's submissions regarding the proposed sale.

Further affiant sayeth not.

Benjamin Alli

Subscribed and sworn before me
this 7th day of September, 2005

A.M. Sadiqua Fayaz, Notary Public
Wayne County, Michigan
My commission expires: 7/17/2011

eallipl.af1.doc