# ALLI, ET AL v. UNITED STATES

## GARY HOPKINS

February 2, 2005

*Prepared for you by*

BIENENSTOCK
COURT REPORTING & VIDEO

Bingham Farms, Detroit, Mt. Clemens, Ann Arbor, Lansing, Flint, Jackson

PHONE: 248.644.8888 FAX: 248.644.1120

www.bienenstock.com

Page 5

Q. You're self-employed?
A. Yes.
Q. Is there a name of a company?
A. The company is His Instead, H-I-S, Instead, I-N-S-T-E-A-D.
Q. That's two words, right?
A. Two words.
Q. His Instead?
A. His Instead.
Q. How long have you been actively working in the real estate brokerage industry?
A. Since around that time, about '86 or so.
Q. Do you know Dr. Benjamin Alli?
A. Yes.
Q. Do you know how you first met him?
A. I'm sure it was real estate, some real estate interaction, probably around the time that I was with another brokerage company.
Q. What brokerage company was that?
A. Marcus and Mellenchamp.
Q. Where are their offices located or where were they at the time?
A. Southfield, Michigan.
Q. Did you -- was your relationship with Dr. Alli professional or personal?

Page 6

A. Professional.
Q. Do you know how he came to know about your services?
A. With Marcus and Mellenchamp we actively solicited apartment owners in the metropolitan area. I was an apartment specialist for them so we actively solicited to various apartment owners in the metro area, and I concentrated primarily in Detroit and he was one of the owners we solicited.
Q. Was this government subsidized housing or some nonsubsidized and some subsidized?
A. Both.
Q. When you first spoke to Dr. Alli what was the -- what was it he was looking for, do you know, do you remember?
A. I don't recall if he was looking for anything, we were looking to list property to sell, and I guess he was convinced that we'd be able to market for him.
Q. Do you know what year that was?
A. That's going back aways because I haven't been with them quite some time, probably late '90s I'm guessing roughly.
Q. Did Dr. Alli express some interest in having your agency list any of his properties?
A. Yes.
Q. Did you eventually enter into a listing agreement with

Page 7

him?
A. Yes.
Q. And which property was that for?
A. We listed the Collingwood, I'm trying to think of the name of that property, it was like a 52-unit or 54-unit building.
Q. Collingwood/Kirkwood?
A. I believe that's right, that's the name we used.
Q. And one of the buildings was located on Collingwood Street?
A. One was on Collingwood.
Q. And one was located on Calvert?
A. Calvert, yes.
Q. Were they marketed as one property?
A. They were marketed as a package.
Q. And you were the agent for that listing?
A. Yes.
Q. Were there any other agents for that listing?
A. No, I was the agent for that listing.
Q. Do you remember what the asking price was?
A. 6 -- 675 I believe, this is going back aways for me but I believe it was 675 or so, it was above 600 for sure.
Q. Did you receive any offers on that property?
A. Yes.

Page 8

Q. Let me back up, what did you do with regard to marketing the property?
A. In addition to marketing or soliciting owners we also solicited potential buyers, and once we get a listing, we would of course market that listing to those buyers, and we would also advertise the listing.
Q. Having been an apartment specialist and dealt with some subsidized housing you were familiar with Section VIII contracts and HUD health -- mortgages, I presume?
A. Familiar with the contracts, yes.
Q. Was it your understanding in this particular project that -- that the sale of this building would have required some approval or approvals from HUD?
A. Yes.
Q. Would that have been communicated to any potential buyer, I presume?
A. Yes.
Q. Were you familiar at all with the process by which HUD -- well, strike that.
Were you familiar at all with the approval process with HUD --
A. No, I don't know the details of their approval.
Q. -- or what forms had to be filed or what needed to be done in order to get the approval?
A. I knew of one, I didn't know about all of the forms.

Q. Would that be -- as the listing agent would that have been something you would have done in attempting to get the approvals from HUD or would that have been somebody on behalf of the buyer?
A. I believe that would be on behalf of the buyer or the lender would do that.
Q. How is this property advertised, or was it advertised?
A. You mean --
Q. Were there -- are there -- was it put out on, you know, those free real estate booklets that are found in restaurants or --
A. No, we actually sent out information to buyers and we advertised in the local papers, that's the standard multi-family advertising listing.
Q. And you sent out flyers to people who you knew were interested in buying multi-family housing?
A. Right, people who profile for that type of property.
Q. Was it advertised as subsidized housing?
A. Yes.
Q. You indicated earlier that you did receive an offer on this property, correct?
A. Yes.
Q. Was there only one offer, was there more than one?
A. There may have been others but we basically settled on one offer.



Q. Do you remember who the buyer was?
A. Fanning.
Q. F-A-N-N-I-N-G, does that sound right?
A. That sounds right.
Q. Corey Fanning?
A. Corey Fanning, yes.
Q. Do you remember what the purchase price was for that offer?
A. I know it was a full-price offer.
Q. Was that offer accepted by the seller?
A. Yes.
Q. There was a written purchase offer signed by both buyer and seller?
A. Yes.
Q. Was there earnest money deposit received from the buyer?
A. Yes, I'm sure there was, we wouldn't have taken the offer without earnest money so probably so, yes.
Q. Do you remember who the lender was or the potential lender was on the property -- well, strike that.
Who the potential lender was for Corey Fanning?
A. I believe it was GMAC.
Q. With regard to this purchase did you take any steps to receive HUD approvals for the sale and purchase of the



property?
A. Did I personally?
Q. Right.
A. I did not personally.
Q. Do you know if anyone did?
A. I believe GMAC did or Corey did.
Q. Do you know what steps they took?
A. I don't know HUD's procedure on that but I would assume they contacted -- they would have had to contact HUD to alert them to the effect that the property was being considered for sale and whatever approvals they would need from HUD to proceed, they would solicit that from HUD.
Q. Did you -- were you in contact with GMAC?
A. Yes.
Q. Did this property ever close?
A. No, it did not -- well, it never closed with me, I was not involved in the closing.
Q. As far as you know it was never closed on that purchase offer?
A. It was never closed on this purchase offer.
Q. At some point the purchase offer either expired by its own terms or the parties withdrew from it?
A. Right, correct.
Q. Do you know what the time frame was between when the



purchase offer was first signed to when it was either expired on its own terms or the parties withdrew?
A. This is going back aways, probably 60, 90 days, somewhere in that range. I don't remember exactly what time frame but somewhere in that range.
Q. During those, and I know it's approximately, but during those approximately 60 to 90 days were you talking to representatives from GMAC about the attempts to get HUD approval?
A. Yes.
Q. Do you remember what they told you about that?
A. The only thing I remember is things seemed -- things were -- seemed to have been along fairly satisfactorily, fairly smooth, and then there was abruptness to them and it kind of fickled, it just kind of went away.
Q. So that purchase offer, there was never a closing on that purchase offer?
A. Never closed.
Q. Do you know why?
A. I don't, I'm trying to remember exactly what stifled, and it seems as though there was some dialogue between GMAC, Corey and HUD, there was like uncooperation on somebody's part, and I think either HUD did not want to proceed with the deal -- it was a significant

Page 13

roadblock, and as best I remember I believe that roadblock involved HUD.
Q. Was it your understanding that HUD did not give the necessary approvals for this -- for the sale of this property?
A. To my understanding, and this is going back aways, to my understanding there was not a HUD concurrence to the sale.
Q. How long were you an apartment specialist for Marcus and Mellenchamp?
A. Roughly two years.
Q. Other than that experience with Marcus and Mellenchamp, do you have other experience with multi-family housing in the City of Detroit?
A. That's sort of been my background.
Q. Since 1987?
A. Since about 1987, right.
Q. Have you spent a lot of time in government subsidized multi-family housing units?
A. Not -- not a lot of time, that's not necessarily my specialty area, it's just one of the areas, but I do -- but I'm fairly comfortable with it.
Q. You're familiar with different types of multi-family housing in the City of Detroit?
A. Yes.

Page 14

Q. And you spend some time in those --
A. Yes.
Q. -- buildings?
A. Yes.
Q. And when you list a property for sale, what steps do you take to determine purchase price and all the factors that you have to take into account for the listing?
A. We look at the mix of the units, one bedroom, two bedroom, three bedroom, general size of the units, general condition of the units, we compare the units to similar units in the area, and we look at cost to build similar units, we look at three aspects; market, rebuild cost and income approach, and those issues determine how we come up with the selling price.
Q. Do you personally go through the buildings and look at them?
A. Yes.
Q. Do you go in every unit?
A. When we do the initial listing we look at a good representation of the units, probably 50 to 60 percent of the units, and then as we're showing units we basically just about get through all of them.
Q. Do you look at the common areas?
A. Oh, absolutely.

Page 15

Q. The mechanical room?
A. Yes.
Q. Based on your observations of all the various multi-family housing units that you've looked at, did you have an opinion with regard to the housing quality of the Collingwood/Kirkwood building -- buildings?
A. My assessment of the units compared to similar kind of units in Detroit, I would place those in the -- in the top one third.
Q. In terms of housing quality?
A. In terms of housing quality.
MR. STEMPIEN: Thank you, I don't have anything further.

EXAMINATION

BY MS. CONNEELY:
Q. I have a few questions.
A. Okay.
Q. Good morning, Mr. Hopkins, my name is Marla Conneely, I'm an attorney representing the United States of America in this case and I just have a few follow-up questions for you, I just need a few minutes.
A. No problem.
Q. Have you met or spoken with Dr. Alli within the last six months?
A. I received a contact from him regarding -- offered

Page 16

some information about the sale, the Collingwood/Kirkwood issue.
Q. When did you receive that information?
A. I'm going to guess probably about a week ago.
Q. Did you ask for that information or did he just send it to you?
A. No, not the information but the call to say would I -- I would probably be likely getting a deposition.
Q. Oh, okay. Did you speak with or meet with him any time before that?
A. No, I did not.
Q. Do you know whether Dr. Alli owns or manages any apartment buildings today?
A. I do not know.
Q. Other than speaking with Eric Stempien on the phone as you mentioned earlier a few weeks ago, have you spoken with or met with him before? Eric Stempien is the man seated next to me.
A. I have not.
Q. Do you know whether Dr. Alli followed the appropriate procedures?
A. I'm sorry, just one quick -- did I speak with him?
Q. Yes.
A. I spoke with him concerning that I would receive -- be deposed for this -- this particular deposition.