IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 01-669C<br>(Judge Allegra) |

DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following reply to the answer to our motion for partial summary judgment filed by plaintiffs, Benjamin and Shaki Alli and BSA Corporation.

Our statement of facts appears in full in our motion for partial summary judgment. Briefly, plaintiffs bring breach of contract claims against the United States regarding three apartment buildings owned and managed by plaintiffs. Def. Mot. 1.[1] All three buildings were covered by a Housing Assistance Payment contract ("HAP contract") with HUD. Id. at 3-7. HUD held a mortgage on two of the buildings, the Pingree apartments and the Collingwood apartments, and each of those buildings were also covered by a regulatory agreement. Id. Plaintiffs claim

[1] Defendant's Motion for Partial Summary Judgment, filed on August 15, 2005, will be cited as "Def. Mot." followed by the specific page reference.

HUD refused to approve the sale of the Collingwood apartments, and that this alleged refusal breached a sale upon approval clause in the respective HAP and regulatory contracts. Id. at 2.

On August 15, 2005, we filed a motion for partial summary judgment upon plaintiffs' claim based upon plaintiffs' failure to submit a transfer of physical assets application ("TPA application") and a failure to identify a contractual duty that had been breached by defendant.

On September 7, 2005, plaintiffs filed an answer to our motion to dismiss. In their answer, plaintiffs argue that HUD had no discretion and was contractually obligated to approve the sale of the Collingwood apartments to Cory Fanning. Pl. Br. 5-6.[2] Plaintiffs also argue that Mr. Fanning's lender, GMAC Commercial Mortgage Company ("GMAC"), sought FHA insurance for the proposed loan, and that HUD's alleged denial of that financing constituted a denial of the sale as a whole. Id. at 8. Although plaintiffs tacitly concede that no party ever submitted to HUD a completed TPA application, plaintiffs appear to argue that it was GMAC's responsibility to submit the TPA application. Id. at 3. Finally, plaintiffs argue that even though a TPA application was never submitted, HUD "knew about" the proposed sale and that this knowledge should have triggered HUD's TPA

---

[2] Plaintiffs' answer to our motion for partial summary judgment, filed on September 7, 2005, will be cited as "Pl. Br." followed by the specific page reference.

application review process. Id. at 8.

## I. Neither The HUD Regulations Nor The Collingwood HAP Or Regulatory Contracts Created A Duty Upon HUD To Approve The Sale Of The Collingwood Apartments To Cory Fanning

Plaintiffs allege that the Government does not have discretion to approve or disapprove the sale of a building upon which it holds a mortgage because HUD's regulations list the steps that HUD must take in determining whether to approve a TPA application. Pl. Br. 5. This argument should be rejected.

First, plaintiffs' argument is irrelevant because neither plaintiffs nor the proposed buyer, Cory Fanning, ever submitted a TPA application requesting HUD's approval of the sale. Def. App. 198-99, 206-08, 217-21, 243-45.[3] Plaintiffs do not allege that a complete TPA application was submitted to HUD for the sale of the Collingwood apartments to Cory Fanning. Pl. Br. 1-10. Therefore, plaintiffs' argument that if they had submitted a proper TPA application and if that TPA application had met certain criteria, HUD should have approved it, is of no relevance. Plaintiffs have not raised a genuine issue of material fact that precludes summary judgment in favor of the Government.

Secondly, plaintiffs still cannot point to a single provision in either HUD's regulations or in the Collingwood HAP or regulatory contracts that created a duty upon HUD to approve

[3] The appendix to defendant's motion for partial summary judgment will be cited as "App." followed by the specific page reference.

the sale of the Collingwood apartments. Id. Paragraph 19(a) of the HAP contract states:

> The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD. However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD shall consent in writing if HUD has approved the terms of the financing.

Def. App. at 94. This provision creates no duty upon HUD to approve the sale of the Collingwood apartments to Cory Fanning. Likewise, paragraph 8(a) of the regulatory contract simply provides that plaintiffs "shall not without the prior written approval of [HUD] . . . convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property." Id. at 105. The regulatory contract also imposes no duty upon HUD to consent to plaintiffs' sale of the Collingwood apartments to Mr. Fanning.

Indeed, HUD's regulations explicitly prohibited HUD from consenting to plaintiffs' sale of the Collingwood apartments to Mr. Fanning. The regulations provide that HUD shall not review any TPA application that is incomplete. Id. at 145 ("When a complete application is obtained, the Field Office [f]orwards the application to the appropriate servicer for review."). In this case, neither a complete nor partially complete TPA application

was ever submitted to HUD. Accordingly, the Government is entitled to summary judgment upon claim VI of plaintiffs' second amended complaint.

## II. Requesting HUD's Approval To Transfer Property Upon Which HUD Holds A Mortgage And Requesting FHA Insurance For A Loan Are Two Entirely Different Requests

In their answer to our motion for partial summary judgment, plaintiffs argue that HUD's alleged refusal to approve FHA insurance for Mr. Fanning's loan must be deemed to be a refusal to approve the sale of the Collingwood apartments. Id. at 7-8. Plaintiffs' argument is unsupported.

As an initial matter, pursuant to 24 C.F.R. § 203, a "HUD approved mortgagee" is a private financial institution that is authorized to process loans that require FHA-insurance. A HUD approved mortgagee does not process or prepare TPA applications; its sole function is to review mortgage applications and determine whether the proposed mortgagee, in this case, Mr. Fanning, is eligible for FHA insurance. 24 C.F.R. § 203. This relationship is clearly set forth in the agreement between Mr. Fanning and GMAC. Paragraph 1 of the agreement states,

> Cory Fanning, (The "Borrower(s)"), hereby authorizes GMAC Commercial Mortgage Corporation to serve as the mortgagee to prepare and submit the necessary application(s) to the U.S. Department of Housing and Urban Development ("HUD") to obtain a Commitment for Mortgage Insurance for the above captioned project, pursuant to Section 223(f) of the National Housing Act.

Pl. App. Ex. 1 at 1.[4]

A section 223(f) loan is simply a refinancing of existing properties, typically at a lowered interest rate, and is not related to a TPA application. In fact, the plain language of the agreement did not obligate GMAC to submit or prepare a TPA application for Mr. Fanning or plaintiffs. Nor did the agreement state that GMAC would act as Mr. Fanning's representative with regards to obtaining HUD's approval to sell the property.

Indeed, the agreement between Mr. Fanning and GMAC contemplated that a TPA application had already been submitted and approved. Provision 15 of the agreement stated that, by signing the agreement, Mr. Fanning represented that he was "the Owner of the Project, or the Owner's agent, or contractually in control of the Project by way of a valid, existing contract, or option agreement." Pl. App. Ex. 1 at 4. Plaintiffs' broad statement that "GMAC was Fanning's representative with regard to obtaining the appropriate approvals from HUD" is misleading. Pursuant to the agreement, GMAC was obligated to secure 223(f) loan insurance for Mr. Fanning and nothing more.

Moreover, HUD Form 92266, titled the Application for Transfer of Physical Assets, states that the responsibility for submitting a TPA application rests with the proposed buyer, and a

---

[4] The appendix to plaintiffs' answer to our motion for partial summary judgment will be cited as "Pl. App." followed by the exhibit number and the specific page reference.

number of documents that comprise a completed TPA application could only be prepared by the proposed buyer. Def. App. 239-49. In this case, Mr. Fanning testified that he did not even know HUD’s approval to transfer the Collingwood apartments was required and that he did not take any steps to obtain that approval. Def. App. 217-18. Therefore, plaintiffs’ argument that Mr. Fanning somehow delegated the responsibility for submitting a TPA application to its lender, GMAC, is contrary to the evidence. In any event, plaintiffs’ allegations are irrelevant. As HUD is not permitted to act upon a proposed sale where no TPA application has been submitted, it hardly matters who was at fault (Mr. Fanning or GMAC) in failing to submit the application.

More importantly, plaintiffs’ argument that HUD’s refusal to award FHA insurance to a proposed buyer is a refusal to approve a sale in general is contrary to the regulations. The process to obtain FHA insurance is entirely different from the TPA application process, and one does not take the place of the other. FHA insurance can be denied and a TPA application approved for the same sale. For example, Mr. Fanning could have found other financing to purchase the Collingwood apartments. The Government had absolutely no obligation to Mr. Fanning to insure any of his loans, and its alleged denial to provide insurance did not constitute a denial of a TPA application that

was never submitted in the first place.

III. The Submission Of An Already-Executed Purchase Agreement Is Not A Substitute For A Proper TPA Application

Plaintiffs argue that HUD knew about the sale of the Collingwood apartments to Mr. Fanning, and that mere knowledge, alone, should have triggered the TPA review process. Pl. Br. 8. This argument is contrary to reason and HUD regulations.

Section 4350.1, chapter 13, of the HUD handbook states that the TPA review process shall only begin upon HUD's receipt of a completed TPA application. Def. App. 145. The regulations provide that HUD may return a seriously deficient TPA application. Id. If an application is not seriously deficient, the regulations provide that HUD should alert the applicant as to the missing documents. Id.

In this case, no TPA application was ever submitted for the sale of the Collingwood apartments to Mr. Fanning. The only document sent to HUD was a copy of an already-executed purchase agreement between plaintiffs and Mr. Fanning. The claim that HUD should have realized it was being asked to approve a transaction that had already been entered is contrary to reason. At that point, plaintiffs had already breached the HAP and regulatory agreements by contractually obligating itself to sell the Collingwood apartments prior to requesting HUD's approval.

IV. HUD Did Not Violate Its Own Handbook Provisions

In their brief, plaintiffs raise, for the first time, a claim that HUD violated section 4335.2 of the HUD handbook, which, plaintiffs argue, required HUD to encourage the plaintiffs to sell the Collingwood apartments in light of imminent foreclosure by HUD. Pl. App. Ex. 5 at 2. Specifically, plaintiffs cite to the provision of the handbook which states that, before recommending foreclosure, HUD should "encourage sale, by the mortgagor, as an alternative to foreclosure." Id.

Plaintiffs, however, fail to cite to the rest of that provision, which states that HUD should "not delay foreclosure for this reason." Id. Moreover, plaintiffs had already entered into a purchase agreement to sell the Collingwood apartments to Mr. Fanning three months before HUD issued a notice of intent to foreclose; thus, plaintiffs apparently needed no encouragement from HUD to induce them to try to sell the building.

Pursuant to HUD regulations, HUD will halt the foreclosure process and allow the sale of a property to proceed even after a notice of intent to foreclose a property is issued if the mortgagor has entered into a contract with a purchaser which will result in one of the following within 60 days: (1) payment in full of the HUD-insured mortgage; (2) full reinstatement through assumption; (3) assumption without full reinstatement if it is acceptable to HUD; or (4) if the mortgage is being assumed by a

mortgagor who is not an owner-occupant, the mortgage must be brought current. See Exhibit 1, attached hereto at 3. The terms of the purchase agreement between Mr. Fanning and plaintiffs did not meet any of these four conditions.

Finally, even if HUD had violated its regulations regarding foreclosure, which it did not, that is irrelevant to plaintiffs' claim that HUD breached the HAP and regulatory contract by allegedly refusing to approve the sale of the Collingwood apartments to Mr. Fanning. As stated in our motion, HUD neither approved nor denied the sale of the Collingwood apartments to Mr. Fanning because a TPA application was never submitted for review. Accordingly, the Government is entitled to judgment, as a matter of law, upon count VI of plaintiffs' second amended complaint.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court enter judgment in favor of the Government as a matter of law as to count VI of plaintiffs' second amended complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Mark A. Melnick by Frank E. White, Jr.
MARK A. MELNICK
Assistant Director

OF COUNSEL:

Thomas G. Massouras
Sol T. Kim
Office of General Counsel
U.S. Department of Housing &
Urban Development
77 West Jackson Boulevard
Suite 2629
Chicago, Illinois 60604

September 14, 2005

s/Marla T. Conneely
MARLA T. CONNEELY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street
Washington, D.C. 20530
Tel. (202) 307-1011
Fax. (202) 307-0972

Attorneys for Defendant

*Secretary-Held Servicing*

*Directive Number:* [Prev Hit][Next Hit]**4335.2**



CHAPTER 5 - FORECLOSURE

5-1. FIELD OFFICE RESPONSIBILITIES BEFORE RECOMMENDING FORECLOSURE

Foreclosure, or the threat of foreclosure, should not be used unless the office intends to foreclose. Foreclosure is the last resort after it is evident that the mortgagor cannot, or will not, meet the mortgage obligation. Before recommending foreclosure:

A. Assure that all required and reasonable servicing actions have been undertaken and efforts exhausted.

B. Encourage sale, by the mortgagor, as an alternative to foreclosure (this includes sale by assumption of the mortgage), but do not delay foreclosure for this reason.

C. Suggest the offering of a deed-in-lieu of foreclosure by the mortgagor (see Paragraph 5-8 on deeds-in-lieu). (This does not apply to investors.)

The encouragement of a sale or the suggested offering of a deed-in-lieu of foreclosure should be by active (if possible face-to-face) and direct methods rather than passively subsuming it in the text of a letter without explanation or elaboration.

D. If the field office determines that the property has little, or no, residual value, the case should be placed on an inactive status and foreclosure avoided.

E. Where there are high municipal liens on a vacant/abandoned property, which would prove a major liability to anyone acquiring title, placement of a property on an inactive status may also be an appropriate alternative, though the property has substantial residual value.

5-2. PROCEEDING TOWARDS FORECLOSURE. Foreclosure actions start with the preparation of a Notice of Intention to Foreclose.

A. Before determining the amount required to bring the mortgage current:

1) On all accounts with account numbers beginning with 07, check Loan Screen 2 (LNS2) for the Code 12 indicating that a Post Audit has been completed. Call the Service Center to request a Post Audit if the Code 12 is missing.

2) If the account is a Graduated Payment Mortgage (GPM), notify the Service Center to have the account adjusted before preparing figures.

This amount should include all known charges against the account, for example: taxes paid but not posted. Perform a manual escrow analysis, taking into account any shortages or excess funds.

B. Complete and mail a Notice of Intention to Foreclose and Accelerate Mortgage Balance and to Report to Credit Bureau (NOI), giving the bring-current amount and 30 days to respond. The NOI must be sent to the mortgagor by certified mail. (See Exhibit 5-1.1). This is a new NOI and previous versions are obsolete.

NOTE: If the mortgagor has filed a Petition in Bankruptcy, the Acceleration Notice may not be sent to the mortgagor while the bankruptcy stay is effective. (See Bankruptcy, Section 9).

C. At the time the NOI is sent, the field office must file-maintain Loan Screen One (LNS1):

1) Change the Pay Option Code to 9 to stop the sending of bills;

2) Enter 21 (Accept no Payments) and 38 (Send no Mail) in the Condition Codes to alert the System not to accept and apply any partial payments, or send mail.

NOTE: The field office may annotate LNS3, under comment, with the amount it considers substantial enough to consider reinstatement.

D. Substantial Payments. In the case of the original mortgagor the substantial payment should, at least, clear up the delinquency under the prior forbearance agreement, or as much as 50 percent of the mortgage delinquency, whichever is greater, unless the field office determines that a lesser amount is appropriate.

E. Acceptance of a Partial Payment after Mailing the NOI.

1) If the mortgagor tenders less than what the field office considers a substantial payment towards the delinquency, it should be accepted. But, if the field office desires to continue with foreclosure, send a new NOI containing both a new bring-current amount, and substantial payment amount, to the mortgagor before requesting foreclosure. (See Exhibit 5-1.2.)



[Prev Hit][Next

NOTE: This does not necessitate an extension of the 30-day period, if reinstatement doesn't occur; however, the NOI should state that the money will be applied against the delinquency-but does not satisfy the amount needed to consider reinstatement, and make it clear that the original 30-day term applies.

2) Where the amount tendered represents a significant proportion of the "substantial payment" the field office, at its discretion, may grant an 30-day term to allow for

resolution

NOTE: The field office shall not use this procedure to incrementally make up the entire delinquency by stringing the mortgagor along beyond that point which, originally, would have been viewed as a substantial amount subject to 2 D.1 (above).

F. The System is designed to treat payment as an exception when a Code 21 is in place. Therefore, OFA's Single Family Notes Branch's Cash Control Staff will contact the Field Office to inform you of the payment's receipt. All payments received prior to actual recommendation of foreclosure shall be accepted. The field office must than decide whether to:

1) Act in accordance with 5-3., below, or

2) Continue to foreclose after following the instructions in this section (2).

5-3. MORTGAGOR RESPONSE TO THE NOI. The period between the sending of the NOI and the actual referral of a case to foreclosure is not the last opportunity for resolution. However, it may be the last opportunity to avoid incurring foreclosure costs by HUD.

A. If the mortgagor responds to the Notice, the field office shall withhold further action leading to foreclosure under the following conditions:

1) The account is fully reinstated.





2) The account is paid in full.

3) The mortgagor tenders an acceptable deed-in-lieu of foreclosure. (The deeding is not complete until actual title approval.)

4) The mortgagor has entered into a contract with a purchaser which will result in one of the following within 60 days:

a. Payment in full.

b. Full reinstatement through assumption.

c. Assumption without full reinstatement acceptable to the field office. (See 5 below.)

d. If the mortgage is being assumed by a mortgagor who is not an owner-occupant, the mortgage must be brought current.

5) The mortgagor, or occupant assumptor, makes a substantial lump-sum payment towards the delinquency and enters into a forebearance agreement.

If the mortgage has been held by the Secretary for more than 36 months, or in the case of an assumptor, the forbearance agreement must provide for no less than a regular mortgage payment.

B. If resolution is accomplished, change Pay Option Code to 4, remove Condition Codes 21 and 38, and establish the forbearance screen (if appropriate). If a deed-in-lieu is accepted, see Section 8 of this chapter.

5-4. INITIATING FORECLOSURE

A. If resolution does not occur, or if the mortgagor does not respond after issuance of the NOI, the field office must promptly recommend foreclosure after the 30-day period expires.

NOTE: Due to the terminal nature of a foreclosure action recommendations must be fully supportable. Recommendations made to achieve goals, in lieu of appropriate servicing activities, will not be tolerated. Similarly, system encoding must accurately reflect case status. Each recommendation must have supervisory review and approval, and that review may not be of a cursory nature nor a superficial inspection of the Foreclosure Checksheet, HUD-92218, (Exhibit 5-2).



[Prev Hit][Nex

B. In most cases forward the original foreclosure recommendation to the Office of General Counsel, Home Mortgage Insurance (GHH) using the memorandum in Exhibit 5-3 along with the Tax Data Card or data from CPPS; a copy of the NOI; and, a completed foreclosure checksheet. A completed HUD-698, Statement of Account, and all pertinent legal instruments required for foreclosure processing must also accompany the recommendation. If the original Title File is unavailable the field office must obtain certified copies of the legal instruments.

EXCEPTION: Only GPMs, Bulks, and other special loans shall continue to be forwarded to OFA. All other cases must be forwarded to OGC. Remember to submit the legal file with your recommendation. Instructions for the preparation of the HUD-698 are contained in Exhibit 5-4.

C. Send a copy of the complete foreclosure recommendation and checksheet to the Single Family Servicing Division in Headquarters.

D. Simultaneously, file maintain Loan Screen One (LNS1) of the SFMNS by entering a Status Code 41, and annotate Loan Screen 3 (LNS3) with the date foreclosure documents were sent to OGC.

E. If the account is receiving Section 235 assistance, suspend the subsidy by file maintaining the C235 trailer. (See the SFMNS Users Guide, at 4-31b, for further guidance.)

F. Check the system's HSTY screen to determine whether payments have inadvertently been applied. If so, follow instructions at 5-2.E (above).

5-5. ACTION BY THE OFFICE OF GENERAL COUNSEL

A. The account will be assigned to a foreclosure agent by OGC. That agent is under contract to HUD to foreclose the mortgage.

B. Field offices will receive a copy of OGC's referral to the agent. Only if the field office does not receive that copy within 60 days of the date on LNS3 (see 5-5A., above) should any inquiry be made of OGC regarding the case's status. Once that copy is received, no inquiry shall be made of OGC except in cases of suspensions or termination of foreclosure, or bankruptcy.





C. Foreclosure attorneys are required to obtain updated 698 data just prior to foreclosure and, with the exception of bidding instructions related to efforts to avoid acquiring title at the foreclosure sale, there should be no other direct contact with the foreclosing agent or the foreclosing attorney. All other contacts with these agents are to occur through OGC, with the exception of the notices of occupied or vacant conveyance (an informal notification to the foreclosing attorney may supplement this only where the foreclosure sale is imminent). The foreclosing agent will be requested to notify the field office whether the property is occupied or vacant.

NOTE: If the property is occupied, the Property Disposition Section shall commence the occupied delivery procedures as prescribed in outstanding instructions (memorandum entitled: Occupied Conveyance, dated August 15, 1984). Unless notified to the contrary, the foreclosing agent will convey the property to HUD unoccupied.

5-6. SUSPENSION OR TERMINATION OF FORECLOSURE

If a suspension or termination of foreclosure is desired, after the foreclosure recommendation has been sent to OGC, contact OGC immediately by phone (FTS 755-7080), with confirmation in writing (do not send a copy to OFA). Under no circumstance shall the foreclosure agent, the attorney, or OFA be contacted directly. Contact OGC when partial payments have been inadvertently applied to the mortgagor's account.

A. Reasons for Suspension of Foreclosure

1) Filing bankruptcy

2) Fruitful negotiations with the mortgagors which will lead to a resolution similar to those described in 5-3A (above), but which may extend beyond the date of the sheriff's sale.

3) Regional or Headquarters review, for cause, of a case in foreclosure.

B. Reasons for Termination of Foreclosure

1) The mortgagor performed adequately under and outside of the bankruptcy plan.

2) Reinstatement, payment-in-full, etc. has occurred. (Foreclosure costs incurred by the Department must be secured from OGC and considered as part of the resolution.)

3) The condition of the property has been found to meet the criteria for placement under inactive status.

4) Acceptance of a deed-in-lieu of foreclosure. At the request of the field office, OGC will instruct the foreclosure agent to prepare and record the deed. As part of its foreclosure processing, the foreclosure agent will have determined whether there are any other outstanding liens.

C. SFMNS File Maintenance Requirements when Foreclosure is Terminated.

When foreclosure has been terminated:

1) Remove Condition Codes 21 and 38, and Status Code 41; and,

2) Except for inactive cases, change the pay option code to 4.

NOTE: In the case of a reinstatement, check that reinstatement funds have been applied (and, where applicable, a forbearance agreement established) to avoid the mortgage being billed as delinquent.

5-7. SPECIAL FORECLOSURE SITUATIONS. Vacant Properties, Rentals, and Junior Liens (Special conditions not described below may require the field office to seek advice from the Secretary-Held and Counseling Services Branch, Headquarters (HSSL) before action).

A. Abandoned or Vacant Properties.

1) The mortgagor's intent to protect the property should be determined by contacting him/her. Under unusual circumstances, it might be necessary for HUD to protect and preserve the property when the mortgagor is unable or unwilling to take protective measures.

2) If the only payments being applied to the account result from assistance or buy-down, then:





a. The Section 235 assistance must be suspended and reversed to when the vacancy occurred (unless the vacancy is temporary and approvable); or,

b. The buy-down escrow agent should be informed, in writing, to suspend remittances until further notice. After foreclosure (or a deed-in-lieu) is completed, the field office must make demand of the escrow agent for the escrowed funds.

In both situations, noted above, OFA must be notified.

3) Initiate foreclosure once it has been firmly established that the property has been abandoned or vacant for more than 60 days, and the mortgagor cannot be located.

4) In the foreclosure recommendation, advise OGC that the property has been vacant for more than 60 days, and the mortgagor cannot be located.

5) Immediately, request Property Disposition to take protection and preservation measures to avoid depreciation and vandalism. The mortgagor continues to own the property until title has been transferred. Also, be sure that no personal property, regardless of its condition, is removed from the property.

The only authorized expenditures are for securing the property, this does not include yard maintenance. The Department is to merely take actions required to protect its mortgage security, as permitted by the mortgage instrument. HUD Handbook 4310.5, Property Disposition Handbook, paragraph 95, provides procedures and authority for protection and preservation of SH mortgaged property.

B. Rental Property. Providing that servicing standards have been met, the fact that the property is occupied by other than the homeowner should not be a deterrent to recommending foreclosure.

1) Occupancy, even by other than the mortgagor, may reduce the potential of vandalism.

2) Prior to accepting rental payments from tenants of the mortgagor, field offices must consult field counsel.



[Prev Hit][Next

If counsel approves field offices may accept rent or other payments from non-owner occupants when tendered on a delinquent account. However, such payments must be clearly identified and placed in an escrow account to be applied or disbursed depending on the accounting after final disposition of the foreclosure. Such receipt should be sent directly to the Post Insurance Division, AFMP, with a covering instructional memorandum.

C. Foreclosing Junior Liens. Most SHMs are first liens and the foreclosure by a junior lien holder means that the field office will have to work with a replacement mortgagor. Field offices must be sure that they are familiar with all foreclosure laws for the states in which they have jurisdiction. Notice of a foreclosure action by a junior lien holder must be referred immediately to field counsel.

The replacement mortgagor must be viewed in the same way as an assumptor. That is, if the account is delinquent, it must be brought current either immediately or through a forbearance agreement.

The same conditions must be met as with an ordinary assumption that does not bring the account current (see 5-3A above). Failure to accomplish either requires the field office to recommend foreclosure.

D. Federal Interest in Junior Liens

1) Most junior liens are held by private parties. However, there are instances where the junior lien will be federally insured, or held by a federal agency. Such examples are Title I and

Section 312 loans.

2) It is not in HUD's interest to have a junior Title I or Section 312 loan foreclosed where there is an active and successful repayment plan addressing the problem of a delinquent SHM. Nor, would it be in HUD's interest to sue to collect on a judgment under similar circumstances.

3) Field offices must coordinate their collection activities with the best interests of the Secretary always in mind, especially where Title I or Section 312 loans are involved. Case records should be adequately "flagged" where HUD junior lien is known to exist. The SFMNS loan monitoring screen should be used for this purpose.





5-8. DEEDS-IN-LIEU OF FORECLOSURE. A deed-in-lieu, generally, is acceptable only if the property is free of all liens other than the Secretary-Held mortgage. This is because a deed-in-lieu obligates HUD to those junior liens. The deed should not be recorded until it is established by Field Counsel that there are no other liens.

However, the existence of a junior lien is not, of itself, reason to reject a deed-in-lieu. The fact that HUD is intent upon foreclosure can be used to negotiate compromises of smaller junior liens. As a "rule-of-thumb", if junior liens can be compromised for less than the foreclosure costs, they should. Seek guidance from Field Counsel.

If the office wishes to accept a deed-in-lieu when there are other liens, contact Field Counsel for approval after securing the title documents (see 5-8.B., below). One must remember that judgments against individuals are different from liens against the property, and seek guidance from Field Counsel.

A. General

1) A deed given before initiation of foreclosure will rarely affect the mortgagor adversely. When a deed-in-lieu of foreclosure is accepted HUD will not permit the property to be conveyed occupied.

2) Up to $200 may be authorized to be paid the mortgagor. The amount to be paid (if it is a part of the negotiation) must always be the minimum necessary to accomplish the objective. This amount is part of the total anticipated cost of foreclosure.

3) Generally a deed-in-lieu will not be accepted from a corporate mortgagor. Decisions to accept must be considered carefully, especially if the properties are being used for income production. This includes a mortgagor owning two or more properties subject to an FHA-insured mortgage or SHMs builder "bail-out" situations, or someone taking title through foreclosure of a junior lien.)

4) Generally, HUD will not accept a deed-in-lieu on the residual properties resulting from bulk-sales. HUD's intent in entering into bulk-sales agreements was not to take back the worst properties after the purchaser spun-off and sold the best. The mortgagor shall be informed that HUD will actively

pursue a deficiency judgment if foreclosure does occur. (Waiver of this policy may be requested of the Director, Office of Insured Single Family Housing, (HSS) where documentation will support an extension of mortgage term).





If the properties are deteriorated, they should be placed on inactive status, as you would any other property. If any irregularities are detected concerning the mortgagor's handling of a bulk sale mortgage (such as equity-skimming), the case should be referred to the Office of the Inspector General for investigation.

5) Need for a title search:

a. Deeds-in-lieu of foreclosure must be supported by a title search indicating no subordinate liens; or,

b. If a title search indicates subordinate liens, those liens must be able to be compromised for less than the cost of continuing foreclosure.

NOTE: Where the property is subject to a Section 235 Recapture Lien, a deed-in-lieu will not wipe-out the lien. However, the mortgagor's disposal of title, with no gain, eliminates the potential of recapture.

If a property is subject to Title I or Section 312 liens a deed-in-lieu does not wipe out those liens. Those liens must be satisfied prior to disposition. Loan management must discuss satisfaction of these liens with the other HUD program areas before the deed is accepted.

B. Legal Representation Involving Deeds-in-Lieu

1) If the case has been referred for foreclosure, inform OGC so it may have the foreclosure agent handle the matter. Otherwise, the field office is authorized to engage an attorney or title company to represent HUD. In the latter event, provide the following documents to the attorney or title company:

a. The original security instrument and note.

b. Title evidence held by the Secretary, if available.

c. Form HUD-2319, Attorney's Certificate of Title or, Title Policy, as appropriate.

d. Deed to Secretary, if one has been obtained, or a request that one be prepared for the mortgagor's(s') signature.

2) Marketable Title. Before preparation or recording the deed, the attorney of title company must examine the condition of the record title. The deed should not be recorded if there are outstanding encumbrances other than the HUD mortgage, current taxes and assessments, or customary easements, mineral reservations or restrictions of the type waived by Section 203.389 of the HUD Regulations.

3) Approval of Acceptance by Field Counsel. If encumbrances or liens appear on record, the Field Counsel must be consulted concerning acceptance of the deed. All particulars of the case, including all available information or status of the encumbrances, will be presented to the Field Counsel with the recommendation of the attorney or title company, and the field office with respect to possible compromise of the objectionable liens.

4) Satisfaction or Release from Liability. If there were no questions regarding marketability, or when the Field Counsel has approved acceptance of the deed-in-lieu where there are objectionable liens outstanding the attorney or title company will have a deed prepared, if not already provided by the mortgagors, and recorded after execution. At the same time, the Satisfaction or Release should be prepared for the field office's execution and recorded immediately following the deed-in-lieu.

5) Title Evidence.

a. Once the deed has been recorded, the attorney or title company, must provide title evidence to the date of recording that certifies good marketable title vested in the name of the Secretary of Housing and Urban Development, c/o (appropriate Field Office having jurisdiction) his successors and assigns. (If evidence is provided pursuant to the title binder program, it should insure the Secretary of Housing and Urban Development, c/o (appropriate Field Office having jurisdiction) his successors and assigns, or the Secretary's purchaser.) The type of title evidence can be no less than that customarily used in the area where the property is located.

b. The attorney or title company, should return the recorded deed, along with the new title evidence and bill for services and costs, to the field office. The recorded satisfaction or release should be given to the former mortgagor(s). The title docket and final title evidence should be submitted to Field Counsel for approval prior to being forwarded to the Property Disposition Branch.



[Prev Hit][Nex

5-9. BANKRUPTCY AND FORECLOSURE

A. Bankruptcy Petition. A Petition filed under the Bankruptcy Act operates as a "stay" which prohibits any activity to collect a claim against the debtor or to obtain possession of his property.

When the field office receives a Notice of Bankruptcy, there may be no further contact initiated by HUD with the mortgagor

concerning the existing delinquency. All collection efforts under the mortgage or forbearance agreement shall cease and neither the Notice of Intent to Foreclose nor the Occupancy Notice may be sent to the mortgagor. Follow the instructions outlined in Chapter 6.

B. Bankruptcies Occurring After a Case has been Referred to Foreclosure. OGC should be informed, immediately of the bankruptcy. Thereafter, all actions will be the responsibility of the foreclosure agent.

C. Bankruptcies Occurring Before the Sending of the NOI.

1) If, after the Payment Plan is commenced, all payments under or outside the plan are not received as scheduled for a 90-day period the field office should refer the case to OGC for foreclosure, but shall not send the mortgagor collection letters or a NOI. The field office may inform the mortgagor's attorney or the trustee of its intent.

2) If the mortgagor makes payments both inside and outside of the plan for a 90-day period, OGC will reassign the case to the field office for servicing pursuant to the terms of the Plan, and that payments, both inside and outside the Plan, should be sent to HUD pursuant to its instructions.

At this point, the field office would assume responsibility for monitoring of the account as outlined in Chapter 6.

D. Foreclosures After Bankruptcy.

If the bankruptcy case has been dismissed, or the mortgagor discharged by the Bankruptcy Court, a Notice of Intent to Foreclose may be sent to the mortgagor and the case treated like non-bankruptcy cases. A copy of the dismissal or discharge order must be attached to the request for foreclosure and forwarded to OFA along with your recommendation. The system codes must be updated, as appropriate, by inserting Condition Codes 21, 38, and Status Code 41. Delete Status Code 46.





RESERVED





RESERVED