# In The United States Court of Federal Claims

No. 01-669 C

(Filed: August 16, 2006)

**This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.**

_________

| | |
|---|---|
| BENJAMIN & SHAKI ALLI AND BSA CORPORATION, | * |
| Plaintiffs, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

_________

**OPINION**

_________

**ALLEGRA, Judge:**

Pending before the court in this government contract case are, effectively, cross-motions for partial summary judgment.

## I. BACKGROUND

Benjamin Alli and Shaki Alli are married and reside in Michigan. They own BSA Corporation (BSA), a Michigan corporation doing business in Michigan. Where appropriate, the court will collectively refer to the Allis and BSA as "plaintiffs."

This action involves three housing properties in the Detroit, Michigan area. The first, the Pingree/Gladstone property (Pingree), was acquired by the Allis in 1983 through an auction conducted by the U.S. Department of Housing and Urban Development (HUD) with financing provided by a HUD mortgage. In like fashion and with similar financing, Mr. Alli (doing business as BSA) also acquired the Riverside property (Riverside) in 1989. Finally, in that same year, BSA (with Mr. Alli as signatory) acquired the Collingwood/ Kirkwood property (Collingwood) with financing through a HUD mortgage loan. Each of these properties participated, at one point or another, in the HUD Section 8 housing program, which provides

subsidies for low-income tenants' rent through direct payments to landlords of qualified properties or housing vouchers to low-income tenants. *See* 42 U.S.C. § 1437f; *Cuyahoga County Metropolitan Housing Auth. v. United States*, 57 Fed. Cl. 751, 753 (2003) (describing the program). Under so-called Housing Assistance Payment (HAP) contracts, the landlords of Section 8 properties are required to maintain and operate them to provide decent, safe, and sanitary housing. Failure to do so can be considered an event of default and result in the suspension of payments if deficiencies are not corrected.

On August 22, 1983, HUD and the Allis entered into a HAP contract for Pingree, which contract was renewed on August 25, 1998, August 25, 1999, and February 25, 2000. Because HUD also held the mortgage on that building, on August 24, 1982, HUD and the Allis also entered into a regulatory agreement with respect to that project. Both the HAP and regulatory agreements provided, *inter alia*, that the Allis could not, without the prior written approval of HUD, convey, transfer or encumber any of the mortgaged property. On June 8, 1989, HUD and BSA entered into a HAP contract with respect to Riverside. Finally, on March 24, 1998, HUD and BSA entered into a HAP contract for Collingwood (effective January 16, 1998), which contract was renewed several times, the last renewal expiring on March 15, 2000. Again because HUD held a mortgage on this property, on July 6, 1990, HUD and BSA entered into a regulatory agreement, which contained the same approval provision discussed above. In 1992, HUD issued a handbook that provided information concerning how an owner's request to transfer property should be submitted and would be considered by the agency.

Beginning in the mid-1990s, HUD became concerned that plaintiffs were not maintaining their housing projects in the conditions required by the applicable HAP and regulatory contracts. The projects repeatedly failed HUD inspections, leading HUD eventually to suspend its monthly subsidy payments. Eventually, Mr. Alli sold Riverside and plaintiffs paid off the HUD-held mortgage for Pingree.

On or around July 14, 1999, BSA entered into an agreement to sell Collingwood to Cory Fanning. Although, as previously mentioned, the regulatory and HAP contracts for those apartments explicitly required BSA to obtain written approval from HUD of any transfer, the purchase agreement was not conditioned upon HUD's approval. Plaintiffs did not comply with the instructions in the 1992 handbook – indeed, neither they, Mr. Fanning nor his proposed lender, GMAC Commercial Mortgage Corporation, ever submitted a formal request to HUD to approve the sale of the apartments. The only document that HUD received was a copy of the already executed purchase agreement between plaintiffs and Mr. Fanning. In October of 1999, Mr. Alli's real estate broker, Gary Hopkins, informed him that the purchase agreement was null and void because HUD had refused to approve the sale.

On November 29, 2001, plaintiffs filed their complaint in this court, naming, as defendants, the United States and Secretary Mel Martinez of the Department of Housing and Urban Development. Plaintiff filed an amended complaint on May 22, 2002, and a second amended complaint on August 15, 2002, which asserts six counts. Count VI of the second

amended complaint seeks damages of $675,000 for HUD's disapproval of the proposed sale of Collingwood property to Mr. Fanning.

Defendant filed an answer and counterclaim on October 2, 2002. It asserts three counterclaims for breach of contract for Riverside, Collingwood and Pingree, respectively. The first counterclaim seeks damages for the Allis' breach of the HAP contracts in their alleged failure to maintain the property in good repair and condition so as to provide decent, safe, and sanitary housing. As a result of the alleged breach of the HAP contract for Riverside, defendant seeks the cost to HUD of relocating families from Riverside to safe housing, in the amount of $79,675.00. For the alleged breach of the HAP contract for Collingwood, defendant seeks damages for the cost of moving families from Collingwood to safe housing ($90,646.40), the cost of foreclosure of Collingwood ($18,128.80), and the cost to HUD of providing basic services, security, and repairs to Collingwood while acting as Mortgagee in Possession ($1,112,173.45), for a total amount of $1,220,948.65. Finally, defendant counterclaims that it is entitled to $110,096.45 for the cost of moving families from Pingree to safe housing as a result of the alleged breach of the Pingree HAP contract.

Following discovery, plaintiff and defendant each moved for partial summary judgment on August 15, 2005. Oral argument on the motion was conducted on November 2, 2005, following which various supplemental briefs were filed.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold*, 369 U.S.

654, 655 (1962)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

Plaintiffs have moved for partial summary judgment on three issues: (i) whether, as alleged in Count VI of the second amended complaint, HUD breached its contract with BSA by refusing to approve the sale of Collingwood to Mr. Fanning; (ii) whether Shaki Alli is liable to defendant under its counterclaims relating to Riverside and Collingwood and whether Benjamin Alli is liable under the counterclaim relating to Collingwood; and (iii) whether the HAP contracts provide defendant with the ability to recover the relocation expenses that it seeks in its counterclaims. In its cross-motion for partial summary judgment, defendant has responded by asserting, *inter alia*, that: (i) it is entitled to judgment under Count VI because the absence of any approval of the sale of Collingwood did not effectuate a breach of any of the relevant contracts; and (ii) Mr. Alli should be liable on contracts between HUD and BSA because he essentially was the alter ego of the corporation. The court will consider these issues *seriatim*.

### A. Breach of the HAP and Regulatory Contracts Regarding Collingwood

Plaintiffs claim that HUD breached its HAP and Regulatory contracts with respect to Collingwood when it did not approve the proposed sale to Mr. Fanning. In support of this assertion, plaintiffs filed an affidavit from Mr. Alli in which he asserts that Walter Gegneczak, a representative of Mr. Fanning's proposed lender, GMAC Commercial Mortgage Corporation, informed him that an application seeking approval of the purchase had been submitted to HUD. There is, however, no documentary evidence that such an application was received. According to Mr. Alli, Mr. Gegneczak then received verbal notice from Robert Brown, the Director for Multi-Family Housing for HUD's Detroit office, that the application was denied. In his affidavit, Mr. Alli asserts that he contacted Mr. Brown and was told that HUD would not consent to the sale to Fanning because HUD would not allow him, in Mr. Brown's asserted words, to "make more money from the U.S. government." While Mr. Alli contends that these assertions are corroborated by his real estate broker, Gary Hopkins, a review of the transcript of the latter's deposition does not support that claim. Defendant has filed affidavits and other evidence that controvert plaintiffs' explanation of the course of events.

At the outset, it is important to place plaintiffs' assertion in its proper contractual context. The approval requirement is defined in paragraph 19(a) of the Collingwood HAP contract, which provides –

> The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD.

Likewise, paragraph 8(a) of the regulatory contract simply provides that plaintiffs "shall not without the prior written approval of [HUD] . . . convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property." In 1992, HUD issued guidelines as part of its project servicing handbook for the Section 8 housing program that prescribe how requests for approval are to submitted and processed. *See* HUD Handbook No. 4350.1 REV-1, HUD Multifamily Asset Management and Project Servicing Manual, Chap. 13 (hereinafter "HUD Manual"). Those provisions indicate which HUD officials have the authority to approve transfer under certain circumstances. *Id*. at Section 1 (Delegations of Authority and Exceptions). They also provide that the request for approval must be in writing and accompanied by a variety of specified documents, *id*. at Appendix A, Part III; Appendices B-C; and that HUD will review only applications that are complete. *Id*. at Appendix A, Part III. A. Without expressly stating so, the HUD Manual suggests that an approval or denial of a transfer request should be in writing because it provides form letters that are to be used for that purpose. *Id.* at Appendix A-7 through A-11.

Neither plaintiffs nor any individual or entity associated with the potential transfer to Mr. Fanning ever submitted an application to the relevant HUD field office that conformed with the HUD Manual provisions. Defendant argues that this fact alone precludes plaintiffs from arguing that HUD's failure to approve the proposed transaction was a breach. However, defendant has provided no evidence that the provisions of the HUD Manual were binding upon plaintiffs for this purpose. Although it asserted otherwise at oral argument, nothing in the relevant contracts appears to make those provisions directly applicable.[1] Notably, older cases generally have not treated HUD Manuals as the equivalent of regulations. *See, e.g., Armstead v. United States Dep't of Housing and Urban Dev.*, 815 F.2d 278, 282 (3d Cir. 1987); *Brown v. Lynn*, 385 F. Supp. 986, 998 (N.D. Ill. 1974); *Fairington Apartments of Lafayette v. United States*, 7 Cl. Ct. 647, 651 (1985); *cf. Beverly v. Macy*, 702 F.2d 931 (11th Cir. 1983) (HUD handbook binding where expressly incorporated into contract). These cases have often focused on whether a given handbook was published or promulgated under the standards set out in the Administrative Procedure Act. *See Armstead*, 815 F.2d at 282. More recently, in *Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1155 (1996), indicated that, even if not promulgated under the APA, an agency handbook could be treated as a regulation with the force and effect of law if: (i) the agency was "vested with the authority to create such a regulation;"

---

[1] The preamble to the Regulatory Agreement for Collingwood indicates that the owner of the property is entering into the agreement "in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto." However, there is no indication whether the HUD Manual represents part of the "Regulations" for this purpose. *See Reynolds Assocs. v. United States*, 31 Fed. Cl. 335, 339 (1994) (rejecting the notion that the Manual was, by similar language, incorporated into HAP and regulatory contracts). And, even if so, it is far from clear that this glancing reference has the effect of incorporating any regulation issued by HUD into the agreement. *See generally*, *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 732 (2004) (rejecting an incorporation argument based upon more compelling language).

(ii) the agency "conformed to all procedural requirements, if any, in promulgating the regulation;" (iii) the agency "intended the provision to establish a binding rule;" and (iv) "the provision does not contravene a statute." *See also Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 276-77 (1969). Defendant has not sought to qualify the handbook as a regulation under this standard and, indeed, in earlier cases has successfully argued to the contrary. *See United States v. Coleman*, 200 F. Supp. 2d 561, 569 (E.D.N.C. 2002); *Reynolds*, 31 Fed. Cl. at 339.

Without some indication that the HUD Manual provisions are binding on plaintiffs, the court hesitates to rely upon their failure to submit an application, in the form prescribed by the Manual, as a basis for dismissing Count VI. Likewise, the court is ill-positioned to determine whether, based upon the Manual or otherwise, Mr. Brown was authorized to reject an informal request made by plaintiffs that did not meet the submission requirements of the handbook, let alone to do so orally without employing the various letters specified by the handbook. The latter point is important, of course, because for a breach of a government contract to arise, a government agent must have been authorized to make the representation or take the action that caused the breach. *See Nematollahi v. United States*, 38 Fed. Cl. 224, 231-32 (1997); *see also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). Moreover, the court does not believe, as defendant contends, that HUD was under no obligation to approve a transfer request under the HAP and regulatory contracts, no matter the circumstances.[2] As such, in the court's view, plaintiffs have raised fact questions regarding whether Mr. Brown was authorized to reject the application and whether his supposed rejection constituted a breach. Indeed, more fundamental factual questions exist as to the nature and content of the communications that occurred between HUD officials, on the one hand, and plaintiffs and their representatives, on the other, the resolution of which may be dispositive. Accordingly, the court believes that summary judgment on this issue is inappropriate.

**B. Piercing the Corporate Veil**

Defendant agrees that its counterclaim for breach of the Riverside HAP contracts should be dismissed as against Shaki Alli because of lack of privity. Plaintiffs claim that the Allis also should not be liable on the counterclaim relating to the Collingwood property because the

---

[2] The case law generally suggests that where a contract contains an approval provision, the person exercising that approval must act reasonably. *See Contra Costa County Flood Control & Water Conserv. Dist. v. United States*, 512 F.2d 1094, 1097-98 (Ct. Cl. 1975) ("The usual standard is that concurrence or approval is not left to unbridled discretion but can be withheld only if objectively reasonable in the particular circumstances, particularly when the item contracted for is not one which can be evaluated only on the basis of personal taste or fancy."); see also Restatement (Second) of Contracts § 228 (1979). Even where a contract explicitly requires personal satisfaction (which is manifestly not the case here), a failure to approve must be done in good faith. *See Coppinger v. Republic Nat. Gas Co.*, 171 F.2d 4, 6 (10th Cir. 1948); 13 Williston on Contracts, § 38:22 (4th ed. 2006).

relevant contracts were between HUD and BSA. Defendant responds by contending that there are genuine issues of material fact as to whether BSA's corporate veil should be pierced, so as to make the Allis liable for the corporation's breaches.

BSA was incorporated under the laws of Michigan which apply in deciding whether the corporate veil should be pierced. *See In re Cambridge Biotech Corp.,* 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999) ("When a court considers disregarding a corporate entity, *i.e.*, 'piercing the corporate veil,' the court applies the law of the state of incorporation."). Under Michigan law, when a corporation is used to subvert justice, it may be ignored. *Foodland Distributors v. Al-Naimi*, 559 N.W. 2d 379, 380-81 (Mich. Ct. App. 1996). "The entire spectrum of relevant facts forms the background for such an inquiry," a Michigan court has stated, and "the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused." *Klager v. Robert Meyer Co.*, 329 N.W. 2d 721, 725 (Mich. 1982); *see also Solomon v. W. Hills Develop*, 312 N.W. 2d 428, 431 (Mich. App. 1981) ("Each case involving disregard of the corporate entity rests on its own special facts."). While "[t]here is no single rule delineating when the corporate entity may be disregarded," *Foodland Distributors*, 559 N.W. 2d at 381, Michigan courts often have employed the following three-part test:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the [party seeking to pierce the veil].

*Id*. (quoting *SCD Chem. Distribs. v. Medley*, 512 N.W. 2d 86 (Mich. Ct. App. 1994). Complicating matters further, the prongs of this tripartite inquiry are informed by several factors. For example, in determining whether a corporation is a mere instrumentality, court have examined: undercapitalization of the corporation, commingling of funds, diversion of corporate assets for personal use, lack of corporate formalities, and domination and control over the corporation by another person or entity. *Herman v. Mobile Homes*, 26 N.W. 2d 757, 763 (Mich. 1947); *Papo v. Aglo Rest. of San Jose, Inc*., 386 N.W. 2d 177, 185 (Mich. Ct. App. 1986).

In the court's view, factual issues abound as to this piercing issue, precluding the grant of summary judgment. Contrary to plaintiffs' claim, defendant need not prove fraud in order to pierce BSA's corporate veil, but merely that the corporation was used to perpetrate a wrong. Thus, in *Papo*, which, like the instant case, involved the breach of a contract, a Michigan court of appeals held that the trial court had properly pierced the corporate veil of the corporation that had entered into a lease, stating –

> Defendants argue that plaintiff, in order to pierce the corporate veil, had to show fraud, deceit and misrepresentation. The [Michigan] Supreme Court, on more than one occasion, has acknowledged that the corporate veil can be pierced in the absence of fraud, . . . .

*Papo*, 386 N.W.2d at 185 n.15 (citations omitted); *see also Herman*, 26 N.W. 2d at 763 (upholding a lower court's ruling piercing the veil "notwithstanding the lack of actual fraud"); *Soloman*, 312 N.W. 2d at 432 (injustice must "relate to a misuse of the corporate form short of fraud or illegality"). Hence, the resolution of the issue whether BSA's corporate veil should be pierced here awaits further factual development.

### C. The Relocation Expenses

Lastly, plaintiffs contend that defendant may not recover relocation expenses under the HAP and regulatory contracts if the court determines that plaintiffs breached those contracts. While defendant argues that consideration of this issue is premature, in the court's view, this issue, having been fully briefed, is ripe for decision.

In the case *sub judice*, whether the relocation expenses are recoverable is, at least initially, a matter of contract interpretation. Several interpretational guides mark this decisional path. First, as an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)). Toward that end, contract interpretation "begins with the plain meaning of the agreement." *Id.*; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 458-59 (2001); *Cuyahoga*, 57 Fed. Cl. at 759.

It is clear that the relevant agreements potentially provide for the recovery of the relocation expenses and most certainly do not preclude that recovery. Thus, section 2.231(b)(3) of the Riverside and Pingree HAP contracts, as well as section 20(b)(3) of the Collingwood HAP contract, all provide that, in the event of a breach, HUD may –

> [a]pply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with this Contract, or for other relief as may be appropriate. These remedies are appropriate since the injury to [HUD] arising from default under any of the terms of this Contract could be irreparable and [the] amount of damage could be difficult to ascertain.

The same language is found in the Collingwood and Pingree regulatory agreements. In addition, each of the HAP contracts further provides, in a clause entitled "Remedies Not Exclusive," that "[f]ailure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time."

Plaintiffs contend that these provisions limit defendant to injunctive relief. However, nothing in the language of these provisions remotely purports to make the remedies listed therein exclusive. In fact, that would appear to be exactly the opposite of what was intended, as evidenced in the clause that preserves for HUD the ability to "exercise . . . any right or remedy at any time." Indeed, even the provision that discusses injunctive relief speaks in terms of creating a remedy in addition to monetary damages, as suggested by its reference to the fact that the remedies are being added because the "amount of damages ***could*** be difficult to ascertain." (Emphasis added). Certainly, this language does not suggest that compensatory damages are not recoverable at all. *See Fireman's Fund Indem. Co. v. United States*, 63 F. Supp. 750, 752-53 (Ct. Cl. 1945) (presence of liquidated damages clause did not limit the recovery of actual compensatory damages). And to the extent that it is even reasonably arguable that these clauses constitute limits on the recovery of damages, plaintiffs run into not one, but two potential interpretational obstacles: (i) that constructions of clauses as limiting damages generally are disfavored, *see, e.g., Comptrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1070 (8th Cir. 2000); and (ii) that even clauses that admittedly limit damages are construed against the party invoking their protection, *see, e.g., Nahra v. Honeywell, Inc.*, 892 F.Supp. 962, 969 (N.D. Ohio 1995); *see also Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 809 (N.D. Ill. 1996). Accordingly, no reasonable basis exists upon which to construe the relevant contracts as somehow exculpating plaintiffs from paying damages of the sort that defendant claims.

## III. CONCLUSION

The court need go no further. Based on the foregoing, it **GRANTS**, **in part**, and **DENIES**, **in part**, plaintiffs' motion for partial summary judgment and **GRANTS, in part,** and **DENIES**, **in part**, defendant's cross motion. The Clerk shall dismiss the first counterclaim (breach of contract for Riverside) in defendant's answer and counterclaim, which was filed on October 7, 2002, insofar as it relates to Shaki Alli. On or before September 15, 2006, the parties shall file a joint status reporting indicating how this case should proceed, with an appropriate proposed schedule. The parties are encouraged to pursue settlement. Prior to filing the aforementioned joint status report, the parties shall have at least one conversation regarding the prospects for settlement of this action and shall, in their joint status report, report on the results of those discussions.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge