UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and
BSA CORPORATION, a Michigan Corporation,

Plaintiffs,

Case No. 01-669C
Judge Francis Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.
_______________________________________/

STEMPIEN & STEMPIEN, PLLC
By: Gregory J. Stempien
Eric Stempien
Attorney for Plaintiff
315 N. Center Street, Suite 200
Northville, MI 48167
(248) 735-9200

U.S. DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
By: Marla Conneely
Attorney for Defendant
1100 L Street N.W., Room 11054
Washington, DC 20005
(202) 307-0318
_______________________________________/

# PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Plaintiffs, BENJAMIN ALLI, SHAKI ALLI and BSA CORPORATION, by and through their attorneys, STEMPIEN & STEMPIEN, PLLC, pursuant to Appendix A, Paragraph 14 of the Rules of the United States Court of Federal Claims ("RCFC"), hereby submit their Memorandum of Contentions of Fact and Law, stating as follows:

## I. STATEMENT OF FACTS

The individual plaintiffs, Dr. Benjamin Alli ("Dr. Alli") and his wife, Shaki Alli, are the owner of BSA Corporation ("BSA") (sometimes referred to as "plaintiffs"). In the 1980's, the Allis and BSA invested their money in three large residential apartment complexes in the City of Detroit, Michigan. All three properties participated in the U.S. Housing and Urban Development's ("HUD" or "the government") Section 8 housing program; a program in which the government provides housing subsidy payments to individuals qualifying for the program on the basis of their income and need. The following is a brief timeline of the major events for these three properties.

**A. Pingree Property**

On June 24, 1983, Benjamin Alli and Shaki Alli, the individual plaintiffs in this matter, purchased what has been commonly referred to as the Pingree Apartments from HUD as a part of a HUD property disposition sale.[1] Concurrent with the purchase of the property, Benjamin and Shaki Alli and HUD entered into a Housing Assistance Payment ("HAP") contract for Section 8 payments for the Pingree property. The Pingree HAP contract obligated HUD to provide rental assistance for the qualified tenants of the Pingree property as long as the property was maintained in a "decent, safe and sanitary" condition. A separate Regulatory Agreement was signed by the parties and incorporated into the HAP contract. Both the HAP contract and the Regulatory Agreement prohibited the Allis, as owners, from selling or encumbering the property without first receiving written approval from HUD. When this initial HAP contract expired, the Allis and HUD entered into several short-term extensions of the contract on August 25, 1998, August 15, 1999, and February 25, 2000. Prior to the expiration of the last extension to the contract, HUD, in a correspondence dated April 28, 2000, unilaterally suspended its Section 8

1 The Pingree property consists of two buildings: (1) 2211 Pingree and (2) 2987 Gladstone

payments for tenants residing in the Pingree Apartments, based on its belief that plaintiffs had failed to maintain the property in a "decent, safe and sanitary" condition. Thereafter, HUD relocated the Pingree tenants, providing them with Section 8 vouchers for alternative housing. After the relocation process was finished, HUD terminated the Pingree HAP contract.

B. **Collingwood Property**

On June 9, 1989 BSA Corporation purchased what has commonly been referred to as the Collingwood property[2] from a private party, L&R Realty Limited Partnership. As part of the purchase, BSA assumed the prior owners' obligations under the Collingwood HAP contract and Regulatory Agreement between L&R Realty Limited Partnership and HUD. The material provisions contained in Collingwood HAP contract and associated Regulatory Agreement mirror those contained in the Pingree agreements, cited above. Additionally, HUD held a purchase money mortgage for the Collingwood property.

After nearly a decade of actively owning and managing the Collingwood apartments, Dr. Alli began communicating with Gary Hopkins, a real estate broker for the firm of Marcus & Millichap in Detroit, Michigan. Mr. Hopkins indicated that he represented a client, Cory Fanning, who had an interest in purchasing the Collingwood apartments. After Hopkins and Fanning had an opportunity to thoroughly inspect the property on several different occasions, Fanning agreed to purchase the property from BSA, conditioned upon HUD approval. A real estate purchase agreement dated July 15, 1999 was signed by Mr. Fanning and Dr. Alli, as an agent for BSA, for the purchase price of $675,000.00. Subsequent to this agreement, Fanning received financing from the commercial mortgage division at GMAC. His representative at GMAC, Walter Gegneczak, familiar with HUD Section 8 contracts, was authorized to

2 The Collingwood property consists of two buildings: (1) 1610 Collingwood, Detroit, Michigan and (2) 1635 Calvert, Detroit, Michigan

communicate with HUD in order to receive the necessary approval for the sale of the Collingwood apartments. GMAC's responsibilities were set forth in a correspondence to Cory Fanning dated September 23, 1999. In October 1999, Gary Hopkins informed Dr. Alli that the July 1999 Purchase Agreement was void because of HUD's failure to approve the sale of Collingwood to Fanning. Despite having knowledge of the purchase agreement and the Allis' desire to transfer title to the Collingwood property, HUD never communicated with any of the parties involved in the transfer.

When the initial Collingwood HAP contract expired, BSA and HUD entered into an agreement to extend the contract through March 15, 2000. Prior to this date, however, HUD officials made the determination that BSA had abandoned the property. This determination was based on HUD's claim that when HUD officials visited the Collingwood property on January 25, 2000, the furnace was not running and the building had been without heat for several days. The Government has been unable to corroborate this allegation with either physical evidence or testimony from tenants that resided at Collingwood apartments during this time.

Nonetheless, in a correspondence dated January 28, 2000, HUD declared itself an "involuntary mortgagee-in-possession," and immediately foreclosed on the Collingwood mortgage. Thereafter, HUD terminated the Collingwood HAP contract and relocated the Collingwood tenants, providing them with Section 8 vouchers.

**C. Riverside property**

Approximately at the same time that BSA Corporation purchased the Collingwood property, Benjamin Alli, doing business under the assumed name BSA and Associates, purchased what has commonly been referred to as the Riverside property from HUD.[3] On June

---

3 The Riverside property consists of four buildings: (1) 1730 Magnolia, Detroit, Michigan, (2) 1800 Magnolia, Detroit, Michigan, (3) 1830 Magnolia, Detroit, Michigan and (4) 1831 Hazel, Detroit Michigan

8, 1989, BSA and Associates and HUD entered into a HAP contract for the Riverside property. The material provisions contained in Riverside HAP contract mirrored those contained in the Pingree and Collingwood agreements described above. The June 8, 1989 Riverside HAP contract expired on June 7, 2004. Prior to the contract's expiration, HUD unilaterally elected to suspend its Section 8 subsidy payments pursuant to the Riverside HAP contract based on its contention that BSA and Associates had failed to maintain the Riverside apartments in a "decent, safe and sanitary" condition. Thereafter, on June 29, 1999, HUD terminated the Riverside HAP contract. The testimony of Roland Samaroo, a contracted repairman at the Riverside property, will establish that a substantial number of the violations contained in the HUD report leading to the termination of the HAP contract were materially false.

**D. Plaintiffs' Responses to the Government's Claims**

The government's position has consistently remained that it was justified in unilaterally terminating the Pingree, Collingwood and Riverside HAP contracts based on its determination that the properties had not been maintained in a "decent, safe, and sanitary" condition, as required by the parties' contracts. Plaintiffs assert that the clear weight of the evidence indicates that the HUD inspection reports drafted periodically throughout plaintiffs' ownership of the properties do not accurately reflect the true condition of the properties. These inspection reports served as the basis for HUD's decision to suspend Section 8 payments to the plaintiffs and to subsequently terminate all three HAP contracts. The testimony of two independent housing experts, David Compo and Gordon Hileman, will establish that the majority of the violations that were listed in HUD's inspection reports of the Pingree property were either severely exaggerated or utterly nonsensical. BSA's repairman, Roland Samaroo, who was intimately familiar with all three of plaintiffs' properties, will testify that he had an opportunity to review all HUD

inspection reports in his efforts to correct the alleged violations. On many occasions he was unable to do so because the problems listed on the inspection report simply did not exist. Additionally, two tenants, Linda Hamilton and Dorothy Riggins, who resided at the Pingree apartments when it was owned by the Allis, will testify that they felt safe and comfortable at all times living at Pingree. In fact, Ms. Hamilton still resides at Pingree.

Plaintiffs will present evidence that HUD's claim that the Collingwood and Riverside properties did not meet the decent, safe and sanitary standard is also erroneous. Roland Samaroo, the Allis' contractor, will testify at trial that the violations cited by HUD in its reports did not coincide with the true condition of these properties. Emmanuel Uzoigwe will establish that he was a tenant at Collingwood during the time when it was owned by BSA and that he had no complaints about the condition of the buildings. Additionally, Gary Hopkins, who is familiar with the Detroit mulit-family housing market, will testify at trial that he had several opportunities to inspect the Collingwood property in his representation of Cory Fanning and that according to his assessment of the condition of the property, he placed the buildings in the top one third of similar multi-family housing in the Detroit area.

The parties are also in disagreement with regard to the factual basis underlying HUD's decision to foreclose on the Collingwood mortgage. The government contends that BSA had abandoned the property based on allegations that the heat in the Collingwood apartment buildings had not functioned in several days when it investigated the property on January 25, 2000. The only support for the government's position is the testimony of HUD officials. At trial, plaintiffs will present two witnesses who have specific recollection that the heat was functioning at the Collingwood apartments on January 25, 2000 and the days preceding. Roland Samaroo will testify at trial that he kept some of his belongings in the Collingwood apartments

and that he used the shower on the morning of January 25, 2000. Emmanuel Uzoigwe will testify that he was present in his Collingwood apartment on the morning of January 25, 2000 and recalls the heat being on at all times. It is plaintiffs' position that the government terminated the mortgage on the Collingwood property without a proper justification for doing so.

The last area of factual contention is HUD's failure to approve the proposed sale of the Collingwood property to Cory Fanning. The government's position, as explained in its Motion for Partial Summary Judgment, is twofold. First, it argues that it was under no contractual or statutory obligation to approve the sale of the property.[4] And second, in the alternative, it argues that even if it were obligated to approve the sale of Collingwood, it was justified in denying approval because the parties failed to submit a TPA application, as required by the HUD handbook.[5] Plaintiffs contend that a proper TPA application was never submitted because such an act would have been futile given HUD's stated position of its intent to summarily reject the sale. Plaintiffs do not dispute the fact that both the HAP and Regulatory Agreements required HUD's written approval before transferring title of the properties. Rather, plaintiffs' position is that the government has an obligation to give reasonable consideration to requests for approval once it becomes aware of a proposed sale of a Section 8 property. There is no evidence that the government satisfied this obligation after it learned of the Collingwood purchase agreement.

Throughout the lengthy course of this litigation, the government has attempted to raise facts that have no relevance on either its defense against plaintiffs' five counts of breach of contract or in their support of their counterclaims against plaintiffs' for breach of contract. In Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment, the Government alleges several instances of impropriety by plaintiffs that have no probative value to the issue of

4 Def. Mot. for Partial Summ. J. at 10
5 Def. Mot. for Partial Summ. J. at 13.

whether the properties were maintained in a "decent, safe, and sanitary" condition. Specifically, the Government emphasizes in its brief that the Allis issued a Deed of Trust for the Collingwood apartments to Shaki Alli's mother. Quite clearly, this has no bearing on whether these apartments were in a "decent, safe, and sanitary" condition. Additionally, the Government makes reference to the fact that Shaki Alli was paid for the services she performed as a manager at Collingwood. The only possible purpose this allegation could serve is to unfairly prejudice the Court by portraying the plaintiffs in a negative light. These allegations have no probative value and should not be afforded any weight.

## II. UNRESOLVED ISSUES OF LAW AND FACT

### A. Issues of Fact

1. Whether the HUD Inspection Summary Reports that served as the basis for HUD's termination of the three HAP Contracts are credible in light of fact that the majority of the violations cited in the Reports were later determined to be unfounded and nonexistent by independent inspectors.
2. Whether there is sufficient evidence to establish that plaintiffs failed to maintain the properties in a "decent, safe, and sanitary" condition.
3. Whether Detroit HUD officials gave due consideration to plaintiffs' proposed sale of the Collingwood apartments to Cory Fanning after they received notice of the purchase agreement.

4. Whether the government was justified in foreclosing on the Collingwood mortgage when the evidence indicates that BSA had not abandoned the property.

**B. Issues of Law**

1. Whether the provision in HUD's Mortgage Servicing Handbook that requires HUD officials to "encourage sale by the mortgagor, as an alternative to foreclosure" was violated when HUD officials failed to approve the proposed sale of the Collingwood Property to Cory Fanning because of plaintiffs' failure to submit a formal application for approval.
2. Whether the corporate veil of BSA Corporation should be pierced to hold plaintiffs Benjamin and Shaki Alli liable for the Government's claim of breach of the Collingwood HAP Contract, to which they were not parties.

## III. LEGAL ANALYSIS

### A. Termination of the HAP Contracts

The duty of good faith and fair dealing is implied in every government contract. *Centex Corp. v. United States,* 49 Fed. Cl. 691, 708 (2001). All government officials are presumed to act in good faith in the discharge of their duties. *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986). To satisfy the burden of proof, a plaintiff must present proof that the government acted in bad faith. *Torncello v. United States,* 231 Ct. Cl. 20, 47, 681 F.2d 756, 771 (1982). Plaintiff must demonstrate "facts constituting malice or, in other words, a specific intent to injure the plaintiff on the part of a government official." *Morris v. U.S.,* 33 Fed. Cl. 733, 752 (1995) (citing *Torncello,* 681 F.2d at 771; *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976)). However, the implied obligation "must attach to a specific substantive obligation, mutually assented to by the parties." *Allstates Air Cargo, Inc. v. United States,* 42

Fed. Cl. 118, 124 (1998) (quoting *Alaska v. United States*, 35 Fed. Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997)).

Here, the government had a specific obligation to the plaintiffs to make Section 8 payments as long as the properties were maintained in a "decent, safe, and sanitary" condition. Section 1.3 of all the relevant HAP contracts states that "[t]he execution of this Contract is an assurance by HUD to the Owner that: (a) The faith of the United States is solemnly pledged to the payment of the housing assistance payments pursuant to this Contract…" That faith was breached when the Government unilaterally terminated each one of the HAP contracts in question without sufficient justification. HUD breached its HAP contracts with the plaintiffs by terminating the Section 8 payments despite the fact that the properties in question met the decent, safe and sanitary standard. In this brief, plaintiffs have refrained from a line-by-line discussion of the HUD inspection reports, but at the trial, plaintiffs, through the testimony of the independent inspectors and the Allis' contractor, will provide a detailed analysis of the alleged violations.

**1. Pingree Property**

In Count IV of the Second Amended Complaint, plaintiffs allege that HUD breached the HAP contract for the Pingree property by suspending and terminating the Section 8 housing payments. The good faith of the government's determination that the Pingree property was not maintained in a decent, safe, and sanitary is placed into serious question by the reports of two housing inspection experts who separately inspected the buildings. Both reports draw the same conclusion: that the HUD inspection reports provides a severely misleading picture of the condition of the Pingree property. David Compo, a home inspector for Americomp, inspected the Pingree property on June 7, 2000. He will testify that when he was inspecting the buildings,

he was checking the accuracy of the HUD inspection report that had been drafted six months earlier. His testimony will show that HUD's report cited several violations that were simply false.

Gordon Hileman, a licensed public adjuster for State Wide Claim Service, inspected the Pingree property in June 2000. He will testify, based on his extensive experience in the housing industry, that HUD's report that served as the basis for its termination of the Pingree HAP contract, was prepared by an inexperienced housing inspector, who was unfamiliar with the intricacies of the trade.

Roland Samaroo will also provide detailed testimony regarding the condition of the Pingree property compared to what was reported in the HUD inspection in November 1999. He will testify that he went through each item on the HUD report and concluded that the majority of the violations were either exaggerated or simply false. Additionally, several tenants who resided at Pingree during this time will state that they were completely satisfied with the condition of the building and the safety that it provided. Taking these accounts as a whole, it becomes increasingly less likely that the Pingree HAP contract was terminated in good faith.

**2. Collingwood property**

Count V of the Second Amended Complaint alleges a breach of the HAP contract for the Collingwood property. HUD terminated BSA's HAP contract after it foreclosed on the mortgage it held. In the same way HUD relied on misinformation to foreclose on BSA's mortgage on the Collingwood, it took advantage of its position of power and drafted error-ridden reports about the buildings' condition. Roland Samaroo was intimately familiar with the Collingwood property and will testify that HUD's inspection reports did not accurately reflect the condition of the property. He will establish that many of the violations cited in these reports were either

exaggerated or completely false. The testimony of one of Collingwood's tenants, Emmanuel Uzeigwe, will also erode the credibility of the HUD reports and its decision to terminate the Collingwood HAP contract.

**3. Riverside Property**

Count II of the Second Amended Complaint alleges a breach of contract regarding the HAP contract for the Riverside property. HUD terminated the Riverside HAP contract on July 29, 1999, after it determined that it had not been maintained in a decent, safe, and sanitary condition. Like its other decisions regarding plaintiffs' properties, HUD's termination of the Riverside HAP was based not on the objective inspection criteria set forth in the Code of Federal Regulations, 24. C.F.R. § 5.703, but instead on its desire to defraud Dr. Alli out of his contractual rights.

Roland Samaroo will testify that he went through the HUD inspection reports line by line and concluded that a large number of the violations that were cited did not exist and could not be verified just days after the reports were made.

The fact that HUD is unable to produce any independent physical evidence of the true condition of the Riverside property when it chose to terminate the HAP contract, puts serious doubt into the legitimacy and good faith nature of its decision to terminate the Riverside HAP contract.

**B. HUD's Failure to Approve the Sale of Collingwood**

Count VI of the Second Amended Complaint alleges that HUD breached the HAP contract for the Collingwood property by unreasonably refusing to approve the proposed sale of the Collingwood property to Cory Fanning. Since this Court has already determined that Dr. Alli was not required to submit a formal TPA (Transfer of Physical Assets) Application pursuant to

Chapter 13 of the HUD Manual in order to receive HUD approval for the proposed sale of Collingwood to Cory Fanning, the only issue remaining is whether HUD gave due consideration to the proposed sale after it became aware of the signed purchase agreement.[6]

When a contract contains an approval provision such as the one contained in the HAP and Regulatory contracts, the individual vested with granting approval must act reasonably. *Contra Costa County Flood Control & Water Conserv. Dist. v. United States*, 512 F.2d 1094, 1097-98 (Ct. Cl. 1975) ("[t]he usual standard is that concurrence or approval is not left to unbridled discretion but can be withheld only if objectively reasonable in the particular circumstances"). See also Restatement (Second) of Contracts s 228 (1979) (failure to approve must be done in good faith). The circumstances surrounding the proposed sale of Collingwood to Cory Fanning suggest that HUD did not act reasonably in denying the transfer request and thus violated the sale-upon-approval provision of the Regulatory Agreement.

HUD came into possession of the July 15, 1999 Collingwood purchase agreement several months after it was entered into, although there is uncertainty regarding when HUD first received notice of BSA's intent to transfer the property. However, it refused to take any action in response to this notice. Instead, it relied on its own handbook that stated that an owner of Section 8 housing was required to submit a formal TPA application in order to receive consideration. This Court recently determined that HUD had yet to provide evidence to support its contention that the HUD Handbook is binding on plaintiffs. (*See Court's August 16, 2006 Opinion, Document 78, p. 5*).

HUD did not attempt to initiate the approval process for Mr. Fanning. The testimony of Gary Hopkins will prove that it was made clear to Fanning's representatives in the transaction

6 Significant questions remain as to when HUD became aware of the proposed sale as well as the communication between GMAC and HUD regarding approval.

that the sale would not have been approved regardless of compliance with the HUD procedures. During the approval process, Robert Brown, the Director of Multi-Family Housing for the Detroit HUD office, told Dr. Alli that HUD would not approve any request by the plaintiffs to sell the property because they would not allow the Allis to make any more money from HUD. In that sense, submission of a TPA application would have been an exercise in futility.

The evidence further shows that following HUD's denial of the Collingwood sale, it listed the property at a price far below the market price. Gary Hopkins and Cory Fanning will testify that following HUD's rejection of the transfer, it sold the Collingwood property for approximately $80,000.00. HUD's willingness to sell the property for less than 1/8 of its value for the purpose of denying the Allis any proceeds from the sale strongly suggests an ulterior motive.

**C. HUD's Foreclosure of the Collingwood Mortgage**

Count III of the Second Amended Complaint alleges that HUD breached the mortgage contract on the Collingwood property by illegally foreclosing on the mortgage. On January 27, 2000, HUD foreclosed on BSA's mortgage for the Collingwood property. This decision was made in direct response to allegations that the Collingwood apartments had been without heat on January 25, 2000 and the days immediately preceding. This allegation is without merit. Both Roland Samaroo and Emmanuel Uzeigwe were present at the Collingwood apartments on this morning and both will testify that the heat was functioning properly. This suggests that HUD's allegations about the heat being turned off were nothing more than pretext for its underlying reason for foreclosure.

During the foreclosure process, HUD was bound by its Mortgage Servicing Handbook. Paragraph 5-1 of that Handbook states that HUD is required to "encourage sale, by the

mortgagor, as an alternative to foreclosure." The regulations provide further directives, requiring that "encouragement of a sale…should be by active (if possible face-to-face) and direct methods rather than passively subsuming it in the text of a letter without explanation or elaboration."

In January 2000, HUD was aware of the purchase agreement between Fanning and Alli for the Collingwood property. So even if it was, in fact, justified in denying approval based on the lack of TPA application when it originally received notice of the propose transfer, the same argument does not apply once HUD elected to foreclose on the mortgage. Its policy required HUD officials to actively pursue the possibility of sale as an alternative to the harshness of foreclosure. Here, HUD officials actively *discouraged* Dr. Alli's attempt to sell the property in lieu of foreclosure. This is a clear violation of the sale-upon-approval provision of the parties' agreement, the mortgage contract and the guidance contained in HUD's handbook.

**D. Piercing the Corporate Veil**

The government argues that it should be allowed to hold Dr. Alli and Mrs. Alli personally liable for the alleged debts of BSA Corporation through the legal doctrine of piercing the corporate veil. The parties and this Court are in agreement that a party attempting to pierce the corporate veil need not establish actual fraud. However, the party challenging the validity of the corporate form must assert more than a mere breach of contract by the corporate entity. *Klager v. Robert Meyer Co.*, 415 Mich. 402; 329 N.W.2d 721 (1982). Furthermore, "a court will refuse to pierce the corporate veil where corporate action is not fraudulent or otherwise illegal." *Id*. at 728.

According to this Court, in order to pierce BSA's corporate veil, the Government must show that: (1) BSA was a mere instrumentality of the Allis, (2) BSA was used by the Allis to commit a fraud or wrong, and (3) the Government suffered an unjust loss or injury. August 16, 2006 Order, p. 7; citing *Foodland Distributors v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct.

App. 1996). The Government has the burden of proving all three of these elements in order to proceed in its counterclaims against Dr. and Mrs. Alli, as individuals, with regard to the alleged breach of the Collingwood property.

Although this Court refused to grant plaintiffs' motion to dismiss defendant's counterclaim against the Allis for breach of the Collingwood HAP contract, there is little evidence to support defendant's claim that BSA's corporate veil should be pierced in these circumstances. In fact, even if the Government is able to show that it suffered an injury as a result of BSA's breach of the Collingwood HAP contract, it will not be able to establish that the Allis were hiding behind BSA's corporate structure as a way of defrauding the Government. Here, the Government made Section 8 subsidy payments directly to BSA in exchange for decent, safe and sanitary housing for qualifying tenants. The Government has yet to produce any evidence that would begin to show that the Allis were abusing the corporate structure for their own financial benefit. It is not enough merely for the government to show that BSA breached the Collingwood HAP contract. See *Foodland*. In this instance, it seems as though the Collingwood property was targeted for no other reason than the fact that it was owned by BSA Corporation, while the other properties were owned by the Allis as individuals. This clearly is not enough to even raise the suspicion of wrongdoing.

## IV. BIFURCATION

This Court has already approved the parties' request to bifurcate the issues of liability and damages. Accordingly, plaintiffs have refrained from discussing the issue of damages in this memorandum.

STEMPIEN & STEMPIEN, PLLC

s/ Eric Stempien______________
By: Eric Stempien
Attorney for Plaintiffs
315 N. Center Street
Suite 200
Northville, Michigan 48167
(248)735-9200
stempieneric@yahoo.com

Dated: February 9, 2007