UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BENJAMIN & SHAKI ALLI AND<br>BSA CORPORATION | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-669C<br>(Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to paragraph 14(b) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the claims of plaintiffs, Benjamin and Shaki Alli and BSA Corporation (collectively, "plaintiffs" or "Alli").

QUESTIONS PRESENTED

1. Whether Alli breached the Housing Assistance Payment ("HAP") contracts for the Collingwood, Riverside and Pingree apartments[1] when they failed to maintain those apartments in decent, safe and sanitary condition.

2. Whether Alli breached the regulatory agreements for the Collingwood and Pingree apartments when they (a) failed to maintain those apartments in decent, safe and sanitary condition; (b) encumbered the Collingwood apartments without the approval of the United States

[1] Each apartment building consisted of several related buildings. One set of apartment buildings is commonly referred to as the Collingwood apartments and is located at 1610 Collingwood and 1635 Calvert in Detroit, Michigan. Compl. 2. Another set of apartment buildings is commonly referred to as the Riverside apartments and is located at 1730 Magnolia, 1800 Magnolia and 1830 Magnolia in Detroit, Michigan. Id. The third set of apartment buildings is commonly referred to as the Pingree apartments and is located at 2211 Pingree and 2987 Gladstone in Detroit, Michigan. Id. In this brief, the apartment buildings will be referred to as Collingwood, Riverside, and Pingree, respectively.

Department of Housing and Urban Development ("HUD"); and (c) entered into an agreement to sell the Collingwood apartments without HUD's approval.

3. Whether HUD properly ceased making Section 8 payments in accordance with the terms of the HAP contracts for the Collingwood, Riverside and Pingree apartments after those apartments were found by HUD inspectors not to be in decent, safe and sanitary condition.

4. Whether HUD properly foreclosed upon its mortgage for the Collingwood apartments in accordance with the terms of the regulatory agreement after receiving reports of no heat in the buildings during dangerously freezing temperatures.

5. Whether an authorized government representative unreasonably denied Alli's informal request to sell the Collingwood apartments.

6. Whether BSA Corporation's corporate veil should be pierced to hold Benjamin and Shaki Alli individually liable for BSA Corporation's breach of the Collingwood HAP contract and regulatory agreement.

## INTRODUCTION

Plaintiffs allege breach of contract claims relating to three multi-family housing projects that plaintiffs owned and managed in Detroit, Michigan. Compl. 1-6. Specifically, plaintiffs allege that the United States breached the HAP contracts at issue when HUD suspended monthly subsidy payments after plaintiffs failed to keep those projects in a decent, safe, and sanitary condition. Id. Plaintiffs further claim that defendant breached the Collingwood regulatory agreement when it allegedly refused to approve the sale of Collingwood to a prospective buyer. Id.

Defendant has counterclaimed that plaintiffs, not HUD, breached the HAP and regulatory contracts by failing to maintain the projects in a decent, safe, and sanitary condition; by encumbering the Collingwood project without HUD's approval; and by entering into a purchase agreement to sell Collingwood without HUD's approval. As a result, HUD incurred significant expenses in relocating tenants and acting as the mortgagee-in-possession of the Collingwood apartments.

CONTENTIONS OF FACT DEFENDANT WILL PROVE AT TRIAL

I. Contentions Of Fact Regarding The Riverside Apartments

Alli acquired the Riverside apartments in 1989 through a HUD federal auction process. Compl. 2. On June 8, 1989, HUD and BSA & Associates[2] entered into a 15-year HAP contract for the Riverside apartments pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. Pursuant to the Riverside HAP contract, qualified low-income residents in the Riverside apartments paid a small percentage of their income in rent with HUD making up the market value difference in monthly subsidy payments to plaintiffs. DX 125 A provision in the Riverside HAP contract required plaintiffs to maintain the Riverside apartments in a decent, safe and sanitary condition. Id. Specifically, sections 2.5(a) and 2.5(b)(2) of the contract stated as follows:

> (a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). . . . If [HUD] determines that the Owner is not

[2] BSA & Associates transferred the Riverside apartments to BSA Corporation in 1996. Compl. 2.

meeting one or more of these obligations, [HUD] shall have the right to take action under section 2.21(b).

(b) Inspection.

(2) [HUD] shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times . . . as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition, including the provision of the agreed-upon utilities and other services. [HUD] shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

DX 125.

Section 2.21(b) set forth the rights of HUD in the event of the owner's default:

(1) Events of Default.

A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by [HUD] in connection with any annual or other inspection . . .

* * * * *

(2) [HUD] Determination of Default.

Upon a determination by [HUD] that a default has occurred, [HUD] shall notify the Owner . . . of

(i) The nature of the default;

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

> (iii) The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.
>
> If the Owner . . . fail[s] to respond or take action to the satisfaction of [HUD], [HUD] shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD.
>
> (3) Corrective Actions.
>
> * * * * *
>
> (iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to [HUD] arising from a default under the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

Id.

If the units were not maintained in a decent, safe, and sanitary condition, the HAP contract specifically provided HUD with the additional option of suspending its subsidies, in whole or in part, to Alli. Section 2.5(c) of the contract provided as follows:

> (c) Units Not Decent, Safe, and Sanitary. If [HUD] notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, [HUD] may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit.

Id. (Emphasis added).

In 1991, HUD inspectors discovered that the Riverside apartments were not meeting the decent, safe, and sanitary standards as required under the Riverside HAP contract. In a September 23, 1991 letter to Alli, HUD reported that units in Riverside failed inspection for several reasons, including, but not limited to, missing or inoperable smoke detectors, roach infestation in kitchens and bathrooms; broken cabinets, broken shower tiles and sinks, broken or missing window screens, broken windows, broken toilets, holes in the ceiling, broken doors, garbage and debris in staircases and hallways, shattered glass in various locations, 5 cats roaming the hallways, large piles of garbage and trash outside, a front door that does not close or lock, and six feet tall weeds along the side of the building. DX 230.

Several years later, the conditions of the buildings seemed to deteriorate further. On June 16, 1995, HUD inspector, David Salazar, conducted an inspection of the Riverside apartments and failed several units for serious deficiencies such as missing smoke detectors, missing window screens, torn carpeting, leaking faucets, rusty bathtubs and sinks, missing radiator covers, holes in walls and ceilings, roach infestation, broken or missing floor tiles, inoperable stove burners, missing oven handles, clogged toilets, flooding, and non-functional electrical outlets. DX 163.

On May 15-16, 1997, HUD employees, James Kalvin and David Salazar, conducted an inspection of the Riverside apartments and concluded that the property, as a whole, failed to be maintained in a decent, safe and sanitary condition. Specifically, the inspection revealed "serious and widespread safety and health violations" at the property. DX 244. Some of the deficiencies included the following: inoperable elevator, inoperable smoke detectors, missing stairway

handrail, peeling paint, damaged carpeting, improper wiring in basement, backed-up sewage spillage, a leaking sanitary line in the basement, broken fire doors, missing wall outlet covers, cracked floor tiles, deteriorated concrete trim near the top of the buildings, missing window screens, thin plastic installed in place of window glass, inoperable stoves, cracked and leaking toilets, missing radiator covers, inoperable stovetop burners, roach infestation, deteriorated countertops, exposed wires, and damaged walls and floors. Id. HUD provided Alli at least 30 days to correct the deficiencies, but Alli failed to do so.

On or around August 12, 1997, a follow-up inspection was conducted by HUD employees, Rob Nelson, Mark Spooner and David Salazar. The inspectors verified that most of the deficiencies noted during the May 15-16, 1997 inspection had not been corrected and that "those few that were completed were done in an unprofessional manner, which result[ed] in [a] quick failure and [a] break down of [the] inadequate job performed." DX 244. The inspectors further concluded that the "[l]iving conditions [were] deplorable and [the] complex as a whole is unfit for children [and] people to reside . . . [The] [p]roperty does not meet the minimum standards at providing safe, decent and sanitary housing." Id. Again, HUD provided Alli at least 30 days to correct the deficiencies, but Alli failed to do so.

On January 23, 1998, another follow-up inspection was conducted by HUD employees, James Bow and Silas Polk. Of 34 units inspected in the May 1997 inspection, 6 units passed inspection, 19 units failed due to health and safety violations, and 9 units failed due to no entry. DX 164. On March 16, 1998, HUD notified Alli that it was suspending payments for the failed units. DX 165. Another re-inspection occurred on December 9, 1998. Again, HUD inspectors found that Riverside failed to meet the standards set forth in the Riverside HAP contract. On

December 14, 1998, Alli certified to HUD, by facsimile, that repairs were completed at Riverside. As a result, HUD conducted a re-inspection on December 16, 1998. DX 152. During this re-inspection HUD found that many of the buildings deficiencies had not been corrected, and that all the units inspected still failed to meet required standards due to "roach infestation, inoperable stove burners, inoperative range hood fans . . . inoperable or missing smoke detectors, broken windows," and other deficiencies. Accordingly, pursuant to the plain terms of the Riverside HAP contract, HUD issued a notice to Alli on December 18, 1998, suspending all Section 8 payments for Riverside.

On December 23, 1998, in accordance with the plain language of the Riverside HAP contract, HUD notified Alli, in writing, that the Detroit Housing Commission would relocate the Section 8 tenants at Riverside to suitable housing. The basis for the action was HUD's determination that "the housing accommodations provided [to] the residents at Riverside Apartments do not meet HUD's housing quality standards and as such, it is no longer safe for the residents to remain at Riverside Apartments." DX 138. On June 29, 1999, HUD notified Alli, in writing, that it was terminating the Riverside HAP contract due to Alli's failure to maintain the property in decent, safe and sanitary condition. DX 153.[3]

II. Contentions of Fact Regarding The Pingree Apartments

On August 22, 1983, HUD and Benjamin and Shaki Alli entered into a 15-year HAP contract for the Pingree apartments. DX 134. The contract was renewed on August 25, 1998, August 25, 1999, and February 25, 2000. DX 126, 127, 128. Similar to the Riverside HAP contract, the Pingree HAP contract allowed qualified lower-income residents to pay only a small

---

[3] Eventually, Alli sold the Riverside Apartments.

percentage of their income in rent with HUD subsidizing the remainder. Id. The contract also contained the provision that plaintiffs keep the Pingree apartments in a decent, safe and sanitary condition or else HUD could cease subsidizing the apartments. Id. In short, sections 2.5(a), 2.5(b)(2), 2.5(c) and 2.21(b) of the Pingree HAP contract contained the same language as those provisions in the Riverside HAP contract quoted in the previous section. Id.

In addition to providing subsidy payments for qualified tenants at the Pingree apartments, HUD also held a low-interest mortgage upon the building. DX 135. Accordingly, on August 24, 1983, HUD and plaintiffs Benjamin and Shaki Alli entered into a Regulatory Agreement for Insured Multi-Family Housing Projects. DX 135. Section 9(b) of the regulatory agreement provided that a violation of the Pingree HAP contract may constitute a default of the regulatory agreement. In the event plaintiffs breached the regulatory agreement, section 14 of the regulatory agreement provided HUD with several options including:

> (a) (i) [D]eclaring the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;
>
> * * * * *
>
> (b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project; [and]
>
> (c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement . . . .

In late 1990, HUD inspectors encountered unacceptable living conditions at the Pingree apartments. During a September 24, 1990 inspection, HUD employee, Mark Spooner, found

inoperable stove burners, roach infestation inside refrigerators, pealing paint, leaks, filth, roach infestation in kitchens, and an elevator that did not operate in a safe manner. DX 18. On May 8, 1991, Mr. Spooner conducted another routine inspection of Pingree and noted several serious health and safety violations, including, without limitation, an inoperable elevator[4], inoperable range burners, roach infestation, and tripping hazards from worn carpeting.

A few years later, on April 14, 1993, an inspection by Mr. Spooner revealed missing smoke detectors, roach infestation, peeling paint, wall and ceiling deterioration due to water leaks, blocked fire escapes, and unsafe steel gates. DX 2. Later that year, on September 21, 1993, Mr. Spooner discovered that many of the same deficiencies noted in his previous inspection (i.e. roach infestation, missing smoke detectors, blocked fire escapes, peeling paint, and deteriorated walls and ceilings) still existed and were never corrected.

These deplorable conditions continued through September 16, 1994, when Mr. Spooner noted several serious deficiencies at Pingree, including torn carpeting, missing floor tiles, water damage to walls and ceiling, roach infestation, inoperable range burners, inoperable smoke detectors, missing and broken pressure valves on water heaters, loose and broken door moldings, and separated countertops. Mr. Spooner again failed several units during a February 1, 1996 inspection as a result of several health and safety violations. DX 7. The next year, on February 5, 1997, Mr. Spooner conducted an inspection of Pingree and failed several units for deficiencies such as inoperable stove burners, roach infestation, missing or inoperable smoke detectors,

[4] This is a significant health and safety violation for buildings like Pingree, where the majority of the tenants were elderly tenants.

deteriorating ceilings and walls due to water leaks, inoperable toilets, and missing floor tiles. DX 5.

On or around May 1, 1998, HUD employee, Silas Polk, received a copy of a letter to Alli from Gloria Norwood, a tenant at the Pingree apartments. In her letter, Ms. Norwood declared that she was moving out of the Pingree apartments due to "the deplorable living conditions of the apartment [she] rented from [Alli]." DX 195. In June 1998, HUD received an anonymous, hand-written letter from another resident of Pingree reporting the following:

> Dear Inspector,
>
> You will notice that most of my closet doors are broken and my bedroom ceiling has a terrible leak. When it rains[,] it pours in [here]. My bed use[d] to be right under that part of the ceiling[,] and I came home one day and my 3 year old daughter was going to go in the bed when we saw all the plaster in the bed and my bed got soak-in-wet. I couldn't sleep in it for a week. [T]here is also 2 leaks right over my toilet, (you'll probably notice the [hole] in the ceiling)[.]

DX 196. HUD also received several letters from Dorothy Roach, another Section 8 tenant, detailing the unacceptable living conditions at Pingree. DX 197, 198 and 199.

On June 2, 1998 and June 4, 1998, HUD conducted an inspection of the Pingree apartments. Of the 38 units inspected, 24 units failed the inspection. Among the health and safety items cited were inoperable and missing smoke detectors, a crumbling parapet, roach infestation, tripping hazards and generally poor conditions. Alli was notified in writing of HUD's findings on September 16, 1998.

On November 16, 1998, HUD received a telephone complaint from Ms. Barrett, a tenant at Pingree, complaining of inadequate heat in the building. According to Ms. Barrett, she had not

had sufficient heating in her apartment for over a year. DX 234. On November 18, 1999, HUD's Real Estate Assessment Center ("REAC") inspected the property and identified numerous physical defects, including 39 health and safety issues. Among the findings were failing smoke detectors, deteriorated grounds and parking areas, cracks and exposed rebar in the foundation, deteriorated masonry, missing handrails in stairwells, inoperable lighting in common areas and inoperable exit lights. Out of a possible 100 points, Pingree was awarded 18 points during its REAC inspection. DX 170.

On January 13, 1999, HUD classified Pingree as a troubled property. As a result, on or around February 26, 1999, Pingree was referred to HUD's department enforcement center for administrative review by HUD's Chicago satellite office. The purpose of the review was to determine whether enforcement action or other administrative action upon the property was necessary. To aid in its decision, HUD contracted with Pinnacle Realty Management Company ("Pinnacle") to conduct a third-party review of Pingree. DX 9. On June 8, 1999, Pinnacle submitted an initial report, with photographs, concluding that the Pingree apartments were not in a decent, safe and sanitary condition. Specifically, Pinnacle determined that "[the picture painted by prior inspections is accurate, [and] [t]he sites are not being maintained to minimal standards of Decent, Safe, and Sanitary Condition." DX 1.

On or around February 14, 2000, HUD received a notice from the City of Detroit's Building and Safety Engineering Department that the Pingree apartments were in violation of city code for failing to provide adequate heat to its tenants. DX 210. On March 2, 2000, HUD notified Alli that they were in default of the Pingree HAP contract for failure to maintain the

property in a decent, safe and sanitary condition. On April 28, 2000, HUD notified Alli that they remained in default of their HAP contract and suspended all Section 8 payments for Pingree.

On May 4, 2000, HUD issued to Alli a formal notice that it was in default of the regulatory agreement for the Pingree apartments. In the notice, HUD specifically cited Alli's failure to maintain the property in good repair and condition as required under paragraph 10 of the agreement. On May 10, 2000, Margarita Marionet, the Director of HUD's Chicago Satellite Departmental Enforcement Center, sent a memorandum to Robert Brown, the Director for HUD's Detroit Multifamily Hub, recommending that HUD foreclose upon the mortgage for the Pingree apartments. DX 236. On May 12, 2000, Mr. Brown sent a memorandum to Alvin Bragg, Director of HUD's Multifamily Property Disposition Center in Fort Worth, Texas, concurring in the recommendation for foreclosure. DX 232. However, before HUD completed the foreclosure process, Alli paid off the mortgage and is believed to still own and operate the Pingree property today. Eventually, due to Alli's failure to maintain Pingree in a decent, safe and sanitary condition, HUD was forced to relocate all of its Section 8 tenants to other suitable housing.

III. Contentions Of Fact Regarding The Collingwood Apartments

L&R Realty LP ("L&R Realty") entered into a 15-year HAP contract with HUD for the Collingwood apartments on or around May 12, 1981. DX 130. In June 1989, BSA Corporation ("BSA") acquired the Collingwood apartments from L& R Realty with the assistance of a low-interest, HUD-held mortgage. Compl. 3.

When the original 15-year HAP contract expired, HUD and BSA entered into a HAP contract on June 27, 1997, and, upon expiration, entered into another contract on September 30,

1997. DX 131, 132. Because HUD held the mortgage upon the property, HUD and BSA also entered into a regulatory agreement in June 1990. DX 133. The September 30, 1997 contract was renewed several times until March 24, 1998, when HUD and plaintiff BSA Corporation entered into a new 5-month HAP contract. DX 129. This contract was also renewed by the parties several times, with the last renewal expiring on March 15, 2000. DX 128.

All of the HAP contracts between HUD and BSA contained the same relevant provisions. The Collingwood HAP contract allowed low-income residents to pay a small percentage of their income in rent with HUD subsidizing the remainder. Section 6 of the contract provided that BSA keep the Collingwood apartments in decent, safe and sanitary condition or else HUD would cease subsidizing payments for the apartments. Specifically, section 6 of the Collingwood HAP contract contained the same language as section 2.5 of the Pingree and Riverside HAP contracts. Section 20 of the Collingwood HAP contract provided HUD the same remedies for default as section 2.21(b) of the Pingree and Riverside HAP contracts, with the additional remedy of recovering any overpayments.

Moreover, section 19(c) of the Collingwood HAP contract required as follows:

> The Owner agrees to notify HUD promptly of any proposed [sale, assignment, conveyance, or transfer of the property]. The Owner further agrees to request the prior written consent of HUD.

This requirement was reiterated in the Collingwood regulatory agreement. Section 8 of the agreement provided that BSA could not, without the prior written approval of HUD, convey, transfer or encumber any of the mortgaged property. DX 133. Similar to the regulatory agreement for Pingree, section 9(b) of the Collingwood agreement stated that a violation of the Collingwood HAP contract may be construed by HUD to constitute a default of the regulatory

agreement. In the event of a default, section 14 of the Collingwood HAP contract provided HUD several remedies, including, without limitation, the option to "[t]ake possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of the Agreement" and/or "to declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage."

Serious health and safety violations were discovered at Collingwood as early as May 1, 1991, when Mr. Spooner conducted a scheduled HUD inspection. During the inspection Mr. Spooner found such deficiencies as inoperable range burners, unsecured handrails on stairs, broken windows and a cracked and leaking main sewer drain pipe in the basement. The condition of the buildings only worsened a few years later. On June 29, 1995, HUD employee, David Salazar, inspected the Collingwood apartments. He failed several units for health and safety violations such as inoperable smoke detectors, presence of vermin, roach infestation, inoperable stove burners, missing floor tiles, missing window screens, damaged ceilings and floors, and water leaks. DX 91, 263.

On October 29, 1997, a HUD inspection failed 48 of 52 units inspected at Collingwood. Among other health and safety concerns noted were roach infestation, inoperable smoke detectors and exit lighting, and unclean conditions. BSA was notified of HUD's findings on December 15, 1997. DX 168. A follow-up inspection was conducted on April 28, 1998, where 19 of 21 inspected units failed reinspection. DX 82. Serious deficiencies were noted in the re-inspection reports, including roach infestation, holes in walls and doors, toilets loose from the wall, lack of hot water, inoperable range burners, missing window screens, mildew damage,

water leaks, missing knobs on stoves, rotten window sills, inoperable and overflowing toilets, missing or inoperable smoke detectors, lack of heat, an inoperable intercom, and sagging cabinets. As a result, HUD suspended all payments for the failed units.

On June 4, 1998, HUD notified BSA that it was in violation of the Collingwood HAP contract and regulatory agreement for several reasons, including failure to obtain HUD's approval on a deed of trust encumbering the property and failure to maintain the property in good repair and condition. On September 28, 1998, HUD referred Collingwood to the Departmental Enforcement Center for review. DX 108. As part of the review, HUD contracted with a third party, Pinnacle, to conduct a complete inspection and issue a report. On November 9, 1998, REAC inspected Collingwood and identified numerous physical deficiencies, including excessive leaks and water damage, exposed jagged glass, inoperable smoke detectors and exit lighting, deteriorated cement pads constituting severe tripping hazards, and deteriorated window sills with exposed rear. DX 160. Out of a possible 100 points, Collingwood received 16.31 points on its REAC inspection.

On January 7, 1999, HUD received a telephone complaint from Victoria Dobson, a tenant at Collingwood, stating that her refrigerator had not worked for several weeks, and that her complaints to the landlord were ignored. DX 150. On January 13, 1999, HUD classified the Collingwood apartments as a troubled property. DX 80. On March 16, 1999, a site visit was conducted by a HUD Enforcement Analyst and the project manager. The overall physical condition of the property as identified in the REAC inspection was confirmed by the site visit. DX 247. In a letter dated June 4, 1999, BSA was notified of the violations and given an opportunity to cure the deficiencies. Also on June 4, 1999, Pinnacle issued an initial report of its

investigation, with photographs, concluding that "[p]hysically, the property is not in decent, safe, and sanitary condition." DX 76.

On July 23, 1999, a HUD project manager visited Collingwood and determined that no significant changes had been made to the property. On September 30, 1999, HUD issued written notice to BSA that it had defaulted upon the Collingwood regulatory agreement for failure to maintain the apartments in a decent, safe, and sanitary condition. DX 48. That same day, HUD issued formal notice to BSA that it was suspending and abating its Section 8 payments for Collingwood. DX 51. Shortly thereafter, on October 5, 1999, HUD notified BSA that it was initiating foreclosure proceedings for Collingwood due to BSA's default. In the notice, HUD offered BSA an opportunity to submit reasons why foreclosure should not take place. DX 52. At Dr. Alli's request, a hearing regarding the foreclosure was held on October 25, 1999. DX 166. Because no legal reasons were presented by Dr. Alli or his attorney to prevent foreclosure, HUD proceeded with foreclosure proceedings.

On December 23, 1999, HUD employee, Silas Polk, made a site visit to the Collingwood apartments and found garbage piled in the hallways, cats roaming the common areas, broken windows, and wide open access to the roof. Moreover, several tenants complained to Mr. Polk that the building had minimum heat and hot water.[5] DX 261.

On January 4, 2000, HUD attorney, Mike Polsinelli, and HUD construction analyst, Jim Bow, visited Collingwood with Dr. Alli and his attorney at the time, Stephen Palms. During that visit, Mr. Bow and Mr. Polsinelli found leaking water in the basement, raw sewage in the boiler

[5] Utilities were the responsibility of BSA and were included in the rent payment. Therefore, any savings from lower utility bills directly benefitted BSA and Benjamin and Shaki Alli.

room, exposed wires and crumbling exterior walls. A few days later, on January 10, 2000, Mr. Palms sent Dr. Alli a letter stating that he could no longer represent him and that he "believe[d] HUD [would] restore the Section 8 payments once the property meets the standard required by HUD." Mr. Palms further stated that bringing the building up to standards was "necessary for [Alli] to complete a sale of the building." DX 98.[6]

A. Proposed Sale To Cory Fanning

By December 4, 1998, BSA had contracted with Marcus & Millichap to assist with the sale of Collingwood. DX 252. Eventually, Marcus & Millichap found a potential buyer for the dilapidated property, Cory Fanning. Mr. Fanning was a pastor of a church and had no experience in managing public housing. Indeed, Mr. Fanning had virtually no experience in managing any housing. On July 14, 1999, Marcus & Millichap, representing BSA, and Cory Fanning entered into a real estate purchase agreement, pursuant to which Mr. Fanning agreed to purchase the property for $675,000. DX 137. Mr. Fanning planned to purchase the building with

[6] The reason why buildings must be brought up to standards before HUD will approve a sale of the buildings is to prevent a slippery-slope type of deterioration among buildings suitable for Section 8 housing. For example, if HUD were to allow a building in deteriorating condition to be sold, owners could purchase Section 8 buildings with a low-interest HUD-held mortgage, spend no money on repairs or upkeep, pocket the monthly rent from HUD as pure profit and then sell the building in an even worse condition to the next owner before HUD forecloses upon the mortgage. With subsequent owners following the same pattern, eventually the buildings would fall into such a state of disrepair that HUD would have to foreclose upon the HUD-held mortgage and spend its own funds to bring the buildings up to code, most likely through demolition and rebuilding. Moreover, during this "hot-potato" passing of the property between owners, Section 8 tenants are left in a dilapidated building where each new owner blames the previous owner for the condition of the building and asks HUD for time to complete repairs, which are never made before the building is sold again. Therefore, the approval requirement prevents Section 8 housing owners from reaping extreme profits at the expense of HUD and public funds.

the help of members from his congregation. The real estate purchase agreement was not conditioned upon HUD's approval, and, in fact, made no reference to HUD whatsoever.

Under the Collingwood HAP contract and regulatory agreement, any sale of Collingwood had to first be approved by HUD. Pursuant to HUD manuals, a Transfer of Physical Assets application ("TPA") must be submitted as part of the approval process. Indeed, when Dr. Alli purchased Collingwood from L&R Realty, he submitted a proper TPA to HUD. DX 251.

On September 23, 1999, Cory Fanning contracted with GMAC Commercial Mortgage Corporation to assist him in preparing and submitting the necessary applications to HUD to obtain mortgage insurance. DX 136. On October 6, 1999, BSA and Mr. Fanning entered into an agreement to extend the purchase closing date to November 30, 1999. The purpose of the extension was to provide time to comply with HUD 223(f) requirements. In the agreement, Mr. Fanning agreed to submit the required documents "on a timely basis without delay." DX 191.

Although HUD received a copy of the already executed real estate purchase agreement for Collingwood, it never received a TPA application or any other written request to approve the sale. An authorized HUD employee did not deny the sale of Collingwood either orally or in writing. Despite this, the sale did not go through.

B. <u>January Heat Shut-Off And Foreclosure</u>

On January 25, 2000, upon receiving numerous complaints of a lack of heat, a site inspection was made by a HUD Construction Analyst and the project manager. They verified that there was no heat in the building or in any of the occupied units. The outside temperature at

the time was 7 to 10 degrees Fahrenheit, well below freezing. Upon gaining entry to the boiler room, it was apparent to the HUD employees that the heating system had been shut down for some time as there was no residual heat in the unit at all. To keep warm, residents were operating their stoves and other unsafe heating devices. There were no building or maintenance personnel on the premises to assist the tenants. That same day, HUD issued to BSA a formal declaration of involuntary mortgagee-in-possession of the Collingwood apartments due to the abandonment of the project by the owner. DX 155. Specifically, the declaration stated that BSA failed to provide decent, safe and sanitary housing, and that HUD was taking immediate possession of the buildings to protect the health and safety of the residents. Id.

HUD incurred substantial expenses to bring Collingwood to minimal living standards for the tenants while they awaited relocation. Eventually, HUD was forced to relocate all the tenants to suitable housing and held a foreclosure sale of the Collingwood buildings. HUD was the only bidder for the buildings at the foreclosure sale and purchased the property for well below the amount that remained on BSA's defaulted mortgage.

## IV. Contentions Of Fact Regarding Improper Expenditures By Benjamin And Shaki Alli

Benjamin and Shaki Alli are the sole owners of BSA Corporation, a Michigan company. While managing the Collingwood apartments for BSA, Benjamin and Shaki Alli misused funds in the Collingwood project account on several occasions. First, for three years, Collingwood leased a car from Dr. Alli with a monthly payment of $420. This was not an eligible or approved project expense. During a site visit, a HUD employee asked to see the leased vehicle, but Dr. Alli refused to show the vehicle and admitted that no lease documents

existed because he was leasing the vehicle from himself. DX 240, 247. On March 2, 1999, HUD asked that the project be reimbursed the total amount paid for the leased vehicle, $15,120. This money was never refunded to the project by any of the plaintiffs. DX 79.

Second, on June 30, 1992, Benjamin and Shaki Alli entered into a deed of trust, as individuals, encumbering the Collingwood property in exchange for two loans, $250,000 and $75,000, respectively. Dr. and Mrs. Alli removed funds from the Collingwood project account to make payments on these two loans. DX 141. These loans were never approved by HUD as required under the Collingwood regulatory agreement, and plaintiffs are unable to specify what happened to the money from the loans. DX 109.

Third, instead of hiring a professional management company, Dr. and Mrs. Alli chose to manage the properties themselves. In managing the Collingwood apartments, they paid themselves at least $7,948 in excess of authorized fees over the course of three years. Also, even though many tenants reported that they never saw Mrs. Alli at the project, the project paid Shaki Alli at least $78,000 in unauthorized distributions from 1993 to 1999. This was in addition to the management fees and salary Shaki Alli was being paid from the project accounts for Pingree and Riverside. Mrs. Alli was receiving at least $21,000 per year from the Pingree account. However, all of the buildings also had their own building manager, who was also being paid from project funds. Therefore, Mrs. Alli's responsibilities regarding the three projects did not warrant the nearly $100,000 a year income she received from the operating accounts.

Fourth, Dr. and Mrs. Alli removed money from the Collingwood project account to pay two of their children for allegedly processing HUD Section 8 payments. For this work, each child was paid an alarming $50 an hour. DX 240.

Fifth, Dr. and Mrs. Alli also removed $4,292 from the Collingwood project account to pay a loan to the Pingree account. The purpose for the loan is unknown to HUD, and the loan was not approved by HUD as required by the contracts at issue.

CONTENTIONS OF LAW DEFENDANT WILL PROVE AT TRIAL

I. Law Regarding The Contractual Obligation To Keep The Properties Decent, Safe And Sanitary

Contract interpretation begins with the plain language of the agreement. NVT Techs. Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983). In order to recover for breach of contract, one must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).

The HAP contracts and regulatory agreements at issue required that the projects be maintained in a decent, safe, and sanitary condition. The plain language of the contracts give HUD the discretion to determine whether this condition is met. The standard of decent, safe and sanitary has been defined in prior caselaw and in HUD regulations.

In C.J. Betters, Corp. v. United States, the Court recognized that "[h]ousing is considered to be 'Decent, Safe, and Sanitary' if the requirements of [24 C.F.R. §882.102] are met." 21 Cl.Ct. 378, 383 n.3 (Cl. Ct. 1990), *vacated on other grounds by* C.J. Betters, Corp. v. United States, 69 F.3d 553 (Fed. Cir. 1995). Section 882.102 of Title 24 of the Code of Federal

Regulations provides that housing is decent safe and sanitary if it meets the physical condition standards in 24 CFR part 5, subpart G. That provision requires the following to meet the decent, safe and sanitary standard:

> (a) Site. The site components, such as fencing and retaining walls, grounds, lighting, mailboxes/project signs, parking lots/driveways, play areas and equipment, refuse disposal, roads, storm drainage and walkways must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as abandoned vehicles, dangerous walks or steps, poor drainage, septic tank back-ups, sewer hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards.
>
> (b) Building Exterior. Each building on the site must be structurally sound, secure, habitable, and in good repair. Each building's doors, fire escapes, foundations, lighting, roofs, walls and windows, where applicable, must be free of health and safety hazards, operational, and in good repair.
>
> (c) Building System. Each building's domestic water, electrical system, elevators, emergency power, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable and in good repair.
>
> (d) Dwelling Units. (1) Each dwelling unit within a building must be structurally sound, habitable and in good repair. All areas and aspects of the dwelling unit . . . must be free of health and safety hazards, functionally adequate operable and in good repair.
> (2) Where applicable, the dwelling must have hot and cold running water . . . (3) If the dwelling unit includes its own sanitary facility, it must be in proper operating condition, usable in privacy and adequate for personal hygiene and the disposal of human waste. (4) The dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit.
>
> (e) Common areas. The common areas must be structurally sound, secure and functionally adequate for the purposes intended . . .
>
> (f) Health and Safety Concerns. All areas and components of the housing must be free of health and safety hazards. These areas

> include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits . . . infestation, and lead-based paint. For example, the buildings must have fire exits that are not blocked and have hand rails that are undamaged and have no other observable deficiencies. The housing must have no evidence of infestation by rats, mice, or other vermin, or garbage and debris. The housing must have no evidence of electrical hazards, natural hazards, or fire hazards. . . . .

At trial, it will be shown that defendant did not breach any duty pursuant to the HAP contracts or regulatory agreements at issue in this case. Upon determining that the projects were not decent, safe, and sanitary, HUD took action as it was permitted to do under the explicit terms of the contracts.

On the other hand, plaintiffs were obligated to maintain the properties in decent, safe and sanitary condition, failed to do so, and, as a result, HUD incurred significant expenses in its efforts to relocate the tenants and restore the buildings to proper living conditions.

II. Michigan Law Regarding Piercing the Corporate Veil

Generally, when a court considers disregarding a corporate entity, the law of the state of incorporation applies. In re Cambridge Biotech Corp., 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999). However, when the United States is the party seeking to pierce the corporate veil, a question arises regarding whether state or federal law should apply. In BLH, Inc. v. United States, this Court recognized that the Court infrequently examines the issue of alter egos and looked to other jurisdictions for guidance. 13 Cl. Ct. 265, 272 (1987). The Court adopted the legal standards used by the Court of Appeals for the Fifth Circuit in Berger v. Columbia Broadcasting System, Inc., 453 F.2d 991, 995 (5th Cir. 1972), and Miles v. American Tel. &Tel. Co., 703 F.2d 193, 195-96 (5th Cir. 1983). In those cases, the Fifth Circuit applied the law of the

state of incorporation. For example, in Berger, the Court applied New York law and in Miles, the Court applied Texas law. Several years later, this Court applied the standards it used in BLH to address the question of alter ego in Twin City Shipyard, Inc. v. United States, 21 Cl.Ct. 582, 590 (1990).

Specifically, in BLH, this Court held that three elements must be satisfied to pierce the corporate veil: complete control, fraud or injustice, and proximate causation. 13 Cl. Ct. 265, 272 (1987). These are essentially the same elements required by Michigan law. Therefore, to the extent that federal law and Michigan law are the same, we do not object to the use of Michigan law, as has already been done during summary judgment briefing in this case, in examining the question of whether BSA's corporate veil should be pierced.

BSA was incorporated under the laws of Michigan. Compl. at 2; In re Cambridge Biotech Corp., 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999). Typically, the law treats a corporation as a separate entity from its stockholders. Foodland Distributors. v. Al-Naimi, 559 N.W.2d 379, 380-81 (Mich. Ct. App. 1996). However, when the corporate form is used to subvert justice, it may be ignored by the courts. Id. There is no bright-line rule under Michigan state law delineating when the corporate entity may be disregarded. Id. Instead, the inquiry is fact intensive. The court must take the entire spectrum of relevant facts that form the background for the inquiry, and those facts are to be assessed in light of the corporation's economic justification to determine whether the corporate form has been abused. Id.

The following standard applies to determine whether a corporate veil should be pierced:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to

> commit a fraud or wrong. Third, there must have been an unjust loss or injury to the [party seeking to pierce the veil].

Id. (quoting SCD Chem. Distribs., Inc. v. Medley, 512 N.W.2d 86 (Mich. Ct. App. 1994)).

Several factors may be considered in determining whether a corporate entity is a mere instrumentality of another. These factors include: undercapitalization of the corporation, commingling of funds, diversion of corporate assets for personal use, lack of corporate formalities, and complete domination and control over the corporation by another person or entity. Herman v. Mobile Homes Corp., 26 N.W.2d 757, 763 (Mich. 1947); Foodland Distributors, 559 N.W.2d at 381-82; Papo v. Aglo Rest. of San Jose, Inc., 386 N.W.2d 177, 185 (Mich. Ct. App. 1986). Not all of these factors must be established to pierce a corporate veil. In Papo, the court found that diverting corporate funds for personal use was enough to show the corporation was simply a mere instrumentality of another entity or individual. 386 N.W.2d at 185. Also, in Foodland Distributors, the court found that the corporation was the mere instrumentality of the defendant where the defendant was the owner and operator of the corporation, defendant loaned money back and forth between the corporation and his other businesses, and the corporation assumed $400,000 of defendant's personal debt with no consideration. 559 N.W.2d at 381-82.

Contrary to plaintiffs' assertions, fraud need not be shown to pierce the corporate veil. See Herman v. Mobile Homes Corp., 26 N.W.2d 757, 763 (Mich. 1947) ("The trial court, notwithstanding the lack of actual fraud, properly found the parent company's domination and control so complete as to make the short-lived subsidiaries the mere instrumentalities and adjuncts . . . and correctly held [it] responsible for [the] contractual obligations to plaintiffs.");

Papo, 386 N.W.2d at 185 ("The [Michigan] Supreme Court, on more than one occasion, has acknowledged that the corporate veil can be pierced in the absence of fraud.").

In Papo, the court pierced the corporate veil where the corporation was found to be a mere instrumentality of the defendant, and defendant's actions, which resulted in this finding, breached the equipment lease at issue in the case. 386 N.W.2d at 185. Also, in Herman, the court pierced the corporate veil to hold the parent company liable for the subsidiaries' breach of their contracts with plaintiffs where the parent company so completely controlled and dominated the subsidiaries that each of them was a mere instrumentality of the parent company. 26 N.W.2d at 763.

The Michigan Court of Appeals has held that the wrong committed by the corporate entity must be causally liked to the injury of the party seeking to pierce the corporate veil. Soloman v. W. Hills Develop. Co., 312 N.W.2d 428, 432 (Mich. Ct. App. 1981). Although the Michigan Supreme Court pierced the corporate veil in Herman without identifying a causal link between the defendant's abuse of the corporate form and the plaintiffs' injury, the Michigan Court of Appeals held in Soloman, 312 N.W.2d at 432, that "[a]lthough it is clear that the corporate form may be disregarded to prevent injustice and to reach an equitable result, we believe that the injustice sought to be prevented must in some manner relate to a misuse of the corporate form short of fraud or illegality." Moreover, in Daymon v. Fuhrman, 705 N.W.2d 347 (Mich. Nov. 10, 2005), several judges of the Michigan Supreme Court dissented from the majority's opinion rejecting defendant's application for leave to appeal a lower court's decision to pierce the corporate veil. The dissenting judges recognized that "this [c]ourt has never adopted clear standards for determining when the corporate veil should be pierced," and believed that the court

should have granted leave to hear the appeal and consider whether the party seeking to pierce the veil failed to prove a causal link between any wrong or fraud committed and that party's injury. Id. at 348-49.

At trial, defendant will show that the corporate veil of BSA should be pierced because Benjamin and Shaki Alli (1) had sole control over BSA Corporation; (2) admitted to personal loans with BSA with no documentation or forms for repayment; (3) used the assets of BSA Corporation to secure personal loans for themselves; (4) used assets of BSA to make significant monthly payments to themselves for "leasing" their car to the corporation; and (5) used assets of BSA Corporation to make payments to themselves and their children.

Defendant will further show that Benjamin and Shaki Alli's diversion of BSA assets is causally linked to the injury suffered by the United States. Benjamin and Shaki Alli diverted assets from BSA to themselves and their children. This included assets from the operating account for the Collingwood apartments, which were to be used for maintaining the Collingwood apartments and required HUD's approval to be used. As a result, those assets were unavailable to make necessary repairs to the Collingwood apartments, and HUD incurred significant expenses for relocating tenants and foreclosing upon the Collingwood property.

III. Law Regarding Representations By Unauthorized Government Agents

It is well-established that the Government is not bound by the representations of its agents unless that agent had the actual authority to make such representations. Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Kiszka v. Office of Pers. Mgmt., 372 F.3d 1301, 1307 (Fed. Cir. 2004); Nematollahi v. United States, 38 Fed. Cl. 224, 231-32 (1997). Any party entering into an arrangement with the Government accepts the risk of correctly ascertaining the authority

of the agents who purport to act for the Government. Merrill, 332 U.S. at 384. This rule applies even where the agent himself is unaware of the limitations upon his authority. Id.

The burden rests upon the plaintiff to show that the Government's agent was authorized to make the representations or take the action that caused the breach. Nematollahi, 38 Fed. Cl. at 231-32. The scope of a Government agent's actual authority "may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power." Merrill, 332 U.S. at 384. Accordingly, an agent for the Government does not have the actual authority to make representations that are contrary to any statute or regulation. Id. at 383-86. In other words, "[the actual authority of a Government employee to enter into an oral contract may be limited by statute or regulation." Ruttenburg v. United States, 65 Fed. Cl. 43, 48 (2005).

In Raines v. United States, 12 Cl. Ct. 530, 538 (1987), this Court found that the Government official's representations of higher yield amounts were unauthorized because those amounts were not in accordance with governing regulations. Likewise, in Merrill, the Supreme Court found that plaintiff's damaged wheat crop was not covered by Federal insurance regardless of statements made by the agency because the regulations explicitly prohibited insuring the type of wheat damaged in plaintiff's crop. 332 U.S. at 383-86.

In Seaboard Lumber Co. v. United States, 45 Fed. Cl. 404, 409-10 (1999), this Court found that the Forest Supervisor's statements were unauthorized where the contract explicitly stated that actual authority lay with the Forest Service chief. Likewise, in Nematollahi, this Court found that HUD was not bound by the statements of a real estate broker regarding the quality of groundwater on a property purchased from HUD where the broker's statements were

contrary to disclaimers in the contract, and the contract did not give the broker the authority to orally change the terms of the contract. 38 Fed. Cl. at 231-32. In Detroit Hous. Corp. v. United States, 55 Fed. Cl. 410, 416 (2003), this Court found that the Government was not bound by representations made in writing by the Government's agent where the contract did not provide the agent with the authority to alter the express terms of the contract.

At trial, defendant will show that Robert Brown was not authorized to orally deny plaintiffs' request to sell the Collingwood property to Cory Fanning, and that even if he were authorized, his denial was not unreasonable.

OBJECTIONS TO PLAINTIFFS' WITNESS AND EXHIBIT LISTS

1. At this time, defendant has no objections to plaintiffs' witness list.

2. Defendant objects to plaintiffs' exhibits 73, 74, 75, 76 and 77. These exhibits are amateur audio recordings recorded by Dr. Alli, without the knowledge of the other parties on the tape. The recordings are so poorly recorded, it is difficult to understand what the parties are saying and even more difficult to identify the parties making the statements. There are hours of recorded conversations, and it would be insufficient to play only portions of the conversations as later or earlier parts of the conversations must be played to put each portion in its proper context. As such, the tapes are confusing, unfairly prejudicial to HUD and would be a complete waste of precious trial time. Moreover, there is no information on the tapes that is relevant to the issues in this case. Therefore, any probative value of the tapes is greatly outweighed by the danger of unfair prejudice. Accordingly, the tapes should be excluded under Rules 401 and 403 of the Federal Rules of Evidence, which prevent irrelevant, prejudicial and confusing evidence to be presented at trial.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/Marla T. Conneely
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Flr.
1100 L Street, NW
Washington, D.C. 20530
Tel. (202) 305-3689
Fax (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing &
Urban Development
77 West Jackson Blvd.
Suite 2629
Chicago, Illinois 60604

March 13, 2007