UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and
BSA CORPORATION, a Michigan Corporation

Plaintiffs,

Case No. 01-669C
Hon. Francis Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.
_______________________________________/

STEMPIEN & STEMPIEN, PLLC
By: Eric Stempien
Attorney for Plaintiff
315 N. Center Street, Suite 200
Northville, MI 48167
(248) 735-9200

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
By: Marla Conneely
Attorney for Defendant
1100 L Street N.W., Room 11054
Washington, DC 20005
(202) 307-0318
_______________________________________/

# *PLAINTIFFS' POST TRIAL BRIEF*

## INTRODUCTION

Plaintiffs Benjamin Alli, Shaki Alli and BSA Corporation filed a Second Amended Complaint in which they allege five substantive counts against the Defendant, the United States of America (hereinafter "USA"): Count II - Breach of Contract with regard to Riverside Property, Count III - Breach of Contract with regard to Mortgage for Collingwood/Kirkwood Property, Count IV - Breach of Contract with regard to Pingree Property, Count V - Breach of Contract with regard to Section 8 Contract for Collingwood/Kirkwood Property and Count VI - Breach of Contract with regard to Sale Upon Approval Clause for the Collingwood/Kirkwood Property. Defendant USA filed a counterclaim in which it alleges three counts of breach of contract by Alli, one each for the Pingree Property, Collingwood/Kirkwood Property and the Riverside Property.

## I. PLAINTIFF'S CLAIMS

### A, Breach of HAP contract for Pingree
### Count IV of Plaintiffs' Second Amended Complain

The properties referred to as the Pingree property are commonly known as 2211 Pingree, Detroit, Michigan and 2987 Gladstone, Detroit, Michigan. ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 3* On August 22, 1983, the Department of Housing and Urban Development (hereinafter "HUD") entered into a 15-year housing assistance payments contract ("HAP contract") with Benjamin and Shaki Alli. ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 25* In 1988, the ownership of the Pingree property was transferred from Benjamin and Shaki Alli to BSA Corporation. ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 26* Therefore, the only Plaintiff making a claim pursuant to Count VI of Plaintiff's Second Amended Complaint is BSA Corporation.

The HAP contract for Pingree provides that HUD will make housing assistance payments on behalf of eligible lower income families living at the Pingree apartments. ***Defendant's Exhibit 134****, p. 8 - Pingree HAP Contract, paragraph 2.2* The Pingree HAP Contract further provides that the owner, BSA Corporation, is required to maintain the Pingree property in decent, safe and sanitary condition. ***Defendant's Exhibit 134****, p. 12 - Pingree HAP Contract paragraph 2.5(a)*

The Pingree HAP Contract was renewed on August 25, 1998, August 25, 1999 and February 25, 2000. ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 27* On April 28, 2000, HUD suspended and abated all HAP payments for the Pingree property. The stated reason was that BSA Corporation had failed to maintain Pingree property in decent safe and sanitary condition. ***Defendant's Exhibit 66*** - *Notice of suspension and abatement for Pingree* Thereafter, HUD relocated most of the tenants from Pingree. ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 32* The sole basis for HUD's abatement of the Section 8 payments for Pingree was the alleged failure to maintain the property in decent safe and sanitary condition.

**1. Decent, safe and sanitary standards**

The Pingree HAP Contract provides a definition of decent safe and sanitary. Paragraph 1.1(f) provides that contract includes certain exhibits attached to it. Specifically, Exhibit 6 to the Pingree HAP Contract is the Code of Federal Regulations section regarding housing quality standards. 24 CFR 886.307 is made part of the Pingree HAP Contract by the contract's own terms. ***Defendant's Exhibit 134****, p. 2 and p. 10, Pingree HAP Contract, paragraph 1.1(f)* Section 886.307 provides the standards for the physical condition of properties receiving HUD housing assistance. Specifically, the section references 24 CFR part 5, subpart G for additional requirements. The controlling authority for decent, safe and sanitary housing is found at 24 CFR 5.703. *See*

***Defendant's Exhibit 259*** The definition is divided into six subsections: (a) site, (b) building exterior, (c) building systems, (d) dwelling units, (e) common areas and (f) health and safety concerns.

During the trial, Plaintiffs presented the following witnesses with regard to Count IV of the Second Amended Complaint: Gordon Hileman, David Compo, Mark Schlotter, Emmanuel Uzoigwe, Dorothy Riggins and Linda Hamilton. Defendant presented Dorothy Roach, Mark Spooner, James Bow and James Pollock. Both parties also introduced into evidence numerous documents related to the physical condition of the Pingree property.

**a. Site**

24 CFR 5.703(a) provides that:

> The site components, such as fencing and retaining walls, grounds, lighting, mailboxes/project signs, parking lots/driveways, play areas and equipment, refuse disposal, roads, storm drainage and walkways must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as abandoned vehicles, dangerous walks or steps, poor drainage, septic tank back-ups, sewer hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards.

Gordon Hileman (hereinafter "Hileman") testified that he inspected both buildings of the Pingree property in June 2000. ***Transcript at 78*** Hileman is a public insurance adjuster, with 31 years of experience inspecting multifamily apartment buildings. Hileman has inspected 250 to 500 large apartment buildings during his career. ***Transcript at 76*** Hileman also prepared a report with regard to his inspection. ***Plaintiffs' Exhibit 6*** He had two purposes for his inspection: (1) for a general housing inspection and (2) to check the accuracy of HUD's Real Estate Assessment Center inspection report, No. 52047 (found at page 12 of Hileman's report). ***Transcript at 78*** With regard to the site for the property located at 2211 Pingree, Hileman made the following findings:

1. Parking lot : He found that the parking lot was in excellent condition ***Plaintiffs' Exhibit 6****, p. 4* In fact during the trial, Hileman testified that "the parking lot as perfect. I couldn't find anything wrong with that parking lot." ***Transcript at 96*** Hileman attached photographs of the parking lot to his report to show its condition. ***Plaintiffs' Exhibit 6****, p. 28*

2. Mailboxes: He found that all occupied units had mailboxes that were intact and operational. ***Plaintiffs' Exhibit 6,*** *p. 4* He also included photographs of the mailboxes for the 2211 Pingree building. ***Plaintiffs' Exhibit 6****, p. 32*

3. Erosion: Hileman found no evidence of erosion. ***Plaintiffs' Exhibit 6,*** *p. 4* and ***Transcript at 93-94*** He attached photographs to show that there was no erosion on the site. ***Plaintiffs' Exhibit 6****, p. 29*

With regard to the Gladstone building, Hileman made similar findings with regard to the site:

1. Parking lot: At Gladstone, the adjoining property was City of Detroit property. ***Transcript at 106*** With regard to walkways, Hileman found them to be in acceptable condition. ***Plaintiffs' Exhibit 6****, p. 7*

2. Mailboxes: Again, Hileman found that all occupied units had an operational mailbox. ***Transcript at 106*** and ***Plaintiffs' Exhibit 6****, p. 7* Hileman attached photographs of the mailboxes. ***Plaintiffs' Exhibit 6****, p. 44-45*

3. Erosion: Hileman found no evidence of erosion. ***Plaintiffs' Exhibit 6****, p. 7*Again, he attached photographs to show that there was no erosion. ***Plaintiffs' Exhibit 6****, p. 40*

David Compo also inspected the buildings at 2211 Pingree and 2987 Gladstone in June 2000. ***Transcript at 130-131*** Compo is certified from the National Association of Certified Home Inspectors. He has conducted over 1,000 inspections in his career, including approximately fifty

multifamily units. He has been in the construction business his entire life. ***Transcript at 129-130*** He was also conducting a general inspection as well as checking the accuracy of HUD Report No. 52047. ***Transcript at 131*** With regard to the walkways and sidewalks he testified:

A From what I recall in the HUD report, it talked about driveways, potholes, walkways and so on. Except for the approach walk from the city walk to the buildings, there were no driveways or other walk that was a factor that we recalled. All the walks we saw were city walks or city streets.

Again, building in Detroit we know that the city is responsible from the inside of the driveway, which is towards the building, outward. They're responsible for maintaining, replacing, damage. You have to call in.

Once the drive is initially put in when you build the structure then you pay for it at that time as the original owner of the building, and then they're responsible from that point.

Q On any of the walkways that were within the property lines outside of the right-of-way that were within the property of these buildings did you find any trip hazards?

A No, I did not.

Q Any heaving of the concrete?

A No.

* * * *

Q The last line of that same bullet point that's talking about the exterior damage indicates that the extent of the report inaccuracy regarding these items is overwhelming. What did you mean by overwhelming?

A That things were reported on that don't exist and that are definitely not the responsibility of the building owner, so why would that even be in the report?

***Transcript at 141-142***

Compo also indicated in his report that any missing mailboxes were the result of a mailbox lock

being removed when a tenant leaves until the unit is reoccupied. ***Plaintiffs' Exhibit 5***, *p. 2* As indicated in his report and in his testimony, his findings completely contradicted the findings of HUD with regard to the building site.

**b. Building exterior**

24 CFR 5.703(b) provides:

> Each building on the site must be structurally sound, secure, habitable, and in good repair. Each building's doors, fire escapes, foundations, lighting, roofs, walls and windows, where applicable, must be free of health and safety hazards, operable, and in good repair.

With regard to the 2211 Pingree building, Hileman made the following findings regarding the exterior:

1. Foundation: Hileman found that the rear brick wall had only minor spalling and that the foundation was otherwise in good condition. ***Plaintiffs' Exhibit 6***, *p. 81* He found no evidence of foundation gaps, cracks, spalling or exposed rebar, as was reported by HUD in its November 1999 inspection report. ***Transcript at 81-82***

2. Doors, walls and windows: Hileman found that only minor tuck pointing was needed with regard to the exterior walls. He testified that this would be only an issue of "routine maintenance". ***Transcript at 82-83*** Hileman testified that all of the exterior doors were locked and that there were no damaged or missing locks.[1] ***Transcript at 83*** The doors were in working condition. ***Plaintiffs' Exhibit 6***, *p. 2* Hileman also found that the windows all had screens. ***Transcript at 84***

3. Roof: Hileman found that the roof at 2211 Pingree was in serviceable condition.

---

1 Please note that both Linda Hamilton, a Pingree resident, and Emmanuel Uziogwe, a former Pingree resident, testified that the locks were functional at Pingree, with the only example of the locks not working was one time

***Transcript at 82*** Hileman provided photographs of the roof with his report. ***Plaintiffs' Exhibit 6****, p. 36-37* This was in direct contrast to HUD Report No. 52047 which found missing ballast, damaged and torn membrane. ***Plaintiffs' Exhibit 6****, p. 15* Further, Hileman found that there was no damage to the soffits and fascia at this building. ***Plaintiffs' Exhibit 6,*** *p. 2* This again was in contrast to HUD's Report No. 52047.

With regard to the 2987 Gladstone building, Hileman found:

1. Foundation: Again, Hileman found that there was only minor spalling, a routine maintenance item. He did find evidence of previous repair work. He did not find the cracks, gaps and exposed rebar reported by HUD several months earlier. ***Plaintiffs' Exhibit 6,*** *p. 5*

2. Roof: The roof at Gladstone was one area where Hileman agreed with the HUD inspection with regard to the need for repair. He indicated that there was some damage to the roof cover in a couple of spots that needed repair. He did not believe that this was a health and safety issue, but it did need attention to avoid any future water encroachment into the building. ***Transcript at 97-98*** Further, he found damage to the soffits at Gladstone. He indicated that there was a separation where the soffit meets the building and it needed immediate repair to avoid the danger of falling debris. ***Transcript at 99-100***

3. Doors, walls and windows: The doors were secure at Gladstone.[2] ***Transcript at 98-99*** With regard to the exterior walls, he found a need for minor tuck pointing and one chimney in need of repair. ***Plaintiffs' Exhibit 6****, p. 5* This directly contradicts the dire picture painted by Report No. 52047 of the building's exterior.

---

when people could not open the door. *See* ***Transcript at 252 and 424***

2 Dorothy Riggins, a former tenant and manager at Gladstone, testified that during her tenancy there was never a time that the security system was not working.

Compo also addressed the exterior of the buildings in his report, indicating that there is the need for minor roof repair and minor paint. ***Plaintiffs' Exhibit 5**, p. 2*

**c. Building systems**

24 CFR 5.703(c) provides:

> Each building's domestic water, electrical system, elevators, emergency power, fire protection, HVAC and sanitary system must be free from health and safety hazards and functionally adequate, operable and in good repair.

Hileman found that the electrical systems were all operational and in good repair at both buildings. ***Plaintiffs' Exhibit 6**, p. 3 and p. 6, **Transcript at 86 and 100-101*** Compo found that the elevator in the Gladstone building required a minor adjustment because the cable had stretched. ***Transcript at 145*** There were no other reported problems with the building systems.

Benjamin Alli (hereinafter "Alli") testified that BSA Corporation contracted with Lardner Elevator Company for maintenance and repair of the elevator at the Pingree buildings. He indicated that Lardner performs monthly oil and grease treatments to the elevators, a yearly governor test as well as routine maintenance. He further testified that Mark Schlotter (hereinafter "Schlotter"), the handyman at Pingree, performs simple maintenance. ***Transcript at 476*** Lardner provided a monthly examination on the elevators at the Pingree and Gladstone buildings. ***Plaintiffs' Exhibits 30, 31 and 34** - Invoices for monthly examination for Pingree and Gladstone elevators* Under the "Description" column, each of these exhibits prove that the elevator examination was conducted "Once a Month". Further, Lardner provided the repair work on the elevator in each building. ***Plaintiffs' Exhibits 32 and 36** - Invoices for repair work on Gladstone elevator and Pingree elevator, respectively*

Alli testified that BSA Corporation contracted with Blue Ray for maintenance and repair of the boiler. Blue Ray provided preventive care for the HVAC system, inspections, preparation for

winter as well as repair work. ***Transcript at 476-477*** Plaintiffs have provided the invoices from Blue Ray Heating & Cooling which show the repair and maintenance work performed from 1998 through 2000 at the Pingree and Gladstone buildings. ***Plaintiffs' Exhibit 38*** Further, Plaintiffs have provided the Certificates of Acceptance from the City of Detroit for the boiler at the Pingree building. ***Plaintiffs' Exhibits 37 and 39***

Clearly, the building systems at the Pingree and Gladstone buildings satisfy the decent, safe and sanitary requirement of 24 CFR 5.703(c).

**d. Dwelling units**

24 CFR 5.703(d) provides:

> (1) Each dwelling unit within a building must be structurally sound, habitable and in good repair. All areas and aspects of the dwelling unit (for example, the unit's bathroom, call-for-aid (if applicable), ceiling, doors, electrical systems, floors, hot water heater, HVAC (where individual units are provided, kitchen, lighting, outlets/switches, patio/porch/balcony, smoke detectors, stairs, walls and windows) must be free of health and safety hazards, functionally adequate, operable and in good repair.
>
> (2) Where applicable, the dwelling unit must have hot and cold running water, including an adequate source of potable water (note for example that single room occupancy units need not contain water facilities).
>
> (3) If the dwelling unit includes its own sanitary facility, it must be in proper operating condition, usable in privacy, and adequate for personal hygiene and the disposal of human waste.
>
> (4) The dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit.

Hileman testified that he saw approximately 70 to 80 percent of the dwelling units at the Pingree and Gladstone buildings. ***Transcript at 124*** Hileman found that all of the apartments he inspected were habitable, with the only difference being the various states of cleanliness that the

tenants maintained. The only deficiencies he noted were some of the apartments needed paint and some of the carpets could have used a steam cleaning. ***Plaintiffs' Exhibit 6,*** *p. 4 and p.7* With regard to the Pingree building, he testified:

Q What was your general finding with regard to the apartments, the individual units?

A They were a little bit better than what's typical for the area. The median apartment was habitable and, like I said, it was a little bit better. I'm in a lot of inner city buildings, and it was better than what I normally see.

***Transcript at 90***

He also testified that he saw no evidence of roaches or mice. ***Transcript at 79*** With regard to the Gladstone building, he testified:

Q …Were your findings with regard to the specific units in Gladstone similar to those you found in Pingree?

A We tried to observe as many units as possible and pick out a median type unit to photograph. It seemed to be about the same condition as the other building.

Q Were there the same issues with regard to the individual unit cleanliness?

A Yes. There were some housekeeping issues in some of the units and not in others. I mean, not every unit was dirty. Some were cleaner than others.

***Transcript at 104-105***

With regard to the general condition of the units in both buildings, he testified:

Q With regard to both buildings, were there any individual units that you would find to be an issue with health and safety?

A No. In my opinion, the housekeeping didn't cross the line into like a health and safety issue as far as like spoiled food or garbage not taken out and so forth, although some units were cleaner than others.

Q How about with regard to health and safety issues for the structural issues in

each unit, floor and walls, ceilings?

A In that regard, no.

Q Bathrooms?

A No, there was none.

***Transcript at 105***

He testified that apartments with roach or mice infestations, rotting or missing drywall or a carpet that became a trip hazard would not be habitable. ***Transcript at 118*** He also provided photographs of a typical apartment in both Pingree and Gladstone. ***Plaintiffs' Exhibit 6****, pp. 33-34 and p.47-49*

Compo's inspection of the Gladstone and Pingree buildings involved a unit by unit comparison of the apartments inspected by HUD in Report No. 52047. He testified that he was performing his own inspection as well as checking the accuracy of the HUD report. ***Transcript at 162*** In his report, he found only minor routine maintenance items to be addressed in each of the units that he was able to access. ***Plaintiffs' Exhibit 5*** Clearly, the issues raised by Compo do not rise to the level of health and safety violations. His inspection reveals that the dwelling units are decent, safe and sanitary. He testified about the difference between what he was expecting and what he actually saw:

Q When you were reviewing the report, just based on the report did you have any initial impression before you even stepped foot into the buildings?

A Well, first of all getting the call initially knowing the area in Detroit, my father and I were trying to plan our time accordingly that we were going to spend out there.

Looking at it, there were several units in two different buildings. We earmarked the whole day because we weren't sure what to expect, except we figured we kind of expected the worst.

Thinking of the apartment buildings, Section 8, that there was going to be some discrepancies in what we might be looking at, but the fact that we might be getting into some bad areas so we kind of expected the worst to go in there and see things in a pretty sorry state.

Q And overall, based on what your initial thoughts were versus what you actually saw, what was your impression?

A We were actually quite surprised going in. The exteriors of the buildings for their age -- again, we do a lot of historic renovations. Even ourselves we've done some stuff in Detroit from some old churches to other projects. My parents have been building in Detroit for many, many years.

We were again quite surprised considering the units and the common areas that they were actually in pretty decent shape.

***Transcript at 133-134***

In addition to the professional inspectors, Plaintiffs presented the testimony of three tenants/former tenants of the Pingree buildings. Emmanuel Uziogwe (hereinafter "Uzoigwe") testified that after he was forced to leave the Collingwood building, he moved into the Pingree building despite the fact that he would not be receiving Section 8 assistance from HUD for Pingree. ***Transcript at 251*** He made this move after rejecting the housing shown to him by HUD. ***Transcript at 250-251*** He would have rather paid more rent to remain in one of the Plaintiffs' buildings than to live in the places shown to him by HUD. He indicated that he did not see any roaches or mice while at Pingree. He also testified that there was a regimen of extermination, both an outside company and the manager. This occurred a couple of times per month. ***Transcript at 252*** With regard to maintenance and repairs for his unit, he testified:

Q With regard to maintenance, what would you have to do if you needed something repaired or maintained in your apartment?

A I had to call. I had to call the landlord or report to the manager or call Mark. Mark is the maintenance guy.

Q Mark?

A Yes. He comes all the time. He is there to fix it. He's a very good worker.

***Transcript at 253***

He testified that when he had a repair issue (his refrigerator) at Pingree, it was resolved the very same day. ***Transcript at 253***

Dorothy Riggins (hereinafter "Riggins") was initially a tenant and then the manager at the Gladstone building. Riggins testified that she would conduct monthly inspections of the units and if there were items to be repaired, she would provide reports to Mark Shlotter (hereinafter "Schlotter"), the handyman. Her inspections involved her going to each unit, checking that everything works, and that there was no damage. She would work from a checklist. ***Transcript at 382*** In addition to the regular inspections, she contacted Schlotter for repair and maintenance issues. She testified that Schlotter would always respond "right away". ***Transcript at 381*** She only saw a few roaches at Gladstone. ***Transcript at 379*** Gladstone, like Pingree, had a regular regimen for extermination. Riggins would participate in extermination every three months and every time there was turnover in a particular unit. ***Transcript at 378***

Linda Hamilton (hereinafter "Hamilton") is a resident at the Pingree building. She has lived there since the 1980s. ***Transcript at 422*** When HUD canceled the Section 8 subsidy for Pingree, she decided to remain living there because Pingree is "a clean building and safe". She received a letter from HUD, but never responded to the letter because she was not interested in moving from the Pingree building. ***Transcript at 423*** This another example of a tenant with an opportunity to find other subsidized housing, but deciding instead to remain in the Plaintiffs' building.

Hamilton testified that she did see roaches on a couple of occasions, but that she would spray and the problem did not continue. ***Transcript at 424*** She testified that in the many years that she has lived in Pingree, she has had some need for repairs. Most of the repairs were made the very same day she reported the problem, with the only exception being a pipe that broke in the apartment above her because it took a few days to dry. ***Transcript at 428-430 and 437-438*** Clearly, BSA Corporation was responsive to the needs of its tenants.

Schlotter also testified about the condition of the apartments and the protocol at Pingree and Gladstone:

> Q Are you aware of any inspection procedure by the managers of Pingree and Gladstone?
>
> A Yes. They had a form that they had to fill out occasionally. I'm not sure how often. They had a list of things they had to check, and if there was anything wrong, they'd mark them. I'd fix them. Then the tenant would sign an inspection from, preprinted.
>
> ***Transcript at 364***

He also testified about the extermination program. He stated that the buildings were sprayed every three months, and if he saw a problem before that then it would be addressed. He indicated that he occasionally saw roaches in apartments that were not kept clean by the tenants. ***Transcript at 362***

**e. Common areas**

24 CFR 5.703(e) provides:

> The common areas must to structurally sound, secure and functionally adequate for the purposes intended. The basement/garage/carport, restrooms, closets, utility, mechanical, community rooms, day care, halls/corridors, stairs, kitchens, laundry rooms, office, porch, patio, balcony and trash collection areas, if applicable, must be free of health and safety hazards, operable, and in good repair. All common area ceilings, doors, floors, HVAC, lighting, outlets/switches, smoke detectors, stairs, walls, and windows, to the extent applicable, must be free of health and

> safety hazards, operable and in good repair. These standards for common areas apply, to a varying extent, to all HUD housing, but will be particularly relevant to congregate housing, independent group homes/residences and single room occupancy units, in which the individual dwelling units (sleeping areas) do not contain kitchen and/or bathroom facilities.

Hileman provided photographs of the common areas along with his report. He photographed a typical hallway at the Pingree and a typical stairwell at the Gladstone buildings. ***Plaintiffs' Exhibit 6****, p. 35 and 50* He photographed the lobby at both buildings. ***Plaintiffs' Exhibit 6****, pp. 31-32 and pp. 44-46*

Hileman testified that at the Gladstone building the "stairwells, hallways, the ceilings were intact:" They could have used "some spackling and some paint work, touch-ups". He did not find any missing tiles, panels cracks, water damage, mold and mildew as reported by HUD in Report No. 52047. The carpet in the common areas could have used a steam cleaning, but was intact and presented no trip hazards. There were no areas of missing carpet. This contrasted with Report No. 52047 in that HUD claimed that the common area carpet was damaged, water stained with mold and mildew. He found no evidence of those claims. ***Transcript at 101-102*** Based on his photographs and his testimony, it is clear that the carpet in the common areas was not new. Therefore, the only conclusion is that the report itself was completely wrong.

Compo testified:

Q How about the cleanliness of the common areas in both buildings?

A I felt the cleanliness was again for its age in excellent condition.

***Transcript p. 144***

In his report, he indicated that there was some need for minor paint work in the hallways at Pingree and in the public basement area at Gladstone. He reported that the fire doors are in acceptable

condition. ***Plaintiffs' Exhibit*** ***5**, p. 3 and p. 4*

The tenants all concurred with the testimony of the inspectors. Uziogwe:

Q The general condition of the common areas [at Pingree]. What was your opinion about that?

A Very good.

***Transcript at 252***

Hamilton:

Q What was the condition of the lobby area of the Pingree building?

A It was clean.

Q Was there anything you ever made any complaints about in terms of the lobby?

A No.

Q Do you recall what kind of surface the floors were?

A It was tile I believe.

Q Ever see any missing or something that you considered dangerous?

A No.

***Transcript at 427***

Hamilton testified that she saw the manager cleaning the lobby. ***Transcript at 427***

Riggins testified that as the manager at the Gladstone building she performed cleaning duties for the common areas. She would vacuum the carpet in the common areas and sweep the hard surfaces in the common areas. ***Transcript at 410-411*** She had no complaints about the cleanliness of the common areas, in fact people in the building talked about how clean the common areas were. ***Transcript at 413***

**f. Health and safety concerns**

24 CFR 5.703(f) provides:

> All areas and components of the housing must be free of health and safety hazards. These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits, flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint. For example, the buildings must have fire exits that are not blocked and have hand rails that are undamaged and have no other observable deficiencies. The housing must have no evidence of infestation by rats, mice, or other vermin, or of garbage and debris. The housing must have no evidence of electrical hazards, natural hazards, or fire hazards. The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g. propane, natural gas, methane gas), or other observable deficiencies. The housing must comply with all requirements related to the evaluation and reduction of lead-based paint hazards and have available proper certifications of such (see 24 CFR part 35)

Most of the concerns raised in this subsection have been addressed in the other five sections above. There are two areas to note with regard to this section: fire doors and infestation. As discussed above, BSA Corporation had a regimen of extermination for roaches in the Pingree and Gladstone buildings. While there may have been roaches in apartments that were not properly maintained by the tenants, this does not render the buildings in violation of 24 CFR 5.703. David Salazar (hereinafter “Salazar”) admitted in his testimony that HUD’s expectation of the landlord was to provide a system for roach control:

> Q Roaches are almost impossible to get rid of once there is some in a building, isn’t that true?
>
> A It’s a very difficult process to get rid of them.
>
> Q Okay. And so HUD’s expectation would be that the owner would take some significant steps to eliminate roaches and to stop any spread of roaches, correct?
>
> A Yes.

***Transcript at 747***

Clearly, the system in place at Gladstone and Pingree met HUD's expectation.

The fire doors are an issue in this case because HUD's Report No. 52047 found "severe" violations for both buildings for not having locks on the fire doors. ***Plaintiffs' Exhibit*** *6, p. 22, line 3* It defies common sense to require locks on fire doors in the hallways. If there is a fire and the door to the stairwell is locked, it would create extreme peril for the residents. Compo agreed that fire doors should never have locks. ***Transcript at 144***

**2. General condition of the buildings/comparison to Report No. 52047**

Based on his experience with other multifamily housing in Detroit, Hileman's impression of the two buildings was that the buildings are "a little bit over the median. It's a little bit better than what's available in the marketplace". ***Transcript at 109*** Compo testified:

Q What was your overall impression of the two buildings you were in?

A In general, again I felt that the common areas were, for its age, in good condition. It was kept clean and in general well maintained.

Again, the interior of some of the units I thought was -- interior cleanliness-wise they were quite dirty, more to do with food in the kitchen areas.

***Transcript at 148***

In his report, Compo concluded that "the buildings are in need of some repairs but are overall in good condition based on their age. More care must be in the hands of the tenants to oversee the general day to day maintainance [sic] of the individual units as in keeping windows closed, cleaning stoves and hood fans, keeping the smoke detectors active, etc." ***Plaintiffs' Exhibit 5****, p. 5*

Further, both inspectors were highly critical of HUD Report No. 52047. That report is very significant in the cancellation of the Section 8 contract on these buildings because as a result of that

report, these buildings were referred to the Department Enforcement Center in Chicago. ***Plaintiffs' Exhibit 6****, p. 10* This was the beginning of the slide towards cancellation.

There are several glaring problems with Report No. 52047. Some items were completely false, such as requiring BSA Corporation to paint the floors in the common areas when the floors are carpet or tile. See ***Plaintiffs' Exhibit 6****, p. 15 - requiring paint on utility room floor, p. 16 - requiring paint on storage room floor, p. 21 - requiring paint on basement floor, p. 22 - requiring paint on hallway/corridors/stair floor*

Another common problem with the report was finding that a missing sink stopper was a "severe" violation. This was found in eight units in HUD's report. ***Plaintiffs' Exhibit 6****, pp.17, 18, 22, 23, 24* Clearly a missing sink stopper is not a health and safety issue and is not severe in any sense of the word. The government attempted to explain this obvious problem by stating that the severe only refers to the fact that a missing stopper is the most severe violation that could occur with regard to a stopper. ***Transcript at 869 -*** *testimony of James Pollock* However, this does not change the fact that a severe violation resulted in a reduction of the points received for that building. Because Pingree scored a low number of points on that inspection, it was referred to the Enforcement Center. ***Plaintiffs' Exhibit 6****, p. 10* Therefore, the missing sink stoppers were significant in HUD's analysis of the buildings.

The HUD report also found violations for "peeling paint" on the windows of the Pingree building. ***Plaintiffs' Exhibit 6****, p. 15* However, the windows are aluminum, which is not painted, nor could it be painted. ***Transcript at 135-136 -*** *testimony of David Compo* In fact, Compo testified that the windows at Pingree were probably in better condition than the windows at the United States Courthouse in Detroit. ***Transcript at 135***

The HUD report also found "severe floor covering damage" in areas where there was no floor covering at all, simply a concrete or marble floor. ***Plaintiffs' Exhibit 5****, p. 1* Compo found that the floors in those areas were all smooth with no trip hazards. ***Transcript at 116***

Hileman concluded that:

> Report No. 52047 was prepared by an inexperienced operator using software that does not allow any individual input. This systems [sic] appears to be a "click and move on to the next item" type of system. It is obvious that the person who prepared this report has had no construction experience whatsoever. This observation is predicated upon the repeated classification of "minor cleaning" as "major" problems.
>
> ***Plaintiffs' Exhibit 6****, p. 8*

Likewise, Compo concluded that "Report #52047 as a whole is inaccurate, biased and not a reflection of the buildings that it addresses". ***Plaintiffs' Exhibit 5****, p. 5* Both Hileman and Compo are professionals with no bias or reason to risk their professional reputations for this matter. Compo had no prior contact with the Plaintiffs and Hileman's prior contact was limited to providing insurance adjustment advice in the past. They are both credible, strong witnesses who testified as to what they saw when they were at the buildings in June 2000, shortly after HUD canceled the HAP contract for Pingree.

**3. Defendant's witnesses**

The most significant testimony from the Defendant's witnesses with regard to Pingree came from Mark Spooner (hereinafter "Spooner"), the HUD construction analyst. Spooner testified that he did not have a lot of problems with the overall appearance of Pingree. ***Transcript at 787-790*** Significantly, Spooner testified that the apartment building in general did ***not*** violate the decent, safe and sanitary standard:

Q During the time that you inspected the Pingree apartments, at anytime did you consider them to be decent, safe and sanitary?

A Well, I don't want to generalize and say the apartment in general, no. The units, yes. A lot of the units were not safe and sanitary. There were some that were....

***Transcript at 785***

While he went on to testify that there were some repetitive problems at Pingree, it is clear from his answer that this was not a building that he generally considered to have violated the decent, safe and sanitary requirement. The testimony by all of the witnesses throughout the trial was that there were tenants who did not properly clean their apartments. This may have resulted in Spooner's conclusion that some of the units were not safe and sanitary.

The government also presented the testimony of Dorothy Roach (hereinafter "Roach"), a former tenant at Pingree. Roach was evicted by BSA Corporation for various violations of her lease, including excessive traffic and destruction of property. ***Defendant's Exhibit 199****, p. A0423* While the government will highlight Roach's testimony about her impression of the conditions at Pingree, she has very little credibility. During cross-examination, Roach admitted that she was really angry with Dr. Alli when he evicted her. ***Transcript at 594*** Her anger shows in her incredible testimony. She testified that she did not have a refrigerator for the first three days that she lived in her apartment at Pingree. ***Transcript at 542*** However, her own tenant checklist that she completed the first day that she moved to the apartment indicates that there is a refrigerator. ***Defendant's Exhibit 199****, p. A0416* When confronted with this evidence, Roach quickly changed her story and testified that the refrigerator was there the first day, but had to be replaced, which took three days. ***Transcript at 587*** Further, Roach testified that the debris on her bathroom floor was most definitely

not from the patch work performed by contractors on her first day in the apartment. ***Transcript at 579*** However, the letter she wrote to Alli complaining about the debris clearly states that "Pat [the apartment manager] who was to clean came up and agreed that the apartment was left a mess by the workers. There was wet plaster in the bath tubs, that had dried…" ***Defendant's Exhibit 199****, p. A0414* When presented with this evidence, Roach had no real explanation for the contradiction. ***Transcript at 663-664***

Further, Roach indicated in her testimony that there were problems with a leaky ceiling and her refrigerator, as well as a plethora of other complaints. However, she never mentioned these specific complaints when she sent a letter to Silas Polk (hereinafter "Polk") at HUD on April 13, 1998. ***Exhibit 199,*** *p. A0410-A0411,* ***Transcript at 583*** Her letter to Polk focuses on the eviction process and her complaints about being evicted. Clearly, Roach continues to harbor ill will towards Alli. The final evidence in that regard is the fact that Roach testified that she went from building to building with the intent of trying to find other complaints against Alli. This is a person looking for revenge.

**B. Breach of contract for Riverside HAP contract**
**Count II of Plaintiffs' Second Amended Complaint**

The properties referred to as the Riverside property are commonly known as: (a) 1730 Magnolia, Detroit, Michigan, (b) 1800 Magnolia, Detroit, Michigan and (c) 1831 Hazel, Detroit, Michigan. ***Joint Exhibit 1*** *- Joint Stipulation of Facts, paragraph 1* On June 8, 1989 HUD and Benjamin Alli, doing business as BSA & Associates entered into a 15-year housing assistance payments contract for Riverside (hereinafter "Riverside HAP contract") ***Joint Exhibit 1*** *- Joint Stipulation of Facts, paragraph20*

The Riverside HAP contract provides that HUD will make housing assistance payments on behalf of eligible lower income persons living at Riverside. ***Defendant's Exhibit 125****, Riverside HAP contract paragraph 2.2* The Riverside HAP contract further provides that the owner is required to maintain Riverside in decent, safe and sanitary condition. ***Defendant's Exhibit 125****, Riverside HAP contract, paragraph 2.5(a)*

On December 18, 1998, HUD suspended and abated Section 8 payments on all units at Riverside. ***Defendant's Exhibit 152*** Thereafter, the tenants were relocated by HUD and on June 29, 1999 the Riverside HAP contract was terminated by HUD. ***Defendant's Exhibit 153*** The sole reason for the abatement of payments and the termination of the contract was the alleged failure to maintain Riverside in decent, safe and sanitary condition.

The key witness with regard to the Riverside property for Plaintiffs is Roland Samaroo (hereinafter "Samaroo") Samaroo is a handyman hired by Plaintiffs to provide basic repair and maintenance for Alli. He also performed inspections of the Riverside and Collingwood buildings. He would review the HUD inspection reports and conduct inspections based on those. ***Transcript at 173***

Samaroo testified that as he went through the HUD inspection reports for Riverside, he was unable to verify many of the violations noted by HUD. Specifically, Plaintiffs have provided the HUD inspection reports with Samaroo's handwritten notes which indicate the result of his inspection. ***Plaintiffs' Exhibits 8, 9, 11, 12 and 13*** In 1993, HUD inspector David Salazar (hereinafter "Salazar") conducted an inspection the Riverside property. ***Plaintiffs' Exhibit 8*** Alli gave the report to Samaroo for the purpose of reviewing the deficiencies and making the necessary repairs, or if the repairs were large to report that to Alli. ***Transcript at 174-175*** He testified:

Q And would you go through and look for every single deficiency that was listed on the HUD report?

A If it was in the HUD report, whatever was noted on the report that's what I would look for.

***Transcript at 178***

In reviewing the alleged violations, Samaroo found many inconsistencies. As examples, on page two of the report, unit 1800-202, Salazar found that mice had chewed the vent fan. However, Samaroo's inspection discovered that the fan was aluminum and clearly not chewed. ***Transcript at 181-182*** Further, on page two, unit 1831-304, Salazar found that a window was missing in the third bedroom. Samaroo could not find that deficiency and was incredulous that a tenant would have a bedroom with a missing window with winter approaching. ***Plaintiffs' Exhibit 8****, p. 2* Further, there were several deficiencies (see units 1800-202, 1831-202, 1831-102) for chipped or rusted porcelain sinks. However, each of these units had stainless steel sinks. ***Plaintiffs' Exhibit 8****, p. 2-3* Most of the sinks at Riverside were stainless steel sinks. Stainless steel does not chip or rust. ***Transcript at 183*** As Samaroo went through this report, he noticed a redundant pattern from Salazar. He made a note on the report:

> Inspector has repeatedly made use of three items that would enhance unit for failure (1) roaches, (2) smoke detectors (3) steel doors as entrance doors.

***Plaintiffs' Exhibit 8****, p. 3*

He testified about the intention of that note:

A I was consistently going through. I started the report basically going item by item with the HUD noted deficiencies, but after getting to about this apartment after going through all the preceding apartments and getting to here there was a theme.

The theme was redundant. It was roaches, smoke detectors and steel gates.

> Those were the three things that were mentioned over and over again. I could not verify -- I did not verify, was unable to verify -- that in the apartments that I went through preceding this point.
>
> On occasion with the smoke detectors, yes, there were some hanging smoke detectors, open doors with no batteries, but not no smoke detectors. Not missing smoke detectors.

***Transcript at 184***

He also wrote:

> Dr. Alli this is unbelievable. These incredulous patterns continue throughout the report.

***Plaintiffs' Exhibit 8****, p. 3*

At the point of making that note, Samaroo stopped taking notes. He explained why:

> A Yes, I did [stop taking notes] about halfway through on page 3 and that was for the very same reason as aforementioned. It just seemed it was repetitive, a rubber stamp.
>
> After going through these preceding apartments, when I couldn't validate it I got rather frustrated seeing that I am spending this time and this effort and the results are the same. What I saw was not consistent with what was alleged as deficiencies in these preceding files.

***Transcript at 185***

With regard to the smoke detectors, Samaroo testified that they were missing batteries because the tenants would remove them to use for something else. Samaroo would carry a supply of batteries and make replacements as necessary. ***Transcript at 180***

Samaroo also reviewed the June 16, 1995 inspection report from Salazar. On this report, he stated:

> Dr. Alli, this report appears to be concocted. None of the listed HUD violations could be found on my inspection. Recommendation: Request for HUD inspector supervisor to personally visit the site and visit the described violations unit by unit.

***Plaintiffs' Exhibit 9****, p. 1*

Salazar was not the only HUD employee to conduct an inspection at Riverside. On April 15, 1994 Richard T. Schemanski (hereinafter "Schemanski"), a HUD employee, conducted a Section 8 housing quality standards inspection at Riverside. ***Plaintiffs' Exhibit 19*** All units *passed* inspection. Schemanski's inspection fell in between the 1993 and 1995 inspections by Salazar. Salazar in 1993 and 1995 inspected three of the same units that Schemanski inspected in 1994:

| **1993** | **1994** | **1995** |
|---|---|---|
| Salazar inspection | Schemanski inspection | Salazar inspection |
| *Failed* | *Passed* | *Failed* |
| **Units** | **Units** | **Units** |
| 1800 – 202 | 1800 – 202 | 1800 – 202 |
| 1830 - 204 | 1830 - 204 | 1830 - 204 |
| 1831 – 202 | 1831 – 202 | 1831 – 202 |

Salazar testified that HUD inspectors use the same standards and criteria to conduct their inspections. ***Transcript at 731-732*** Not only were these individual common apartments different between the two inspectors, the entire reports were contradictory. In Schemanski's report all units passed with no negative comments. In both of Salazar's reports the violations were extensive and repetitive.

The best explanation for this incredible discrepancy is the personal animosity/friendliness between Alli and the respective inspectors. Alli testified that he had a difficult relationship with Salazar, saying that Salazar "pushe[d] on him". ***Transcript at 462*** Salazar testified about the hostility between him and Alli, although he described the hostility as being completely on part of

Alli. ***Transcript at 725-727*** Alli described his relationship with Schemanski as "excellent" and as the "best of anyone we ever met working for the United States Government". ***Transcript at 461***

Samaroo also investigated the May 16, 1997 HUD inspection report for Riverside. ***Plaintiffs' Exhibit 11*** As indicated by his handwritten notes, Samaroo conducted an inspection on each of the violations listed by HUD. Eight units were given violations for either cluttered or dirty apartments: 1730-101, 1730-102, 1730-104, 1730-111, 1730-312, 1730-404. and 1800-303 Sixteen out of the thirty-four units that were inspected were violated for having inoperable burners on the stove. On each of these, Samaroo simply cleaned the food that had boiled over the pot and into the burner. He would then show the tenant how to clean it. ***Plaintiffs' Exhibit 11, Transcript at 199*** These problems are due to the lifestyle of the individual tenants, not the care of the landlord.

Further, seven units (1800-103, 1800-204, 1800-302, 1830-102, 1831-203 and 1831-304) were given violations for having either a chipped or rusted sink. However, the sinks in each of these apartments were made of stainless steel, which does not rust or chip. ***Transcript at 183*** Samaroo testified that, while there were some violations from the 1997 inspection he had to repair, the "vast majority were not true". ***Transcript at 198***

Each of these inspection reports are significant because they provided the basis for HUD's decision to abate and then terminate the Riverside HAP contract. ***Defendant's Exhibit 153*** Because these inspection reports are not credible and therefore do not establish a violation of the decent, safe and sanitary provision of the contract, HUD's decision to terminate the Riverside HAP contract is without basis and therefore a breach of the contract.

Samaroo is a credible witness because he would have had no reason to find a lack of deficiencies at the apartments. In fact, his motivation would be exactly the opposite. Samaroo was

paid by the job for larger tasks. ***Transcript at 214-215*** If there was more work, Samaroo would make more money. In fact, Samaroo would become frustrated because he would see the report and expect to have to hire a lot of workers to help, but would find that in fact there was not a significant amount of work. ***Transcript at 215*** Also, Samaroo last performed any work for Plaintiffs in the late 1990s. ***Transcript at 172***

**C. Breach of the Sale Upon Approval Clause/Collingwood Count VI of Plaintiffs' Second Amended Complaint**

The properties referred to as the Collingwood property are commonly known as 1610 Collingwood, Detroit, Michigan and 1635 Calvert, Detroit, Michigan. ***Joint Exhibit 1*** *-Joint Stipulation of Facts, paragraph 2* In March 1998, BSA Corporation and HUD entered into a housing assistance payments contract (hereinafter "Collingwood HAP contract"). ***Joint Exhibit 1*** *-Joint Stipulation of Facts, paragraph 4* Paragraph 19(a) of the Collingwood HAP contract provides:

> The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement … or the project or any part of them or any of its interest in them, without the prior written consent of HUD.
>
> ***Defendant's Exhibit 132****, p. 010*

Further, BSA Corporation and HUD entered into a Regulatory Agreement for the HUD held mortgage for the Collingwood property on July 6, 1990. ***Joint Exhibit 1*** *-Joint Stipulation of Facts, paragraph 8* Paragraph 8(a) of the Regulatory Agreement for Collingwood provides that BSA Corporation "shall not without the prior written approval of the Secretary [HUD] convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property". ***Defendant's Exhibit 133****, p. 2*

On July 15, 1999, BSA Corporation and Cory Fanning (hereinafter "Fanning") entered into a

purchase agreement whereby Fanning agreed to purchase the Collingwood property for $675,000.00. The real estate broker was Marcus & Millichamp. ***Defendant's Exhibit 137*** The Purchase Agreement provided that the sale was subject to HUD approval. ***Defendant's Exhibit 137****, p. A056, paragraph 37*

Gary Hopkins (hereinafter "Hopkins") was the real estate agent listing the Collingwood property for Marcus & Millichamp. The three principals to the sale all testified that the ***only*** reason that the sale did not close was HUD's refusal to provide the necessary approval.

Fanning testified:

Q Why didn't it close?

A GMAC called me and they just said that HUD pulled the deal.

Q Do you have an understanding as to why HUD pulled the deal?

A They said they didn't know.

Q How close were you to closing on this property?

A I think two weeks.

Q Was it your intention to close on the property?

A Oh, yes.

Q Did Dr. Alli ever indicate to you that it was his intention to pull out of that agreement?

A No.

Q Was there any issue with your financing in terms of obtaining the financing in order to purchase the building?

A No. Everything was in line.

***Transcript at 332***

Hopkins testified:

Q Did that purchase offer from Cory Fanning ever close?

A It did not.

Q And why not?

A Somewhere in this process I was either advised by GMAC or Cory, because there was dialogue with both, that something had happened with HUD with the property and things just seemed to fizzle out after that time at that point.

* * * *

Q Was it your understanding in this instance that the sale required some level of approval from HUD?

A I believe it did, yes.

Q Was it your understanding that that did not occur?

A I don't believe that occurred.

***Transcript at 272***

Alli testified:

Q Was it your intention to close on that [Fanning purchase agreement]?

A Oh yes. Immediately. In fact --

***Transcript at 495-496***

The government admits that it had knowledge of the pending proposed transaction between Fanning and BSA Corporation. The Joint Stipulation of Facts states that "the only document HUD received regarding the potential sale of Collingwood apartments to Mr. Fanning was the executed purchase agreement". ***Joint Exhibit 1*** - *Second Joint Stipulation of Facts, paragraph 9* Further, Robert Brown (hereinafter "Brown") was the Director of the Multifamily Hub for the Detroit office

of HUD at the time of the purchase agreement between Fanning and Alli. In that position, he had the supervisory authority over all Section 8 housing assistance payment programs in the Detroit portfolio. ***Transcript at 1043-1044*** Brown testified:

Q In the middle of 1999, did you become aware that Dr. Alli was attempting to sell the Collingwood/Kirkwood apartments to Cory Fanning?

A Yes, I'd heard about it.

Q Do you recall how you heard about it?

A I think I just heard about it from staff. I think staff told me that they had seen purchase agreements or some other documents that indicated or they had heard through the grapevine that he was trying to sell the property.

***Transcript at 1070-1071***

On October 6, 1999, Fanning and BSA Corporation entered into an agreement extending the expiration of the purchase agreement "until such time as may be necessary to comply with HUD 223(f) requirements." ***Defendant's Exhibit 191*** This is further proof that there was communication between at least one of the parties to the purchase agreement and HUD. Further, Fanning chose GMAC for the financing specifically because they "had someone who had worked for HUD and knew how to do the HUD financing". ***Transcript at 331***

Brown testified that the first level of review for a proposed sale of a property within HUD's portfolio is with the project manager. ***Transcript at 1087*** In 1999, the project manager for the Collingwood property was Silas Polk (hereinafter "Polk"). ***Transcript at 1076-1077*** Based on the testimony, it is clear that there was significant animosity between Polk and Alli. Alli testified that Polk interfered with his attempted eviction of a tenant, Hope Square, by contacting Alli and telling him that the issue with regard to Hope Square was Alli's problem, not the tenant's. He warned Alli

not to evict Hope Square. ***Transcript at 485-486*** When Alli attempted to evict another tenant from Pingree, Patricia Mosley, for property damage, Polk held a meeting with some of the tenants and told them not to worry, that HUD will be taking the building and if they have any problems with Alli, to contact him. Alli overheard this conversation after being tipped by a tenant that the meeting was taking place. Alli also saw Polk's business card in the possession of a lot of the tenants. ***Transcript at 489-490***

Further, Polk told Alli that the HUD employees do not like him because Alli came to America and took advantage of the opportunities for African-Americans. ***Transcript at 486*** This assertion is bolstered by the testimony of Emmanuel Uzoigwe, the former tenant of Pingree and Collingwood. Uzoigwe testified that he attended one of the relocation meetings after HUD took possession of the Collingwood building. He testified that during the meeting, he heard a statement from Polk. He testified:

> Q Do you recall any comments that were made at that meeting by any HUD personnel regarding the ownership of the buildings?
>
> * * * *
>
> A When I came in, I didn't know anybody when I came in. I overheard one guy talking to somebody else. I don't know who they were at the time. These guys are coming over here and taking over the buildings.
>
> * * * *
>
> Q Do you recall the person's name who made that comment?
>
> A Later I found out that his name is Polk.
>
> ***Transcript at 250***

Polk was the first line of review of Alli's attempt to sell the Collingwood property to

Fanning. The animosity between Alli and Polk may have played a role in the HUD's refusal to approve the sale. In fact, HUD did not want to see Alli profit from any of the buildings. Alli testified that Brown told him that HUD would "not allow you to benefit any longer from a U.S. financial resource, something like that". ***Transcript at 494*** The facts surrounding the proposed sale and the foreclosure on Collingwood provide a lot of support to this claim. Based on the timeline of events, it is clear that HUD was doing everything it could to stop Alli and BSA Corporation from profiting on the Collingwood building:

| Date | Event | Evidence |
|---|---|---|
| 7/14/99 | Purchase Agreement | Def's Exhibit 133 |
| Sometime in mid 1999 | HUD becomes aware of proposed sale of Collingwood | Transcript at 1070 |
| 10/5/99 | 21-day notice for foreclosure | Def's Exhibit 52 |
| 10/6/99 | Extension of purchase agreement between Fanning and Alli to allow time for submission of documents to HUD | Def's Exhibit 191 |
| Sometime after 10/6/99 | HUD refuses approval for sale to Fanning | Transcript at 332, 272 |
| 1/25/00 | HUD declares mortgagee-in-possession | Def's Exhibit 155 |
| Sometime after 1/25/00 | HUD foreclosure sale, HUD only bidder | Joint Stip, paragraph 18 |
| 2/21/01 | HUD sells Collingwood to third party for $80,890.00 | Joint Stip, paragraph 19 |

HUD sold a $675,000.00 building for less than $81,000.00. Further, HUD policy with regard to foreclosure is to encourage a sale of the building in lieu of foreclosure. ***Plaintiffs' Exhibit 14*** Chapter 5-1, of HUD's Servicing Handbook, provides:

> Foreclosure, or the threat of foreclosure, should not be used unless the office intends to foreclose. Foreclosure is the last resort after it is evident that the mortgagor cannot, or will not, meet the mortgage obligation. Before recommending foreclosure:
>
> * * * *
>
> B. Encourage sale, by the mortgagor, as an alternative to foreclosure (this includes sale by assumption of the mortgage), but do not delay foreclosure for this reason.
>
> * * * *
>
> C. Suggest the offering of a deed-in-lieu of foreclosure by the mortgagor (see Paragraph 5-8 on deeds-in-lieu). (This does not apply to investors).
>
> The encouragement of a sale or the suggested offering of a deed-in-lieu of foreclosure should be by active (if possible fact-to-face) and direct methods rather than passively submitting it in the text of a letter without explanation or elaboration.

Here, the government has presented no evidence that there was any encouragement to sell Collingwood in lieu of foreclosure as the handbook provides. In fact, the evidence proves the opposite. HUD was aware of the proposed sale, after it became aware, it started foreclosure and then refused to approve the sale to Fanning. HUD operated in bad faith with regard to this proposed sale. They would have rather sold the property for 12% of its value then see Alli and BSA Corporation reap any proceeds from the building.

HUD expressed concern about the physical condition of Collingwood (through the testimony of James Pollock, Silas Polk and James Bow). However, Fanning testified he received a "ballpark"

estimate from the engineering firm for repairs in the amount of $155,340.00. ***Plaintiffs' Exhibit 46, Transcript at 346*** Fanning testified that this was approximately the amount he was expecting for repairs. ***Transcript at 344*** He further testified:

> Q Even after you went back to the building, after you put in the offer and saw more apartments and had a more in-depth view of these buildings and after the Eckland report, did you still feel that the building was worth your $675,000.00 investment?
>
> A Yes. Financially, I thought in my opinion it worked well.
>
> ***Transcript 333***

There was a ready, willing and able buyer for the property who was prepared to invest over $150,000.00 into the Collingwood buildings. If HUD were truly concerned only about the physical condition of the property, it would have approved this proposed sale. The fact that HUD did and would not indicates that there were other motives for their decision.

The government will most likely defend their actions on this count by arguing that neither the purchaser nor the seller submitted the proper forms for a transfer of physical assets. Plaintiffs do not dispute Defendant's contention that the transfer of physical assets application was not submitted to HUD. However, this is not dispositive of this matter. First, Defendant has not presented any evidence that supports the contention that the HUD regulations regarding transfer of physical assets are made a part of the Collingwood HAP contract. Further, despite having knowledge of the proposed sale, it would appear HUD did not request that either party submit the appropriate documents. Fanning testified:

> Q Well, if HUD through GMAC or directly, if HUD had asked you to fill out any additional paperwork, what would you have done?
>
> A Filled it out.

***Transcript at 333***

Defendant may also argue that no one in the Detroit office had the authority to approve or disapprove this particular sale. However, Brown testified that he does have the authority to approve or deny TPA applications, except in "unique situations". ***Transcript at 1070*** When discussing the proposed sale to Fanning, Brown could only state that he thinks or believes that the sale would require approval from his superior. ***Transcript at 1071-1072*** Neither he nor the Defendant have provided any authority establishing the fact that this sale would have required approval from a level above Brown.

HUD did not act reasonably in refusing to approve the sale to Fanning. Fanning was prepared to invest significant money into the building. Instead, HUD foreclosed on the property (without regard to their own regulations), spent significant sums of taxpayer money (see Defendant's Counterclaim) and eventually sold the property for 12% of its value.

**D. Breach of the Collingwood mortgage contract**
**Breach of Collingwood HAP contract**
**Counts III and V of Plaintiffs' Second Amended Complaint**

The Collingwood HAP contract requires the owners to maintain the property in decent, safe and sanitary condition. ***Defendant's Exhibit 129****, Collingwood HAP Contract, paragraph 6(a)* Further, the Regulatory Agreement for the Collingwood mortgage contract incorporates the terms and conditions of the Collingwood HAP contract by reference. ***Defendant's Exhibit 133****, Collingwood Regulatory Agreement, paragraph 9(a) and 9(b)* HUD foreclosed on the Collingwood mortgage, sold the property at a mortgage sale where it was the only bidder and eventually sold the property to a third party for $80,890.00. ***Joint Exhibit 1*** *- Joint Stipulation of Facts, paragraphs 18*

*and 19* Also, HUD abated and then terminated the Collingwood HAP contract. ***Defendant's Exhibit 51*** and ***Joint Exhibit 1*** - *Joint Stipulation of Facts, paragraph 9* The only reason for the abatement and termination of the contract was the alleged failure to maintain the property in decent, safe and sanitary condition. ***Defendant's Exhibit 51***

As with Pingree, the Collingwood property was referred to the Department of Enforcement Center following an inspection by HUD's Real Estate Assessment Center (hereinafter "REAC"). ***Defendant's Exhibit 108*** Following receipt of the REAC report for Collingwood, Alli provided it to Samaroo for the purpose of checking the listed deficiencies and make necessary repairs. ***Transcript at 201*** While checking the REAC report, Samaroo made handwritten notations on the report. ***Plaintiffs' Exhibit 7*** For many of the deficiencies noted by REAC, Samaroo simply wrote "False" next to it. He testified:

> Q Throughout this report you've got various notations under the Comment section, many of which just simply say, "False". When you would put the word false in that comment section what were you referring to?
>
> A False would mean that it was not so. What I saw was not consistent with the noted deficiency of HUD.
>
> I'd like to point out just for clarification's sake when I say not consistent with the deficiency that's just because this item appears in front of me on this page.
>
> There's a citation for the parking lot and a safety hazard on page 2, the first item in the left-hand column that has an asterisk. I have a "False" by that. There was no parking lot for that building, so I was kind of confused about why we would get a citation for that. There was no parking lot there.
>
> Q Does Collingwood have a laundry room?
>
> A No, no laundry room. There was a citation about the laundry room I remember. I remember saying how could they be citing something that's not there?

***Transcript at 203-204***

The report from Eckland Consultants also states that the Collingwood "sites have no on-site parking. Parking is available on the adjoining streets". ***Plaintiffs' Exhibit 46****, p. 7* Another example is that the REAC inspector found that there was no boiler certificate. However, upon inspection, Samaroo found the boiler certificate posted in the boiler room. ***Plaintiffs' Exhibit 7****, p.2* The REAC inspector found that the "roads" on the site had ponding, a major violation. Of course, Samaroo found that there are no roads at the Collingwood sites. ***Plaintiffs' Exhibit 7****, p.2* The REAC inspector found that there were seven windows on the north side of the building that were "broken resulting in sharp jagged edges". ***Plaintiffs' Exhibit 7****, p.2* Samaroo could not find any broken windows. In fact, he took photographs of the building to show that there were no broken windows. ***Transcript at 208, 210*** *and* ***211****, also see photographs at* ***Plaintiffs' Exhibit 52****, pp.1,3,5,6,7,8* As can be seen in these photographs, there were no broken windows with sharp jagged edges.

For Apartment K202 in the Calvert building, Samaroo noted that the apartment is an "excellent unit like suburbs". He also noted that this is "one of the best kept units". ***Plaintiffs' Exhibit 7****, p.7-8* As Samaroo came near the end of the report, he began to make notes about the alleged deficiencies. One note states, "get another inspector who is objective"; another: "contact HUD supervisor". ***Plaintiffs' Exhibit 7****, p.7* His conclusion was: "I recommend that you promptly notify the supervisor of this HUD inspector and ask for an objective HUD inspector. This inspector appears to have it in for you. RS". ***Plaintiffs' Exhibit 7****, p.8* During trial, Samaroo explained why he thought the inspector had it in for Alli:

Q You indicate in here that the inspector appeared to have it in for him. What led you to that conclusion as opposed to just this being inaccurate?

A You know, I could see a few things, something they missed. Sometimes my homes will be inspected sometimes in the licensing. There may be a few things that will be missed.

When it was consistent, it was repetitive, things that were stated that were not there were there and things that were stated that were there like the sinks, for example, the stainless steel sink rust and stuff, you know, something like that cannot be an accident perspective in my impression, but I saw it repeated, the pattern repeated. Then it was my strong impression that someone was doing this deliberately.

***Transcript at 205***

Both Hopkins and Fanning also testified about the physical condition of Collingwood. Hopkins went through approximately 95% of the units at Collingwood during the listing period. ***Transcript at 270*** He testified:

Q In listing these multifamily housings, do you ever ask the owner to make changes?

A If we feel the property's condition is such that it's going to significantly impact the value we do.

Q Did you ask Dr. Alli to make any changes to the Collingwood or Calvert buildings?

A No.

Q Did you feel that the condition of the buildings affected the marketability at all?

A No.

***Transcript at 270***

Hopkins has listed dozens of multifamily housing buildings in the City of Detroit. ***Transcript at 268-269*** Based on his experience with other multifamily apartment buildings in Detroit, he provided his impression of the housing quality for the Collingwood and Calvert

buildings:

> A The units I saw, the apartments, again a significant number of them, the common areas, I would place that building in the top one-third, 40 percent of the properties.
>
> ***Transcript at 274***

Fanning looked at 20-30 other apartment buildings before placing an offer to purchase Collingwood. ***Transcript at 322*** He indicated that the housing quality for the Collingwood buildings was not out of the ordinary based on his experience looking at other apartment buildings in the City of Detroit. ***Transcript at 330*** He saw no evidence of mice, no large holes in the ceilings (except in vacant apartments) and the front doors were locked every time he went to the building. He did see roaches, but only in those units where the tenants failed to maintain a clean apartment. ***Transcript at 328-329*** With regard to the common areas, Fanning testified:

> Q With regard to the condition of the common areas, how did you find those?
>
> A They were fine. They were bare. They didn't have art or anything on the walls to make them nice, but they were fine.
>
> ***Transcript at 327***

He also testified that there were always work crews making repairs during his visits:

> A …When I went there, there were guys repairing stuff constantly, painting this or painting that.
>
> Q Was that every time you were there you saw crews working?
>
> A Yes. I don't know. To me, it was my understanding that they were pretty much part of the scenery down there.
>
> Q When you say "they were part of the scenery", what do you mean?
>
> A That they were staying at painting and fixing.

***Transcript at 326***

Based on the testimony of the disinterested witnesses, Hopkins and Fanning, about the physical condition of Collingwood, as well as the testimony of Samaroo about the legitimacy of HUD's REAC inspection, it is clear that the government breached the Collingwood HAP contract and the mortgage contract by cancelling the Section 8 payments and foreclosing. More importantly, however, is that these issues never should have arisen. If HUD had acted reasonably, the property would have been sold to Fanning and the foreclosure/cancellation of Section 8 never would have occurred. HUD would not approve the sale and instead engaged in an entirely wasteful, unnecessary and expensive process of foreclosure process. This should have been avoided.

## II. DEFENDANT'S COUNTERCLAIMS

In its three counterclaims, the Defendant claims that Plaintiffs breached their HAP contracts with HUD by failing to maintain the properties in decent, safe and sanitary condition. The details regarding each count are addressed in Section I of this brief.

As a further note, the government is claiming damages with regard to Collingwood for all of its expenses related to its administrative costs as mortgagee-in-possession of Collingwood. HUD became mortgagee-in-possession on January 25, 2000. The proposed sale to Fanning was in the summer/fall 1999. Even without regard to the legality of HUD's decision to declare mortgagee-in-possession, these expenses could have and should have been avoided.

## III. CONCLUSION

The testimony during the trial brought forth some basic facts: there was a difficult, if not acrimonious, relationship between Alli and some of the HUD personnel; David Salazar and Silas Polk in particular. The testimony shows that the feelings were mutual. There was some testimony

about potential motives for Polk's animosity towards Alli, and clearly Alli was frustrated with some of the HUD personnel. No matter what the reason was for the strained relationship, personal animosity is not a proper basis for making decisions. There is no other logical conclusion for the actions taken by HUD. Some of HUD's actions were specifically tailored to hurt Alli financially (blocking the sale of Collingwood). Other actions, such as the Report No. 52047, contained errors that are so obvious and without basis as to indicate more than mere mistake (requiring paint on floors, paint on aluminum windows, locks on the fire doors).

Each of the projects met the decent, safe and sanitary requirements. Plaintiffs' disinterested witnesses have established this fact. All of the parties involved in the BSA Corporation/Fanning testified that HUD denied the proposed sale. There was no evidence to the contrary. Plaintiffs hereby request a finding in their favor on each count in their Second Amended Complaint and a finding of no cause of action on each of Defendant's Counterclaims.

STEMPIEN & STEMPIEN, PLLC

s/Eric Stempien
By: Eric Stempien
Attorney for Plaintiffs
315 N. Center Street, Suite 200
Northville, Michigan 48167
(248)735-9200
stempieneric@yahoo.com

Dated: October 12, 2007