IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BENJAMIN AND SHAKI ALLI AND BSA CORPORATION, | ) | |
| Plaintiffs, | ) | No. 01-669C (Judge Francis M. Allegra) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to paragraph 19 of Appendix A to the Rules of the United States Court of Federal Claims ("RCFC"), the United States respectfully submits this post-trial brief.

INTRODUCTION

The contracts at issue in this case required plaintiffs to maintain three properties in decent, safe and sanitary condition in order to obtain Section 8 subsidy payments from the United States Department of Housing and Urban Development ("HUD"), and, with respect to two fo the properties, to prevent foreclosure of HUD's mortgage. At trial, the Government provided overwhelming evidence to prove that this standard was nowhere close to being met by the plaintiffs. Several HUD employees from offices in Detroit and Chicago, (David Salazar, Jim Bow, Mark Spooner, Patrick Berry, Robert Brown and James Pollock), third-party contractors (Pinnacle and Eckland Consulting), and third-party individuals (Cory Fanning, Stephen Palms, and Dorothy Roach) all confirmed through reports and/or testimony that the properties were not decent, safe or sanitary despite the many opportunities given to plaintiffs to repair the deficiencies. The only testimony provided by plaintiffs to rebut the Government's evidence and witnesses came from inexperienced, unknowledgeable, and biased witnesses (Benjamin Alli, Roland Samaroo, Mark Schlotter, Dorothy Riggins, Linda Hamilton, Emmanuel Uzoigwe) or

from witnesses who offered insights without being fully informed of the situation or the contracts at issue (David Compo and Gordon Hileman). Consistently, the documentary evidence plaintiffs presented was equally flawed. The evidence provided at trial demonstrated that plaintiffs, not HUD, breached the contracts at issue, and that HUD incurred significant expenses as a result of those breaches.

Moreover, we offered testimony to contradict plaintiffs' claim that an authorized agent of the Government orally denied the sale of the Collingwood apartments to Cory Fanning. We also presented testimony from HUD officials to support HUD's decision to take possession of the Collingwood apartments, as allowed under the Collingwood regulatory agreement governing the HUD-mortgaged properties, after the apartments were without heat in the middle of winter and attempts to contact plaintiffs were unsuccessful.

Finally, we provided clear evidence to show that BSA Corporation is a mere instrumentality of Benjamin and Shaki Alli, and that BSA's corporate veil should be pierced to hold Mr. and Mrs. Alli liable for BSA's breach of the Collingwood Housing Assistance Payment ("HAP") contract and regulatory agreement. Each of these issues will be discussed in further detail below.

## STATEMENT OF FACTS

### I. The Riverside Apartments[1]

Plaintiff Benjamin Alli, acquired the Riverside apartments in 1989 through a HUD competitive auction. TR 444:11-19 (Alli). On June 8, 1989, Mr. Alli, doing business as BSA &

---

[1] Each apartment complex consisted of several related buildings. The Riverside apartments were located at 1730 Magnolia, 1800 Magnolia, 1830 Magnolia, and 1831 Hazel in Detroit, Michigan.

Associates,[2] entered into a 15-year HAP contract for the Riverside apartments pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. DX 125. Pursuant to the Riverside HAP contract, qualified low-income residents in the Riverside apartments paid a small percentage of their income in rent with HUD making up the market value difference in monthly subsidy payments to plaintiffs. Id. TR 1046:11-16 (Brown). A provision in the Riverside HAP contract required plaintiffs to maintain the Riverside apartments in a decent, safe and sanitary condition. Id. Specifically, sections 2.5(a) and 2.5(b)(2) of the contract stated as follows:

> (a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). . . . If [HUD] determines that the Owner is not meeting one or more of these obligations, [HUD] shall have the right to take action under section 2.21(b).
>
> (b) Inspection.
>
> (2) [HUD] shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times . . . as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition, including the provision of the agreed-upon utilities and other services. [HUD] shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

DX 125.

Section 2.21(b) of the Riverside HAP contract set forth the rights of HUD in the event of the plaintiffs' default:

> (1) Events of Default.

[2] BSA & Associates was not incorporated.

A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by [HUD] in connection with any annual or other inspection . . .

* * * * *

(2) <u>[HUD] Determination of Default</u>.

Upon a determination by [HUD] that a default has occurred, [HUD] shall notify the Owner . . . of

(i) The nature of the default;

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

(iii) The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.

If the Owner . . . fail[s] to respond or take action to the satisfaction of [HUD], [HUD] shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this contract [], in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD.

(3) <u>Corrective Actions</u>.

* * * * *

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to [HUD] arising from a default under the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

If the units are not maintained in a decent, safe, and sanitary condition, the HAP contract specifically provided HUD with the additional option of suspending its subsidies, in whole or in part. Section 2.5(c) of the contract provided as follows:

> (c) Units Not Decent, Safe, and Sanitary. If [HUD] notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, [HUD] may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit.

In 1991, HUD inspectors discovered that the Riverside apartments were not meeting the decent, safe and sanitary standard as required under the Riverside HAP contract. DX 230. HUD notified Mr. Alli that units in Riverside failed inspection for several reasons, including missing or inoperable smoke detectors, roach infestation, broken cabinets, broken shower tiles and sinks, broken or missing window screens, broken windows, broken toilets, damaged ceilings, broken doors, garbage and debris in staircases and hallways, shattered glass, and a front door that did not close or lock. Id. Mr. Alli was given 30 days to respond with actions taken to correct these items, but with each subsequent inspection, HUD found that little to no action was taken. Id.

HUD inspector, Mark Spooner, testified that during the time he inspected Riverside, from 1993 through 1997, he found several health and safety violations, including inoperable smoke detectors, broken windows, missing floor tiles, deteriorated surfaces, plumbing leaks, and roach infestations. TR 771:10-23 (Spooner). According to Mr. Spooner, the roach infestation at Riverside was so severe that he recalled seeing roaches in a refrigerator with a 40 degree Fahrenheit temperature. TR 772:14-15; 773:1-2 (Spooner). Mr. Spooner testified that he did not

consider Riverside to be decent, safe or sanitary during the approximately four years that he inspected the buildings. TR 774:3-6 (Spooner).

In July 1993, HUD inspector, David Salazar, conducted another inspection of the Riverside apartments and noted several failed items and deficiencies in individual units and the buildings. PX 8. The noted items included inoperable toilets, roach infestation, broken drawers, ceiling and wall damage, mice droppings, broken windows and cabinets, inoperable burners, missing exit signs, missing lighting, and P-traps leaking sewer gases. Id. After performing this inspection, Mr. Salazar did not consider Riverside to be a decent, safe and sanitary place to live. TR 698:23-25 (Salazar). Mr. Alli was provided two weeks to respond to the deficiencies, but HUD's next inspection revealed the same problems. DX 163.

On June 16, 1995, Mr. Salazar conducted another inspection of the Riverside apartments and failed several units for deficiencies such as missing smoke detectors, missing window screens, torn carpeting, leaking faucets, rusty bathtubs and sinks, missing radiator covers, damaged walls and ceilings, roach infestation, broken or missing floor tiles, inoperable stove burners, missing oven handles, clogged toilets, flooding, and non-functional electrical outlets. DX 163. Mr. Salazar noted that what little repairs were performed on Riverside since the last inspection were not professionally completed. Specifically, Mr. Salazar testified as follows:

> Repairs are not professionally completed [at Riverside]. He would do a quick fix. For example, he would cut out the ends of a Maxwell House Coffee container and he would use that to put over openings where a dead-bolt lock should have been, or he would use it to secure a bi-fold knob[] to the bi-fold doors, and he would just do silly stuff like that, or whoever was doing the maintenance would do that, because I don't know who did it. I can just tell you what I see.

> And for example, like holes in the walls, he would stuff newspapers, napkins, or anything he could find to make repairs, and that's not the proper way to make a repair.

TR 706:1-21 (Salazar). Following this inspection, Mr. Salazar did not consider Riverside to be decent, safe or sanitary. TR 706: 22-24 (Salazar).

On November 9, 1995, Mr. Salazar conducted a re-inspection of the Riverside apartments. PX 10. During the re-inspection, he found that many of the items noted during his June 16, 1995 inspection had not been corrected and some new deficiencies had developed. TR 710: 4-8 (Salazar). At the time of the re-inspection, Mr. Salazar did not consider the Riverside Apartments to be decent, safe and sanitary. TR 710: 21-23 (Salazar).

On May 15-16, 1997, Mr. Salazar and another HUD inspector, James Kalvin, conducted a follow-up inspection of the Riverside apartments and concluded that the property, as a whole, failed to be maintained in a decent, safe and sanitary condition. DX 244, DX 180 at 21. Specifically, the inspection revealed "serious and widespread safety and health violations" at the property, including, an inoperable elevator, inoperable smoke detectors, missing handrails, peeling paint, damaged carpeting, improper wiring, backed-up sewage, a leaking sanitary line, broken fire doors, missing wall outlet covers, cracked floor tiles, deteriorated concrete trim, missing window screens, thin plastic installed in place of window glass, inoperable stoves, cracked and leaking toilets, missing radiator covers, roach infestation, deteriorated countertops, exposed wires, and damaged walls and floors. Id. Moreover, several units failed the inspection because the inspectors were not allowed to enter the units. Id. Mr. Salazar explained this policy as follows:

> Q. What happens when a HUD inspector is not given access to a particular unit?

> A. Normally we shouldn't have that problem because we issue a letter stating that we're going to be conducting an inspection, and all the units should be available to us. If a unit is not open to us, it was either because the person was not home or we didn't have a key to get in, but my thinking is that if we have already given notice, that we have a right to inspect that unit. And if I was not able to get into a unit, it would automatically fail the inspection.
>
> Q. Why?
>
> A. It's important during an inspection to get into units to see if they are [in a] safe[] and sanitary condition to continue the subsidy.

TR 690:10-25 (Salazar). HUD provided Mr. Alli 30 days to correct the deficiencies, but he failed to do so. DX 244. On June 27, 1997, HUD gave Ben Alli a 30-day notice that it would terminate the Riverside HAP contract for failure to maintain the property as required. PX 11.

On or around August 12, 1997, another follow-up inspection was conducted by Mr. Spooner, Mr. Salazar, and a third HUD inspector, Rob Nelson. DX 244. The inspectors verified that most of the deficiencies noted during the May 15-16, 1997 inspection had not been corrected and that "those few that were completed were done in an unprofessional manner, which result[ed] in [a] quick failure and [a] break down of [the] inadequate job performed." Id. The inspectors further concluded that the "[l]iving conditions [were] deplorable and [the] complex as a whole is unfit for children [and] people to reside . . . [The] [p]roperty does not meet the minimum standards at providing safe, decent and sanitary housing." Id. During this inspection, this inspectors also noted that the basement floor of one of the buildings was covered with animal feces and infested with flees. Id. Mr. Spooner recalled the situation as follows:

> Q. Do you recall any other infestations at Riverside?
>
> A. Yes. Two of my colleagues and I were inspecting the basement, you know, one of the buildings at Riverside, and as we walked down there we noticed a couple of things. One, that there

> was feces on the floor from some animal. Secondly, there was standing water, and as we noticed it, there were no lights, and after we noticed that we came out, and the three of us were infested with fleas. I mean, I had a light shirt on. It was like it just had specks all over it, so with my two colleagues. In fact, one had to go home and change because he was being bitten.
>
> Q. Was Dr. Alli present?
>
> A. Yes, he was.
>
> Q. What was his reaction?
>
> A. He laughed. He thought it was funny.

TR 773:3-21 (Spooner).

On January 23, 1998, HUD performed another follow-up inspection of Riverside. DX 164. Of 34 units inspected in the May 1997 inspection, six units passed inspection, 19 units failed due to health and safety violations, and nine units failed due to no entry. DX 164. On March 16, 1998, HUD notified Mr. Alli that it was suspending payments for the failed units. DX 165. Before suspending these payments, however, Robert Brown, the Director of the Multifamily Hub in Detroit, visited the Riverside apartments to verify that the inspection reports he was receiving were accurate. TR 1048:22-25 (Brown); 1049:1-9 (Brown). He concluded that the reports were true, and that the Riverside apartments were in a generally dilapidated condition. TR 1049:18-25 (Brown); 1050:1-5 (Brown). On March 16, 1998, HUD suspended payments for 28 failed units at Riverside. DX 165.

During this time, a Section 8 tenant from the Pingree apartments, Dorothy Roach, visited the Riverside apartments. TR 566:10-12 (Roach). Ms. Roach testified that the front door was wide open and the floors and tiles in the hallway were wet. TR 566:14-23 (Roach). Electrical wires were strewn from one apartment to another, and tenants without electricity were sharing

electricity from apartments that had electricity. TR 566:14-25; 567:1-13 (Roach). Ms. Roach testified that her impression of the Riverside apartments was that "it was third-world." TR 568:3-4 (Roach).

HUD conducted yet another re-inspection of the Riverside apartments on December 9, 1998. DX 152. Again, HUD inspectors found that Riverside failed to meet the standards set forth in the Riverside HAP contract. Id. On December 14, 1998, Ben Alli certified to HUD, by facsimile, that repairs were completed at Riverside. Id. As a result, HUD conducted a re-inspection on December 16, 1998, only to find that Mr. Alli's certification was not truthful. Id. During the re-inspection HUD found that many of the deficiencies had not been corrected, and that all the units inspected still failed to meet required standards due to "roach infestation, inoperable stove burners, inoperative range hood fans . . . inoperable or missing smoke detectors, broken windows," and other deficiencies. Id. Accordingly, pursuant to the terms of the Riverside HAP contract, HUD issued a notice to Ben Alli on December 18, 1998, suspending all Section 8 payments for Riverside. Id.

On December 23, 1998, in accordance with the Riverside HAP contract, HUD notified Mr. Alli, in writing, that the Section 8 tenants at Riverside would be relocated to suitable housing. DX 138. The basis for this action was HUD's determination that "the housing accommodations provided [to] the residents at Riverside Apartments do not meet HUD's housing quality standards and as such, it is no longer safe for the residents to remain at Riverside Apartments." Id. On June 29, 1999, HUD notified Mr. Alli that it was terminating the Riverside HAP contract due to his failure to maintain the property in a decent, safe and sanitary condition. DX 153.

II. The Pingree Apartments[3]

Mr. and Mrs. Alli purchased the Pingree apartments in 1983 through a HUD competitive auction. TR 442:12-17 (Alli). On August 22, 1983, HUD and Mr. and Mrs. Alli entered into a 15-year HAP contract for the Pingree apartments. DX 134. The contract was renewed, with the last renewal occurring on February 25, 2000. DX 126, 127, 128. Similar to the Riverside HAP contract, the Pingree HAP contract allowed qualified low-income residents to pay only a small percentage of their income in rent with HUD subsidizing the remainder. Id.; TR 1047:4-11 (Brown). The contract also contained the provision that plaintiffs keep the Pingree apartments in a decent, safe and sanitary condition or else HUD would cease payments. Id. Sections 2.5(a), 2.5(b)(2), 2.5(c) and 2.21(b) of the Pingree HAP contract contained the same language as those provisions in the Riverside HAP contract quoted in the previous section. Id.

In addition to providing subsidy payments for qualified tenants at the Pingree apartments, HUD also held a mortgage upon the property. DX 135; TR 1047:4-16 (Brown). Accordingly, on August 24, 1983, HUD and Mr. and Mrs. Alli entered into a Regulatory Agreement for Insured Multi-Family Housing Projects ("regulatory agreement"). DX 135. The regulatory agreement incorporated by reference the terms of the HAP contract, and, at paragraph 10, required that the mortgaged property, as well as the grounds and equipment appurtenant to it, be maintained in "good repair and condition." DX 135 at 3. In the event plaintiffs breached the regulatory agreement, section 14 of the regulatory agreement provided HUD with several options including:

> (a) (i) [D]eclaring the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

[3] The Pingree apartments were located at 2211 Pingree and 2987 Gladstone in Detroit, Michigan.

* * * * *

> (b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project; [and]
>
> (c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement . . . .

On April 14, 1993, an inspection by Mr. Spooner revealed missing smoke detectors, roach infestation, peeling paint, wall and ceiling deterioration due to water leaks, blocked fire escapes, and unsafe steel gates. DX 2. Mr. Spooner testified that, during this inspection, he found serious water damage to kitchen cabinets and shower areas that had not been corrected for a significant amount of time.

> Q. Did you see water damage at the Pingree Apartments?
>
> A. Yes, there was water damage in the cabinets, kitchen cabinets especially. There was water damage in the shower areas where water had gotten behind the actual shower tub tile. The tile had never been repaired so the water kept going behind there and causing leaks, causing the [tile] to buckle, and that was pretty much common for both kitchen and bathroom areas at Pingree. The plumbing was just never really addressed as an issue to be repaired.
>
> Q. Could you tell how long the water damage had been there?
>
> A. No, I can't tell you exactly how long. I can tell it had been there for awhile, especially when you get into like the bathtubs, for instance, where you have tile that is buckled three or four inches, pulled away from the wall three or four inches. That doesn't happen overnight. That happens over a period of time – weeks, months, whatever.

TR 782:22-25; 783:1-16 (Spooner).

Later that year, on September 21, 1993, Mr. Spooner discovered that many of the same deficiencies noted in his previous inspection still existed and were never corrected. DX 3.

On September 16, 1994, Mr. Spooner conducted another inspection of Pingree and noted several serious deficiencies, including torn carpeting, missing floor tiles, water damage to walls and ceiling, roach infestation, inoperable range burners, inoperable smoke detectors, missing and broken pressure valves on water heaters, loose and broken door moldings, and separated countertops. DX 25. Mr. Spooner again failed several units during a February 1, 1996 inspection as a result of several health and safety violations. DX 7. On January 7, 1997, Mr. Spooner conducted an inspection of Pingree and saw the same reoccurring problems he had seen in his previous inspections. DX 5; TR 784:4-12 (Spooner).

Around this time, HUD began receiving letters from Dorothy Roach, a Section 8 tenant residing at Pingree. DX 199. In November 1997, Ms. Roach contacted Mr. Alli to inquire about renting an apartment at the Pingree apartments. TR 536:7-15 (Roach). Ms. Roach had been unemployed for medical reasons and had a pregnant daughter living with her. TR 534:13-18; 535:3-11 (Roach). Ms. Roach testified that the furnace at her current apartment was broken, and she was desperate to find other housing before her granddaughter was born. Id. Mr. Alli told Ms. Roach that the apartment would be ready on December 22, 1997, and Ms. Roach made arrangements to move that day. TR 537:2-20 (Roach).

When she arrived on moving day, with all of her belongings in a truck, Ms. Roach was shocked to see the condition of her apartment, and testified as follows:

> Q. [W]hat was the condition of the apartment?
>
> A. It was kind of shocking. When I went in, the bathroom, the first thing that I saw when I walked into the apartment was that it

> was exactly the same way as they had shown it to me when I had told them that it was incomplete. It was not ready. There was a hole in the ceiling of the bathroom, and where the debris from the ceiling had fallen down, it was on the floor. It was on the top of the commode. It was in the bathtub and just was like hanging there.

TR 537:24-25; 538:1-23 (Roach); see also DX 246. The apartment also came with a dirty, non-working refrigerator, a bathroom sink that did not work and no working smoke detectors. TR 664:6-15 (Roach). Although the hole in her ceiling was poorly covered that same day, Ms. Roach would not receive another refrigerator for three days, and neither the bathroom sink nor the smoke detectors would ever be repaired during the year she lived at the Pingree apartments. TR 543:2-8; 22-25; 544:1-5; 547:7-18. While at Pingree, Ms. Roach continued to have other problems with her unit. Her ceiling started to leak again and her unit was infested with roaches. TR 549:3-15 (Roach). She never saw anyone exterminate her apartment or the building the entire year she lived there. TR 552:18-20 (Roach). At trial, Ms. Roach vividly described conditions at Pingree, which she believed created an environment for roaches:

> Q. Now the apartments that aren't as you call them show apartments, [] what were the conditions of those apartments that you saw?
>
> A. People had moved out, left the garbage, left the trash. It was there, just there. Nobody ever cleaned the apartments. Some of the apartments had the ceiling completely down into the bathtubs. some of them had the sinks and the toilets hanging off the walls. Refrigerators had been closed up with the food in them. They would create new roaches. There were quite a few like that.
>
> And some of the apartments had not been lived in for a long time, and it wasn't like trying to go in. You could just push the door open. You could just walk in. Some didn't have doorknobs.

> Q. The apartments that you say had not been lived in for some time, did it look like those apartments had been cleaned out since the tenants left?
>
> A. Oh, no. Absolutely not. There were documents in some of those apartments that go way back beyond time, before the time that I came, two years before the time that I came. The documents laid strewn on the floor.

TR 550:22-25; 551: 1-22 (Roach). Moreover, Ms. Roach confirmed the reports of HUD inspectors that the elevators at Pingree did not work, leaving the many elderly tenants stranded in their apartments. TR 561:4-25; 562:1-4 (Roach).

On June 2, 1998 and June 4, 1998, HUD inspector, James Bow, inspected the Pingree apartments. DX 274. Of the 38 units inspected, 24 units failed the inspection. Id. Among the health and safety items cited were inoperable and missing smoke detectors, a crumbling parapet, roach infestation, tripping hazards and generally poor conditions. Id.

On January 13, 1999, HUD classified Pingree as a troubled property. DX 121. On or around February 26, 1999, Pingree was referred to HUD's Departmental Enforcement Center ("DEC") for administrative review by DEC's Chicago satellite office. DX 10. The purpose of the review was to determine whether enforcement action or other administrative action upon the property was necessary. Although Pingree was referred to DEC, the HUD Multifamily Hub in Detroit continued to handle routine matters for the property and continued to make site visits to determine whether repairs had been completed. TR 1055:25; 1056:1-8 (Brown); 1022:21-25; 1023:1-3 (Berry).

In March 1999, James Pollock, an enforcement analyst at the time with DEC, conducted a site visit of Pingree with four other HUD employees. TR 827:17-21; 828:19-24 (Pollock); see also DX 247. The purpose of the site visit was to determine the current conditions of the

property, to confirm the findings of previous inspection reports, and to determine whether Mr. and Mrs. Alli were willing and able to bring the properties into compliance. TR 828:6-18 (Pollock). During his visit, Mr. Pollock found the condition of the Pingree apartments to be as described in previous inspection reports. There were inoperable smoke detectors, severe water damage, sinks and shower units separating from walls, leaking plumbing, damaged or inoperable ranges and refrigerators, roach infestation, damaged doors and inoperable hardware, and missing or inoperable lighting. DX 174, 247. Upon entering the Pingree apartments, Mr. Pollock recalled the following:

> I remember walking into this building. There was a very foul odor of sewage, and there was a discussion amongst the group about how there had been a sewer backup within the day or two prior to our visits.

TR 839:11-15 (Pollock). To accompany his written findings, Mr. Pollock took several photographs during his visit. At trial, Mr. Pollock described several of his photographs of Pingree as follows:

> Q. And the bottom picture, would you tell us about that picture?
>
> A. Again very common in many of the bathrooms we saw where there was tile that had fallen away from the tub surround, cracking tiles, cracking mortar, mold buildup. This particular shower, it appeared as though somebody had made a haphazard attempt to repair or replace the tiles using just white caulking.
>
> Q. On page 28, would you tell us about the bottom picture?
>
> A. This was an active leak at the time of our visit. It's the ceiling of one of the units at one of the Pingree buildings, and the ceiling was heavily saturated with water and there was water dripping into the unit at the time. It was an occupied unit by the way.
>
> *****

> Q. Can you tell us what we're looking at [page 34] at the bottom picture there?
>
> A. That's a sink base cabinet in one of the kitchens of one of the Pingree buildings. This one, and again this was very common, where there were leaks under sinks that had caused the shelf at the bottom of the base cabinets to actually collapse under their own weight. In this particular case the tile, linoleum tile had also lifted away from the floor. There was heavy staining along the backsplash of the countertop, heavy staining on the counter itself, a missing cabinet drawer, all indicating a general lack of maintenance.
>
> Q. Do you recall whether this was an occupied unit?
>
> A. Yes, it was.

TR 841:10-25; 844: 15-25; 845:1-5 (Pollock); DX 174 at 27-28, 34. Mr. Pollock also reported dangerous conditions at Pingree, including ceilings at risk of collapsing and spalling concrete about to fall onto the sidewalks below. TR 840: 18-24; 842:25; 843:1-4 (Pollock); DX 174 at 30. According to Mr. Pollock, the Pingree apartments were not decent, safe and sanitary at the time of his visit, "they weren't even close." TR 853:2-7 (Pollock).

DEC contracted with Pinnacle Realty Management Company ("Pinnacle") to conduct an independent review of Pingree. DX 9. On June 8, 1999, Pinnacle submitted an initial report, with photographs, concluding that the Pingree apartments were not in a decent, safe and sanitary condition. Specifically, Pinnacle determined that "[t]he picture painted by prior inspections is accurate, [and] [t]he sites are not being maintained to minimal standards of Decent, Safe, and Sanitary Condition." DX 1.

On November 18, 1999, HUD's Real Estate Assessment Center ("REAC") inspected sample units at the Pingree apartments and identified numerous physical defects, including 39 health and safety issues. DX 170. Among the findings were failing smoke detectors,

deteriorated grounds and parking areas, cracks and exposed rebar in the foundation, deteriorated masonry, missing handrails, inoperable lighting and inoperable exit lights. Id. A copy of the REAC report was sent to Ben Alli with a letter stating that "[b]ecause you are required to maintain your property in good repair and condition, we are directing you to conduct a complete survey of the entire property to determine the full extent of the physical deficiencies that are present and in need of correction or repair." Id. No survey was ever submitted.

On March 2, 2000, HUD notified Mr. and Mrs. Alli that they were in violation of their regulatory agreement and in default of the Pingree HAP contract for failure to maintain the property in a decent, safe and sanitary condition. DX 143. On April 28, 2000, HUD notified Ben Alli that he and his wife remained in default of their HAP contract and suspended all Section 8 payments for Pingree. DX 66. HUD continued to perform site visits to the Pingree Apartments in 2000 to examine whether the property had been repaired to meet the standard of decent, safe, and sanitary, but HUD found with each visit that the required repairs had not been made. TR 1022:21-25; 1023:1-3 (Berry); TR 1056:9-17 (Brown).

On May 4, 2000, HUD issued Ben Alli a formal notice that he and his wife were in default of the regulatory agreement for the Pingree apartments. DX 65. In the notice, HUD specifically cited Ben Alli's failure to maintain the property in good repair and condition as required under paragraph 10 of the agreement. Id. On May 10, 2000, Margarita Maisonet, the Director of DEC in Chicago, sent a memorandum to Robert Brown, recommending that HUD foreclose upon the mortgage for the Pingree apartments. DX 236. On May 12, 2000, Mr. Brown sent a memorandum to Alvin Bragg, Director of HUD's Multifamily Property Disposition Center in Fort Worth, Texas, concurring in the recommendation for foreclosure. DX 232. HUD

subsequently began relocating tenants from Pingree to other suitable housing. Before HUD completed the foreclosure, Mr. and Mrs. Alli paid off the HUD-held mortgage and still own and operate the Pingree property today. The payoff did not affect the HAP contract breach

As a direct result of Ben and Shaki Alli's failure to maintain Pingree in a decent, safe and sanitary condition, HUD incurred significant expenses in relocating all of its Section 8 tenants from the Pingree Apartments to other suitable housing. TR 1057:24-25; 1058:1-15 (Brown).

III. The Collingwood Apartments[4]

L&R Realty LP ("L&R Realty") entered into a 15-year HAP contract with HUD for the Collingwood apartments on or around May 12, 1981. DX 130. In June 1989, BSA Corporation ("BSA"), an alter ego of Ben and Shaki Alli, acquired the Collingwood apartments, subject to the HAP contract, through a transfer of physical assets ("TPA") process. TR 1048:2-9 (Brown); 498:15-18 (Alli).

When the original HAP contract expired, HUD and BSA entered into a HAP contract on June 27, 1997, and, upon expiration, entered into another HAP contract on September 30, 1997. DX 131, 132. The September 30, 1997 contract was renewed several times until March 24, 1998, when HUD and plaintiff BSA Corporation entered into a new 5-month HAP contract. DX 129. This contract was also renewed by the parties several times, with the last renewal expiring on March 15, 2000. DX 128.

Similar to the Pingree and Riverside HAP contracts, the Collingwood HAP contract allowed low-income residents to pay a small percentage of their income in rent with HUD subsidizing the remainder. DX 132; TR 1048:2-9 (Brown). Section 6 of the HAP contract

[4] The Collingwood apartments were located at 1610 Collingwood and 1635 Calvert in Detroit, Michigan.

provided that BSA keep the Collingwood apartments in decent, safe and sanitary condition or else HUD would cease its payments. DX 132. Specifically, section 6 of the Collingwood HAP contract contained the same language as section 2.5 of the Pingree and Riverside HAP contracts. Id. Section 20 of the Collingwood HAP contract provided HUD the same remedies for default as section 2.21(b) of the Pingree and Riverside HAP contracts, with the additional remedy of recovering any overpayments. Id. Moreover, section 19(c) of the Collingwood HAP contract required as follows:

> The Owner agrees to notify HUD promptly of any proposed [sale, assignment, conveyance, or transfer of the property]. The Owner further agrees to request the prior written consent of HUD.

Id.

HUD also held the mortgage upon the Collingwood property. TR 1048:2-9 (Brown). Accordingly, HUD and BSA also entered into a regulatory agreement in June 1990. DX 133. The regulatory agreement incorporated by reference the terms of the HAP contract, and, paragraph 10 required that the mortgaged property, as well as the grounds and equipment appurtenant to it, be maintained in "good repair and condition." DX 133 at 95. Section 8 of the regulatory agreement provided that BSA could not, without the prior written approval of HUD, convey, transfer or encumber any of the mortgaged property. Id. In the event of a default, section 14 of the regulatory agreement provided HUD several remedies, including, the option to "[t]ake possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of the Agreement" and/or "to declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage." Id.

On June 29, 1995, HUD inspector, David Salazar, inspected the Collingwood apartments. DX 91, 263. During this inspection, Mr. Salazar cited several units for serious health and safety violations such as inoperable smoke detectors, presence of vermin, roach infestation, inoperable stove burners, missing floor tiles, missing window screens, cracked windows, damaged ceilings and floors, and water leaks. DX 91, 263. These findings were reported to BSA, and BSA was given 30 days to correct the failed items and provide written certification that the repairs were completed. DX 263.

On October 29, 1997, HUD inspector, James Bow, inspected and failed 48 of 52 units at the Collingwood apartments. DX 249. Mr. Bow took photographs of the units that day to show conditions which he believed did not meet decent, safe, and sanitary housing standards. DX 180; TR 800:21-25; 802:7-13 (Bow). In his inspection report, Mr. Bow noted that "[i]n general, the units are filthy, roach infested, unsanitary, and unsafe" and that "[t]he owners, the management team, and maintenance crews have failed to provide decent, safe and sanitary housing." Id. at 666. Mr. Bow further reported that "[r]oaches or evidence of [the] same were observed in every apartment," and that the walkway up to the roof was scattered with "fecal matter [and] urine soaked clothes, trash, newspaper [], wood, [and] litter." Id. One of Mr. Bow's photographs shows the door leading to the roof to be off its hinges and lying on the ground, making the building susceptible to vermin, vandals, trash and the outside elements. DX 180; TR 804:9-16. In the individual apartment units, Mr. Bow found several violations including broken windows, missing doors, inoperable smoke detectors, torn carpet, missing floor tiles, water leaks, missing window screens, water damage, inoperable stove burners, missing cabinets and drawers,

inoperable electrical outlets, inoperable sinks, and leaking toilets. DX 249. In unit 201 at 1610 Collingwood, Mr. Bow reported as follows:

> Kitchen ceiling falling in/walls destroyed/floor covering destroyed/cabinets are falling off wall/there is no electrical service in the kitchen. Tenant states she has to eat out since she cannot prepare food in here. Replace range. It does not work.

Id. at 671.

BSA was notified of HUD's findings on December 15, 1997 and given 30 days to either make the necessary repairs or to provide HUD with "an acceptable plan for repair of the property." DX 168. No acceptable plan was submitted by BSA, and on April 28, 1998, Mr. Bow conducted a follow-up inspection of Collingwood to see whether the property had been brought up to the required standard. Id. He found that most items had not been corrected, and 19 of 21 inspected units failed reinspection. DX 82. Mr. Bow noted serious deficiencies in his re-inspection report, including roach infestation, holes in walls and doors, toilets loose from the wall, lack of hot water, inoperable range burners, missing window screens, mildew damage, water leaks, missing knobs on stoves, rotten window sills, inoperable and overflowing toilets, missing or inoperable smoke detectors, an inoperable intercom, and sagging cabinets. Id.

On June 4, 1998, HUD notified BSA that it was in default of the Collingwood HAP contract and in violation of the regulatory agreement for several reasons, including failure to maintain the property in good repair and condition. DX 141. On September 28, 1998, HUD referred Collingwood to DEC for review. DX 108. As part of the review, HUD contracted with a third party, Pinnacle, to conduct an independent inspection; Pinnacle subsequently confirmed the poor physical condition of the project. Id. On November 9, 1998, REAC inspected Collingwood and identified numerous deficiencies, including excessive leaks and water damage,

exposed jagged glass, broken windows, inoperable smoke detectors and exit lighting, missing radiator covers, damaged countertops and cabinets, and rotten and deteriorated flooring. DX 160.

On January 13, 1999, HUD classified the Collingwood apartments as a troubled property. DX 80. On March 16, 1999, a site visit was conducted by James Pollock and four other HUD employees. DX 247. According to Mr. Pollock, the purpose of his visit to Collingwood was the same purpose for his visit to Pingree that day: to confirm the findings of prior inspection reports, to determine the current condition of the property, and to determine whether the owner was willing or able to bring the property into compliance. TR 828:6-18 (Pollock). Mr. Pollock reported the findings of his site visit in a written report with accompanying photographs. DX 174, 247. He discovered that many of the deficiencies at the Pingree apartments were also found at Collingwood, including water damage, roach infestation, spalling concrete, and inoperable smoke detectors and appliances. DX 247; TR 831-36 (Pollock); DX 174 at 2-7, 9, 11. At trial, Mr. Pollock described some of his pictures of Collingwood as follows:

> Q. Looking at the next page, why did you take the top picture there?
>
> A. That was the area above the carpet in the previous picture where there was an active leak at the time of my visit.
>
> Q. What do you mean when you say “active leak”?
>
> A. It was still leaking water. There was actually water coming down out of the ceiling at the time of our visit.
>
> Q. And why did this pose a problem?
>
> A. Well, a couple of reasons. One, you know, if gone unattended, it could cause severe damage to the floor underneath the carpeting. It had already appeared to have caused [a] large area of saturation

> of the carpeting. It also presents the high likelihood that the ceiling wold be saturated to the point where it would have to be either repaired extensively or replaced. It also at some point these ceiling tiles could actually collapse [on] somebody walking underneath them.

TR 831:1-25; 832:1-7 (Pollock), DX 174 at 3. Mr. Pollock also described several hazardous conditions existing at Collingwood:

> Q. And what about the picture at the bottom, what are we looking at there?
>
> A. That's a view looking down from the roof of one of the Collingwood/Kirkwood buildings. You can see that the concrete around the face of the building is spalling, and presents a hazard to people walking below if any of this were to fall way from the building.
>
> Q. Let's look at the next page. Could you tell us about the top picture?
>
> A. This is another view looking down from one of the Collingwood/Kirkwood buildings. You can see there is a very large piece of concrete that's falling away from the building, again posing a hazard to people below.
>
> *****
>
> Q. Would you turn to [] page 9? Would you tell us about that bottom picture?
>
> A. I remember this specifically actually. This is a ceiling in one of the stairwells in one of the Collingwood/Kirkwood buildings. There obviously had been a leak in this section of the ceiling. You can see that the floor timbers are heavily rotted and covered in mold. There is lath and plaster that had fallen away, and the lath is all rusted. There is a piece of corroded pipe there which may or may not have been the cause of the leak. I don't know. The damage had also gone down the wall. You can see a large crack in the wall surface there.
>
> Q. And why was this a problem?

> A. Well, in addition to being just a general lack of maintenance and care, it also is dangerous in that these floor timbers are holding up, literally holding up the floor above, and could collapse, you know, causing injury or death to anybody walking above it or below it if it fell at the time.

TR 834:24-25; 835:1-13; 836: 2-21 (Pollock), DX 174 at 5-6, 9. At the end of his site visit, Mr. Pollock concluded that the overall unacceptable physical condition of the property as identified in the REAC inspection and prior HUD inspections was accurate. DX 247. He also concluded that the Collingwood apartments were not decent, safe and sanitary, and that the owners were not willing or able to bring the project into compliance. TR 852:19-25; 853:1, 21-25; 854:1-9; see also DX 259.

In a letter dated June 4, 1999, BSA was notified of the violations on Collingwood and given an opportunity to cure the deficiencies. DX 95. BSA was also notified that it was in violation of the HAP contract and regulatory agreement. DX 141. Also on June 4, 1999, Pinnacle, HUD's third-party contractor, issued its initial report, with photographs, concluding that "[p]hysically, the property is not in decent, safe, and sanitary condition." DX 76.

On July 23, 1999, HUD conducted a site visit of Collingwood and determined that no significant changes had been made to the property. DX 51 at 1. On September 30, 1999, HUD issued written notice to BSA that it had defaulted upon the Collingwood regulatory agreement for failure to maintain the apartments in a decent, safe, and sanitary condition. DX 48. That same day, HUD issued formal notice to BSA that it was suspending and abating its Section 8 payments for Collingwood. DX 51. Shortly thereafter, on October 5, 1999, HUD notified BSA that it was initiating foreclosure proceedings for Collingwood due to BSA's default. DX 52. In the notice, HUD offered BSA an opportunity to submit reasons why foreclosure should not take place. Id.

At Ben Alli's request, a hearing regarding the foreclosure was held on October 25, 1999. DX 166. Because no legal reasons were presented by Ben Alli or his attorney to prevent foreclosure, HUD proceeded with foreclosure proceedings. Id.

On December 23, 1999, HUD employees, Silas Polk and Patrick Berry, made a site visit to the Collingwood apartments and found garbage piled in the hallways, cats roaming the common areas, broken windows, and wide open access to the roof. DX 261. Moreover, several tenants complained to Mr. Polk and Mr. Berry that the building had minimum heat and hot water. Id. These conditions were eerily similar to the conditions described by Dorothy Roach more than a year earlier. TR 565:3-24 (Roach).

On January 4, 2000, HUD attorney, Mike Polsinelli, and HUD employees, James Bow and Patrick Berry, visited Collingwood with Ben Alli and his attorney at the time, Stephen Palms. DX 148. During the visit, Mr. Berry observed leaking water in the basement, raw sewage in the boiler room, exposed wires and crumbling exterior walls. Id. Mr. Palms testified that his first impression of the building was that it was in "very bad shape." TR 1010:10-12 (Palms). Mr. Palms described his visit as follows:

> Q. When you entered that door in the wing of the building as you've described, what did you see?
>
> A. It was a dark hallway. In fact, as I recall, I'm not even sure the door had been shut, but it was a dark hallway. The carpeting was in serious disrepair. I would describe it as in tatters, filthy, dirty. Again, I had a sense of a very dark enclosed space that was quite, quite dirty and not well-lit.
>
> Q. After you went to that hallway or that area you're describing, did you see anything else in the building?
>
> A. My recollection is that we went through that hallway, and then we went to a common area that I believe was attached to that

> building, and the common area was a larger room. I don't remember much in the way of furniture in that room, but what I do remember is that the floor was I would say half covered with water, because I remember picking my way across the floor to make sure that I could stand in areas that were dry.

TR 1010:21-25; 1011:1-16 (Palms). According to Mr. Palms, the Collingwood apartments at the time of his visit were "filthy, dilapidated, [and] appalling," and he "was actually surprised people were living there." TR 1014:4-12 (Palms).

A. Proposed Sale To Cory Fanning

By December 4, 1998, BSA had contracted with Marcus & Millichap to assist with selling the Collingwood apartments. DX 252. Marcus & Millichap found a potential buyer for the dilapidated property, Cory Fanning, who agreed to pay the full asking price of $675,000. TR 271:3-7 (Hopkins). Mr. Fanning was a pastor of a church and had no experience in managing Section 8 housing. TR 333:24-25; 334:1-8; 335:12-15 (Fanning). Indeed, Mr. Fanning had virtually no experience in managing any housing. TR 335:8-11, 16-20 (Fanning). Although Mr. Fanning was looking for an apartment building as an investment for himself, he actively sought investors from the congregation to help with the down payment for the building. TR 334:25-7 (Fanning). On July 14, 1999, Marcus & Millichap, representing BSA, and Cory Fanning entered into a real estate purchase agreement for the Collingwood apartments. DX 137.

On September 23, 1999, Mr. Fanning contracted with GMAC to be his proposed lender. DX 136. Mr. Fanning testified that he chose GMAC because they "knew how to do the HUD financing" and "were able to do these HUD loans." TR 331:7-9; 12-18 (Fanning). Mr. Fanning planned to finance more than 90 percent of the purchase price for Collingwood because most of the money he had planned to use for a down payment was going to repairs on the property. TR

350:3-19 (Fanning). Mr. Fanning hired Eckland Consultants, Inc. to perform a walk-through observation of Collingwood and prepare a Property Condition Report. PX 46. Without observing any concealed materials or conditions, Eckland estimated that the total repair cost to fix only the visible problems was $155,340. PX 46 at 17, 20; TR 343:19-25; 344:1-9 (Fanning). Mr. Fanning testified that he was aware that the Collingwood apartments "needed extensive repair" and was "a fixer-upper." TR 341: 8-16; 344:1-5 (Fanning).

Under the Collingwood HAP contract and regulatory agreement, any sale of Collingwood had to first be approved by HUD. DX 78, 133. Pursuant to HUD's handbook, a TPA application must be submitted as part of this approval process. TR 1068:21-25; 1069:1-18 (Brown). The purpose of the TPA application is:

> for HUD to make sure that the buyer is capable of assuming all of the obligations that are contained in the mortgage and the regulatory agreement and also to make sure that the property meets all of HUD's standards after the sale.

TR 1069:1-5 (Brown). In determining whether to approve a TPA application, HUD considers the condition of the property and the financial capability of the buyer to purchase the property and to pay for repairs. TR 1069:6-18 (Brown). HUD also considers whether the proposed buyer is experienced and capable of managing a Section 8 property. TR 1069:19-25 (Brown). When Ben Alli purchased Collingwood, he submitted a proper TPA to HUD, which was approved. DX 251.

On October 6, 1999, BSA and Mr. Fanning entered into a letter agreement to extend the closing date to November 30, 1999. DX 191. The purpose of the extension was to provide time

to comply with HUD 223(f) requirements.[5] Id. According to the letter agreement, "Should [the] transaction not close for reasons other than lender loan disapproval, buyer deposit of $20,000 is non-refundable." DX 191. Mr. Fanning testified that all of his deposits for the purchase of the property were refunded to him when the sale did not go through. TR 345:8-13 (Fanning).

Neither plaintiffs nor Mr. Fanning ever submitted a TPA application or any other written request to approve the sale of Collingwood to Mr. Fanning. Joint Ex. 1 at 2. Moreover, an authorized HUD employee did not deny the sale of Collingwood either orally or in writing. TR 1072:4-22 (Brown).

B. January Heat Shut-Off And Foreclosure

On January 25, 2000, Patrick Berry received several complaints from tenants at Collingwood that one of the buildings did not have heat. TR 1027:4-8 (Berry). Mr. Berry attempted to reach Ben Alli four or five times before performing a site visit to Collingwood with James Bow. TR 1027:17-25; 1028:1-15 (Berry). Mr. Berry recalled that the temperature that day was around five degrees Fahrenheit, well below freezing. TR 1028:16-18 (Berry). Upon arriving at the building, Mr. Bow observed that the building was very cold and that he could see his breath. TR 812: 8-21 (Bow). Mr. Berry recalled his visit as follows:

> We saw that oven doors were wide open. The broiler was on. People were wrapped in winter coats and blankets, along with the little children. There were space heaters and just an attempt to try and keep warm, but they were still having to wear blankets, winter coats and the like to try and maintain some warmth.

[5] HUD insures mortgages under Section 207 of the National Housing Act pursuant to Section 223(f) of the same Act for purchasing or refinancing existing multifamily projects originally financed with or without federal mortgage insurance.

TR 1029:21-25; 1030:1-2 (Berry). Upon gaining entry to the boiler room, it was apparent to Mr. Bow that the heating system had been shut down for some time as there was no residual heat in the unit. TR 812:18-21 (Bow). There was also no building or maintenance personnel on the premises to assist the tenants. TR 814:22-23 (Bow); DX 222. That same day, after several unsuccessful attempts to reach Ben and Shaki Alli, HUD issued to BSA a formal declaration of involuntary mortgagee-in-possession of the Collingwood apartments due to the abandonment of the project by the owner. DX 155. HUD restored the heat to the buildings and hired a contractor, AMI, to take over management of the building. DX 222. When AMI arrived to announce that they were taking over the management of the building, "tenants came out into the hallway [and] were very appreciated and were clapping and shouting." Id. at 3. At trial, Mr. Brown explained HUD's decision to take this action:

> Q. When Mr. Bow and Mr. Berry returned to the office and confirmed to you the situation, what action did you take next?
>
> A. Well, that day was a very cold day. The temperature range was somewhere between 7 and 10 degrees, and we were very concerned that the tenants were in danger. It's not uncommon to read in Detroit newspapers in the wintertime about fires in buildings and people dying. We were extremely concerned. . . . And we came to the conclusion after a couple of hours of discussion that given the fact that the owner apparently was not in town and we couldn't reach the owner and . . . there was nobody onsite that could fix the problem, that HUD had to take action to protect the health and safety of the residents. So we decided to take involuntary mortgagee in possession to get the heat back on and to take care of any other immediate threats to the health and safety of the tenants.

TR 1064:17-25; 1065:1-22 (Brown). HUD remained the involuntary mortgagee-in-possession of the Collingwood apartments until the foreclosure sale. TR 1067: 20-22. Prior to the foreclosure sale, HUD terminated the HAP contract and relocated the residents of Collingwood to suitable

housing. On March 6, 2000, in response to Ben Alli's request, HUD quoted Ben Alli a payoff amount of $97,210.66 for his HUD-held mortgage on Collingwood. DX 139. Ben Alli disputed the payoff amount, and the mortgage was never paid off. DX 140.

HUD incurred substantial expenses to bring Collingwood to minimal living standards for the tenants while they awaited relocation. TR 1034: 2-24 (Berry); 1063:5-15 (Brown). Eventually, HUD relocated all of the tenants to suitable housing and held a foreclosure sale of the Collingwood apartments. Joint Ex. 1 at 2. On February 2, 2001, HUD sold the Collingwood apartments to a third-party for $80,890. Id. at 3.

## ARGUMENT

### I. Applicable Law

Contract interpretation begins with the plain language of the agreement. NVT Techs. Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983). In order to recover for breach of contract, one must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). The party alleging the breach of contract bears the burden of establishing these elements by a preponderance of the evidence. Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965).

The HAP contracts and regulatory agreements in this case required that plaintiffs maintain the properties in a decent, safe and sanitary condition. These physical standards are set

forth in 24 C.F.R. Part 5, Subpart G, which became effective in 1998.[6] The regulation requires the following to meet the decent, safe and sanitary standard:

> (a) Site. The site components, such as fencing and retaining walls, grounds, lighting, mailboxes/project signs, parking lots/driveways, play areas and equipment, refuse disposal, roads, storm drainage and walkways must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as abandoned vehicles, dangerous walks or steps, poor drainage, septic tank back-ups, sewer hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards.
>
> (b) Building Exterior. Each building on the site must be structurally sound, secure, habitable, and in good repair. Each building's doors, fire escapes, foundations, lighting, roofs, walls and windows, where applicable, must be free of health and safety hazards, operational, and in good repair.
>
> (c) Building System. Each building's domestic water, electrical system, elevators, emergency power, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable and in good repair.
>
> (d) Dwelling Units. (1) Each dwelling unit within a building must be structurally sound, habitable and in good repair. All areas and aspects of the dwelling unit . . . must be free of health and safety hazards, functionally adequate operable and in good repair. (2) Where applicable, the dwelling must have hot and cold running water . . . (3) If the dwelling unit includes its own sanitary facility, it must be in proper operating condition, usable in privacy and adequate for personal hygiene and the disposal of human waste. (4) The dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit.
>
> (e) Common areas. The common areas must be structurally sound, secure and functionally adequate for the purposes intended . . .
>
> (f) Health and Safety Concerns. All areas and components of the housing must be free of health and safety hazards. These areas

---

[6] Prior to 1998, only the Housing Quality Standards, 24 C.F.R. § 886.307, were in effect for these projects.

> include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits . . . infestation, and lead-based paint. For example, the buildings must have fire exits that are not blocked and have hand rails that are undamaged and have no other observable deficiencies. The housing must have no evidence of infestation by rats, mice, or other vermin, or garbage and debris. The housing must have no evidence of electrical hazards, natural hazards, or fire hazards. . . . .

## II. Ben Alli, Not HUD, Breached The Riverside HAP Contract By Failing To Maintain The Riverside Apartments In A Decent, Safe, And Sanitary Condition

The plain language of the Riverside HAP contract required Ben Alli to maintain the Riverside apartments in a decent, safe and sanitary condition. DX 125 at 11. If HUD reasonably determined that these standards were not being met, the plain language of the contract permitted HUD, after proper notice and a failure of the owner to respond or take satisfactory action, to terminate the contract, in whole or in part, and to apply to any court for appropriate relief. Id. at 23-24. The contract also provided HUD with the additional option of suspending its payments either in whole or in part. Id. at 11.

In this case, HUD determined that the Riverside apartments did not meet decent, safe and sanitary standards due to numerous deficiencies found during its inspections. TR 698:23-25; 706:22-24 (Salazar); 774:3-6 (Spooner); 1049:18-25; 1050:1-5 (Brown). With each inspection and re-inspection, HUD inspectors found inoperable or missing smoke detectors, severe water damage, roach infestation, missing radiator covers, broken cabinets and countertops, inoperable toilets, worn carpeting and many other problems that affected the safety and cleanliness of the property. DX 163, 164, 230, 244; PX 8, 10. As David Salazar testified:

> Riverside was not a place that I would want anybody to live in. It was horrible. It was not a good place. It was not being maintained or taken care of, and a lot of maintenance, in my opinion, [was] neglected, or if they would make repairs, the repairs were so bad

> that they would result in quick failure, so they were never done right to start off with, and that's my opinion.

TR 698:9-16 (Salazar). At trial, Mark Spooner confirmed Mr. Salazar's statements:

> Q. During the time that you conducted inspections on Riverside, did you consider Riverside to be decent, safe and sanitary?
>
> A. No, I did not.
>
> Q. Why not?
>
> A. Because it wasn't. There was just too many problems with Riverside. . . . [and] [n]one of the buildings had been maintained to any degree, and the older building, going back to the elevator problems, was even worse.

TR 774:3-14 (Spooner).

HUD notified Mr. Alli that Riverside was not being maintained as required by the HAP contract and provided him multiple opportunities to bring the property into compliance. PX 11; DX 164, 165, 244; TR 1053:11-14 (Brown). He failed to do so over the course of several years, and breached the plain language of the HAP contract. DX 125. As a result, HUD suspended payments and terminated the contract, as permitted. DX 153, 165. In doing so, HUD incurred substantial expenses in relocating the tenants to suitable housing. TR 1052:12-21; 1053:15-18 (Brown).

Ben Alli argues that the HUD inspection reports contained false statements, and that the Riverside apartments were decent, safe and sanitary. He claims that HUD breached the Riverside HAP contract when it suspended payments and terminated the contract. To support his claim that the HUD inspection reports contained false statements, Ben Alli offered the testimony of Roland Samaroo, a licensed psychologist, whom Ben Alli hired to do minor repairs and check the accuracy of HUD's inspections.

Mr. Samaroo's testimony was biased, unreliable, and contained several flaws. First, Mr. Samaroo is a licensed psychologist, not a building inspector. TR 216:10-25; 217:1-25 (Samaroo). He has both a bachelor's and master's degree in psychology, and is currently studying for his doctorate. TR 217:1-25 (Samaroo). His statements that he could not find some of the deficiencies in the HUD reports is more likely a result of his lack of experience rather than an alleged false inspection report. Second, Mr. Samaroo was hired by Ben Alli to perform minor repairs at Riverside on an as-needed basis. TR 220:1-22 (Samaroo). Therefore, if any deficiencies were admitted to, it would have reflected on his ability or inability to perform his responsibilities. Third, Mr. Samaroo admitted that he did not go through and check every item or every unit on the HUD reports. TR 227:23-25; 228:25; 229:1-8; 230:13-16 (Samaroo). Fourth, several of Mr. Samaroo's statements were inconsistent. For example, he admitted that the elevators did not work at Riverside because they would be shut down to prevent drug runners. TR 232:17-24 (Samaroo). However, when asked whether he thought the building was safe, Mr. Samaroo testified that it was safe. TR 232:25; 233:1 (Samaroo). Moreover, when asked whether he was able to confirm HUD's finding that one of the units had a large, gaping hole covered by a red umbrella to catch water leaking from the ceiling, Mr. Samaroo testified that he found only "a small hole." TR 233:21-25; 234:1-22 (Samaroo). When confronted with the photograph of the large hole taken by Mr. Salazar, Mr. Samaroo testified that he had not seen that hole. TR 235:19-21 (Samaroo). Finally, Mr. Samaroo offered very few pictures to support his testimony about the condition of Riverside, and the pictures that were provided were taken at a distance. PX 52. Indeed, Mr. Samaroo could not even identify the year in which the pictures were taken. TR 240:2-25; 241: 1-14 (Samaroo).

Moreover, it is a well-settled presumption that HUD employees are presumed to act in good faith and to perform their duties properly, and that it requires "'clear and convincing evidence" to overcome this presumption. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) Mr. Salazar and Mr. Spooner testified under oath that they never falsified any information on their inspection reports, and that the information in their reports were true. TR 692:10-11; 699:23-25; 700:1-5 (Salazar); 778:11-13 (Spooner). Mr. Samaroo's testimony that he, a licensed psychologist, could not confirm or find some of the deficiencies noted in the reports, is not sufficient to overcome this presumption. Also, Mr. Samaroo admitted that he found evidence of roach infestation, inoperable smoke detectors, and an elevator that did not work. TR 185:19-25: 186:1-6; 231:17-24 (Samaroo). According to plaintiffs' own witness, Mr. Hileman, a building inspector hired by Mr. Alli, a building without working smoke detectors would not be compliant, and a building with roach infestation would not be habitable. TR 117:20-25; 118:1-21 (Hileman).

Ben Alli failed to overcome the presumption that HUD's inspection reports were accurate, and failed to prove by a preponderance of the evidence that the buildings were in decent, safe and sanitary condition. Accordingly, Ben Alli, not HUD, breached the Riverside HAP contract by failing to keep the property in a decent, safe and sanitary condition.

## III. Ben And Shaki Alli, Not HUD, Breached The Pingree HAP Contract And Regulatory Agreement By Failing To Maintain The Pingree Apartments In A Decent, Safe, And Sanitary Condition

Similar to the Riverside HAP contract, the plain language of the Pingree HAP contract required Ben and Shaki Alli to maintain the property in a decent, safe, and sanitary condition. DX 134. If HUD reasonably determined that these standards were not being met, the plain

language of the contract permitted HUD, after proper notice and a failure of the owner to respond or take satisfactory action, to terminate the contract, in whole or in part, and to apply to any court for appropriate relief. Id. The contract also provided HUD with the additional option of suspending payments to Ben and Shaki Alli, either in whole or in part. Id. The plain language of the Pingree regulatory agreement also required Ben and Shaki Alli to maintain the property in a decent, safe and sanitary condition. DX 135. In the event of such a breach, the regulatory agreement provided several options to HUD, including declaring the remainder of the HUD-held mortgage to be immediately due and payable and/or foreclosing upon the property. Id.

Beginning in 1993, HUD found that the Pingree apartments were not decent, safe, or sanitary, as the contracts required. DX 2. For the next several years, HUD inspectors found roach infestation, broken windows, inoperable elevators, worn carpeting, severe water damage, damaged ceilings and walls, inoperable appliances, and many other problems affecting the health and safety of the tenants at Pingree. DX 25, 5, 274. The deteriorated condition of Pingree was confirmed by HUD's third-party contractor, Pinnacle, who reported that the prior inspections conducted by HUD were accurate and that the property was not being "maintained to [the] minimal standard of [a] Decent, Safe, and Sanitary Condition." DX 1 at 17. HUD's prior findings were also confirmed by the Chicago satellite office of the DEC. James Pollock, then an enforcement analyst with DEC, and now its Chicago Satellite Office director, testified that Pingree was one of the "absolute worst" properties he had ever visited in his nine years of inspecting multifamily housing. TR 870:15-21 (Pollock).

Despite being given multiple opportunities over the course of several years to make repairs, Mr. and Mrs. Alli never acceptably corrected the problems at Pingree and breached the

Pingree HAP contract and regulatory agreement by failing to maintain the buildings as required. DX 5, 25, 172, 274; TR 1055:5-10 (Brown). As a result, HUD suspended payments on Pingree, terminated the Pingree HAP contract and regulatory agreement, and began foreclosure proceedings upon the property, all of which it was allowed to do pursuant to the terms of the contracts. DX 134, 135. HUD also incurred significant expenses in relocating the tenants from Pingree to suitable housing. TR 1058:3-10 (Brown).

Ben and Shaki Alli argue that the HUD inspection reports for Pingree contained false statements and that the Pingree apartments were decent, safe and sanitary. They claim that HUD breached the Pingree HAP contract and regulatory agreement when HUD suspended payments and terminated the contracts. At trial, Ben and Shaki Alli offered the testimony of two building inspectors, Gordon Hileman and David Compo to support their claim.

Mr. Hileman and Mr. Compo were asked to review the accuracy of a November 1999 REAC inspection of Pingree. TR 78:10-13 (Hileman); 151:10-15 (Compo). Both witnesses represented that the REAC report was not an accurate reflection of the Pingree apartments at the time of their inspections. PX 5,6. Their inspections, however, occurred in June 2000, over seven months after the REAC inspection was conducted. Id. Moreover, at the end of 1999, unbeknownst to Mr. Hileman and Mr. Compo, Ben Alli had hired a handyman, Mark Schlotter, at $10 an hour, to correct deficiencies identified in the REAC report. TR 356:23-25; 367:23-25; 368:1-6 (Schlotter). Mr. Schlotter was able to identify two-thirds of the problems identified on the REAC report and worked five to twenty hours a week for one to two months. TR 357:21-25; 358:1-19; 368:7-11 (Schlotter). Even so, he was still unable to correct all of the problems he had identified in the report because he was the only one hired to work on them. Id.

Moreover, Mr. Hileman and Mr. Compo were unable to access all of the apartments in the REAC report, and they were not provided with any other written inspection reports for Pingree. TR 119:1-3; 125:1-11 (Hileman); 150:18-21; 160:17-19 (Compo). In fact, the only units which were seen by Mr. Compo, were units Ben Alli personally instructed him to inspect. TR 150:18-21 (Compo).

Accordingly, Mr. and Mrs. Alli failed to demonstrate by a preponderance of the evidence that the HUD inspection reports for Pingree were not accurate at the time they were produced and failed to overcome the presumption that the HUD inspectors acted in good faith and performed their duties properly when inspecting the Pingree apartments. HUD inspectors, James Bow and Mark Spooner testified under oath that they never falsified information in their reports and that the information contained in their inspection reports were true. TR 778:11-13 (Spooner); 811:23-25; 812:1-3 (Bow). Therefore, Mr. and Mrs. Alli, not HUD, breached the Pingree HAP contract and regulatory agreement by failing to maintain the property as contractually required.

## IV. Plaintiffs, Not HUD, Breached The Collingwood HAP Contract And Regulatory Agreement By Failing To Maintain The Collingwood Apartments In A Decent, Safe And Sanitary Condition

Similar to the Pingree HAP contract and regulatory agreement, the Collingwood HAP contract and regulatory agreement required BSA corporation to maintain the Collingwood apartments in a decent, safe and sanitary condition. DX 132, 133. In the event BSA did not maintain such standards, the Collingwood HAP contract permitted HUD to suspend payments and terminate the contract, and the regulatory agreement permitted HUD to declare the remainder of the HUD-held mortgage immediately due and payable and/or begin foreclosure proceedings upon the property. Id.

In 1995, HUD discovered that the Collingwood apartments were not being maintained in a decent, safe and sanitary condition. DX 91, 263. BSA was provided an opportunity to correct the health and safety violations identified by HUD, but failed to do so. The condition of the Collingwood apartments only continued to deteriorate over the course of several years. DX 51, 82, 168, 204, 247. With each inspection and re-inspection, HUD inspectors found health and safety violations and maintenance issues at the property including the presence of vermin, roach infestation, serious water damage, leaks, inoperable appliances, inoperable toilets, broken windows, damaged countertops and cabinets, and rotten and deteriorated flooring. Id. The condition of Collingwood was confirmed by Pinnacle, a third-party contractor, and by HUD's DEC. DX 76 at 20; 174, 247. It was also confirmed by Ben Alli's former attorney, Stephen Palms, who visited the property in January 2000. TR 1010: 10-25; 1011:1-16 (Palms). According to Mr. Palms, the building was dilapidated, filthy, and appalling, and he could not believe people were allowed to live there. TR 1014:4-12 (Palms).

HUD provided BSA with repeated opportunities over the course of many years to bring Collingwood into compliance, but BSA failed to do so. As a result, BSA breached the Collingwood HAP contract and regulatory agreement. HUD suspended HAP payments, terminated the HAP contract and began foreclosure proceedings as it was permitted to do pursuant to the plain language of the HAP contract and regulatory agreement. DX 132, 133. HUD also incurred significant expenses in relocating tenants to suitable housing and, as involuntary mortagee-in-possession, in addressing the exigent health and safety issues while those residents waited to be relocated. TR 1034:2-24 (Berry); 1063:5-15 (Brown).

BSA claims that the Collingwood inspection reports contained false information and that the Collingwood apartments were decent, safe and sanitary. BSA argues that HUD breached the Collingwood HAP contract and regulatory agreement when it suspended payments, terminated the contracts and foreclosed upon Collingwood. In support of its claim, BSA offered the testimony of Roland Samaroo, who was hired by BSA to verify the findings of the HUD inspection reports for Collingwood.

Mr. Samaroo's testimony, however, is contradicted by the testimony and reports of third-parties, all of whom confirmed the findings of HUD's inspections. DX 76; PX 46; TR 1014:4-12 (Palms). Although Mr. Samaroo claims that he could not find the violations identified by HUD inspectors, this does not mean that those violations did not exist. Mr. Samaroo was a licensed psychologist, not a building inspector, operating his own full-time business in addition to the work he performed for BSA. TR 216:10-25; 217:1-25; 218:1-5 (Samaroo). At best, his inability to identify the deficiencies noted in HUD's reports is most likely attributable to his lack of knowledge, experience, and time.

Moreover, as Mr. Samaroo was responsible for making minor repairs at Collingwood on an as-needed basis, violations found by HUD would have reflected on his ability or inability to perform his job. TR 218: 10-16 (Samaroo). Mr. Samaroo also could not recall what year he took the pictures of Collingwood that BSA offered into evidence. TR 240:4-25; 241:1-14 (Samaroo). Even if he could have recalled the year, the pictures were taken at such a distance that they are not sufficient to contradict the inspection reports or the claims by HUD, Pinnacle, and Stephen Palms that the property was in a dilapidated condition. PX 52. Even a third-party contractor hired by Cory Fanning, a potential purchaser, confirmed the findings of HUD and directly

contradicted the testimony of Mr. Samaroo. PX 46. For example, where Mr. Samaroo claimed that he could not verify the deficiencies in the HUD reports, Eckland Consultants found that the building needed over $155,000 for visible repairs alone. Id. This is a significant expense given that the amount remaining upon the mortgage was less than $97,000. DX 139. Specifically, Eckland observed damaged tile and carpeting, damaged and missing kitchen cabinets, appliances that need replacing, and leaking or damaged shower and bath faucets. PX 46.

Accordingly, BSA failed to demonstrate, by a preponderance of the evidence, that the HUD inspection reports for Pingree were not accurate at the time they were produced, and failed to overcome the presumption that the HUD inspectors acted in good faith and performed their duties properly when inspecting the Collingwood apartments. HUD inspectors, James Bow and David Salazar testified that they never falsified information in their reports and that the information contained in their inspection reports were true. TR 692:10-11; 699:23-25; 700:1-5 (Salazar); 811:23-25; 812:1-3 (Bow) Therefore, BSA, not HUD, breached the Collingwood HAP contract and regulatory agreement by failing to maintain the property as contractually required.

### A. Contrary To BSA's Assertions, An Authorized Agent Of HUD Did Not Deny The Sale Of Collingwood To Cory Fanning

The Collingwood regulatory agreement required BSA to obtain HUD's approval before selling, encumbering or transferring the property, in whole or in part. DX 133 at 94. The approval process begins with the submission of a written TPA application, which is typically compiled and submitted by the buyer. DX 1068:21-25; 1069:1-18 (Brown). For example, when BSA purchased Collingwood, BSA submitted the TPA application, which was eventually approved by HUD. TR 498:15-18 (Alli).

The purpose of the TPA application is to provide HUD with sufficient information for determining the condition of the property and the financial capability of the buyer to purchase the property and to pay for repairs. TR 1069:6-18 (Brown). In this case, neither BSA, Cory Fanning nor any of their representatives ever submitted a TPA application to HUD. Joint Ex. 1 at 2.

BSA claims that Robert Brown, the Director of the MultiFamily Hub in Detroit, orally denied BSA's request to sell the Collingwood apartments, and that the denial was unreasonable. TR 494:3-24 (Alli). BSA argues that this was a breach of the covenant of good faith and fair dealing that is implied in the Collingwood regulatory agreement. Contrary to BSA's claims, however, Mr. Brown (1) did not deny the sale of Collingwood; (2) had no authority to orally approve or deny the sale of Collingwood; and (3) even if Mr. Brown had the authority and had denied the sale, his denial would have been reasonable. See Contra Costa County Flood Control & Water Conserv. Dist. v. United States, 512 F.2d 1094, 1097-98 (Ct. Cl. 1975) ("The usual standard is that concurrence or approval is not left to unbridled discretion but can be withheld only if objectively reasonable in the particular circumstances, particularly when the item contracted for is not one which can be evaluated only on the basis of personal taste or fancy.").

It is well-established that the Government is not bound by the representations of its agents unless that agent had the actual authority to make such representations. Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Kiszka v. Office of Pers. Mgmt., 372 F.3d 1301, 1307 (Fed. Cir. 2004); Nematollahi v. United States, 38 Fed. Cl. 224, 231-32 (1997). Any party entering into an arrangement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government. Merrill, 332 U.S. at 384. This rule applies even where the agent himself is unaware of the limitations upon his authority. Id. The burden

rests upon the plaintiff to show that the Government's agent was authorized to make the representations or take the action that caused the breach. Nematollahi, 38 Fed. Cl. at 231-32.

In this case, Mr. Brown testified that he did not deny the sale of Collingwood to Cory Fanning, either orally or in writing. TR 1072:20-22 (Brown). He further testified that he did not have the authority to orally approve or deny the sale of Collingwood, and that there was a "good possibility" that actual authority to approve or deny the sale was with HUD headquarters in Washington, D.C. TR 1071:10-25; 1072:1-22 (Brown). Moreover, even if Mr. Brown had the authority and had denied the sale of Collingwood to Cory Fanning, the denial would have been reasonable and not a breach of the implied covenant of good faith and fair dealing.

Mr. Brown testified that there are several factors that HUD considers when determining whether to approve or deny a TPA application. TR 1069:19-25; 1070:1-11 (Brown). For example, HUD examines whether the buyer is capable of assuming all of the obligations in the mortgage and the regulatory agreement and whether the new owner has the financial capabilities and experience to bring the property into compliance with HUD standards. Id. In this case, Cory Fanning had no experience managing multifamily property, let alone Section 8 housing, was financing over 90 percent of the purchase price, and was relying upon donations from his congregation to pay for the down payment. TR 334:25; 335:1-20; 350:13-19 (Fanning). Therefore, it was clear that Mr. Fanning did not have the experience or the financial capabilities to handle the mortgage or the repairs necessary for Collingwood. Id. Accordingly, even if HUD had denied the sale of Collingwood, which it did not, its decision would not have been unreasonable.

Moreover, evidence presented at trial suggests that the sale of Collingwood did not go through due to Mr. Fanning's failure to secure financing, not because of HUD's alleged refusal to approve the sale. Mr. Fanning testified that all of his deposits for the proposed sale were returned, and the letter agreement, which extended the closing date for the sale, provided that Mr. Fanning's deposits would only be returned if the sale did not go through due to "lender loan disapproval." DX 191; TR 345:8-13 (Fanning).

B. HUD Did Not Breach Any Contractual Provision With Plaintiffs By Taking Involuntary Mortgagee-In-Possession Of Collingwood

The Collingwood regulatory agreement provided HUD with several remedies in the event of a default by the owners. DX 133. After 30 days notice of a violation, HUD could, in addition to beginning foreclosure proceedings,

> [t]ake possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage.

DX 133 at 96. By January 25, 2000, HUD had already provided BSA with 30-days notice of violation and subsequent default of the regulatory agreement, and had begun foreclosure proceedings on Collingwood. DX 52.

On Tuesday, January 25, 2000, HUD received calls from tenants that one of the Collingwood buildings had no heat. TR 1027:4-8 (Berry). Upon arriving at the scene, Patrick Berry deemed the situation to be extremely serious. TR 1039:18-22 (Berry). Tenants were using dangerous and unconventional methods to heat their apartments, and the outside temperature was well below freezing. TR 1028:16-18; 1029:21-25; 1030:1-2 (Berry). Attempts to reach Ben Alli

were unsuccessful, and no one from BSA could be found on the premises except for a building caretaker who could provide no assistance other than to show Mr. Bow and Mr. Berry to the boiler room. TR 814:13-25 (Bow); 1027:17-25; 1030:6-9 (Berry). Although HUD has a policy that it will allow an owner 72 hours to repair an exigent situation, HUD officials deemed the situation too serious to wait that long. TR 1083:18-25; 1084:1-2 (Brown). As Mr. Brown testified at trial,

> [T]he basic policy is common sense. HUD officials are worried about their liability if they don't act in situations where they must act, and this is how we concluded that we had to take action to protect the tenants when the owner was not available. . . . We believed that the heat had been off for some time and that the conditions at the building overrode the wisdom of following that policy at this time, that people were in immediate danger.

TR 1083:3-8, 24-25; 1084:1-2 (Brown); see also DX 222. Accordingly, HUD took involuntary mortgagee-in-possession of the property, as it was permitted to do under the regulatory agreement, until foreclosure proceedings concluded. DX 155.

C. BSA's Corporate Veil Should Be Pierced, And Ben And Shaki Alli Should Be Held Individually Responsible For The Damages Caused By BSA's Breach Of The Collingwood HAP Contract And Regulatory Agreement

Generally, when a court considers disregarding a corporate entity, the law of the state of incorporation applies. In re Cambridge Biotech Corp., 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999). However, when the United States is the party seeking to pierce the corporate veil, a question arises regarding whether state or federal law should apply. In BLH, Inc. v. United States, this Court recognized that the Court infrequently examines the issue of alter egos and looked to other jurisdictions for guidance. 13 Cl. Ct. 265, 272 (1987). The Court adopted the legal standards used by the Court of Appeals for the Fifth Circuit in Berger v. Columbia

Broadcasting System, Inc., 453 F.2d 991, 995 (5th Cir. 1972), and Miles v. American Tel. &Tel. Co., 703 F.2d 193, 195-96 (5th Cir. 1983). In those cases, the Fifth Circuit applied the law of the state of incorporation. For example, in Berger, the Court applied New York law and in Miles, the Court applied Texas law. Several years later, this Court applied the standards it used in BLH to address the question of alter ego in Twin City Shipyard, Inc. v. United States, 21 Cl.Ct. 582, 590 (1990).

Specifically, in BLH, this Court held that three elements must be satisfied to pierce the corporate veil: complete control, fraud or injustice, and proximate causation. 13 Cl. Ct. 265, 272 (1987). These are essentially the same elements required by Michigan law.

BSA was incorporated under the laws of Michigan. DX 133 at 93. Typically, the law treats a corporation as a separate entity from its stockholders. Foodland Distributors. v. Al-Naimi, 559 N.W.2d 379, 380-81 (Mich. Ct. App. 1996). However, when the corporate form is used to subvert justice, it may be ignored by the courts. Id. There is no bright-line rule under Michigan state law delineating when the corporate entity may be disregarded. Id. Instead, the inquiry is fact intensive. The court must take the entire spectrum of relevant facts that form the background for the inquiry, and those facts are to be assessed in light of the corporation's economic justification to determine whether the corporate form has been abused. Id.

The following standard applies to determine whether a corporate veil should be pierced:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the [party seeking to pierce the veil].

Id. (quoting SCD Chem. Distribs., Inc. v. Medley, 512 N.W.2d 86 (Mich. Ct. App. 1994)).

Several factors may be considered in determining whether a corporate entity is a mere instrumentality of another. These factors include: undercapitalization of the corporation, commingling of funds, diversion of corporate assets for personal use, lack of corporate formalities, and complete domination and control over the corporation by another person or entity. Herman v. Mobile Homes Corp., 26 N.W.2d 757, 763 (Mich. 1947); Foodland Distributors, 559 N.W.2d at 381-82; Papo v. Aglo Rest. of San Jose, Inc., 386 N.W.2d 177, 185 (Mich. Ct. App. 1986). Not all of these factors must be established to pierce a corporate veil. In Papo, the court found that diverting corporate funds for personal use was enough to show the corporation was simply a mere instrumentality of another entity or individual. 386 N.W.2d at 185. Also, in Foodland Distributors, the court found that the corporation was the mere instrumentality of the defendant where the defendant was the owner and operator of the corporation, defendant loaned money back and forth between the corporation and his other businesses, and the corporation assumed $400,000 of defendant's personal debt with no consideration. 559 N.W.2d at 381-82.

Moreover, fraud need not be shown to pierce the corporate veil. See Herman v. Mobile Homes Corp., 26 N.W.2d 757, 763 (Mich. 1947); Papo, 386 N.W.2d at 185. However, the wrong committed by the corporate entity must be causally linked to the injury of the party seeking to pierce the corporate veil. Soloman v. W. Hills Develop. Co., 312 N.W.2d 428, 432 (Mich. Ct. App. 1981).

In this case, Mr. and Mrs. Alli are the sole owners of BSA and "hired" BSA to manage all three properties. While managing the Collingwood apartments for BSA, Mr. and Mrs. Alli misused and commingled funds from the Collingwood project account on several occasions.

First, Collingwood leased a car from Mr. Alli for a monthly payment of $420. DX 179 at 6; DX 247 at 402. This was not an eligible or approved project expense. Id. Prior to visiting Collingwood, Mr. Pollock reviewed the financial statements of BSA and concluded that an unapproved monthly car expense was being taken out of the project's operating account. TR 849-50 (Pollock). This is the same account from which repairs to the building are to be paid. Id. Mr. Pollock's finding was confirmed by Pinnacle, who also performed a financial review of Collingwood. DX 179 at 16. When Mr. Pollock visited Collingwood in March 1999, he asked to see the leased vehicle, but Mr. Alli refused to show it, claiming that the vehicle was locked up in storage. TR 849-50 (Pollock); DX 247 at 402. When Mr. Pollock asked for the key to unlock the storage area, Mr. Alli claimed that the gentleman who had the key was not in town and could not be reached. Id. Mr. Pollock then asked to see the lease for the car, and Mr. Alli admitted that no lease documents existed because he was leasing the vehicle from himself. Id.

Mr. Pollock also concluded that a salary was being paid to Mrs. Alli from the project's operating account for site management. TR 851:4-24 (Pollock). However, each building had a caretaker who appeared to be responsible for the day-to-day operations of the site, and many witnesses testified that they rarely, if ever, saw Mrs. Alli at the property. Id.; TR 371: 10-13 (Schlotter); 570:25; 571:1-14 (Roach); 851:9-12 (Pollock).

Second, on June 30, 1992, Mr. and Mrs. Alli entered into a deed of trust, as individuals, encumbering the Collingwood property in exchange for two loans, $250,000 and $75,000, respectively. DX 179 at 17; 109. Mr. and Mrs. Alli removed funds from the Collingwood project account to make payments on these two loans. DX 141. These loans were never approved by HUD as required under the Collingwood regulatory agreement, and plaintiffs

provided no evidence that it was used for reasonable or necessary project operating expenses and not for personal benefit. DX 109.

Third, instead of hiring a professional management company, Mr. and Mrs. Alli chose to manage the properties themselves. In reviewing BSA's financial statements, Mr. Pollock discovered that in managing the Collingwood apartments, Mr. and Mrs. Alli paid themselves in excess of the authorized management fee for Collingwood. DX 240 at 659. Moreover, in 1995, as the individual owners of Pingree, they paid themselves $4,292 from the Collingwood operating account for a loan Pingree allegedly had made to Collingwood. Id.

Mr. and Mrs. Alli diverted funds from BSA and Collingwood for their own personal use, failed to observe corporate formalities by entering into a car lease and loans without proper documentation, and commingled the funds of Collingwood with their own personal funds. As a result, money which should have been used for repairs on Collingwood were transferred for Mr. and Mrs. Alli's personal use. Because repairs were not made on Collingwood, HUD was forced to incur substantial expenses to relocate the tenants to suitable housing and to address exigent health and safety issues while the tenants awaited relocation. Accordingly, this Court should pierce the corporate veil to hold Mr. and Mrs. Alli liable for BSA's breach of the Collingwood HAP and regulatory agreement.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court enter judgment for the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick by Deborah A. Bynum
MARK A. MELNICK
Assistant Director

s/Marla T. Conneely
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Flr.
1100 L Street, NW
Washington, D.C. 20530
Tel. (202) 305-3689
Fax (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing &
Urban Development
77 West Jackson Blvd.
Suite 2629
Chicago, Illinois 60604

October 12, 2007