IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BENJAMIN AND SHAKI ALLI AND BSA CORPORATION, | ) | |
| Plaintiffs, | ) | No. 01-669C |
| | ) | (Judge Francis M. Allegra) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS' POST-TRIAL BRIEF

Pursuant to this Court's October 28, 2007 order and paragraph 19 of Appendix A to the Rules of the United States Court of Federal Claims ("RCFC"), the United States respectfully submits this reply to plaintiffs' post-trial brief, filed on October 12, 2007.

BACKGROUND

In our post-trial brief, we demonstrated that the testimony and evidence presented at trial overwhelmingly support the Government's claims that plaintiffs, not the Government, breached the contracts at issue by failing to maintain the Collingwood, Riverside, and Pingree apartments in decent, safe, and sanitary condition. We further established in our brief that no authorized agent of the Government denied, either orally or in writing, the proposed sale of the Collingwood apartments to Cory Fanning, and that the Government acted in accordance with the applicable HAP contract and regulatory agreement when it took possession of Collingwood after the apartments were found to be without heat in the middle of winter and attempts to contact plaintiffs were unsuccessful. Finally, we showed with clear evidence that BSA Corporation is a mere instrumentality of Benjamin and Shaki Alli, and that BSA's corporate veil should be

pierced to hold them individually liable for breach of the Collingwood HAP contract and regulatory agreement.

In their post-trial brief, plaintiffs argue that the Collingwood, Riverside, and Pingree apartments were decent, safe, and sanitary; that Department of Housing and Urban Development ("HUD") inspectors were biased against plaintiffs; and that HUD inspection reports were inaccurate and full of errors. Plaintiffs further allege that HUD refused to approve the sale of the Collingwood apartments to Cory Fanning, and that this alleged refusal was in bad faith. Plaintiffs arguments, however, are contrary to the clear and credible evidence and testimony presented at trial by the Government, and are either entirely unsupported or supported by witnesses lacking knowledge and credibility. Plaintiffs failed to keep the entirety of each project in decent, safe and sanitary condition as required by their HAP contracts and, in the case of Collingwood and Pingree, their regulatory agreements and the regulations. See 24 C.F.R. Part 5 Subpart G.

## ARGUMENT

### I. Contrary To Plaintiffs' Assertions, The Pingree Apartments Were Neither Decent, Safe, Nor Sanitary As Required By The HAP Contract And Regulatory Agreement

#### A. The Testimony And Reports Of Gordon Hileman And David Compo Are Unreliable And Do Not Contradict The Evidence Or Testimony Presented By The Government

Plaintiffs rely upon the testimony and inspection reports of Gordon Hileman and David Compo to support their argument that the November 18, 1999, HUD Real Estate Assessment Center ("REAC") report was inaccurate, and that the Pingree apartments were in decent, safe,

and sanitary condition.[1] Pl. Br. 3-21. However, the reports and testimony of Mr. Hileman and Mr. Compo suffer from several flaws that render the evidence offered by them to be unreliable.

First, Mr. Hileman and Mr. Compo both asserted in their reports and at trial that the November 18, 1999, HUD REAC report was inaccurate and identified deficiencies that did not exist. PX 5, 6; TR 107:12-22 (Hileman); 149:1-9 (Compo). Mr. Hileman and Mr. Compo, however, did not visit the Pingree apartments until June 2000, more than seven months after the REAC inspection was conducted, and well after HUD declared plaintiffs to be in default of the Pingree HAP contract and regulatory agreement. TR 110:16-19 (Hileman); 151:16-19 (Compo); DX 65, 143. Although Mr. Hileman and Mr. Compo saw evidence of prior repair work, both were quick to conclude that the REAC report contained errors, and did not consider that the deficiencies may have existed at the time of the REAC inspection, but had recently been repaired perhaps as a result of plaintiffs' anticipated filing of this lawsuit. TR 110:16-19; 116:5-11 (Hileman); 151:16-19; 157:22-24 (Compo). Indeed, Mr. Compo testified that it was plaintiffs' attorney, Mr. Stempien, who contacted him about doing an inspection of Pingree in June 2000. TR 130:19-25 (Compo).

Moreover, plaintiffs' witness, Mark Schlotter, testified that he was given a copy of the REAC report at the end of 1999 and was instructed to begin repairing the deficiencies identified in the report. TR 355:22-25; 356:1-25 (Schlotter). According to Mr. Schlotter, he began making the repairs at the end of 1999 or early 2000. TR 367:23-25; 368:1-11 (Schlotter). Mr. Schlotter, an unlicensed handyman, testified that he was able to identify two-thirds of the deficiencies in the

[1] "Pingree" was the collective name of two buildings located at 2211 Pingree and 2987 Gladstone in Detroit, Michigan.

REAC report. TR 357:21-25; 358:1-3 (Schlotter). Despite spending up to 20 hours a week for several months making repairs, Mr. Schlotter was unable to fix all of deficiencies at the Pingree apartments. TR 358:4-19; 368:7-11 (Schlotter). When asked why he did not finish, Mr. Schlotter testified that Ben Alli had not hired more help, that it was mostly just him working and that he could "only move so fast." TR 358:13-16 (Schlotter). Accordingly, the statements by Mr. Hileman and Mr. Compo regarding the accuracy of the REAC report are neither credible nor reliable because the discrepancies with the HUD report are most likely attributable to the fact that the condition of the Pingree apartments at the time of the June 2000 visit was not the same as at the time of the November 1999 REAC inspection.[2] At trial, Mr. Hileman testified as follows:

> Q. It's possible, isn't it, that some of the deficiencies in the [REAC] report had in fact been repaired prior to inspection?
>
> A. That is true.
>
> Q. In fact, during your inspection you saw evidence of past repair work, correct?
>
> A. Yes, I did.

TR 116: 5-11 (Hileman).

Second, Mr. Hileman and Mr. Compo did not have access to the same apartments that were inspected in the REAC report. TR 125:7-11 (Hileman); 158:15-25; 159:1-6 (Compo). Contrary to plaintiffs' assertion, the sole purpose of Mr. Hileman's visit was to verify the accuracy of the REAC report. TR 78:10-13 (Hileman); Pl. Br. 4. However, Mr. Hileman's report did not identify which apartments he inspected at Pingree, and he admitted that he could

---

[2] By the time of Mr. Hileman and Mr. Compo's June 2000 visit, Ben and Shaki Alli had already paid off the HUD-held mortgage on Pingree.

not access most of the apartments that were inspected on the REAC report. TR 125:7-11 (Hileman). Specifically, Mr. Hileman testified:

> The apartments that the HUD inspector had been in for the most part I couldn't get access to, and the apartments I could get into weren't noted on the HUD report . . . .

Id. Mr. Compo admitted that the only units he inspected were units that Ben Alli personally instructed him to inspect. TR 150:18-21 (Compo). At least one of the units that Mr. Compo could not access was a unit that the HUD inspector found to have serious deficiencies. Mr. Compo testified as follows:

> Q. Let's go back to Plaintiffs' Exhibit No. 6, page 20. Do you see where it says Building 1, Unit 402.
>
> A. Yes.
>
> Q. And that was the unit that you weren't able to access?
>
> A. Yes.
>
> Q. Do you see there where it states that the toilet was inoperable in this unit on the HUD report?
>
> A. Yes.
>
> Q. Do you also see the third line down, a report of water stains, water damage/mold and mildew?
>
> A. Yes.
>
> Q. And this was the unit you couldn't access, correct?
>
> A. You could not. We could not access. Correct.

TR 158:15-25; 159:1-6 (Compo). Incredibly, Mr. Compo was allowed to access units Mr. Hileman was not allowed to access, although both men conducted their inspections on the same

day around the same time. TR 110:24-25; 111:1-9; 125:7-11 (Hileman); 162:22-25; 163:1-2 (Compo). While Mr. Compo was allowed to inspect units inspected in the November 1999 REAC report, Mr. Hileman was not allowed access to those same units. Id.

Third, Mr. Compo's testimony on the stand and the findings in his report were biased, evasive, and contrary to physical evidence. For example, Mr. Compo found that the REAC report was false because it stated that the floor covering was damaged when there was a concrete or marble floor. PX 5 at 1. When presented with a picture taken by HUD of the obviously damaged flooring (DX 174 at 19), Mr. Compo insisted that the floor covering in the picture was not damaged, but "ha[d] chips in it." TR155:4-8 (Compo). Specifically, Mr. Compo testified as follows:

> Q. You state there that there is a statement of severe floor covering damage when there is a concrete or marble floor and no covering at all. Do you see that?
>
> A. Yes.
>
> Q. Did you assume that the HUD inspector's use of the word covering did not include marble or concrete?
>
> A. There were no common areas that were concrete. The marble was a flat marble flooring. It would have been obvious it there was a repair because they were all again old floors.
>
> *****
>
> Q. Looking at this picture, Mr. Compo, would you consider this to be "severe floor covering damage?"
>
> A. No. The floor covering is not damaged. The edge of the nosing on the steps has chips in it.

TR 154:7-18; 155:4-8 (Compo). This exchange reflects the extremely low standard of care applied by Mr. Compo during his inspection. Mr. Compo further testified that he did not

consider an inoperable toilet to be a severe deficiency. TR 157:3-7 (Compo). Moreover, although Mr. Compo testified that it would have been obvious if the marble floor had been repaired, TR: 154:7-18, a comparison of HUD's photo of the lobby at the time of Mr. Pollock's visit in March 1999, DX 174 at 19, compared to Mr. Hileman's photo of the lobby at the time of his visit, PX 6 at 31, shows that the marble floor had indeed been recently repaired.

Mr. Compo also testified that the REAC report was false because it stated that flooring needed paint when the floor was carpeted. PX 5 at 1. However, when asked on cross-examination whether all of the hallways, corridors and stairs were carpeted, Mr. Compo admitted that the areas either contained carpet or a hard surface, which could be painted. TR 151:1-25; 152:1-25; 153:1-18; 160:23-25; 161:1-10 (Compo).

Accordingly, the testimony and reports of Mr. Compo and Mr. Hileman are unreliable and insufficient to overcome the overwhelming evidence offered by the Government regarding Pingree's deplorable conditions at the time of HUD's inspections.

B. The Testimony Offered By Plaintiffs' Other Witnesses Regarding The Conditions At Pingree Are Also Unreliable And Unsupported

Plaintiffs offered the testimony of four other witnesses to support their assertions that HUD's inspection reports were false and that the Pingree apartments were in decent, safe and sanitary condition. The testimony of each of these witnesses, however, is flawed.

Although Emmanuel Uzoigwe, who is not a building inspector, testified that he never saw any roaches and that the conditions at Pingree were fine, he had limited knowledge of the conditions of Pingree during the relevant times. The Pingree apartments began failing HUD inspections as early as 1997, and by early 2000, HUD had declared the HAP contract and

regulatory agreement to be in default. DX 5, 65, 143. Mr. Uzoigwe did not move into Pingree until 2001, a year after HUD had terminated the contracts and plaintiffs had paid off the HUD-held mortgage. TR 244:1-2 (Uzoigwe). Moreover, Mr. Uzoigwe testified that he was never home, but would leave early in the morning and return late in the evening. TR 264:9-24 (Uzoigwe). He further testified that he never socialized with any neighbors and did not visit other parts of the building. Id.

Mr. Uzoigwe further testified that Mark Schlotter performed the simple maintenance at Pingree, and that Mr. Schlotter "comes all the time." TR 253:1-9 (Uzoigwe). While that may be true when Mr. Uzoigwe resided at Pingree from 2001 to 2005, during the relevant times, Mr. Schlotter had barely worked at Pingree. TR 367:23-25; 368:1-11 (Schlotter). Mr. Schlotter testified that he was not hired until the end of 1999 or early 2000 to make repairs at Pingree. Id. Even then, Mr. Schlotter worked only part-time and spent most of his time attempting to correct all of the deficiencies listed in the November 1999 REAC report. Id.

Mr. Uzoigwe further suggested that he liked Pingree so much that he moved there despite the fact that he would not receive Section 8 assistance from HUD. Pl. Br. 13; TR 251:18-25 (Uzoigwe). However, with employment as a teacher in the Detroit public schools, it is unlikely that Mr. Uzoigwe, an unmarried man with no children living with him, would have been eligible for Section 8 assistance. Indeed, at trial Mr. Uzoigwe testified that he did not know whether he was eligible for Section 8 assistance when he moved to Pingree. TR 259:25; 260:1-15 (Uzoigwe).

Like Mr. Uzoigwe, Dorothy Riggins and Linda Hamilton, who were not building inspectors, also testified that the conditions at Pingree and Gladstone were fine. Pl. Br. 17. Ms. Riggins was the one building manager at Gladstone, one of two buildings comprising the Pingree apartments, and her duty was to keep Gladstone clean. Id. Her testimony is unreliable and biased because she has an incentive to testify that the condition of the building was acceptable because it was her job to maintain it in such a condition. As Ms. Riggins stated, "It was clean because I kept it clean." TR 389:4 (Riggins). However, whether she was physically able to maintain her duties is questionable. Ms. Riggins moved to Pingree in order to have a first floor apartment because of physical problems with her knee. TR 403:25; 404:1-3 (Riggins). She admitted that her knee made carrying things difficult and that her knee was painful and would give out without warning, causing her to fall. TR 405:11-25; 406:1-15 (Riggins). She also testified that she lost the tip of her finger and that the strength in her hand would become drained when it was too cold or too hot. Id. At the time she was a building manager at Gladstone, she was receiving disability payment for these injuries from the Social Security Administration. TR 412:7-17; 415:13-20 (Riggins).

Gladstone was comprised of four floors and thirty-four units. TR 406:19-23 (Riggins). Ms. Riggins testified that she helped to exterminate the building every three months, vacuumed the entire building every day, inspected every apartment unit every month, swept the common areas, shoveled the snow in the front, helped to install and remove stoves and refrigerators, plastered the building, painted the building, showed apartments to prospective tenants, gave warnings for violations, and accompanied HUD inspectors during visits, all while receiving social security disability. TR 413:22-25; 414:1-25; 415:1-20 (Riggins). Although in performing

exterminations, Ms. Riggins testified that she exterminated only as needed as she felt was necessary. TR 407:21-25; 408:1-4 (Riggins).

Ms. Riggins further testified that if there were any repairs needed she would contact Mark Schlotter. TR 380:25; 381:1-25; 382:1-11 (Riggins). However, Mark Schlotter, did not begin working at the Pingree apartments until the end of 1999 or the beginning of 2000. TR 367:23-25; 368:1-11 (Schlotter). Plaintiffs have not identified anyone who performed repairs at Pingree prior to Mr. Schlotter. Although Ms. Riggins testified that Mr. Schlotter would respond "right away," TR 381:19-21, Mr. Schlotter testified that he worked only up to 20 hours a week and that most of his time was spent making repairs identified on the November 1999 REAC report. TR 358:4-19; 368:7-11 (Schlotter). Moreover, although Ms. Riggins testified that the lobby of Gladstone was carpeted and could not be painted, a picture taken by plaintiff's witness, Mr. Hileman, of the lobby of Gladstone shows that it was not carpeted. TR 387:6-9 (Riggins); PX 7 at 46.

Ms. Riggins also contradicted herself several times in her testimony. She testified that there were no problems with the elevator in Gladstone, but then stated that she would shut the elevator off because she "didn't want a problem with kids getting stuck on it or anything." TR 380:19-24 (Riggins). She also testified that she was not paid for working as the building manager, but then later admitted that she received a reduction in her rent from Ben Alli and payments for performing exterminations. TR 394:23-25; 395:1-3; 407:3-10 (Riggins). Of course, payments to Ms. Riggins as a building manager were required to be reported as income in her annual tax filings and would have put her social security disability at risk.

Similar to Ms. Riggins, Ms. Hamilton's testimony is unreliable and biased because she was also paid to help keep the Pingree apartments clean. TR 431:5-18 (Hamilton). Therefore, she had an incentive to testify that the conditions as Pingree were satisfactory because it was part of her duty to keep them in that condition. However, Ms. Hamilton contradicted her own testimony regarding the conditions at Pingree. For example, although she testified that the conditions at Pingree were clean, she also testified that she had roaches in her apartment and her apartment was sprayed maybe once a year. TR 425:9-17; 426:2-9 (Hamilton). After having her stove fail twice, Ms. Hamilton decided to buy her own appliances. TR 429:20-25; 430:1-22 (Hamilton). Ms. Hamilton also had problems with her toilet not flushing and once her front door literally came off its hinges. TR 433: 8-23 (Hamilton). She also testified that, while living on the fourth floor at Pingree, the elevator was not turned on most of the time, and even when it was turned on, it did not always work properly. Id.

Although Ms. Hamilton suggested that she preferred to stay at Pingree rather than continue with Section 8 assistance, she actually did not have the choice. She lost her Section 8 benefits when HUD discovered that she was making sufficient income as a full-time nurse. TR 436:25; 437:1-11 (Hamilton).

Mark Schlotter, an unlicensed handyman, also testified for plaintiffs regarding the conditions at Pingree. Mr. Schlotter's knowledge of these conditions, however, is limited. Pingree began failing HUD inspections as early as 1997, and Mr. Schlotter testified that he was not hired to perform work on Pingree until the end of 1999 or early 2000. TR 367:23-25; 368:1-2 (Schlotter). By March 2000, HUD had already declared the HAP contract to be in default, and by May 2000, HUD had already declared the regulatory agreement to be in default. DX 65, 143.

Similar to plaintiffs' other witnesses, Mr. Schlotter continuously contradicted himself regarding the conditions at Pingree. Although he testified that the buildings were clean, he also testified that he saw roaches in the building and that he could identify two-thirds of the deficiencies cited in the November 1999 REAC report. TR 357:21-25; 358:1-3 (Schlotter). Mr. Schlotter spent five to twenty hours a week working on the deficiencies over the course of several months in 2000, but still could not repair them all. TR 358:9-19 (Schlotter).

Moreover, although Ms. Riggins testified that Mr. Schlotter aided her in performing routine exterminations every three months, Mr. Schlotter contradicted her statement and testified that he did not do the routine exterminations but only exterminated when he "was working in an apartment that might have needed it." TR 370:8-15 (Schlotter); 406:24-25; 407:1 (Riggins).

Accordingly, the testimony offered by Mr. Uzoigwe, Ms. Riggins, Ms. Hamilton and Mr. Schlotter, were inconsistent, biased, unreliable, and insufficient to overcome the Government's evidence that the Pingree apartments were not in decent, safe or sanitary condition.

C. Plaintiffs Mischaracterize HUD Inspector Mark Spooner's Testimony, Ignore The Testimony From Other HUD Witnesses And Third-Party Inspectors, And Challenge, Without Basis, The Credibility Of Dorothy Roach

In their post-trial brief, plaintiffs misrepresent the testimony of HUD inspector Mark Spooner and allege that Mr. Spooner believed that the Pingree apartments were in a decent, safe and sanitary condition. Pl. Br. 21-22. To the contrary, Mr. Spooner testified that although an apartment unit would pass inspection every now and then, many of the units were not safe and sanitary, and the building itself was not up to standards. TR 784:25; 785:1-23 (Spooner). The full text of Mr. Spooner's testimony, which is cut short in plaintiffs' brief, is as follows:

> Q. During the time that you inspected the Pingree Apartments, at anytime did you consider them to be decent, safe and sanitary?
>
> A. Well, I don't want to generalize and say the apartment in general, no. The units, yes. A lot of the units were not safe and sanitary. There were some that were. I mean, you know, don't get me wrong. But basically, getting back to also protecting the Secretary's interest, Secretary of HUD, you know, we still had problems with the building, the actual building itself, the envelope. The roof leaks, the deterioration in the mortar for the brick, windows that had bars on them, et cetera. Those type of things that we still had to – had to be corrected, okay?
>
> But I wouldn't say every unit failed, but you know, generally there is quite a few, and they were still repetitive. Every time it was repetitive problems. In other words, instead of taking care of all smoke detectors, he would only take care of those in the unit, you know, that failed, and it had to do [with] the plumbing leaks too. You can't just do one, you've got to do everything, you know, to really get the place up to the standards that are within code.

Id.

Moreover, plaintiffs do not challenge the fact that they failed to maintain the physical condition of Pingree in its *entirety* prior to the time HUD took any enforcement actions. See 24 C.F.R. Part 5, Subpart G (defining the "decent, safe, and sanitary" standard to include maintaining the site, building exterior, building systems, dwelling units, common areas, and all health and safety concerns).

Plaintiffs also do not challenge the testimony of other HUD witnesses and the findings of a third-party that Pingree was not in decent, safe or sanitary condition. Jim Pollock, an enforcement analyst at the time in HUD's Chicago satellite office of the Departmental Enforcement Center ("DEC"), testified that the Pingree apartments "weren't suitable for habitation by anybody" and were "not even close" to being decent, safe or sanitary. TR 852:2-

12; 853:2-7 (Pollock). Pinnacle Realty Management Company, a third-party hired by HUD to perform an independent inspection of Pingree, also concluded that Pingree was not in decent, safe or sanitary condition. DX 1 at 17-18. This same conclusion was reached by HUD inspector, James Bow. DX 274; TR 811:2-25 (Bow).

Plaintiffs challenge the credibility of Dorothy Roach, a former tenant of Pingree. Plaintiffs argue that Ms. Roach's testimony is not credible based upon the fact that Ms. Roach initially testified that she had no refrigerator for the first three days of her residence at Pingree, but then remembered that she indeed had a refrigerator, but that it was inoperable and removed the same day. Pl. Br. 23; TR 664:6-25; 665:1-8 (Roach). This alone does not render Ms. Roach's entire testimony unreliable. Ms. Roach was recalling an event almost eight years earlier, and the difference between having an inoperable refrigerator removed the day she moved in and having no refrigerator at all is negligible. The point is Ms. Roach did not have an operable refrigerator for three days and when a replacement finally arrived, it was filthy. TR 664:6-25; 665:1-8 (Roach); DX 199 at A0414. Accordingly, the evidence in this case supports a finding that the Pingree apartments were not in decent, safe or sanitary condition, and that plaintiffs breached the Pingree HAP contract and regulatory agreement for failure to maintain the property as required.

## II. Contrary To Plaintiffs' Assertions, The Riverside Apartments Were Neither Decent, Safe, Nor Sanitary As Required By The Riverside HAP Contract

In their post-trial brief, plaintiffs argue that the Riverside apartments were in decent, safe and sanitary condition, and offered Roland Samaroo as their "key witness" to support their

assertion. Pl. Br. at 24. According to Mr. Samaroo, HUD's inspection reports of the Riverside apartments were false because he could not find the deficiencies identified in those reports. Id.

It is a well-settled presumption that HUD employees are presumed to act in good faith and to perform their duties properly, and that it requires "clear and convincing evidence" to overcome this presumption. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Mr. Samaroo's testimony, handwritten notations and photographs are not sufficient to overcome this presumption.

First, Mr. Samaroo admitted that he would not check the accuracy of the entire HUD inspection report. TR 227:23-25 (Samaroo). If he could not find the first few deficiencies, he would simply stop his review. TR 228:9-24 (Samaroo). He also admitted that it was virtually impossible to determine by examining his notes which deficiencies on the HUD reports actually existed and which ones did not because he did not thoroughly review the reports. TR 228:25; 229:1-8 (Samaroo). Mr. Samaroo took several pictures of Riverside, but, despite testifying that his memory "has a super chip in it," he could not remember when he took the pictures. TR 206: 17-18; 240:4-14 (Samaroo); PX 52. Moreover, many of the pictures were taken at such a distance, it is impossible to see the condition of the buildings. TR 240:4-14 (Samaroo); PX 52.

Second, Mr. Samaroo testified that he could not *verify* some of the deficiencies in the HUD report. Pl. Br. 24; TR 184:7-22 (Samaroo). Samaroo was a licensed psychologist, with a bachelor's and master's degree in psychology. TR 216:10-18 (Samaroo). He was not a licensed building inspector or builder. TR 217:16-25 (Samaroo). He was a psychologist who answered Ben Alli's newspaper advertisement for a handyman. TR 218:1-3 (Samaroo). With his lack of experience and knowledge, the fact that Mr. Samaroo could not find or verify a noted deficiency

does not necessarily result in the conclusion that the deficiency did not exist. Indeed, Mr. Samaroo testified that one of the false items on a HUD inspection was the report of a large hole in the ceiling covered by a red umbrella. PX 11 at 5; TR 233:21-25; 234:1-22 (Samaroo). Mr. Samaroo testified that he never saw this deficiency, but could not offer an explanation when presented with a picture of the large, gaping hole taken by David Salazar during his inspection. TR 234:15-25; 235:1-23 (Samaroo); DX 180 at 21.[3]

Third, Mr. Samaroo continuously contradicted himself throughout his testimony. He testified that the elevator in Riverside would be shut down to prevent drug runners, but then testified that he considered the building to be safe. TR 232:9-25; 233:1 (Samaroo). He also reported that he could find "[n]one of the listed HUD violations" on his inspection, but then testified that he did not check each and every thing in that report. Pl. Br. at 26; TR 229:9-25; 230:1-16 (Samaroo). Moreover, Mr. Samaroo first testified that he could not verify inoperable smoke detectors, but then contradicted this statement within the same answer. TR 184:8-22 (Samaroo). Mr. Samaroo also later admitted that he did see roaches at Riverside. Id.

> Q. What about the roaches? You indicated that was a common deficiency.
>
> A. Yes. That was repeated as a deficiency over and over again. I didn't see any roaches scurrying about the floor or anything.

---

[3] Mr. Samaroo also testified that the HUD reports identified chipped and rusted sinks when the sinks were stainless steel. Pl. Br. at 25. HUD inspector, David Salazar, testified that while he was inspecting Riverside the sinks were all porcelain and that there were no stainless steel sinks. TR 697:9-17; 746:21-25; 745:12-25; 747:1-4 (Salazar). Moreover, Mr. Samaroo testified that a HUD report identified a mouse-chewed fan, but that the fan was an aluminum fan, which a mouse could not chew. Pl. Br. at 25. Mr. Salazar testified that the exhaust fan was plastic. TR 696:8-21 (Salazar).

> On two occasions, from my recollection, just a couple of occasions, behind the stove, you know, when I was doing my inspections and so I saw some dead roaches . . . .

TR 184:23-25; 185:1-6 (Samaroo). According to plaintiffs' own witness, Mr. Hileman, an apartment without a working smoke detector would not be compliant and an apartment infested with roaches would not be habitable. TR 117:20-25; 118:1-3 (Hileman).

In addition to the testimony of Mr. Samaroo, plaintiffs also rely upon one inspection by HUD inspector Richard Schemanski to support their claim. Pl. Br. 27-28. Specifically, plaintiffs argue that David Salazar's inspection reports must be false because HUD inspector, Richard Schemanski, passed inspection of certain units in the Riverside apartments in 1994, while Mr. Salazar failed those same units in 1993 and 1995. Id. Plaintiffs conclude that Mr. Salazar's inspections must be false and Mr. Schemanski's inspection must be accurate. Id.

Mr. Schemanski never testified at trial regarding his inspection report. Mr. Salazar, on the other hand, testified under oath that he never falsified any of his inspection reports and that all the information he reported was true. TR 699:25; 700:1-5 (Salazar). When asked about Mr. Schemanski's report, Mr. Salazar simply testified as follows:

> Q. Again, on Mr. Schemanski's report do you see where in the middle column of the listing of the units one of the passages is 1830-204. Do you see that?
>
> A. Yes, I see that, but I can't answer to – this is unbelievable. I can't answer to why he passed a unit.

TR 737 11-16 (Salazar). Moreover, the conditions of the Riverside apartments as reported by Mr. Salazar were confirmed by several other witnesses at trial. Mark Spooner testified that Riverside was not decent, safe or sanitary in the seven years that he inspected the buildings, and

that there were "just too many problems with Riverside." TR 774:3-25 (Spooner). Robert Brown described the conditions at Riverside as "pretty deplorable," and Dorothy Roach testified that her impression of Riverside was that it was "third world conditions." TR 568:3-9 (Roach); 1049:18-25 (Brown).

Finally, plaintiffs argue that many of the problems with Riverside were "due to the lifestyle of the individual tenants, not the care of the landlord." Pl. Br. 28. The Riverside HAP contract was an agreement between HUD and Ben Alli, and the plain language of the contract obligates Ben Alli, not his tenants, to maintain the Riverside apartments in a decent, safe and sanitary manner. DX 125. If his tenants are behaving in a manner that disrupts this obligation, Ben Alli has a duty to routinely inspect his units and evict those tenants. See id. This duty was explained at trial by Mr. Salazar:

> THE COURT: Cleanliness issues, and I'm going to need you to move to the side, how do cleanliness issues enter into those types of evaluations? Do you actually make determinations as to whether or not, for example, when you see a dirty stove or grease accumulation, whether it's the tenant's fault or the landlord's fault?
>
> THE WITNESS: We would inform the owner.
>
> THE COURT: The landlord, essentially the owner of the building?
>
> THE WITNESS: Right. But you know, my relationship is with the owner because we have a contract with the owner, not the tenant. Now, if the tenant does not want to obey the landlord and upkeep their unit, then they have every right to evict that tenant, but it's not my decision to take sides and to even encourage for him to take action. That's strictly his business.
>
> *****
>
> His duty and responsibility is to take care of the deficiencies, the failed items and the maintenance items. As to how he goes about doing that, that's really his business.

TR 759:22-25; 760:1-25 (Salazar). Mr. Pollock reiterated Mr. Salazar's comments during his testimony:

> Q. In a lot of the apartments the tenants didn't do a very good job of taking care of their apartments. Isn't that true?
>
> A. Yes.
>
> Q. And it would be HUD's expectation that the landlord should have to be responsible for that, is that correct?
>
> A. To a certain extent in that the owner/agent is required to inspect units periodically to determine if there are repairs that need to be made, and as part of that inspection they would [need] to determine whether a tenant is living up to their lease, and the owner/agent is required to enforce the lease and make sure that tenants are keeping their units up.
>
> Q. Up to and including eviction if necessary, correct?
>
> A. Absolutely. Yes.

TR 884:1-17 (Pollock). Accordingly, the evidence in this matters supports a finding that the Riverside apartments were not maintained in a decent, safe and sanitary condition, and that Benjamin Alli breached the Riverside HAP contract by failing to keep the building to the required contractual standards.

## III. Plaintiffs, Not HUD, Breached The Collingwood HAP Contract And Regulatory Agreement

### A. An Authorized Agent Of HUD Did Not Deny The Sale Of Collingwood To Cory Fanning

It is well-established that the Government is not bound by the representations of its agents unless that agent had the actual authority to make such representations. Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Kiszka v. Office of Pers. Mgmt., 372 F.3d 1301, 1307 (Fed.

Cir. 2004); Nematollahi v. United States, 38 Fed. Cl. 224, 231-32 (1997). Any party entering into an arrangement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government. Merrill, 332 U.S. at 384. This rule applies even where the agent himself is unaware of the limitations upon his authority. Id. The burden rests upon the plaintiff to show that the Government's agent was authorized to make the representations or take the action that caused the breach. Nematollahi, 38 Fed. Cl. at 231-32.

Plaintiffs argue that Robert Brown orally denied the sale of Collingwood to Cory Fanning. TR 494:3-24 (Alli). Mr. Brown testified that he did not deny the sale of Collingwood to Cory Fanning, either orally or in writing. TR 1072:20-22 (Brown). He further testified that he did not have the authority to orally approve or deny the sale of Collingwood, and that there was a "good possibility" that actual authority to approve or deny the sale was with HUD headquarters in Washington, D.C. TR 1071:10-25; 1072:1-22 (Brown). Moreover, even if Mr. Brown had the authority and had denied the sale of Collingwood to Cory Fanning, the denial would have been reasonable and not a breach of the implied covenant of good faith and fair dealing. See Def. Post Trial Br. at 44-45.

In their post-trial brief, plaintiffs make a startling new suggestion that Silas Polk may have denied the sale of Collingwood to Cory Fanning. Pl. Br. 33-34. According to plaintiffs, Mr. Polk was "the first line of review of Alli's attempt to sell the Collingwood property to Fanning" and that "[t]he animosity between Alli and Polk may have played a role in [] HUD's refusal to approve the sale." Pl. Br. 33-34. Plaintiffs, however, have never made this allegation in the almost four years that this case has been litigated. Instead, they have alleged that Mr. Brown orally denied the sale of Collingwood to Ben Alli by telephone. Pl. Resp. Def. Mot.

Summ. J. at 8; Pl. Memo Facts & Law at 13-14. When Mr. Brown testified at trial that he never denied the sale of Collingwood, either orally or in writing, and that he most likely did not have the authority to deny or approve the sale, plaintiffs now, at this late stage, raise a new allegation. Notwithstanding the impropriety of plaintiff raising a new allegation in a post-trial brief, plaintiffs' new allegation has very little merit.

Mr. Brown testified that a transfer of physical assets ("TPA") application would initially come through the project manager before being reviewed by other parts of HUD, including the legal division, the construction analysts, the asset management division and a development team. TR 1087:4-10 (Brown). Here, there was never a first-line review of the request to sell Collingwood, as plaintiffs suggest, because plaintiffs never submitted a TPA application to be reviewed in the first place. Joint Ex. 1 at 2. Moreover, Mr. Polk had no authority to approve or deny the sale of Collingwood to Cory Fanning. As Mr. Brown testified, that authority either resided with him or, more likely, with HUD's headquarters in Washington, D.C. TR 1071:10-25; 1072:1-3 (Brown). Even if plaintiffs had submitted a TPA application, which they did not, Mr. Polk only had the authority to conduct a first-line review. TR 1087:4-10 (Brown).

Plaintiffs argue that Mr. Fanning and Mr. Hopkins testified that HUD denied the sale of Collingwood. Plaintiffs mischaracterize the testimony of both witnesses. Pl. Br. 30-31. The testimony of both witnesses can be interpreted to support the theory that the sale did not go through because Mr. Fanning could not secure financing from HUD, not because HUD refused to approve the sale. Mr. Hopkins testified that "something had happened with HUD with the property and things just seemed to fizzle out." TR 272:8-12 (Hopkins). Similarly, Mr. Fanning testified that GMAC called and simply told him "HUD pulled the deal." TR 6-7 (Fanning).

Moreover, an October 6, 1999 letter agreement between plaintiffs and Mr. Fanning extended the deadline for completing the sale in order to comply with requirements to request financing from HUD, and Mr. Fanning testified that he chose "GMAC for the financing specifically because they 'had someone who had worked for HUD and knew how to do the HUD *financing*.'"[4] Pl. Br. at 32 (emphasis added); DX 191.

Finally, plaintiffs argue that HUD violated the foreclosure provision in its Servicing Handbook by failing to encourage the sale of the property as an alternative to foreclosure. Pl. Br. at 35. Plaintiffs, however, have offered no evidence that the provisions of the Servicing Handbook are binding upon HUD, and this Court has ruled in this case that HUD handbooks are not equivalent to regulations. See Order On Cross-Mots. For Summ. J. (August 16, 2006) (citing Armstead v. United States Dep't of Housing and Urban Dev., 815 F.2d 278, 282 (3d Cir. 1987); Brown v. Lynn, 385 F. Supp. 986, 998 (N.D. Ill. 1974); Fairington Apartments of Lafayette v. United States, 7 Cl. Ct. 647, 651 (1985)). Furthermore, plaintiffs did not need encouragement to sell Collingwood. They had entered into a purchase agreement with Mr. Fanning and, later, requested a payoff amount to pay off the HUD-held mortgage. DX 137, 267. Accordingly, HUD did not breach any actual or implied provision in the Collingwood HAP contract or regulatory agreement with respect to the sale of Collingwood to Mr. Fanning.

---

[4] Plaintiffs suggest that this letter was proof that there was communication between at least one of the parties to the purchase agreement and HUD, but there is no indication in the letter that anything had been communicated to HUD, HUD was not a party to the letter agreement, and there is no evidence that a copy of this letter agreement was sent to HUD. Pl. Br. at 32.

B. Contrary To Plaintiffs' Suggestion, The Collingwood Apartments Were Neither Decent, Safe Nor Sanitary As Required By The HAP Contract And Regulatory Agreement

Plaintiffs again rely upon the testimony of Roland Samaroo to support their assertion that the Collingwood apartments were in a decent, safe and sanitary condition. Pl. Br. 38. However, Mr. Samaroo could not identify what year his pictures of Collingwood were taken, and most of the pictures were taken at such a distance it is impossible to see the condition of the building and its windows. TR 240:4-25; 241:1-14 (Samaroo). According to Mr. Samaroo, the HUD inspection reports were not credible because they referenced a parking lot and laundry room at Collingwood which did not exist. Pl. Br. 38-39. However, when presented with pictures of muddy parking lots next to Collingwood with cars parked in it, Mr. Samaroo evasively answered that he would not consider those lots "parking lots."

> Q. Looking at the top picture there, would you consider that a parking lot?
>
> A. I would consider that a vacant lot.
>
> Q. But you would not consider it a parking lot?
>
> A. No. That term is variable. It's a vacant lot with two vehicles parked on it.
>
> Q. Would you now turn to page 5 of the same exhibit?
>
> A. Yes, I'm there.
>
> Q. At the bottom picture, would you consider that a parking lot?
>
> A. Cars are parked there. Again, you know, to me a parking lot is a paved area and usually has lines of demarcation to direct cars to be positioned.

TR 223: 4-17 (Samaroo); see also DX 113; TR 325:15-20 (Fanning).

Eckland Consultants, Inc. was hired by Cory Fanning to perform a walk-through survey of Collingwood. PX 46. In its report, Eckland confirmed the existence of the laundry room and the deteriorating conditions at Collingwood. PX 26 at 4, 7, 15. With only a walk-through survey, Eckland found numerous problems with Collingwood and reported it in "fair to poor condition" with "significant physical deficiencies and issues." PX 26 at 4. HUD's reported condition of Collingwood was also confirmed by Cory Fanning, who, contrary to plaintiffs' assertions in its brief, declared Collingwood a "fixer-upper" and reported seeing water damage, roaches, and unacceptable carpeting. TR 341:1-16 (Fanning). Accordingly, plaintiffs, not HUD, breached the Collingwood HAP contract and regulatory agreement by failing to maintain the property as contractually required.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court enter judgment for the United States.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick by Deborah A. Bynum
MARK A. MELNICK
Assistant Director

OF COUNSEL:

Thomas G. Massouras
Office of General Counsel
U.S. Department of Housing &
Urban Development
77 West Jackson Blvd.
Suite 2629
Chicago, Illinois 60604

s/Marla T. Conneely
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Flr.
1100 L Street, NW
Washington, D.C. 20530
Tel. (202) 305-3689
Fax (202) 305-7643

November 27, 2007

Attorneys for Defendant