UNITED STATES OF AMERICA

COURT OF FEDERAL CLAIMS

BENJAMIN ALLI, SHAKI ALLI and
BSA CORPORATION, a Michigan Corporation

Plaintiffs,

Case No. 01-669C
Hon. Francis Allegra

vs.

UNITED STATES OF AMERICA,

Defendant.
_______________________________________/

STEMPIEN & STEMPIEN, PLLC
By: Eric Stempien
Attorney for Plaintiff
315 N. Center Street, Suite 200
Northville, MI 48167
(248) 735-9200

DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION
By: Marla Conneely
Attorney for Defendant
1100 L Street N.W., Room 11054
Washington, DC 20005
(202) 307-0318
_______________________________________/

# *PLAINTIFFS' POST TRIAL REPLY BRIEF*

## ARGUMENT

### I. PINGREE APARTMENTS

In its Post Trial Brief, the government relies on the testimony of Mark Spooner, James Pollock, Dorothy Roach as well as a report from Pinnacle Realty Management, a government contractor, in support of its position that BSA Corporation (hereinafter "BSA"), not the Department of Housing and Urban Development (hereinafter "HUD"), breached the housing assistance payments contract for Pingree (hereinafter "Pingree HAP contract"). Further, the government attempts to discredit the testimony of Plaintiffs' witnesses, David Compo and Gordon Hileman.

What is significant about the government's reliance on the testimony of Mark Spooner (hereinafter "Spooner") is what it does not cite, that is Spooner's testimony regarding whether Pingree as a whole meets the decent, safe and sanitary requirement. As previously stated in Plaintiffs' Post Trial Brief, Spooner testified that he did not "want to generalize and say the apartment in general" did not meet the decent, safe and sanitary requirement. ***Transcript at 785*** According to Spooner, some of the units did not meet the requirement, but every witness testified that many of the tenants did not do a good job of maintaining their apartments. In fact, he testified that he "does not make a differentiation between what management does or what the resident does". ***Transcript at 791-792***

Further, the Defendant quotes Spooner's trial testimony regarding water damage that he observed during one of his site visits to Pingree. *See Defendant's brief at p. 12* Spooner also testified that the water damages was something that he actually recalled observing, not just from his notes. However, during his deposition on January 31, 2005, more than two years prior to the trial, he was given the opportunity to list all of the health and safety violations at Pingree. In his deposition

answer, he never mentioned any instances of water damage. ***Transcript at 790-791***

The testimony of James Pollock (hereinafter "Pollock") with regard to Pingree is contradicted by Spooner. In its brief, the government highlights Pollock's testimony that Pingree was one of the absolutely worst buildings he had ever seen in his career at HUD. *See Defendant's brief at p. 37* However, this characterization does not fit with Spooner's description of the property. Although Pollock attempted to show that he had no preconceived notions or biases when visiting Pingree, the fact is that troubled properties are referred to the Departmental Enforcement Center. Therefore, it is likely that Pollock would have a preconceived notion about the state of the buildings simply based on the fact that they were sent to the Enforcement Center. Those preconceptions are clearly demonstrated by his gross overstatements regarding Pingree's physical condition.

Plaintiffs' have already provided the Court with clear evidence of the bias that Dorothy Roach (hereinafter "Roach") has for Dr. Alli. Further, her inconsistent and incredible testimony demonstrates that her statements cannot be trusted. In addition to the internal inconsistencies in her testimony already argued in Plaintiffs' Post Trial Brief, the government's own documents show that her testimony lacks credibility. During the trial, Roach testified that in the year she lived at Pingree, she saw no exterminations in her apartment or anywhere in the building. ***Transcript at 552***, *see also Defendant's brief at p. 14* As part of the inspection process, HUD hired Pinnacle Realty Management (hereinafter "Pinnacle") to perform a review of Pingree. ***Defendant's Exhibit 1*** One of the specific questions addressed in the Pinnacle review was:

> Are exterminator services provided regularly as necessary? Are tenants properly notified?

Pinnacle answered "yes" to that question. ***Defendant's Exhibit 1***, *p. 35* The Pinnacle review is

dated June 8, 1999, which was after Roach was evicted from Pingree.

The government also relies on the report from Pinnacle. However, there was no testimony from anyone from Pinnacle. The government has not established that Pinnacle was aware of, or used, the standards for determining decent, safe and sanitary conditions found in the Code of Federal Regulations. The Pinnacle made some additional significant findings:

- "On February 5, 1997, the owner was notified of an HQS inspection performed on January 7, 1997. Of the 12 units inspected, 10 failed the inspection. On March 26, 1997, HUD performed a follow-up inspection (done on a trip report) stated that all 10 units which failed the January 7, 1997 inspection have been re-inspected, and passed." ***Defendant's Exhibit 1****, p. 29*

- Pinnacle's review of the Pingree file found that the March 26, 1997 trip report was the ***only*** re-inspection performed by HUD. ***Defendant's Exhibit 1****, p. 30* According to Pinnacle, the only time HUD returned to Pingree to re-inspect apartments that had failed, every failed unit passed. Clearly, BSA was maintaining Pingree appropriately.

- One of the questions HUD asked Pinnacle to determine was whether there were "any instances where the owner made improper use of project funds". Pinnacle's answer was: "Nothing found in the file". ***Defendant's Exhibit 1****, p. 30*

- Pinnacle also stated that it was missing documents. With regard to the physical condition of Pingree, Pinnacle requested a "copy of January 7, 1997 physical inspection conducted (listed in REMS as receiving a satisfactory rating, and the findings were closed on March 31, 1997) ***Defendant's Exhibit 1****, p. 26* This appears to request documents related to the inspection which found that 10 of 12 units failed, then passed re-inspection as discussed above. However, it would be inconsistent for an inspection to find 10 of 12 units failed, but still be rated "satisfactory". Either Pinnacle's analysis of the Pingree file is flawed, or the units never failed.

The Defendant's attempt to discredit the testimony of David Compo (hereinafter "Compo") and Gordon Hileman (hereinafter "Hileman") fails. The government cannot prove any bias on the part of either witness. Both are professionals who have no reason to risk their reputations for the Plaintiffs or this lawsuit. Compo was not contacted by either Plaintiff and had no prior contact with the Allis. Hileman's prior contact was limited to some professional advice regarding fire and/or

water loss at one or more of the Plaintiffs' apartment buildings.

Defendant attempts to discredit Compo by stating that he only went to apartments that Dr. Alli told him to inspect. *See Defendant's brief, p. 39* However, Compo clearly testified that he did a unit-by-unit inspection of each apartment inspected in HUD Report No. 52047. ***Transcript at 161*** The only units from Report No. 52047 that he did not enter were inaccessible because the manager did not have the key for those particular units. ***Transcript at 161-162***

Another of the government's criticism of Hileman and Compo is that their only task was to review the HUD report for accuracy. However, Compo testified:

> Q Did you review it [HUD Report No. 52047] while you were going through the buildings?
>
> A Yes, because I wanted to compare the notes that were in there to specifically what we were looking at, in addition to what we would do in our general inspection, which is to look over the buildings, interiors and exteriors.
>
> No matter what we had saw in a report, we would be looking for any materials or flaws that we found, especially safety wise that might be a problem.
>
> ***Transcript at 132***

The government also criticizes both Hileman's and Compo's testimony on the basis that their inspections occurred seven months after the HUD inspection and that BSA hired Mark Schlotter (hereinafter "Schlotter") to perform the repairs from Report No. 52047. *See Defendant's brief, p. 38* First, there is no evidence to support the proposition that Pingree and Gladstone were in deplorable condition at the time of the HUD inspection, but was transformed by the work of Schlotter. In fact, the testimony of Linda Hamilton, a tenant at Pingree, established that Pingree has been in good condition for a long time. ***Transcript at 423*** Second, even if the government's contention is true,

i.e. that BSA corrected the deficiencies in the HUD report, it supports Plaintiffs' contention that BSA maintained the apartments in decent, safe and sanitary condition and was responsive to both HUD and most importantly, the tenants.

## II. RIVERSIDE APARTMENTS

The government attacks Plaintiffs' position regarding the Riverside Apartments in two ways: (1) by arguing that Roland Samaroo (hereinafter "Samaroo") was biased, unreliable and flawed and (2) that the law presumes that HUD employees act in good faith in their duties and requires clear and convincing evidence to overcome the presumption.

The government's basis for challenging Samaroo's testimony is that he is a licensed psychologist, not a professional inspector or builder and that he is biased because it was his work that the HUD personnel were inspecting. In its brief, the government argues that Samaroo's "statements that he could not find some of the deficiencies in the HUD reports is more likely a result of his lack of experience" rather than an inaccurate report from HUD. *Defendant's brief, p. 35* However, the items that Samaroo testified that he could not verify do not require any specialized training or expertise. The inaccurate portions of the HUD reports that Samaroo confirmed included:

- A HUD report that a window was missing in a bedroom of an occupied unit during the winter. Samaroo found that the window was there. ***Plaintiffs' Exhibit 8****, p. 2*

- HUD reports of chipped sinks, when the sink was stainless steel. ***Plaintiffs' Exhibit 8****, p. 2-3,* ***Transcript at 183***

- A HUD report of a fan that had been chewed by mice, however, the fan was constructed with aluminum. ***Transcript at 181-182***

None of these observations require any particular knowledge, experience or skill set. It is clear from Samaroo's testimony that this is true of almost all of his observations.

Further, Defendant has not made a sufficient showing of bias on the part of Samaroo. Samaroo did perform work for the Plaintiffs at Riverside, however, he did not act nor appear defensive during his testimony about HUD's criticisms. Further, he had more incentive to find that the HUD deficiencies were accurate, because he would have then had more work and thus made more money from Plaintiffs.

The Defendant also argues that Samaroo admitted that he found evidence of roach infestation, inoperable smoke detectors and a non-working elevator. With regard to roaches, Samaroo testified:

> A Let me just look over my notes to make sure because I know the roaches. I made this note in my general mentioning of inspecting the apartments over a period of time. Just a couple of times I saw roaches, and they were dead roaches, so not pertaining particularly to the report.
>
> ***Transcript at 186***

Having seen dead roaches a couple of times can hardly be said to be an admission that there was a roach infestation. As the Court is aware, there was testimony during the trial about the cleanliness of some the tenants who occupied these properties and its effect on the presence of roaches. There was also much testimony about the Plaintiffs' regimen of extermination. The extermination program has been acknowledged by Pinnacle, HUD's contractor. ***Defendant's Exhibit 1****, p. 35*

With regard to the smoke detectors, Samaroo testified that "usually the tenant would have taken them [the batteries] out to use, taken out the batteries from the smoke detectors to use for something". He would carry batteries with him and replace them as needed. ***Transcript at 180, 185***

Defendant also relies on testimony by Roach to support its claims regarding the Riverside property. Roach testified that there were electrical wires strewn from one apartment to another,

some tenants did not have any electricity and were sharing electricity with neighbors. ***Transcript at 566-567****, also see Defendant's brief, pp. 9-10* Incredibly, there is no evidence of any HUD inspector making such a finding. It is difficult to imagine that a HUD inspector would have missed such an obvious deficiency.

In its brief, the government argues that HUD inspectors are presumed to act in good faith and to overcome the presumption, Plaintiffs must provide clear and convincing evidence, relying on *Am-Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234 (Fed, Cir. 2002) In that case, Am-Pro argued that it should be granted relief from a release on the basis that it had signed the release under duress due to the improper actions of the government's contracting officer. In order to prevail, Am-Pro had to prove bad faith on the part of the government official. In this matter, Plaintiffs do not have to prove bad faith. The claims brought by Plaintiffs in their Second Amended Complaint are only for breach of contract. Intent or motive, while it could be used to explain why a contract was breached, is not an element of breach of contract. Because Plaintiffs do not have to prove bad faith, the clear and convincing standard announced in *Am-Pro* is inapplicable.

## III. COLLINGWOOD APARTMENTS

### A. Sale to Fanning

The government raises three defenses to Plaintiffs' breach of contract claim with regard to the proposed sale of Collingwood to Cory Fanning (hereinafter "Fanning"): (1) HUD did not reject the sale, (2) Robert Brown (hereinafter "Brown") did not have the authority to reject the sale and (3) even if he did have the authority and did reject the sale, the rejection was reasonable. Defendant's first argument is meritless. While Brown denied having rejected the sale, Benjamin Alli testified that Brown told him that he would not consent to the sale to Fanning and that "we will not allow you

to benefit any longer from a U.S. financial resource." ***Transcript at 494*** Further, both Fanning and Gary Hopkins, the real estate broker, testified that the only reason the sale did not close was due to HUD's refusal to provide the necessary approval. ***Transcript at 332, 272***

The government's next argument is that Brown did not have the authority to approve or reject the proposed sale. However, his testimony was clear that he did have that authority in general, however, he might not have in this particular case. ***Transcript at 1070-1072*** This case involves more than just a he said/he said argument between Alli and Brown. All of the circumstantial evidence supports Plaintiffs' argument that a HUD official with proper authority refused to approve the sale. Fanning testified he hired GMAC as his mortgage company because "they had someone who had worked for HUD and knew how to do HUD financing". ***Transcript at 331*** Presumably, a former HUD employee who knew HUD financing would be aware of the requirements for receiving approvals, including who in the office has the appropriate authority. Further, GMAC would be unlikely to simply abandon a potential deal without a conviction that HUD would not approve the sale. In addition, Fanning testified that his financing was in line at the time the deal was rejected by HUD. ***Transcript at 332*** All of the parties involved in the sale (except HUD) have indicated that the only reason the sale did not close was HUD's failure to approve the sale. Taking the evidence as a whole, it is clear that HUD breached the Collingwood HAP contract by failing to approve the proposed sale to Fanning.

The government's final argument is that if there was a denial, it was reasonable. Defendant lists Fanning's alleged shortcomings as a potential owner of HUD-subsidized property, but does not provide any authority to indicate whether the lack of any of these attributes is dispositive. Additionally, it appears Fanning would meet the standards that Brown testified HUD considers for

approval of a sale. In its brief, Defendant states that the factors include "whether the buyer is capable of assuming all of the obligations in the mortgage and regulatory agreement and whether the new owner has the financial capabilities and experience to bring the property into compliance with HUD standards." *Defendant's brief, p. 44,* ***Transcript at 1069-1070*** Fanning testified that he was ready, willing and able to invest over $150,000.00 into the Collingwood Apartments. ***Transcript at 333*** HUD has filed a counterclaim against the Plaintiffs alleging that the properties, including Collingwood, were not properly maintained. Now, in response to a claim that they breached the sale upon approval clause, HUD argues that it was reasonable to reject the proposed sale to a buyer who was willing to spend a significant sum of money on the physical appearance of the building.

This Court has held that:

> The usual standard is that concurrence or approval is not left to unbridled discretion but can be withheld only if objectively reasonable in the particular circumstances, particularly when the item contracted for is not one which can be evaluated only on the basis of personal taste or fancy.

*Contra Costa Co. Flood Control v. United States*, 512 F.2d 1094, 1097 (Ct. Cl. 1975)

It is clear that HUD's disapproval of the sale to Fanning was not objectively reasonable in these circumstances.

**B. Involuntary mortgagee-in-possession**

It is Plaintiffs' position that this issue need not be addressed by the Court because HUD breached the Collingwood HAP contract by not approving the sale to Fanning prior to its declaration of involuntary mortgagee-in-possession. However, HUD did breach the mortgage contract by assuming possession of Collingwood on January 25, 2000.

HUD claims that it received reports on Tuesday January 25, 200 that there was no heat at the

Collingwood and that there had been no heat for two days. ***Transcript at 1027*** HUD provided no corroboration for its contention that the heat was off at Collingwood for two days. In fact, that contention is directly contradicted by two witnesses who were physically present at Collingwood at that time. Samaroo testified that he worked at Collingwood and in fact showered in a vacant apartment on the Sunday prior to the day that HUD received these complaints. He also testified that he was at Collingwood on that Monday as well, performing repairs. He testified that the heat was on both days. ***Transcript at 207-208*** A former tenant at Collingwood, Emmanuel Uziogwe (hereinafter "Uziogwe"), also testified regarding the heat on January 25, 2000. Uzoigwe testified that on the day that HUD received this complaint, he woke up at 7:30 a.m, showered and left for day and returned at approximately 8:00 p.m. He testified the heat was on in his apartment that morning. ***Transcript at 248-249*** Brown testified that it is HUD's policy to allow an owner 72 hours to repair an exigent issue. ***Transcript at 1083-1084*** This policy was not followed in this case, based in part on the allegation that the heat had been off for several days, which has been proven to be untrue.

The decision to declare involuntary mortgagee-in-possession was part of the overall foreclosure process for the Collingwood buildings. HUD was determined to remove BSA from ownership of Collingwood, without allowing him to obtain fair market value for the property.

## IV. PIERCING THE CORPORATE VEIL

Defendant seeks to pierce the corporate veil of BSA to hold the stockholders of the corporation individually liable for BSA's debts. However, the only evidence that Defendant has produced regarding the identity of the stockholders is found in the Joint Stipulation of Facts. ***Joint Exhibit 1*** In its brief, Defendant makes the bold factual statement that "Mr. and Mrs. Alli are the sole owners of BSA". *Defendant's brief, p. 48* Defendant does not cite to any evidentiary support

for this statement. In fact, Benjamin Alli is the only identified stockholder for BSA. ***Joint Exhibit 1, ¶****5* The government cannot now argue that Shaki Alli is a stockholder, having placed no evidence on the record to support that proposition. Therefore, the only issue is whether the corporate veil should be pierced to hold Benjamin Alli individually liable for any of the debts of BSA.

"A court will pierce this corporate veil only reluctantly and cautiously, and only upon a strong showing by the party asking it to do so." *BLH, Inc. v. United States*, 13 Cl. Ct. 265, 272 (1987) (internal citations omitted) "[D]isregard of the corporate fiction is not without precedent in this circuit, where it is clear that formal corporate arrangements are a mere sham and have no valid business purpose, but rather, are aimed at avoiding the consequences of an efficacious transaction." *Twin City Shipyard, Inc. v. United States*, 21 Cl.Ct. 582, 590 (1990)

Under Michigan law, there is no single rule delineating when a corporate entity may be disregarded. *Papo v. Aglo Restaurants of San Jose, Inc.*, 149 Mich App 285, 301; 386 NW2d 177 (1986) "The entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused." *Klager v. Robert Meyer Co.*, 415 Mich 402, 411-412; 329 NW2d 721 (1982) In order for the United States to pierce the corporate veil of BSA Corporation, it must show that the corporate form was used to commit a fraud or wrong. *Foodland; Kline v. Kline*, 104 Mich App 700; 305 NW2d 297 (1981)

It is clear from a review of Michigan cases that the Court focuses on the use of the corporate ***form*** to commit a fraud or wrong in deciding whether to disregard the corporate entity. In *Kline*, the Michigan Court of Appeals held:

> When the notion of a corporation as a legal entity is used to defeat public

> convenience, justify a wrong, protect fraud or defend crime, that notion must be set aside and the corporation treated as the individuals who own it. The fiction of a corporate entity different from the stockholders themselves was introduced for convenience and to serve the ends of justice, but when it is invoked to subvert the ends of justice it should be and is disregarded by the courts.
>
> *Kline* at 703 (citations omitted)

The Michigan Supreme Court has provided some guidance regarding when to apply the doctrine of piercing the corporate veil. *Klager v. Robert Meyer Co.,* 415 Mich 402; 329 NW2d 721 (1982) In *Klager*, the Court held that:

> By limiting an investor's financial risk to the amount of his stock contribution, the corporate form serves important social policies by creating an incentive to pool resources and to channel them into productive activity. By the same token, freeing shareholders from all personal liability runs the risk that the corporate form may be used as a shield for action the law would not condone if done by an individual and as a subterfuge for increasing one's personal autonomy at the expense of others. In an effort to strike a balance between these opposing policies, this Court has held that fraud or other attempts to evade the law justify invoking equity's power to look through and behind the legal entity of corporate existence.
>
> *Klager* at 411 (citations omitted)

*Klager* involved a breach of contract action by the plaintiff against the corporate defendant and its shareholders. The trial court and the Michigan Court of Appeals held that piercing the corporate veil was appropriate in that case. The Michigan Supreme Court reversed, stating that "a Court will refuse to pierce the corporate veil where corporate action is not fraudulent or otherwise illegal". *Klager* at 418 There was no dispute that the corporation had breached the contract at issue in that case. Therefore, it is clear that the Michigan Supreme Court does not consider a breach of a contract action that is not "fraudulent or otherwise illegal" an appropriate basis for disregarding the corporate entity.

STEMPIEN & STEMPIEN, PLLC

s/Eric Stempien________________
By: Eric Stempien
Attorney for Plaintiffs
315 N. Center St., Ste. 200
Northville, MI 48167
(248)735-9200
stempieneric@yahoo.com

Dated: November 27, 2007