# In The United States Court of Federal Claims

No. 01-669 C

(Filed: August 26, 2008)

BENJAMIN & SHAKI ALLI AND BSA CORPORATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

* Trial; Breach of contract; Section 8 housing program; Housing Assistant Payments contracts and associated regulatory agreements; Requirement that owner maintain decent, safe and sanitary housing for tenants; HUD properly determined that properties in question were not maintained in a decent, safe and sanitary fashion; HUD did not commit contract breaches in suspending and terminating HAP contracts and regulatory agreements; HUD did not breach contract provisions regarding transfer of property; Counterclaim; Plaintiffs breached HAP contracts and associated agreements; Corporate veil pierced.

## OPINION

*Eric Stempien*, Northville, Michigan, for plaintiffs.

*Marla Tun Conneely* and *Dawn Elyse Goodman*, Civil Division, U.S. Department of Justice, with whom was *Peter D. Keisler*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

"One picture is worth 1,000 denials."[1]

This contract action involves several apartment complexes in the Detroit, Michigan area. Each of them participated, at one point, in a subsidized housing program run by the United States Department of Housing and Urban Development (HUD). Under so-called Housing Assistance Payments (HAP) contracts, the landlords of properties in the subsidized housing program are required to maintain and operate them to provide decent, safe, and sanitary housing. Failure to do so can be considered an event of default and result, *inter alia*, in the suspension of payments or even the cancellation of the HAP contracts. The latter is what happened here when HUD,

[1] Ronald W. Reagan.

relying on multiple inspections conducted over a number of years, found that each of the properties in question were not decent, safe or sanitary. Challenging HUD's actions as contract breaches, plaintiffs hotly deny that their properties were substandard, and aver instead that defendant acted arbitrarily and even fraudulently. But, as will be seen, the record here overwhelmingly demonstrates otherwise, revealing plaintiffs' claims regarding the well-kept state of their buildings to be nothing short of fanciful. While plaintiffs attempt to portray HUD as the villain here, as will be seen, they were not the oppressed, but the oppressors.

## I. FINDINGS OF FACT

Based on the record at trial, including the parties' joint stipulations, the court finds as follows:

In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. That program, as noted, provides federally subsidized housing to millions of low-income tenants by authorizing, *inter alia*, the payment of rent subsidies to private owners and developers of low-income housing. Under the program, tenants make rental payments based upon their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. *Park Properties Assocs., L.P. v. United States*, 82 Fed. Cl. 162, 164 (2008) (describing the program); *Cuyahoga County Metropolitan Housing Auth. v. United States*, 57 Fed. Cl. 751, 753 (2003) (same); 42 U.S.C. §§ 1437a(a), 1437f(c)(3)(A); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997).

The three housing properties at issue were acquired by one or more of plaintiffs[2] in the 1980s with varying degrees of assistance from HUD. In 1983, the Allis, doing business as BSA Associates,[3] acquired the Pingree/Gladstone property (Pingree) through a HUD auction and with financing provided by a HUD mortgage. In 1989, Dr. Alli, doing business as BSA Associates, acquired the Riverside property (Riverside) in like fashion and with similar HUD financing. That same year, BSA Corp. (with Dr. Alli as signatory) acquired the Collingwood/Kirkwood property (Collingwood), again with financing through a HUD mortgage. Each of these properties participated in the Section 8 housing program.

---

[2] Benjamin Alli and Shaki Alli are married and reside in Michigan. They are the sole shareholders of BSA Corporation (BSA Corp.), a Michigan corporation doing business in Michigan. Where appropriate, the court will collectively refer to the Allis and BSA Corp. as "plaintiffs."

[3] BSA Associates was a partnership or joint venture owned by the Allis and should be distinguished from BSA Corp., their wholly-owned corporation.

### A. The HAP Contracts and Regulatory Agreements

To facilitate housing assistance payments, plaintiffs and HUD entered into HAP contracts for each of the three properties – Pingree, Riverside and Collingwood. *See* 42 U.S.C. §§ 1437f, 3531. These contracts required plaintiffs to maintain decent, safe and sanitary housing for their tenants, and provided that failure to do so was a breach allowing HUD to take corrective action. Specifically, sections 2.5(a) and 2.5(b)(2) of the original HAP contracts[4] here stated:

> (a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e) . . . If [HUD] determines that the Owner is not meeting one or more of these obligations, [HUD] shall have the right to take action under section 2.21(b).
>
> (b) Inspection.
>
> * * * * *
>
> (2) [HUD] shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times . . . as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition, including the provision of the agreed-upon utilities and other services. [HUD] shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

Section 2.5(c) of the contracts stated that "[i]f [HUD] notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, [HUD] may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit."[5]

Section 2.21(b) of the contracts specified that a default thereunder would result if: "[t]he Owner has violated or failed to comply with any provision of, or obligation under, this Contract

---

[4] These provisions and others quoted herein were in each of the various HAP contracts entered into by the parties, albeit sometimes with different numbering.

[5] The HAP contracts each included exhibits quoting HUD's standards for decent, safe and sanitary housing. Initially, those standards derived from 24 C.F.R. § 886.307; effective in 1998, they were taken from 24 C.F.R. §§ 5.703 and 982.401.

or of any Lease, including failure to correct any deficiencies identified by [HUD] in connection with any annual or other inspection . . ." In that event, section 2.21(b)(2) of the contract required HUD to notify the owner of "the nature of the default," "[t]he actions required to be taken and the remedies to be applied on account of the default," and "[t]he time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken." Under this provision and section 2.21(b)(3), "[i]f the Owners . . . fail[s] to respond or take action to the satisfaction of [HUD]," HUD had the right to take corrective action, including the right to –

> (i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract.
>
> (ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project . . .
>
> (iii) Apply to any court . . . for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate . . .
>
> (iv) Reduce or suspend housing assistance payments.
>
> (v) Recover any overpayments.

Section 2.21(c) emphasized that the above-listed remedies were nonexclusive and that the exercise of one remedy should not "be considered a waiver of any other."

Because HUD held the mortgage on the Pingree and Collingwood properties, as to those properties, the parties entered into a second agreement, a Regulatory Agreement for Insured Multi-Family Housing Projects (regulatory agreement). This regulatory agreement incorporated, by reference, all the terms of the HAP contract, including the requirement that the units be kept in decent, safe and sanitary condition. Reemphasizing this point, paragraph 10 of the regulatory agreement provided: "Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition." Like section 2.21 of the HAP contracts, section 14 of the regulatory agreement stated that HUD "may give written notice" of any violation of the agreement. This provision continued –

> "[i]f such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:
>
> > (a)(i) If the Secretary holds the note – declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage . . .;
> >
> > * * * * *
> >
> > (b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project; [and]
> >
> > (c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as [HUD] in its discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage.

Both the regulatory agreements, as well as the HAP contracts, precluded plaintiffs from transferring any interest in the properties without the prior written approval of HUD.

## B. The Properties

The following segments describe the court's findings as to each of the properties at issue.

### 1. The Pingree Apartments

On August 22, 1983, HUD and the Allis entered into a HAP contract for Pingree, which contract was renewed periodically thereafter. These contracts included the aforementioned provisions requiring plaintiffs to keep the Pingree apartments in a decent, safe and sanitary condition. Because HUD held a mortgage on this property, on August 24, 1983, HUD and the Allis also entered into a regulatory agreement with respect to that project, incorporating the provisions highlighted above.

In the early 1990s, HUD became aware of significant problems at Pingree. On November 30, 1992, Mark Spooner, then facilities manager for public housing at HUD's Detroit office, met with the maintenance manager at Pingree to inspect repairs for which Dr. Alli had requested reimbursement. Beginning this inspection on the third floor of one of the buildings in the complex, Mr. Spooner found that the listed repairs had not been made or had been made in an unprofessional or unsafe manner. The inspection abruptly terminated when Dr. Alli denied Mr. Spooner access to the remainder of the complex. On April 14, 1993, Mr. Spooner inspected the property again. He found significant problems, among them, missing smoke detectors and other fire hazards, roach infestation, peeling paint, and wrinkled carpeting in common areas that constituted a tripping hazard. He also observed major and long-standing damage occasioned by water leaks – significant wall and ceiling deterioration, damage to bathroom and kitchen cabinets, and buckled tile.[6] On September 21, 1993, Mr. Spooner notified Dr. Alli of these problems and ordered him to effectuate repairs within thirty days. On October 5, 1993, Dr. Alli responded, essentially indicating that most of the problems had been remedied. Yet, when Mr. Spooner reinspected the property on September 16, 1994, he found that many of the deficiencies previously noted were uncorrected, including roach infestation. In addition, he observed that: (i) there was significant water damage to walls and ceilings; (ii) the carpeting in common areas and units was torn, threadbare or in a state of extensive disrepair; (iii) floor tiles and pressure valves on water heaters were missing or broken; (iv) door moldings were loose or broken; and (v) various range burners were inoperable. By letter dated November 15, 1994, HUD ordered Dr. Alli to submit a written plan to correct these problems within thirty days. He did not do so, although on January 20, 1995, he sent HUD a letter summarizing various repairs that supposedly

---

[6] In this regard, he testified –

Q.: Did you see water damage at the Pingree Apartments?

A.: Yes, there was water damage in the cabinets, kitchen cabinets especially. There was water damage in the shower areas where water had gotten behind the actual shower tub tile. The tile had never been repaired so the water kept going behind there and causing leaks, causing the [tile] to buckle, and that was pretty much common for both kitchen and bathroom areas at Pingree. The plumbing was just never really addressed as an issue to be repaired.

Q.: Could you tell how long the water damage had been there?

A.: No, I can't tell you exactly how long. I can tell it had been there for awhile, especially when you get into like the bathtubs, for instance, where you have tile that is buckled three or four inches, pulled away from the wall three or four inches. That doesn't happen overnight. That happens over a period of time – weeks, months, whatever.

had been performed at the complex. On February 1, 1996, however, Mr. Spooner found many of the same deficiencies were still present and reported the same to Dr. Alli. On February 26, 1996, Mr. Alli responded that he "had corrected and made repairs necessary and as directed to the units concerned." Yet, an inspection on January 19, 1997, revealed that the same deficiencies were still present.[7]

As the problems worsened, other HUD components became involved. On June 2 and June 4, 1998, a second HUD inspector, James Bow, checked the Pingree apartments, failing 24 of the 38 units inspected. The conditions he encountered were much the same as had been previously identified. On October 20, 1998, Dr. Alli reported to HUD that the most important deficiencies had been corrected and that the rest would be "corrected and ready for inspection within [a] few weeks."[8] When correction of the deficiencies still did not materialize, HUD, on

---

[7] While plaintiffs have contested the accuracy of Mr. Spooner's findings, his impressions were confirmed by Ms. Dorothy Roach, a section 8 tenant residing, with her pregnant daughter, at Pingree during portions of the period in question. Ms. Roach not only convincingly testified regarding the problems that she experienced at her own apartment (including leaking ceilings), but also graphically highlighted the problems she saw in vacant units in the complex, testifying:

> People had moved out, left the garbage, left the trash. It was there, just there. Nobody ever cleaned the apartments. Some of the apartments had the ceiling completely down into the bathtubs. Some of them had the sinks and the toilets hanging off the walls. Refrigerators had been closed up with the food in them. They would create new roaches. There were quite a few like that. And some of the apartments had not been lived in for a long time, and it wasn't like trying to go in. You could just push the door open. You could just walk in. Some didn't have doorknobs.

She also noted that the elevators at the four-story Pingree complex often stopped working, leaving elderly tenants or those with health conditions to cope with the stairs. Her observations are confirmed by several letters in which various tenants complained to Dr. Alli about the living conditions at Pingree.

[8] Notwithstanding these assurances, Dr. Alli contended that Mr. Polk's reports were "bogus," "inflammatory," and animated by ethnic discrimination. In this regard, he stridently asserted –

> Mr. Polk did not see any good in us, other than Black foreigners who come to Africa to take his jobs, bought Apartment buildings that belong to him and native (US) Blacks. He is bend [sic] to destroy our investment, making false and fraudulent statement on a US Government letterhead to get even, on a 300-400 years inhumane treatment the Africa perpetuated on U.S. Black.

January 13, 1999, classified Pingree as a "troubled property." On February 3, 1999, it referred Pingree to the Chicago office of HUD's Department Enforcement Center (DEC) to determine whether an enforcement action should be pursued. On February 26, 1999, HUD sent Dr. Alli a letter notifying him of this referral. Several weeks later, on March 16, 1999, a HUD team led by James Pollack, an enforcement analyst with the DEC, conducted a site visit of Pingree. Consistent with prior reports, the team found the conditions at Pingree to be deplorable – severe water damage; sink and shower units separating from the walls; actively-leaking plumbing; damaged or inoperable appliances, doors and lighting; and roach infestation. Their observations were confirmed by photographs taken during the inspection.[9] Based on these and other observations, Mr. Pollack, on behalf of the team, concluded that the Pingree apartments were not decent, safe and sanitary.

DEC contracted Pinnacle Realty Management Company (Pinnacle) to conduct an independent review of Pingree. After performing this task, on June 8, 1999, Pinnacle submitted a report, with extensive documentation, including photographs, in which it found that "[t]he picture painted by prior inspections is accurate, [and] [t]he sites are not being maintained to

---

At a later point in the same letter, Dr. Alli accused Mr. Polk of "encouraging our tenants to destroy our property, to be able to find things to get us for, to shame us for, to harass intimidate us for, and overall to make a case 'WHY AFRICAN CANNOT MANAGE APARTMENT FOR NATIVE BLACKS'." (Emphasis in original).

[9] Describing one of these photographs, Mr. Pollack stated –

> This was an active leak at the time of our visit. It's the ceiling of one of the units at one of the Pingree buildings, and the ceiling was heavily saturated with water and there was water dripping into the unit at the time. It was an occupied unit by the way.

In describing a picture of another occupied unit, he testified –

> Q.: Can you tell us what we're looking at . . . at the bottom picture there?
>
> A.: That's a sink base cabinet in one of the kitchens of one of the Pingree buildings. This one, and again this was very common, where there were leaks under sinks that had caused the shelf at the bottom of the base cabinets to actually collapse under their own weight. In this particular case, the tile, linoleum tile had also lifted away from the floor. There was heavy staining along the backsplash of the countertop, heavy staining on the counter itself, a missing cabinet drawer, all indicating a general lack of maintenance.

minimal standards of Decent, Safe, and Sanitary Condition."[10] On November 18, 1999, HUD's Real Estate Assessment Center (REAC) inspected sample units at the Pingree apartments and identified numerous physical defects, including 39 separate health and safety issues. The report filed by REAC confirmed the continuing existence of many past deficiencies, but also revealed new ones – deterioration in masonry, missing handrails and inoperable lighting and exit lights. That report gave Pingree a score of 18 out of a possible 100 points – significant, because HUD viewed anything under 30 points as indicating that a property was seriously troubled. HUD sent a copy of this report to Dr. Alli, stating that "[b]ecause you are required to maintain your property in good repair and condition, we are directing you to conduct a complete survey of the entire property to determine the full extent of the physical deficiencies that are present and in need of correction or repair." Dr. Alli never provided such a survey to HUD. On December 3, 1999, HUD restated its findings to Dr. Alli in two different letters (one from the REAC and the other from Mr. Berry), stressing again the need for him to make immediate repairs and to provide HUD with written confirmation thereof. In January and February 2000, the Housing Inspection Division of the City of Detroit conducted its own inspections of Pingree and cited plaintiffs for a variety of violations consistent with the problems previously-identified by HUD.

On March 2, 2000, HUD notified Dr. and Mrs. Alli that they were in violation of their regulatory agreement and in default of the Pingree HAP contract for failing to maintain the property in a decent, safe and sanitary condition. The letter indicated that the November 18, 1999, inspection had revealed that "neglect, failure to maintain the exterior of the premises, and the failure to adequately maintain the interior units, is systemic at this property and is a material violation of your [HAP] contract." This letter yet again gave the Allis thirty days within which to correct the violations. On April 28, 2000, HUD notified Dr. Alli that he and his wife remained in default of their HAP contract and that it had suspended all section 8 payments for Pingree. On May 4, 2000, it issued Dr. Alli a formal notice that he and his wife were in default of the regulatory agreement for the Pingree apartments. That notice specifically cited Dr. Alli's failure to maintain the property in good repair and condition, as required under paragraph 10 of the agreement, listing, as evidence thereof, the results of the inspections conducted on June 2, 1998, June 4, 1998, and November 18, 1999. On May 10, 2000, Margarita Maisonet, the Director of DEC in Chicago, sent a memorandum to Robert Brown, recommending that HUD foreclose upon the mortgage for the Pingree apartments. On May 12, 2000, Mr. Brown sent a memorandum to Alvin Bragg, Director of HUD's Multi-family Property Disposition Center in Fort Worth, Texas, concurring in the foreclosure recommendation. HUD subsequently began relocating tenants from

---

[10] The report extensively summarized the history of HUD's inspections of the property, as well as the findings made by Pinnacle based upon its own site visit on May 7, 1999. The report catalogued nineteen categories of deficiencies that, although previously noted by HUD on repeated occasions, had not been remedied, including problems with exterior walls, roofs, common areas, windows, carpeting and flooring, cabinetry, appliances, electrical and plumbing, the building elevator and fire safety equipment.

Pingree to other suitable housing.[11] Before HUD completed the foreclosure, Dr. and Mrs. Alli paid off the HUD-held mortgage. They still own and operate Pingree today.

**2. The Collingwood Apartments**

On May 12, 1981, L & R Reality L.P., Series I, entered into a 15-year HAP contract with HUD for the Collingwood apartments. On June 9, 1989, BSA Corp. acquired these apartments, subject to the preexisting HAP contract. Thereafter, HUD and BSA Corp. entered into two new HAP contracts – on June 27, 1997, and September 30, 1997, respectively. Subsequent renewals and other new HAP contracts were executed by the same parties, with the last of these expiring on March 15, 2000. These contracts contained essentially the same provisions outlined above, requiring BSA Corp. to keep the apartments in decent, safe and sanitary condition. Because HUD also held the mortgage on the Collingwood property, on July 6, 1990, it entered into a regulatory agreement with BSA Corp., the critical provisions of which track those described above. Again, both the HAP contract and the regulatory agreement provided that BSA Corp. could not convey, transfer or encumber any of the property, without first obtaining the written approval of HUD.

On June 29, 1995, HUD inspector, David Salazar, inspected the Collingwood apartment. As the result of this inspection, he cited units for violations, such as inoperable smoke detectors, roach infestation, missing floors tiles, cracked windows and missing window screens, damaged ceilings and floors, and water leaks. Nine of the thirteen units inspected failed. On July 20, 1995, HUD reported these findings to BSA Corp. and Dr. Alli, giving them thirty days within which to correct the deficiencies and provide written certification that the necessary repairs had been done. On September 27, 1995, HUD reinspected the nine failed units – four passed. On October 18, 1995, HUD notified Dr. Alli that section 8 payments were being halted for five units because HUD could not gain entry to inspect those units. On February 8, 1996, HUD reinspected these five units and passed three.

On October 29, 1997, HUD inspector, James Bow, inspected and failed 48 of 52 units that he saw at Collingwood for failing to meet health and safety standards. In the notes included in his report, he observed that "[i]n general the units are filthy, roach infested, unsanitary, and unsafe" and that "[t]he owners, the management team, and maintenance crews have failed to provide decent, safe and sanitary housing." He further reported that "[r]oaches or evidence of [the] same were observed in every apartment," and cited numerous violations, among them, broken windows, missing window screens, missing doors, inoperable smoke detectors, torn

[11] On July 21, 2000, Mr. Gordon Hileman, an adjuster from Statewide Claim Service inspected the Pingree apartments. On July 24, 2000, he finalized a written report of his findings. While Mr. Hileman disagreed with HUD's overall characterization of the building, he observed many of the same defects noted in the HUD inspections. Notably, this inspection occurred more than eight months after the last HUD inspection, leaving it unclear to what extent repairs on the building had been effectuated during this intervening period.

carpet, missing floor tiles, water leaks and damage, inoperable stove burners, missing cabinets and drawers, inoperable electrical outlets, inoperable sinks, and leaking toilets.[12] He further reported that the walkway up to the roof was scattered with "fecal matter [and] urine soaked clothes, trash, newspaper [], wood, [and] litter." One of the photographs he took and included in his report shows the door leading to the roof off its hinges and lying on its side, exposing the building to the elements. Cumulatively, Mr. Bow noted hundreds of violations of the housing quality standards.

On December 15, 1997, HUD notified BSA Corp. of these findings and gave it thirty days to effectuate the necessary repairs and provide "written certification of completion." It warned that failure to comply with the health and safety standards "may result in suspension of payments for each ineligible unit (and/or the entire project) as required under the terms of your [HAP] contract," adding that other "available remedies" might be pursued "should they be deemed necessary." While plaintiffs responded to the report in a letter dated January 9, 1998, they did not certify that the deficiencies had been corrected – this was noted by HUD in a letter sent to Dr. Alli on February 17, 1998, in which HUD gave plaintiffs thirty days to submit an "acceptable plan for repair of the property." Plaintiffs did not submit such a plan. On April 28, 1998, Mr. Bow conducted a follow-up inspection of Collingwood. He found that most of the items previously identified had not been corrected, and failed 19 of the 21 units he reinspected. Mr. Bow again noted serious deficiencies in his reinspection report, including roach infestation, holes in walls and doors, toilets loose from the wall, lack of hot water, inoperable or damaged stoves and ranges, sagging cabinets, missing window screens, mildew damage, water leaks, rotten window sills, inoperable and overflowing toilets, missing or inoperable smoke detectors, and an inoperable intercom. On June 4, 1998, HUD notified BSA Corp. that it was in default of the Collingwood HAP contract and in violation of the regulatory agreement for several reasons, including failure to maintain the property in good repair and condition.

On September 28, 1998, HUD referred Collingwood to the DEC for review. As part of this review, HUD contracted Pinnacle to conduct an independent inspection of the property. On November 9, 1998, the REAC inspected Collingwood and identified numerous deficiencies, including excessive leaks and water damage, exposed jagged glass, broken windows, inoperable smoke detectors and exit lighting, missing radiator covers, damaged countertops and cabinets, and rotten and deteriorated flooring. On January 13, 1999, HUD classified the Collingwood apartments as a troubled property.

---

[12] His report clearly reflects that at least some of the affected units were occupied. In one instance, his report notes –

> Kitchen ceiling falling in/walls destroyed/floor covering destroyed/cabinets are falling off wall/there is no electrical service in the kitchen. Tenant states she has to eat out since she cannot prepare food in here. Replace range. It does not work.

On March 2, 1999, Dr. Alli notified HUD that "[l]eaking have [sic] been fixed. All ceiling in the Apartment units, were fixed when the Roof was done less than 30 days ago." On March 16, 1999, Mr. Pollack visited Collingwood to determine the current condition of the property. As his notes reflect, he again found numerous deficiencies, which he documented with photographs that showed holes in basement ceilings and in various walls, stained and ripped carpet, water-stained and leaking ceilings, missing faucets, stained tubs, cracked and hazardous masonry, and corroding pipes. His pictures also documented dangerous conditions with respect to the building's exterior and common areas.[13] As the result of his inspection, Mr. Pollack concluded that the Collingwood apartments were not decent, safe and sanitary, and that the owner was unwilling or unable to bring the project into compliance.

In a letter dated June 4, 1999, HUD notified BSA Corp. of the violations at Collingwood and gave it yet another opportunity to cure the deficiencies. BSA Corp. was also notified that it was in violation of the HAP contract and regulatory agreement not only for failing to maintain the property in a safe and decent fashion, but also for making improper expenditures.[14] The letter

---

[13] Describing one of these pictures at trial, Mr. Pollack testified –

> This is a ceiling in one of the stairwells in one of the Collingwood/Kirkwood buildings. There obviously had been a leak in this section of the ceiling. You can see that the floor timbers are heavily rotted and covered in mold. There is lath and plaster that had fallen away, and the lath is all rusted. There is a piece of corroded pipe there which may or may not have been the cause of the leak. I don't know. The damage had also gone down the wall. You can see a large crack in the wall surface there.

He further testified that this situation was "dangerous in that these floor timbers are holding up, literally holding up the floor above, and could collapse . . . causing injury or death to anybody walking above it or below it if it fell at the time."

[14] The June 4, 1999, letter apprised BSA Corp. that it was in violation of the following contractual provisions:

- Paragraph 8(a) of the Regulatory Agreement, for failing to obtain HUD approval to convey, transfer, or encumber the mortgaged property. In this regard, the letter noted that Dr. and Mrs. Alli, as individuals, had executed two deeds of trust on the mortgaged property – for $250,000 and $75,000 respectively – without obtaining HUD approval.

- Paragraph 8(b) of the Regulatory Agreement, for failing to obtain HUD approval to pay out funds for expenses which were not reasonable operating expenses. On this count, the letter asserted

gave BSA Corp. thirty days in which to cure its violations and ninety days in which to provide a plan to return to the Collingwood project any payments or distributions deemed unauthorized. On that same day, Pinnacle, having completed its inspection of the property, issued a report, replete with photographs, concluding that "[p]hysically, the property is not in decent, safe, and sanitary condition."

On July 23, 1999, HUD conducted a site visit of Collingwood and determined that its condition remained essentially unchanged. On September 30, 1999, HUD issued a written notice to BSA Corp. that it had defaulted upon the Collingwood HAP contract for failing to maintain the apartments in a decent, safe, and sanitary condition, citing the inspections and site visits that had been performed on October 29, 1997, November 9, 1998, and March 16, 1999. The same notice informed BSA Corp. that HUD was suspending and abating its Section 8 payments for Collingwood. On October 5, 1999, HUD notified BSA Corp. that it was initiating foreclosure proceedings for Collingwood due to BSA Corp.'s default on its mortgage. In the notice, HUD offered BSA Corp. an opportunity to explain why foreclosure should not proceed. On October 25, 1999, HUD, responding to a request from Dr. Alli, conducted a hearing regarding the

---

that BSA Corp. had made 33 payments between 1993 and 1997 on the above-mentioned deeds of trust, which payments were not approved by HUD. It noted that audited financial statements showed unauthorized payments for automobile leases and vehicle repairs totaling $26,385, and that Shaki Alli received "office compensation" for management even though BSA Corp. employed property managers who lived on-site.

- Paragraph 8(e)(4) of the Regulatory Agreement, for failing to obtain HUD approval to make distributions when there was non-compliance with outstanding notices of proper maintenance requirements. In this regard, the letter indicated that BSA Corp. had paid Shaki Alli $15,600 for each of five years for providing site management, despite the fact that BSA Corp. had two outstanding notices of requirement for proper maintenance with which it had not complied.

- Paragraph 10 of the Regulatory Agreement, for failing to maintain the property in good repair and condition. The letter detailed the history, recounted above, of Collingwood's failed inspections.

- Paragraph 12(c) of the Regulatory Agreement, for failing to make equipment, books, records and contracts of the mortgaged property available for examination and inspection, including vehicle records, invoices for mortgage payments, and documentation of the management duties allegedly performed by Shaki Alli.

proposed foreclosure. Unpersuaded by Dr. Alli's presentation at that hearing, HUD concluded that the foreclosure should proceed.

On December 23, 1999, two HUD employees, Messrs. Polk and Berry, made a site visit to Collingwood and found garbage piled in the hallways, cats roaming the common areas, broken windows, and wide open access to the roof. Several tenants complained to the HUD officials that the building had insufficient heat and hot water. On January 4, 2000, a HUD attorney, Mike Polsinelli, as well as Messrs. Bow and Berry, visited Collingwood with Dr. Alli and Stephen Palms (a lawyer who was either representing Dr. Alli in the HUD matter or considering doing so). Mr. Berry's notes regarding the inspection of the basement reveal "leaking water," "raw sewage present in the boiler room," "exposed wires," and "crumbling exterior walls."[15] HUD records at or around this time reflect recent complaints from at least eight tenants about the living conditions at Collingwood.

On January 25, 2000, Mr. Berry received several calls from tenants at one of the Collingwood buildings complaining that they did not have any heat. Mr. Berry attempted to reach Dr. Alli four or five times, before proceeding to Collingwood with Mr. Polk and others. The temperature that day was well below freezing. As confirmed by contemporaneous records, including electronic messages, the HUD employees, upon arriving at the building, observed that the inside of the building was very cold – so cold that they could see their breath when they exhaled. The tenants were using their ovens, coats and blankets in an effort to stay warm, a scene described by Mr. Berry in his testimony, thusly –

> We saw that oven doors were wide open. The broiler was on. People were wrapped in winter coats and blankets, along with the little children. There were space heaters and just an attempt to try and keep warm, but they were still having to wear blankets, winter coats and the like to try and maintain some warmth.

---

[15] At or around this time, BSA Corp. was seeking to sell Collingwood. On December 4, 1998, it contracted with a real estate firm to assist it in this regard. On July 14, 1999, a representative of BSA Corp. and Mr. Cory Fanning entered into a real estate purchase agreement for the Collingwood apartments. Mr. Fanning hired Eckland Consultants to perform a "walk-through" observation of the property, which the latter did on September 13, 1999. On September 17, 1999, Eckland sent a report to Mr. Fanning in which it identified a number of "[s]ignificant physical deficiencies and issues," estimating that approximately $130,000 in repairs were needed. On October 6, 1999, BSA Corp. and Mr. Fanning entered into a letter agreement to extend the closing date to November 30, 1999, purportedly to allow BSA Corp. to comply with the requirement that the sale of Collingwood had to be approved by HUD. While plaintiffs claim that HUD denied that permission, the record suggests that neither BSA Corp. nor Dr. Alli filed a formal application seeking approval. The sale of the building did not conclude. Various records, including letters sent by Dr. Alli, indicate that the seller had set aside over $200,000 to perform necessary repairs on the property.

Upon gaining entry to the boiler room, the HUD employees determined that the heating system had been off for an extended period, as there was no residual heat in the unit or associated pipes. No maintenance personnel were available to restart the heating unit. That same day, after several more unsuccessful attempts to reach the Allis,[16] HUD issued a formal declaration to BSA Corp. indicating that it was taking possession of Collingwood, as an involuntary mortgagee-in-possession, because it had been abandoned by its owners.[17] HUD restored the heat to the building and hired a contractor, AMI, to take over the management thereof. On January 26, 2000, Dr. Alli sent HUD a letter in which he denied that he had abandoned the property.[18] Subsequently, HUD terminated the HAP contract and relocated the residents of Collingwood to suitable housing, incurring substantial expenses in bringing Collingwood to minimal standards while the relocations proceeded and in performing the relocations themselves. On February 2, 2001, HUD conducted a foreclosure sale of the Collingwood apartments to a third-party for $80,890.

---

[16] This apparently was a long-standing problem, as plaintiffs had previously received a number of notices from the City of Detroit citing them for violations relating to the failure to provide heat to all habitable apartments. Various other inspections conducted by the City's Department of Buildings and Safety Engineering during 1999 (*e.g.*, on November 8, 1999) had revealed violations similar to those identified by the HUD inspectors.

[17] Explaining the rationale for this decision, Mr. Brown testified –

> The temperature range was somewhere between 7 and 10 degrees, and we were very concerned that the tenants were in danger. It's not uncommon to read in Detroit newspapers in the wintertime about fires in buildings and people dying. We were extremely concerned. . . . And we came to the conclusion after a couple of hours of discussion that given the fact that the owner apparently was not in town and we couldn't reach the owner and . . . there was nobody onsite that could fix the problem, that HUD had to take action to protect the health and safety of the residents. So we decided to take involuntary mortgagee in possession to get the heat back on and to take care of any other immediate threats to the health and safety of the tenants.

[18] In this letter, he stated –

> Contrary to the statement contained in the letter, please be aware that we did not abandoned [sic] the property. We cannot do that.
>
> We are out of town on emergency appointment yesterday and arrived late. Before leaving we spoken [sic] to our heating contractor, "Tony" at Blue Ray Heating and Cooling. Tony went to the premises, while I was away and the Onside [sic] person was not there to let him in. He then went there the second time, and was told they cannot get a key to the boiler room. I went there to give him my extra key but the door has been B/E, and the Heat is on.

### 3. The Riverside Apartments

Dr. Alli, doing business as BSA Associates, acquired the Riverside apartments in 1989 through a HUD auction. The Riverside apartments consisted of several related buildings. On June 8, 1989, Dr. Alli entered into a 15-year HAP contract for the Riverside apartments. Like the other HAP contracts, this contract required him to maintain the Riverside apartments in a decent, safe and sanitary condition.

HUD inspectors first cited Riverside for serious deficiencies in 1991. As reflected in a September 23, 1991, letter to Dr. Alli, the HUD inspectors, in failing a number of units, cited missing or inoperable smoke detectors; roach infestation; broken cabinets; broken shower tiles, sinks and toilets; broken window screens and windows; damaged ceilings; broken doors; garbage and debris in common areas; and a front door that was not secure. Again, Dr. Alli was given thirty days to correct these items. Mr. Spooner inspected Riverside in 1993 and found that health and safety violations remained, involving, *inter alia*, plumbing leaks, and problems with smoke detectors, windows, floor surfaces, and roach infestations. Similar problems were found by Mr. Salazar during an inspection conducted on July 12-13, 1993. Approximately two years later, on June 16, 1995, Mr. Salazar conducted another inspection of the Riverside apartments and found much the same problems. He noted, in particular, that the few repairs that had been performed at Riverside were shoddily done – in one instance, the bottom of a coffee can had been used to patch a hole where a dead-bolt lock had been. On August 2, 1995, HUD reported the inspection findings to Dr. Alli. On August 11, 1995, a handyman hired by Dr. Alli quizzically reported that "[n]one of the listed HUD violations could be found on my inspection." Yet, a November 9, 1995, inspection by Mr. Salazar revealed many of the same violations, leading Mr. Salazar to again conclude that the Riverside apartments were not decent, safe or sanitary.

On February 10, 1997, the Detroit Fire Department cited the property for a variety of violations described as creating "hazardous conditions." On May 15-16, 1997, Mr. Salazar and another HUD inspector, James Kalvin, conducted a follow-up inspection of the Riverside apartments. According to their report, they found "serious and widespread safety and health violations" at the property, including an inoperable elevator, inoperable smoke detectors, missing handrails, peeling paint, damaged carpeting, improper wiring, backed-up sewage, a leaking sanitary line, broken fire doors, missing wall outlet covers, cracked floor tiles, deteriorated concrete trim, missing window screens, thin plastic installed in place of window glass, inoperable stoves, cracked and leaking toilets, missing radiator covers, roach infestation, deteriorated counter-tops, exposed wires, and damaged walls and floors. Several units were failed because the inspectors could not access them.[19] On June 27, 1997, HUD gave Dr. Alli thirty days in

---

[19] On May 19, 1997, Dr. Alli wrote HUD demanding to be allowed to turn the Pingree, Collingwood and Riverside projects over to the agency in return for "fair market value," asserting that he could "no longer continue to do business with HUD-Detroit Office. He complained –

which to correct the deficiencies, warning that if the violations were not cured, it would terminate the Riverside HAP contract. Nonetheless, on or around August 12, 1997, another follow-up inspection, conducted by Messrs. Salazar, Spooner and Rob Nelson, revealed little in the way of progress. As confirmed by various documents in the record, during this inspection, the inspectors noted that the basement floor of one of the buildings was covered with animal feces and infested with fleas.[20] On August 18, 1997, the Detroit Fire Department again cited the property for a variety of violations described as creating "hazardous conditions."

On January 23, 1998, HUD performed another follow-up inspection of Riverside, finding that most of the violations previously-cited still existed. A review of the 34 units that had been

---

> For several years, as you were awared [sic], we have been subject to and becomes [sic] victim [sic] of unjust persecution, deliberate [sic] abused, embarrassment, humiliation, public intimidation, to make sure that our business collapsed and that we suffered and suffer emotional distress, because we bought property that did not belong to us. This has lead [sic] one thing and the other to hunt us down on a daily basis.

This was one of several complaints of this sort that Dr. Alli made during the period in question.

[20] Mr. Spooner testified as follows:

Q.: Do you recall any other infestations at Riverside?

A.: Yes. Two of my colleagues and I were inspecting the basement, you know, one of the buildings at Riverside, and as we walked down there we noticed a couple of things. One, that there was feces on the floor from some animal. Secondly, there was standing water, and as we noticed it, there [were] no lights, and after we noticed that we came out, and the three of us were infested with fleas. I mean, I had a light shirt on. It was like it just had specks all over it, so with my two colleagues. In fact, one had to go home and change because he was being bitten.

Q.: Was Dr. Alli present?

A.: Yes, he was.

Q.: What was his reaction?

A.: He laughed. He thought it was funny.

These observations were confirmed by the testimony of Mr. Salazar.

inspected in May of 1997 resulted in six being passed, nineteen failing due to health and safety violations, and nine failing due to no entry.[21] Shortly before March 16, 1998, Robert Brown, the Director of the Multifamily Hub in Detroit, visited the Riverside apartments to see for himself the situation. Confirming what had been previously reported to him, he found, as stated in his testimony at trial, that the Riverside apartments were "pretty deplorable" and generally in a "dilapidated condition." On March 16, 1998, HUD suspended payments for the twenty-eight units at Riverside that had failed the May 1997 inspection.

On December 9, 1998, HUD conducted yet another reinspection of the Riverside apartments. Again, its inspectors found that Riverside failed to meet the housing standards set forth in the Riverside HAP contract. On December 14, 1998, Dr. Alli certified to HUD that the needed repairs had been completed. But, when HUD conducted a reinspection of the property on December 16, 1998, it found that many of the deficiencies previously-identified remained. Pursuant to the terms of the Riverside HAP contracts, on December 18, 1998, HUD notified Dr. Alli that it was suspending all Section 8 payments for Riverside.[22] On December 23, 1998, HUD

---

[21] The notes of this inspection reveal that the HUD officials found, *inter alia*, a "crumbling exterior concrete ring around the top of the building," common area hallways with "peeling paint and damaged carpeting," ceiling tiles that had fallen or were loose, floor and bathroom tiles that were cracked or missing, broken or missing kitchen cabinets, inoperable appliances, broken windows and missing screens, and roach infestations.

[22] This letter noted that Dr. Alli had certified that the repairs at Riverside were done, but stated that –

> The re-inspection on December 16, 1998, revealed that:
>
> 1. The aluminum covering over the deteriorated concrete trim near the top of the building at 1730 Magnolia has not been repaired. The safety hazard of falling debris from above still remains.
>
> 2. The sidewalk at southeast corner of 1800 Magnolia has been haphazardly repaired; however, the trip hazard leading from west entrance of 1800 Magnolia towards 1830 Magnolia still remains. The repair work performed does not remove the trip hazard. There still remain several trip hazards around the property.
>
> 3. The metal poles sticking out of the ground between 1800 Magnolia and 1831 Hazel are still in place. The metal poles sticking out of ground between 1831 Hazel and 1830 Magnolia are still in place.
>
> 4. The sewer in the basement of 1831 Hazel was no longer backing up in the basement, but the drain pipe in the ceiling coming from apartment 103 above the drain was leaking onto the floor.

notified Dr. Alli that the Section 8 tenants at Riverside would be relocated to suitable housing, explaining that "the housing accommodations provided the residents at Riverside Apartments do not meet HUD's housing quality standards and as such, it is no longer safe for the residents to remain at Riverside Apartments." On June 29, 1999, HUD notified Dr. Alli that it was terminating immediately the Riverside HAP contract due to his failure to maintain the property in a decent, safe and sanitary condition, citing the "continued wilful breach of [his] obligations under the contract."

### C. Proceedings to Date

On November 29, 2001, plaintiffs filed their complaint in this court, naming, as defendants, the United States and Secretary Mel Martinez of the Department of Housing and Urban Development. Plaintiffs filed amended and second-amended complaints on May 22, 2002, and August 15, 2002, respectively, the latter of which asserts six counts. In two of these counts, plaintiffs assert that HUD breached the HAP contracts for Riverside and Pingree, in suspending and then terminating those contracts. Three other counts raise claims relating to Collingwood: one involving an alleged breach of the HUD mortgage, a second relating to the suspension and termination of the HAP contract (similar to the counts described above), and a third alleging breach of the HAP contract relating to HUD's alleged failure to authorize the transfer of the property. Lastly, plaintiffs seek damages of $675,000 for HUD's disapproval of the proposed sale of Collingwood property, and unspecified amounts for the other four counts.

Defendant filed its answer and counterclaims on October 2, 2002. It asserted three counterclaims, one each for Pingree, Riverside, and Collingwood, respectively, for plaintiffs' failure to provide decent, safe, and sanitary housing. For Pingree and Riverside, defendant seeks $110,096.45 and $79,675, respectively – the cost to HUD of relocating families from the properties to safe housing. For Collingwood, defendant seeks $90,646.40 for the cost of moving families to safe housing, $18,128.80 for foreclosures costs, and $1,112,173.45 for the cost of providing basic services, security, and repairs while acting as mortgagee-in-possession. For each counterclaim, defendant seeks relief from Benjamin Alli and Shaki Alli, "jointly and severally and doing business as BSA." For Collingwood, defendant seeks to pierce the corporate veil of BSA Corp. and hold the Allis personally liable for the damages.

On August 15, 2005, plaintiffs and defendant each moved for partial summary judgment. The court heard oral argument on the cross-motions on November 2, 2005, after which the

---

5. The interiors of approximately 18 units were inspected. None of the units inspected passed [health and safety inspections]. Each unit failed [health and safety inspections] because of either roach infestation, inoperative stove burners, inoperative range hood fans, inoperative or missing garbage disposals, inoperative bathroom exhaust fan, trip hazards in unit, inoperative or missing smoke detectors, broken windows, inoperative duplex plugs, defective cabinets, or a combination of the above mentioned violations. This is only a sample of the violations noted.

parties filed supplemental briefs. On August 16, 2006, the court granted, in part, and denied, in part, plaintiffs' and defendant's motions. The court observed that "fundamental factual questions exist as to the nature and content of the communications that occurred between [HUD officials and plaintiffs.]" *Alli v. United States*, 2006 WL 5625455, at * 5 (Fed. Cl. 2006). The court further determined that, depending upon the nature of those communications, a fact issue might exist as to whether Mr. Brown, the Director of Multi-Family Housing for HUD in Detroit, had the authority to reject the application to transfer Collingwood. *Id*. The court also found that "factual issues abound" as to whether BSA Corp. could be pierced to hold the Allis personally liable for defendant's counterclaims regarding the Collingwood property. *Id.* at *6. Nonetheless, the court dismissed defendant's first counterclaim for breach of the Riverside contract as against Shaki Alli due to lack of privity. *Id*. at *7. Finally, also dealing with issues raised in defendant's counterclaims, the court held that "relevant agreements potentially provide for the recovery of the relocation expenses and most certainly do not preclude that recovery." *Id.*

On March 20, 2007, at the pretrial conference, the court bifurcated the issues of liability and damages, and indicated that the former would be tried first. From July 24-27, 2007, the court conducted trial on the liability issues in Detroit, Michigan.[23] The parties submitted simultaneous post-trial briefs on October 12, 2007, and simultaneous post-trial reply briefs on November 27, 2007. After reviewing these briefs, the court deems closing argument unnecessary.

**D. Credibility Findings**

Several important credibility findings underlie many of the other factual findings in this case. Specifically, the court finds that significant portions of the testimony of many of plaintiffs' witnesses, particularly that of Dr. Alli himself, are not worthy of belief. In varying degrees, each of these witnesses was less than forthcoming at trial. Key points in their testimony were contradicted not only by the convincing testimony of other witnesses, but also by a wealth of documentary evidence, including dozens of pictures. While the court's findings regarding the credibility of these witnesses are based not only upon a totality of the record, but their demeanor at trial, a medley of examples serves to illustrate why the court lacks confidence in their testimony.

We begin with Dr. Alli, who was repeatedly evasive in his testimony. A prime example was his testimony regarding the loss of heat at the Collingwood complex in January 2000. The record confirms that Dr. Alli was well-versed with the facts surrounding this event, which, after all, eventually led HUD to foreclose its mortgage on the property. He had, *inter alia*, received a series of emergency notices about the loss of heat not only from HUD, but the City of Detroit, and he had responded, in writing, to those notices, objecting, for example, to HUD's assertion

---

[23] Trial on the counterclaim related solely to two issues: (i) whether plaintiffs breached the HAP contracts and regulatory agreements; and (ii) whether the Allis are liable for any damages owed with respect to the breach associated with Collingwood, despite the fact that the property was purchased by BSA Corp.

that he had abandoned the building. If nothing else, he obviously knew that issues surrounding the loss of heat were to be tried in this case. Yet, when asked about this subject at trial, he seemed to feign lack of knowledge, testifying as follows:

> Q.: Do you recall there being a time when there was no heat at Collingwood in 2000?
>
> A.: Not necessarily.
>
> Q.: What do you mean when you say "not necessarily"?
>
> A.: Because I don't know what period you are talking about.
>
> Q.: You don't know? I'm sorry. Can you say that again?
>
> A.: I do not know what period you are talking about.
>
> Q.: Any time in the year 2000, was there a period where Collingwood/Kirkwood, one of the two buildings [,] did not have heat?
>
> A.: Well, I heard of it from somewhere else, not that I know. Somebody told me. I was not aware of it.
>
> Q.: So you weren't aware of it?
>
> A.: I was not aware of it, but I was told.
>
> Q.: You were told that there was no heat?
>
> A.: Yes.
>
> Q.: You were only told that there was no heat, but there was never a time that you verified there was no heat at Collingwood/Kirkwood, is that correct?
>
> A. No.
>
> Q.: Is that your testimony?
>
> A.: Yes.

Q.: Let me rephrase it. Was there a time in 2000 where there was no heat at either the Collingwood or Kirkwood building? Do you know?

A.: I was still not aware. Somebody told me.

Q.: So, yes, there was a time when there was no heat at the Collingwood/Kirkwood building in 2000?

A.: Based on what they told me.

To provide more background on why this testimony is so troubling – elsewhere in his testimony, Dr. Alli implied that he did not receive a certified emergency notice from HUD regarding the lack of heat at Collingwood because it was sent to an old address. The record, however, reveals that he received and responded to letters directed to the same address both before and after the HUD notice was sent. In fact, when prompted, at trial, for his current business address, Dr. Alli gave this same "old," supposedly-outdated address.[24] And while Dr. Alli, at trial, denied receiving anything in writing from Mr. Brown regarding the heat loss incident – claiming that the only information he received was through phone messages – the record includes a letter signed by Dr. Alli on January 26, 2000, in which he responded to a letter regarding the incident faxed by Mr. Brown to him on January 25, 2000.

Other aspects of Dr. Alli's testimony were marked by casuistry, particularly, his testimony regarding roach exterminations. At first, Dr. Alli gave the impression that, contrary to dozens of HUD reports, there was no rampant problem with roaches at the buildings. He emphasized that records for each unit verified when exterminations had occurred and that he had a "lot of people" to perform maintenance at the buildings, including "in house repair people at different buildings that do minor work like . . . exterminations." Yet, a review of the unit records reveals nothing therein about exterminations. Perhaps inadvertently explaining this omission, Dr. Alli, later in his testimony, admitted that the extermination work at the building was not performed by professional exterminators, but by the tenants themselves – these, apparently, were the "in house repair people" to whom he had earlier referred – who were given a pump and paid $3 to $4 per apartment to spray. This revelation conflicts with a letter Dr. Alli sent to HUD that left the strong

[24] Specifically, on January 25, 2000, HUD issued a formal Declaration of Involuntary Mortgagee in Possession of Collingwood, which it sent by certified mail to Dr. Alli's address at P.O. Box 36081, Grosse Pointe, Michigan 48236. The record shows that Dr. Alli had sent and received mail at this address both before and after January 25, 2000. For example, on March 7, 2000, Dr. Alli sent a letter to Ms. Deborah Courtright at HUD on letterhead featuring this address. Further, at trial, he verified that his current address was on a City of Detroit Housing Inspection notice dated January 19, 2000: "My current address is right here in the exhibit we find at 212."

impression that outside contractors were performing the extermination work.[25] More fundamentally, it appears that, despite having extensive roach problems at his buildings, Dr. Alli had no established spraying regime, let alone the bi-monthly regime he claimed existed at trial.[26] Evidence that spraying was sporadic, at best, may be found in the testimony of various of plaintiffs' witnesses, who did not agree with Dr. Alli (or each other) as to the timing of spraying – Mr. Schlotter, a handyman, and Ms. Riggins, a tenant, testified that spraying occurred every three months; Mr. Uzoigwe, another tenant, testified that it was twice a month; and Ms. Hamilton, another tenant, indicated once a year.

The court might be more inclined to view Dr. Alli's testimony less skeptically were it not for his ragged history of dealings with HUD – punctuated by dozens of false reports, broken promises and other forms of gamesmanship. On more than a dozen occasions, Dr. Alli responded to HUD inspection reports by assuring that the deficiencies identified in the three properties at issue had been remedied – when, in fact, he knew that they had not. This pattern manifested itself early on. For example, on November 30, 1992, a HUD official met with the maintenance manager at Pingree to verify repairs for which Dr. Alli had requested reimbursement. The HUD official found that many of the repairs had not been made. In one instance, Dr. Alli sought reimbursement for "fire alarm code violation repairs," which included the cost for new lens covers for the exit signs. But, the HUD official discovered that Dr. Alli's staff had not installed real lenses, but had merely placed cardboard over the lit signs with the word "exit" cut out. In another example, Dr. Alli sought reimbursement for an "upgrade[d] fire alarm as required by City Code violation," a reference to a hard-wired alarm with a pull. The HUD official, however, found that the unit in question had been screwed shut so that it could not be pulled to activate the alarm. This pattern, of course, continued over the years, with inspection after inspection revealing defects that Dr. Alli claimed had been remedied. Later, Dr. Alli made misrepresentations to HUD in paying what were later revealed to be personal expenses from the Collingwood's project's operating account.[27] Every indication is that all these representations

---

[25] Thus, on October 5, 1993, Dr. Alli responded to a HUD inspection report regarding roach infestation at Pingree, by stating:

> The BOCA - National Property Maintenance Code /1990 adopted by the City of Detroit, Ordinance No. 2-90 required tenants to be responsible for roaches extermination and to maintain rat proof condition . . . However, we are still doing the Extermination periodically. Cleaning and mopping is the key to getting rid of roaches. We don't clean for tenants, and not in our contract either to do so. We shall continue to enforce cleaning while we do extermination.

[26] At trial, Mr. Salazar convincingly testified that he once asked Dr. Alli whether he had any regiment for exterminations and that Dr. Alli answered: "What do you have against roaches? They are creatures of God."

[27] Recounting the circumstances regarding lease payments of $26,385, Mr. Pollack testified at trial, without contravention:

were motivated by raw self-interest – a willingness on Dr. Alli's part to say virtually anything to keep the checks from HUD rolling in. Similar self-interest, not to mention a careless attitude about telling the truth, unfortunately characterized much of Dr. Alli's testimony at trial – a fact that becomes painfully obvious when viewed through the prism of the dozens of pictures taken during the various inspections.

The court places no stock in Dr. Alli's banner claim that he was persecuted by HUD officials because of his African heritage. He testified, in this regard, about one encounter with Mr. Polk, a HUD official in Detroit, as follows:

> When he threatened me, he threatened me that they don't like me because you came over here to take advantage of opportunity left for black in this country, and we don't like it, and if you keep on doing something that we told you not to do, we are going to close your building down.

At a later point in his testimony, Dr. Alli attributed nearly identical statements to Mr. Brown, then the Director of Multi-Family Housing for HUD in Detroit. He asserted that Mr. Brown urged him to give Collingwood "to the community, that based on what he's saying that we came over from Africa, the few opportunities the white folks leave for the black here, we are taking advantage of it." But, there was no verification of these claims – confirmation of which should have been readily forthcoming given Dr. Alli's further claim that comments like these were

---

> In reviewing the financial statements for these projects, I identified that there had been payments made on vehicle leases that had not been approved by [HUD]. So I asked Dr. Alli while I was at the site to show me the vehicles. Dr. Alli said he couldn't show me the vehicles because they were locked up in storage. I asked him if we could go and get the key and unlock the storage so we could see the vehicles. He said no, that the gentleman who held the key was not in town and he could not be reached.
>
> Q.: Did you ask to see the leases for the vehicle?
>
> A.: In the absence of seeing the vehicles, I asked if I could see the vehicle leases. Dr. Alli told me that there was no formal vehicle leases because he leased the vehicles from himself.
>
> Q.: Are you sure that he said he leased the vehicles from himself?
>
> A.: Yes.

Because the record suggests that the vehicles were not used for property-related errands – a fact confirmed by Mr. Schlotter – it is reasonable to assume that they were used by Dr. Alli and his family as their regular means of transportation.

commonly made by HUD officials to his tenants.[28] Moreover, it should not be overlooked that Dr. Alli claimed that this discrimination led the HUD inspectors to falsify their reports. Yet, there is no evidence that the reports themselves were false, which, of course, undercuts any notion that they were the product of animus. Indeed, given the sheer number of adverse reports here, any conspiracy against Dr. Alli would have required the complicity not only of Messrs. Brown and Polk, but a dozen or more HUD inspectors and enforcement personnel located in several different HUD offices in Detroit and Chicago, not to mention that of the City of Detroit and several outside contractors. Can it be that all these actors secretly regarded Dr. Alli with animus, without a shred of concrete evidence to corroborate this? The court thinks not. Rather, the record suggests that Dr. Alli's discrimination claims were little more than a smoke screen, designed to obfuscate and distract.

In sum Dr. Alli's testimony was not only demonstrably counterfactual, but seemingly so out of touch with reality as to make one wonder whether he was serious. This court need not decide whether Dr. Alli knew that his testimony was demonstrably false for, regardless of his state of mind, the impact is the same: his testimony was utterly incredible and wholly unreliable.

Likewise, the court finds incredible – and certainly unreliable – critical testimony offered by other witnesses called by plaintiffs. The court's lack of confidence in this testimony stems from one or more factors. Typically, these witnesses rebutted only a few of the deficiencies that were identified in the HUD reports – and none that were critical. Some of them inspected only isolated portions of the building in question and, for reasons unexplained, conveniently avoided the units that had been identified as deficient by HUD.[29] In several instances, their testimony related to periods well before or well after those at issue, in the latter instance after some

---

[28] Indeed, while the record includes letters in which Dr. Alli accused Mr. Polk of discrimination, there are no contemporaneous documents suggesting that he ever accused any other HUD official, including Mr. Brown, of such discrimination.

[29] Testimony of this sort was offered by Gordon Hileman, a public insurance adjuster, who indicated that he had seen some apartments that were being "reconstructed" or "rehabbed," but had not seen most of the units that had been inspected by HUD. In this regard, he testified: "The apartments that the HUD inspector had been in for the most part I couldn't get access to, and the apartments I could get into weren't noted on the HUD reports so what I attempted to do is do an overall overview of the building." Another of plaintiff's witnesses, Mr. David Compo, a custom builder, admitted that he had "inspected the units that Dr. Alli personally instructed [him] to look at." Both of these witnesses also admitted seeing recent repairs – Mr. Compo described these as having been "recent or within weeks" or even "in progress." This is significant as the witnesses did not visit Pingree until June 2000, more than seven months after the REAC inspection was conducted, and well after HUD had declared plaintiffs to be in default of the Pingree HAP contract and regulatory agreement.

superficial repairs apparently had been effectuated.[30] Some of these witnesses plainly lacked the expertise to appreciate the importance of some of the less obvious deficiencies at issue. Others appeared simply to have extraordinarily low expectations of low-income housing – expectations that fell well below the contracts' definition of a decent, safe and sanitary housing. Still others were current or former employees/associates of Dr. Alli – often, the very ones who were responsible for maintaining or repairing the buildings in question. These witnesses, which include Mr. Roland Samaroo, as well as Ms. Riggins and Ms. Hamilton, understandably were hesitant to implicate their own work or lack thereof as being partly responsible for the many deficiencies encountered by HUD.[31] And, most importantly, none of these witnesses explained – or even attempted to explain – the dozens of compelling photographs that were offered by defendant as proof that the conditions catalogued in its deficiency reports actually existed.[32]

On the other hand, the court found the many HUD officials who testified at trial to be convincing and highly credible for several reasons. First, the testimony of these officials was interlocking and mutually reinforcing, that is to say that each official's testimony was not only internally consistent, but consistent with the testimony of other officials, as well as the documentary evidence in the case. This corroboration was all the more compelling because it came from officials in so many different offices within HUD's housing program. Second, the testimony of these HUD officials was supported by third parties. That the buildings in question

---

[30] This not only appropriately characterizes the testimony of Messrs. Hileman and Compo, but also that of one Dr. Alli's tenants, Mr. Uzoigwe, at least insofar as he testified about the state of Pingree. Mr. Uzoigwe did not move into Pingree until 2001, a year after HUD had terminated the HAP contract and plaintiffs had paid off the HUD-held mortgage.

[31] Mr. Samaroo supposedly performed numerous repairs on the buildings. He, however, had no licenses to perform electrical or plumbing repairs, but instead was a licensed psychologist, who answered Dr. Alli's newspaper advertisement for a handyman. It should be noted that plaintiff offered no record-keeping that confirmed the observations of his employees regarding the inspections of units or when repairs were effectuated. Several of these employees, moreover, contradicted each other (and sometimes themselves) on critical facts. An example involves the availability of elevators in the properties – the availability of which was critical to the many elderly tenants in these complexes. Mr. Samaroo, in particular, offered contradictory testimony in this regard, testifying, for example, that the Riverside building was safe, but that the elevators there were shut down to frustrate drug runners.

[32] A classic example of this occurred when Mr. Samaroo, in his testimony, at first denied the HUD report of a large hole in a ceiling covered by a red umbrella. He could not, however, provide any explanation when presented with a picture of the same hole taken by David Salazar during his inspection. Indeed, Mr. Fanning, who, at one point, offered to purchase Collingwood, admitted that in touring the building, he had seen water damage, damage to ceilings and walls, and problems with drywall and carpeting. He concluded that the building was "a fixer-upper, no question."

were not decent, safe or sanitary thus was confirmed by extensive reports generated by independent inspection firms, among them Pinnacle and Eckland, Inc., with the latter firm, notably, having been hired by Mr. Fanning pursuant to his planned purchase of Collingwood. In addition, particularly convincing testimony that supported HUD's views was supplied by Mr. Palms, the attorney who declined to represent Dr. Alli in his dispute with HUD after visiting Collingwood.[33] And then there are the pictures – page after page of them – which illustrate and confirm the testimony of the HUD officials. The overall impact of the evidence is to the lead the court to conclude that the HUD witnesses were telling the truth.

---

[33] Regarding his visit to Collingwood on January 4, 2000, Mr. Palms testified as follows:

Q.: What was your first impression of the building?

A.: That it was in very bad shape.

* * * * *

Q.: . . . When you entered that door in the wing of the building as you've described, what did you see?

A.: It was a dark hallway. In fact, as I recall, I'm not even sure the door had been shut, but it was a dark hallway. The carpeting was in serious disrepair. I would describe it as in tatters, filthy, dirty. Again, I had a sense of a very dark enclosed space that was quite, quite dirty, and not well-lit.

Q.: After you went to that hallway or that area you're describing, did you see anything else in the building?

A.: My recollection is that we went through that hallway, and then we went to a common area that I believe was attached to that building, and the common area was a larger room. I don't remember much in the way of furniture in that room, but what I do remember is that the floor was I would say half covered with water, because I remember picking my way across the floor to make sure that I could stand in areas that were dry.

Asked to comment further on the interior of the building, Mr. Palms stated "[t]o be honest with you, I was actually surprised people were living there." Asked to describe Collingwood with three adjectives, he responded, "[f]ilthy, dilapidated, appalling."

## II. DISCUSSION

The gravamen of plaintiffs' complaint is that defendant breached the HAP contracts it had with plaintiffs with respect to the Pingree, Collingwood and Riverside apartment complexes. Specifically, plaintiffs allege that breaches occurred when, as to these complexes, HUD suspended payments, terminated the HAP contracts and, in the case of Collingwood, took involuntary mortgagee-in-possession. They also contend defendant breached its contract with BSA Corp. by refusing to approve the sale of Collingwood to Mr. Fanning. Not so, defendant remonstrates, vigorously asserting that no breaches occurred here. Indeed, via its counterclaim, it seeks to recover various costs that were associated with relocating the tenants here and taking over Collingwood. And, it claims that Dr. and Mrs. Alli should be personally liable for these damages. The court will consider plaintiffs' claims and defendant's counterclaims *seriatim*.

### A. Breach of Contract Claims

As in any claim for breach of contract, in order to recover here, plaintiffs must establish that: (i) valid contracts existed between them and the government; (ii) those contracts gave rise to duties or obligations; (iii) the government breached those duties or obligations; and (iv) the breaches resulted in damages. *See San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Health Ins. Plan of Greater New York v. United States*, 62 Fed. Cl. 33, 43 (2004); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). Plaintiffs bear the burden of establishing these elements by a preponderance of the evidence. *See Gibson v. Dept. of Veterans Affairs*, 160 F.3d 722, 728 (Fed. Cir. 1998); *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998); *Die Casters Intern., Inc. v. United States*, 73 Fed. Cl. 174, 195 (2006).

To determine whether plaintiffs' contractual rights were breached, the court first must determine what those rights were. *See San Carlos Irrigation*, 877 F.2d 957 at 959; *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003). As an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 729 (2004). Toward that end, contract interpretation "begins with the plain meaning of the agreement." *Gould*, 935 F.2d at 1274; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Franconia Assocs*., 61 Fed. Cl. at 730; *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 459 (2001).

### 1. Suspension of Payments/Termination of HAP Contracts

As previously noted, the plain language of the HAP contracts and regulatory contracts *sub judice* required that plaintiffs maintain the property in a "decent, safe and sanitary condition." The latter phrase was defined in each of the HAP contracts via the incorporation of HUD regulations that prescribed the decent, safe and sanitary standards. Though those regulations were revamped in 1998, *see* 63 Fed. Reg. 46577 (Sept. 1, 1998), their substance, in key respects, remained essentially the same throughout the period in question. The standards required that the site components be "free of health and safety hazards and be in good repair."[34] They further indicated that "[t]he site must not be subject to material adverse conditions," such as "vermin or rodent infestation or fire hazards."[35] To meet the standard, the buildings had to be "structurally sound, secure, habitable, and in good repair," "free of health and safety hazards, operable, and in good repair."[36] Building systems – such as elevators; health, ventilating and air conditioning (HVAC); and sanitary systems – also had to be "functionally adequate, operable, and in good repair," as did common areas.[37] The most detailed rules were reserved for the dwelling units themselves, which had to be "structurally sound, habitable and in good repair . . . free of health and safety hazards, functionally adequate, operable, and in good repair."[38] Such units had to have "hot and cold running water," and a sanitary facility "in proper operating condition, usable in privacy and adequate for personal hygiene and the disposal of human waste."[39] These provisions supplied concrete standards by which to measure plaintiffs' performance. *See Englewood Terrace Ltd. Ptshp. v. United States*, 79 Fed. Cl. 516, 539-40 (2007); *see also United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 678 (5th Cir. 2002).

The HAP contracts authorized HUD to take steps if it found that a property was not being maintained in decent, safe and sanitary condition. If an owner failed to respond to a notice to correct deficiencies, HUD could reduce or suspend its payment of rent subsidies or terminate the contract. At various points, HUD determined that each of the properties at issue did not meet the decent, safe and sanitary standards due to numerous deficiencies that were repeatedly found during its inspections. It eventually suspended payments under the HAP contracts and then terminated those contracts. There is no debate that if the health and safety deficiencies identified by HUD actually existed, the agency was empowered, under the HAP contracts, to take the action it did. The question, rather, is whether the conditions described in various HUD reports actually existed – with plaintiffs claiming that those reports were largely fabricated. The record,

---

[34] 24 C.F.R. § 5.703(a) (1998); 24 C.F.R. § 886.307 (1987).

[35] 24 C.F.R. § 5.703(a) (1998); 24 C.F.R. § 886.307(k)(2) (1987).

[36] 24 C.F.R. § 5.703(b) (1998); 24 C.F.R. § 886.307(f) (1987).

[37] 24 C.F.R. § 5.703(c) (1998); 24 C.F.R. § 886.307(f)(2) (1987).

[38] 24 C.F.R. § 5.703(d)(1) (1998); 24 C.F.R. § 886.307(g), (m)(3) (1987).

[39] 24 C.F.R. § 5.703(d)(2)-(3) (1998); 24 C.F.R. § 886.307(a), (a)(2) (1987).

however, says otherwise. Indeed, the evidence that the properties were not maintained in a decent, safe and sanitary state is overwhelming – documented, *inter alia*, by dozens of pictures that illustrate the indecent, unsafe and unsanitary conditions. While the findings rendered in the first section of this opinion represent the court's best effort to summarize the extensive evidence that supports these HUD findings, some highlights of that evidence bear repeating.

Throughout the periods in question, a rancid potion of health and safety violations was brewed at the buildings operated by plaintiffs. The HUD standards required these properties to be free of vermin and rodent infestation. Yet, they were plagued by such infestations. And how did plaintiffs react? They had the tenants spray their own buildings, a tepid response that years of failed inspections should have shown was woefully inadequate. The HUD standards also required the structure in these buildings – doors, lighting, roofs, ceilings, walls and windows – to be free of hazards and in good repair. Yet, these buildings had missing and dilapidated doors, leaky roofs, ceilings and walls that were heavily water-damaged and pock-marked, and broken windows. And how did plaintiffs react? Mostly not at all, particularly in addressing the systemic plumbing problems that left many ceilings and walls collapsing or on the verge thereof. The HUD standards required the basic systems in these buildings – elevators, electricity, HVAC, and sewage – to be adequate, operable and in good repair. Yet, in these buildings, those systems worked poorly, and sometimes not at all. The loss of heat at Collingwood on January 25, 2000, was the most dramatic, but far from the only episode that left many tenants to fare for themselves. And how did plaintiffs react? With palliatives and false denials, repeatedly certifying that problems either were nonexistent or had been rectified. And, finally, those HUD standards required individual units to be structurally sound, habitable, functionally adequate, in good repair and with adequate sanitary facilities. Yet, photograph after photograph showed these units to be in a chronic state of disrepair, almost third-worldly in appearance – bathrooms with crumbling walls that lacked functional toilets and plumbing; kitchens with antiquated, unsafe and nonoperational appliances; and the seemingly ever-present water damage, again affecting ceilings and walls alike. And how did plaintiffs react? Largely by blaming others, including not only their tenants, but the dozens of HUD officials who inspected the properties. But, as has been seen, these accusations have a decidedly hollow ring.[40]

---

[40] Plaintiffs attempt to blame their tenants for many of the problems at their complexes, including roach infestation, implying that had the tenants taken better care of their units, at least some of these problems would not have arisen. But, this claim misses the mark for several reasons. First, while certain tenants did not adequately care for their units, the wide majority of the deficiencies identified by HUD had nothing to do with that. Indeed, even as to the roaches, plaintiffs allowed vacant apartments to become breeding grounds and failed to adopt a systematic extermination regime. Second, under the HUD health and safety standards, plaintiffs – and not their tenants – remained ultimately responsible for keeping the housing in a decent, safe and sanitary condition. *See Marshall v. Cuomo*, 192 F.3d 473, 479 (4th Cir. 1999) (landlord "remained ultimately responsible for repairing the housing to ensure a decent, safe, and sanitary condition regardless of the cause of the needed repairs"). Dr. Alli did not hesitate to seek the eviction of certain tenants and, over the lengthy period in question, clearly could have removed those that he truly felt were contributing to the HUD deficiencies.

Another way to capture the sheer gravity of the violations that occurred here is to view time-lines that reflect the inspection history of various buildings. Take, for example, the history of inspections for Pingree:






Over a seven-year period beginning in late 1992, HUD conducted eight separate inspections of Pingree, each revealing numerous defects and health and safety issues, with a final report assigning Pingree a woeful score of 18 out of 100 on health and safety issues. These inspections were performed by at least seven different HUD inspectors from HUD offices in Detroit and Chicago, each of whom reinforced the findings of the others, belying any notion that the survey results were concocted. Those findings were confirmed not only by the credible testimony of these officials, but also by inspections conducted by an outside firm and the City of Detroit. And, there are the ever-present photographs, to which plaintiffs have no real response. Time and again, plaintiffs were given the opportunity to correct these health and safety deficiencies – and they did little more than offer what each succeeding inspections revealed to be false assurances.

As the following time-line illustrates, the problems at Collingwood were even worse:



From 1995 through early 2000, six different inspectors from four HUD components conducted eleven separate inspections of this property. Again and again, numerous deficiencies were noted – on one occasion 48 of 52 units failed; on another, 19 of 21 reinspected units failed. Plaintiffs were given an opportunity to repair the property and again they did not, refusing to take curative steps even after HUD, on January 13, 1999, classified Collingwood as a troubled property. As with Pingree, the findings in the Collingwood deficiency reports reinforce each other and are confirmed by the inspections of third-parties and the City of Detroit, as well as uncontroverted pictures. And in a unique, but unfortunate way, those deficiencies represented merely a prelude to the events of January 25, 2000, on which date HUD was compelled, by freezing conditions and an absence of heat, to take control and eventually possession of the property.

Lastly, there is the time-line of activity at Riverside:






As this illustration reveals, from 1995 through 1999, four different HUD inspectors, including the head of multi-family housing in Detroit, conducted eleven separate inspections of this property, with numerous deficiencies noted. While plaintiffs claimed that the findings of the resulting reports were fabricated, inspection after inspection confirmed the existence of a host of deficiencies, again supported by inspections conducted by the City of Detroit and pictures. As with the other buildings, the HUD finding that these buildings were not decent, safe or sanitary again is supported by overwhelming evidence.

In the end, this is not a close call – plaintiffs' breach claims are not remotely supported by the record. While plaintiffs tangle with a few stray twigs of evidence (*e.g.*, violations associated with a vacant lot adjoining Pingree not owned by plaintiffs), they virtually ignore the dense forest of proof of their misfeasance that stands starkly before them. They seemingly proceed from the notion that if they thrust aside those twigs, the forest will disappear. But, there is neither magic nor mirrors here – proof that a few violations were mistaken does not negate thousands of violations corroborated by multiple inspectors and inspections, as well as pictures.[41] Viewing the

---

[41] Plaintiffs make much of a letter, dated April 18, 1994, that indicates that HUD inspector Richard T. Schemanski inspected Riverside on April 15, 1994, and found that seven units there "passed" and were qualified for occupancy. But, the court is not persuaded that this short, conclusory letter undercuts the other much more extensive reports in the record. For one thing, the record contains only the bare-bones letter and nothing about Mr. Schemanski's rationale, leaving the court to wonder what he did or did not do in inspecting the units. Indeed,

record as a whole, it is manifest that plaintiffs did not satisfy their obligations under the HAP and regulatory contracts to provide decent, safe and sanitary housing at the Pingree, Collingwood and Riverside complexes. Nor can there by any doubt that plaintiffs were provided fair and meaningful opportunities to cure these deficiencies – indeed, they were afforded so many opportunities as almost to defy belief. *Compare Englewood Terrace*, 79 Fed. Cl. at 540. As such, it appears that HUD was well within its rights in suspending and terminating the agreements in question and, concomitantly, that plaintiffs have demonstrated no breach of those agreements.

**2. Sale of Collingwood**.

The Collingwood regulatory agreement required BSA Corp. to obtain HUD's approval before selling, encumbering or transferring the property, in whole or in part. That approval process generally is triggered by the submission of an Application for the Transfer of Physical Assets (TPA) or, perhaps, the equivalent, which information typically is submitted by the prospective purchaser.

Plaintiffs claim that various HUD officials denied their request to sell the Collingwood apartments to Mr. Fanning. They assert that the denial was unreasonable and constituted a breach of the covenant of good faith and fair dealing implied by the Collingwood regulatory agreement. Plaintiffs, however, could provide no evidence that either they or Mr. Fanning ever formally requested approval from HUD, let alone supplied the detailed information required by the TPA application. *See also Alli*, 2006 WL 5625455, at *4. Nor could they even identify, with any particularly, which HUD official supposedly effectuated the denial. Unable to produce any documentary evidence of such a denial, they asserted that the denial occurred in an oral conversation between a HUD official and one of Mr. Fanning's representatives – yet, they could not produce even the latter individual. Moreover, the fact that they allege that the denial was oral is critical in its own right because HUD procedures understandably appear to require that the denial of such applications be in writing. *See* HUD-92266, Application for Transfer of Physical Assets (TPA) (1991). Accordingly, even if a denial occurred in the fashion plaintiff claims – and the evidence demonstrates that it did not occur at all – such a denial would not have been authorized. Plaintiffs certainly have not shown otherwise. *See Alli*, 2006 WL 5625455, at * 5 (suggesting that plaintiffs would be obliged to prove that "Mr. Brown was authorized to reject an informal request made by plaintiffs that did not meet the submission requirements of the handbook, let alone to do so orally"). And no damages against the United States could be

---

there are indications that his inspection was not very extensive – the aforementioned letter refers only to seven of the thirty-four units that were at Riverside and makes no reference to common areas or the building's structure and systems. And plaintiffs did not produce Mr. Schemanski to testify as a witness, so that he might clarify these matters. Lastly, this inspection took place more than four years prior to the HUD actions that plaintiffs claim gave rise to a breach of their HAP contract.

predicated upon such an unauthorized decision.[42] Nonetheless, based upon the record as a whole – including the convincing testimony of the HUD officials in question and the absence of a shred of documentary evidence to support the notion that some sort of application was filed, let alone denied – the court finds that defendant did not deny a request to transfer Collingwood from BSA Corp. to Mr. Fanning and, therefore, did not breach the regulatory agreement in question.

### B. Counterclaims

In its counterclaims, defendant has asserted three breach of contract claims – one each for Pingree, Riverside, and Collingwood – attributable to plaintiffs' failure to maintain the property in good repair and condition so as to provide decent, safe and sanitary housing. For Pingree and Riverside, defendant seeks $110,096.45 and $79,675, respectively – its cost of relocating families from the properties to safe housing. For Collingwood, defendant seeks $90,646.40 for the cost of moving families to safe housing, $18,128.80 for foreclosures costs, and $1,112,173.45 for the cost to HUD of providing basic services, security, and repairs while acting as mortgagee-in-possession of Collingwood.

Defendant must carry the burden of proof on its counterclaims. *See, e.g.*, *Trans Ocean Van Servs. v. United States*, 426 F.2d 329, 355 (Ct. Cl. 1970); *Int'l Harvester Co. v. United States*, 342 F.2d 432, 447 (1965); *Daum v. United States*, 120 Ct. Cl. 192, 221 (Ct. Cl. 1951); *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 740 (1984). Based on the record, the court finds that defendant has done so, demonstrating that plaintiffs breached the HAP contracts in failing to maintain the properties in a safe, decent and sanitary state. There is little additional to be said on this count, as the relevant facts here are firmly established, regardless of who has the burden of proof.[43]

The next question is who is liable for the damages caused by these breaches. Defendant asserts that the Allis should be "jointly and severally" liable for these damages. As to Collingwood, that means that the court must decide whether the corporate veil of BSA Corp. should be disregarded and liability imposed directly upon Dr. Alli and his wife. "The concept of 'piercing the corporate veil' is equitable in nature," the Federal Circuit has stated, and "courts will

---

[42] It is, of course, axiomatic that the United States "cannot be subjected to liability based upon the conduct of those not authorized to act in a particular regard." *Info. Sys. & Networks, Corp. v. United States*, 81 Fed. Cl. 740, 747 (2008); *see Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("Anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority."); *Miller Elevator Co., Inc. v. United States*, 30 Fed. Cl. 662, 693 (1994); *Sam Gray Enters., Inc. v. United States*, 43 Fed. Cl. 596, 602 (1999), *aff'd*, 250 F.3d 755 (Fed. Cir. 2000).

[43] Given the nature of the record here, the fact that the burden of proof shifts to defendant on the counterclaims is of little moment, at least in determining whether plaintiffs breached the HAP contracts.

pierce the corporate veil 'to achieve justice, equity, to remedy or avoid fraud or wrongdoing, or to impose a just liability.'" *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 (Fed. Cir. 1999) (quoting 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.20, at 598-601, 603 (Perm. ed.1999)); *see also Foodland Distr. v. Al-Naimi*, 559 N.W. 2d 379, 456 (Mich. App. 1996). "When a court considers disregarding the corporate entity, i.e., 'piercing the corporate veil,' the court applies the law of the state of incorporation." *In re Cambridge Biotech Corp.*, 186 F.3d at 1376 n.11; *see also Alli*, 2006 WL 5625455, at *5. Because BSA Corp. was incorporated under the laws of Michigan, the court applies that law in deciding whether the corporate veil should be pierced.

Under Michigan law, "[t]he entire spectrum of relevant fact forms the background for such an inquiry," with "the facts . . . to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused." *Klager v. Robert Meyer Co.*, 329 N.W.2d 721, 725 (Mich. 1982); *see also Solomon v. W. Hills Develop*, 312 N.W.2d 428, 431 (Mich. App.1981) ("Each case involving disregard of the corporate entity rests on its own special facts."); *Brown Bros. Equip Co. v. State Hwy. Comm.*, 215 N.W. 2d 592, 593-94 (1974)). While "[t]here is no single rule delineating when the corporate entity may be disregarded," *Foodland Distr.*, 559 N.W. 2d at 380, Michigan courts often have employed the following tripartite formula:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the [party seeking to pierce the veil].

559 N.W.2d at 380-81 (quoting *SCD Chem. Distribs. v. Medley*, 512 N.W.2d 86 (Mich. Ct. App.1994)); *see also Bodenhamer Building Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir. 1989); *Alli*, 2006 WL 5625455, at *5-6.[44] In considering the first of these prongs – whether the corporation is a mere instrumentality – courts have examined, *inter alia*, the adequacy of the corporation's capitalization, the commingling of funds, the diversion of corporate assets for personal use, a failure to comply with the formalities of corporate organization, and domination and control over the corporation by another person or entity. *Herman v. Mobile Homes*, 26 N.W.2d 757, 763 (Mich. 1947); *Papo v. Aglo Rest. of San Jose, Inc.*, 386 N.W.2d 177, 185 (Mich. Ct. App. 1986); *see also Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996) (citing Alabama law).

In general, then, under Michigan law, when the notion of a corporation as a legal entity is used to defeat public convenience, justify a wrong, protect fraud or defend a crime, that notion may be set aside and the corporation treated as being one with its shareholders. *See Shusterman v Employment Sec. Comm.*, 57 N.W. 2d 869, 875-76 (Mich. 1953); *People ex rel Potter Attorney*

[44] The Supreme Court of Michigan "has failed to establish clear standards for piercing the corporate veil." *Ross v. Auto Club Group*, 748 N.W.2d 553, 564 (Mich. 2008) (Corrigan, J., concurring, in part, dissenting, in part).

*General v. Mich. Bell. Tel. Co.*, 224 N.W. 2d 438, 440 (Mich. 1929); *Paul v. Univ. Motor Sales Co.*, 278 N.W. 714, 720 (Mich. 1938); *see also* Fletcher Cyclopedia Law of Private Corporations § 41.25 ((2007). As the Sixth Circuit once commented:

> Michigan appears to follow the general rule that requires demonstration of patent abuse of the corporate form in order to pierce the corporate veil. There must be such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist, and the circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote an injustice.

*United States v. Cordove Chem. Co.*, 113 F.3d 572, 580 (6th Cir. 1997) (en banc), *vacated on other grounds, sub nom.*, *United States v. Bestfoods*, 524 U.S. 51 (1998); *see also Donahey v. Bogle*, 129 F.3d 838, 843 (6th Cir. 1997), *vacated on other grounds*, 524 U.S. 924 (1998). Other cases emphasize that while there must be some misuse of the corporate form to trigger piercing, that misuse need not necessarily constitute fraud. *See Papo*, 386 N.W.2d at 185 (explicitly holding that the existence of "fraud" is not a requisite for piercing); *Soloman*, 312 N.W.2d at 432; *Herman v. Mobile Holmes Corp.*, 26 N.W.2d 757, 763 (Mich. 1947).

In the case *sub judice*, the Allis were the sole owners of BSA Corp., which they purportedly hired to manage their properties and which purportedly owned Collingwood. Every indication is that this corporation was a mere instrumentality that the Allis relied upon when it served their purposes and ignored when it did not. They commingled their funds with those of the corporation – indeed, at trial and in his earlier deposition, Dr. Alli admitted that he and his wife provided interest-free loans to BSA Corp. and, at other times, deposited their personal funds into accounts supposedly controlled by the corporation. The Allis certainly treated the assets of the corporation as if their own – on June 30, 1992, for example, they entered into a deed of trust, as individuals, that encumbered the Collingwood property in exchange for two loans of $250,000 and $75,000, respectively. They provided no evidence to indicate that the proceeds from these loans were used to maintain or improve Collingwood – in fact, BSA Corp. never requested HUD's approval of the loans, as would have been required under the Collingwood regulatory agreement. Periodically, thereafter, the Allis took funds from the Collingwood project account to make payment on these loans and to pay for personal expenses. Accordingly, there is clear proof that BSA Corp. was a merely instrumentality here, disregarded when it served the Allis' purposes, thereby satisfying one of the requirements for piercing the corporate veil.[45]

---

[45] *See Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 799 (6th Cir. 2007) (under Michigan law, parent corporation could be liable for subsidiary's breach of agreement, applying a "mere instrumentality" analysis); Stephen H. Schulman, Cyril Moscow & Margo Rogers Lesser, Michigan Corporation Law and Practice, § 3.9(c) at n.66c (2008) (citing other breach of contract cases in which Michigan courts applied piercing); *see also United States v. Walton*, 909 F.2d 915, 927-28 (6th Cir. 1990) (corporation disregarded where shareholders

The other requirements under Michigan law for piercing the corporate veil are satisfied here, as well. First, BSA Corp. certainly was wielded by the Allis to commit a wrong – the failure to maintain the buildings in question in safe, decent and sanitary condition, consistent with BSA Corp.'s contractual obligations. And this entire opinion is a testament to magnitude and seriousness of this wrong. Second, every indication is that the failure to pierce the veil of this thinly-capitalized corporation would lead the United States to suffer an unjust loss. Defendant is seeking well in excess of $1 million in its counterclaims, insofar as it relates to Collingwood, with the majority of those costs associated with HUD's taking over as mortgagee-in-possession. The record suggests that BSA Corp. lacks the funds to pay a judgment of even a fraction of that magnitude. Accordingly, the court concludes that the circumstances here are appropriate for allowing defendant to pierce the corporate veil and hold Dr. Alli and his wife personally liable for any damages arising under the Collingwood counterclaim.

## III. CONCLUSION

Picture again these unpleasant images. A bathroom with an umbrella hanging upside-down to catch water leaking through a gaping hole in the ceiling. Other erstwhile bathrooms with exposed and deteriorating floor boards; buckled, molded and mildewed tiling, some with empty holes where plumbing once existed. Kitchens with broken and missing counters, cabinetry with no doors (some dangling from the walls), roach-infested and rusted refrigerators, and other nonfunctional appliances. Plastered walls and tiled ceilings in dimly-lit hallways, so dilapidated, water-damaged and partially-collapsed as to appear cave-like. Outside doors left off their hinges, cracked masonry, and roofs and flashing no longer impermeable, all exposing residents to the elements. A basement filled with feces and vermin, the latter an army so plentiful that those who enter unprotected immediately become infested. And, at least on one January day, elderly and little children huddled in coats and blankets around open ovens trying to keep warm in sub-freezing temperatures. Scenes from a dystopian novel about a post apocalyptic world? No, we now know that these graphic pictures are of the dwellings at issue in this case.

Even these soul-chilling images cannot quite capture the pernicious conditions and degradation reflected by the record – predicaments and experiences that, nonetheless, formed the essence of the everyday existence of the tenants who lived in the affected properties. Faced with overwhelming evidence, the court is convinced that plaintiffs failed to comply with their solemn contractual obligations to maintain and operate the properties in question so as to provide decent, safe and sanitary housing – and that HUD was correct in finally calling them to task.

As such, the court finds that plaintiffs have not met their burden of proof in establishing that defendant breached the HAP contracts and regulatory agreements at issue. On its counterclaim, defendant has borne its burden of establishing that plaintiffs breached the very same agreements. Defendant also has demonstrated that the corporate veil of BSA Corp. should be

---

failed to observe corporate formalities, commingled personal and corporate funds, and siphoned off corporate funds).

pierced and that Dr. Alli and his wife, therefore, should be liable for any damages owed with respect to the Collingwood property. On or before September 26, 2008, the parties shall file a joint status report indicating how this case should proceed in terms of assessing damages owed under the counterclaims, with a proposed schedule to the extent appropriate.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge